# United States Court of Appeals
### for the
# Eleventh Circuit

---

CASE NO.: 21-13720

---

CHARNESHA ALEXANDER,
Plaintiff/Appellant,

v.

UNITED STATES OF AMERICA and PAUL ROLSTON, individually,
Defendants/Appellees.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA, TALLAHASSEE DIVISION
CASE NO.: 4:19-cv-00138-RH-MAF

---

APPENDIX

---

**JAMES V. COOK, ESQ.**
Florida Bar No. 0966843
**LAW OFFICE OF JAMES COOK**.
314 West Jefferson Street
Tallahassee, Florida 32301
(850) 222-8080; (850) 561-0836 fax
cookjv@gmail.com

For Appellant Charnesha Alexander

## 1. Table of Selected Appendices

| Description | Tab |
|---|---|
| Docket | A |
| Amended Complaint | 21 |
| Answer USA | 29 |
| Answer Rolston | 30 |
| Rolston Affidavit | 87-6 |
| Davis Affidavit 1 | 87-7 |
| Davis Affidavit 2 | 87-8 |
| Order on Consolidation | 99 |
| Pretrial Order | 132 |
| Civil Minutes | 166 |
| Jury Instructions | 166-12 |
| Judgment | 169 |
| Notice of Appeal | 176 |
| Transcript, Hearing of 5-20-21 | H 5-20 |
| Transcript, Hearing of 5-28-21 | H 5-28 |
| Transcript, Hearing of 9-2-21 | H 9-2 |
| Transcript Trial Day 1, 9-13-21 | T V.1 |
| Transcript Trial Day 2, 9-14-21 | T V.2 |
| Transcript Trial Day 3, 9-15-21 | T V.3 |
| Transcript, Trial Day 4, 9-16-21 | T V.4 |

CLOSED,APPEAL,MEDIATION

# U.S. District Court
## Northern District of Florida (Tallahassee)
## CIVIL DOCKET FOR CASE #: 4:19-cv-00138-RH-MAF

| | |
|---|---|
| ALEXANDER v. UNITED STATES OF AMERICA et al | Date Filed: 03/25/2019 |
| Assigned to: JUDGE ROBERT L HINKLE | Date Terminated: 09/23/2021 |
| Referred to: MAGISTRATE JUDGE MARTIN A FITZPATRICK | Jury Demand: Both |
| | Nature of Suit: 440 Civil Rights: Other |
| Cause: 28:2671 Federal Tort Claims Act | Jurisdiction: Federal Question |

**Plaintiff**

| | | |
|---|---|---|
| **CHARNESHA ALEXANDER** | represented by | **RICHARD ERROL JOHNSON** |
| | | RICHARD E JOHNSON PA - TALLAHASSEE FL |
| | | 314 W JEFFERSON ST |
| | | TALLAHASSEE, FL 32301 |
| | | 850-425-1997 |
| | | Fax: 850-561-0836 |
| | | Email: rick@rej-law.com |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **JAMES VERNON COOK** |
| | | JAMES V COOK PA - TALLAHASSEE FL |
| | | 314 W JEFFERSON ST |
| | | PO BOX 10021 [32302] |
| | | TALLAHASSEE, FL 32301-1608 |
| | | 850-222-8080 |
| | | Fax: 850-561-0836 |
| | | Email: cookjv@gmail.com |
| | | *ATTORNEY TO BE NOTICED* |

V.

**Defendant**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | represented by | **KATHYRN WILBURN DREY** |
| | | US ATTORNEY - 21 E GARDEN ST - PENSACOLA FL |
| | | 21 E GARDEN ST - STE 400 |
| | | PENSACOLA, FL 32502 |
| | | 850/444-4000 |
| | | Fax: 850/434-9050 |
| | | Email: kathryn.drey@usdoj.gov |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **MARIE ARMSTRONG MOYLE** |

000001

DOJ-USAO
111 N ADAMS STREET
4TH FLOOR
TALLAHASSEE, FL 32301
850-942-8430
Email: marie.moyle@usdoj.gov
*ATTORNEY TO BE NOTICED*

**MARY ANN LANE COUCH**
DOJ-USAO
21 E GARDEN STREET
SUITE 400
PENSACOLA, FL 32502
850-444-4037
Email: mary.ann.couch@usdoj.gov
*ATTORNEY TO BE NOTICED*

**PETER GUNNAR FISHER**
DOJ-USAO
NORTHERN DISTRICT OF FLORIDA
111 N ADAMS ST
4TH FLOOR
TALLAHASSEE, FL 32301
850-216-3827
Fax: 850-942-8448
Email: peter.fisher@usdoj.gov
*ATTORNEY TO BE NOTICED*

**WINIFRED L ACOSTA**
US ATTORNEY - TALLAHASSEE FL
NORTHERN DISTRICT OF FLORIDA
111 N ADAMS ST
4TH FL
TALLAHASSEE, FL 32301
850-942-8430
Fax: 850-942-8448
Email: Winifred.Acosta@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**PAUL ROLSTON**                    represented by **MIRIAM REBEKKAH COLES**
HENRY BUCHANAN HUDSON ETC -
TALLAHASSEE FL
2508 BARRINGTON CIR
TALLAHASSEE, FL 32308
Email: mcoles@henryblaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JOEL STEVEN CARTER**

000002

HENRY BUCHANAN HUDSON ETC -
TALLAHASSEE FL
2508 BARRINGTON CIR
TALLAHASSEE, FL 32308
Email: scarter@henryblaw.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/25/2019 | 1 | COMPLAINT *FOR DAMAGES* against All Defendants ( Filing fee $ 400 receipt number AFLNDC-4439015.), filed by CHARNESHA ALEXANDER. (Attachments: # 1 Appendix Summons Rolston, # 2 Appendix Summons Rolston 2, # 3 Appendix Summons USA) (COOK, JAMES) (Entered: 03/25/2019) |
| 03/25/2019 | 2 | CIVIL COVER SHEET. (COOK, JAMES) (Entered: 03/25/2019) |
| 03/26/2019 | 3 | Summons Issued as to PAUL ROLSTON, UNITED STATES OF AMERICA. (Attachments: # 1 Rolston Summons) (toy) (Entered: 03/26/2019) |
| 06/09/2019 | 4 | AFFIDAVIT of Service for Summons and Complaint served on Paul Rolston on 06/04/2019, filed by CHARNESHA ALEXANDER. (COOK, JAMES) (Entered: 06/09/2019) |
| 06/10/2019 | | Set Deadlines/Hearings PAUL ROLSTON answer due 6/25/2019. Answer due by **6/25/2019**. (toy) (Entered: 06/10/2019) |
| 07/19/2019 | 5 | ANSWER to 1 Complaint, by UNITED STATES OF AMERICA. (ACOSTA, WINIFRED) (Entered: 07/19/2019) |
| 07/22/2019 | 6 | INITIAL SCHEDULING ORDER: Fed.R.Civ.P. 7.1 Corporate Disclosure Statement Deadline set for **8/5/2019**. Rule 26 Meeting Report due by **9/4/2019**. Discovery due by **11/19/2019**. Status Report due by **8/22/2019**. Signed by CHIEF JUDGE MARK E WALKER on 07/22/2019. (toy) (Entered: 07/22/2019) |
| 08/05/2019 | 7 | Defendants' Motion For Extension Of Time To Answer Or Otherwise Respond To Complaint by PAUL ROLSTON. (toy) (Entered: 08/06/2019) |
| 08/06/2019 | 8 | ORDER GRANTING IN PART 7 EXTENSION OF TIME TO RESPOND TO THE COMPLAINT. PAUL ROLSTON answer due 9/23/2019. To the extent that Defendant is seeking an extension of 90 days for counsel he believes will be appointed by the Department of Justice, the motion is denied. If counsel makes an appearance for Defendant in this case, counsel may then request a continuance if necessary. In any event, Defendant must respond to the complaint with or without counsel.(Answer due by **9/23/2019**.) Signed by CHIEF JUDGE MARK E WALKER on 08/06/2019. (toy) (Entered: 08/06/2019) |
| 08/16/2019 | 9 | Emergency MOTION Requesting an Enlargement Of Time by PAUL ROLSTON. (toy) (Additional attachment(s) added on 8/16/2019: # 1 Sealed) (toy). (Entered: 08/16/2019) |
| 08/27/2019 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of CHIEF JUDGE MARK E WALKER notified that action is needed Re: 6 Scheduling Order. *No monthly report filed* (toy) (Entered: 08/27/2019) |

000003

| | | |
|---|---|---|
| 08/27/2019 | 10 | STATUS REPORT *On Discovery* by UNITED STATES OF AMERICA. (ACOSTA, WINIFRED) (Entered: 08/27/2019) |
| 08/27/2019 | | Set Deadlines/Hearings Status Report due by **9/27/2019**. (toy) (Entered: 08/27/2019) |
| 08/29/2019 | 11 | REPORT of Rule 26(f) Planning Meeting. (ACOSTA, WINIFRED) (Entered: 08/29/2019) |
| 08/29/2019 | 12 | ORDER GRANTING IN PART DEFENDANT'S 9 MOTION FOR EXTENSION OF TIME TO RESPOND TO COMPLAINT. PAUL ROLSTON answer due 10/18/2019. No further extensions will be granted absent good cause. (Rolston Answer due by **10/18/2019**.) Signed by CHIEF JUDGE MARK E WALKER on 08/29/2019. (toy) (Entered: 08/29/2019) |
| 08/30/2019 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of CHIEF JUDGE MARK E WALKER notified that action is needed Re: 11 Report of Rule 26(f) Planning Meeting (toy) (Entered: 08/30/2019) |
| 09/06/2019 | 13 | SCHEDULING AND MEDIATION ORDER Re: 11 Report of Rule 26(f) Planning Meeting :( Discovery due by **1/21/2020**., Dispositive Motions to be filed by **2/11/2020**., Jury Trial set for **6/22/2020 08:15 AM** in U.S. Courthouse Tallahassee before CHIEF JUDGE MARK E WALKER., Mediation Report due by **3/13/2020**.), Case referred to mediation. Signed by CHIEF JUDGE MARK E WALKER on 09/06/2019. (toy) (Entered: 09/06/2019) |
| 09/18/2019 | 14 | NOTICE of Appearance by JOEL STEVEN CARTER on behalf of PAUL ROLSTON (CARTER, JOEL) (Entered: 09/18/2019) |
| 09/23/2019 | 15 | ANSWER to 1 Complaint, by PAUL ROLSTON. (CARTER, JOEL) (Entered: 09/23/2019) |
| 09/27/2019 | 16 | STATUS REPORT *on Discovery* by UNITED STATES OF AMERICA. (ACOSTA, WINIFRED) (Entered: 09/27/2019) |
| 09/27/2019 | | Set Deadlines/Hearings Status Report due by **10/28/2019**. (toy) (Entered: 09/27/2019) |
| 10/04/2019 | 17 | Plaintiff's Objection To Subpoenas Directed By The United States To Non-Parties And MOTION for Protective Order And/Or To Quash Subpoenas *as to Medical and Mental Health Records* by CHARNESHA ALEXANDER. (Attachments: # 1 Exhibit 1 TMH Subpoena, # 2 Exhibit 2 Refuge House Subpoena) (COOK, JAMES) Modified on 10/7/2019 to match PDF title (toy). (Entered: 10/04/2019) |
| 10/05/2019 | 18 | ORDER REQUIRING EXPEDITED RESPONSE. Defendant, United States of America, is ordered to file its response, if any, to Plaintiff's Objection to Subpoenas, ECF No. 17 , on or before October 11, 2019. (Internal deadline for referral to judge if response not filed earlier: **10/11/2019**.) Signed by CHIEF JUDGE MARK E WALKER on 10/05/2019. (toy) (Entered: 10/07/2019) |
| 10/07/2019 | 19 | NOTICE OF TELEPHONIC HEARING RE: 17 MOTION for Protective Order as to Medical and Mental Health Records: Telephonic Motion Hearing set for **10/17/2019 09:00 AM** before CHIEF JUDGE MARK E WALKER. United States Courthouse, **Courtroom 5 West,** 111 North Adams St., Tallahassee, Florida 32301. ALL PARTIES are directed to call the AT&T Conference Line (see below) Conference Call Information |

| | | |
|---|---|---|
| | | You may dial into the conference call up to five minutes before start time. Call in number: **888-684-8852** When prompted for an access code, enter: **3853136#** If you are asked to join as the host, just ignore and wait until you are asked for a security code. When asked for a security code, enter: **4565#** Say your name, when prompted. You are now in the conference call. Remember to mute your phone when you are not speaking. The Court also asks that counsel NOT use cell phones or speaker phones during the call as the quality of the audio connection is comprised by these devices.<br><br>s/ Victoria Milton McGee<br>Courtroom Deputy Clerk(vkm) (Entered: 10/07/2019) |
| 10/11/2019 | 20 | RESPONSE to Motion re 17 MOTION for Protective Order *as to Medical and Mental Health Records* filed by UNITED STATES OF AMERICA. (ACOSTA, WINIFRED) (Entered: 10/11/2019) |
| 10/15/2019 | 21 | FIRST AMENDED COMPLAINT against PAUL ROLSTON, UNITED STATES OF AMERICA, filed by CHARNESHA ALEXANDER. (Attachments: # 1 Exhibit 1 FTCA Form) (COOK, JAMES) (Entered: 10/15/2019) |
| 10/16/2019 | 22 | NOTICE OF CANCELLED HEARING: Telephonic Motion Hearing set for **10/17/2019 09:00 AM** before CHIEF JUDGE MARK E WALKER Re: 17 MOTION for Protective Order as to Medical and Mental Health Records is **CANCELLED.** (vkm) (Entered: 10/16/2019) |
| 10/16/2019 | 23 | ORDER ON PLAINTIFF'S 17 OBJECTION TO SUBPOENAS DIRECTED BY THE UNITED STATES TO NON-PARTIES AND MOTION FOR PROTECTIVE ORDER AND/OR TO QUASH SUBPOENAS. ECF No. 17 , is GRANTED. Signed by CHIEF JUDGE MARK E WALKER on 10/16/2019. (toy) (Entered: 10/16/2019) |
| 10/16/2019 | 24 | SUPPLEMENTAL ORDER REGARDING PLAINTIFF'S 21 FIRST AMENDED COMPLAINT. In order to avoid confusion as to which complaint is the operative pleading, this Court deems Plaintiff's first amended complaint, ECF No. 21 , a nullity. If Plaintiff wishes to amend her complaint, Plaintiff shall, within ten (10) days from the date of this order, follow the procedure for amending her complaint as set forth in Rule 15(a)(2) and Local Rule 15.1. (Amended Complaint due by **10/28/2019**.) Signed by CHIEF JUDGE MARK E WALKER on 10/16/2019. (toy) (Entered: 10/16/2019) |
| 10/24/2019 | 25 | MOTION to Amend/Correct *Complaint for Damages* by CHARNESHA ALEXANDER. (Attachments: # 1 Appendix Proposed Amended Complaint) (COOK, JAMES) (Entered: 10/24/2019) |
| 10/25/2019 | 26 | STATUS REPORT *on Discovery* by UNITED STATES OF AMERICA. (ACOSTA, WINIFRED) (Entered: 10/25/2019) |
| 10/25/2019 | | Set Deadlines/Hearings Status Report due by **11/25/2019**. (toy) (Entered: 10/25/2019) |
| 10/25/2019 | 27 | ORDER GRANTING PLAINTIFF'S 25 MOTION TO AMEND COMPLAINT FOR DAMAGES. Plaintiff is directed to file its amended complaint as a separate docket entry on or before Wednesday, October 30, 2019. The date the amended complaint is filed as a separate docket entry will serve as the operative date for responsive pleadings. (Amended Complaint due by **10/30/2019**.) Signed by CHIEF JUDGE MARK E WALKER on 10/25/2019. (toy) (Entered: 10/25/2019) |

000005

| | | |
|---|---|---|
| 10/25/2019 | 28 | FIRST AMENDED COMPLAINT against All Defendants All Defendants., filed by CHARNESHA ALEXANDER. (COOK, JAMES) (Entered: 10/25/2019) |
| 11/01/2019 | 29 | ANSWER to 28 Amended Complaint by UNITED STATES OF AMERICA. (ACOSTA, WINIFRED) (Entered: 11/01/2019) |
| 11/05/2019 | 30 | ANSWER to 28 Amended Complaint by PAUL ROLSTON. (CARTER, JOEL) (Entered: 11/05/2019) |
| 11/07/2019 | 31 | MOTION / Defendant United States of America Motion for entry of Privacy Act Protective Order by UNITED STATES OF AMERICA. (Attachments: # 1 Proposed text order) (ACOSTA, WINIFRED) (Entered: 11/07/2019) |
| 11/07/2019 | | Set Response to Motion Deadline as to 31 MOTION / Defendant United States of America Motion for entry of Privacy Act Protective Order . (Internal deadline for referral to judge if response not filed earlier: **11/21/2019**). (toy) (Entered: 11/08/2019) |
| 11/08/2019 | 32 | ORDER REQUIRING EXPEDITED RESPONSE. Plaintiff is ordered to file its response to Defendant United States of America's Motion for Entry of Privacy Act Protective Order, ECF No. 31 , on or before November 13, 2019. (Response to motion due by by **11/13/2019**.) Signed by CHIEF JUDGE MARK E WALKER on 11/08/2019. (toy) (Entered: 11/08/2019) |
| 11/12/2019 | 33 | RESPONSE in Opposition re 31 MOTION / Defendant United States of America Motion for entry of Privacy Act Protective Order filed by CHARNESHA ALEXANDER. (Attachments: # 1 Exhibit 1 Plaintiff's Proposed Protective Order) (COOK, JAMES) (Entered: 11/12/2019) |
| 11/18/2019 | 34 | ORDER GRANTING IN PART AND DENYING IN PART 31 MOTION FOR PROTECTIVE ORDER. Signed by CHIEF JUDGE MARK E WALKER on 11/18/2019. (toy) (Entered: 11/18/2019) |
| 11/21/2019 | 35 | STATUS REPORT *on Discovery* by UNITED STATES OF AMERICA. (ACOSTA, WINIFRED) (Entered: 11/21/2019) |
| 11/21/2019 | | Set Deadlines/Hearings Status Report due by **12/23/2019**. (toy) (Entered: 11/21/2019) |
| 12/23/2019 | 36 | STATUS REPORT by UNITED STATES OF AMERICA. (ACOSTA, WINIFRED) (Entered: 12/23/2019) |
| 12/26/2019 | | Set/Reset Deadlines: Status Report due by **1/26/2020**. (blb) (Entered: 12/26/2019) |
| 01/06/2020 | 37 | ORDER FOR PRETRIAL CONFERENCE. Signed by CHIEF JUDGE MARK E WALKER on 01/06/2020. Attorney Conference to take place by **5/15/2020**. Pretrial Stipulation due by **5/22/2020**. Jury Trial set for **6/22/2020 08:15 AM** in U.S. Courthouse Tallahassee before CHIEF JUDGE MARK E WALKER. Pretrial Conference set for **5/29/2020 10:00 AM** in U.S. Courthouse Tallahassee before CHIEF JUDGE MARK E WALKER. (rcb) (Entered: 01/06/2020) |
| 01/06/2020 | 38 | MOTION for Leave to Depose Plaintiff by UNITED STATES OF AMERICA. (ACOSTA, WINIFRED) (Entered: 01/06/2020) |
| 01/07/2020 | 39 | ORDER GRANTING 38 MOTION FOR LEAVE TO DEPOSE PLAINTIFF. The unopposed motion is GRANTED. Defendants USA and Rolston may depose the prisoner plaintiff. Signed by CHIEF JUDGE MARK E WALKER on 01/07/2020. (rcb) (Entered: 01/07/2020) |

000006

| 01/11/2020 | 40 | RULE 26 Disclosures by CHARNESHA ALEXANDER. (COOK, JAMES) (Entered: 01/11/2020) |
|---|---|---|
| 01/15/2020 | 41 | NOTICE of Appearance by MARIE ARMSTRONG MOYLE on behalf of UNITED STATES OF AMERICA (MOYLE, MARIE) (Entered: 01/15/2020) |
| 01/16/2020 | 42 | Joint MOTION for Extension of Time to Complete Discovery *and Permit Additional Depositions* by CHARNESHA ALEXANDER. (COOK, JAMES) (Entered: 01/16/2020) |
| 01/17/2020 | 43 | AMENDED SCHEDULING AND MEDIATION ORDER Re: 42 Joint MOTION for Extension of Time to Complete Discovery *and Permit Additional Depositions*. Discovery due by **4/21/2020**. Dispositive Motions to be filed by **5/12/2020**. Jury Trial set for **9/21/2020 08:15 AM** in U.S. Courthouse Tallahassee before CHIEF JUDGE MARK E WALKER. Mediation to take place by **5/19/2020**. Mediation Report due by **6/2/2020**. Signed by CHIEF JUDGE MARK E WALKER on 1/17/2020. (kjw) (Entered: 01/17/2020) |
| 01/17/2020 | 44 | NOTICE of Appearance by KATHYRN WILBURN DREY on behalf of UNITED STATES OF AMERICA (DREY, KATHYRN) (Entered: 01/17/2020) |
| 01/23/2020 | 45 | NOTICE of Appearance by RICHARD ERROL JOHNSON on behalf of CHARNESHA ALEXANDER (JOHNSON, RICHARD) (Entered: 01/23/2020) |
| 01/28/2020 | | ACTION NO LONGER REQUIRED BY DISTRICT JUDGE: Chambers of CHIEF JUDGE MARK E WALKER notified that action is no longer needed. (Entered: 01/28/2020) |
| 02/27/2020 | | ***PLEASE DISREGARD THIS ENTRY***Set Deadlines/Hearings Status Report due by **3/26/2020**. (rcb) (Entered: 02/27/2020) |
| 02/28/2020 | | Set Deadlines/Hearings Status Report due by **3/26/2020**. (rcb) (Entered: 02/28/2020) |
| 02/28/2020 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of CHIEF JUDGE MARK E WALKER notified that action is needed Re: Set/Reset Deadlines (rcb)**January & February Status Reports not filed** (Entered: 02/28/2020) |
| 03/02/2020 | 46 | Sixth Joint Status Report *ON DISCOVERY* by CHARNESHA ALEXANDER. (COOK, JAMES) Modified to edit title on 3/3/2020 (rcb). (Entered: 03/02/2020) |
| 03/02/2020 | 47 | MOTION for Extension of Time to File *Expert Report* by CHARNESHA ALEXANDER. (Attachments: # 1 Exhibit 1 Davis affidavit, # 2 Exhibit 2 Barnett affidavit, # 3 Exhibit 3 Rolston affidavit, # 4 Exhibit 4 Reed affidavit, # 5 Exhibit 5 OIA Investigative report, # 6 Exhibit 6 Tucker report, cv, articles) (COOK, JAMES) (Entered: 03/02/2020) |
| 03/03/2020 | 48 | CORRECTED SIXTH JOINT STATUS REPORT *ON DISCOVERY (COOK, JAMES). Modified to edit title on 3/4/2020 (rcb). (Entered: 03/03/2020)* |
| 03/03/2020 | | Set Deadlines/Hearings Status Report due by **4/2/2020**. (rcb) (Entered: 03/03/2020) |
| 03/03/2020 | 49 | ORDER EXPEDITING RESPONSE TO 47 PLAINTIFF'S MOTION FOR LATE SUBMISSION OF EXPERT OPINION. Plaintiff has moved this Court for leave to present an expert report after the expiration of the expert disclosure deadline. ECF No. 47 . Defendants shall file their response on or before **3/10/2020**. See N.D. Fla. Loc. R. 7.1(E) ("Unless otherwise ordered, the deadline for a memorandum opposing a motion... is 14 days after service of the motion.") (emphasis added). Signed by CHIEF |

| | | |
|---|---|---|
| | | JUDGE MARK E WALKER on 03/03/2020. (rcb) (Entered: 03/03/2020) |
| 03/04/2020 | | Set Deadlines/Hearings Status Report due by **4/3/2020**. (rcb) (Entered: 03/04/2020) |
| 03/10/2020 | 50 | Defendant's Response In Opposition To Plaintiff's Motion For Late Submission Of Expert Opinion (Attachments: # 1 Exhibit 1 - 02-08-20 email from Plaintiff's counsel, # 2 Exhibit 2 - UNDER SEAL- Clinical Encounter, # 3 Exhibit 3 - 02-09-20 email from Plaintiff's counsel, # 4 Exhibit 4 - Rolston OIA Affidavit, # 5 Exhibit 5 - Deposition of Harold White, # 6 Exhibit 6 - Deposition of Laura Preston, # 7 Exhibit 7 - Deposition of Kendall Fairchild) (CARTER, JOEL) Modified to edit title on 3/11/2020 (rcb). (Entered: 03/10/2020) |
| 03/10/2020 | 51 | Defendant's Response In Opposition To Plaintiff's Motion For Late Submission Of Expert Opinion (Attachments: # 1 Exhibit A - USA Initial Disclosures) (MOYLE, MARIE) Modified to edit title on 3/11/2020 (rcb). (Entered: 03/10/2020) |
| 03/11/2020 | 52 | Response in Opposition To 47 Plaintiff's Motion For Late Submission Of Expert Opinion filed by PAUL ROLSTON. (rcb) (Entered: 03/12/2020) |
| 03/11/2020 | 53 | **Sealed Document** (rcb) (Entered: 03/12/2020) |
| 03/12/2020 | 54 | ORDER GRANTING 47 LEAVE TO SUBMIT EXPERT OPINION OUT OF TIME. Plaintiff's motion, ECF No. 47 , is GRANTED. Signed by CHIEF JUDGE MARK E WALKER on 3/12/2020. (rcb) (Entered: 03/12/2020) |
| 03/17/2020 | 55 | United States' Motion For Leave To Depose Inmates (MOYLE, MARIE) Modified to edit title on 3/18/2020 (rcb). (Entered: 03/17/2020) |
| 03/17/2020 | 56 | ORDER GRANTING 55 MOTION FOR LEAVE TO DEPOSE INMATES. ECF No. 55 . The motion is GRANTED. The Government may depose Inmates Michelle Morton and Shondolyn Blevins. Signed by CHIEF JUDGE MARK E WALKER on 3/17/2020. (rcb) (Entered: 03/17/2020) |
| 03/19/2020 | 57 | MOTION for Protective Order *on deposition of Michelle Morton* by CHARNESHA ALEXANDER. (JOHNSON, RICHARD) (Entered: 03/19/2020) |
| 03/19/2020 | 58 | MOTION for Protective Order *with first deposition attached* by CHARNESHA ALEXANDER. (Attachments: # 1 Exhibit Morton deposition) (JOHNSON, RICHARD) (Entered: 03/19/2020) |
| 03/20/2020 | 59 | ORDER REQUIRING EXPEDITED RESPONSES. Plaintiff has moved for a protective order preventing the re-deposition of witness Michelle Morton. ECF Nos. 57 & 58 . Defendants shall file expedited responses on or before Friday, **3/27/2020**. Signed by CHIEF JUDGE MARK E WALKER on 3/20/2020. (kjw) (Entered: 03/20/2020) |
| 03/27/2020 | 60 | Defendant's Response In Opposition To Plaintiff's Motion For Protective Order (Attachments: # 1 Exhibit 1 - Deposition of Charnesha Alexander) (CARTER, JOEL) Modified to edit title on 3/30/2020 (rcb). (Entered: 03/27/2020) |
| 03/27/2020 | 61 | United State's Response In Opposition To Plaintiff'S Motion For Protective Order (MOYLE, MARIE) Modified to edit title on 3/30/2020 (rcb). (Entered: 03/27/2020) |
| 03/30/2020 | 62 | **DISREGARD DOCKETED IN ERROR**NOTICE OF TELEPHONIC HEARING: Telephonic Pretrial Conference set for **5/29/2020 10:00 AM** before CHIEF JUDGE MARK E WALKER. |

000008

| | | |
|---|---|---|
| | | ALL PARTIES are directed to call the AT&T Conference Line (see below)<br><br>Conference Call Information<br><br>You may dial into the conference call up to five minutes before start time. Call in number: **888-684-8852** When prompted for an access code, enter: **3853136#** If you are asked to join as the host, just ignore and wait until you are asked for a security code. When asked for a security code, enter: **4565#** Say your name, when prompted. You are now in the conference call. Remember to mute your phone when you are not speaking. The Court also asks that counsel NOT use cell phones or speaker phones during the call as the quality of the audio connection is comprised by these devices.<br><br>NOTE: If you or any party, witness or attorney in this matter has a disability that requires special accommodation, such as a hearing impairment, please contact Victoria Milton McGee at 850-521-3510 in the Clerk's Office at least one week prior to the hearing (or as soon as possible) so arrangements can be made.<br><br><u>s/ Victoria Milton McGee</u><br>Courtroom Deputy Clerk (vkm) Modified on 3/30/2020 (vkm). (Entered: 03/30/2020) |
| 03/31/2020 | 63 | ORDER GRANTING 57 & 58 IN PART AND DENYING IN PART MOTION FOR PROTECTIVE ORDER. For the reasons provided below, Plaintiff's motions, ECF No. 57 & 58 are GRANTED IN PART AND DENIED IN PART. Signed by CHIEF JUDGE MARK E WALKER on 03/31/2020. (rcb) (Entered: 03/31/2020) |
| 04/02/2020 | 64 | ORDER FOR PRETRIAL CONFERENCE. Attorney Conference to take place by **8/14/2020**. Pretrial Stipulation due by **8/21/2020**. Jury Trial set for **9/21/2020 08:15 AM** in U.S. Courthouse Tallahassee before CHIEF JUDGE MARK E WALKER. Telephonic Pretrial Conference set for **8/28/2020 09:00 AM** in U.S. Courthouse Tallahassee before CHIEF JUDGE MARK E WALKER.Signed by CHIEF JUDGE MARK E WALKER on 4/2/2020. (rcb) (Entered: 04/02/2020) |
| 04/02/2020 | 65 | Joint MOTION to Extend Time, MOTION to Take Deposition from Dr. Tucker by UNITED STATES OF AMERICA. (MOYLE, MARIE) (Entered: 04/02/2020) |
| 04/02/2020 | 66 | ORDER GRANTING 65 MOTION TO TAKE DR. TUCKER'S DEPOSITION OUT OF TIME. This Court has considered, without hearing, the Joint Motion to Take Dr. Tuckers Deposition Out of Time. ECF No. 65 . The motion is GRANTED. Dr. Tuckers deposition may be taken after the discovery deadline of 4/27/2020. Signed by CHIEF JUDGE MARK E WALKER on 4/2/2020. (rcb) (Entered: 04/02/2020) |
| 04/02/2020 | 67 | NOTICE OF TELEPHONIC HEARING: Telephonic Pretrial Conference set for **8/28/2020 09:00 AM** before CHIEF JUDGE MARK E WALKER.<br><br>ALL PARTIES are directed to call the AT&T Conference Line (see below)<br><br>Conference Call Information<br><br>You may dial into the conference call up to five minutes before start time. Call in number: **888-684-8852** When prompted for an access code, enter: **3853136#** If you are asked to join as the host, just ignore and wait until you are asked for a security code. When asked for a security code, enter: **4565#** Say your name, when prompted. You are now in the conference call. Remember to mute your phone when you are not speaking. |

| | | |
|---|---|---|
| | | The Court also asks that counsel NOT use cell phones or speaker phones during the call as the quality of the audio connection is comprised by these devices.<br><br>NOTE: If you or any party, witness or attorney in this matter has a disability that requires special accommodation, such as a hearing impairment, please contact Victoria Milton McGee at 850-521-3510 in the Clerk's Office at least one week prior to the hearing (or as soon as possible) so arrangements can be made.<br><br>s/ Victoria Milton McGee<br>Courtroom Deputy Clerk (vkm) (Entered: 04/02/2020) |
| 04/03/2020 | 68 | STATUS REPORT *on Discovery* by UNITED STATES OF AMERICA. (MOYLE, MARIE) (Entered: 04/03/2020) |
| 04/03/2020 | 69 | ORDER REASSIGNING CASE. Case reassigned to MAGISTRATE JUDGE MARTIN A FITZPATRICK for all further proceedings. MAGISTRATE JUDGE CHARLES A STAMPELOS no longer assigned to case. Signed by CHIEF JUDGE MARK E WALKER on 4/3/2020. (erl)**Please use the new judge's initials for all future filings: 4:19cv138-MW/MAF. (Entered: 04/06/2020) |
| 04/06/2020 | | Set Deadlines/Hearings Status Report due by **5/6/2020**. (rcb) (Entered: 04/06/2020) |
| 04/10/2020 | 70 | NOTICE of Appearance by MARY ANN LANE COUCH on behalf of UNITED STATES OF AMERICA (COUCH, MARY ANN) (Entered: 04/10/2020) |
| 04/14/2020 | 71 | Defendant's Joint Motion To Take Michelle Morton's Deposition Out of Time (MOYLE, MARIE) Modified to edit title on 4/15/2020 (rcb). (Entered: 04/14/2020) |
| 04/14/2020 | 72 | ORDER GRANTING 71 MOTION TO TAKE MICHELLE MORTONS DEPOSITION OUT OF TIME. This Court has considered, without hearing, Defendants' Joint Motion to Take Michelle Morton's Deposition Out of Time. ECF No. 71 . The motion is GRANTED. Ms. Morton's deposition may be taken after the discovery deadline of April 21, 2020. Signed by CHIEF JUDGE MARK E WALKER on 4/14/2020. (rcb) (Entered: 04/15/2020) |
| 04/20/2020 | 73 | Plaintiff's Motion To Compel Better Answers From Defendant United States Of America- (Attachments: # 1 Exhibit 1 Discovery responses, # 2 Exhibit 2 Conference Table, # 3 Exhibit 3 Moyle letter, # 4 Exhibit 4 Final Notice, # 5 Exhibit 5 Privilege Log) (COOK, JAMES) Modified to edit title on 4/21/2020 (rcb). (Entered: 04/20/2020) |
| 04/21/2020 | 74 | ORDER DIRECTING EXPEDITED RESPONSE. Plaintiff has filed her Motion to Compel Better Answers From Defendant United States of America. ECF No. 73 . Defendant USA must file a response to the motion not later than Tuesday, **4/28/2020**. See N.D. Fla. Loc. R. 7.1(E). Signed by CHIEF JUDGE MARK E WALKER on 4/21/2020. (rcb) (Entered: 04/21/2020) |
| 04/28/2020 | 75 | NOTICE OF MEDIATION re Scheduling by UNITED STATES OF AMERICA (MOYLE, MARIE) (Entered: 04/28/2020) |
| 04/28/2020 | 76 | RESPONSE in Opposition re 73 First MOTION to Compel *Better Answers* filed by UNITED STATES OF AMERICA. (Attachments: # 1 Exhibit A - Harvey Declaration, # 2 Exhibit B - Alexander Transcript) (MOYLE, MARIE) (Entered: 04/28/2020) |

000010

| | | |
|---|---|---|
| 04/30/2020 | 77 | Plaintiff's Motion To Reply To Defendant United States' Response To Plaintiff's Motion To Compel Better Answers From Defendant United States (COOK, JAMES) Modified to edit title on 5/1/2020 (rcb). (Entered: 04/30/2020) |
| 05/01/2020 | 78 | ORDER GRANTING 77 MOTION TO FILE REPLY. The 77 motion is GRANTED. Plaintiff may file her reply on or before Monday, **5/4/2020**. Signed by CHIEF JUDGE MARK E WALKER on 5/1/2020. (rcb) (Entered: 05/01/2020) |
| 05/04/2020 | | Set Deadlines/Hearings Reply Deadline - by **5/4/2020**. (rcb) (Entered: 05/04/2020) |
| 05/04/2020 | 79 | Plaintiff's Reply To Defendant United States' Response To Plaintiff's Motion To Compel Better Discovery Answers From Defendant United States (Attachments: # 1 Exhibit 1 Conference Morton, # 2 Exhibit 2 Emails to family, # 3 Exhibit 3 Proof of service, # 4 Exhibit 4 Petition on Stalking, # 5 Exhibit 5 Order of dismissal, # 6 Exhibit 6 1996 DV injunction, # 7 Exhibit 7 Fisher conference response) (COOK, JAMES) Modified to edit title on 5/5/2020 (rcb). (Entered: 05/04/2020) |
| 05/08/2020 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of CHIEF JUDGE MARK E WALKER notified that action is needed Re: Set 5/6/2020 Status Report Deadline (rcb)**Status Report due by 5/6/2020 not filed** (Entered: 05/08/2020) |
| 05/08/2020 | 80 | Joint MOTION for Disclosure *of Dr. Wolf's Expert Opinion and Take His Deposition Out of Time* by UNITED STATES OF AMERICA. (MOYLE, MARIE) (Entered: 05/08/2020) |
| 05/08/2020 | 81 | Eighth Joint Status Report On Discovery (MOYLE, MARIE) Modified to edit title on 5/11/2020 (rcb). (Entered: 05/08/2020) |
| 05/11/2020 | | Set Deadlines/Hearings Status Report due by **6/8/2020**. (rcb) (Entered: 05/11/2020) |
| 05/11/2020 | 82 | ORDER GRANTIG 80 MOTION TO DISCLOSE AND TAKE EXPERT"S DEPOSITION OUT OF TIME. This Court has considered, without hearing, the Joint Motion to Disclose Dr. Wolfes Expert Opinion and Take His Deposition Out of Time. ECF No. 80 . The 80 motion is GRANTED. Defendant may disclose Dr. Wolfes expert opinion by June 8, 2020. Dr. Wolfes deposition shall be taken before **7/1/2020**. Signed by CHIEF JUDGE MARK E WALKER on 5/11/2020. (rcb) (Entered: 05/11/2020) |
| 05/11/2020 | 84 | Mediation Report-Impasse. (rcb) (Entered: 05/12/2020) |
| 05/12/2020 | 83 | ORDER DENYING 73 MOTION TO COMPEL. Plaintiff's motion to compel, ECF No. 73 , is DENIED. Signed by CHIEF JUDGE MARK E WALKER on 5/12/2020. (rcb) (Entered: 05/12/2020) |
| 05/12/2020 | 85 | NOTICE *OF FILING DOCUMENTS IN SUPPORT OF DEFENDANT PAUL ROLSTON'S MOTION FOR SUMMARY JUDGMENT* by PAUL ROLSTON (Attachments: # 1 Plaintiff's response to Rolston's First Interrogatories, # 2 Charnesha Alexander's Deposition and Exhibits F,G,I, # 3 Excerpts from Rolston's deposition in Morton v. USA et al., # 4 Admin Remedy Program Statement 1330.18) (CARTER, JOEL) (Entered: 05/12/2020) |
| 05/12/2020 | 86 | Defendant Paul Rolston's Motion For Summary Judgment, Statement Of Undisputed Facts And Memorandum of Law (CARTER, JOEL) Modified to edit title on 5/13/2020 (rcb). (Entered: 05/12/2020) |
| 06/02/2020 | 87 | Plaintiff's Notice of Filing Exhibits by CHARNESHA ALEXANDER (Attachments: # 1 Exhibit 1 Clinical Encounter, # 2 Exhibit 2 Inmate request, # 3 Exhibit 3 Alexander |

000011

| | | |
|---|---|---|
| | | deposition, # 4 Exhibit 4 Hassan Pap, # 5 Exhibit 5 Alexander affidavit, # 6 Exhibit 6 Rolston affidavit, # 7 Exhibit 7 Davis affidavit 1, # 8 Exhibit 8 Davis affidavit 2, # 9 Exhibit 9 Li affidavit, # 10 Exhibit 10 TMH Rape Exam, # 11 Exhibit 11 FTCA form, # 12 Exhibit 12 Final closure, # 13 Exhibit 28 CFR 542.13) (COOK, JAMES) Modified to edit title on 6/3/2020 (rcb). (Entered: 06/02/2020) |
| 06/02/2020 | 88 | Plaintiff's Response To Defendant Rolston's Motion For Summary Judgment filed by CHARNESHA ALEXANDER. (COOK, JAMES) Modified to edit title on 6/3/2020 (rcb). (Entered: 06/02/2020) |
| 06/08/2020 | 89 | NINTH JOINT STATUS REPORT ON DISCOVERY by UNITED STATES OF AMERICA. (MOYLE, MARIE) Modified to edit title on 6/9/2020 (rcb). (Entered: 06/08/2020) |
| 06/09/2020 | | Set Deadlines/Hearings Status Report due by **7/8/2020**. (rcb) (Entered: 06/09/2020) |
| 06/09/2020 | 90 | NOTICE OF FILING DOCUMENTS IN SUPPORT OF DEFENDANT PAUL ROLSTON'S REPLY TO PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT(Attachments: # 1 Excerpts of Charnesha Alexander's deposition) (CARTER, JOEL) Modified to edit title on 6/10/2020 (rcb). (Entered: 06/09/2020) |
| 06/09/2020 | 91 | Defendant, Paul Rolston's Reply To Plaintiff's Response In Opposition To Motion For Summary Judgment filed by PAUL ROLSTON. (CARTER, JOEL) Modified to edit title on 6/10/2020 (rcb). (Entered: 06/09/2020) |
| 07/02/2020 | 92 | NOTICE *of Filing Motion to Consolidate* by UNITED STATES OF AMERICA (MOYLE, MARIE) (Entered: 07/02/2020) |
| 07/06/2020 | 93 | ORDER DIRECTING CLERK TO REASSIGN CASE. The Clerk is directed to reassign this case to Judge Hinkle.Signed by CHIEF JUDGE MARK E WALKER on 7/6/2020. (rcb) (Entered: 07/06/2020) |
| 07/06/2020 | | JUDGE ROBERT L HINKLE added. CHIEF JUDGE MARK E WALKER no longer assigned to case. (rcb) (Entered: 07/06/2020) |
| 07/07/2020 | 94 | Letter to Judge Walker from CHARNESHA ALEXANDER (rcb)**Case reassigned to Judge Hinkle ECF 93 ** (Entered: 07/07/2020) |
| 07/13/2020 | 95 | PLAINTIFF'S OPPOSITION TO MOTION TO CONSOLIDATE (COOK, JAMES) Modified to edit title on 7/14/2020 (rcb). (Entered: 07/13/2020) |
| 07/14/2020 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of CHIEF JUDGE MARK E WALKER notified that action is needed Re: Set Deadlines/Hearings: (rcb)**Status Report due on 7/8/2020 not filed** (Entered: 07/14/2020) |
| 07/22/2020 | 96 | UNOPPOSED REQUEST FOR STATUS CONFERENCE by UNITED STATES OF AMERICA. (MOYLE, MARIE) Modified to edit title on 7/23/2020 (rcb). (Entered: 07/22/2020) |
| 07/24/2020 | 97 | NOTICE OF TELEPHONIC HEARING (on 86 Motion for Summary Judgment): Telephonic Motion Hearing set for **7/30/2020 02:15 PM** before JUDGE ROBERT L HINKLE.<br><br>Call in number: **888-684-8852**<br>Access code: 3243416#<br>Security code: **1234#** |

000012

| | | |
|---|---|---|
| | | *s/ Cindy Markley*<br>Courtroom Deputy Clerk (ckm) (Entered: 07/24/2020) |
| 07/30/2020 | 98 | Minute Entry for proceedings held before JUDGE ROBERT L HINKLE: Telephonic Motion Hearing held on 7/30/2020. Court hears argument of counsel on the Motion for Summary Judgment (in 4:19cv138) and Motion to Consolidate (in 4:18cv177). Parties discuss procedures for trial during the pandemic. Ruling by Court: Motion for Summary Judgment is denied. Motion to Consolidate is granted. Trial is set for December 7, 2020. A status conference will be set a couple months out. An order is forthcoming. (Court Reporter Megan Hague) (ckm) (Entered: 07/30/2020) |
| 08/03/2020 | 99 | ORDER CONSOLIDATING CASES, DENYING THE EXHAUSTION MOTION, AND REVISING THE SCHEDULE. This order confirms positions taken and rulings made on the record of a hearing on July 30, 2020. The motion to consolidate, ECF No. 77 in Case No. 4:18cv177, is granted in part. These cases are consolidated for case-management purposes and will be maintained on a common docket under Consolidated Case No. 4:18cv177. Signed by JUDGE ROBERT L HINKLE on 8/3/20. (blb) (Entered: 08/03/2020) |
| 02/24/2021 | 100 | ORDER FOR ENTRY OF JUDGMENT ON MORTON AND BARNETT CLAIMS. The clerk must enter judgment in the individual cases of Ms. Morton (No. 4:18cv177) and Ms. Barnett (No. 4:20cv449) stating, "The parties are ordered to comply with their settlement agreement. All claims in this case are voluntarily dismissed with prejudice. The court reserves jurisdiction to enforce the order to comply with the settlement agreement." The clerk must close the files in Ms. Morton's and Ms. Barnett's individual cases. All further filings in the plaintiff Charnesha Alexander's individual case must be made in that docket (No. 4:19cv138), not in the consolidated docket (No. 4:18cv177). After entry of this order, the consolidated docket will be closed. Signed by JUDGE ROBERT L HINKLE on 02/24/2021. (rcb) (Entered: 02/24/2021) |
| 03/01/2021 | 101 | ORDER CONFIRMING THE SCHEDULE. The schedule previously established by orders in the consolidated docket remains in place. The pretrial conference remains set for **5/24/2021 10:00 AM** in U.S. Courthouse Tallahassee before JUDGE ROBERT L HINKLE. The trial remains set for the two-week trial period that begins on **6/21/2021 08:15 AM** in U.S. Courthouse Tallahassee before JUDGE ROBERT L HINKLE. Pretrial Stipulation due by **5/17/2021.**, Attorney Conference to take place by **5/3/2021.** Signed by JUDGE ROBERT L HINKLE on 03/01/2021. (rcb) (Entered: 03/02/2021) |
| 05/04/2021 | 102 | AMENDED NOTICE OF TELEPHONIC HEARING: Telephonic Pretrial Conference initially set for May 24 is reset for **5/20/2021 10:00 AM** before JUDGE ROBERT L HINKLE.<br><br>Call in number: **888-684-8852**<br>Access code: **3243416#**<br>Security code: **1234#**<br><br>*Proceedings may not be recorded or otherwise broadcast for public dissemination.*<br><br>*s/ Cindy Markley*<br>Courtroom Deputy Clerk (ckm) (Entered: 05/04/2021) |
| 05/07/2021 | 103 | MOTION Access to Medical Records by UNITED STATES OF AMERICA. (Attachments: # 1 Exhibit) (FISHER, PETER) (Entered: 05/07/2021) |

000013

| | | |
|---|---|---|
| 05/09/2021 | 104 | MOTION in Limine *(Consolidated)* by UNITED STATES OF AMERICA. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit) (FISHER, PETER) (Entered: 05/09/2021) |
| 05/10/2021 | 105 | NOTICE of Appearance by PETER GUNNAR FISHER on behalf of UNITED STATES OF AMERICA (FISHER, PETER) (Entered: 05/10/2021) |
| 05/10/2021 | 106 | First MOTION in Limine *OMNIBUS* by CHARNESHA ALEXANDER. (COOK, JAMES) Modified on 9/2/2021 (ckm). (Entered: 05/10/2021) |
| 05/12/2021 | 107 | PLAINTIFF'S AMENDED OMNIBUS MOTION IN LIMINE. (COOK, JAMES) Modified to edit title on 5/13/2021 (rcb). (Entered: 05/12/2021) |
| 05/12/2021 | 108 | DEFENDANT ROLSTON'S MOTIONS IN LIMINE AND INTEGRATED MEMORANDUM OF LAW. (Attachments: # 1 Exhibit 1 - Report of Dr. Lisa Tucker) (CARTER, JOEL) Modified to edit title on 5/13/2021 (rcb). (Entered: 05/12/2021) |
| 05/13/2021 | | Set/Reset Deadlines as to 104 MOTION in Limine *(Consolidated)*, 107 MOTION in Limine *(Omnibus Motion)*, 108 MOTION in Limine , 106 First MOTION in Limine *OMNIBUS*. (Internal deadline for referral to judge if response not filed earlier: **5/27/2021**). (rcb) (Entered: 05/13/2021) |
| 05/13/2021 | 109 | ORDER CONFIRMING APPLICABILITY OF ORDER ALLOWING ACCESS TO MEDICAL RECORDS. The government's motion, ECF No. 103 in Case No. 4:19cv138, for an order confirming this is granted. Signed by JUDGE ROBERT L HINKLE on 05/13/2021. (rcb) (Entered: 05/13/2021) |
| 05/17/2021 | 110 | Proposed Findings of Fact by UNITED STATES OF AMERICA. (FISHER, PETER) (Entered: 05/17/2021) |
| 05/17/2021 | 111 | RESPONSE in Opposition re 107 MOTION in Limine *(Omnibus Motion)* filed by UNITED STATES OF AMERICA. (Attachments: # 1 Exhibit A - Morton Transcript, # 2 Exhibit B - Alexander Transcript, # 3 Exhibit C - Rolston Transcript) (MOYLE, MARIE) (Entered: 05/17/2021) |
| 05/17/2021 | 112 | TRIAL BRIEF by UNITED STATES OF AMERICA. (FISHER, PETER) (Entered: 05/17/2021) |
| 05/17/2021 | 113 | PRETRIAL Stipulation by UNITED STATES OF AMERICA. (Attachments: # 1 Exhibit Plaintiff's Exhibit List, # 2 Exhibit Defendant Rolston's Objections to Plaintiff's Exhibit List, # 3 Exhibit Defendant United States' Objections to Plaintiff's Exhibit List, # 4 Exhibit Defendant Rolston's Exhibit List with Plaintiff's Objections, # 5 Exhibit Defendant United States' Witness and Exhibit List with Plaintiff's Objections, # 6 Exhibit Plaintiff's Witness List, # 7 Exhibit Defendant Rolston's Exhibit List) (MOYLE, MARIE) (Entered: 05/17/2021) |
| 05/17/2021 | 114 | Exhibit List by PAUL ROLSTON.. (CARTER, JOEL) (Entered: 05/17/2021) |
| 05/17/2021 | 115 | Proposed Findings of Fact by CHARNESHA ALEXANDER. (JOHNSON, RICHARD) (Entered: 05/17/2021) |
| 05/18/2021 | 116 | TRIAL BRIEF by CHARNESHA ALEXANDER. (Attachments: # 1 Exhibit 1 Blevins complaint, # 2 Exhibit 2 Davis deposition, # 3 Exhibit 3 Tucker report) (COOK, JAMES) (Entered: 05/18/2021) |

| 05/19/2021 | 117 | RESPONSE in Opposition re 108 MOTION in Limine *of Defendant Rolston* filed by CHARNESHA ALEXANDER. (COOK, JAMES) (Entered: 05/19/2021) |
| 05/19/2021 | 118 | RESPONSE in Opposition re 104 MOTION in Limine *(Consolidated) as to United States* filed by CHARNESHA ALEXANDER. (COOK, JAMES) (Entered: 05/19/2021) |
| 05/20/2021 | 119 | PLAINTIFF'S PROPOSED JURY INSTRUCTIONS TABLE OF CONTENTS. (COOK, JAMES) Modified to edit title on 5/20/2021 (rcb). (Entered: 05/20/2021) |
| 05/20/2021 | 120 | NOTICE *OF PLAINTIFF'S CURRENT STATUS* by CHARNESHA ALEXANDER (COOK, JAMES) (Entered: 05/20/2021) |
| 05/20/2021 | 121 | Minute Entry for proceedings held before JUDGE ROBERT L HINKLE: Telephonic Pretrial Conference held on 5/20/2021. Plaintiff counsel provides update on plaintiff's status. Court hears argument of counsel on plaintiff's ore tenus motion to continue trial. Court hears argument of counsel on pending motions in limine. Court conducts pretrial conference and parties discuss trial procedures. Ruling by Court: Motion to continue is denied at this point. A telephonic status conference will be set in approximately one week. An order will follow. (Court Reporter Lisa Snyder) (ckm) (Entered: 05/20/2021) |
| 05/21/2021 | 122 | NOTICE *TO COURT* by UNITED STATES OF AMERICA (Attachments: # 1 Exhibit, # 2 Exhibit) (FISHER, PETER) (Entered: 05/21/2021) |
| 05/21/2021 | 123 | NOTICE OF TELEPHONIC HEARING: Telephonic Status Conference set for **5/28/2021 10:00 AM** before JUDGE ROBERT L HINKLE.<br><br>Call in number: **888-684-8852**<br>Access code: **3243416#**<br>Security code: **1234#**<br><br>*Proceedings may not be recorded or otherwise broadcast for public dissemination.*<br><br>*s/ Cindy Markley*<br>Courtroom Deputy Clerk (ckm) (Entered: 05/21/2021) |
| 05/21/2021 | 124 | DOCKET ANNOTATION BY COURT TO ALL COUNSEL: Counsel is advised that for all future pleadings in this case and any future cases assigned to Judge Hinkle, exhibits attached to a document filing should be properly identified in the docket text when posting the document. (Example: Deposition of John Doe rather than Exhibit A.) (rcb) (Entered: 05/21/2021) |
| 05/27/2021 | 125 | SUPPLEMENTAL NOTICE TO COURT (MOYLE, MARIE) Modified to edit title on 5/28/2021 (rcb). (Entered: 05/27/2021) |
| 05/28/2021 | 126 | PLAINTIFF'S SECOND AMENDED WITNESS LIST. (COOK, JAMES) Modified to edit title on 5/28/2021 (rcb). (Entered: 05/28/2021) |
| 05/28/2021 | 127 | Minute Entry for proceedings held before JUDGE ROBERT L HINKLE: Telephonic Status Conference held on 5/28/2021. Parties discuss continuance of trial. Government provides update on plaintiff's status. Ruling by Court: Trial will be continued to September 13, 2021 trial period and will be stacked with another case set during that period. Court will issue writs for those witnesses previously identified, and Plaintiff will file request for any additional writs. An order will follow. (Court Reporter Lisa |

000015

| | | |
|---|---|---|
| | | Snyder) (ckm) (Entered: 05/28/2021) |
| 05/28/2021 | 128 | WRIT OF HABEAS CORPUS AD TESTIFICANDUM-SHONDOLYN ROCHELLE BLEVINS, Inmate No. 15329-035, a. (rcb)Copy of ECF 128 forwarded to Seatac Federal Correctional Institution, 2425 South 200th Street, Seattle, Washington, 98198*** (Entered: 05/28/2021) |
| 05/28/2021 | 129 | WRIT OF HABEAS CORPURS AD TESTIFICANDUM-CONNIE BATCHELOR, Inmate No. 34810-001 (rcb) **Copy of ECF 129 forwarded to USMS & Warden Strong Federal Correctional Institution Tallahassee, 501 Capital Circle, N.E., Tallahassee, Florida 32301** Modified on 7/15/2021 (rcb). (Entered: 05/28/2021) |
| 05/28/2021 | 130 | WRIT OF HABEAS CORPUS AD TESTIFICANDUM-ASHLEY NICHOLE BARNETT, Inmate No. 60509-018 (rcb)***Copy of ECF 130 forwarded to USMS & Warden Strong Federal Correctional Institution Tallahassee, 501 Capital Circle, N.E., Tallahassee, Florida 32301*** (Entered: 05/28/2021) |
| 05/28/2021 | 131 | WRIT OF HABEAS CORPUS AD TESTIFICANDUM-DAPHNE RODRIGUEZ, Inmate No. 46806-074 (rcb) **Copy of ECF 131 forwarded to USMS & Warden Strong Federal Correctional Institution Tallahassee, 501 Capital Circle, N.E., Tallahassee, Florida 32301** (Entered: 05/28/2021) |
| 06/14/2021 | 132 | PRETRIAL ORDER. The trial is rescheduled for the trial period that begins on **9/13/2021 08:15 AM**in U.S. Courthouse Tallahassee before JUDGE ROBERT L HINKLE. The government's motion in limine, ECF No. 104 , is granted in part and denied in part. The plaintiff's motion in limine, ECF No. 107 , is granted in part and denied in part. The motion is denied as to (2) alleged fabrication of the victims' testimony, (3) training within the Bureau of Prisons, and (5) Mr. Rolston's education and training, except as to details of his military service, as set out above. 13. Mr. Rolston's motion in limine, ECF No. 108 , is granted in part and denied in part. Signed by JUDGE ROBERT L HINKLE on 06/14/2021. (rcb) (Entered: 06/14/2021) |
| 06/28/2021 | 133 | DEFENDANT, UNITED STATES OF AMERICA'S, RULE 26(a)(3) DISCLOSURES (MOYLE, MARIE) Modified to edit title on 6/29/2021 (rcb). (Entered: 06/28/2021) |
| 06/28/2021 | 134 | DEFENDANT'S NOTICE OF FILING DESIGNATION OF DEPOSITION TESTIMONY (FISHER, PETER) Modified to edit title on 6/29/2021 (rcb). (Entered: 06/28/2021) |
| 06/28/2021 | 135 | DEFENDANT ROLSTON'S RULE 26(a)(3) DEPOSITION DESIGNATIONS (CARTER, JOEL) Modified to edit title on 6/29/2021 (rcb). (Entered: 06/28/2021) |
| 07/26/2021 | 136 | DEFENDANT ROLSTON'S OBJECTIONS TO PLAINTIFF'S FOURTH AMENDED EXHIBIT LIST FOR TRIAL by PAUL ROLSTON (CARTER, JOEL) Modified to edit title on 7/27/2021 (rcb). (Entered: 07/26/2021) |
| 07/26/2021 | 137 | DEFENDANT, UNITED STATES' OBJECTIONS TO PLAINTIFF'S EXHIBITS FOR TRIAL (MOYLE, MARIE) Modified to edit title on 7/27/2021 (rcb). (Entered: 07/26/2021) |
| 07/26/2021 | 138 | PLAINTIFF'S OBJECTIONS TO THE UNITED STATES EXHIBIT LIST by CHARNESHA ALEXANDER (COOK, JAMES) Modified to edit title on 7/27/2021 (rcb). (Entered: 07/26/2021) |
| 07/26/2021 | 139 | PLAINTIFF'S OBJECTIONS TO PAUL ROLSTON'S EXHIBIT LIST by CHARNESHA ALEXANDER (COOK, JAMES) Modified to edit title on 7/27/2021 |

000016

| | | |
|---|---|---|
| | | (rcb). (Entered: 07/26/2021) |
| 08/26/2021 | 140 | PARTIALLY UNOPPOSED REQUEST FOR STATUS CONFERENCE (MOYLE, MARIE) Modified to edit title on 8/27/2021 (rcb). Modified on 9/14/2021 to terminate motion (ckm). (Entered: 08/26/2021) |
| 08/27/2021 | 141 | NOTICE OF TELEPHONIC HEARING: Telephonic Status Conference set for **9/2/2021 09:00 AM** before JUDGE ROBERT L HINKLE.<br><br>Call in number: **888-684-8852**<br>Access code: **3243416#**<br>Security code: **1234#**<br><br>*Proceedings may not be recorded or otherwise broadcast for public dissemination.*<br><br>*s/ Cindy Markley*<br>Courtroom Deputy Clerk (ckm) (Entered: 08/27/2021) |
| 09/01/2021 | 142 | Witness List by CHARNESHA ALEXANDER. (COOK, JAMES) (Entered: 09/01/2021) |
| 09/01/2021 | 143 | Exhibit List *Fifth Amended* by CHARNESHA ALEXANDER.. (COOK, JAMES) (Entered: 09/01/2021) |
| 09/02/2021 | 144 | Minute Entry for proceedings held before JUDGE ROBERT L HINKLE: Telephonic Status Conference held on 9/2/2021. Parties discuss trial procedures. Ruling by Court: Trial remains scheduled for September 13, 2021. (Court Reporter Lisa Snyder) (ckm) (Entered: 09/02/2021) |
| 09/07/2021 | 145 | DEFENDANT'S NOTICE OF FILING PROPOSED VOIR DIRE QUESTIONS. (CARTER, JOEL) Modified to edit title on 9/8/2021 (rcb). (Entered: 09/07/2021) |
| 09/08/2021 | 146 | Proposed Jury Instructions by PAUL ROLSTON. (CARTER, JOEL) (Entered: 09/08/2021) |
| 09/08/2021 | 147 | Exhibit List *Amended* by PAUL ROLSTON.. (CARTER, JOEL) (Entered: 09/08/2021) |
| 09/09/2021 | 148 | Exhibit List *2nd Amended* by PAUL ROLSTON.. (CARTER, JOEL) (Entered: 09/09/2021) |
| 09/10/2021 | 149 | UNOPPOSED TIME-SENSITIVE MOTION FOR CLARIFICATION AS TO EXECUTION OF THE WRIT OF HABEAS CORPUS AD TESTIFICANDUM AS TO THE INMATE-WITNESSES. (COOK, JAMES) Modified to edit title on 9/10/2021 (rcb). Modified on 9/14/2021 to terminate motion (ckm). (Entered: 09/10/2021) |
| 09/10/2021 | 150 | Amended Writ of Habeas Corpus ad Testificandum Issued as to ASHLEY NICHOLE BARNETT for 09/14/2021. (rcb) **Writ has been emailed to USMS** (Entered: 09/10/2021) |
| 09/10/2021 | 151 | Amended Writ of Habeas Corpus ad Testificandum Issued as to SHONDOLYN ROCHELLE BLEVINS for 09/14/2021. (rcb) **Writ has been emailed to USMS** (Entered: 09/10/2021) |
| 09/10/2021 | 152 | Amended Writ of Habeas Corpus ad Testificandum Issued as to CONNIE BATCHELOR, for 9/14/2021. (rcb) **Writ has been emailed to USMS** (Entered: 09/10/2021) |

000017

| 09/10/2021 | 153 | Amended Writ of Habeas Corpus ad Testificandum Issued as to DAPHNE RODRIGUEZ for 9/14/2021. (rcb) **Writ has been emailed to USMS** (Entered: 09/10/2021) |
| 09/10/2021 | 154 | RULE 26 Disclosures by UNITED STATES OF AMERICA. (FISHER, PETER) (Entered: 09/10/2021) |
| 09/12/2021 | 155 | Proposed Jury Instructions by CHARNESHA ALEXANDER. (COOK, JAMES) (Entered: 09/12/2021) |
| 09/13/2021 | 156 | Minute Entry for proceedings held before JUDGE ROBERT L HINKLE: Attorney Conference held on 9/13/2021. (Court Reporter Lisa Snyder) (ckm) (Entered: 09/14/2021) |
| 09/13/2021 | 157 | Minute Entry for proceedings held before JUDGE ROBERT L HINKLE: Voir Dire held on 9/13/2021. (Court Reporter Lisa Snyder) (ckm) (Entered: 09/14/2021) |
| 09/13/2021 | 158 | Minute Entry for proceedings held before JUDGE ROBERT L HINKLE: Jury Selection held on 9/13/2021. (Court Reporter Lisa Snyder) (ckm) (Entered: 09/14/2021) |
| 09/13/2021 | 159 | Minute Entry for proceedings held before JUDGE ROBERT L HINKLE: Jury Trial (Day 1) held on 9/13/2021. (Court Reporter Lisa Snyder) (ckm) (Entered: 09/14/2021) |
| 09/14/2021 | 160 | Discussion draft: jury instructions. Issued by JUDGE ROBERT L HINKLE on 9/14/21. (RH) (Entered: 09/14/2021) |
| 09/14/2021 | 161 | Discussion draft: verdict form. Issued by JUDGE ROBERT L HINKLE on 9/14/21. (RH) (Entered: 09/14/2021) |
| 09/14/2021 | 162 | Minute Entry for proceedings held before JUDGE ROBERT L HINKLE: Jury Trial (Day 2) held on 9/14/2021. (Court Reporter Lisa Snyder) (ckm) (Entered: 09/15/2021) |
| 09/15/2021 | 163 | Second discussion draft of jury instructions showing changes on page 8. Issued by JUDGE ROBERT L HINKLE on 9/15/21. (RH) (Entered: 09/15/2021) |
| 09/15/2021 | 165 | Minute Entry for proceedings held before JUDGE ROBERT L HINKLE: Jury Trial (Day 3) held on 9/15/2021. (Court Reporter Lisa Snyder) (ckm) (Entered: 09/16/2021) |
| 09/16/2021 | 164 | NOTICE OF FILING OF OFFICIAL EXCERPT TRANSCRIPT of Jury Trial held on 9/13/2021, before Judge Robert Hinkle. Court Reporter/Transcriber Lisa Snyder, Telephone number 850-567-1374.<br><br>*Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.*<br><br>Redaction Request due **9/23/2021**. Release of Transcript Restriction set for **12/22/2021**. (ls) (Entered: 09/16/2021) |
| 09/16/2021 | 166 | Minute Entry for proceedings held before JUDGE ROBERT L HINKLE: Jury Trial completed on 9/16/2021. (Court Reporter Lisa Snyder.) (Attachments: # 1 Exhibit List, # 2 Pltf Exhibits (1-48), # 3 Pltf Exhibits (49-53), # 4 Pltf Exhibits 55-82, # 5 Govt Exhibits, # 6 Rolston Exhibits, # 7 BENCH Pltf Exhibits Part 1, # 8 BENCH Pltf Exhibits Part 2, # 9 BENCH Pltf Exhibits Part 3, # 10 BENCH Pltf Exhibits Part 4, # 11 BENCH Govt Exhibits, # 12 Jury Instructions) (ckm) (Entered: 09/20/2021) |

000018

| | | |
|---|---|---|
| 09/16/2021 | 167 | JURY VERDICT (redacted) (ckm) (Entered: 09/20/2021) |
| 09/16/2021 | 168 | Sealed Document (Unredacted Verdict) (ckm) (Entered: 09/20/2021) |
| 09/23/2021 | 169 | CLERK'S JUDGMENT entered pursuant to 167 Jury Verdict. 90 Day Exhibit Return Deadline set for **12/22/2021** (ckm) (Entered: 09/23/2021) |
| 10/04/2021 | 170 | MEMORANDUM in Support re 169 Clerk's Judgment by PAUL ROLSTON. (CARTER, JOEL) (Entered: 10/04/2021) |
| 10/04/2021 | 171 | BILL OF COSTS by PAUL ROLSTON. (CARTER, JOEL) (Entered: 10/04/2021) |
| 10/05/2021 | 172 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Rule 50 Motion Proceedings held on 9/14/2021, before Judge Robert Hinkle. Court Reporter/Transcriber Lisa Snyder, Telephone number 850-567-1374. *Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.* Redaction Request due **10/12/2021**. Release of Transcript Restriction set for **1/10/2022**. (ls) (Entered: 10/05/2021) |
| 10/05/2021 | 173 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Defense Closing Arguments held on 9/16/2021, before Judge Robert Hinkle. Court Reporter/Transcriber Lisa Snyder, Telephone number 850-567-1374. *Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.* Redaction Request due **10/12/2021**. Release of Transcript Restriction set for **1/10/2022**. (ls) (Entered: 10/05/2021) |
| 10/05/2021 | | Set Deadlines/Hearings Bill of Cost Objection Deadline Re: 171 **10/19/2021)**. (rcb) (Entered: 10/05/2021) |
| 10/18/2021 | 174 | PLAINTIFF'S OBJECTIONS TO MOTION FOR COSTS BY DEFENDANT PAUL ROLSTON (COOK, JAMES) Modified to edit title on 10/19/2021 (rcb). (Entered: 10/18/2021) |
| 10/20/2021 | 175 | ORDER ON TAXATION OF COSTS. The clerk must tax costs as provided under the governing law and this order. Signed by JUDGE ROBERT L HINKLE on 10/20/2021. (rcb) (Entered: 10/21/2021) |
| 10/22/2021 | 176 | NOTICE OF APPEAL as to 169 Clerk's Judgment by CHARNESHA ALEXANDER. ( Filing fee $505 Receipt Number AFLNDC-6506738.) (JOHNSON, RICHARD) (Entered: 10/22/2021) |
| 10/25/2021 | 177 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 176 Notice of Appeal. (rcb) (Entered: 10/25/2021) |
| 10/25/2021 | | Set Deadlines re 176 Notice of Appeal : Clerk to check status of Appeal on **1/24/2021**. Certificate of Readiness (FRAP 11) due by **11/8/2021**. (rcb) (Entered: 10/25/2021) |

000019

| 10/27/2021 | 178 | USCA Acknowledgment #21-13720 Re: 176 Notice of Appeal. (rcb) (Entered: 10/28/2021) |
| 11/09/2021 | 179 | Pursuant to F.R.A.P. 11(c), the Clerk of the District Court for the Northern District of Florida certifies that the record is complete for purposes of this appeal re: 176 Notice of Appeal, Appeal No. 19-11484. The entire record on appeal is available electronically. (rcb) (Entered: 11/09/2021) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 11/09/2021 19:19:04 | | |
| **PACER Login:** | cookjv01 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 4:19-cv-00138-RH-MAF |
| **Billable Pages:** | 15 | **Cost:** | 1.50 |

000020

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

| | |
|---|---|
| CHARNESHA ALEXANDER, | CIVIL ACTION |
|     Plaintiff, | Case No. 4:19-cv-138-MW-CAS |
| v. | |
| UNITED STATES OF AMERICA and PAUL ROLSTON, | |
|     Defendants. | |

## AMENDED COMPLAINT FOR DAMAGES

Plaintiff sues Defendants and alleges as follows:

### Jurisdiction

1. This Court has jurisdiction of this action under 28 U.S.C. §§1331 and 1346 and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1972) and 28 U.S.C. §2671, et. seq., Federal Tort Claims Act.

2. Plaintiff filed a claim under the Federal Tort Claims Act on July 2, 2018 (attached as Exhibit 1), which has not been honored and is deemed denied.

3. Plaintiff has exhausted her administrative remedies and obtained the relief that the administrative remedies could afford, to wit: an investigation.

4. Plaintiff has otherwise performed all acts precedent to bringing this suit or such acts have been waived.

## Parties

5.  At all times material hereto, Plaintiff CHARNESHA ALEXANDER was a federal prisoner confined in FCI Tallahassee, in Tallahassee, Florida, which facility is within the Northern District of Florida.

6.  At all times material hereto, Defendant PAUL ROLSTON was a Physicians' Assistant at FCI Tallahassee, which facility is within the Northern District of Florida. Defendant Rolston acted in the course and scope of his employment.

7.  At all times material hereto, Defendant UNITED STATES OF AMERICA owned and operated a corrections facility known as FCI Tallahassee and were the employers of Defendant ROLSTON.

## Common Allegations of Fact

1.  In 2016, Charnesha Alexander was a federal prisoner confined at Federal Correctional Institution (FCI) Tallahassee in Tallahassee, Florida.

2.  On September 27, 2016, Charnesha Alexander was called to the office of Physician Assistant Paul Rolston's office for a Pap smear.

3.  Defendant Paul Rolston was a Physician's Assistant at FCI Tallahassee with a responsibility to provide medical care for federal inmates.

4.  Ms. Alexander asked Nurse Davis and Defendant Rolston to reschedule because she was menstruating and she was bleeding heavily.

5.  Defendant Rolston declined to reschedule the procedure.

6.    Rolston said he did pap smears under these circumstances all the time.

7.    Rolston told Plaintiff to undress from the waist down and get on the table.

8.    During the examination, Rolston rubbed the lips of Plaintiff's vagina from top to bottom, rubbed her clitoris and put two fingers in of her vagina.

9.    Rolston then rubbed Plaintiff's clitoris again, thrust his fingers back into her vagina and pressed on her stomach asking her if she felt pain.

10.   Rolston manipulated Plaintiff's clitoris very deliberately, leaving no doubt that his actions constituted a sexual assault, not medical care.

11.   When Rolston left the room, Plaintiff complained tearfully to Nurse Davis.

12.   Nurse Davis told Plaintiff she needed to complain to Rolston herself.

13.   Rolston returned to find Plaintiff still crying and asked what was wrong.

14.   Rolston pressed his leg against her thigh, making Plaintiff more afraid.

15.   Rolston told Plaintiff he had to do a breast exam but Plaintiff refused.

16.   Rolston told Plaintiff she had to sign a waiver and she did so.

17.   On leaving, still crying, Plaintiff returned to the Special Housing Unit (SHU) where she was housed as a temporary transfer prisoner.

18.   Officers saw that she was still crying and asked her what was wrong.

19.   Plaintiff told Officer Jackson what Rolston had done and Jackson told her she needed to take action, if not for herself, then for the other prisoners.

000023

20. Plaintiff was interviewed by Security Officer Proffitt who told her that he would start an investigation into the incident.

21. Plaintiff got the feeling that other inmates had complained about Rolston.

22. Rolston showed up in Plaintiff's housing area and asked her what was wrong. Plaintiff's cellmate told Rolston to go away.

23. SIS Proffitt also told Rolston his shift was over and he needed to leave.

24. Plaintiff reported this misconduct immediately to security officers.

25. After she spoke with SIS Proffitt, Plaintiff went to her cell to clean up.

26. Plaintiff had never been instructed not to bathe so as to preserve evidence.

27. Officers took Plaintiff's clothing and did not return it.

28. Plaintiff was taken for a rape exam at Tallahassee Memorial Hospital.

29. After the rape exam, she spoke with a rape trauma team.

30. One of the team members later visited her at the prison to see how she was.

31. Plaintiff spoke with a psychologist or counselor.

32. Plaintiff also spoke to the prison chaplain but she could not bring herself to tell him what had happened to her so she just asked him to pray for her.

33. Plaintiff has mostly just discussed the incident with her mother.

34. Rolston has done the same thing to other women at FCI Tallahassee.

35. Rolston had a practice of sexually abusing female inmates at FCI.

36. Rolston used his job and FCI resources to target women for sexual abuse.

37. As an inmate, Plaintiff was unable to resist Rolston's predatory behavior.

38. Although Plaintiff was heartened that SIS Proffitt told her that an investigation had been started, she never saw any results from it.

39. Plaintiff never got the results of the rape exam.

40. Discovery will show officials at FCI Tallahassee were aware of Rolston's sexual predations by then and enabled and covered for them.

41. Alexander told prison officials that Rolston had sexually abused her, but at that time, she did not realize how she had been targeted by him.

42. The acts of the Defendant Rolston violated Plaintiff's constitutional rights, were wrongful as a matter of both federal and Florida law and without justification under any applicable federal statute or rule.

43. Defendant Rolston was acting within the course and scope of his employment at the time of the wrongful acts.

44. FCI Tallahassee had an informal policy of turning a blind eye to abuse.

45. FCI officials enabled and abetted Rolston in his sexual predation.

46. FCI officials failed to timely implement PREA regulations.

47. As a result of the abuse, Plaintiff suffered physical trauma, invasion of her person, great emotional harm, anguish, insecurity, self-revulsion, damage to self-esteem, shame, humiliation, anxiety, depression, loss of sleep, alienation from her husband, and an impaired ability to comfort her children.

000025

## Causes of Action

### I.   Cruel and Unusual Punishment (*Bivens*) Rolston

48.  Plaintiff Alexander is entitled to relief against Rolston because he violated her Eighth Amendment rights through coercive sexual acts involving sexual penetration, more fully set out in the Common Allegations above.

49.  Defendant Rolston intended to cause this harmful and offensive contact which was ostensibly part of his job but done for his sexual gratification.

50.  The sexual abuse of Plaintiff by Rolston was accomplished under color of law and subjected and caused Plaintiff to be deprived of rights, privileges or immunities secured by the Eighth Amendment to the U.S. Constitution.

51.  Rolston was emboldened to physically abuse inmates because the prior reports of sexual predations by him were never punished.

52.  Repeated sexual abuse is not part of the penalty criminal offenders pay for their offenses against society and constitutes a cognizable claim of cruel and unusual punishment under the Eighth Amendment.

53.  As a result of the sexual abuse of Plaintiff by Defendant Rolston, Plaintiff suffered physical trauma and invasion of her person, suffered and continues to suffer physical harm, emotional harm, anguish, insecurity, self-revulsion, damage to her self-esteem and self-worth, shame and humiliation.

WHEREFORE, Plaintiff seeks relief as noted below.

## II.    Federal Tort Claims Act Claim as to the United States

54.  Plaintiff is entitled to relief against Defendant, United States of America because it breached its duty of care to Plaintiff, an inmate in its care and custody, as more fully set out in the Common Allegations above, in that it negligently operated and managed FCI Tallahassee by:

   a.  Hiring, retaining and entrusting Defendant Rolston who is, and was or should have been known to Defendant to be of such poor moral character, temperament, and disposition as to be unfit to be hired and retained as a medical provider with power over the Plaintiff.

   b.  Failing to implement such policies and procedures for the operation and management of FCI Tallahassee as would reasonably protect Plaintiff and others detained or incarcerated in the corrections facility from Defendant Rolston or other predatory corrections facility employees.

   c.  Failing to properly supervise, investigate, and review the operation and management of the corrections facility and the activities and performance of Defendant Rolston as an employee.

   d.  Failing in the course of its investigation of the sexual abuse of other inmates to protect subsequent victims like Alexander.

   e.  Failing in the course of its investigation of Rolston's sexual abuse of Alexander to protect other inmates abused by Rolston.

55.  The negligence of Defendant United States of America was wrongful as a tort under the law of Florida and of the United States and without excuse or justification under any applicable state or federal statute or rule.

56.  As a result of the wrongful acts of Defendant United States of America, Plaintiff suffered physical trauma and invasion of her person, suffered and

continues to suffer great emotional harm, anguish, insecurity, self-revulsion, damage to her self-esteem and self-worth, shame and humiliation.

WHEREFORE, Plaintiff seeks relief as noted below.

### III.   Federal Tort Claims Act (Battery) as to Defendant United States

57.  Plaintiff is entitled to relief against the United States of America because Defendant Rolston sexually battered her under the color of law, as more fully set out in the Common Allegations, above.

58.  Defendant Rolston performed deliberate sexual acts on Plaintiff without her freely-given consent and such acts were wrongful as a tort under the law of Florida and of the United States and without justification or excuse under any applicable state or federal statute or rule.

59.  In committing the abuse, Defendant Rolston was acting within the course and scope of his employment with Defendant United States of America, using the powers given him by his employers.

60.  As a result of the abuse by Defendant Rolston, Plaintiff suffered physical trauma, invasion of her person, suffered and continues to suffer great emotional harm, anguish, insecurity, self-revulsion, damage to self-esteem, shame and humiliation, anxiety, depression, loss of sleep, alienation from her husband, and an impaired ability to comfort her children.

WHEREFORE, Plaintiff seeks relief as noted below.

**<u>Prayer for Relief</u>**

WHEREFORE, the Plaintiff respectfully seeks judgment as follows:

   A. That the Court assume jurisdiction over this action;

   B. Declare that the acts and omissions described herein violated Plaintiff's

       rights under the Constitution and Laws of the United States and Florida;

   C. Award compensatory damages against each of the defendants herein;

   D. Award punitive damages against Individual Defendants under federal law;

   E. Provide a trial by jury on all issues so triable;

   F. Such further relief as the Court deems just and proper.

                         Respectfully Submitted,   *s/James V. Cook*_____
                                                    JAMES V. COOK, ESQ.
                                                    Florida Bar Number 966843
                                                   Law Office of James Cook
                                                     314 West Jefferson Street
                                                   Tallahassee, FL 32301
                                                   (850) 222-8080; 561-0836 fax
                                                   cookjv@gmail.com

                                                   RICHARD E. JOHNSON, ESQ.
                                                   Florida Bar Number 858323
                                                   Law Office of Richard E. Johnson
                                                   314 West Jefferson Street
                                                   Tallahassee, Florida 32301
                                                   (850) 425-1997; 561-0836 fax
                                                   richard@nettally.com

                                                   Attorneys for Plaintiff

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit to Appropriate Federal Agency: | 2. Name, address of claimant, and claimant's personal representative if any. (See instructions on reverse.) Number, Street, City, State and Zip code. |
|---|---|
| U.S. Bureau of Prisons<br>Southeast Regional Office<br>3800 North Camp Creek Parkway S.W., Bldg. 2000<br>Atlanta, GA 30331-6226 | CHARNESIA ALEXANDER, FRN 15404002<br>c/o James Cook, Richard Johnson, Attorneys<br>314 West Jefferson Street<br>Tallahassee, FL 32301 |

| 3. TYPE OF EMPLOYMENT | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT | 7. TIME (A.M. OR P.M.) |
|---|---|---|---|---|
| ☐ MILITARY  ☒ CIVILIAN | 09/27/1984 | | 09/27/2016 | Various |

**8. BASIS OF CLAIM** (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary).

See Exhibit A, attached hereto.

| 9. | PROPERTY DAMAGE |
|---|---|

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

n.a.

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED. (See instructions on reverse side).

n.a.

| 10. | PERSONAL INJURY/WRONGFUL DEATH |
|---|---|

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT

See Exhibit A, attached hereto

| 11. | WITNESSES |
|---|---|

| NAME | ADDRESS (Number, Street, City, State, and Zip Code) |
|---|---|
| See Exhibit A, attached hereto. | |

| 12. (See instructions on reverse). | AMOUNT OF CLAIM (in dollars) | | |
|---|---|---|---|
| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights). |
| 0.00 | 5,000,000 | | 5,000,000 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side). | 13b. PHONE NUMBER OF PERSON SIGNING FORM | 14. DATE OF SIGNATURE |
|---|---|---|
| *Charnesia Alexander* | 850-222-8080 | 4/08/2008 |

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) |

000030

| INSURANCE COVERAGE | | |
|---|---|---|

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of the vehicle or property.

15. Do you carry accident Insurance?  ☐ Yes   If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number.  ☒ No

16. Have you filed a claim with your insurance carrier in this instance, and if so, is it full coverage or deductible?   ☐ Yes  ☒ No   17. If deductible, state amount.

18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim? (It is necessary that you ascertain these facts.)

19. Do you carry public liability and property damage insurance?   ☐ Yes   If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code).  ☒ No

## INSTRUCTIONS

**Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident.  If the incident involves more than one claimant, each claimant should submit a separate claim form.**

### Complete all items - Insert the word NONE where applicable.

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY

**Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid.  A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.**

If instruction is needed in completing this form, the agency listed in item #1 on the reverse side may be contacted.  Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations.  If more than one agency is involved, please state each agency.

The claim may be filed by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant.  A claim presented by an agent or legal representative must be presented in the name of the claimant.  If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item number 12 of this form.

DAMAGES IN A <u>SUM CERTAIN</u> FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN <u>TWO YEARS</u> AFTER THE CLAIM ACCRUES.

The amount claimed should be substantiated by competent evidence as follows:

*(a)* In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of the injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

*(b)* In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

*(c)* In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident.  Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

*(d)* Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.
  A.  *Authority:*  The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B.  *Principal Purpose:*  The information requested is to be used in evaluating claims.
C.  *Routine Use:*  See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D.  *Effect of Failure to Respond:*  Disclosure is voluntary.  However, failure to supply the requested information or to execute the form may render your claim "invalid."

## PAPERWORK REDUCTION ACT NOTICE

This notice is solely for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501.  Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.  Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention:  Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, DC  20530 or to the Office of Management and Budget.  Do not mail completed form(s) to these addresses.

**STANDARD FORM 95** REV. (2/2007) BACK

**Exhibit A**:

Statement of Claim:

Claimant was sexually assaulted on September 27, 2016, by Physicians Assistant Paul Rolston at the Federal Correctional Institution, Tallahassee, Florida, between 12 and 3 PM. She was called to his office for a Pap smear because she had a bacterial infection since August 3, 2016. She informed the nurse, Mrs. Davis, that her menstrual cycle was on and asked to reschedule. Physician's Assistant Rolston declined to reschedule.

Rolston robbed the lips of her vagina from top to bottom and then he rubbed her clitoris and then put two fingers inside of her vagina and then rubbed her clitoris again and then he thrust his fingers back into her vagina and pressed on her stomach asking her if she felt any pain. Rolston manipulated her clitoris very suggestively, leaving no doubt that his actions constituted a sexual assault. Rolston then told her he needed to do a breast exam and she refused.

Claimant began crying during this examination and complained to the nurse, Ms. Davis, who told her to voice her complaints to Rolston, but claimant was afraid. Claimant reported this misconduct immediately and spoke to security officers. She was taken to see SIS and the Warden and told them everything that happened. She was taken for a rape exam. She has not heard anything more. Rolston has done the same thing to other women at FCI Tallahassee.

Prisoner complaints about Rolston have had no effect on the prison authorities.

Injury:

Claimant has suffered physical pain and suffering and emotional distress.

Witnesses:

Nurse Davis, FCI Tallahassee
Ofc. Jackson, FCI Tallahassee
Warden Singletary, FCI Tallahassee
SIS Proffet, FCI Tallahassee

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

**CHARNESIA ALEXANDER,**

     **Plaintiff,**                     **Civil Case No. 4:19-cv-00138-MW/CAS**

**v.**

**UNITED STATES OF AMERICA and
PAUL ROLSTON,**

     **Defendants.**

_____/

## DEFENDANT UNITED STATES OF AMERICA'S AMENDED ANSWER

COMES NOW, the Defendant, UNITED STATES OF AMERICA, (hereinafter, "United States"), acting by and through the undersigned Assistant United States Attorney, and hereby answers and otherwise, responds to Plaintiff's Amended Complaint for Damages (ECF 21), as follows:

### Jurisdiction

1.  Paragraph 1 of the Complaint states Plaintiff's alleged bases for jurisdiction; and as such, requires no response. To the extent that an answer may be required, United States admits that Plaintiff purports to bring an action under 28 U.S.C. §1331 and §1346, and 28 U.S.C. §2671. United States however, denies that Plaintiff presents this Court with a justiciable controversy over which it has subject-matter jurisdiction and denies any liability.

1

000033

2.   United States admits that Plaintiff filed a tort claim on July 9, 2018,

to which the Bureau of Prisons acknowledged receipt of the claim on July 23, 2018.

United States however, denies the basis for which Plaintiff filed her claim and any

remaining allegations of Paragraph 2.

3.   United States admits that Plaintiff has exhausted her administrative

Remedies under the Federal Tort Claims Act.

4.   United States admits the allegations of Paragraph 4.

**Parties**

1.   United States admits the Plaintiff was an inmate at the Federal

Correctional Institution-Tallahassee (FCI Tallahassee) from on or about July 26,

2016, until on or about October 18, 2016.

2.   United States admits that Defendant Paul Rolston, "Defendant

Rolston") was a Physician Assistant at FCI Tallahassee, which is a facility located

in the Northern District of Florida.   United States, however denies the remaining

allegations of paragraph 6.

3.   United States admits the allegations of Paragraph 7.

**Common Allegations of Fact**

4.   United States admits the Plaintiff was an inmate at FCI Tallahassee

From on or about July 26, 2016, until on or about October 18, 2016.   United States

denies the remaining allegations of Paragraph 8.

2

5.   United States admits that at Plaintiff's request, Plaintiff was seen in a medical office in the Special Housing Unit located at FCI Tallahassee on September 27, 2016.   United States denies the remaining allegations of paragraph 9.

6.   United States admits the allegations of paragraph 10.

7.   United States lacks sufficient knowledge to admit or deny the allegations of paragraph 11; and therefore, United States denies the allegations.

8.   United States lacks sufficient knowledge to admit or deny the allegations of paragraph 12; and therefore, United States denies the allegations.

9.   United States lacks sufficient knowledge to admit or deny the allegations of paragraph 13; and therefore, denies the allegations of paragraph 13.

14.  United States lacks sufficient information to admit or deny the allegations of paragraph 14; and therefore, denies the allegations.

15.  United States denies the allegations of paragraph 15.

16.  United States denies the allegations of paragraph 16. However, United States avers that Defendant Rolston asked Plaintiff if she had pain in her ovaries or any pain or pressure in her bladder when Defendant Rolston pressed on it.

17.  United States denies the allegations of paragraph 17.

000035

18.  United States admits that at some point while in the medical office, Plaintiff started crying.   United States lacks sufficient information to admit or deny the remaining allegations of paragraph 18; and therefore, denies the remaining allegations.

19.  United States denies the allegations of paragraph 19.

20.  United States admits that at some point while in the medical office, Plaintiff began crying and Defendant Rolston asked her what was wrong.  United States lacks sufficient knowledge to admit or deny the remaining allegations of paragraph 20; and therefore, United States denies the allegations denies the remaining allegations.

21.  United States lacks sufficient knowledge to admit or deny the allegations of  paragraph 21; and therefore, United States denies the allegations.

22.  United States lacks sufficient knowledge to admit or deny the allegations of paragraph 22; and therefore, denies the allegations of paragraph 22.

23.  United States admits the Plaintiff signed a Medical Refusal Form for a breast and rectal examination.   United States lacks sufficient knowledge to admit or deny the remaining allegations of paragraph 23; and therefore, denies the allegations.

24.  United States admits that Plaintiff was housed as a temporary transfer

000036

inmate assigned to the Special Housing Unit, at the time when Plaintiff alleges the misconduct.   United States lacks sufficient knowledge to admit or deny the remaining allegations of paragraph 24; and therefore, denies the allegations.

25.   United States lacks sufficient knowledge to admit or deny the allegations of paragraph 25; and therefore, denies the allegations.

26.   United States lacks sufficient knowledge to admit or deny the allegations of paragraph 26; and therefore, denies the allegations.

27.   United States lacks sufficient knowledge to admit or deny the allegations of paragraph 27; and therefore, denies the allegations of paragraph 27.

28.   United States admits that Plaintiff made a report of misconduct; and as part of the investigation into her report, Plaintiff was interviewed.   United States lacks sufficient knowledge to admit or deny the remaining allegations of Paragraph 28; and therefore, United States denies the remaining allegations.

29.   United States lacks sufficient knowledge to admit or deny Plaintiff's mental thoughts; and therefore, denies the allegations of paragraph 29.

30.   United States lacks sufficient knowledge to admit or deny the allegations of paragraph 30; and therefore, denies the allegations of paragraph 30.

31.   United States lacks sufficient knowledge to admit or deny the allegations of paragraph 31; and therefore, denies the allegations of paragraph 31.

32.   United States lacks sufficient knowledge to admit or deny the

000037

allegations of paragraph 32; and therefore, denies the allegations of paragraph 32.

33.   United States lacks sufficient knowledge to admit or deny the allegations of Paragraph 33; and therefore, United States denies the allegations.

34.   United States lacks sufficient knowledge to admit or deny the allegations of Paragraph 34; and therefore, United States denies the allegations.

35.   United States admits the allegations of paragraph 35.

36.   United States admits that Plaintiff was administered a rape exam by the Refuge House staff while at the Tallahassee Memorial Hospital.  United States lacks sufficient knowledge to admit or deny the remaining allegations; and therefore, denies the allegations.

37.   United States lacks sufficient knowledge to admit or deny the remaining allegations; and therefore, denies the allegations.

38.   United States lacks sufficient knowledge to admit or deny the allegations of paragraph 38; and therefore, denies the allegations.

39.   United States lacks sufficient knowledge to admit or deny the allegations of paragraph 39; and therefore, denies the allegations.

40.   United States lacks sufficient knowledge to admit or deny the allegations of paragraph 40; and therefore, denies the allegations.

41.   United States lacks sufficient knowledge to admit or deny the allegations of paragraph 41; and therefore, denies the allegations.

000038

42.   United States lacks sufficient knowledge to admit or deny the allegations of paragraph 42; and therefore, denies the allegations.

43.   United States denies the allegations of paragraph 43.

44.   United States lacks sufficient knowledge to admit or deny Plaintiff's allegations concerning her feelings; and therefore, denies the allegations of paragraph 44.

45.   United States admits that an investigation was conducted and that Plaintiff was not privy to the conclusion of the investigation.  United States lacks sufficient knowledge to admit or deny Plaintiff's mental thoughts on how she felt about an investigation; and therefore, United States denies the remaining allegations of paragraph 45.

46.   United States admits the allegations of paragraph 46.

47.   United States denies the allegations of paragraph 47.

48.   United States admits that Plaintiff made a report of misconduct against Defendant Rolston.   United States lacks sufficient knowledge to admit or deny Plaintiff's mental thoughts on how she felt about being targeted; and therefore, United States denies these allegations.   United States denies any remaining allegations of paragraph 48.

49.   United States denies the allegations of paragraph 49.

50.   United States denies the allegations of paragraph 50.

000039

51.  United States denies the allegations of paragraph 51.

52.  United States denies the allegations of paragraph 52.

53.  United States denies the allegations of paragraph 53.

54.  The allegations of paragraph 54 include Plaintiff's prayer for relief and contain legal conclusions; and as such, require no response.   To the extent that the paragraph is deemed to set forth allegations of fact to which an answer is required, United States denies the allegations of paragraph 54.   United States, further denies any liability for any alleged wrongful acts.

## Causes of Action

### II.  Federal Tort Claims Act Claim as to the United States

61.  The allegations of paragraph 61 include Plaintiff's prayer for relief and contain legal conclusions; and as such, require no response.   To the extent that the paragraph is deemed to set forth allegations of fact to which an answer is required, United States denies the allegations of paragraph 61.

62.  The allegations of paragraph 62 contain legal conclusions; and as such, require no response.   To the extent that the paragraph is deemed to set forth allegations of fact to which an answer is required, United States denies the allegations of paragraph 62.

63.  The allegations of paragraph 63 contain legal conclusions; and as such, require no response.   To the extent that the paragraph is deemed to set forth

000040

allegations of fact to which an answer is required, United States denies the allegations of paragraph 63.

The unnumbered paragraph below paragraph 63 contains Plaintiff's Prayer for Relief; and as such, requires no response.  To the extent that the paragraph is deemed to set forth allegations of fact to which an answer is required, such allegations are denied and further, United States avers that Plaintiff is not entitled to any relief in this action.

### III.    Federal Tort Claims Act (Battery) as to Defendant United States

64.   United States denies the allegations of paragraph 64.

65.   United States denies the allegations of paragraph 65.

66.   United States denies the allegations of paragraph 66.

67.   The allegations of paragraph 67 include Plaintiff's prayer for relief and contain legal conclusions; and as such, require no response.   To the extent that the paragraph is deemed to set forth allegations of fact to which an answer is required, United States denies the allegations of paragraph 67.

The unnumbered paragraph below paragraph 67 contains Plaintiff's Prayer for Relief; and as such, requires no response.  To the extent that the paragraph is deemed to set forth allegations of fact to which an answer is required, such allegations are denied and further, United States avers that Plaintiff is not entitled to any relief in this action.

000041

**Prayer for Relief**

This unnumbered paragraph and its subparts (A) through (F) represents Plaintiff's Prayer for Relief and Demand for Trial by Jury; and as such, require no response.  To the extent that the paragraph is deemed to set forth allegations of fact to which an answer is required, such allegations are denied and further, United States denies Plaintiff's entitlement to a jury trial.   United States further avers that Plaintiff is not entitled to any relief in this action, including but not limited to the specifically enumerated relief sought.

**AFFIRMATIVE DEFENSES**

Having responded fully to the allegations contained in the Complaint, the United States asserts the following affirmative defenses:

1.  Plaintiff fails to state a claim upon which relief can be granted.

2.  The injuries and harm alleged by Plaintiff, if any, were not proximately caused by the negligent or wrongful acts of an agent or employee of the United States working within the scope of his employment.

3.  The injuries and harm alleged by Plaintiff, if any, were caused by acts or omissions of third parties, none of whom are agents or employees of the United States working within the scope of their employment.

4.  United States violated no legal duty which it owed to Plaintiff.

000042

5. Plaintiff's recovery is barred or limited by the provisions of Florida's law on comparative negligence.

6. The facts alleged were not foreseeable; and the United States exercised due care in all actions taken.

7. Plaintiff failed to mitigate her damages.

8. United States is entitled to offset in an amount equal to all payments for Plaintiff's injuries by any party or non-party of this litigation, or by any collateral and third-party sources by settlement or judgment, or through any agreement entered into by Plaintiff.

9. Plaintiff is not entitled to punitive damages against United States.

10. Plaintiff is not entitled to prejudgment interest against United States.

11. Plaintiff is not entitled to an award of costs against United States.

12. Pursuant to 28 U.S.C. § 2402, Plaintiff is not entitled to a jury trial.

13. Pursuant to 28 U.S.C. § 2678, Plaintiff is not entitled to a separate award of attorney's fees. Thus, Plaintiff's entitlement to attorney fees is limited by statute.

14. Any state or federal common or statutory law that limits the liability of a private individual, or the damages awarded, under similar circumstances to those alleged in the Complaint, shall limit or preclude Plaintiff's recovery against United States.

000043

15.   The Discretionary Function Exception to the FTCA bars liability against the United States.

16.   United States hereby specifically preserves any and all other defenses, not currently known, which it has or through discovery learns may be applicable.

FURTHERMORE, any allegation of the Complaint that is not specifically admitted above is expressly denied and United States reserves the right to prepare and present additional and alternative defenses and to supplement or amend this Answer.

WHEREFORE, having fully answered Plaintiff's Complaint, United States requests that this Complaint be dismissed with prejudice and that it be allowed to go hence with its reasonable costs and other such relief as this Court deems necessary and proper.

Respectfully submitted,
LAWRENCE KEEFE
United States Attorney

*/s/ Winifred L. Acosta*
WINIFRED L. ACOSTA
Assistant United States Attorney
Florida Bar No. 0076333
111 North Adams Street, 4th Floor
Tallahassee, FL  32301
(850) 942-8430
winifred.acosta@usdoj.gov
Attorney for United States of America

000044

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing Answer was sent electronically via CM/ECF to Counsel for Plaintiff, on this 01st day of November, 2019.

*<u>/s/ Winifred L. Acosta</u>*
WINIFRED L. ACOSTA
Assistant U. S. Attorney

000045

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**CHARNESHA ALEXANDER,**

    **Plaintiff,**

**v.**                              **Case No. 4:19cv138-MW/CAS**

**UNITED STATES OF AMERICA**
**and PAUL ROLSTON,**

    **Defendants.**
_____/

## ANSWER, DEFENSES AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S AMENDED COMPLAINT FOR DAMAGES

Defendant, PAUL ROLSTON (ROLSTON), by and through his undersigned attorneys, hereby answers the similarly numbered paragraphs of Plaintiff's Amended Complaint for Damages as follows:

### Jurisdiction

1.    Admitted for jurisdictional purposes only.

2.    The Exhibit 1 attached to Plaintiff's Amended Complaint for Damages speaks for itself. Otherwise denied.

3.    Denied.

4.    Denied.

## **Parties**

5.   Admitted that Plaintiff was a federal prisoner at FCI. Otherwise, denied.

6.   Admitted.

7.   Admitted.

## **Common Allegations of Fact**

8.   Admitted that Plaintiff was a federal prisoner at FCI. Otherwise without knowledge.

9.   Denied.

10.   Admitted that ROLSTON was a Physician Assistant at FCI and that included performing medical examination of inmates including Plaintiff. Otherwise, denied.

11.   Denied.

12.   Denied.

13.   Denied.

14.   Denied.

15.   Denied.

16.   Denied.

17.   Denied.

18.   Without knowledge regarding Plaintiff's comments. Otherwise, denied.

19.   Denied.

2

20.   Denied.

21.   Denied.

22.   Denied.

23.   Denied.

24.   Without knowledge. Otherwise, denied.

25.   Without knowledge. Otherwise, denied.

26.   Without knowledge regarding Plaintiff's comments. Otherwise, denied.

27.   Without knowledge. Otherwise, denied.

28.   Without knowledge. Otherwise, denied.

29.   Without knowledge. Otherwise, denied.

30.   Denied.

31.   Denied.

32.   Without knowledge. Otherwise, denied.

33.   Without knowledge. Otherwise, denied.

34.   Without knowledge. Otherwise, denied.

35.   Without knowledge. Otherwise, denied.

36.   Without knowledge. Otherwise, denied.

37.   Without knowledge. Otherwise, denied.

38.   Without knowledge. Otherwise, denied.

39.   Without knowledge. Otherwise, denied.

000048

40.    Without knowledge. Otherwise, denied.

41.    Denied.

42.    Denied.

43.    Denied.

44.    Denied.

45.    Without knowledge. Otherwise, denied.

46.    Without knowledge. Otherwise, denied.

47.    Denied.

48.    Denied.

49.    Denied.

50.    Denied that there were any wrongful acts. Admitted that ROLSTON was a Physician Assistant at FCI and that included performing medical examination of inmates including Plaintiff. Otherwise, denied.

51.    Denied.

52.    Denied.

53.    Denied.

54.    Denied.

## Causes of Action

### I.    Cruel and Unusual Punishment (*Bivens*) Rolston

55.    Denied.

000049

56.    Denied.

57.    Denied.

58.    Denied.

59.    Denied.

60.    Denied.

The unnumbered paragraph below paragraph 60 is Plaintiff's prayer for relief to Count I against Defendant, ROLSTON.  ROLSTON denies that Plaintiff is entitled to any relief against him.

## II.    Federal Tort Claims Act Claim (Negligence) as to the United States

61.    This paragraph applies to a claim against the United States of America (USA). Accordingly, ROLSTON does not respond to this paragraph, except to deny allegations in paragraph 29(a) through (e) that alleged improper conduct and/or attempt to disparage ROLSTON's background, character, and experience.

62.    This paragraph applies to a claim against the USA. Accordingly, ROLSTON does not respond to this paragraph.

63.    This paragraph applies to a claim against the USA. Accordingly, ROLSTON does not respond to this paragraph.

The unnumbered paragraph below paragraph 63 is Plaintiff's prayer for relief against USA.  Accordingly, ROLSTON does not respond to it.

000050

### III.    Federal Tort Claims Act (Battery) as to Defendant United States

64.    This paragraph applies to a claim against the USA. Accordingly, ROLSTON does not respond to this paragraph, except to deny any allegation that alleges that ROLSTON engaged in improper conduct.

65.    This paragraph applies to a claim against the USA. Accordingly, ROLSTON does not respond to this paragraph, except to deny any allegation that alleges that ROLSTON engaged in improper conduct.

66.    This paragraph applies to a claim against the USA. Accordingly, ROLSTON does not respond to this paragraph, except to deny any allegation that alleges that ROLSTON engaged in improper conduct.

67.    This paragraph applies to a claim against the USA. Accordingly, ROLSTON does not respond to this paragraph, except to deny any allegation that alleges that ROLSTON engaged in improper conduct.

The unnumbered paragraph below paragraph 67 is Plaintiff's prayer for relief against USA.  Accordingly, ROLSTON does not respond to it.

### **GENERAL DENIAL**

All allegations not expressly admitted by Defendant, ROLSTON, are hereby specifically denied.

000051

## PRAYER FOR RELIEF

Denied that Plaintiff is entitled to any relief whatsoever requested in her "Prayer for Relief" including the paragraphs (A) through (F). Admitted that Plaintiff requests a trial by jury on all issues so triable, and Defendant, ROLSTON, also request a trial by jury on any issue that is entitled to a jury trial.

## DEFENSES AND AFFIRMATIVE DEFENSES

1.     Plaintiff's Complaint fails to state a cause of action for which relief can be granted, or alternatively, Plaintiff cannot establish the essential elements of the causes of actions asserted.

2.     Defendant, ROLSTON, was acting in the capacity of his employment and did not violate any clearly established laws or rights in carrying out his duties. Moreover, ROLSTON and is entitled to the protection of qualified immunity.

3.     Defendant, ROLSTON, is immune from any and all claims based upon *Bivens v. Six Unknown Identified Agents*, 403 U.S. 388 (1971), in accordance with the doctrine of qualified immunity. The doctrine of qualified immunity applies to the facts alleged in this case, and is a complete bar to Plaintiff's constitutional allegations against ROLSTON. Any and all action of Defendant, ROLSTON, was in the course and scope of his employment, were taken in good faith and were not contrary to obligations created by clearly established law. Thus, because ROLSTON

000052

did not violate any clearly established statutory or constitutional right of Plaintiff, he is entitled to qualified immunity.

4.      Defendant, ROLSTON, acted in good faith at all times material, and at all times as a physician assistant provided appropriate and reasonable medical care and treatment.

5.      Any and all actions of Defendant, ROLSTON, were objectively and subjectively reasonable given the totality of circumstances and therefore comport with the Eighth Amendment to the United States Constitution.

6.      Plaintiff failed to meet the conditions precedent to bringing this action and failed to exhaust administrative remedies. Plaintiff has failed to exhaust her available administrative remedies pursuant to 42 U.S.C. §1997e, to which she was subject by virtue of her status as a prisoner incarcerated in prison at the time that she brought this action for alleged violation of constitutional rights.

7.      Plaintiff is barred under 42 U.S.C. § 1997e(a) from raising any claims that were not administratively exhausted in the timeframe required by this statute.

8.      Plaintiff's claims may be barred by the Prison Litigation Reform Act.

9.      All or part of the claims asserted against the Defendant are barred by the applicable statute of limitations

10.      Plaintiff's claims are barred by the doctrines of estoppel, judicial estoppels, and waiver and unclean hands.

000053

11.     To the extent that Plaintiff is entitled to an award of damages (which the Defendant expressly denies) Plaintiff has failed to mitigate her damages.

12.     Defendant is entitled to a set off for any benefits paid or by any collateral sources.

13.     Plaintiff's alleged injury or harm, if any, was not proximity caused by any wrongful act of Defendant ROLSTON, and no legal duty owed to Plaintiff was violated by Defendant ROLSTON.   Plaintiff's own conduct, including her comparative negligence, limits or bars Plaintiff's claims in this matter.

14.     Defendant reserves the right to assert further affirmative defenses if and when they become evident during the course of discovery.

WHEREFORE, Defendant, PAUL ROLSTON, requests a jury trial and hereby demands judgment in his favor, and against Plaintiff and for the Court to award costs, fees, and any other and further relief it deems just and proper.

## **JURY DEMAND**

Defendant, PAUL ROLSTON, admits that Plaintiff has demanded trial by jury and similarly demands trial by jury himself.

000054

Dated this 5th day of November 2019.

HENRY BUCHANAN, P.A.

_s/ J. Steven Carter_
J. STEVEN CARTER
Florida Bar No. 896152
scarter@henryblaw.com
MIRIAM R. COLES
Florida Bar No. 58402
mcoles@henryblaw.com
Post Office Drawer 14079
Tallahassee, Florida 32317-4079
(850) 222-2920: Telephone
(850) 224-0034: Facsimile
_Counsel for Defendant_

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been electronically filed via the CM/ECF, which automatically provides electronic documentation/notification of this filing to all attorneys of record, on this the 5th day of November 2019.

_s/J. Steven Carter_
Attorney

000055

U.S. DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS
TALLAHASSEE, FLORIDA

## A F F I D A V I T

I, Paul Rolston, Mid-Level Practitioner at the Federal Correctional Institution in Tallahassee, Florida, do hereby make this statement freely without any promises or assurances:

1. I understand this is an official investigation and I am required to cooperate fully by providing all pertinent information. I understand that I have a duty to reply to questions in this investigation, and the agency may take disciplinary action, including dismissal, if I refuse to answer or fail to reply fully and truthfully to each question.

2. I have not taken any medication nor have I consumed any alcoholic beverages or any illegal drugs prior to being interviewed that would interfere with my ability to answer questions in this investigation.

3. I do not have any recording devices on my person or in my effects and I understand that this interview is not being recorded by the investigator.

4. I am aware as a bargaining staff member, I am afforded representation from the union. Union President Mr. Coleman will serve as your representative.

5. I do not specifically remember the encounter with inmate Alexander.

6. I did not rub her clitoris with lubricant.

7. I did not rub her inside her vagina, I did not rub her clitoris again.

8. I do not specifically remember conducted a pap smear on inmate Alexander.

9. I do not specifically remember conducting a pap smear on this inmate. I would never rub the inside of an inmate's vagina. Absolutely not.

*Sensitive But Unclassified*

Date:     December 6, 2018                          Page  1  of  2

10.   I do not remember spreading this inmates butt cheeks

11.   I have no specific memory of asking this inmate about any hemorrhoid medication

12.   I have no specific memory of asking this inmate about any pregnancies, but I probably did.

13.   I have no specific memory if I asked her if she wanted a breast exam.

14.   I remember a patient crying, but I have no recollection if this was the inmate.

15.   I do not recall this inmate crying and I do not recall trying to fix her collar

16.   I understand I am not to discuss anything about this interview or any other information concerning this case, without approval of the Special Investigative Agent.

//////////////////////////////////////////// END OF STATEMENT ////////////////////////////////////////////////////////

*Sensitive But Unclassified*

Date:      December 6, 2018                    Page  2  of  2

DISC-00000558

# Oath

*I declare under the penalty of perjury that the foregoing statement consisting of 2 pages is true and accurate to the best of my knowledge and belief.*

Paul Rolston, Mid-Level Practitioner

*Subscribed and sworn to before me this 6th day of December, 2018*

*Authorized by 5 USC 303
to Administer Oaths*

Steven Rivera
Acting Special Investigative Agent
FCI/FDC Tallahassee, Florida

*Sensitive But Unclassified*

DISC-00000559

BP-A0194
APR 15
U.S. DEPARTMENT OF JUSTICE

**WARNING AND ASSURANCE TO EMPLOYEE**
**REQUIRED TO PROVIDE INFORMATION**

FEDERAL BUREAU OF PRISONS

This is an official administrative inquiry regarding misconduct or improper performance of official duties.

This inquiry pertains to: Allegation of Sexual Abuse of an inmate.

The purpose of this interview is to obtain information which will assist in the determination of whether administrative action is warranted.

You are going to be asked a number of specific questions regarding the performance of your official duties.

You have a duty to reply to these questions and agency disciplinary action, including dismissal, may be undertaken if you refuse or fail to reply fully and truthfully.

Neither your answers nor any information or evidence gained by reason of your answers can be used against you in any criminal proceeding, except that if you knowingly and willfully provide false statements or information in your answers, you may be criminally prosecuted for that action.  The answers you furnish and any information or evidence resulting therefrom may be used in the course of agency disciplinary proceedings which could result in disciplinary action, including dismissal.

If you are a member of the bargaining unit and you believe your rights are being threatened, you may request the presence of a representative.  If you desire a representative, no further questioning will take place until your representative is present.  However, if your representative is not available within a reasonable period of time, questioning may proceed without a representative being present.

### ACKNOWLEDGMENT

I have read and understand my rights and obligations set forth above:

| Employee Signature | Date 12/06/18 |
|---|---|
| Signature of Bureau of Prisons Official Conducting inquiry | Date 12/06/18 |

PDF                    Prescribed by P1210      This form replaces BP-A194 dated JUN 10

U.S. DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS
TALLAHASSEE, FLORIDA

AFFIDAVIT

I, Letitia, Davis, Medical Assistant, at the Federal Correctional Institution in Tallahassee, Florida, do hereby make this statement freely without any promises or assurances:

1.  I understand this is an official investigation and I am required to cooperate fully by providing all pertinent information.  I understand that I have a duty to reply to questions in this investigation, and the agency may take disciplinary action, including dismissal, if I refuse to answer or fail to reply fully and truthfully to each question. _LD_

2.  I have not taken any medication nor have I consumed any alcoholic beverages or any illegal drugs prior to being interviewed that would interfere with my ability to answer questions in this investigation. _LD_

3.  I do not have any recording devices on my person or in my effects and I understand that this interview is not being recorded by the investigator. _LD_

4.  As an outside contractor I am aware, I am not afforded representation from the union. _LD_

5.  I remember being the chaperone with P.A. Rolston on September 27, 2016, we saw inmate Alexander in the Special housing Unit (SHU). Rolston did use a lubricant, but he did not do anything inappropriate. Rolston does the PAP smears all the same, as he begins the examination he explains what he is doing and why. _LD_

6.  I was on the side and she was on the table with a drape covering her, so I was not able to see specifically what was going on. _LD_

7.  I heard Rolston ask her if she felt pain in her right and left ovaries, he asked her if she felt any pain or pressure in her bladder when he touched it. _LD_

*Sensitive But Unclassified*

Date: _December 27, 2018_                          Page _1_ of _3_

9.  Rolston is the only person I ever seen do a PAP smear like that. In my experience I never seen or been a subject of that type of PAP smear examination before. LD

10. I have been a chaperone for others medical professionals here, and Rolston is the only one who does it that way. LD

11. Rolston checked her anus, but I do not recall what he was saying, Rolston normally checks the inmate's anuses. This in normal Bureau of Prison screening. This screening is done initially during the Admission and Orientation (A&O). Rolston normally does this type of screening for everyone all the time. LD

12. Rolston conducts PAP smears and anal examinations when they are not necessary. Rolston has conducted PAP smears on inmates who do not want them, and he convince's them to do it. LD

13. Rolston has conducted PAP smears on inmates who are menstruating and that is not normal. LD

14. Alexander did not tell me that Rolston "Fucked her with his fingers." LD

15. I did not tell Alexander that I was sorry I was doing her paperwork, we did not have that conversation. LD

16. I do not recall Rolston talking to inmate Alexander about a breast exam or how many pregnancies she had. LD

17. I remember inmate Alexander crying. Rolston asked her what was wrong and she just shook her head, she did not respond to him LD

18. Rolston did try and fix her collar and she did snatch away from him. LD

19. Rolston did say it seems like she was crying from being hurt and not pain. Alexander did not respond to him. LD

*Sensitive But Unclassified*

*Date:*  *December 27, 2018*          *Page* **2** *of* **3**

20.   The officer then brought her back to her cell. LD

21.   Fifty percent of the PAP smears that I was a chaperone with Rolston were
      unnecessary LD

22.   I have reported any conduct which I felt was not appropriate. LD

23.   I have fully cooperated with this investigation and I do not know of, or have any
      additional information that I have not already mentioned concerning this case. I
      understand I am not to discuss anything about this interview or any other
      information concerning this case, without approval of the Special Investigative
      Agent. LD

.

//////////////////////////////////////// END OF STATEMENT ////////////////////////////////////////////////////////////

*Sensitive But Unclassified*

*Date:*      *December 27, 2018*                    *Page*   3   *of*   3

# Oath

*I declare under the penalty of perjury that the foregoing statement consisting of 2 pages is true and accurate to the best of my knowledge and belief.*

Letitia, Davis, Medical Assistant

*Subscribed and sworn to before me this 27th day of December, 2018*

*Authorized by 5 USC 303*
*to Administer Oaths*

Steven Rivera
Acting Special Investigative Agent
FCI/FDC Tallahassee, Florida

*Sensitive But Unclassified*

DISC-00000564

BP-A0194                   **WARNING AND ASSURANCE TO EMPLOYEE**
APR 15                     **REQUIRED TO PROVIDE INFORMATION**
**U.S. DEPARTMENT OF JUSTICE**                        **FEDERAL BUREAU OF PRISONS**

This is an official administrative inquiry regarding misconduct or improper performance of official duties.

> This inquiry pertains to: _Inattention to Duty._
>
>
> _____ .

The purpose of this interview is to obtain information which will assist in the determination of whether administrative action is warranted.

You are going to be asked a number of specific questions regarding the performance of your official duties.

You have a duty to reply to these questions and agency disciplinary action, including dismissal, may be undertaken if you refuse or fail to reply fully and truthfully.

Neither your answers nor any information or evidence gained by reason of your answers can be used against you in any criminal proceeding, except that if you knowingly and willfully provide false statements or information in your answers, you may be criminally prosecuted for that action.  The answers you furnish and any information or evidence resulting therefrom may be used in the course of agency disciplinary proceedings which could result in disciplinary action, including dismissal.

If you are a member of the bargaining unit and you believe your rights are being threatened, you may request the presence of a representative.  If you desire a representative, no further questioning will take place until your representative is present.  However, if your representative is not available within a reasonable period of time, questioning may proceed without a representative being present.


### ACKNOWLEDGMENT


I have read and understand my rights and obligations set forth above:

| Employee Signature | Date |
|---|---|
| | 12/27/2018 |
| Signature of Bureau of Prisons Official Conducting inquiry | Date |
| | 12/27/18 |


PDF                          Prescribed by P1210        This form replaces BP-A194 dated JUN 10

DISC-00000565

U.S. DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS
TALLAHASSEE, FLORIDA

## A F F I D A V I T

I, Letitia, Davis, Medical Assistant, at the Federal Correctional Institution in Tallahassee, Florida, do hereby make this statement freely without any promises or assurances:

1.  I understand this is an official investigation and I am required to cooperate fully by providing all pertinent information.  I understand that I have a duty to reply to questions in this investigation, and the agency may take disciplinary action, including dismissal, if I refuse to answer or fail to reply fully and truthfully to each question. *LD*

2.  I have not taken any medication nor have I consumed any alcoholic beverages or any illegal drugs prior to being interviewed that would interfere with my ability to answer questions in this investigation. *LD*

3.  I do not have any recording devices on my person or in my effects and I understand that this interview is not being recorded by the investigator. *LD*

4.  As an outside contractor I am aware, I am not afforded representation from the union. *LD*

5.  Unnecessary PAP smears to me is when an inmate complains of a head ache and he conducts a PAP smear, and he does this all the time. *LD*

6.  I have never seen any activity conducted by P.A. Rolston that was unnecessary, other than unnecessary PAP smears. *LD*

7.  I have never seen P.A. Rolston conduct any activity that was sexual in nature. *LD*

8.  I do not have any OGBYN experience. *LD*

*Sensitive But Unclassified*

Date:   _December 28, 2018_              Page  1  of  2

9.     There is an OBGYN that comes in to see the inmates monthly or every two months. *LD*

10.    As the chaperone my role is to verify the inmates information, this is done while the inmate is undressing. I also hand him equipment when he needs *LD*

11.    My main purpose is to watch everything he medical professionals do. I even chaperone with female medical staff. *LP*

12.    The SHU is small, and the bed is along the wall. The desk is right next to the bed, so I had to stand towards her head and she had a drape covering her from her chest down. Therefore, I was not able to see exactly what he was doing. *LD*

13.    I have fully cooperated with this investigation and I do not know of, or have any additional information that I have not already mentioned concerning this case. I understand I am not to discuss anything about this interview or any other information concerning this case, without approval of the Special Investigative Agent. *LD*

///////////////////////////////////////// END OF STATEMENT /////////////////////////////////////////

*Sensitive But Unclassified*

DISC-00000567

# Oath

*I declare under the penalty of perjury that the foregoing statement consisting of 2 pages is true and accurate to the best of my knowledge and belief.*

Letitia, Davis, Medical Assistant

*Subscribed and sworn to before me this 28th day of December, 2018*

*Authorized by 5 USC 303*
*to Administer Oaths*

Steven Rivera
Acting Special Investigative Agent
FCI/FDC Tallahassee, Florida

*Sensitive But Unclassified*

BP-A0194      **WARNING AND ASSURANCE TO EMPLOYEE**
APR 15         **REQUIRED TO PROVIDE INFORMATION**
**U.S. DEPARTMENT OF JUSTICE**                          **FEDERAL BUREAU OF PRISONS**

This is an official administrative inquiry regarding misconduct or improper performance of official duties.

This inquiry pertains to: Inattention to Duty.

The purpose of this interview is to obtain information which will assist in the determination of whether administrative action is warranted.

You are going to be asked a number of specific questions regarding the performance of your official duties.

You have a duty to reply to these questions and agency disciplinary action, including dismissal, may be undertaken if you refuse or fail to reply fully and truthfully.

Neither your answers nor any information or evidence gained by reason of your answers can be used against you in any criminal proceeding, except that if you knowingly and willfully provide false statements or information in your answers, you may be criminally prosecuted for that action.  The answers you furnish and any information or evidence resulting therefrom may be used in the course of agency disciplinary proceedings which could result in disciplinary action, including dismissal.

If you are a member of the bargaining unit and you believe your rights are being threatened, you may request the presence of a representative.  If you desire a representative, no further questioning will take place until your representative is present.  However, if your representative is not available within a reasonable period of time, questioning may proceed without a representative being present.

**ACKNOWLEDGMENT**

I have read and understand my rights and obligations set forth above:

| Employee Signature | Date 12/28/2018 |
|---|---|
| Signature of Bureau of Prisons Official Conducting inquiry | Date 12/28/19 |

PDF                          Prescribed by P1210        This form replaces BP-A194 dated JUN 10

DISC-00000569

# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION

MICHELLE MORTON,

      Plaintiff,

v.                                CASE NO. 4:18cv177-RH/CAS

UNITED STATES OF AMERICA
and PAUL ROLSTON,

      Defendants.

_____/

CHARNESHA ALEXANDER,

      Plaintiff,

v.                                CASE NO. 4:19cv138-RH-MAF

UNITED STATES OF AMERICA
and PAUL ROLSTON,

      Defendants.

_____/

## ORDER CONSOLIDATING CASES, DENYING THE EXHAUSTION MOTION, AND REVISING THE SCHEDULE

This order confirms positions taken and rulings made on the record of a hearing on July 30, 2020.

The parties agreed that all discovery in both of these cases has been completed.

The defendant United States said that the plaintiff Charnesha Alexander's participation in the Prison Rape Elimination Act investigation was sufficient to satisfy the requirement to exhaust available administrative remedies. The United States confirmed its position that Ms. Alexander thus was not obligated to pursue remedies under the four-part Bureau of Prisons Administrative Remedy Program prior to filing this action. The defendant Paul Rolston acknowledged that Ms. Alexander was not obligated to invoke the Administrative Remedy Program if the United States deemed PREA participation sufficient.

For the reasons set out on the record,

IT IS ORDERED:

1. The motion to consolidate, ECF No. 77 in Case No. 4:18cv177, is granted in part. These cases are consolidated for case-management purposes and will be maintained on a common docket under Consolidated Case No. 4:18cv177. Every filing—other than a complaint (or counterclaim, crossclaim, or third-party complaint), answer, judgment, notice of appeal, or motion to amend or amended version of any of them—that is applicable to either case must be filed in Consolidated Case No. 4:18cv177 and must not be filed separately in Case No. 4:19cv138. Every filing—other than a complaint (or counterclaim, crossclaim, or

000070

third-party complaint), answer, judgment, notice of appeal, or amended version of any of them—that is filed in Case No. 4:18cv177 will be deemed filed in both cases.

2. The jury trial is set for the two-week trial period that begins on December 7, 2020.

3. The case remains set for a status conference by telephone on September 15. *See* ECF No. 76 in Case No. 4:18cv177.

4. By September 8, the attorneys must confer on the presentation of "testimony in open court by contemporaneous transmission from a different location" as allowed by Federal Rule of Civil Procedure 43 and on other steps to conduct the trial safely during the covid-19 pandemic. Agreed or unilateral suggestions may be filed before or presented orally at the September 15 status conference.

5. The deadline is October 12 for an attorney conference to address pretrial matters, stipulate to as many facts and agree on as many issues as possible, and prepare a pretrial stipulation. The plaintiffs' attorney must initiate arrangements for the conference, but all attorneys are responsible for ensuring that the conference occurs and the requirements are met. The pretrial stipulation and related filings will supersede those previously filed in Case No. 4:18cv177.

6. At or before the attorney conference required by paragraph 5, each party must make the disclosures required by Federal Rule of Civil Procedure 26(a)(3). As required by the rule, each party must separately identify witnesses and exhibits the party expects to offer and those the party may offer if the need arises, and each party must designate deposition testimony the party expects to offer. The deadline for objections under Rule 26(a)(3) is seven days later.

7. At or before the attorney conference, each party must provide an attorney for each other party a copy of every exhibit that will or may be offered in evidence, marked with a readily identifiable exhibit number. It is not sufficient that a document has been produced during discovery or is on an exhibit list; each exhibit must be provided with a readily identifiable exhibit number.

8.   The parties must file a pretrial stipulation by October 26. The pretrial stipulation must include:

(a) The basis of federal jurisdiction;

(b) A brief general statement of each party's case;

(c) Each party's witness list, separately identifying those the party intends to call and those the party may call if the need arises, and identifying those who will give expert testimony;

(d) Each party's exhibit list, separately identifying those the party intends to introduce and those the party may introduce if the need arises.

(e) All stipulations of fact and agreements on issues;

(f) A concise statement of those factual issues that remain to be litigated;

(g) A concise statement of legal issues that remain for determination by the court;

(h) A concise statement of any disagreement on admissibility of evidence or application of the Federal Rule of Civil Procedure or Evidence;

(i) A list of all motions that remain pending;

(j) A statement of whether this is a jury or nonjury case and each side's estimate of the length of trial.

9.    Witness and exhibit lists must include rebuttal witnesses and exhibits as well as those that may be offered in a party's case in chief. A witness or exhibit not timely and properly listed will be excluded unless (a) the late discovery or disclosure of the witness or exhibit did not result from lack of diligence, (b) the full substance and import of the evidence is disclosed to all other parties immediately upon discovery of the omission, and (c) the court determines that justice requires admission of the evidence. Evidence not timely and properly disclosed is almost always excluded.

10.  Each party must file a trial brief by October 26.

11.  Each party must file proposed jury instructions by October 26. Eleventh Circuit standard instructions should be cited by number without setting out the full

text. Preliminary and concluding instructions unrelated to the issues in this case
need not be requested.

12. Each party must file by October 26 a motion for writs of habeas corpus
ad testificandum for prisoners the party wishes to call in person at the trial. The
motion must include a brief description of the witness's anticipated testimony.

13. By a separate notice, the clerk must set a pretrial conference by
telephone for the first available date on or after November 2. Each party's lead
attorney and each other attorney who will have a significant role in conducting the
trial must attend. All motions that remain pending at the time of the conference
may be heard or ruled on.

14. Mr. Rolston's summary-judgment motion, ECF No. 86 in Case No.
4:19cv138, which asserts failure to exhaust administrative remedies, is denied.

SO ORDERED on August 3, 2020.

s/Robert L. Hinkle_____
United States District Judge

# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION

CHARNESHA ALEXANDER,

      Plaintiff,

v.                        CASE NO. 4:19cv138-RH-MAF

UNITED STATES OF AMERICA
and PAUL ROLSTON,

      Defendants.

_____/

## PRETRIAL ORDER

This order confirms and adds to the rulings entered at the pretrial conference on May 20, 2021 and the status conference on May 28, 2021.

IT IS ORDERED:

1. The trial is rescheduled for the trial period that begins on September 13, 2021. The plaintiff will present her case first, followed by the defendant Paul Rolston, followed by the defendant United States.

2. Unless otherwise ordered before the striking of the jury begins, the plaintiff and Mr. Rolston will each have three peremptory challenges and the government none. The government has elected not to participate in jury selection.

3. By 7 days before trial, a party may file a proposal for voir dire questions by the court. At the trial, a party may orally request voir dire questions by the court. After the court's voir dire, a party may ask its own voir dire questions, but they must be reasonably calculated to develop information for use in exercising cause or peremptory challenges and must *not* include questions intended solely or primarily to establish a relationship with the jurors, condition the jurors, inform the jurors of the facts or issues in the case, elicit an agreement from the jurors on the facts or law or a possible verdict, or argue the case.

4. The deadline for Federal Rule of Civil Procedure 26(a)(3) disclosures related to depositions that will be used as evidence at trial has passed. Any failure to disclose must be cured by June 28.

5. An exhibit offered at the trial (a) may be numbered in accordance with the exhibit list submitted as part of the pretrial stipulation, or (b) may be numbered in accordance with a more recent exhibit list filed with the consent of all parties. The pages of an exhibit must be numbered, or other means must be readily available for identifying each page. An exhibit must not be renumbered except as authorized by this paragraph.

6. Every exhibit (or an exact copy), marked with a readily identifiable exhibit number, *must* be provided to the attorney for each other party by June 28 and must be reviewed by an attorney for each other party by July 19. A party may

file a notice of additional objections to exhibits—setting out objections on grounds that first became apparent from the exchange and review of exhibits required by this paragraph—by July 26. An objection not noted in the pretrial stipulation or in a timely notice of additional objections will be deemed waived.

7. Materials that a party proposes to show the jury in opening statement must be disclosed in advance to an attorney for each other party.

8. A further hearing to address evidentiary issues or other pretrial matters will be conducted by telephone at the request of either side. A request may be made orally to the courtroom deputy clerk.

9. The attorneys and members of their staffs may bring laptops and electronic tablets into the courtroom. They may bring cellular telephones or other hand-held electronic devices into the courtroom but must have them off or in silent mode, must never use them while court is in session, and must never let the jury see them or become aware that they are in the courtroom.

10. All rulings in Consolidated Case No. 4:18cv177 while this case was consolidated with that one for case management purposes remain applicable in this case unless the context clearly indicates otherwise.

11. The government's motion in limine, ECF No. 104, is granted in part and denied in part, as follows:

(a)  Unless authorized on a request made outside the jury's hearing, these must not be mentioned in the jury's hearing or suggested to the jury in any way: (1) the defendant Paul Rolston's reputation among inmates and comments about Mr. Rolston (but this does not preclude evidence in the judge-only part of the trial, outside the jury's hearing, about statements made by a government employee at any time or statements made to a government employee before the last alleged assault on the plaintiff); (2) the history of assaults or other adverse events at FCI-Tallahassee and investigations of any such events, but this does not preclude evidence of other alleged assaults by Mr. Rolston; (3) proceedings against or arising from conduct of FCI-Tallahassee personnel other than Mr. Rolston; (8) settlements with other alleged victims; (9) restitution owed by the plaintiff Charnesha Alexander.

(b)  Evidence of (5) alleged assaults by Mr. Rolston and (6) the conduct of unnecessary PAP smears by Mr. Rolston, whether occurring before or after the alleged assault on Ms. Alexander, is not excluded. Evidence about (4) the investigation of Mr. Rolston's conduct will be admitted only to the extent it bears on what happened—not for the purpose of showing that the government was negligent or can otherwise be held liable based on the failure to conduct an adequate investigation or failure to impose sufficient discipline on Mr. Rolston. Ms. Alexander must not suggest the improper purpose to the jury.

(c)  Witnesses (7) Qruintrell Cook and Elise Wiley are excluded.

(d)  The government must provide copies of alleged victims' medical records to an attorney for Ms. Alexander promptly upon receipt by an attorney for the government. The records must not be used or disclosed except as needed to conduct this litigation.

12. The plaintiff's motion in limine, ECF No. 107, is granted in part and denied in part, as follows:

(a) Unless authorized on a request made outside the jury's hearing, these must not be mentioned in the jury's hearing or suggested to the jury in any way: (1) Ms. Alexander's convictions, arrests, disciplinary history, or other bad acts, except as proper under Federal Rule of Evidence 609, but this does not preclude evidence that Ms. Alexander was in the special housing unit and a brief description of why; (4) lay opinions of proper medical care, but this does not preclude Ms. Alexander or other alleged victims from testifying about their own treatment and their own perception of whether their own treatment was proper; (5) information about Mr. Rolston's military service other than the branch, length of service, and, if he was trained in or provided medical services for women, the nature of the services.

(b) The motion is denied as to (2) alleged fabrication of the victims' testimony, (3) training within the Bureau of Prisons, and (5) Mr. Rolston's education and training, except as to details of his military service, as set out above.

13. Mr. Rolston's motion in limine, ECF No. 108, is granted in part and denied in part, as follows:

(a) Evidence related to (1) other alleged victims, (2) Mr. Rolston's reputation and comments about him, and (3) other events at FCI-Tallahassee is excluded to the extent set out above in the ruling on the government's motion.

(b) Unless authorized on a request made outside the jury's hearing, these must not be mentioned in the jury's hearing or suggested to the jury in any way: (4) service of process on Mr. Rolston and his alleged reaction to it; (5) Mr. Rolston's divorce proceedings; (7) the concept of, and professional standards for, trauma-informed care and the proper treatment of women who have suffered a prior sexual assault.

(c) Witnesses (6) Cook and Wiley are excluded as set out above. Witness Daphne Rodriguez is not excluded. Ms. Alexander has announced she does not intend to call Carmen McCune as a witness, so the motion to exclude her is granted by consent.

SO ORDERED on June 14, 2021.

s/Robert L. Hinkle
United States District Judge

# United States District Court
## CIVIL MINUTES - TRIAL

Case No.: <u>4:19cv138-RH</u>                              Date: <u>September 13-16, 2021</u>

CHARNESHA ALEXANDER v. UNITED STATES OF AMERICA and PAUL ROLSTON

PROCEEDINGS: Attorney Conference; Voir Dire; Jury Selection; Jury Trial; Verdict

**PRESENT:   ROBERT L. HINKLE, U.S. DISTRICT JUDGE**

<u>Cindy Markley</u>                    <u>Lisa Snyder</u>
Deputy Clerk                     Court Reporter

Attorneys for Plaintiff:                          Attorneys for Defendant USA:
James Cook                                        Peter Fisher
Richard Johnson                                   Marie Moyle

                                                  Attorneys for Defendant Rolston:
                                                  Steven Carter
                                                  Miriam Coles

☐   Case called and continued to _____.
☐   COURT TRIAL
☒   JURY TRIAL.   Jury impaneled and sworn in.   See separate minutes for jury selection.
☒   Jury retires to deliberate at <u>10:51 a.m.</u> on <u>9/16/21</u>.
☒   Jury returns at <u>12:51 p.m.</u> on <u>9/16/21</u>.
☒   JURY VERDICT.   See signed verdict.
        ☒ Jury polled          ☐ Polling waived          ☐ Mistrial declared
☐   FINDINGS BY COURT
☐   JUDGMENT BY COURT for   ☐ Plaintiff   ☐ Defendant    for $_____
☐   Findings, Conclusion of Law, Judgment to be prepared by   ☐ Plaintiff   ☐ Defendant
☐   Briefs to be filed   ☐ Plaintiff   ☐ Defendant   ☐ Reply
☐   Continued to _____ for ☐ setting trial   ☐ further trial

000081

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA

CIVIL MINUTES

JUDGE ROBERT L. HINKLE
Cindy Markley/Kimberly Westphal, Courtroom Deputy
Lisa Snyder, Court Reporter

Case:       4:19cv138-RH
Legend:     Plaintiff Charnesha Alexander – James Cook, Richard Johnson
            Defendant USA – Peter Fisher, Marie Moyle
            Defendant Paul Rolston – Steven Carter, Miriam Coles

**Jury Trial – Day 1**
**DATE: September 13, 2021**

| | |
|---|---|
| 8:17 | Court in session |
| | Rule invoked |
| | Attorney conference |
| 8:44 | Court in recess |
| | |
| 9:02 | Court in session |
| 9:12 | Jury pool sworn |
| | Voir dire began |
| 9:27 | Jurors 6 & 7 dismissed with the thanks of the Court |
| | Continued voir dire |
| 9:29 | Juror 10 dismissed with the thanks of the Court |
| | Continued voir dire |
| 9:30 | Juror 12 dismissed with the thanks of the Court |
| | Continued voir dire |
| 9:31 | Juror 15 dismissed with the thanks of the Court |
| | Continued voir dire |
| 10:21 | Court in recess |
| | |
| 10:25 | Court in session |
| | Bench conference for individual voir dire of jurors |
| 10:40 | Juror 5 dismissed with the thanks of the Court |
| | Continued individual voir dire |
| 11:10 | Juror 19 dismissed with the thanks of the Court |
| | Continued individual voir dire |
| 11:19 | Court in recess |
| | |
| 11:25 | Court in session |
| | Bench conference to select jury |
| 11:31 | Court in recess |
| | |
| 11:33 | Court in session |
| | Jury selected |
| | Remaining jurors dismissed with the thanks of the Court |
| 11:37 | Court in recess |

12:53   Court in session
12:54   Jury in
        Jury sworn in and addressed by the Court
1:05    Opening statement by Plaintiff (Cook)
1:24    Opening statement by Rolston Defense (Carter)
2:08    Plaintiff Witness:
                Charnesha Alexander – sworn, direct (Cook)
                    Plaintiff Exhibits 1 and 5.17 – marked, ID'd, admitted
2:40    Jury out
        Court addresses the attorneys
2:49    Court in recess

2:55    Court in session
        Jury in
2:59    Cross examination by Rolston Defense (Carter)
                    Plaintiff Exhibit 2.1 – marked, ID'd, admitted
                    Plaintiff Exhibit 5.17 – previously admitted
                    Rolston Exhibit 3.1 – marked, ID'd, admitted
                    Rolston Exhibit 7 – marked, ID'd
3:48    Cross examination by Government Defense (Moyle)
                    Government Exhibit 7.2 – marked, ID'd, admitted
3:53    Redirect by Plaintiff (Cook)
3:56    Plaintiff Witness:
                Patrice Jackson-Richardson – sworn, direct (Cook)
4:04    Cross examination by Rolston Defense (Coles)
4:07    Cross examination by Government Defense (Moyle)
                    Government Exhibit 39 – marked, ID'd, admitted
4:10    Redirect by Plaintiff (Cook)
                    Plaintiff Exhibit 82 – marked, ID'd, admitted
4:15    Plaintiff Witness:
                Ronald Proffitt – sworn, direct (Cook)
4:35    Cross examination by Rolston Defense (Coles)
                    Plaintiff Exhibit 5.17 – previously admitted
4:39    Redirect by Plaintiff (Cook)
4:40    Court addresses the jury
4:41    Jury out
        Court addresses the attorneys
4:53    Plaintiff Witness (outside of the jury):
                Steven Rivera – sworn, direct (Cook)
5:07    Cross examination by Government Defense (Fisher)
                Government Exhibit 109-6 – marked, ID'd
                Government Exhibits 109-5, 109-7, 109-8, 109-1 – marked, ID'd, admitted for the
                    bench trial (not for the jury)
5:20    Motion for mistrial made by Rolston Defense (Carter)
5:24    Court in recess until 9:00 a.m. on 9/14/2021

**Jury Trial – Day 2**
**DATE: September 14, 2021**

| | |
|---|---|
| 8:49 | Court in session |
| | Parties discuss witness testimony |
| 9:02 | Jury in |
| 9:03 | Plaintiff Witness: |
| |     Letitia Davis – sworn, direct (Cook) |
| |         Plaintiff Exhibit 5 – marked, ID'd, admitted |
| 9:17 | Cross examination by Rolston Defense (Carter) |
| 9:40 | Cross examination by Government Defense (Fisher) |
| 9:40 | Redirect (Cook) |
| 9:51 | Plaintiff Witness: |
| |     Ashley Nicole Barnett – sworn, direct (Johnson) |
| 10:14 | Cross examination by Rolston Defense (Carter) |
| 10:31 | Cross examination by Government Defense (Moyle) |
| 10:34 | Redirect (Johnson) |
| 10:35 | Jury out |
| | Court addresses the attorneys |
| 10:47 | Rolston Defense renews motion for mistrial (Carter) |
| 10:49 | Court in recess |
| | |
| 10:56 | Court in session |
| 10:57 | Jury in |
| 10:58 | Plaintiff Witness: |
| |     Connie Batchelor – sworn, direct (Johnson) |
| 11:05 | Cross examination by Rolston Defense (Coles) |
| 11:14 | Cross examination by Government Defense (Moyle) |
| 11:15 | Redirect (Johnson) |
| 11:22 | Plaintiff Witness: |
| |     Daphne Rodriguez – sworn, direct (Cook) |
| |         Plaintiff Exhibit 6.4 – marked, ID'd, admitted |
| 11:38 | Cross examination by Rolston Defense (Coles) |
| 11:51 | Cross examination by Government Defense (Fisher) |
| 11:53 | Redirect (Cook) |
| 11:58 | Jury out |
| 12:03 | Court in recess |
| | |
| 1:01 | Court in session |
| | Rolston Defense requests curative instruction (Carter) |
| 1:04 | Rolston Defense requests limited expert testimony (Coles) |
| 1:05 | Jury in |
| 1:06 | Plaintiff Witness: |
| |     Shondolyn Blevins – sworn, direct (Cook) |
| 1:38 | Cross examination by Rolston Defense (Coles) |
| |     Rolston Exhibit 98 – shown to witness |
| 1:58 | Bench conference |
| 2:00 | Cross examination by Government Defense (Fisher) |
| |     Government Exhibit 109-7 – marked, ID'd, admitted |
| 2:03 | Redirect (Cook) |
| 2:11 | Plaintiff Witness: |
| |     Joann Bellamy – sworn, direct (Johnson) |

2:17    Cross examination by Rolston Defense (Carter)
2:23    Cross examination by Government Defense (Moyle)
2:27    Plaintiff Witness:
        Beth Danielle Farber – sworn, direct (Johnson)
2:38    Cross examination by Rolston Defense (Carter)
        Rolston Exhibit 91 – shown to witness
2:47    Redirect (Johnson)
2:50    Jury out
2:56    Court in recess

3:07    Court in session
3:09    Jury in
        Plaintiff Witness:
        Elizabeth Tucker – sworn, direct (Cook)
3:21    Bench conference
3:23    Continued direct (Cook)
3:39    Cross examination by Rolston Defense (Coles)
4:09    Cross examination by Government Defense (Moyle)
4:10    Redirect (Cook)
        Plaintiff Exhibit 1 – previously admitted
4:19    Plaintiff rests
        Jury out
4:21    Plaintiff moves to admit Plaintiff Exhibits 5, 8, 9, 13, 25, 27, 35, 37, 48, 49, 50, 53, 55,
        58, 59, 60, 63, 65, 83, 84, 85, 86, 87, 88, 89; Government Exhibit 98; Rolston Exhibits
        31a, 32 (2014 Inmate Handbook only)
4:27    Jury dismissed for the day
4:33    Government Defense objects to offered exhibits (Fisher)
        Ruling by Court: Objection is sustained as to Plaintiff Exhibits 5, 8, 9, 83, 84, 85, 86, 87,
        88, 89.   Plaintiff Exhibits 13, 25, 27, 35, 37, 48, 49, 50, 53, 55, 58, 59, 60, 63, 65 are
        admitted for the bench trial (not for the jury).
4:57    Government Defense moves for judgment on Count 3 (Fisher)
5:02    Response by Plaintiff (Cook)
5:10    Ruling by Court: Government's motion is granted. There is no claim against the
        Government in Count 3.
5:11    Government Defense moves for judgment on Count 2 (Fisher)
5:33    Response by Plaintiff (Cook and Johnson)
5:57    Ruling by Court: Government's motion is granted. There are no claims against the United
        States.
6:00    Rolston Defense makes Rule 50 motion (Coles)
6:05    Response by Plaintiff (Cook)
6:09    Ruling by Court: The jury will get an instruction.
6:10    Court in recess


**Jury Trial – Day 3**
**DATE: September 15, 2021**

8:46    Court in session
        Parties discuss jury instructions
8:54    Court in recess

| | |
|---|---|
| 9:00 | Court in session |
| | Jury in |
| 9:02 | Defense Witness: |
| |     Paul Rolston – sworn, direct (Carter) |
| |         Rolston Exhibit 27 – marked, ID'd, admitted |
| |         Government Exhibit 35 – marked, ID'd, admitted |
| |         Rolston Exhibit 31b – marked, ID'd, admitted |
| |         Plaintiff Exhibit 6.4 – previously admitted |
| |         Plaintiff Exhibit 6.7 – marked, ID'd, admitted |
| |         Plaintiff Exhibit 6.9 – marked, ID'd, admitted |
| |         Plaintiff Exhibit 6.13 – marked, ID'd, admitted |
| |         Plaintiff Exhibit 6.14 – marked, ID'd, admitted |
| 10:33 | Jury out |
| | Court addresses the attorneys |
| 10:38 | Court in recess |
| | |
| 10:46 | Court in session |
| | Jury in |
| 10:47 | Continued direct (Carter) |
| |     Plaintiff Exhibit 2.1 – previously admitted |
| |     Plaintiff Exhibit 1 – previously admitted |
| |     Rolston Exhibit 3.1 – previously admitted |
| |     Plaintiff Exhibit 48 – marked, ID'd, admitted |
| |     Plaintiff Exhibit 53 – marked, ID'd, admitted |
| |     Plaintiff Exhibit 49 – marked, ID'd, admitted |
| |     Plaintiff Exhibit 55 – marked, ID'd, admitted |
| |     Plaintiff Exhibit 50 – marked, ID'd, admitted |
| |     Rolston Exhibit 9 – marked, ID'd, admitted |
| 12:34 | Jury out |
| 12:40 | Court in recess |
| | |
| 1:35 | Court in session |
| | Jury in |
| 1:36 | Cross examination (Johnson) |
| 1:39 | Bench conference |
| 1:42 | Continued cross examination (Johnson) |
| |     Plaintiff Exhibit 83.3 – marked, ID'd, admitted |
| 2:02 | Redirect (Carter) |
| 2:05 | Defense Witness: |
| |     Laura Preston – sworn, direct (Carter) |
| 2:10 | Cross examination (Cook) |
| 2:24 | Redirect (Carter) |
| 2:27 | Bench conference |
| 2:28 | Defense Witness: |
| |     Joann Holoka – sworn, direct (Carter) |
| 2:35 | Cross examination (Cook) |
| |     Plaintiff Exhibit 6.4 – previously admitted |
| |     Rolston Exhibit 31a – marked, ID'd, admitted |
| 2:55 | Redirect (Carter) |
| 2:57 | Defense Witness: |
| |     Samuel Wolf – sworn, direct (Coles) |
| |         Plaintiff Exhibit 1 – previously admitted |

3:10   Bench conference
3:11   Continued direct (Coles)
3:23   Cross examination (Cook)
3:25   Bench conference
3:26   Continued cross examination (Cook)
3:39   Redirect (Coles)
3:40   Defense Witness:
        Harold White – sworn, direct (Carter)
            Rolston Exhibit 27 – previously admitted
3:53   Cross examination (Cook)
4:02   Redirect (Carter)
4:03   Jury out
      Court addresses the attorneys
4:09   Court in recess

4:20   Court in session
      Court addresses the attorneys
4:22   Jury in
4:23   Defense Witness:
        Jalandrian Reed – sworn, direct (Carter)
4:34   Cross examination (Johnson)
4:39   Defense Witness:
        Dorinda Paynter – sworn, direct (Coles)
            Plaintiff Exhibit 6.4 – previously admitted
            Government Exhibit 109-7 – previously admitted
4:54   Defense rests
4:55   Plaintiff Rebuttal Witness:
        Charnesha Alexander – direct (Cook)
5:02   Plaintiff rests
5:03   Jury out
      Court addresses the attorneys
5:10   Defense requests curative instruction (Carter)
5:18   Court in recess


**Jury Trial – Day 4**
**DATE: September 16, 2021**

8:49   Court in session
      Plaintiff moves to withdraw Plaintiff Exhibit 83.3 (Cook)
      Ruling by Court: Plaintiff Exhibit 83.3 is withdrawn and is not in evidence.
      Parties review jury instructions and verdict form
8:55   Court in recess

9:00   Court in session
      Jury in
9:03   Closing argument by Plaintiff (Johnson)
9:40   Closing argument by Defendant (Coles)
10:24  Rebuttal closing argument by Plaintiff (Johnson)
10:34  Court instructs the jury
10:51  Jury retires to deliberate
      Court addresses the attorneys

10:55   Defense moves for mistrial (Carter)
         Response by Plaintiff (Johnson)
10:58   Ruling by Court
         Review of Exhibits
11:08   Court in recess

12:51   Court in session
         Jury in
12:53   Court publishes verdict:
              Question 1 – No
              Question 2 – No
              Question 3 – N/A
              Question 4 – N/A
              Question 5 – N/A
12:54   Jury polled
12:58   Jury dismissed with thanks of the Court
12:58   Ruling by Court: Judgment will be entered for the Defendant and for the United States of America.
12:59   Court adjourned

✎ AO 187 (Rev. 7/87) Exhibit and Witness List

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF FLORIDA

CHARNESHA ALEXANDER

**EXHIBIT LIST**

v.

Case Number:  4:19cv138-RH

UNITED STATES OF AMERICA et al.

| PRESIDING JUDGE | | PLAINTIFF ATTORNEYS | | | DEFENSE ATTORNEYS | |
|---|---|---|---|---|---|---|
| Robert L. Hinkle | | James Cook, Richard Johnson | | | Peter Fisher, Marie Moyle (USA)<br>Steven Carter, Miriam Coles (Rolston) | |
| HEARING DATE | | COURT REPORTER | | | COURTROOM DEPUTY | |
| September 13-16, 2021 | | Lisa Snyder | | | Cindy Markley/Kimberly Westphal | |
| PLTF NO. | DFT USA NO. | DFT ROLSTON NO. | ADMITTED | DESCRIPTION OF EXHIBITS | | |
| 1 | | | 9/13/21 | Charnesha Alexander 2016 FCI TLH Medical Records (labeled 1.1-1.8, 1.10, 1.15-1.16) | | |
| 2.1 | | | 9/13/21 | Charnesha Alexander Inmate Request | | |
| 5.17 | | | 9/13/21 | Charnesha Alexander Affidavit (labeled 5.17-5.18) | | |
| 6.4 | | | 9/14/21 | Exam room photograph | | |
| 6.7 | | | 9/14/21 | Exam room photograph | | |
| 6.9 | | | 9/14/21 | Exam room photograph | | |
| 6.13 | | | 9/14/21 | Exam room photograph | | |
| 6.14 | | | 9/14/21 | Exam room photograph | | |
| 13 | | | 9/14/21 | BENCH TRIAL ONLY – NOT FOR JURY<br>PREA Prison and Jail Standards | | |
| 25 | | | 9/14/21 | BENCH TRIAL ONLY – NOT FOR JURY<br>PowerPoint Sexually Abusive Behavior | | |
| 27 | | | 9/14/21 | BENCH TRIAL ONLY – NOT FOR JURY<br>PREA proof of posting | | |
| 35 | | | 9/14/21 | BENCH TRIAL ONLY – NOT FOR JURY<br>PREA Program Review 2014-15 (REDACTED-SANITIZED) | | |
| 37 | | | 9/14/21 | BENCH TRIAL ONLY – NOT FOR JURY<br>ACA Audit | | |
| 48 | | | 9/15/21 | Barnett medical records (labeled 48.36-48.51, 48.164-48.165, 48.177-48.187) | | |
| 49 | | | 9/15/21 | Batchelor medical records (labeled 49.1-49.10) | | |
| 50 | | | 9/15/21 | Blevins medical records (labeled 50.1-50.23) | | |
| 53 | | | 9/15/21 | Farber Medical Records (labeled 53.1-53.22) | | |
| 55 | | | 9/15/21 | Rodriguez Medical Records (labeled 55.1-55.40) | | |
| 58 | | | 9/14/21 | BENCH TRIAL ONLY – NOT FOR JURY<br>Barnett Investigation | | |

| | | | | |
|---|---|---|---|---|
| 59 | | | 9/14/21 | BENCH TRIAL ONLY – NOT FOR JURY<br>Batchelor Investigation |
| 60 | | | 9/14/21 | BENCH TRIAL ONLY – NOT FOR JURY<br>Blevins Investigation |
| 63 | | | 9/14/21 | BENCH TRIAL ONLY – NOT FOR JURY<br>Farber Investigation |
| 65 | | | 9/14/21 | BENCH TRIAL ONLY – NOT FOR JURY<br>Rodriguez Investigation |
| 82 | | | 9/13/21 | Proof of posting PREA posters |
| | | | | |
| | USA Exhibits | | | |
| | | 7-2 | 9/13/21 | Sexual Assault Information Sheet |
| | | 35 | 9/15/21 | Managing Female Offenders Cross Development Course (DISC-00000789, 844, 853-855) |
| | | 39 | 9/13/21 | PREA Poster |
| | | 109-1 | 9/13/21 | BENCH TRIAL ONLY – NOT FOR JURY<br>Blevins Affidavit |
| | | 109-5 | 9/13/21 | BENCH TRIAL ONLY – NOT FOR JURY<br>OIG |
| | | 109-7 | 9/14/21 | Nursing Note |
| | | 109-8 | 9/13/21 | BENCH TRIAL ONLY – NOT FOR JURY<br>Sexual Abuse Intervention Note |
| | | | | |
| | | Rolston Exhibits | | |
| | | 3.1 | 9/13/21 | Charnesha Alexander BOP Medical Records at FCI Tallahassee |
| | | 9 | 9/15/21 | OIA Investigative Report re: Alexander - OIA 2017-00084 |
| | | 27 | 9/15/21 | BOP Program Statement 6031.04 Patient Care |
| | | 31a | 9/15/21 | FBOP RN & APP Clinical Skills Training Program |
| | | 31b | 9/15/21 | FBOP Preventative Health Care Screening |
| | | | | |

000090

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

CHARNESHA ALEXANDER,

       Plaintiff,

v.                            CASE NO. 4:19cv138-RH-MAF

PAUL ROLSTON,

       Defendant.

_____/

## <u>JURY INSTRUCTIONS</u>

Members of the Jury:

It is now my duty to instruct you on the law that you must follow in deciding the case. When I have finished you will go to the jury room and begin your deliberations.

I have written my instructions and will give each of you a copy for reference during your deliberations. You therefore don't need to take notes; please just pay

close attention as I go through the instructions with you. I'm going to start with general instructions that apply in all civil cases. Then I'll address the claim in this case. Then I'll conclude with general instructions on things like how you will return your verdict.

You must follow the law as I explain it to you whether you agree with the law or not. And you must follow all of the instructions as a whole. You may not single out, or disregard, any instruction. Also, you must not be influenced in any way by sympathy or prejudice for or against the plaintiff or the defendant.

The parties are two individuals. The plaintiff is Charnesha Alexander. The defendant is Paul Rolston. All individuals, regardless of their station in life, are entitled to the same fair and unbiased treatment in a court of law.

You must decide the case based only on the evidence presented during the trial. The evidence consists of the testimony and the exhibits. What the lawyers say is *not* evidence. It is your own recollection and interpretation of the evidence that controls, not theirs. Also, you should not infer from anything I have said or done that I have any opinion on the merits of the case favoring one side or the other.

As you consider the evidence, you may make deductions and reach conclusions based on reason and common sense. And you should not be concerned about whether the evidence is direct or circumstantial. "Direct evidence" is testimony of a person who asserts actual knowledge of a fact, such as an eye witness. "Circumstantial evidence" is proof of a chain of facts and circumstances tending to prove, or disprove, a fact in dispute. The law makes no distinction between the weight you may give to either direct or circumstantial evidence.

Now, in saying that you must *consider* all the evidence, I do not mean that you must *accept* all the evidence as true or accurate. You should decide whether you believe what a witness said and how important the testimony was. You may believe or disbelieve any witness, in whole or in part. Also, the number of witnesses testifying on a dispute is not controlling.

In determining the believability of a witness and the weight to be given the testimony, you may properly consider how the witness acted as well as what the witness said. Some things you should consider are:

(1)  Did the witness have an adequate opportunity to see and know the things the witness testified about?

(2)  Did the witness have a good memory?

(3)  Was the witness honest and straightforward in answering the questions?

(4)  Did the witness have an interest in the outcome of the case or any reason not to tell the truth?

(5)  Did the witness's testimony seem reasonable, considered in the light of all the evidence and in the light of your own experience and common sense?

(6)  Did the witness do or say something at some other time inconsistent with the testimony the witness gave before you during the trial?

If a witness has been convicted of a felony, that is another factor you may consider in deciding whether you believe the witness's testimony.

When knowledge on a technical subject might help the jury, a person having special training or experience is permitted to state an opinion on the subject. But that does not mean that you must accept the opinion. The same as with any other witness, it is up to you to decide whether to rely on the testimony.

It is the responsibility of Ms. Alexander, as the plaintiff, to prove every essential part of her claim by the greater weight of the evidence. This is sometimes called the burden of proof.

The "greater weight of the evidence" means an amount of evidence that is

enough to persuade you that a contention is more likely true than not true. In deciding whether a contention has been proved by the greater weight of the evidence, you may consider the testimony of all the witnesses, no matter who called them, and all the exhibits, no matter who introduced them.

Now let me turn to the substance of this case. Ms. Alexander asserts she was sexually abused by Mr. Rolston during a medical examination. Mr. Rolston asserts he conducted a proper, medically appropriate examination—that there was no sexual abuse.

Your verdict will be for Ms. Alexander if you find by the greater weight of the evidence that Mr. Rolston engaged in a "sexual act" or "sexual contact" during Ms. Alexander's medical examination on September 27, 2016. If Mr. Rolston did not engage in a sexual act or sexual contact, your verdict will be for Mr. Rolston.

"Sexual act" means the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.

"Sexual contact" means the intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.

If your verdict is for Ms. Alexander, you will address the issue of damages. There are three possibilities: compensatory damages, nominal damages, and punitive damages.

First, compensatory damages are actual damages. Ms. Alexander can recover compensatory damages only if you find that Mr. Rolston engaged in a sexual act—not just sexual contact—during Ms. Alexander's medical examination. If you find that Mr. Rolston engaged in a sexual act, you should assess as compensatory damages the amount you find to be justified by the greater weight of the evidence as full, just, and reasonable compensation for all the damages to Ms. Alexander caused by the sexual act and any sexual contact, no more and no less. Compensatory damages are not restricted to loss of money; they also cover—and in this case they are limited to—the mental and emotional aspects of injury.

No evidence of the value of mental and emotional damages has been or need be introduced. It is not value you are trying to determine, but an amount that will fairly compensate Ms. Alexander for the damages she has suffered. There is no exact standard for determining the amount. Any award must be fair and just in the light of the evidence, must not be based on speculation or guesswork, and must not be imposed or increased to punish Mr. Rolston.

The second type of damages is nominal damages. If you find Mr. Rolston engaged only in sexual contact, not a sexual act, you may award Ms. Alexander nominal damages of not more than $10.

The third type of damages is punitive damages. If you find that Mr. Rolston acted with a malicious purpose or in a manner showing willful disregard of Ms. Alexander's rights, then you may award punitive damages, if you choose to do so. Even if Mr. Rolston acted in that manner, you are not required to award punitive damages.

Punitive damages may be awarded only to punish Mr. Rolston or to deter others from engaging in similar misconduct. Any award of punitive damages must be fair and reasonable in light of the overall circumstances of the case. And any

award of punitive damages must be no greater than necessary to punish Mr.

Rolston and to deter others.

In assessing damages, you must not consider taxes, attorney's fees, or court

costs.

Of course, the fact that I have given you instructions on damages is not an

indication of which side should win the case.

Now some concluding instructions. Each side has had its day in court—its

opportunity to present all relevant evidence. The evidence that is before you is all

there is. You should ignore any suggestion that there is other information that has

not been made available to you. And as I have told you many times now, you must

make your decision based only on the evidence presented during the trial.

I emphasize that you are here to determine the issues as I have described

them in these instructions. You are not here to determine any other issue.

In that respect, let me add a note on the testimony about sexual abuse of other women. As with all evidence, it is up to you to decide whether to believe the testimony. This is Ms. Alexander's case, not a case about what happened to the other women. But if you find that Mr. Rolston engaged in a sexual act or sexual contact during a medical examination of another woman, you may consider this on these issues: whether Mr. Rolston had an opportunity to engage in a sexual act or sexual contact during medical examinations, his intent while examining Ms. Alexander, and whether any contact with Ms. Alexander was a mistake or accident.

Any verdict must be unanimous. In other words, to return a verdict you must all agree. Your deliberations will be secret. You will never have to explain your verdict to anyone.

It is your duty as jurors to discuss the case with one another in an effort to reach agreement if you can do so. Each of you must decide the case for yourself, but only after full consideration of the evidence with the other jurors. While you are discussing the case do not hesitate to reexamine your own opinion and change your mind if you become convinced that you were wrong. But do not give up your

honest beliefs just because the others think differently or merely to get the case over with.

Remember that in a real way you are judges—judges of the facts. Your only interest is to seek the truth from the evidence.

When you go to the jury room you should first select a foreperson. The foreperson will preside over your deliberations and will speak for you here in the courtroom.

A verdict form has been prepared for your use. [Explanation of verdict form]. You will have in the jury room the exhibits, 7 copies of these instructions, and 7 copies of the verdict form. When you reach unanimous agreement, your foreperson will fill in one verdict form, date and sign it, and tell the court security officer you have reached a verdict. Do not give the verdict form to the court security officer. Your foreperson will carry the verdict form when you are brought back into the courtroom, and the verdict will be announced in open court. None of you should bring back into the courtroom another copy of the verdict form—the other copies are provided for your convenience, but they should not be filled out and signed or brought back into the courtroom.

I am the only person who can give you instructions or explain anything about the law or procedures from this point forward. If you have questions or wish to communicate with me at any time, please write down your message or question and give it to the court security officer. The officer will bring it to me, and I will respond as soon as possible, either in writing or by having you returned to the courtroom so that I can address you orally. In any message or question you send, you should *not* tell me your numerical division at the time.

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

CHARNESHA ALEXANDER,

      Plaintiff,

v.                                 CASE NO. 4:19cv138-RH-MAF

UNITED STATES OF AMERICA
and PAUL ROLSTON,

      Defendants.

_____/

## JUDGMENT

    This action came before the court and a jury with the Honorable Robert L. Hinkle presiding. The issues have been tried, a verdict has been returned, and rulings have been announced.

    IT IS ORDERED AND ADJUDGED that the plaintiff Charnesha Alexander recover nothing on her claims against the defendants United States of America and Paul Rolston. The claims are dismissed with prejudice.

                          JESSICA J. LYUBLANOVITS
                          CLERK OF COURT


September 23, 2021          s/ Cindy Markley
DATE                       Deputy Clerk: Cindy Markley

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

CHARNESHA ALEXANDER,

     Plaintiff,

v.                                  CASE NO. 4:19cv138-RH-MAF &
                                        CASE NO. 4:18cv177-RH-CAS

UNITED STATES OF AMERICA
and PAUL ROLSTON.

     Defendants.

_____/

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that Plaintiff CHARNESHA ALEXANDER hereby appeals to the United States Court of Appeals for the Eleventh Circuit from the following judgments and orders from the above-referenced two cases.  Ms. Alexander's case and that of a third plaintiff were consolidated into the case of Michelle Morton, Case No. 4:18cv177-RH-CAS.  Upon settlement by Ms. Morton and the third plaintiff, Ms. Alexander's case went back to its own case number for trial.  This appeal seeks review of orders in both cases.

From Case No. 4:19cv138-RH-MAF: ECF No. 109: Order Confirming Applicability of Order Allowing Access to Medical Records; ECF No.132 Pre-Trial Order; ECF No. 169 Clerk's Judgment.

From Case NO. 4:18cv177-RH-CAS: ECF No. 32 Order on Information Subject to the Privacy Act; ECF No. 75 Order Continuing the Trial and Ruling on the Motions in Limine; ECF No. 85 Order Allowing Access to Medical Records; ECF No. 119 Order on Scope of Discovery, Number of Depositions, and Conflicts with Trial Date; ECF No. 130 Order Partially Granting the Motion to Compel Discovery.

Respectfully submitted,

*/s/ Richard E. Johnson*
Richard E. Johnson
Florida Bar No. 858323
rick@rej-law.com
Law Office of Richard E. Johnson
314 West Jefferson St.
Tallahassee, FL 32301
(850) 425-1997

James V. Cook
Florida Bar Number 966843
Law Office of James Cook
314 West Jefferson Street
Tallahassee, FL 32301
(850) 222-8080; 561-0836 fax
cookjv@gmail.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I served the foregoing document through the court's CM/ECF system this 22d day of October, 2021.

*/s/ Richard E. Johnson*
Richard E. Johnson

2

000104

2          **UNITED STATES DISTRICT COURT**
          **NORTHERN DISTRICT OF FLORIDA**
3             **TALLAHASSEE DIVISION**

4  CHARNESHA ALEXANDER,              )
                                     )
5              Plaintiff,            ) Case No: 4:19cv138
                                     )
6          v.                        ) Tallahassee, Florida
                                     ) May 20, 2021
7                                    )
   UNITED STATES OF AMERICA          )
8  and PAUL ROLSTON,                 )
                                     ) 9:59 AM
9              Defendants.           )
   _____   )

10
             **TRANSCRIPT OF TELEPHONIC HEARING**
11        **BEFORE THE HONORABLE ROBERT L. HINKLE**
             **UNITED STATES DISTRICT JUDGE**
12                **(Pages 1 through 57)**

13  <u>APPEARANCES</u>: (By telephone)

14  For the Plaintiff:      James V. Cook, PA
                           By:  JAMES V. COOK
15                              Attorney at Law
                                cookjv@gmail.com
16                         314 W. Jefferson Street
                           Tallahassee, Florida 32301
17
                           Richard E. Johnson, PA
18                         By:  RICHARD ERROL JOHNSON
                                Attorney at Law
19                              rick@rej-law.com
                           314 W. Jefferson Street
20                         Tallahassee, Florida 32301

21

22              ***LISA C. SNYDER, RPR, CRR***
            **Official United States Court Reporter**
23    **111 North Adams Street, Tallahassee, FL 32301**
          **(850)567-1374 * lisasnydercr@gmail.com**

24

25       *Proceedings reported by stenotype reporter.*
      *Transcript produced by Computer-Aided Transcription.*

```
 1    Appearances Continued:

 2    For the Defendant        Henry Buchanan Hudson
      Rolston:                 By:   JOEL STEVEN CARTER
 3                                   MIRIAM REBEKKAH COLES
                                     Attorneys at Law
 4                                   scarter@henryblaw.com
                                     mcoles@henryblaw.com
 5                             2508 Barrington Circle
                               Tallahassee, Florida 32308
 6

 7    For the Defendant        DOJ – USAO
      USA:                     By:   KATHRYN WILBURN DREY
 8                                   MARY ANN LANE COUCH
                                     US Attorney
 9                                   kathryn.drey@usdoj.gov
                                     mary.ann.couch@usdoj.gov
10                             21 E. Garden Street, Suite 400
                               Pensacola, Florida 32502
11

12                             DOJ – USAO
                               By:   MARIE ARMSTRONG MOYLE
13                                   PETER GUNNAR FISHER
                                     marie.moyle@usdoj.gov
14                                   peter.fisher@usdoj.gov
                               111 N. Adams Street, 4th Floor
15                             Tallahassee, Florida 32301

16

17

18

19

20

21

22

23

24

25
```

**P R O C E E D I N G S**

(Call to Order of the Court at 9:59 AM on Thursday, May 20, 2021.)

THE COURT: Good morning. This is Judge Hinkle.

You all know the ground rules for the telephone hearing. If I call on you by name we'll know who you are. Otherwise, if you would start each time by giving your name that will help me and the court reporter.

The first thing we should talk about probably is the notice that the plaintiff just filed indicating that she may be moved to home confinement. There obviously would be some benefit, probably to everybody, certainly in terms of administering the trial, if she's out at the time of the trial. But let me hear what you have to say about that.

Starting on the plaintiff's side to, Mr. Johnson or, Mr. Cook.

MR. COOK: Yes, Your Honor. This is James Cook.

I just got this information from Waseca -- FCI Waseca, in Minnesota, and Ms. Alexander says that there is -- she is actually going on a quarantine for the trip, as of, I think, Friday. So she will be off quarantine on the 11th. Then they could move her.

As I understand they would move her to Atlanta and then she would be driven to her home and get an ankle monitor.

After that, she, of course, could travel freely with

1   permission, of course.

2           THE COURT:  Right.  Where is her home?

3           MR. COOK:  Her home is in Mississippi, I believe.

4   That is a place that she will end up staying, I think probably,

5   with her mother.

6           THE COURT:  So we are set for trial June 21.  Do you

7   anticipate she can be here June 21?

8           MR. COOK:  I think it would be very difficult, Your

9   Honor.

10          THE COURT:  So she is at the facility in Minnesota?

11          MR. COOK:  Yes, Your Honor.

12          THE COURT:  You anticipate she will be released --

13   move to home confinement June 11th?

14          MR. COOK:  Approximately.  She has no absolute promise

15   of that, but that's --

16          THE COURT:  I understand.

17          MR. COOK:  -- what is anticipated.

18          THE COURT:  And you think that she will then be

19   transported to Atlanta.  My guess is, and this could be

20   completely wrong, my guess is they let her go and get to Atlanta

21   on her own.  No?  I have had occasions where they give somebody

22   a bus ticket.

23          MR. COOK:  She believes she will be flown to Atlanta.

24   That's what she leaves, but I haven't had a chance --

25          THE COURT:  Does she believe she will be -- be flown

1    there by the marshal service or given a ticket?

2          MR. COOK:  That, I don't know.  But I can certainly

3    find that out.  She didn't have any knowledge, but I could

4    inquire from the facility.

5          THE COURT:  What do you want to do?  You want me to

6    put the trial date back?  You want me to play it by ear and

7    let's wait and see what happens?  Everybody knows what the

8    burden is in the run up to trial.  It's an intense process for

9    the lawyers.  Nobody particularly wants to go through trial

10   preparation and find out the trial is going to be moved.

11         MR. COOK:  Our client is asking for the trial to be

12   moved, Your Honor.

13         THE COURT:  And how long -- how far would you like it

14   moved?

15         MR. COOK:  At least two weeks.

16         THE COURT:  All right.  Mr. Carter, since I've skipped

17   you so many times last time I will let you go first responding.

18         MR. CARTER:  Yes, sir.  We clearly see the practical

19   aspect of that, if it's not delayed very much.  My client refers

20   to go forward, but obviously, as you said, the resources

21   associated with the run-up to trial only then to have a

22   continuance would be something we would not want to do.  So if

23   we are talking two or four weeks, or a month, or something like

24   that, I don't see a real problem with it and we would not object

25   to that.  But, my client prefers to go forward and get this off

1   his back.

2         THE COURT:  All right.  How about for the government?

3         MS. MOYLE:  Good morning, Your Honor.  This is Marie

4   Moyle.  We would strongly object to any continuance.

5         Plaintiff's counsel raised this issue on our attorney

6   conference on May 3rd.  We asked for documentation so we could

7   run this issue to ground.  We received nothing until 30 minutes

8   ago.  So we have independently reached out to her -- the task

9   counsel at main DOJ who is handling the reduction in sentence

10   request, and from our understanding, what was proposed, is that

11   this was just a routine request for reduction in sentence that

12   was expected to be denied.

13         So we are, frankly, a little shocked this morning that

14   she is expected to be on home confinement.  We don't think

15   that's really accurate, there is still no way of knowing that

16   it's going to be granted.  And then we are just looking at

17   delaying this trial even again.

18         We have had numerous BOP witnesses who have retired

19   and this is now the third time that we have started and stopped

20   them for trial prep.  Reserving their calendar days for trial

21   has been frankly, a logistical headache.  Even to move it now

22   two weeks, with summer vacation schedules, would really be

23   inconvenience, especially given the uncertainly of plaintiff's

24   home confinement.

25         THE COURT:  Well, let explore this a little bit.  I

1  take it from what Mr. Cook said that this is not a reduction in

2  sentence.  It's an exercise of the Bureau of Prisons' discretion

3  to move someone to home detention for service of the remainder

4  of the sentence.  It's not a sentence reduction.  It's a change

5  in where and how the sentence will be served.

6          Do you think, Ms. Moyle, you're talking to somebody

7  that knows, that understands that context and thinks that he or

8  she knows the answer?

9          MS. MOYLE:  No, Your Honor.  We -- when this was

10  raised at the attorney conference it was framed as she is filing

11  something and expects to get out soon, that may affect her

12  travel with the trial date.

13          We took it upon ourselves, after we asked for

14  documentation of this, to find out what this was being referred

15  to.  There are filings in her criminal case in the Middle

16  District of Alabama that reflect it is a reduction in sentence

17  request.  We had --

18          THE COURT:  That's an entirely -- that's an entirely

19  different thing.  There are two different things that can go on

20  separately and they are not related to each other; one is

21  defendant can seek a reduction of sentence.  I have dealt with

22  hundreds of them.  Often the request is to reduce the sentence

23  because of the risk posed by COVID-19.  Sometimes those are

24  granted.  More often they are not.  But that's a sentence

25  reduction under the statute that is sometimes referred to as

compassionate release.

There is an entirely different statute that authorizes the Bureau of Prisons to move someone to home confinement. That is under the CARES Act, and it typically is not reflected in the court file at all.

So, for example, if somebody I have sentenced asks for a sentence reduction under the compassionate release statute, 18 USC Section 3582(c)(1l(A), that motion comes to me and I make a decision. It is reflected in the Court file.

On the other hand, if someone asks for a reassignment to home confinement to serve the sentence that does not get reflected in the court file. I never know about it. I don't -- when the Bureau of Prisons moves a prisoner from Minnesota to California or Nebraska, or whatever, they don't tell me. They just do that. They just do that. Has nothing to do with my case.

In the same way, when they move someone from a traditional facility to home detention for service of the sentence they don't tell me. It's not up to. Me and I don't need to know.

So if all you have done is contacted somebody who has looked at the court file you haven't gotten to the information that's relevant at all.

MS. MOYLE: Yes, Your Honor. And what we would say is that information, we did not receive it, so then we contacted

1    someone as to the court file.  We are just receiving notice of

2    the home confinement when this notice was filed 30 minutes ago.

3    So we have had not had a chance to explore what that is and who

4    is making that decision and anything related to it.

5              THE COURT:  I understand.

6              Let me tell all of you part of the problem here.  I

7    have this case currently set on June 21st.  And you might

8    imagine cases have stacked up during the pandemic because for a

9    long period we were not trying jury cases.

10             I have the weeks of the 21st and 28th I can try this

11   case.  Much better on the 21st than on the 28th.  I would have

12   to move a lot of things but I could get that done if we slid it

13   just a week.

14             On July 6th, I have a criminal trial that I am told is

15   certain to go to trial and has been pushed because of the

16   pandemic, and so I can't move Ms. Alexander's case to July 6th.

17             Then starting July 12, I'm in a criminal trial that

18   I'm told is certain to go to trial.  Nothing is ever certain, of

19   course, but I am told that that's a definite trial.  I am told

20   it's a three-week trial.

21             And then I have got lots of cases tried -- lots of

22   cases scheduled for trial probably up until August 23rd.

23             It would be harder to work it in earlier in August,

24   but that far out it's a little less certain which of these cases

25   that people say are going to trial are actually going to trial.

1    I would much prefer to try the case, other things
2  being equal, after Ms. Alexander is on home detention.  But I
3  think what we need to do is, first, have a better understanding
4  of when she is going to get out and when she is going to travel.
5  If she is in Atlanta and cleared for home detention on June 11,
6  she can be here for the trial on June 21.

7    I don't want to keep you limbo.  Like I said earlier,
8  I know how difficult it is to prepare for trial and you don't
9  want to go through the final trial preparation and have it
10 moved.  But I don't think it's prudent at this point to move the
11 trial.

12   So, Mr. Cook, stay in touch.  And, Ms. Moyle, now you
13 see what's happening you can work on your side.  Don't -- I
14 guess both sides should take care not to interfere in the Bureau
15 of Prisons' decision one way or the other.  The Bureau of
16 Prisons decides where to put someone.  And if they decide to
17 release her to home detention that makes the trial a little
18 easier.  So I am going to leave it on June 21 for now.

19   If something happens that makes this not doable on
20 June 21, I need to know it as soon as possible.

21   One of the next items on my list was writs to get
22 witnesses here.  At last count we had potential writs for seven
23 prisoners.  I don't remember when we counted whether that
24 included Ms. Alexander or not.  One of those seven, Ms. Winston,
25 has been released from the Bureau of Prisons.  So, Mr. Cook, you

1  will have to arrange to get her here.

2       MR. COOK:  Yes, Your Honor.

3       THE COURT:  For the others, I can get writs out.  As

4  you will understand, this is a burden for the marshal service.

5  They have to move people, sometimes from all around the country,

6  to get them here for trial.  And so I don't want them to start

7  moving and then wind up changing the trial date.

8       Let's see if we can get a telephone hearing set in

9  maybe about a week and see if we can get better information.  If

10  necessary maybe we can get the case manager or somebody that

11  knows just how this is going to go.

12       So, I will do this, I will get the courtroom deputy to

13  set a telephone hearing about a week out.  Maybe a little more.

14  Then if either side thinks that it will help to have the case

15  manager on the phone, or, for that matter, Ms. Alexander, we can

16  arrange to do that, too.  Just let the courtroom deputy know you

17  think it would help to have the case manager on the phone and we

18  will arrange that, too.

19       Let me go on down the list.  Both sides have filed

20  motions in limine.  Much of that was dealt with in the Morton

21  case when these cases were consolidated for pretrial purposes.

22       All of the orders in Morton entered while the cases

23  were consolidated for pretrial purposes, or case management

24  purposes, still apply here, unless the context clearly indicates

25  otherwise.

1    On the motions limine, I have read your papers; each

2  side takes issue with some of the rulings I made in Morton.  You

3  haven't persuaded me.  I adhere to the rulings made earlier.

4  Let me go down the list.

5    First of the motions in limine was the defense motion,

6  ECF Number 104, the government's motion.  The first item is

7  testimony about Mr. Rolston's reputation.  I excluded that

8  evidence in Morton.  I adhere to that ruling here.

9    Next item is the history of FCI Tallahassee, other

10 problems there.  I excluded that testimony in Morton.  I adhere

11 to that ruling here.

12   The third item was other pending cases against FCI

13 Tallahassee involving non-medical personnel.  That's excluded.

14 The plaintiff apparently says that the plaintiff wants to

15 introduce that only if the defense opens the door.  Of course,

16 if the defense opens the door that may change things.  Every

17 ruling in limine is subject to change.

18   The next item was investigations after the alleged

19 abuse of the plaintiff.  I think that was September 27th, 2016.

20 I adhere to the ruling in Morton that post-event investigations

21 are excluded, except to the extent they show what happened

22 either on September 27th, or what was known prior to that.  I

23 reject the plaintiff's theory that if someone acted too slowly

24 after an event it somehow means that the defendant acted

25 improperly prior to the event.

1          Next item is sexual abuse of other victims.  I denied

2     the motion in limine in Morton.  I adhere to that ruling here.

3          The next item is evidence that Mr. Rolston performed

4     unnecessary Pap smears.  I denied the motion in limine.

5     Evidence that he conducted unnecessary Pap smears is relevant on

6     the question of his intent when examining Ms. Alexander, but

7     note that this is only going to come in with admissible evidence

8     that he conducted unnecessary smears.  Give me just a minute.

9          So, for example, Ms. Davis who was chaperoning the

10    examination of Ms. Alexander apparently said that he conducted

11    unnecessary Pap smears and then apparently she effectively

12    recanted that.  The government says, Well, that's just a couple

13    weeks early.

14         Well, that's all material that can be dealt with on

15    cross-examination but note that Mrs. Davis' statement is

16    hearsay.  So if she doesn't say it on the stand this is not

17    going to be admissible against Mr. Rolston.

18         Mr. Cook, that's right; isn't it?

19         MR. COOK:  Yes, Your Honor.  She made that statement

20    under oath to investigators, however, and that was part of the

21    basis of their investigation.

22         THE COURT:  Well, tell me the exception for an

23    out-of-court statement made under oath to investigators.

24         MR. COOK:  It would just be to impeach, Your Honor.

25         THE COURT:  Sure.  If she's testifying and she says,

1   No, he didn't conduct unnecessary exams.  You can say, Didn't

2   you tell the investigators that he did.  Sure.  You can impeach

3   with a prior inconsistent statement.

4           What you can't do is introduce her out-of-court

5   statement as affirmative evidence on its own.

6           MR. COOK:  Right, Your Honor.  I presumed that we

7   could introduce evidence that she had had a Pap smear five

8   months earlier.

9           THE COURT:  That Ms. Alexander had?

10          MR. COOK:  Yes.

11          THE COURT:  Well, Ms. Alexander presented with an

12  infection, Right?  With a problem?

13          MR. COOK:  No, Your Honor.  She had cured that when

14  she got there.  And she told Mr. Rolston that she had cured it

15  with a home remedy and so that was no longer an issue.  She came

16  because she had an appointment.

17          THE COURT:  What did she go in for?

18          MR. COOK:  She had -- months before she had requested

19  an appointment for the infection but it took so long to be seen

20  that although she had the appointment she had already cured the

21  infection and she told him that.

22          THE COURT:  So she -- she no longer had a problem?

23  She went in just to tell him she didn't have a problem?

24          MR. COOK:  She's a prisoner.  She had a call out.

25          THE COURT:  All right.

1      MR. CARTER:  Your Honor, I don't mean to interrupt.

2  This is Steve Carter.  She was in the SHU.  I don't want us to

3  get confused about the various inmates.  She was in the Special

4  Housing Unit, not on sick call, call out.  Just to clarify.

5      THE COURT:  Well, don't they get called out from the

6  SHU?  If you request sick leave when you are in the SHU, just

7  like you request sick leave when you were on the compound; don't

8  you?

9      MR. CARTER:  It's a little different, Your Honor, but

10  I just wanted to make sure you were clear.  She didn't just come

11  out call out down to medical like you would do in open pop, is

12  the point.

13      THE COURT:  All right.  In any event, I denied the

14  motion to exclude evidence that Mr. Rolston performed

15  unnecessary Pap smears.

16      Next on the list is witnesses Cook and Willey, and if

17  I understand it the plaintiff now agrees that you are not going

18  to call Ms. Cook?

19      MR. COOK:  Yes, Your Honor.

20      THE COURT:  And Ms. Willey, you didn't disclose and I

21  excluded her in Morton.  The order in Morton just says she is

22  excluded.  Doesn't have the explanation.  But I take it the

23  reason I excluded her was you didn't disclose her?

24      MR. COOK:  Yes, Your Honor.  She was -- she came after

25  the rest, but the government was aware of her for, oh, probably

1  almost a year.

2          THE COURT:  Well, to the extent the argument is I

3  didn't have to make a 26(a)(1) disclosure because the other side

4  already knew, that's not just right.

5          When did you ever, or have you ever made a 26(a)(1)

6  disclosure for Ms. Willey?

7          MR. COOK:  Yes, Your Honor.  We did it just early this

8  month; however, we had provided notice on April 26th, and no one

9  asked to take her deposition although she's here in town.

10         THE COURT:  Well, wasn't that after the discovery

11  deadline?

12         MR. COOK:  Excuse me, sir?

13         THE COURT:  Wasn't that after the discovery deadline?

14         MR. COOK:  Yes, Your Honor.

15         THE COURT:  You've all heard this speech before; I

16  hate excluding witnesses who would otherwise be permitted to

17  testify, but you have to comply with these rules.  And if I just

18  say, Well, you didn't make a 26(a)(1) disclosure, you waited

19  until after the end of discovery, shortly before the trial, and

20  then you disclosed them, and he response is, Well, they could

21  ahead and take the deposition.  Yes.  And we could abandon all

22  the rules about discovery deadlines and 26(a)(1) disclosures.

23  But as soon as I start saying, Don't worry about those rules.

24  You can just disclose the witness in the run-up to the trial,

25  word gets around.  And you get good lawyers and they still

1   comply with the rules.  And if every now and then there is an

2   oversight, well that happens and you deal with it.  But if word

3   gets around that these rules are not enforced and don't make any

4   difference, then unscrupulous lawyers will try to gain an

5   advantage on the other side by not complying with the rules.

6           I'm going to exclude Ms. Willey.

7           MR. COOK:  Yes, Your Honor.

8           THE COURT:  The next item was settlements with other

9   victims.  As I understand it, the plaintiff agrees with that.

10  Of course, settlements with other victims are not admissible,

11  generally.

12          I take it Ms. Moyle that you don't intend to impeach

13  another victim with the fact that they settled their case that

14  they sought to get money, or do you?

15          MS. MOYLE:  Your Honor, AUSA Fisher is handling these

16  motions in limine, if you wouldn't mind allowing him jump in

17  here.

18          THE COURT:  Sure.

19          Mr. Fisher?

20          MR. FISHER:  Yes, Your Honor.  I think that's correct.

21  We certainly intend to impeach the witnesses, generally, but not

22  with the fact that they had settled a case.

23          THE COURT:  Or that they brought a case.  I mean, you

24  know, I guess you could say -- you can say you brought a case

25  and it was resolved, but you don't want to do that.  You don't

1  plan to even go into fact that they brought a case?

2        MR. FISHER:  That's not our intention, Your Honor.

3  That's correct.

4        THE COURT:  All right.  And then the next item was the

5  amount of restitution owed by the plaintiff, and the plaintiff

6  doesn't object to that, so that will be granted by consent.

7        Next on the list is plaintiff's motion in limine, ECF

8  107, which superceded or amended 106.  The first item is

9  evidence of the plaintiff's character, or convictions, or

10 arrests, or discipline except under 609.

11       Let me start on the plaintiff's side.  Does

12 Ms. Alexander have convictions that don't qualify for admission

13 as impeachment under 609?

14       MR. COOK:  Yes, Your Honor.  I think she has some

15 remote convictions, but our main focus is on limiting the

16 information to that allowed by 609.

17       Looking at the Defendant USA exhibits they want to

18 bring in a whole lot of stuff, including the restitution.  You

19 know, there are just probably -- I don't know -- several --

20 anyway several pages that go beyond just the fact of the

21 conviction.

22       THE COURT:  Mr. Fisher or Ms. Moyle, whoever is going

23 to take it, what is it you plan to go into?

24       MS. MOYLE:  This is Ms. Moyle, Your Honor.  I am

25 unsure specifically what plaintiff is referring to.  In some of

1    our exhibits that include her inmate file, those will, of

2    course, have evidence of the underlying conviction.  We intend

3    to comply with 609.  The only thing that we want to raise is

4    that Ms. Alexander was only in the SHU due to disciplinary

5    reasons at Marianna.  And plaintiff has repeatedly put this

6    theory of the case that inmates who are told about sexual

7    assault are put in the SHU.  So we just need to establish that

8    she was in the SHU due to disciplinary reasons.

9           MR. COOK:  Your Honor, we are --

10          THE COURT:  Wait -- wait just a minute.

11          She had no prior complaint of sexual assault and had

12   suffered no prior sexual assault.

13          MS. MOYLE:  That's correct.

14          THE COURT:  Mr. Cook, you agree with that?

15          MR. COOK:  Yes, Your Honor.  That's my understanding.

16   We have no intention, nor have we signaled any, of claiming that

17   she was in the SHU because she had complained about sexual

18   abuse.  Certainly other witnesses have had that experience.

19   But, no, she was in the SHU because she was transit.  And it

20   wasn't specifically because of something she did at another

21   institution.  It was because she was being transferred and she

22   wasn't part of the general population there.  She was just

23   there, you know, waiting for transport.

24          THE COURT:  And you think that when somebody is being

25   transported they get put in the SHU?  They probably do now

1    because of COVID, but this all happened before COVID.

2         MR. COOK:  That was my understanding, Your Honor;

3    however, we are not planning to imply that she was in there

4    because she made a complaint of sexual abuse.  Obviously that

5    happened after she was placed in the SHU.

6         THE COURT:  Do you object -- wait just a minute.

7    Mr. Cook, do you object to evidence that she was in the SHU --

8    there may be some differences in procedure.

9         MR. COOK:  I don't object to that.  I do object to

10   them bringing in records of an investigation that occurred at

11   Marianna as improper character evidence.  But what I'm speaking

12   here about the judgment and sentences they have exhibits that

13   are judgment and sentences for the plaintiff and all of the

14   witnesses.  And in those --

15        THE COURT:  Wait.  Just hold on just a minute.  None

16   of that will come in unless a witness denies the conviction.

17        MR. COOK:  Exactly.

18        THE COURT:  All you get under 609 is there was a

19   conviction and what it was for.  And if the witness answers the

20   question there is no need for the document.

21        MR. COOK:  And we plan to present that right at the

22   beginning.

23        THE COURT:  Ms. Moyle, what was she being disciplined

24   for in your view?

25        MS. MOYLE:  She was removed from Marianna because

1    there was an incident where her husband brought in contraband.

2    And from my understanding that Marianna only has three Special

3    Housing Units, so she was transferred to Tallahassee to be in

4    the SHU for disciplinary reasons and was evidently transferred

5    to Aliceville, which is a higher security than Marianna.

6           THE COURT:  So if the jury finds out she was in the

7    SHU is there any need to find anything else out?

8           MS. MOYLE:  Our concern is the inference that they

9    have repeatedly suggested that inmates are in the SHU for

10    complaining about sexual abuse.  And so without explaining that

11    that -- it's really our intent to do a quick question of: You

12    were in the SHU for disciplinary reasons and you were never a

13    member of the general population.

14           THE COURT:  Well, how about just: You had never

15    suffered any prior sexual assault, you being to the SHU didn't

16    have anything to do with any complaint about any sexual assault.

17    She will say yes to both of those and then we will move on.

18           MS. MOYLE:  That's perfectly appropriate, Your Honor.

19           THE COURT:  Okay.

20           MR. CARTER:  Your Honor, this is Steve Carter.  May I

21    add a point here?

22           THE COURT:  Yes.

23           MR. CARTER:  One thing that we thought that that

24    disciplinary situation was relevant to was the fact that she had

25    lost visitation privileges.

1        Ms. Alexander got upset after her examination and the

2   medical encounter suggests it was because they were talking

3   about family and things of that nature -- children.  And her

4   visitation in Marianna was very -- it's a work camp.  So,

5   obviously, she would have five children and two adults on

6   multiple times at Marianna.  Well, all of that got shut-off

7   immediately when she went through this disciplinary event.  So

8   the fact that she has lost privileges and is on discipline we

9   feel like explains part of the reason she is upset while she was

10  in the SHU so that would be a point we would make.

11       THE COURT:  All right.  And so you can say, We don't

12  need to talk about why you were in the SHU, but while you were

13  there you didn't have any visitation; and she will say yes.

14       MR. CARTER:  Right.  You were upset about visitation.

15  Previously, before that, you had pretty liberal visitation with

16  your family.  But the why -- the actual why, no; we don't have

17  to get into that.

18       THE COURT:  All right.

19       MR. COOK:  Your Honor, if I may?

20       THE COURT:  Yes.

21       MR. COOK:  She never complained about her children, or

22  concern about her family, while she was in the examination.

23  That is something that Mr. Rolston added to the record.  That's

24  nothing that she ever said.

25       THE COURT:  Right.  But if somebody testifies to it

1    then somebody testifies to it and the jury gets to sort it out.

2            MR. COOK:  Yes, sir.

3            THE COURT:  All right.  The next item is a suggestion

4    that alleged victims conspired to concoct these allegations.  I

5    think the response on this point is correct; the defense is

6    certainly entitled to argue that even though there are six or

7    eight -- whatever number of prisoners -- who say Mr. Rolston

8    mistreated them, they were all in custody together and so people

9    jumped on the allegation.  That may be true, may be not true,

10   but I can't tell the defense that you can't argue that these

11   folks just piled onto somebody else's allegation.

12           MR. COOK:  Yes, Your Honor.  James Cook.

13           Our position is that if there is a foundation I think

14   they can raise that.  If there is no foundation then it is I

15   think -- it should be excluded without foundation.

16           THE COURT:  That motion is denied.

17           The next item is general records as to BOP training.

18   Mr. Rolston can certainly testify as to how he was trained.

19   Other evidence of how he was trained is admissible.  The

20   plaintiff is right that how they trained people at the federal

21   prison in one pop doesn't have anything to do with how people

22   were performing examinations in Tallahassee.  So, you will have

23   to make it relevant by indicating it has something to do with

24   what Mr. Rolston did.

25           And then on the part of the case just against the

1    government can show what they trained, and what they expect, and

2    so forth.

3         Yes, Ms. Moyle?

4         MS. MOYLE:  I just wanted to raise, we were primarily

5    concerned about their training with PRIA rather than

6    Mr. Rolston's specific training as to medical examinations.

7         THE COURT:  Explain that to me a little more.

8         MS. MOYLE:  Sure.

9         So, plaintiff should exclude any self-serving

10    declarations as to how training governs their actions.  For

11    example, if the SIA agent or the officer who responded to a PRIA

12    complaint is talking about how they received annual training on

13    PRIA and that the PRIA training governs their actions and how

14    they responded, we would like that testimony admitted.

15         THE COURT:  It's not entirely clear to me how that's

16    going to come in on the front end, but certainly anyone whose

17    actions are being challenged can testify about how they were

18    trained and why they did -- why they took the challenged action.

19         The fact that evidence is self-serving has absolutely

20    nothing to do with admissibility.  It's up to the jury to decide

21    whether testimony is true.  And there simply is no rule against

22    a witness giving testimony that supports the witness.

23         If I excluded all self-serving testimony Ms. Alexander

24    wouldn't be able to testify and the plaintiff wouldn't be able

25    to make a prima facia case.

 1          MR. COOK:  Yes, Your Honor.  If I could, we have no

 2     objection to each witness coming up saying how they were trained

 3     and how that affected their actions.  For instance, we were

 4     trained to report abuse under these circumstance, et cetera, and

 5     this is what we were trained to do.

 6          But what I don't want is for an administrator to get

 7     on the stand and say, we train all of our officers to report

 8     abuse as soon as it happens and we train them to do this and to

 9     do that.

10          There's -- but, we haven't heard from the individual

11     witnesses.  It can't be a blanket statement that this is how we

12     train.

13          THE COURT:  Well, let me just tell you, if the defense

14     puts the warden on the stand to say, we always do things right,

15     then you can put in all your evidence about all the other

16     problems at the facility.  I don't think they're going to do

17     that.

18          But, look, if both sides will just try this case we

19     will get a good verdict -- the correct verdict in this case.

20          Next on the list is lay opinions about well-woman

21     care.  Obviously, a layperson can't come in and testify on how

22     to perform a proper examination.

23          Ms. Moyle, what, if anything, do you plan to put in

24     about well-woman care?

25          MS. MOYLE:  No, Your Honor; we agree with this motion

1   in limine.  Just wanted to make sure it wouldn't encompass
2   statements from say a healthcare administrator who says, we
3   provide annual Pap smears or annual mammograms to our inmates.
4           MR. CARTER:  Your Honor, this is Steve Carter.  If I
5   can say something.
6           THE COURT:  Sure.
7           MR. CARTER:  Obviously, to the extent Mr. Rolston is a
8   medical provider and part of the plaintiff's theory is that he
9   would offer preventative care and the well-woman exam when
10  patients come in there, we intend for him to explain that too,
11  and talk about that, as a medical physician assistant.  We would
12  want to be able to present that, too.
13          THE COURT:  Of course.
14          MR. COOK:  Your Honor, we have no objection to medical
15  personnel talking about how they were trained with regard to
16  well-woman care.  We can -- we have an expert who will explain
17  how well-woman care works and we can cross-examine on that.
18          However, what we had happen -- for instance, the
19  medical assistant, who is a certified nursing assistant,
20  described the Pap smear and Mr. Carter says, Is that what you
21  call well-woman care.  That, you know, basically puts it out
22  there in a way that it's hard for us to refute.
23          THE COURT:  If they've got a medical provider that
24  says, Here is what we do and here's is why we do it, and that's
25  well-woman care, then they can testify to that.

1        MR. COOK:  If they have a background --

2        THE COURT:  I'm not --

3        MR. COOK:  If they have received training.

4        THE COURT:  It doesn't matter whether Mr. Rolston has

5 obtained any training or not.  He can explain what he did and

6 why he did it and why he thinks it was proper.

7        MR. COOK:  Yes, Your Honor.

8        THE COURT:  Next on the list is Mr. Rolston's military

9 service and scholastic achievement, particularly that he got PA

10 training at Yale.

11        Mr. Cook, I guess I understand that he didn't go to

12 Yale.  And that he apparently went to some program that has some

13 attachment to Yale.  But why can't he explain where he was

14 trained and why he did it the way he did it, and that this is

15 the way he was trained to do it and where he was trained to do

16 it?

17        MR. COOK:  Yes, Your Honor.  I think he can explain

18 that.  And I am a little concerned about the confusion that he

19 was admitted to Yale.  But what I'm chiefly concerned about is

20 that he will try to get in, you know, that he was sent to the

21 Middle East and he trained doctors there and he fought ISIS and

22 all of that kind of stuff, which has nothing to do with this

23 case.

24        THE COURT:  He doesn't need to be saying that he won

25 the war against ISIS.  But I think he can give his background

1 and training and what he has done and where.

2 Ms. Moyle, is there any reason that he needs to say

3 where he was in the military?

4 MS. MOYLE:  No, Your Honor.  As long as he can testify

5 to the fact that in the military he performed numerous

6 gynecological exams on females, et cetera.

7 THE COURT:  So keep him out of the war zone and just

8 indicate he was in the military.  Which branch was he in?

9 MS. MOYLE:  I believe United States Army, but

10 Mr. Carter may want to add to that.

11 MR. CARTER:  Your Honor, that's correct.

12 If you don't mind, while I'm speaking, the suggestion

13 that this is some, you know, correspondence course and a PA

14 degree from Yale is just not accurate.  He was admitted into the

15 graduate school of Arts and Science and got a master's in the

16 medical science, and the PA program is part of the Yale

17 University School of Medicine.  So I want to make sure that's

18 clear, because I wasn't sure what the argument was there.

19 As far as his education and background, including the

20 military experience, and his gynecological experience there, we

21 were going to present all of that.

22 THE COURT:  All right.  And that's fine.  Just -- he

23 was in the Army and how many years he was in the Army and you

24 don't need to say that he was --

25 MR. CARTER:  No.  We're not --

1          THE COURT:  -- assigned to Desert Storm, or whatever.

2          MR. CARTER:  Right.  Right.

3          THE COURT:  All right.

4          Next on the list is Number 108.  That's Mr. Rolston's

5     motion in limine.

6          Number one in that is the other alleged victims.  Same

7     ruling as in Morton.  Those can come in.

8          One of the points made in the motion is that they

9     didn't complain to the BOP and that's okay.  That's the basis on

10    which they can be cross-examined.  But the fact that somebody

11    didn't complain doesn't mean it didn't happen.

12         MR. CARTER:  Your Honor, may I ask one question as it

13    relates to that, not to reargue the point or anything?

14         In the rule, it talks about a preliminary -- well,

15    some of the case law talks about a preliminary determination

16    that it meets the sexual assault standard which is defined in

17    the rule as touching of genitals or anal area, and things of

18    that nature.

19         Some of these similar people, unlike maybe what we

20    dealt with in Morton, involve only an allegation about being

21    touched on the outside of her shirt in her breast area, or

22    having a breast exam.  That was intended to be part of what we

23    were trying to argue is just that it's not, you know,

24    appropriate under the rule.  And maybe I didn't clarify that

25    enough in my argument.  But as to a couple of these 12 that they

1    have listed it was simply breast examinations and so we would

2    want to point that out.

3          THE COURT:  Well, let me make a point and then ask a

4    question.

5          The other act evidence to come in has to be

6    substantially similar.  Here substantial similarity is the use

7    of a purported medical exam in the Bureau of Prisons for a

8    sexual purpose.  And so substantial similarity is there.

9          Now your point is, well, you go to Rule 415 and it's

10   talking about sexual assault and some of these alleged victims

11   didn't suffer a sexual assault as defined in the rule.  Why

12   isn't the answer to that the following:  First, if it's an

13   alleged sexual assault, then you go to Rule 415.  But if it's

14   not an alleged sexual assault, you go to 404(b) and it's the

15   same analysis.

16         MR. CARTER:  Yes, sir.  You are asking me, Your Honor?

17   This is Steve Carter.

18         THE COURT:  Yes.  Doesn't that work?

19         MR. CARTER:  I understand the argument.  I just want

20   to -- obviously, we -- and I understand Your Honor's ruling.  We

21   object to it as some of this not meeting the substantial

22   similarity standard.  But I understand Your Honor's ruling on

23   all of these.

24         THE COURT:  All right.  Let me say this, you hear the

25   beep in the background, that's people calling in for the next

hearing.  I have a hearing at 11 o'clock.  We are going to be running a little long in the one I have got now.  Why don't you call back at 11:45 and I hope I am done well ahead of that.  But that will be safe.  If you will call back at 11:45 we will go from there.

Next was the reputation point.  That's the same as we discussed before.

Historical events at FCI Tallahassee.  Same thing.

Service of process on Mr. Rolston.  Same thing.  I think the plaintiff has agreed unless the door is opened that's the nature of the orders in limine.

Then the next item on the list is Mr. Rolston's divorce and his former wive's testimony.

MR. CARTER:  Your Honor, I might can short circuit.  The wives were not listed on the witness list that was part of the stipulation.  They were disclosed in that late Rule 26 disclosure, but not listed as a witness on the witness list so that may preclude even having to deal with that particular issue as long as they are not trying to get into the divorce through the cross-examination of Mr. Rolston.

THE COURT:  I think the response was that they agree unless the door is opened.

I did note in the motion the defense said that the state privilege law applied.  At least as to Mr. Rolston it's a federal claim.  I think federal privilege law would apply.  I am

1  not sure it's different.  I suspect that federal privilege law

2  applies to the FDCA claim even though the FDCA incorporates some

3  of the state substantive standards.  We can address all that if

4  it comes up.  Yes, sir.  I will look at this again.  I was

5  looking at it -- or having someone look at it from a *Bivens*

6  standpoint.  I think you may be right.  I think it's the same

7  standards.

8          Next on the list are the four witnesses:  Cook,

9  McCune, Rodriguez and Willey.  I excluded Ms. Willey, as we went

10 through a minute ago, and the plaintiff says not Cook.  I think

11 McCune and Rodriguez the government had not tried to exclude

12 because they were disclosed not initially but before the end of

13 discovery.

14         MR. CARTER:  They were deposed in the other case.

15         THE COURT:  All right.  So they have been deposed, so

16 they can testify.

17         MR. CARTER:  Sorry.  Ms. McCune has not.

18 Ms. Rodriguez was.  I'm sorry.

19         THE COURT:  Ms. McCune was known in time.  She could

20 have been deposed in time if you wanted, right?

21         MR. CARTER:  I don't believe that's right, Your Honor.

22 I don't have that directly in front of me, but I don't think she

23 was part of these Rule 26 disclosures until after or at the end

24 of the discovery process.

25         THE COURT:  All right.  Mr. Cook, what's up with

1    those?

2            MR. COOK:  Yeah.  I think that was a year ago that we

3    included them in the Morton 26(a) disclosures.  And we moved all

4    of those over into this case when it was consolidated.  I can

5    give you an exact date of the previous --

6            THE COURT:  Maybe Ms. Moyle can help with this.

7            Ms. Moyle, the government in, I guess, in Morton moved

8    to exclude Cook or Willey, but agreed that McCune and Rodriguez

9    should not be excluded.  Do you know why?  Do you have the facts

10   at-hand about when they were disclosed and so forth?

11           MS. MOYLE:  Yes.  Briefly, Your Honor.  Ms. Rodriguez

12   was deposed.  Ms. McCune was disclosed in Morton.  And then we

13   chose not to depose her after the COVID situation really got out

14   of hand.  This was all in March of 2020.  So, it was just really

15   a logistical issue.

16           THE COURT:  Mr. Carter, you got a different view of

17   that?

18           MR. CARTER:  Your Honor, when we -- I don't have the

19   disclosure directly in front of me.  Mr. Cook might can shed

20   light on it.  I still don't think it was disclosed in the

21   Alexander case is the issue I was trying to raise.

22           MS. MOYLE:  That is correct, I believe.

23           MR. FISHER:  Your Honor, this is Peter Fisher.  If I

24   may just for a moment, I happen to have the Charnesha Alexander

25   case in front of me.  It was Document 40 disclosed on

1    January 11, 2020, and that disclosure in the Alexander case does

2    not contain Ms. McCune.

3              So, for purposes of the Alexander case itself, there

4    was no actual disclosure until the one that happened just

5    recently weeks ago.

6              The reason that we elected not to include that in our

7    motion was because we were recognizing that at the point in time

8    at which the Alexander disclosures came to us we had known about

9    her name by way of the Morton case.

10             MR. COOK:  Your Honor, if I could --

11             THE COURT:  Please.

12             MR. COOK:  This is James Cook.

13             We disclosed Ms. McCune in the Morton case on

14   February 18th of 2020.

15             MR. FISHER:  Your Honor, that is correct.  I am not

16   sure of the exact date in February, but my recollection is that

17   the name was disclosed in the Morton case.  It was not disclosed

18   in the Alexander case.

19             THE COURT:  Mr. Cook, when did you disclose her in the

20   Alexander case?

21             MR. COOK:  Your Honor, I believe that it was toward

22   the end of 2020, but I think that if we -- you know, we

23   consolidated these cases.  They were altogether and so I think

24   that there is a lot of evidence that has been moved from the

25   consolidated case into this one.  I think that they had notice

1    when the cases were all one case and chose not to depose her.

2            MR. CARTER:  Your Honor, just --

3            THE COURT:  Give me just a minute.

4            Mr. Cook, what's she going to say?

5            MR. COOK:  She is going to say that she had several

6    experiences that are very much like Ms. Alexander's experiences,

7    including the movement of the fingers in the vagina and

8    palpating or rubbing of the clitoris.  There were a number of

9    other things that she came there for some other purpose.  And I

10   think that she may be saying that she was not due for a Pap

11   smear.

12           THE COURT:  Mr. Carter, you had something else?

13           MR. CARTER:  The only response I had, Your Honor, is I

14   believe this case got consolidated after discovery was closed in

15   both of those cases.  So the failure to disclose it in this case

16   really didn't give us the opportunity to take that deposition as

17   it relates to Alexander.  I mean, clearly, they did it in

18   Morton.  I understand that.  I understand we are all parties

19   litigating these cases, but as far as it relates to

20   Ms. Alexander's claim it was not listed.

21           THE COURT:  The consolidation order was in August of

22   2020?

23           MR. COOK:  I believe that's right.

24           MR. CARTER:  We were set for trial, but when the

25   pandemic hit...

1    If I remember, Your Honor, we had a motion for summary

2 judgment that was done obviously after the close of discovery in

3 the Alexander case on the Prison Reform Act and the exhaustion

4 issue that was filed when Judge Walker had the case, but it was

5 consolidated and Your Honor dealt with it. So the timing of all

6 of that I think would demonstrate that discovery was closed.

7    THE COURT: But you were representing Mr. Rolston?

8 You were in both cases all along?

9    MR. CARTER: Yes, sir. Clearly, there is no doubt

10 about that. And Ms. McCune was identified in ultimately their

11 415 disclosures, I believe, and was listed in the Morton Rule

12 26.

13    THE COURT: Do you want to depose McCune now?

14    MR. CARTER: If you're going to allow her as a

15 witness, then, yes, sir, I wouldn't mind taking a deposition of

16 her.

17    THE COURT: All right. This is a little different

18 than the other one I talked about earlier just because they are

19 closely related cases. Same lawyers in them. And sounds,

20 frankly, like just an oversight that Ms. McCune wasn't listed in

21 the Alexander case as well as Morton. There doesn't seem to be

22 any reason why she would be listed in one and not the other.

23    And oversight is not always a good excuse, but when

24 the same lawyer was in the other case and knew about her then it

25 seems to me that I should not exclude her here.

1          MR. CARTER:  I agree, Your Honor.

2          THE COURT:  And I can let you take her deposition.

3          MR. CARTER:  Okay.

4          THE COURT:  Mr. Cook, allowing the deposition is okay

5    with you; isn't it?

6          MR. COOK:  Yes, Your Honor.

7          THE COURT:  Next on the list is trauma informed care

8    and Dr. Tucker.  First, there is some discussion here of how to

9    treat -- how to perform an examination on someone who has been a

10   victim of sexual abuse.

11         Mr. Cook, had Ms. Alexander been a victim of prior

12   sexual abuse?

13         MR. COOK:  Your Honor, I don't think she was in the

14   Department of -- in the Bureau of Prisons.  There may have been

15   something prior to that.

16         THE COURT:  Is there any way Mr. Rolston would know

17   that she had been a victim of prior abuse?

18         MR. COOK:  Well, our expert believes that that is,

19   when you are doing prison work involving gynecological issues,

20   that that's an assumption that should be made.

21         THE COURT:  Okay.  Well, that's -- that's -- really?

22         MR. COOK:  Yes, Your Honor.

23         THE COURT:  So what would your expert have the prison

24   provider, the PA or the doctor -- you would have the doctor say

25   to everybody, "Have you been a victim of sexual abuse?"

1     MR. COOK:  No, Your Honor.  But, I think that what she

2     is saying is --

3          THE COURT:  Just assume that everybody has been?

4          MR. COOK:  As far as rubbing your penis against their

5     leg, or standing with your crotch in their face, rubbing their

6     breast from outside --

7          THE COURT:  Let's back up.

8          The suggestion that a prison medical doctor should

9     assume that everybody has been a victim of sexual abuse strikes

10    me, frankly, as absurd.  I am not sure if I was the defense

11    lawyer I would want to exclude that.  Maybe I would want that

12    witness to give that testimony.  But, that's -- that's the

13    defense decision.  It's one of those that you kind of scratch

14    your head and say, "Really."

15         The response is, you can't rub your penis in

16    somebody -- of course you cannot.  And that has nothing to do

17    with whether they had been a victim of a sexual assault.  So

18    let's keep this in perspective.

19         Why should Dr. Tucker be able to testify about the

20    proper way of conduct an examination of someone who has been a

21    victim of sexual assault?

22         MR. COOK:  Some of the women were.  And there is a

23    screening document that shows who they are but I don't have that

24    in my memory.  And I think that it goes to damages, if nothing

25    else.

1          THE COURT:  It goes to damages?

2          MR. COOK:  Yes, Your Honor.

3          THE COURT:  How do Ms. Alexander's damages relate in

4    any way to the proper way to conduct an examination of someone

5    who has been a victim of sexual abuse?

6          MR. COOK:  If you have been a victim of sexual abuse

7    then I think that it's a reasonable assumption that the ongoing

8    fact of sexual abuse inside the prison environment basically

9    means there is no refuge.  They can get you there.  They can get

10   you anywhere.  And I have heard women say that.

11         THE COURT:  All right.  There is to be no testimony

12   from Dr. Tucker about the proper way to conduct an examination

13   of someone who has been a victim of sexual abuse.

14         MR. COOK:  Yes, Your Honor.

15         THE COURT:  Now, Mr. Carter, why shouldn't Dr. Tucker

16   be able to testify about the proper way to conduct gynecological

17   exam of any presenting woman?

18         MR. CARTER:  You mean, generally, Your Honor?

19         THE COURT:  Yes.

20         MR. CARTER:  What it does is it tends to conflate

21   the -- almost the negligence standard on what we are dealing

22   with, with the claims against Mr. Rolston, as it relates to Ms.

23   Alexander, that he intentionally committed an intentional sexual

24   assault which are two different things.

25         When we deposed Ms. -- Dr. Tucker, I asked a very

1    specific question:  Are you giving any opinions about detailed

2    medical encounters as to any particular visit that any patient

3    had with Mr. Rolston, and she said, no, she was not.

4           And if Mr. Rolston -- if a patient was presented with

5    a certain presentation, like Ms. Alexander had, and Mr. Rolston

6    evaluated that, and did an examination, is that appropriate.

7    She said, I would not criticize him for evaluating a problem.

8    No, I would not do that.

9           So the problem we get into is allowing that general

10   testimony when it really is not relevant to Ms. Alexander's

11   case, conflates -- maybe these doctors have different ways of

12   doing certain gynecological exams, but having a difference of

13   the way they perform it does not equate to a sexual assault.

14   And that's the point we were trying to make.

15          THE COURT:  Well, that's certainly correct.

16          MR. CARTER:  I can provide you --

17          THE COURT:  I understand that if Dr. Tucker says,

18   Well, here's the standard of care.  Here is how you do these

19   exams.  And then the plaintiff's testimony is that that's not

20   how this exam was conducted, that would be relevant in a medical

21   negligence claim.  And this is not a medical negligence claim.

22   But the fact that that's relevant, and goes right to the heart

23   of a medical negligence claim, does not mean it's irrelevant in

24   this case.

25          To know whether Mr. Rolston did the exam properly, or

instead committed a sexual assault, it's helpful to know how an
exam ought to be conducted.  Frankly, you're going to have
jurors, and some number of them will be women, who have
undergone these exams, and they will bring their own experience
and common sense.  But some presumably will be men, and unless
both sides are violating *Batson,* and it will be helpful for the
men to know how one conducts a gynecological exam.

I am not going to exclude Dr. Tucker's testimony on
the general manner of conducting an exam.  I will -- you have
alerted me to the problem.  I will be paying attention.

And, Mr. Cook, you will do well to try this case.  I
think one theme that has run through all of these motions in
limine is the plaintiff wants to have a global trial of FCI
Tallahassee and that's not what we are going to do.  We are
going to try Ms. Alexander's case.

Now, the testimony of the other alleged victims is
going to come in because it's admissible under 404(b), or 415,
to show intent.  But the focus is going to remain on
Ms. Alexander, why she was there, and what happened to her.

That's all the motions limine.  I think that's all the
pending motions.

Before I go down my list of things I always talk about
at a pretrial conference tell me if there is anything else you
think we need to address.

Mr. Cook, anything on your side?

1            MR. COOK:  Yes, Your Honor.

2            Going back to the notice, the prison official who sent

3    us that information said that if the Court has any other

4    questions that she would be glad to answer them or get them

5    answered.

6            If I may Your Honor, tell her that the Court would

7    like to know the details of the logistics of the transport if in

8    fact that comes to pass.

9            THE COURT:  Yeah.  Who is this person?

10           MR. COOK:  Her name is Ms. Commons, and I think her --

11           THE COURT:  Let's just plan to get her on the phone

12   when we have our next hearing.

13           The courtroom deputy will work with you to get contact

14   information, and find out when we can have Ms. Commons available

15   so that we can find out as much as we can about just where

16   things stand and we can do it as soon as we can.

17           MR. COOK:  Yes, Your Honor.

18           THE COURT:  Anything on the defense side, Ms. Moyle,

19   anything we need to talk about today?

20           MS. MOYLE:  Your Honor, yes, just a few housekeeping

21   items.

22           Wanted to raise the order presentation of the defense

23   case.  We have discussed with Mr. Carter, and we plan to go

24   third, and let Mr. Carter present his case second after

25   plaintiff rests.

1          THE COURT:  Okay.  What else?

2          MS. MOYLE:  General discussion as to the advisory jury

3    situation.  We would definitively object to any inclusion on the

4    verdict form to the jury.

5          THE COURT:  Yeah.  We will have on the verdict form

6    the questions that the jury needs to answer.  Are you telling me

7    you don't want the United States listed as a party on the

8    verdict form?

9          MS. MOYLE:  That's correct, Your Honor.

10          And the last thing would be --

11          THE COURT:  Let's talk about that for just a minute.

12    What do you want me to tell the jury about what you are doing

13    there?

14          MS. MOYLE:  Your Honor, it is a delicate situation.

15    We have been advised by main DOJ, in Washington, that we should

16    avoid participating in voir dire or jury selection.  But you

17    could explain to the jury how they are deciding specific claims,

18    and you are deciding others, is perhaps the best way forward,

19    but of course we would defer to your guidance on the issue.

20          THE COURT:  Mr. Cook, if I tell the jury it's a claim

21    by Ms. Alexander against Mr. Rolston.

22          MR. COOK:  Your Honor, if --

23          THE COURT:  And just say -- wait just a minute -- and

24    just say there may be multiple lawyers asking questions for the

25    defense or calling witnesses for the defense.

1    MR. COOK:  I think that the --

2    THE COURT:  Anything wrong with that?

3    MR. COOK:  I think that the Court should say that the

4  jury is just here to hear the case against Mr. Rolston and leave

5  it at that.

6    THE COURT:  Just not even mention that the government

7  is a party?

8    MR. COOK:  Yeah.  One way or the other.

9    MR. CARTER:  Your Honor --

10    THE COURT:  Somebody said one way or the other.  Who

11  was that?  Do you want to keep talking?

12    MR. CARTER:  Your Honor, this is Steve Carter.  It

13  just seems very confusing to me that you're going to have three

14  or four lawyers asking questions and participating in the trial

15  and the jury doesn't understand what's going on.  I think more

16  than just simply some general comment has to be done, or it's

17  just too confusing.

18    MS. MOYLE:  I would agree with that.  I would think

19  that would we would need to say who we represent and just

20  explain how under the FTCA those claims are not decided by the

21  jury.

22    MR. COOK:  I think that's fair, Your Honor.  James

23  Cook.

24    THE COURT:  How about if I say, In a case like this,

25  involving the Bureau of Prisons, the Department of Justice is

1   entitled to participate in the trial, and Ms. Moyle is here as

2   the lawyer for the Department of Justice.  She will be allowed

3   to ask questions and call witnesses?

4           I worry a little bit about the jury thinking that

5   there is another claim against the government.  I don't want

6   them thinking that the money comes out of the government's

7   pocket.  You worry about what speculation might go on.

8           In a different situation, but one similar -- I may be

9   the only one old enough to have dealt with this, although some

10  of you may have -- there was a time in Florida when insurance

11  companies got named in the case.  And the verdict form went to

12  the jury and the name of the insurance company is right there on

13  the defense side in a standard personal injury case.  And often

14  juries figured out which side the insurance company was on.  I

15  suspect that made it a little harder to get a determination on

16  the merits.  I don't know which way it would cut in this case,

17  whether it would favor the plaintiff or the defense, but for the

18  jury to think, well, there is another case that we are not

19  involved with.

20          MS. MOYLE:  Your Honor, perhaps we mull on this over

21  the next week and think about the best way to present it and

22  discuss it more in depth at our hearing next week.

23          THE COURT:  All right.  Fair enough.  I do think they

24  need to find out that you are not Mr. Rolston's lawyers.  What

25  you say can't come back on him.  So they need to know that there

1    are lawyers there for the Department of Justice, or for the

2    United States, however you want to put it.

3          I just -- I don't think, I don't recall trying an FDCA

4    claim when there was a jury portion like there is here, but this

5    is not the first time this has happened.  So, certainly main

6    justice has dealt with this a lot of times and I suspect that

7    there are district judges who have done it different ways.  So,

8    yes, you can look into that more.  And, Mr. Cook, you can think

9    about it and we will revisit it next time.

10         MR. COOK:  Thank you, Your Honor.

11         MS. MOYLE:  Thank you, Your Honor.

12         The last thing I had on my list was the issue of

13   plaintiff's trial exhibits.

14         From our pretrial stipulation we did not object

15   because we had not received the exhibits, specifically.  We had

16   just received broad categories of documents.

17         We have now received some of their exhibits.  They are

18   not quite labeled clear as to which is an exhibit and why.  So,

19   we just want to note that they were deficient and we need more

20   information before we can file our objections.

21         THE COURT:  That's on my list that I was going to go

22   through in a minute.  Let me jump ahead to that.

23         I take it from that that you have not actually put

24   your exhibits in each other's hands.  You need to do that

25   promptly.

1      MR. COOK:  Your Honor, we have.

2      THE COURT:  You need --

3      MR. COOK:  This is James Cook.

4      THE COURT:  Well, let me tell you how they have to be.

5  They have to be labeled.  Plainly identified.  When you stand up

6  in court and say to a witness, I am going to show you

7  Plaintiff's Exhibit 12, Ms. Moyle needs to know just exactly

8  what you are talking about.  She needs to have in her hands an

9  exact copy.

10     You have probably all heard this speech before.  It

11 happens more often than you can imagine that we will be in trial

12 and the plaintiff will say to the witness, I am going to show

13 you Plaintiff's Exhibit 12, and then the two lawyers start

14 talking about what's -- is this got all of the attachments, are

15 these handwritten notes on there, is this really what it's

16 supposed to be, and that all needs to be worked out ahead of

17 time.

18     So you need to put a precise copy of the exhibits in

19 each other's hands.  Probably ought to be done electronically,

20 but however you want to do it.  I would like an electronic copy.

21 I don't want a paper courtesy copy of all of this.  I would like

22 an electronic courtesy copy, so if you have got a thumb drive,

23 or whatever, with your exhibits, that would be helpful.

24     We will give you back your thumb drive as long as you

25 remember to ask for it later.  It helps if the thumb drive is

1   organized the way it probably will be where each exhibit is a

2   separate item I can click on and go right to the exhibit.

3          I will set a deadline for you to put your exhibits in

4   each other's hands exactly as they are supposed to be.  I will

5   set a deadline for any additional objections based on the first

6   disclosure.

7          MR. COOK:  Your Honor, if I may, what you are saying

8   is exactly what we did.  We have a 1A, B, 2A, B, C, 3A, B, C, D,

9   E, F -- whatever it is -- with meaningful descriptive names.

10  However we don't have exhibits from the United States.  And the

11  exhibits that we -- the list of exhibits do not have meaningful

12  descriptive names.

13         THE COURT:  All right.  If you have done it the way

14  you have said, that's perfect.  And, Ms. Moyle, you need to get

15  it back the other way.  And I will confirm the obligation in the

16  order that I will do after today's hearing.

17         MR. COOK:  And, Your Honor, we are missing some

18  exhibits from the United States.  They were supposed to have

19  medical records for the witnesses that the Court agreed to,

20  confirmed, and I don't believe we have all of those.  But to the

21  extent that things are missing it would be those kinds of

22  records.

23         THE COURT:  All right.  Well let's get them together

24  and do it.  Ms. Moyle, is he right?

25         MS. MOYLE:  Yes.  As to the medical records we did not

1  want to pull those until we had your order confirming that we

2  were permitted to, and so we are still in the process of working

3  with the BOP to do that.  As soon as we have them we plan to

4  transmit them.

5         THE COURT:  All right.  Light a fire under them so

6  they get it done.

7         MS. MOYLE:  Okay.

8         THE COURT:  Is that all from the government in?

9         MS. MOYLE:  Yes, Your Honor.

10        THE COURT:  Mr. Carter?  Anything else we need to

11 discuss today?

12        MR. CARTER:  Just briefly on the trial exhibits.

13 Mr. Cook is correct.  Yesterday, after noon, we did get his

14 exhibits.  So I haven't had a chance to go through and

15 specific -- we had the broad categories but not the specific

16 exhibits in the 2A or 2B or 3C, or whatever format.  So we will

17 go back and do the objection under your deadline.

18        There were a couple of exhibits that were listed in

19 their amended exhibit list, 8 and 9, and when I asked for those

20 Mr. Cook said those are going to be used for impeachment only so

21 he is not going to provide those.  So obviously I would like all

22 of the exhibits that were listed on the exhibit list.

23        MR. COOK:  Your Honor, we are going to file an amended

24 exhibit list that will delete those.  They are all only

25 impeachment evidence.

1          THE COURT:  Well, let me tell you where you get to on

2     that.  The standard orders in the district from time in memorial

3     have said that you have to disclose all your exhibits, including

4     those offered in rebuttal for impeachment.  Federal rules don't

5     take the same tact and rarely does the difference come up.

6          I can tell you, you run some risk in holding something

7     back and hoping I am going to let you use it for impeachment

8     that wasn't previously disclosed.  And, in particular, if there

9     has been a production request that should have brought up that

10    document it's not going to come in because production requests

11    can go beyond what 26(a)(3) requires.

12          MR. COOK:  Yes, Your Honor.  They have everything.

13          THE COURT:  So, be careful.

14          MR. CARTER:  Your Honor, part of the concern was when

15    the exhibits were identified they are identified this way --

16    it's 8 and 9 on their list -- FCI Tallahassee historical records

17    of sexual abuse, and then Number 9, Rolston historical records.

18    I just have no idea what's being referred to there.

19          THE COURT:  Say it again, 9 was?

20          MR. CARTER:  It's 8 and 9 on their amended list that

21    was attached to the pretrial.

22          THE COURT:  So 9 was Rolston records.  And 8 was what?

23    FCI Tallahassee historic?

24          MR. CARTER:  Historical records on sexual abuse.  I

25    don't know what that is.

1          THE COURT:  It sounds like what I just excluded.

2          MR. CARTER:  I know.  That's part of my issue, Your

3     Honor.

4          MR. COOK:  Yes, Your Honor.  And we have no intention

5     of bringing any of evidence in unless they open the door.

6          THE COURT:  All right.  So don't.

7          MR. COOK:  We will provide it.

8          THE COURT:  Don't suggest it anyway in front of the

9     jury.

10         MR. COOK:  Yes, Your Honor.  But if the Court wants me

11    to provide those documents to them I will do so.  They have them

12    in discovery.

13         THE COURT:  Yeah.  Let's add that to the things we are

14    circling back on.

15         On my list of things to do, when I run out of things

16    to do -- somehow I never get to -- has been going back and

17    making a deep dive on the standard long-time order in the

18    district requiring all of those disclosures and comparing that

19    to the federal rules.  So, this will force me to put that on the

20    list and get back to it.

21         Mr. Carter, anything else?

22         MR. CARTER:  Yes, sir, Your Honor.  Maybe this is more

23    just logistical.  I mean, as far as trying -- if we try the case

24    June 21st, or even June 28th, logistically, do we have masks?

25    Are you separating us?

THE COURT: Yeah. That is next up on my list. Fair question.

I need to find out whether everybody has been vaccinated.

Mr. Cook?

MR. COOK: Yes, I am.

MR. JOHNSON: I am, too.

THE COURT: Mr. Carter?

MR. CARTER: Yes, sir, I am. Rolston is. I don't know about Ms. Cole. She just walked out. She's young enough I don't know. I have to ask her.

THE COURT: Then Mr. Fisher? Ms. Moyle?

MR. FISHER: I am, Your Honor. This is Peter.

MS. MOYLE: Yes, I am, as well, Your Honor.

THE COURT: All right. Here's what I did in the jury trial I just tried: I let the lawyers speak without masks from the lectern.

The reason I asked about vaccination is, as you know, the CDC guidelines draw a distinction.

MR. CARTER: I asked Ms. Coles, Your Honor, Ms. Coles was vaccinated too, so all the lawyers have been.

THE COURT: All right. Good. So you can speak from the lectern without your mask.

At least as of now, my intention is to go forward by requiring masks otherwise. So, when you are sitting there at

1  the table you ought to have your mask on.

2        I am going to require the jurors to wear masks.  I

3  can't spread them out enough to get them fully socially

4  distanced.  We have run the smoke test in the courtroom to see

5  where the air moves and so forth.  And I think we can conduct a

6  jury trial safely, but it is safer if people wear masks when

7  they are not socially distanced.  And so you will have to wear

8  masks except when you are at the podium, and at the podium you

9  will be more than six feet from anybody.

10        I will let the witnesses take off their masks to

11  testify if they are comfortable doing it.  In the trial I just

12  did I think I had three witnesses that said they wanted to keep

13  their mask on and I let them do it.

14        And then I wear my mask the whole time, except when I

15  am speaking.  So when I am instructing the jury, or whatever, I

16  take my mask off.  I am socially distanced and fully vaccinated

17  as well.

18        I picked my last jury in the jury assembly room.  That

19  worked very well and I plan it do it again.  If things continue

20  to improve, and so forth, we will go back to picking juries in

21  the courtroom.  But, it worked well.

22        Let me tell that you we have people fully separated

23  down there and they are not in neat rows, so a geographic chart

24  where you keep up the jurors is hard because it's not just rows

25  and columns.  They are spread around.

1       Because of that, we used numbers instead of names.

2  They have been doing that for decades in the middle district and

3  southern district and lots of other places.  I have always

4  preferred to use names, because it just seems more respectful,

5  but it's way easier to use numbers.  And so -- and when they are

6  spread out, and not easily identified geographically, it's very

7  hard with names but easy with numbers.

8       So we will do it that way.  And the same jury process

9  you have been through before.  We will have to work out a place

10  for to stand when you are asking questions.  The trial I just

11  did was a criminal says so is asked the questions.

12       You will be able to ask questions.  You have all heard

13  the speech before.  You questions have to be juror questions.

14  They have to relate to how you would exercise a cause challenge

15  or peremptory challenge.  They can't be jury conditioning and

16  substantive argument and all that.

17       We have headphones that we will use for any bench

18  conference.  My goal is not to have bench conference.  I try to

19  resolve the disputes not on the jury's time.  When issues come

20  down the pike, raise it with me, as you have done a good job in

21  doing so far, and we will try to resolve it not when the jury is

22  in the box, but we do have headphones for bench conferences

23  where we can all stay in our place and speak into the

24  microphone.

25       I think that's the COVID procedures.

1          The other procedures you have heard.  If you have an
2     objection just stand up and say "objection" and basically give
3     me the title.  No speaking objections.
4          Please don't run out of witnesses.  Try to have the
5     witnesses available.
6          Mr. Cook, on your side, I am not quite sure who to
7     work with and how, but the best -- please do your best with the
8     marshal service so that they know which prisoners to bring when
9     in a case with multiple people moving back and forth from the
10    facility, whether it's FCI, or sometimes far away as Washington
11    County, so they know when they are going to need which witness.
12         That pretty much what's on my list.  I have other
13    things I go over with less-experienced lawyers but you have all
14    done this.
15         I will say, I always try to remember when the jury
16    goes out, when I have other things to do in the case, like
17    forfeiture counts in criminal cases or like judgment claims, or
18    like in this one, a claim against the government, I will
19    probably bring that up.  But, Ms. Moyle, that's your
20    responsibility to remind me when the jury goes out that you are
21    still there and there is more evidence.  Mr. Cook, yours, too.
22         MR. COOK:  Yes, Your Honor.
23         MS. MOYLE:  Understood.
24         THE COURT:  I think that's all I have.
25         MR. CARTER:  How many jurors -- this is Steve Carter

1    again.

2          How many jurors did you intend to pick for this civil

3    trial?

4          THE COURT:  Probably eight.

5          MR. CARTER:  Okay.

6          THE COURT:  My preference is 12, but I can get eight

7    separated from each other so we will probably go with eight.

8          MR. CARTER:  Peremptories I presume three for each

9    side, in light of the government not participating in the jury

10   process?

11         THE COURT:  I think that's right.  Three a side.

12         Mr. Carter, anything else?

13         MR. CARTER:  No, sir.  I had nothing else.  Thank you.

14         THE COURT:  All right.  Ms. Moyle, anything else?

15         MS. MOYLE:  No, sir, thank you.

16         THE COURT:  Mr. Cook?

17         MR. COOK:  Yes, Your Honor.  When do we need to get

18   you our writs?

19         THE COURT:  I have got the writs.  We just need to get

20   the settled trial date.

21         MR. COOK:  Okay.

22         THE COURT:  And we will try maybe at the next hearing

23   let's confirm which writs you need.  You are now further along

24   in having your order of proof down, so make sure we don't writ

25   somebody who is not going to testify.

1          MR. COOK:  Yes, sir.

2          THE COURT:  Somebody who is needed or may be needed,

3    when we can get them here.

4          All right.  I will talk with you as soon as we get the

5    next phone call set up.

6          Thank you all.  We are adjourned.

7       (Proceedings concluded at 11:40 on Thursday, May 20, 2021.)

8                    * * * * * * * *

9          I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
10   Any redaction of personal data identifiers pursuant to the
     Judicial Conference Policy on Privacy are noted within the
11   transcript.

12   /s/ Lisa C. Snyder                   1/13/2022

13   Lisa C. Snyder, RPR, CRR                  Date
     Official U.S Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

| | |
|---|---|
| CHARNESHA ALEXANDER, | ) |
| | ) |
| Plaintiff, | ) Case No: 4:19cv138 |
| | ) |
| v. | ) Tallahassee, Florida |
| | ) May 28, 2021 |
| | ) |
| UNITED STATES OF AMERICA | ) |
| and PAUL ROLSTON, | ) |
| | ) 9:59 AM |
| Defendants. | ) |
| _____ | ) |

**TRANSCRIPT OF TELEPHONIC HEARING**
**BEFORE THE HONORABLE ROBERT L. HINKLE**
**UNITED STATES DISTRICT JUDGE**
**(Pages 1 through 10)**

<u>APPEARANCES</u>: (By telephone)

For the Plaintiff:     James V. Cook, PA
                      By:  JAMES V. COOK
                           Attorney at Law
                           cookjv@gmail.com
                      314 W. Jefferson Street
                      Tallahassee, Florida 32301

                      Richard E. Johnson, PA
                      By:  RICHARD ERROL JOHNSON
                           Attorney at Law
                           rick@rej-law.com
                      314 W. Jefferson Street
                      Tallahassee, Florida 32301

*LISA C. SNYDER, RPR, CRR*
**Official United States Court Reporter**
**111 North Adams Street, Tallahassee, FL 32301**
**(850)567-1374 * lisasnydercr@gmail.com**

*Proceedings reported by stenotype reporter.*
*Transcript produced by Computer-Aided Transcription.*

Appearances Continued:

```
 1    For the Defendant         Henry Buchanan Hudson
      Rolston:                  By:  JOEL STEVEN CARTER
 2                                   MIRIAM REBEKKAH COLES
                                     Attorneys at Law
 3                                   scarter@henryblaw.com
                                     mcoles@henryblaw.com
 4                              2508 Barrington Circle
                               Tallahassee, Florida 32308
 5

 6    For the Defendant         DOJ – USAO
      USA:                      By:  KATHRYN WILBURN DREY
 7                                   MARY ANN LANE COUCH
                                     US Attorney
 8                                   kathryn.drey@usdoj.gov
                                     mary.ann.couch@usdoj.gov
 9                              21 E. Garden Street, Suite 400
                               Pensacola, Florida 32502
10

11                              DOJ – USAO
                               By:  MARIE ARMSTRONG MOYLE
12                                   PETER GUNNAR FISHER
                                     marie.moyle@usdoj.gov
13                                   peter.fisher@usdoj.gov
                               111 N. Adams Street, 4th Floor
14                             Tallahassee, Florida 32301

15

16

17

18

19

20

21

22

23

24

25
```

**P R O C E E D I N G S**

(Call to Order of the Court at 10:01 AM on Friday, May 28, 2021.)

THE COURT:  Good morning.  This is Judge Hinkle.

I have received the government's filing setting out where we are.  It now appears that it's likely, though not certain, that Ms. Alexander will indeed be moved to home confinement.  The government no longer opposes continuing the case and suggested a couple of dates.

I appreciate everybody being available, including the case manager and people with more knowledge of it.  We may have everything we need already.  It looks to me like what we need to do is just move the trial and it looks like the week of September 13th works, but let me see how that is with the starting with the plaintiff.

MR. COOK:  Your Honor, this is James Cook.  I have no conflicts.

MR. JOHNSON:  This is Rick Johnson.  I'm free too.

THE COURT:  All right.  Where things currently stand, I have one other case set at that time so as often happens we will be stacking the case.  The other one also is a prisoner case and that one is a plaintiff who is in custody.  So, we will need more a definite date for it.  But each of these cases may have a number of prisoners.  I will get you a date certain just as soon as I can.  We are still waiting on information on the

```
 1    other case.

 2          On the defense side, Ms. Moyle, September 13th, I

 3    think was one of the weeks you suggested.  That works for you?

 4          MS. MOYLE:  Yes, Your Honor.

 5          And just a brief update on Ms. Alexander's home

 6    confinement.  Since our filing, I believe Mr. Eric Anderson can

 7    confirm me on this, but she has now been accepted for home

 8    confinement by the contractor so that next stage of the process

 9    has happened.

10          THE COURT:  Very good.  It sounded like from your

11    filing I didn't need to do a writ.  We could work out the --

12    when the order is entered and so forth the -- we can work out

13    moving.  I usually do that with the probation department, but I

14    take it, with the CARES Act move to home detention, that it's

15    not the probation office that's doing the supervision, it's the

16    contractor through the Bureau of Prisons.  Do I have that right?

17          MS. MOYLE:  Yes, Your Honor.  I believe that is

18    correct.  She is still technically under the Attorney General,

19    and the only consideration between the furlow and the writ would

20    be that the writ would -- obviously she would be housed at a

21    jail, the contract facility that the marshal service uses during

22    the trial, versus the furlow, she would be responsible for her

23    own cost and transportation and stay while she is in

24    Tallahassee.

25          THE COURT:  Exactly.  And from Phoenix City, it's two
```

and a half hours away, something like that.  It's not very far
        and wouldn't be very difficult.

                And, Mr. Cook, you can work on those arrangements.  We
        can do what I need to on my end in terms of the furlow.  I will
        get the orders entered and presumably we will be able to do that
        without any difficulty.

                MR. COOK:  Yes, Your Honor.

                THE COURT:  I have representatives on the line.  I
        guess if anybody has anything to tell me about, specifically,
        what you need out of me, if there is anything you need other
        than an order setting the case for trial, this would be a good
        time to tell me.

                All right.  I don't hear anything.  And I'm sure we
        can work all of that out very well.  I will get an order entered
        moving the trial to the trial period that starts on
        September 13.  You can all be in touch with the courtroom deputy
        from time to time if you haven't heard something back more
        specifically about the actual date.

                As soon as I can find out more about my other case
        scheduling I will try to get you a date certain so that
        everybody has lots of advance notice of exactly when we are
        going to be doing this.

                I did need to go down -- I think, Mr. Cook or
        Mr. Johnson, the writs that you need -- let me pull up my list
        here.  I think I mentioned last time Ms. Winston was released so

```
 1   you will need to get her there.

 2            Here are the ones that I have from your list.  Tell me

 3   if these are still going to be witnesses.  I have Daphne

 4   Rodriguez, who is at FCI Tallahassee.

 5            Do you expect her to be a witness still?

 6            MR. COOK:  Yes, Your Honor.

 7            THE COURT:  Michelle Morton, who is apparently in

 8   Dublin, California.  Do you still expect her to be a witness?

 9            MR. COOK:  No, Your Honor.  She is not on our list.

10            THE COURT:  Ashlee Nicol Barnett, at FCI Tallahassee.

11            MR. COOK:  Yes, Your Honor.

12            THE COURT:  Connie Bachelor, also at FCI Tallahassee.

13            MR. COOK:  Yes, Your Honor.

14            THE COURT:  And Carmen McCune, is in Brian, Texas.

15            MR. COOK:  We have removed her from our witness list.

16            THE COURT:  That makes it easy because all of those

17   are at FCI Tallahassee.

18            MR. COOK:  (Inaudible.

19            THE COURT:  Wait.  I can't hear you.  You need to

20   speak up.  Who?

21            MR. COOK:  Sonya Dodd, Shondalin Blevins, and Beth

22   Farber.

23            THE COURT:  Somehow I didn't have those on my list.

24   You believe those are currently in the Bureau of Prisons?

25            MR. COOK:  Yes, Your Honor.  No, actually I think
```

1    Sonya Dodd may be released but I will have to check on that.

2            But, either Dodd or Blevins.  But Winston has been

3    released, so we will be responsible for that person.

4            THE COURT:  All right.  I'm not sure you had asked for

5    writs for Dodd, Blevins, or Farber.

6            MR. COOK:  We meant to, Your Honor.

7            MR. CARTER:  This is Steve Carter.  I had not seen the

8    request for writs either, so I think it was either an oversight

9    on their part or related to the other case that we were

10   combining these cases with.

11           MR. COOK:  Yes, Your Honor.  We were going by our

12   current second amended list, which we just filed this morning.

13           THE COURT:  Were they on there before or are these new

14   witnesses?

15           MR. COOK:  No.  They were on there before.

16           MS. MOYLE:  Your Honor, this is Marie Moyle.  That

17   witness list was filed I think at 9:53, so I haven't had

18   substantial time to review it.  I do want to provide additional

19   information.

20           Ms. Dodd is actually deported from the country.  She

21   was deported before, after we noticed her deposition, back in

22   February of 2020, and from my knowledge no one has had any

23   contact with her since.

24           And, Miss Farber is out of the Bureau of Prisons

25   system entirely.

```
 1              THE COURT:  So that leaves --

 2              MR. COOK:  I'm sorry.

 3              THE COURT:  Go ahead.

 4              MR. COOK:  We have had contact with Ms. Dodd by email,

 5    so I guess we didn't know where it was coming from.  And that's

 6    true, Ms. Farber has been out for some time.

 7              THE COURT:  How about Blevins?  Do you know where she

 8    is?

 9              MR. COOK:  If we could, Your Honor, if we could file a

10    new request for writs, I am going to have to basically get on

11    the BOP website to see what her status is.

12              THE COURT:  File something new, but I have got

13    Rodriguez, Barnett and Batchelor.  And I will issue writs for

14    them.  And they are here in Tallahassee, so that won't be

15    difficult.

16              MR. COOK:  Yes, Your Honor.  And Rodriguez?

17              THE COURT:  Yes.  Rodriguez, Barnett and Batchelor.

18              MS. MOYLE:  Your Honor, this is Marie Moyle.  I

19    believe Blevins in is in Washington State, or Oregon.  Somewhere

20    in that area.  And we will check on the status of their release

21    dates to ensure that no one is scheduled to be released before

22    the September 13th trial date.  And if so, we will notify the

23    parties.

24              THE COURT:  All right.  That will be helpful.  And,

25    Mr. Cook, Ms. Blevins is a witness that is important enough to
```

```
 1   be brought here from Washington or Oregon?

 2            MR. COOK:  We think so, Your Honor.

 3            THE COURT:  All right.  I take it, she is another

 4   alleged victim?

 5            MR. COOK:  Yes, Your Honor.

 6            THE COURT:  Okay.  All right.  So the writs I am going

 7   to issue are for Rodriguez, Barnett, and Batchelor.  And we will

 8   check on Blevins.

 9            Not Dodd, not Farber, not Morton, not McCune.

10            MR. COOK:  Right.

11            THE COURT:  Anything else we can accomplish today?

12            Mr. Cook, anything on your side?

13            MR. COOK:  Nothing more here, Your Honor.

14            THE COURT:  Ms. Moyle, anything on your side?

15            MS. MOYLE:  No, Your Honor.  I believe all pretrial

16   deadlines are in place, so we want to make sure that, you know,

17   nothing changes before the September 13th trial date, that we

18   don't try to reopen discovery on any of the witnesses that we

19   discussed last week and that sort of thing.

20            THE COURT:  Exactly.  The change in the date doesn't

21   effect any of that.

22            All right.  Thank you all.

23            We are adjourned.

24        (Proceedings concluded at 10:13 on Friday, May 28, 2021.)

25
```

1                           * * * * * * * *

2                I certify that the foregoing is a correct transcript
   from the record of proceedings in the above-entitled matter.
3  Any redaction of personal data identifiers pursuant to the
   Judicial Conference Policy on Privacy are noted within the
4  transcript.

5

6  /s/ Lisa C. Snyder                      1/13/2022

7  Lisa C. Snyder, RPR, CRR                Date
   Official U.S Court Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    **UNITED STATES DISTRICT COURT**
                    **NORTHERN DISTRICT OF FLORIDA**
3                      **TALLAHASSEE DIVISION**

4      CHARNESHA ALEXANDER,              )
                                         )
5                       Plaintiff,       ) Case No: 4:19cv138
                                         )
6            v.                          ) Tallahassee, Florida
                                         ) September 2, 2021
7                                        )
       UNITED STATES OF AMERICA          )
8      and PAUL ROLSTON,                 )
                                         ) 9:03 AM
9                       Defendants.      )
       _____ )

10

                    **TRANSCRIPT OF TELEPHONIC HEARING**
11              **BEFORE THE HONORABLE ROBERT L. HINKLE**
                    **UNITED STATES DISTRICT JUDGE**
12                      **(Pages 1 through 33)**

13     <u>APPEARANCES</u>: (By telephone)

14     For the Plaintiff:      James V. Cook, PA
                               By:  JAMES V. COOK
15                                  Attorney at Law
                                    cookjv@gmail.com
16                             314 W. Jefferson Street
                               Tallahassee, Florida 32301
17
                               Richard E. Johnson, PA
18                             By:  RICHARD ERROL JOHNSON
                                    Attorney at Law
19                                  rick@rej-law.com
                               314 W. Jefferson Street
20                             Tallahassee, Florida 32301

21

22                        ***LISA C. SNYDER, RPR, CRR***
                    **Official United States Court Reporter**
23           **111 North Adams Street, Tallahassee, FL 32301**
                 **(850)567-1374 * lisasnydercr@gmail.com**

24

25                *Proceedings reported by stenotype reporter.*
              *Transcript produced by Computer-Aided Transcription.*

```
 1   Appearances Continued: (By telephone)

 2   For the Defendant        Henry Buchanan Hudson
     Rolston:                 By:   JOEL STEVEN CARTER
 3                                  MIRIAM REBEKKAH COLES
                                    Attorneys at Law
 4                                  scarter@henryblaw.com
                                    mcoles@henryblaw.com
 5                            2508 Barrington Circle
                              Tallahassee, Florida 32308
 6

 7   For the Defendant        DOJ – USAO
     USA:                     By:   KATHRYN WILBURN DREY
 8                                  MARY ANN LANE COUCH
                                    US Attorney
 9                                  kathryn.drey@usdoj.gov
                                    mary.ann.couch@usdoj.gov
10                            21 E. Garden Street, Suite 400
                              Pensacola, Florida 32502
11

12                            DOJ – USAO
                              By:   MARIE ARMSTRONG MOYLE
13                                  PETER GUNNAR FISHER
                                    marie.moyle@usdoj.gov
14                                  peter.fisher@usdoj.gov
                              111 N. Adams Street, 4th Floor
15                            Tallahassee, Florida 32301

16

17

18

19

20

21

22

23

24

25
```

**P R O C E E D I N G S**

(Call to Order of the Court at 9:03 AM on Thursday, September 2, 2021.)

THE COURT:  Good morning.  This is Judge Hinkle.  My phone was muted.  I was quite eloquent to this point.  I'm sorry you missed it.

Let me start over.  Plaintiffs a request for a status conference.  That seems to be a good idea.  There were, I think, four subjects on the request.  I will address each of those and hear what you have to say about it.  Then we can address anything else you wish to address.

First, there was a request for a date certain.  That certainly makes sense.  The date certain is September 13.  That's the date that's been set all along and we are stacked first.

There will be an attorney conference at 8:15 just to address any last minute things and take stock of where we are.  But if there are other substantive issues it would be better to address them before that, not the morning of trial, so if you know of anything we can address it today.

We will have the attorney conference and then we will pick the jury and go straight into the trial.

Another question was for information how we are dealing with COVID.  Here is the situation.  We delayed the trial, and other trials, when the pandemic seemed to be at its

peak.  The hope certainly was that by now things would be under
control.  As it turns out, things are the worst they have ever
been at this point in Tallahassee.

We have nonetheless been trying cases.  I have tried
to do it as safely as it can be done.  If either side doesn't
wish to proceed, we can talk about that, but here is how I plan
to do it.

First, everybody in the courtroom will be masked.  And
will wear the masks properly all the time, with this exception,
when one is speaking, and more than six feet from anyone else,
then the mask can be removed.  And so the lawyers conducting
examinations can be at the lectern and have the mask removed
during their examination and put the mask back on and return to
counsel table.

The witness can have the mask off.  What I have done
is tell witnesses that while they are on the witness stand,
socially distanced, they are welcome to take their mask off if
they are comfortable with it.  And so far every witness, except
two, has been comfortable and has taken the mask off.

I had a case where two of the witnesses were students.
I think they were more comfortable with the masking regime
because they had been on campus and they had seen more cases and
so forth, and they wanted to keep their mask on and it didn't
impede the proceeding a bit.

The jurors will all be masked all the time.  I have

1    had no push back on that at all.  They have been very

2    conscientious about wearing masks.  There will be masked during

3    jury selection, except when they are answering a question, and

4    they can take off their mask at that point.

5         I have had a very small amount of push-back in jury

6    selection.  As you all know, somehow wearing a mask became a

7    political issue instead of a public health issue.  There are

8    people who show up, and obviously don't wish to wear their mask,

9    and sometimes they have them at half-staff, as you have seen,

10   but when I explain why we are doing this I have gotten good

11   cooperation.  It's not been a problem.

12        In the civil trial I just completed both sides asked

13   to have only vaccinated jurors, and that's what we did.  And so

14   in the initial stage I said to the jurors:  I am going to give

15   you three categories and I am going to get you to raise your

16   paddle.  We are using paddles with numbers on them so you can

17   identify people.  And the three categories were vaccinated and

18   don't mind saying so, unvaccinated and don't mind saying to, or

19   don't want to tell you.

20        That was the civil case.  I think we had 19 -- I think

21   we had 19 jurors.  We had I believe five who were unvaccinated.

22   Nobody objected to answering the question.  Maybe it was only

23   four unvaccinated -- four or five were unvaccinated.  The rest

24   were vaccinated.

25        I excused the unvaccinated right away.  Explained that

both sides agreed we would have a vaccinated jury and I let them
go right at the beginning.

I always worry letting people go right away because
then the other jurors see that you can give an answer that
disqualifies you and you get to leave right away, but that
wasn't a problem.  And, frankly, at this point, when somebody
responds to a jury summons they are generally pretty
conscientious.  If they want out, they can call back and use
COVID, or some excuse, and we are pretty good about letting them
go.

So by the time the people get in the room they are
generally conscientious of folks willing to perform their public
duty, and they speak up and answer the questions.  So in that
case, we did it that way.  We got a jury that was all
vaccinated.

I have picked all of the juries since coming back from
the pandemic downstairs in the jury assembly room where the
jurors can spread out more.  It works just fine.  Haven't had
any difficulty with that.  It's a little safer.

For one thing, if we bring the jurors up to the
courtroom they have to be transported on the elevator.  That's
multiple car loads if you keep people separated.  And, of
course, there is not as much room in the courtroom, in a civil
trial like this, without many people, if any, in the audience.
I can spread them out in the back of the courtroom so we can

keep them separated for jury selection in the courtroom, but it's just a little easier downstairs. You avoid the elevator and everybody is looking the same direction and it works just fine.

I am not sure we will be able to do that in case. It depends on whether either of the other district judges is picking a jury the same day. But if there is no other jury selection going on, on the 13th, we will pick the jury downstairs in the jury assembly room.

Then during the trial, I have used two jury rooms instead of one so the jurors can keep their distance from one another better. That has not caused any difficulty. In fact, it has been very helpful when we've had -- you probably all read in the newspaper, one of the high visibility cases I had we had two different jurors who had COVID during the trial, and the fact that they were in different jury rooms helped us get through the trial, and so we do it that way.

I have, historically, tried to pick 12 jurors for civil cases, but to be able to spread out as much possible. My plan is to pick eight. We have got enough room then to separate people pretty well in the jury box. Not completely. It's not possible to keep everybody six feet from each other. Basically we will have a juror on the front row and a juror on the back row that are within six feet of each other, but they will be every other chair and so there is a little more room than there

1   would be ordinarily.  All of that has worked pretty well.

2         The only COVID cases I have known about with jurors

3   were I had a juror who visited her mother in the emergency room.

4   She actually lived in the same house with her mother.  During

5   the trial her mother was having breathing difficulties.  They

6   took her to the emergency room.  The juror went in and saw her.

7   The mother had COVID.  And the juror was exposed and indeed

8   later contracted the disease.

9         And then later another juror in that case got COVID --

10   was actually sitting in the jury box for three or four days with

11   the disease thinking he had a very mild cold.  Then one night he

12   got a fever and got tested and it turned out he had COVID.

13         Happily that juror was vaccinated.  It was a mild

14   case.  And we took a break in the trial and came back and that

15   juror managed to finish and it was fine.

16         On that jury we only had a couple of unvaccinated

17   jurors, and -- well three; the first one that got COVID, and

18   then two others, and they were in different rooms, different

19   jury rooms, and they were -- the unvaccinated jurors were

20   removed -- were far enough away in the jury box from the ones

21   that got it that that wound up not being a problem.  So far as I

22   know none of the other jurors contracted COVID.  The others were

23   all unvaccinated and that made it much better.

24         That's what we have done with COVID.  I think I

25   propose to go forward at this point but if somebody wanted to

1    put the case off longer -- one hopes that at some point the

2    pandemic will ease and the situation will be better.  One hopes

3    it's starting to come down even right now, but we might be at

4    the very peak.  We might not.  Hard to know.

5           Let me start on the plaintiff's side.  Are you ready

6    to go on the 13th, or you want to do something because of the

7    pandemic?

8           MR. COOK:  This is James Cook.  We would like to go

9    ahead and have the trial as scheduled.

10          THE COURT:  All right.  Mr. Carter?

11          MR. CARTER:  Your Honor, we would like to go ahead and

12   go too.

13          THE COURT:  And whoever, Mr. Fisher -- who is speaking

14   for the government and tell me the government's position.

15          MS. MOYLE:  Good morning, Your Honor.  This is Ms.

16   Moyle for the government.  We would like to go forward as well.

17          We will note that one witness currently has COVID, but

18   his or her quarantine period is expected to end on

19   September 13th.

20          I'm sorry.  September 10th.

21          THE COURT:  All right.  And having looked at this with

22   some care, because of the COVID exposure in my other case, my

23   conclusion at that point was that somebody who actually has the

24   disease, once it's been 10 days since the onset of symptoms, is

25   probably the -- if not the safest person in the room, is as safe

1 | as anybody else.

2 | The issue has been studied with some care for some

3 | period of time and the indication is that at that point, as long

4 | as it was a mild or moderate case, and not a severe case, and as

5 | long as there are no symptoms, including no fever, that person

6 | is safe and can go back to work.

7 | So, for that witness to come in, that witness's

8 | quarantine period needs to end and that means the person has to

9 | have no symptoms, no fever. Does not necessarily have to have

10 | had a negative test, but does need to be symptom free.

11 | On the government's side, if it's your witness, make

12 | sure that the witness meets all those requirements and we don't

13 | bring somebody into the courtroom that should be separated.

14 | All right. So we will go forward.

15 | One of the issues was the plaintiff's furlow status.

16 | Mr. Cook, is Ms. Alexander going to be out and available?

17 | MR. COOK: Yes, Your Honor. I talked to the head of

18 | the program that she is in last week and she said everything is

19 | fine for her travel.

20 | THE COURT: Good. And then that brings us to how to

21 | deal with the fact that it's a jury trial for the claim against

22 | Mr. Rolston, and a non-jury trial for the claim against the

23 | government. How do you wish to handle it? We talked about this

24 | a little bit back on May the 20th, and we had a hearing set the

25 | next week and said we'd look at it further at that point and

1    then we had the hearing the next week and did not address it

2    further at that point.  So, the request for a status conference

3    is a good one.  We probably need to discuss this.

4         Let me start with the government.  Ms. Moyle, what do

5    you think we ought to do?  How do you propose to handle it?

6         MS. MOYLE:  Yes, Your Honor.  So we first would like

7    to sort of go over how the United States is going to be

8    introduced in front of the jury.  I believe at that May 20th

9    status conference you proposed something along the lines of

10   these are lawyers from the Department of Justice who may or may

11   not ask questions of certain witnesses.  That language is fine

12   with us.  I don't know if plaintiff has any objection.

13        In terms of plaintiff's case-in-chief, our preference

14   would be to allow plaintiffs and Defendant Rolston to have

15   traditional direct, cross, redirect.  And then if we have any

16   questions we would ask some follow ups with allowing plaintiff

17   to redirect after if needed.

18        You know, frankly, thinking about the logistics of who

19   is on their witness list in terms of Ms. Alexander and numerous

20   415 witnesses we can't guarantee anything, but Mr. Carter is a

21   capable attorney and it's not really our intention to be

22   unnecessarily repetitive in asking these witnesses questions

23   that have already been answered.

24        THE COURT:  The only change in that is I think the

25   sequence should be plaintiff, cross by Rolston, cross by the

1  government, redirect.  There is no reason to put the government

2  after the first redirect and then have another redirect.

3          Actually, as I think about it what I have done,

4  generally, when I have had defendants whose interest may be

5  adverse is to put one other step in there.  I think I would go

6  plaintiff, defendant Rolston, government, back to defendant

7  Rolston for just any narrow questioning responding to the

8  government's cross, then back to the government, back to the

9  plaintiff, and then out.  So, Alexander, Rolston, government,

10  Rolston, Alexander, out.

11          That's on the assumption that the interest of

12  Mr. Rolston and the government may be adverse.

13          And I guess, Ms. Moyle, why would I let them -- why

14  would I make them do their redirect before you got to ask

15  questions?

16          MS. MOYLE:  Our thinking was that it would preserve

17  the traditional plaintiff defendant thinking in front of the

18  jury, and if we are introduced as a third party neutral then us

19  asking questions at the end, with plaintiff following up with

20  anything, if needed, would be better keep that.

21          THE COURT:  Yeah.  But, you are not a neutral.  And I

22  am not going to suggest to the jury that you are.  I'm the

23  neutral.  You're a party with an interest.  So, I think what I

24  propose to tell the jury is that in a case like this the

25  government, too, has interests.  Not necessarily the same as the

1    other parties.  And you are entitled to ask questions.  None of

2    the matters that affect the government are things that will be

3    submitted to the jury.  But, all of the evidence elicited by the

4    government is part of the evidence in the case that the jury can

5    consider.  But I am not going to give you any super status as

6    some kind of neutral that gets to come afterwards and tell us

7    what the real truth is.  That's not going to happen.

8         MS. MOYLE:  The way you described it is fine with us,

9    Your Honor.

10        THE COURT:  All right.  Then, Mr. Carter, I have

11   already told you what my tentative idea is.  Does that work for

12   you?

13        MR. CARTER:  Yes, sir.

14        THE COURT:  Tell me whether you think -- do you think

15   you ought to have the opportunity to follow up after the

16   government asks questions?

17        MR. CARTER:  I mean, as far as using the term adverse

18   to the government I don't know if I can go that far.  But,

19   clearly, there are issues that are different.  And the idea of

20   if there is a very narrow follow up after the government asks

21   questions that I think are needed I think that's the place to do

22   it.  So I would agree that the sequence that you laid out is

23   something that should happen.

24        THE COURT:  All right.  Here is what I think I will

25   do, as we do this, and I will get a feel more as we go through

1   it, but my guess is it won't be very often that you have

2   questions after the government's questions.  So I think what I

3   will do is after the plaintiff examines the witness then I call

4   on you for cross -- call on the government.  I won't necessarily

5   go back and call on you every time, but if you have questions

6   stand up and tell me.

7            MR. CARTER:  Okay.

8            THE COURT:  And you will be able to do it then.

9            And then, as we go, if it turns out you have follow-up

10  on witnesses on a regular basis I will start calling on you.

11  But otherwise we will skip back to redirect unless you get my

12  attention.

13           MR. CARTER:  Okay.

14           THE COURT:  Mr. Cook, that all work on our side?

15           MR. COOK:  Yes, Your Honor.

16           MR. CARTER:  Your Honor, this is Steve Carter.  I had

17  something before you move on from this little discussion here.

18           THE COURT:  Okay.

19           MR. CARTER:  As far as the way you indicated you would

20  introduce the government, the government has an interest and the

21  issues are not submitted to the jury, I get all that and that's

22  fine.  My issue is, obviously for the Department of Justice and

23  the US Attorney is there, and they have an interest, I don't

24  want to suggest that it's a criminal interest or an interest in

25  a criminal matter.  Can you introduce them as attorneys handling

civil cases, or civil issues for the government?  That would be my issue.

THE COURT:  Yeah, I will think about how to say it, but I don't want to suggest they are about to bring a prosecution.

MR. CARTER:  Okay.

THE COURT:  Then we will take all the evidence that needs to be taken before the jury.  Ms. Moyle, do you think that the government will have additional evidence that would go only to the claim against the government and that I would probably take after the jury retired?

MS. MOYLE:  Yes, Your Honor.  We do expect that to be the case in terms of some wholly negligence witnesses.  There also may be -- we do have an expert, and that may be presented in front of the jury.

THE COURT:  May be presented in front of the jury?

MS. MOYLE:  Yes.

THE COURT:  But you think you have lay witnesses that will not be presented in front of the jury?

MS. MOYLE:  Yes.  Our intention would be to present any remaining battery witnesses, and then have the jury retire and possibly, you know, closings and then in interest of time and efficiency have any lay witnesses relating solely to the negligence claim just proceed in front of Your Honor after the jury has gone out.

1          THE COURT:  All right.  It seems to me here is what

2     ought to happen with that; to the extent that it doesn't make

3     any real difference, if you have questions of the witnesses who

4     are testifying before the jury, if there are a couple of

5     questions that may go to the government issues but not to jury

6     issues, but it's not going to make any real difference, probably

7     be good to ask them right then.  But if it's something that

8     might be prejudicial, or is more extensive, then you can hold it

9     and you can recall the witness after the jury goes out.  But I

10    think I would say if it's three or four questions it's not going

11    to make any real difference, let's don't recall witnesses if we

12    can avoid it.

13          Does that make sense?

14          MS. MOYLE:  Yes, that's our intention and we discussed

15    that with Mr. Carter and I believe he is in agreement on that.

16          THE COURT:  All right.  Mr. Carter, do you have

17    anything else on that?

18          MR. CARTER:  Yes, sir.  We did discuss that and I

19    think I am in basic agreement, and complete agreement with you

20    that if it does make a difference then I will clearly raise the

21    issue.

22          The other side of that -- that was for the government.

23    As to the plaintiff getting in evidence that might go to an

24    issue that's really before you, and not the jury, I don't -- how

25    would you want to deal with that?  Clearly I will bring it your

1  attention if I think that's the issue, but I know at one of our

2  status conferences you talked about taking them during breaks,

3  or when the jury was out, or something along those lines.  So I

4  just want some clarification of how you want to do that.  I am

5  not saying the plaintiff will, but if they do bring in something

6  that's solely the government's case, and it makes a difference,

7  how would we do that?

8         THE COURT:  Same idea.  If it's something that doesn't

9  make a difference, let's get it done at the same time.  But if

10  it makes a difference, then it can be done after the jury goes

11  out.

12         You are right, if it's somebody that is here in town,

13  or in the courthouse, I am here over lunch and at the end of the

14  day, that kind of thing, so we could take it.  But we would not

15  want to do it in front of the jury.

16         Mr. Cook, all of that work on your side?

17         MR. COOK:  Yes, Your Honor.  We would be in kind of

18  the same position.  We have gone through and taken out the

19  exhibits that pertain only to the government, but we would want

20  to put them back in for the Court, and we may need a witness to

21  testify as to them.

22         MS. MOYLE:  Your Honor, this is Marie Moyle.  We would

23  take the position that any wholly negligence evidence that

24  plaintiff intends to put on should be done at the end of their

25  case, and to preserve our Rule 50 argument.

1          THE COURT:  Yeah.  What you mean is you want the
2  plaintiff to have to put on her evidence before --
3          MS. MOYLE:  Before Mr. Rolston.
4          THE COURT:  -- before Mr. Rolston, or the government.
5          MS. MOYLE:  Yes, Your Honor.  And if Mr. Cook is
6  referring to just one witness, and some documents that you could
7  take under advisement, it seems like maybe that can be
8  accomplished in a long lunch break, or you know -- we don't want
9  to send the jury out unnecessarily by any means.  But we do want
10  to ensure that plaintiff has rested before any defense is put
11  on.
12          THE COURT:  Yeah.  Your issues, of course, are just
13  judge issues.  And it's not going to cause any prejudice to you
14  if evidence has been put on before I rule on a Rule 50 motion.
15          Of course, in a bench trial that motion is different
16  than it is in the jury trial.  At that point, I can make
17  findings of fact unlike in a jury trial.  But I can also keep
18  straight what is part of the record for purposes of that ruling
19  as opposed to the whole ruling.
20          So, for example, if we don't get to it at the close of
21  the plaintiff's case, and Mr. Carter calls witnesses and the
22  case goes forward, and then at the end of the day the jury goes
23  out and you present your motion, I can adjudicate the motion
24  without taking into account whatever evidence has come in during
25  Mr. Carter's presentation of Mr. Rolston's case.

1          So, you are not going to suffer any prejudice, but it

2     would certainly be better to know, because if you're not going

3     to be in the case anymore it would be better for you to be gone

4     and not to be asking questions.

5          Let's just play that by ear.  Maybe there will be

6     something there and maybe there won't, and maybe I'll know at

7     that point that you're just wasting your time with the Rule 50

8     motion, or maybe I'll know that there is really something to

9     this and it's worth taking the time to make sure we deal with it

10    right there.

11         Maybe it will be late in the day so we can send the

12    jury home and there is no issue, or maybe it will be the middle

13    of the day and we need to manage it as best we can.  Let's just

14    see where we are.  But you've alerted me to the problem and we

15    will do it as best we can.

16         I think we are good with all of that but tell me if

17    you have anything else to say about it.

18         Let's start with the plaintiff.  Mr. Cook, anything on

19    your side about any of this?

20         MR. COOK:  No.  I think that what you expressed is our

21    concern, that we -- things are so tangled up together in some

22    cases that we don't want to rest as to the bench part of it

23    until basically all of the testimony is in.

24         THE COURT:  Well, you'll rest before the defense has

25    to put on their case.

1       MR. COOK:  But then the Court can take account of

2  evidence that comes in subsequently, I assume.

3       THE COURT:  Well, no.  If you have had a chance to

4  call -- to put on all your evidence against Mr. Rolston, and

5  against the government, and you announce rest, then adjudicating

6  any Rule 50 motion from the government you will be stuck with

7  that evidence.  Now --

8       MR. COOK:  Okay.

9       THE COURT:  -- another twist here, if you have

10  significant evidence against the government, that will not come

11  in against Mr. Rolston -- we will come back to that, but that

12  could be -- then Ms. Moyle probably has a point that probably

13  needs to get taken -- your evidence probably needs to get taken

14  at that point.

15       MR. COOK:  Okay.

16       THE COURT:  It's not just what I was addressing a

17  minute ago; it's not just that I will have to disregard what's

18  come in, in the defense case.  I was thinking about new evidence

19  in the defense case and I can just ignore that on a Rule 50

20  motion, but to address the Rule 50 motion I do have to have all

21  of your evidence.

22       MR. COOK:  Okay.  We can work that out.

23       THE COURT:  Okay.  So you need to be ready to put your

24  evidence on before you rest.  So if you have got evidence just

25  against the government it seems to me that you should not plan

1  to wait until the jury goes out.  You may need to put it on

2  during, or at the end of the plaintiff's case, before the

3  defense case comes in.

4          How much evidence of that kind do you think there will

5  be?

6          MR. COOK:  I think probably about perhaps 15 or 20

7  pieces.

8          THE COURT:  What does that mean?  15 or 20 pieces of

9  documents?

10         MR. COOK:  Exhibits.

11         THE COURT:  How about any testimony?

12         MR. COOK:  Not a lot of testimony, no.  But there may

13  be some incidental testimony.  I can't exactly predict but maybe

14  in three or four cases.

15         THE COURT:  That's in that category, if it's really

16  not a big deal and if it's the same witness just let's get the

17  questions as we go.  But if it's something that really shouldn't

18  be presented in front of the jury then you have to wait and we

19  will work out a time.  It could be that we just have to take a

20  break in the jury portion of the trial and finish up with any

21  additional evidence at that point that you have that goes only

22  to the government.

23         Tell me how long you think the plaintiff's case is.

24         MR. COOK:  I think that after jury selection and

25  opening we have the half day and then a full day, the next day,

1    and then part of the morning.  Probably not the whole morning.

2            THE COURT:  So you think you will probably rest some

3    time during Wednesday morning?

4            MR. COOK:  Yes, Your Honor.

5            THE COURT:  All right.  Well, we will just track it as

6    we go along and see where we are.

7            Tell me on the defense side, Mr. Carter, how long do

8    you think your case will be?

9            Mr. Carter, are you still there?

10           MR. CARTER:  Sorry, Your Honor.  I had it on mute and

11   I was very eloquent, too.

12           I think a day, or a day and a half, depending on what

13   the plaintiff is going to be calling, and whether we get some of

14   what we are interested in through the witnesses they call.

15   That's kind of what I was thinking.

16           THE COURT:  All right.  Ms. Moyle, how about on your

17   side?  Once they have finished all that what do you think you

18   have?

19           MS. MOYLE:  Your Honor, so much of ours depends on the

20   scope of what's going before us.  In terms of the wholly

21   negligent witnesses that we intend to call, outside of the jury,

22   we can't imagine that goes more than really half a day.

23           THE COURT:  Yeah.  Okay.  It sounds like the case will

24   probably get to the jury on Thursday, but maybe Friday.

25   Possibly Wednesday, but not very likely.  We will see.

1      All right.  And we will just play it by ear in terms

2  of how much of a break we are going to need to put on evidence

3  that just goes to the bench trial issues.

4      By the time we are actually in trial you will have

5  refined your order of proof and we will see how it's going and

6  so we will just -- you alert me of the issues, and we will know

7  what they are, and we will track it as we go along and do what

8  we need to do.

9      It could be that we -- when the plaintiff rests, as

10 against Mr. Rolston with the jury issues, that the plaintiff

11 then, at that point -- we send the jury away, and whether that's

12 at lunch, or overnight, or whatever it means, we send the jury

13 away and take whatever evidence -- additional evidence there is

14 for the plaintiff just against the government.  At that point

15 the plaintiff will rest entirely.

16      I will deal with anything I need to deal with.  And

17 Mr. Rolston will start his case with the jury back in the box,

18 and we will get through that.  And then we can address at that

19 point where we are going to go from there, whether there will be

20 rebuttal evidence and how to sequence it.

21      Does the -- well, I can ask you more at the time.  I

22 would guess that the government will not be calling witnesses in

23 front of the jury, but that may be not be impossible.  I don't

24 know.

25      Ms. Moyle, do you expect to present any evidence in

1    front of the jury other than through cross-examination?

2            MS. MOYLE:  We are still working through that, Your

3    Honor, but quite possibly our expert will testify during that

4    time.

5            On that note, he is a practicing OB-GYN, who has

6    canceled his patient schedule on Wednesday and Thursday of trial

7    week.

8            THE COURT:  Tell me that again.  I'm not sure I heard

9    you right.  He is what, open Wednesday and Thursday.

10           MS. MOYLE:  He is a practicing OB-GYN who has canceled

11   patient schedule on Wednesday and Thursday of trial week.  After

12   we have a better understanding of how trial is going Monday and

13   Tuesday, we would appreciate if we could have a time certain for

14   him to testify, if we decide to call him.

15           THE COURT:  Right.  We can accommodate that.  Talk to

16   the other side and see what you can work out.  Look, we can take

17   people out of order if we need to so we can make that work.

18           MS. MOYLE:  Your Honor, I just want to make sure I

19   have clarity on how the presentation of examinations during

20   Rolston's case.  Is it your intention that's it's Rolston,

21   government, plaintiff, government if needed, and then Rolston

22   closes?

23           THE COURT:  It would ordinarily be Rolston,

24   government, plaintiff, back to Rolston.  The government wouldn't

25   ordinarily get another shot, but you might.  Let's just -- yeah,

1    it really depends on how different the interests are between you

2    and Mr. Rolston and what kind of cross there is.  So, if you --

3    I may do that one the same as I told Mr. Carter.  I would

4    probably start not planning to call on you, but if you have

5    some, what amounts to, essentially redirect, if you tell me I

6    will call on you and we will do it.  Let's see.

7            Obviously, all of this is very discretionary and the

8    object is to give everybody a full shot at presenting your case

9    and not to do like they do in California where everybody gets to

10   ask things 10 times that could be asked once and so forth.  So

11   if there is reason for you to ask questions in there, yes, you

12   will get to do it.

13           What else, Mr. Cook?  Any questions about any of that

14   on your side?

15           MR. COOK:  No, Your Honor.  But I do have a couple of

16   questions that I think should be asked.  I think the order says

17   that we should have the exhibits to the clerk a week prior to

18   trial, but that is a holiday.  And so I am wondering whether we

19   can provide those exhibits on Tuesday.

20           THE COURT:  Yes.

21           MR. COOK:  Okay.  And then the other thing I wanted to

22   know is will we able to have our experts in the courtroom?

23           THE COURT:  Yes.

24           MR. COOK:  All right.  That's all I have, Your Honor.

25           THE COURT:  I answered those questions without hearing

1　from the other side, but that's my usual answer.  Mr. Carter,

2　anything else on your side, or you want to tell me about why his

3　expert shouldn't be in the courtroom?

4　　　　　MR. CARTER:  I don't like it, but if that's your usual

5　practice, I guess...

6　　　　　THE COURT:  It is.  The rule says the expert can

7　testify, including on facts presented at the hearing.  Better

8　for the expert to hear it himself than for somebody to try to

9　say, "Assume A, B, C."

10　　　　　MR. CARTER:  Yes.  I understand, Your Honor.

11　　　　　I do have one issue I wanted to bring before you.  And

12　I appreciate Ms. Moyle saying, or asking for the status

13　conference because as I was putting together the written voir

14　dire questions for Your Honor to possibly ask I started thinking

15　about some of the sensitive nature of some of the questions in a

16　case like this.  And, in the past I know Your Honor has used a

17　questionnaire -- a written questionnaire -- and I wanted to see

18　if you would add some of those sensitive questions, and I can

19　prepare those, of course, to a questionnaire.  I mean, given the

20　nature of the sexual assault allegation, things like: Have you

21　ever been been a victim of that, or, you know, close family and

22　close friends, or, Have you ever been accused of that.  Very

23　basic stuff that I wouldn't think a juror would want to talk

24　about in front of everybody one.

25　　　　　THE COURT:  Yeah; you're right.  I am not sure they

1  will write that down any better.  I have -- I don't remember if

2  I have used written questionnaires for this kind of sensitive

3  information.  I don't remember doing it.  I am skeptical it will

4  help.  We could certainly talk about it.  This presents a

5  wrinkle and I'm glad you brought it up.  I hadn't thought about

6  it in this case.

7       Here is how I have dealt with this before: I have

8  called prospective jurors up individually, even there they may

9  or may not answer the question.  You know, this stuff is

10  intensely personal and it's just hard.  So if you know a better

11  way to get the information out I'm certainly willing to consider

12  it.  It's information you like to know to pick a fair jury and

13  it's just hard to get the information.

14       The problem with individual questioning is how you are

15  going to keep people apart.  How are you -- here is what I need

16  to do.  I need to find out whether there are other juries being

17  selected so I will know whether we are doing this in the

18  courtroom or downstairs in the jury assembly room.

19       It could be we could bring them over one at the time

20  into the Grand Jury room to keep people separated and ask that

21  question.  I am certainly willing to consider a written

22  questionnaire.  It would -- what we would do is just basically

23  have a separate page for the questionnaire and get people to

24  fill it out.

25            MR. CARTER:  Your Honor, I mean, I was thinking

1   questionnaire because I wasn't sure if you were going to

2   actually remove us, or pull us off to the side, and ask those so

3   it's outside the presence of everybody.  I would think that you

4   would, but I didn't know the best way to gather that

5   information.

6        Either one of those is acceptable, clearly, whichever

7   one gets the best information would be our issue, and Your Honor

8   has more experience in how they answer those questions than we

9   do.

10       THE COURT:  You know, if COVID weren't an issue, and

11  we had an easy place to talk to people one at the time, I could

12  see somebody -- seems to me it would be helpful to ask the women

13  if they ever think they have been abused or, you know,

14  mistreated during a gynecological exam.

15       MR. CARTER:  That's one of my questions that I will be

16  thinking about.  Yes, sir.  Maybe even -- yeah.  Maybe broader

17  than that, but, you know, that you thought was inappropriate.

18  Thought that your gynecological or medical exam was

19  inappropriate.

20       THE COURT:  Exactly.  And for the men, the same

21  question, although obviously not a gynecological exam and maybe

22  about relatives.

23       Maybe we're just going to -- maybe we need to bring

24  them in one at a time.  So maybe what we will do is bring the

25  potential jurors in the courtroom one at a time, and put them on

1    witness stand, if we are in the courtroom, or if we are

2    downstairs we can all go across to the Grand Jury room and bring

3    them in one at the time.

4         If we do that, if you have other specific questions of

5    them, you could ask them at the same time.  But, look, here is

6    what is important about this.  Nobody can be just wasting time.

7    But if you really go into things like this, that are important,

8    and you need to know as part of jury selection, we can do it

9    right there.  That's probably the best way to do it is with

10   individual oral questions.

11        The problem with asking them on a written

12   questionnaire, at the beginning, they would have that

13   questionnaire before anybody would be able to explain to them

14   that this is confidential and nobody is going to get it and so

15   forth.  I just think it would be less likely -- and you would

16   probably like to be looking at the person when they explain it.

17        MR. CARTER:  Absolutely.  That's a better way, Your

18   Honor.  I would agree.  I would prefer that.  Just from a

19   logistics standpoint, if that's what you end up doing, what do

20   you think it does to our start time?  Does it push jury

21   selection into the afternoon the first day, or --

22        THE COURT:  It won't take as long as you think.  I

23   hope that we -- I hope we get the right number of jurors.

24   That's always a bit of a crapshoot.  You don't know how many

25   people are going to respond to the summons in the best of times,

 1    and with the pandemic afoot it's just a guess as to how many

 2    people show up in response to the summons.

 3            But, if we have, for example, 16 people we are dealing

 4    with, it doesn't take that long to run them in one at the time

 5    and talk to them.  But, again, that goes back -- I mean, I am

 6    counting on the lawyers to do this responsibly.

 7            But, if we have got them one at a time then in between

 8    I can -- if you're wasting time I will tell you.  And you will

 9    have to -- I mean, this is a sensitive thing for the lawyers as

10    well.  You will have to be careful how you ask the questions.  I

11    will ask the questions and then you will be able to follow up.

12            So, yeah, it will slow down the jury selection some,

13    but not that much.  And I doubt if it will push it into the

14    afternoon.  We will see.  We will take as long as we take.

15            Either of the other parties want to be heard on that?

16    Mr. Cook?  You got anything to say about that process?

17            MR. COOK:  Yeah.  I think we have done that in the

18    past one at a time sidebar in other cases, but that's fine with

19    me.  It hasn't taken that much longer.

20            THE COURT:  All right.  And, Ms. Moyle, the government

21    is trying to stand mute on all of the jury selection questions,

22    as I understand it.

23            MS. MOYLE:  Yes, Your Honor.  We will not be

24    participating in jury selection.

25            THE COURT:  All right.  And if, when we go across the

1    hall to do all this, you are welcome to be there if you wish.

2    You can come to the jury selection or not.  I don't know if you

3    plan to attend, but whatever you want to do you are welcome to

4    do.

5            MS. MOYLE:  We plan to attend.

6            One other quick issue on the jury; in terms of opening

7    statements, we would want to make sure that openings relate

8    to -- for the jury -- relate to the battery case.  If Your Honor

9    would like openings on the negligence case we are happy to do

10   those separately.  We, frankly, think you know the issues and

11   don't really see it as necessary, but we will defer to whatever

12   you think is best.

13           THE COURT:  Yeah.  The opening in front of the jury

14   should go to jury issues.  That's correct.

15           Mr. Cook, you going to want to say anything else by

16   way of opening other than what would be appropriate for the

17   jury?

18           MR. COOK:  No, Your Honor.  We are going to focus on

19   the case against Mr. Rolston.

20           THE COURT:  All right.

21           Mr. Carter, I guess I was with you last.  Anything

22   else you wish to address?

23           MR. CARTER:  No, sir.  I think that's everything I

24   had.

25           THE COURT:  Ms. Moyle, anything else for you?

1          MS. MOYLE:  I believe AUSA Fisher has one exhibit

2     issue he would like to briefly raise.

3          THE COURT:  All right.  Mr. Fisher?

4          MR. FISHER:  Yes, Your Honor.  Thank you.

5          I just wanted to point out to you that we had

6     provided, on a thumb drive, back when we were getting prepared

7     to do the trial in June, to chambers our exhibits one through

8     108, minus the deletions at that point in time.

9          Our exhibit 109 did not get included on that thumb

10    drive.  My mistake.  We have clarified that with the plaintiff,

11    and with Mr. Rolston.  And I just wanted to let you know that

12    that will still be coming to you.  I apologize for that error.

13         THE COURT:  All right.  I hope we still have your

14    thumb drive and it's all worked out, but you can work on that

15    with Ms. Markley.  She probably has it, but whatever -- and if

16    you want to substitute one that has 109 for the one, or if you

17    want to submit 109 separately, any of that works.  So you can

18    work out those logistics with her.

19         MR. FISHER:  Thank you, Your Honor.

20         THE COURT:  All right.  Mr. Cook, anything else on

21    your side?  Mr. Cook?

22         MR. COOK:  I'm sorry.  I was very eloquent, Your

23    Honor.

24         Nothing more here on our side.

25         THE COURT:  All right.  Thank you, all.

1    I will plan to see you on the morning of trial.  If

2    anything else comes up in the meantime that we need to address,

3    let Ms. Markley know and we will get another telephone call set

4    up, but hopefully there won't be anything.  And I will see you

5    at 8:15 on the morning of trial.

6    Thank you, all.  We are adjourned.

7    (Proceedings concluded at 9:59 on Thursday, September 02,

8    2021.)

9

10    * * * * * * * *

11    I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.

12    Any redaction of personal data identifiers pursuant to the
     Judicial Conference Policy on Privacy are noted within the

13    transcript.

14

15    /s/ Lisa C. Snyder                      1/13/2022

16    Lisa C. Snyder, RPR, CRR                Date
     Official U.S Court Reporter

17

18

19

20

21

22

23

24

25

1

2                **UNITED STATES DISTRICT COURT**
              **NORTHERN DISTRICT OF FLORIDA**
3                 **TALLAHASSEE DIVISION**

4 CHARNESHA ALEXANDER,        )
                        )
5          Plaintiff,   ) Case No: 4:19cv138
                        )
6       v.              ) Tallahassee, Florida
                        ) September 13, 2021
7                         )
UNITED STATES OF AMERICA  )
8 and PAUL ROLSTON,        )
                        ) 9:59 AM
9                         )
         Defendants.  ) VOLUME I OF III
10 _____ )

11                **TRANSCRIPT OF JURY TRIAL**
        **BEFORE THE HONORABLE ROBERT L. HINKLE**
12           **UNITED STATES DISTRICT JUDGE**
            **(Pages 1 through 185)**

13

<u>APPEARANCES</u>:
14
For the Plaintiff:      James V. Cook, PA
15                     By:  JAMES V. COOK
                       Attorney at Law
16                      cookjv@gmail.com
                314 W. Jefferson Street
17                 Tallahassee, Florida 32301

18                 Richard E. Johnson, PA
                By:  RICHARD ERROL JOHNSON
19                      Attorney at Law
                     rick@rej-law.com
20                 314 W. Jefferson Street
                Tallahassee, Florida 32301
21
            ***LISA C. SNYDER, RPR, CRR***
22         **Official United States Court Reporter**
     **111 North Adams Street, Tallahassee, FL 32301**
23         **(850)567-1374 * lisasnydercr@gmail.com**

24

25         *Proceedings reported by stenotype reporter.*
    *Transcript produced by Computer-Aided Transcription.*

```
 1   Appearances Continued:

 2   For the Defendant        Henry Buchanan Hudson
     Rolston:                 By:  JOEL STEVEN CARTER
 3                                 MIRIAM REBEKKAH COLES
                                   Attorneys at Law
 4                                 scarter@henryblaw.com
                                   mcoles@henryblaw.com
 5                            2508 Barrington Circle
                              Tallahassee, Florida 32308
 6

 7   For the Defendant:       DOJ – USAO
     USA                      By:  MARIE ARMSTRONG MOYLE
 8                                 PETER GUNNAR FISHER
                                   marie.moyle@usdoj.gov
 9                                 peter.fisher@usdoj.gov
                              111 N. Adams Street, 4th Floor
10                            Tallahassee, Florida 32301

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**P R O C E E D I N G S**

1
2        (Call to Order of the Court at 8:17 AM on Monday, September
3    13, 2021.)
4            THE COURT:  Please be seated.
5            Good morning.
6            Is the plaintiff ready for trial?
7            MR. COOK:  Yes, Your Honor.
8            THE COURT:  Defense ready?
9            MR. CARTER:  Yes, sir, Your Honor.
10           THE COURT:  And for the government?
11           MS. MOYLE:  Yes, Your Honor.
12           THE COURT:  Do you wish to have the rule invoked?
13           MR. COOK:  Yes, Your Honor.
14           THE COURT:  The rule is invoked.  Each side is
15    responsible for seeing that your witnesses abide by the rule,
16    that nobody tells the witness what's happened during the trial
17    in the witness's absence.
18           You told me before how long you expect the trial to
19    last.  Now you have done your final preparation.  Let me get an
20    updated estimate.
21           Mr. Cook, what do you think?
22           MR. COOK:  We should be finished on Wednesday before
23    lunch.
24           THE COURT:  Mr. Carter?
25           MR. CARTER:  Probably Thursday at lunch.

1          THE COURT:  A day after?

2          MR. CARTER:  A day.  Maybe a little longer than that.

3          THE COURT:  All right.  Ms. Moyle?

4          MS. MOYLE:  Half day to a day after.

5          THE COURT:  All right.

6          I will clear the jurors all week, but it does sound
7     like we will get the case in this week.

8          I may check with them a couple of days at the
9     beginning of next week and tell them we don't expect to go over
10    but one doesn't know.

11         I don't recall whether I raised this with you at
12    pretrial.  I've done it both ways in trial since COVID.  Tell me
13    what you think about screening jurors for vaccination status?

14         Do you want an all vaccinated jury or not?

15         MR. JOHNSON:  I do.

16         THE COURT:  Mr. Carter?

17         MR. CARTER:  I don't think it's necessary, Your Honor.
18    It kind of skews the pool.

19         THE COURT:  It may skew the pool.  Are you telling me
20    you object?

21         MR. CARTER:  Yes, sir.

22         THE COURT:  You want the --

23         MR. CARTER:  I just want a fair representation of the
24    community is what I am getting at.

25         THE COURT:  I understand.  And there is no question

you are going to get a different venire if you eliminate
unvaccinated people.

Candidly, to know which side that helps or hurts I
would have to do a mock jury, or some kind of form of analysis
and I haven't.  You may or may not have, but you want the
unvaccinated people kept in the panel.

MR. CARTER:  I think just from our standpoint, Your
Honor, it's a more reflective pool of the community.

THE COURT:  I don't need you to explain it.  I just
want to make sure that is indeed your decision.

MR. CARTER:  Yes, sir.

THE COURT:  All right.  Would you like to know who is
vaccinated and who is not?  Here is the way I put it to jurors,
or have before; I have said, Look, there are three categories,
and wait until you hear the three categories and then tell me
which one you are in.  The first category is vaccinated and
don't mind telling me.  The second is unvaccinated and don't
mind telling me.  The third is you don't want to tell me.

Candidly, I think that tells you more about somebody's
ideology than many other questions you could ask.

You want that question?

MR. CARTER:  Your Honor, I think it's fine.  You know,
in the status conference a week, or so, ago, we talked about
some specific questions that we thought ought to be individually
asked.  And it seems like that might be a good place to do that

1 too, maybe.

2       THE COURT:  They are not going to mind raising their

3 hand.

4       Look, here is my experience, when I have done this,

5 nobody raised their hand in the third category.  The environment

6 we are in people are proud of getting vaccinated, and they are

7 proud of being unvaccinated.  Last count I heard down there

8 there are 19 people and I will be surprised if anyone doesn't

9 want to answer the question.

10       Let me tell you the description I am going to give of

11 the case to see if this causes either side any heartburn.  I

12 will start by telling them my description is not evidence.  That

13 the evidence will come in after the trial starts.  But I need to

14 give them a description to find out if they have heard of the

15 case.  And here is roughly what I plan to tell them.

16       Ms. Alexander was a prisoner at the Federal

17 Correctional Institution, here in Tallahassee.  Prisoners get

18 routine medical care there within the facility.  They go outside

19 for specialized care, but just for routine checkups, and so

20 forth, instead of taking people out to doctors there are medical

21 people, and personnel available, within the facility.

22       Mr. Rolston was a physician's assistant working there

23 at FCI.  Part of his responsibilities were to conduct routine

24 gynecological exams.

25       Ms. Alexander asserts that during what was purportedly

a gynecological exam she was in fact sexually assaulted.  The

exam was not conducted properly.

The issue the jury will be called on to decide is

whether this was a proper medical examination or instead whether

she was sexually assaulted.

Does that description cause the plaintiff any concern?

MR. COOK:  No, Your Honor.

THE COURT:  Mr. Carter?

MR. CARTER:  No, sir, Your Honor.  If I heard it

right, you said part of his duties was the gynecological

examination.

MLP, is middle level providers, provide the primary

care completely.  I don't know if that...

THE COURT:  Yeah.  He does routine physical exams I

take it.

MR. CARTER:  Yeah.  Other than just the gynecological.

THE COURT:  Sure.  I will try to frame it that way.  I

didn't read that.  It won't come out exactly like I just did it,

but it will be roughly like that.

I have a witness list from the government and

plaintiff.  I don't think I have a witness list from Paul

Rolston.  If there is one, I missed it.

MR. CARTER:  I was using one to help Ms. Coles.

THE COURT:  It's docket 113-7.

MR. CARTER:  I had it out.

1    THE COURT:  I have one now.  The courtroom deputy just

2  gave me one.

3    MR. CARTER:  I don't know where it went.

4    THE COURT:  It's all right.  I've got it.

5    When I call on you to introduce yourself downstairs,

6  introduce anybody that may be coming in to help you during the

7  trial.  So if you have got a paralegal or whatever that may

8  bring you a note during the trial, introduce that person too,

9  just so we can make sure there is not a nextdoor neighbor on the

10  panel or something like that.

11    You will have three peremptories a side.  We will

12  probably have eight jurors, assuming that after challenges for

13  cause and with a total of six peremptories, there are enough

14  down there to have eight.  I don't plan to pick more than eight.

15    I probably told you at the pretrial my preference has

16  been to have 12 jurors, even in civil cases, but with COVID and

17  to keep people as separated as possible we are not going to have

18  more than eight.

19    You have all tried cases with me before.  You know the

20  general rule when you have an objection just stand up, say

21  "objection", basically give me the title.  No speaking

22  objections.  No response to an objection unless I ask for it.

23    No bench conference except to point out things that

24  wouldn't be obvious to me from the question and given my state

25  of knowledge of the case.  You know more about your case than I

1    do, so if there is a question that might seem proper, but where

2    you anticipate that something about the answer would not

3    properly come in, that's the time to ask for a bench conference.

4            I think the courtroom deputy tried out with you the

5    headphone system.  It works pretty well.

6            When you are speaking into that you probably need to

7    do it like the NFL coach does, hold the yellow between you and

8    the jury and they won't be able to follow along.

9            You are welcome to speak without your masks when you

10   are six feet from anybody.  So at the lectern for opening

11   statements and when you are examining a witness you can take

12   your mask off.

13           I am going to tell the witnesses that they are welcome

14   to remove their mask while they testify, if they are comfortable

15   doing that.  So far almost every witness has been comfortable

16   doing that.  I did have a couple of witnesses who preferred to

17   keep their mask on and that worked okay.  So we will leave that

18   to the witness.  But I expect all, or most, of them will be

19   comfortable removing the mask.

20           While you are unmasked, they are asking questions, you

21   ought to stay at the lectern.  Don't move around.  Don't get in

22   other people's space.

23           I hope nobody needs to approach the witness.  If you

24   do, slip your mask on when you approach the witness and you are

25   getting near people in the courtroom.  To the extent we can

1    avoid that we should.  We have the electronics so there is

2    usually not a need to approach the witness.

3            I think that's all I have got on my list.

4            What else, if anything, do we need to discuss this

5    morning?  Anything from the plaintiff?

6            MR. COOK:  Not at this time, Your Honor.

7            THE COURT:  Mr. Carter?

8            MR. CARTER:  Your Honor, I was going to inquire, like

9    I did before, about the questions you may ask, the more

10   sensitive questions, that we proposed.  Are you planning to do

11   that?

12           THE COURT:  Yeah.  What I thought I would do is do the

13   examination in the jury assembly room with everybody together,

14   and then move across the hall to the Grand Jury room.  When we

15   go over there, space yourselves out.  The fewer people that go

16   over there the better.  I don't know how many people you will

17   have on each side, but it's not a big room.  That's a story in

18   itself.  But, spread out.  We will have room for the juror to

19   come in to be distanced.  And then I will go through some

20   questions, and I will give each side then a chance to ask, if

21   it's something that hadn't been covered, and you want to follow

22   up while the juror is there, do it while the juror is there.

23   And we will probably do challenges for cause right then after

24   each one has been there.  So if there are any challenges for

25   cause bring it up before we bring the next juror in.  We will

1    deal with it.

2         By the time we get all of them run in and out of the

3    room we ought to have a good list with the challenges for cause

4    having been dealt with.

5         MR. JOHNSON:  Are we going to challenge them for cause

6    in their hearing?

7         THE COURT:  No.  We will get them out.  In between.

8         MR. CARTER:  Yes, sir.  I had another issue.  We can

9    probably do it after the jury selection, but probably simple.

10   Based on your motion in limine ruling, I believe you made a

11   definitive ruling on the admissibility of similar fact witnesses

12   under 415.  I just want to make sure that's true, so I would not

13   be objecting each time that they come up.  That would be my

14   question.

15        THE COURT:  The answer is, yes, generally.

16        I only ask for one fair chance to make a ruling, and

17   you can treat it as a definitive ruling that another prisoner

18   who has suffered the same kind of sexual assault can testify to

19   it.

20        If the assertion that another sexual assault -- if the

21   assertion is that another sexual assault is never similar enough

22   to be admissible, I disagree, and I have definitively said

23   that's not so.

24        If the assertion is that a particular assault, or the

25   circumstances of a particular assault are so different that it

1    is not admissible, I don't think I have definitively ruled on

2    that.

3            I don't recall, at this point, precisely what the

4    assertions were, but I don't think I had all of the details of

5    all of the alleged assaults.

6            MR. CARTER:  Well, that does raise I guess an issue.

7    One of the arguments we attempted to make at pretrial, and I

8    know it's truncated a little bit, was that a couple of the

9    similar witnesses claim solely that during a breast exam

10   something happened -- lingering or something of that nature --

11   and that's where I think it gets complicated a little bit with

12   some of the statutory language.

13           THE COURT:  Well, intent is an issue.  In fact,

14   it's --

15           MR. CARTER:  The issue.

16           THE COURT:  -- the issue in the case.

17           And it does seem to me that an improper breast exam is

18   admissible in the question of intent.  So if the -- it is enough

19   that the similarity is that there was a sexual assault during an

20   alleged medical exam.

21           So, you can treat that as a definitive ruling.  If we

22   get to a point where there is some nuance about a particular

23   case then raise it contemporaneously, but that's where I think

24   we are.

25           MR. COOK:  Your Honor, there are some exams that would

1  be considered a sexual assault under the PLRA, and that's a

2  fairly narrow category.

3       THE COURT:  Well --

4       MR. COOK:  We would ask for a broader --

5       THE COURT:  First, the jury trial is not under the

6  PLRA -- well, I take that back.

7       On the question of whether this shows intent and is

8  admissible, why does a statutory definition of a sexual act have

9  anything to do with it?

10      MR. COOK:  We don't think it should, Your Honor.

11      THE COURT:  Well, I agree.  So what -- maybe I

12  misunderstood your comment.  I thought you were suggesting that

13  somehow the statute had something to do with whether I should

14  admit the evidence.

15      MR. COOK:  Oh, Your Honor, the Court's ruling is what

16  we were looking for.

17      THE COURT:  All right.  What else, Mr. Carter?

18  Anything else?

19      MR. CARTER:  Well, I mean to the extent it might come

20  up during opening, I don't know if it will, I haven't talked to

21  the plaintiff's attorneys about this, and we don't deal with it

22  as much as I know you see in your criminal cases, the criminal

23  convictions coming into evidence in this case -- the date and

24  the sentencing and the nature, the charge -- just wanted to make

25  sure that is where we are on it.  That's the way I read the rule

1    and the cases.

2          THE COURT:  Yeah.  If you have a witness who has been

3    convicted and the conviction meets the criteria in 609 you can

4    show that witness was convicted and what the witness was

5    convicted of.

6          MR. CARTER:  Right.  All right.  And there is a

7    component of that, of whether that crime was false statement or

8    dishonesty, too, and I know that has got another element to it.

9          THE COURT:  That only matters if -- I mean, that shows

10   whether allowing proof of the conviction is mandatory or

11   discretionary.  I don't know that it will matter.  I mean, what

12   difference does it make?  You are going to be able to prove the

13   609 -- under 609, if a conviction is eligible for proof, I am

14   going to let you prove it.

15         MR. CARTER:  Including the charge, or the nature of

16   the charge?

17         THE COURT:  Right.  What the conviction is.

18         MR. CARTER:  Right.

19         MR. COOK:  Your Honor, our contention is to stipulate

20   in opening to the offenses that our client is in prison for.

21   The exhibit of -- the Rolston exam has a whole panoply of things

22   going back to 2003, including traffic offenses and shoplifting

23   charges.

24         MR. CARTER:  Your Honor, we're not going to put that

25   on.  I'm talking about the federal charge that landed them in

1    federal prison.  We did research it and we listed it a long time

2    ago, but I think they were shoplifting charges that she says

3    were dishonest, but I don't think under the case law I can do

4    anything with it.

5              THE COURT:  Remarkably enough, theft is not a crime of

6    dishonesty.  But you don't need to document.  She will admit

7    the -- and presumably any other witnesses will admit the crimes.

8    If they don't, you can prove the crime.  Judgments tend to have

9    information in them that the jury doesn't need to know --

10              MR. COOK:  Thank you.

11              THE COURT:  So -- and ask, and as long as the witness

12    admits the conviction then that takes care of that.

13              MR. CARTER:  And you will allow the sentencing, too.

14              THE COURT:  Well, no.  But to the extent that the

15    person is still serving time, and how long the person is

16    serving, yes.

17              When a witness testifies on a matter like this, where

18    credibility is a key issue, motivations include pleasing the

19    prison authorities or cooperating with other prisoners.  Their

20    motivation that cut each way, and sometimes those are affected

21    by how long somebody is going to be there.  And so I think it's

22    appropriate to prove the witness's convictions that meet the

23    criteria in 609, and how long the witness is serving or when the

24    witness expects to get out.

25              MR. COOK:  Your Honor, we will have three witnesses --

actually four witnesses, who will be in prison garb, and a fifth witness who will be in regular clothing.

THE COURT: You have to speak up for me, or come to the lectern and take your mask off and speak up where we can hear you.

MR. COOK: Yes, Your Honor.

I just wanted to say that we will have four witnesses who will be in prison garb. And then the fifth witness who has been released and will be in regular clothing. So, it will be clear to the jury who is presently detained.

THE COURT: Right.

MR. COOK: But the Court still wants them to say when their sentence ends?

THE COURT: If either side wants to ask them, I think it's okay to say when their term ends.

MR. COOK: Thank you, Your Honor.

THE COURT: The theory is, look, somebody that has got 15 more years in the Bureau of Prisons may take a different tact to testify than somebody that's getting out a week from Tuesday.

MR. COOK: Your Honor, would the Court consider a Rule 403 exception to the naming of the offense if it's not specifically in the nature of the crime of dishonesty but is a felony?

THE COURT: Probably not. But what's the crime that you are worried about?

1    MR. COOK:  There are, I believe, two witnesses who had

2    a conviction for assisting an underage person to work in the sex

3    industry.  I think one of them was in the nature of buying a bus

4    ticket and -- anyway, we would rather not have the jury to, you

5    know, be outraged by an offense considered fairly serious.

6    THE COURT:  Well, 403 analysis certainly applies to

7    the admissibility of the 609 evidence.  I'm not going to exclude

8    that evidence.  It's something that the jury can consider on

9    credibility.  There is some risk of prejudice, but it's

10   outweighed by the probative value.

11   A juror might reasonably evaluate differently the

12   credibility, particularly on an issue of sexual abuse of a

13   person who has been convicted of, for example, growing

14   marijuana, as opposed a person who has been convicted of

15   assisting a sexual crime.

16   MR. COOK:  Yes, Your Honor.

17   THE COURT:  What else?

18   Ms. Moyle, anything from the government?

19   MS. MOYLE:  No, Your Honor.  We would note that the

20   certified copies of the criminal judgments of the 415 witnesses

21   do include the whole commitment packet, so is it okay to just

22   admit, if they deny it, the first page?

23   THE COURT:  Yeah; if they deny it we can deal with the

24   redacted copy of the judgment.  Publish it in some way.  We will

25   deal with it.  Very rare for someone to deny the conviction.

1   Sometimes you get witnesses who don't know how many convictions

2   they have, or what they have been convicted of, and that pretty

3   much tells you all you really need without the paperwork anyway.

4           Anything else?

5           I think we have the -- I hope -- did we give them out

6   right now?  You have the questionnaires.  It looks like we have

7   20 potential jurors.

8           The fact that the list and the questionnaires are

9   ready means that they are pretty close downstairs.  They will be

10  taking a break, and so forth.

11          As soon as we are ready we will convene downstairs.

12  We will start as soon as we are ready to go.  I will see you

13  downstairs in a few minutes.  Until then, we are in recess.

14      (Recess taken 8:44.)

15      (The jury voir dire was not transcribed.)

16      (Proceedings resumed at 12:53 PM.)

17          THE COURT:  Good afternoon.  Please have a seat.

18          Thanks for your patience.  We had the last of the

19  jurors just managed to get through everything downstairs and get

20  brought up here.  So they will have them lined up and in the

21  courtroom in just a moment.

22      (Jury in at 12:54.)

23          THE COURT:  All right.  You may be seated.

24          Good afternoon, ladies and gentlemen.  Welcome back.

25          We had an oath for you to take at the beginning of the

jury selection process.  That was your oath to answer truthfully

the questions asked during that process.  We now have another

oath for you to take.  This is your oath as the jury to try the

case.

The clerk will please administer the oath.

(The jurors were duly sworn by the courtroom deputy.)

COURTROOM DEPUTY CLERK:  Thank you.  You can be

seated.

THE COURT:  You have now been sworn as the jury.

By your verdict you will decide the disputed issues of

fact.  You will do that based only on the evidence introduced

during the trial.  The evidence will consist of testimony of

witnesses and papers or things that are called exhibits.

You should pay close attention to the testimony.  As I

told you briefly during the jury selection process, you will

have to rely on your memory of the testimony and any notes you

choose to take.  You will not receive transcripts.

On the other hand, an exhibit that is admitted into

evidence, ordinarily, will be available to you during your

deliberations.  So you will have access to the exhibit later

even if it's not fully shown to you or read to you during the

trial.

If you wish to take notes during the trial you may do

so.  We've provided pads and pens for your use if you wish to

take notes.  On the other hand, of course, you don't have to

1   take notes.  Whether to take notes or not is left up to each of
2   you individually.

3        If you decide to take notes please don't get so
4   involved in note taking that you lose track of the ongoing
5   proceedings.  And whether or not you take your own notes you
6   should not be unduly influenced by the notes of other jurors.
7   Notes are not entitled to any greater weight than the memory and
8   impression of each juror.

9        When we take breaks, or overnight, please leave your
10  pad right there on your chair.  Nobody will look at your notes.
11  And the courtroom deputy clerk will safeguard them for you
12  overnight and have them back on your chair in the morning.

13       During the trial you must keep an open mind.  Reserve
14  your judgment until you have heard all of the testimony and
15  evidence, the closing arguments, and my instructions on the law.
16  Avoid reaching any hasty impressions or conclusions.

17       So, you will keep an open mind during the trial and
18  then you will decide the case based only on the evidence.

19       To help make sure this happens there is another rule;
20  you must not discuss the case during the trial in any manner
21  among yourselves or with anyone else.  And you cannot allow
22  anyone to discuss the case with you or in your presence.

23       So, you won't be discussing the case with anybody
24  until the trial is over and you retire to deliberate with the
25  other jurors.

1        In addition, you must not have any conversations or

2    communications at all about the case or about anything else with

3    a lawyer, or a party, or witness, or anybody that has a

4    connection to one side of the case or the other.  The reason is

5    to avoid even any appearance of impropriety.

6        A lawyer, for example, would not talk with you about

7    the case.  But if in the morning coming to trial, or in the

8    afternoon as you leave, you are on the courthouse steps and

9    talked to the lawyer, even just to say hello, and somebody was

10   down on the street corner could see you talking to the lawyer

11   but couldn't hear, that person wouldn't know what you were

12   talking about.  So to avoid any impression that you could be

13   talking about the case, the rules provide that they won't talk

14   to you at all while you are serving on the jury, even to say

15   "Hello."  So if they pass you and don't say "Hello" don't think

16   theme rude.  They are just complying with the rules.

17       You must avoid reading any newspaper story about the

18   case and you must not see or hear any radio or television

19   coverage.  I don't expect there to be any conference of this

20   case, but I never know which cases are going to be covered and

21   which are not.  So if there should be make sure you don't hear

22   or see or read it.

23       Also, as we discussed at some length during the jury

24   selection process, you must not give any information over the

25   Internet or send out any information over the Internet or in any

1   other way.

2          The reason for all of these rules, as I have now told

3   you several times, is that it will be your duty to decide the

4   case based just on the evidence during the trial, not on the

5   basis of anything you might see or hear in the media, over the

6   Internet, or on your own.

7          From time to time during the trial I may be called on

8   to make rulings on objections or motions.  You should not infer

9   from any ruling I make, or from anything I say or do, that I

10  have any opinion on the merits of the case favoring one side or

11  the other.

12         When there is an objection to a question that's asked

13  to a witness I will sustain or overrule the objection.  If I

14  overrule the objection the witness will answer the question.

15  You should ignore the objection and treat the question and

16  answer just as you would if there had been no objection.

17         If I sustain an objection to a question, the witness

18  will not answer it.  You should not speculate on what the answer

19  might have been.  And you should not draw any inference from the

20  question itself.

21         It sometimes happens that a witness answers a question

22  even though I sustain an objection.  This sometimes happens

23  because I am too slow saying the objection is sustained, or

24  because the witness doesn't understand that when I sustain an

25  objection the witness shouldn't answer the question.

1    When this happens, when a witness answers the
2    question, even though I have sustained an objection, you should
3    ignore the question and answer just as if the witness had said
4    nothing.
5    The order of the trial's proceedings will be this:  In
6    just a moment we will have opening statements.  The plaintiff
7    then will present evidence during what is called her
8    case-in-chief.  When the plaintiff finishes by announcing that
9    the plaintiff rests, the defendant will have an opportunity to
10   present evidence.  When the defendants -- and I will tell you
11   about that in just second -- when the defendants finish by
12   announcing that they rest, the plaintiff then will have another
13   opportunity to present evidence within narrow limits responding
14   to the defense case.
15   The plaintiff gets to go first and last because she
16   has the burden of proof.
17   When all of the evidence is in, the lawyers will make
18   closing arguments and then I will instruct you on the law.  You
19   will then retire to deliberate on your verdict.
20   I told you a little bit about the daily schedule
21   during the jury selection process.  As I told you, we will start
22   at 9 in the morning.  We will stop either side of 5 at a
23   convenient break point.  You will always get an hour break in
24   the middle of the day for lunch.  Won't always be right at noon.
25   It wasn't today, and it often will not be.  It will be a

1  convenient break point.

2  You will generally get a midmorning break and a

3  midafternoon break. I try not to have you sitting in that chair

4  more than two hours at a stretch.

5  One question I sometimes get during the morning and

6  afternoon break, you will be back in the jury area. For the

7  lunch break, of course, you are free to leave the courthouse and

8  then you are on your own.

9  I also wanted to make a note about the parties in the

10  case. You were introduced to Ms. Alexander, she is the

11  plaintiff in the case. On the claim that you are going to

12  resolve, Mr. Rolston is the defendant in the case.

13  The United States also has attorneys here and will

14  participate in the trial. You will not be resolving any issues

15  involving the United States. But in matters like this, it is an

16  interest -- there are issues for me that may involve the United

17  States. You shouldn't be concerned with those.

18  All the evidence that is introduced in this trial is

19  evidence in this trial, so you should consider all of the

20  testimony, for example, that's given, no matter which lawyer was

21  asking questions when the witness gave the answer. And there

22  may be questions asked, not only by Ms. Alexander's lawyers and

23  Mr. Rolston's lawyers, but also by the lawyers for the United

24  States.

25  And as I told you during the jury selection, the

1  United States may be referred to from time to time as the
2  government.
3  Now, as I told you, we begin with opening statements.
4  In an opening statement, a lawyer may explain the issues in the
5  case and summarize the facts that the lawyer expects the
6  evidence to show.
7  An opening statement is not itself evidence.  That
8  will come after the opening statements have finished, but the
9  opening statements are important.  An opening statement is
10  intended to help you understand the issues and to help you
11  understand the evidence as it comes in.
12  And so I ask that you give the lawyers your close
13  attention as I recognize them for opening statements.
14  Mr. Cook.
15  MR. COOK:  Yes, Your Honor.
16  Ladies and gentlemen of the jury.  May it please the
17  Court.
18  My name is James cook.  I have the honor of
19  representing Charnesha Alexander here today.
20  THE COURT:  Mr. Cook, if you are comfortable with it
21  while you are speaking, you are welcome to take your mask off as
22  they are distanced.
23  MR. COOK:  Thank you.  I will.
24  This is a prison case.  Our client, Charnesha
25  Alexander, was a prisoner.  She was convicted of two felonies

and the felonies are conspiracy to defraud the United States

with respect to claims and aggravated identity theft and aiding

and abetting.  She was sentenced to 111 months.  She is

currently in a halfway house in a special program and she was

able to be here in court today.

You are going to see in the course of this case that

prisoners have to be very careful to follow prison rules.

You will hear the prisoners are under the custody and

care of the prison staff and they are expected to obey the

prison staff.  But the prison staff, including medical staff,

are also subject to certain rules.

One rule is that prisoners cannot legally consent to

sexual abuse by prison staff.

Even medical providers can't unnecessarily and

inappropriately touch prisoners in a sexual manner.  Such

touching can constitute battery.  It can constitute sexual

battery.  And it can constitute a violation of the Eighth

Amendment, which is the amendment that prescribes cruel and

unusual punishment.

The Federal Correctional Institution, FCI, Tallahassee

is a federal women's prison in Tallahassee.  Not far from here.

And, it is run by the Department of Justice Bureau of Prisons.

This case is about something that an FCI Tallahassee

medical provider did to our client.

At the time our client had been in the FCI Tallahassee

1   since July of 2016, and she would be there until October of

2   2016.

3        While she was at FCI Tallahassee she was in something

4   called the Special Housing Unit.  The Special Housing Unit, or

5   SHU, is a place that she was placed as she was in transit to

6   another institution because she had a charge relating to a

7   violation of phone rules at her previous institution.

8        So while she was there you will hear that Charnesha

9   Alexander came down with an infection, a vaginal infection, a

10  yeast infection, she thought.  And she had made multiple

11  requests for a medical examination, a medical appointment at

12  least, to have the condition looked at.  And a month went by,

13  and another 19 days went by before she was able to see

14  physician's assistant, Paul Rolston, who is also referred to

15  sometimes as a midlevel provider.

16       Physician's assistant is a medical specialty.  It's

17  not the level of physician, but it's above the level of a nurse.

18       The time that she waited, before she was able to

19  actually get to an appointment was so long that she was able to,

20  by means of an old home remedy using yogurt, she was able to

21  substantially treat her own infection.  And so by the time she

22  got to the medical appointment the infection had abated, but she

23  was in the middle of her menstrual period and she had a heavy

24  flow.

25       She expected to be turned around and sent back to her

housing unit, but the medical provider, Paul Rolston, said that
he did these kinds of examinations during periods all the time.

His chaperone on that day will tell you that, yes,
indeed he does do those kinds of examinations all the time.

But there were two important points to keep in mind:
first of all, Charnesha Alexander had just had a Pap smear less
than six months earlier, and it was in her medical history.

The rule, you will see, at FCI Tallahassee is for
women who are Ms. Alexander's age -- at that time which was
32 -- are supposed to have Pap smears every five years, not
every five or six months.

Our medical expert, Dr. Lisa Tucker, will tell you
that is -- that three to five years is the norm for those kinds
of examinations.

So, on that date, which was September 27th of 2016,
she was told by the -- by Paul Rolston that she needed a Pap
smear.  And she will testify to you that, as an inmate, she is
trained not to argue.

And so the Pap smear that she had, or the pelvic
examination that she had, was done in a way that she found to be
different than any other such examination that she had ever had.

For one thing, she said that Paul Rolston made a
familiar comment about "keep your legs spread apart so you don't
"cling my ears", which she found unprofessional and concerning.

Another thing that he did was that he rubbed up

against her body as he was navigating the area between his desk
and his work.

And as I say she had had a normal Pap smear just six
months earlier.

Our expert is going to say that it's extremely unusual
to take a Pap smear during a period because of the risk of
contaminating the specimen. And, in fact, we have no record of
ever getting a result back from a laboratory in her medical
records.

The chaperone, who will testify here, said that at the
time that an investigation was done that Paul Rolston -- she
said under oath, that Paul Rolston does Pap smears all the time
and that Pap smears that he does are -- half of the Pap smears
he does are unnecessary in the sense that someone came in with a
complaint other than that. For instance, you will hear from
women who have come in with conditions like blood clots, or
headache, or eczema, and ended up getting one of his Pap smears.

Ms. Alexander will tell you that he rubbed the inside
of her labia. She had never had a medical practitioner do that.
And, in fact, Paul Rolston ultimately, when he was interviewed
on this, denied doing that.

She also said that he rubbed her labia, and rubbed
them with a -- rubbed it with a circular motion to the point
that it became aroused.

She will say that he put -- that he rubbed her

clitoris once before he entered her vagina and once afterwards.

Paul Rolston denies having done that a second time.

She will say that during the examination it was not possible for the chaperone to have seen what he was doing.  One reason for that is because of the way the room was set up and the place that she was standing so that his -- what he was doing was covered by a sheet.

So even though she was a chaperone, and her job was to watch what was going on, she couldn't actually see what he was doing.

After he concluded this Pap smears he left the room and Charnesha Alexander was outraged, and upset, and asked the chaperone to intercede for her with him.  And she wanted the examination to be concluded.

Ultimately, when he came back, he asked her to do a breast exam and she refused.  And she ended up having to sign a paper saying that she refused the breast exam.

By this time she was crying.  And when the officers came to take her back to her housing area, she was still crying, and she cried all the way back to her housing area.  And the officer asked her what was wrong and she couldn't answer.

And the investigator who handles these kinds of things was available, and apparently the officer, or an officer, informed him of what had happened, and what the allegations were, and she gave a statement right on that date, right at

that -- you know, immediately after the examination.

Now, Paul Rolston came to her cell front and started trying to talk to her and she refused to talk to him. He later knocked on the door as she was about to give an interview to the investigator.

The evidence will show that Paul Rolston typically worked until 5 o'clock, but on that particular date, although the examination started at about, I think, 2:49 -- I think I have got that here.

This is when it starts and this is when it finishes, so a total of four hours go by from the time he starts his report until the time that he finishes it. And what we think that he was doing, what the evidence will show, is that he was putting things into the record that would follow his version of events and contrary to what our client was telling investigators.

Paul Rolston is going to have a chance to talk to you. And based on his statements, he is going to say that all of these actions were done for the purpose of medical treatment. Except that he will say some of these things he didn't do at all.

His chaperone, Leticia Davis, will say she was not able to see exactly what was going on. She will say that she worked with other providers but never anyone who did Pap smears the way he does.

1    She said he would do Pap smears on women who are

2    menstruating, and "50 percent of the Pap smears that I was a

3    chaperone with Rolston were unnecessary."

4    She will admit that she said under oath that

5    unnecessary Pap smears, "to me are when somebody comes in with a

6    headache and he conducts a Pap smear and he does this all the

7    time", and she says it's because the office was small and the

8    desk was right next to the bed and he had drape covering Ms.

9    Alexander, she was not able to see what he was doing.

10   Paul Rolston will deny rubbing Ms. Alexander's

11   clitoris with a lubricant and deny rubbing it twice.

12   Our expert is going to tell you that there is

13   absolutely no reason for a doctor, who is conducting -- or a

14   medical provider -- who is conducting a Pap smear to do a -- to

15   touch the clitoris, much less to rub it to the point of arousal.

16   You will hear other witnesses who have had experience

17   with Paul Rolston.

18   Ms. Barnett will tell you that she had blood clots.

19   Ms. Batchelor will tell you she had eczema.

20   Both got Pap smears.

21   Ms. Batchelor previously had a hysterectomy and didn't

22   even have a cervix to take a specimen from.  She got a Pap

23   smear.

24   Ms. Barnette and Ms. Batchelor and Ms. Farber will

25   testify he touched their clitoris.

1  Ms. Batcher and Ms. Farber will describe it as

2  rubbing.

3  Ms. Barnett will describe his breast exam as long.

4  Ms. Batchelor and Ms. Rodriguez will recall he pinched

5  their nipples.

6  Ms. Farber said that in examining her breasts he said,

7  "Oh, wow."

8  Ms. Batcher will testify that Rolston complimented her

9  on her breast surgery.

10  Our gynecological expert is going to testify that

11  absent a specific complaint there is no reason to touch a

12  clitoris or to squeeze a nipple.

13  Ms. Blevins will say that he felt her breast through

14  her clothing, and there was no chaperone present during the

15  examination.

16  Mr. Rolston will say he didn't examine Ms. Blevins'

17  breast through her shirt, and he never examined breasts without

18  a chaperone.  And he had a chaperone that day but didn't

19  remember who it was.

20  Mr. Rolston will testify that there was no medical

21  reason to examine breasts through a shirt and Nurse Dorinda

22  Painter, who we expect to testify, will say that in 27 years of

23  nursing she has never seen a provider do that.

24  Ms. Barnett and Ms. Batchelor will testify Rolston

25  rubbed his body against their legs.

1        Ms. Rodriguez will say that he stood with his crotch
2   four to five inches away from her face and she had to turn her
3   head.
4        All of the women who had chaperones will testify that
5   the chaperone could not see what Paul Rolston was doing with his
6   hands.
7        Charnesha Alexander is going to have to tell you how
8   it made her feel and how it has changed her life.  Her mother is
9   here and she will testify to what changes she has seen both
10  before and after, and how that incident -- how her life changed
11  as a result of that incident.
12       And so I am going to leave you for the present and
13  Charnesha Alexander will tell you in her own words.
14       THE COURT:  Mr. Carter?
15       MR. CARTER:  Thank you, Judge.
16       May it please the Court.  Good afternoon.
17       On behalf of Mr. Rolston and Ms. Coles, we do thank
18  you for being our jury for this case.
19       As you just heard the plaintiff's claims that
20  Mr. Rolston committed intentional, coercive, repeated acts of
21  sexual conduct on Ms. Alexander, that rises to the level of
22  cruel and unusual punishment under the Eighth Amendment of the
23  Constitution.
24       And you also heard from Mr. Cook that Mr. Rolston
25  denies that completely.  And he denies that completely.

1    The evidence will not show that there were intentional

2   sexual acts or conduct that was sexual in any nature whatsoever.

3    He did not touch the clitoris for the purpose of the

4   pelvic exam, to do the Pap smears, or any other way.  He will

5   deny that.

6    He was not taking action or touching Ms. Alexander for

7   the purpose of gratifying his sexual desires, which is the

8   allegation in this case, or to somehow hurt or humiliate

9   Ms. Alexander.

10    The evidence will be -- we believe the evidence will

11   be it was part of a proper medical examination on

12   September 27th, 2016, that was appropriate, that was entirely

13   clinical, and medical, the very objective facts being reported

14   in the records and by Ms. Alexander.  And that information was

15   needed to treat and evaluate her based on what she was

16   presenting with.

17    It was based on her complaints that she was making,

18   that she presented that day, and the exam that Mr. Rolston did

19   was thorough and it was consistent with the training that he has

20   received and his experience as a medical provider and a

21   physician's assistant or mid-level provider, as you have heard

22   Mr. Cook say.  And that training that he has included many years

23   of conducting female examinations, gynecological examinations,

24   in both private practice and in the Army years before, going to

25   work at the federal prison in 2015.

1    The exams that you are going to hear about from the

2  plaintiff, and any other witnesses, were done solely for the

3  purposes of evaluating and treating the plaintiff and the

4  patients, their conditions they presented with, and in

5  Ms. Alexander's case the treatment that she requested.

6    Now, you heard the term "chaperone".  And that the

7  chaperone was there.  That was Ms. Davis for Ms. Alexander.

8    Absolutely, in any intimate examination where a female

9  prisoner, female patient is being undressed, whether that's

10  pelvic or breast or, in some situations, a rectal exam, BOP --

11  Bureau of Prisons -- mandates that a chaperone, a female

12  chaperone, be present.  That's mandatory.

13    The policy is strictly followed, and, frankly, it's

14  strictly followed whether it's a cross-gender examination, a man

15  examining a woman, or if it's the same gender.  In any situation

16  you have a chaperone present.

17    An example of that is Mr. Rolston still works for the

18  Bureau of Prisons, still works for the federal prison here in

19  Tallahassee.  He works down at the federal detention center,

20  which is an all-male facility now, and when he examines a male,

21  he has to have a chaperone -- he does an intimate exam with a

22  male he has to have a chaperone.

23    That's strictly followed by the medical office there

24  in the prison.  It's strictly followed by Mr. Rolston, a

25  practice he has done ever -- his career, he has always followed

those types of rules.  But it's absolutely required by BOP.

            And the evidence will be that if a chaperone is not
available because it's a very busy practice everything stops
until you can find a chaperone.

            Who that chaperone may be -- was Ms. Davis for
Ms. Alexander -- but who that chaperone may be is really random
because if the practice is so busy, you don't know which
patients may need that type of evaluation; you don't know who is
available to be the chaperone; you just don't know who it's
going to be or what they are going to present with.

            It can be a certified nursing assistant, like
Ms. Davis.  It can be a nurse.  It can be the doctor sometimes.
It can be another PA or mid-level provider, a technician.  So
it's a random process, and you never know who you may get as a
chaperone.

            But you will hear from these chaperones, from
Ms. Davis and the nurse, Dorinda Paynter -- maybe some of the
techs -- and these witnesses have personally participated in
hundreds and hundreds of examinations.  It's a large prison
population.  And we -- you know, as many as 20 or 30 female
chaperone examinations a week.

            And they will tell you the primary purpose of being a
chaperone in the room with that patient is the safety of that
patient, to protect that patient from anything that may happen
that's inappropriate.

They will testify universally that they take their job extremely seriously. This is very important. They are there for a specific reason. And they would not -- they are professionals. They are certified nursing assistants. They are nurses. They would not put their professional license on the line to protect Paul Rolston or any other provider who might abuse a patient. They would stop the exam if they saw something inappropriate, and they would immediately report it.

They are not in the corner of the room working on Paperwork and not paying attention. They are paying attention to what happened. And they all will testify -- they will come here and testify to you that they never saw anything inappropriate, either in Ms. Alexander's examination, or the other patients that Mr. Cook mentioned.

It's a very small examination room. We believe the evidence will be -- you may see pictures, photographs, of the examination room. In the medical department -- it's very small, maybe 14 by 8, with a table -- a table with the stirrups in it. There's not much room in there at all. In the SHU, as you heard, the Special Housing Unit, it's even smaller, maybe 12 by 7.

So the evidence will be you got three people in that room, and a table and a desk, everyone is very close together. They are on top of each other. We believe some of the witnesses may even say you can reach out and touch Ms. Davis, you are so

1   close to her in that room.  And the chaperone sits there and
2   observes the patient the entire time.

3           While there may be a drape over certain portions of
4   the examination -- that's undisputed -- the chaperone,
5   Ms. Davis, is in there watching the patient, watching Mr.
6   Rolston, watching the course of the examination, and she is
7   there assisting in examinations too, so she has to pay
8   attention.

9           When he needs lubricant, she's got to know -- that's
10  part of the exam that he needs lubricant on his gloved hand.
11  When he needs the speculum, she has to be paying attention right
12  there at his side, right there in this small room, to be able to
13  handle [sic] him the speculum, and the cytobrush, and the
14  spatula, the paddle -- everything he needs to conduct these
15  exams, Ms. Davis is there watching and paying attention.

16          She is there to see the facial reactions, any movement
17  of the patient, so she is not unable to tell if something
18  inappropriate is happening.

19          And the allegation is that Mr. Rolston would jam his
20  hand in Ms. Alexander's vagina in a way -- in such a way, in and
21  out, and then touching her clitoris, there is no way a chaperone
22  could not see that happening.

23          A prisoner has the right to decline any treatment they
24  want.  A patient -- just like any other patient, they have the
25  right and that doesn't change because they are a prisoner.

1    If they don't want the treatment, they have this right

2    to decline.  All of the exams that you will hear us discuss in

3    this courtroom, they have the right -- they consent to them and

4    they have the right to decline.

5    They are not following a medical provider's

6    instruction that you have to have this exam.  An intimate exam

7    like that they can decline at any time.

8    What you will hear is when an exam like that comes up,

9    Mr. Rolston discusses what he is going to do medically, in a

10   very detailed way, trying to educate the patient on what's going

11   on.  He specifically asks them "Do you want the exam?"  And if

12   yes, he leaves the room where the chaperone is now in the room

13   and confirms, "Do you want to go forward with the exam?"

14   When Mr. Rolston comes back in, he asks again, "This

15   is the exam.  Do you want to go forward?"

16   Now, the evidence will be that -- and you will hear --

17   all during that process they have had patients many times

18   decline going forward with whatever the exam is.

19   In fact, you heard Mr. Cook say that Ms. Alexander did

20   decline a breast and a rectal exam that day, but she declined it

21   in the beginning of the exam, not after she got dressed and he

22   came in and said, "Now do you want to have a breast exam?"  It's

23   done in the beginning.  And she declined those two procedures.

24   You will hear from the other inmates -- or about the

25   other inmates who also declined treatment throughout some of

their examinations.  So declining treatment is something inmates
do all the time because they are in charge of their own medical
care, just like anyone else.

Now Mr. Cook mentioned on September 27th, 2016,
Ms. Alexander was in the SHU, the Special Housing Unit.  She had
been there.  The SHU is a disciplinary lockdown facility within
the prison.  You are locked down.  You are in a cell.  You don't
have freedom of movement.

She had been placed there, as Mr. Cook said, because
of a violation she had at Marianna work camp, and she had been
transported to Tallahassee waiting to move on to another prison.

So it's not like you call the prisoner out and they
come to the medical office.  It's not like that at all.  Doing a
medical exam in the SHU is very detail oriented.

It's a locked down facility.  You have to pass through
the doors to the exam room.  And the prisoners cannot come out
of their cell without an officer escort into the exam room.
It's not like you were called out by Mr. Rolston.

In fact, what happened, Ms. Alexander wrote something
called a cop-out, an inmate request for treatment -- you heard
Mr. Cook refer to it -- that she had had a bacterial infection
from the time she came onboard at the SHU.  But when you see
this cop-out, what you will see is it said, "I have a bacterial
infection.  I have had it for a month." It doesn't say, "I had a
vaginal bacteria infection or a yeast infection."  It just says,

1    "bacterial infection."

2          Now, why is that significant?  Well, when it finally

3    makes its way to Mr. Rolston in the medical department -- it has

4    to go through a process to get to him -- he can't just call her

5    out based on that cop-out.  It doesn't tell you what the problem

6    is.  It only says a bacterial infection.  Period.  It could be a

7    foot, skin.  It could be anything.  And he had never seen this

8    patient before.

9          So when he gets to the cop-out, he starts working.  He

10   has already got patients in the medical department, a separate

11   facility than the SHU.  He gets a cop-out and he works her into

12   the schedule that he has got.

13         He quickly reviews the medical records as quick as he

14   can, even though, like lots of medical records, there are

15   different formats and different modules.  He looks at that

16   quickly and then goes over to the SHU to talk to Ms. Alexander

17   at cell-front.  He has to pass through the secured lockdown area

18   and talk -- try to get to her cell and talk to her to find out

19   what the problem is and what she wants.

20         It's what any doctor or PA would do, what any nurse in

21   any practice, whether it's a prison or in the community, would

22   do.

23         And what is told to Mr. Rolston at the cell-front that

24   day is that she was complaining of a bad smelling, yellowish,

25   thick vaginal discharge that was itching and was painful, that

1   she had had it for almost three months.

2        Now, initially Mr. Rolston is educated in saying,

3   well, not all discharges require -- there is variance to the

4   type of discharge and maybe we can do a urine examination, urine

5   analysis, or we don't necessarily have to go forward with the

6   exam.

7        But what Ms. Alexander says is -- and this is the key

8   point -- she has pain below her bellybutton, sharp pain, 6 to 7

9   out of 10, which is severe pain; 7 out of 10 pain, you will

10   hear, the evidence will show is like a broken bone.  It's

11   debilitating pain.

12        That pain in the lower pelvic region.  She was saying

13   nothing would alleviate it and it was sharp.

14        And here is what she said, too:  She is certain this

15   is abnormal.  She knows her body.  Please check me out.

16        And you will hear -- I believe you will hear

17   Ms. Alexander say and testify that she has had symptoms like

18   that before, bacterial infections before -- before she was in

19   prison, and when that happened, they always did a Pap smears;

20   they always did a pelvic exam -- her doctors did that -- because

21   that was called for and that was appropriate.

22        I believe what she will testify to is that when she

23   has symptoms like that, she wants it looked at.  It needed to be

24   looked at.

25        So Mr. Rolston assessed these -- the presentation, the

complaints that she was making.  He also noticed from the

records that he looked at briefly that she had the urinalysis

and there was -- in the UTI there was blood and proteins from

the lab report, and he was concerned about STDs, and some form

of infection.

            And, in fact, Ms. Alexander had an STD that she had

had before, herpes, and she had had severe bleeding and cramps

that required medical attention.

            So what this is, is not some regular Pap smears that

you wait five years to do.  It's a presentation that she had

with a complaint that she had in the SHU on September 27th,

2016.

            When that happens at cell-front, now Mr. Rolston has

to go back and call a chaperone and then have Ms. Alexander

moved to the exam room in the SHU.

            So when she is brought to the exam room, he does just

like I told you before, like he does in any exam; he explains,

he walks out while Ms. Alexander undresses, trying to show

dignity and respect for a patient, because Mr. Rolston will tell

you he treats every one of the inmates as patients, not as

prisoners, as patients, and he cares about giving good medical

care.

            And it was at that point in time when he comes back

into the room, after Ms. Davis had confirmed to go forward with

this exam, that she declines the breast and the rectal exam.

But she knew the pelvic was required, the vaginal exam was required.

Now upon examination, he confirms there is no surgical issue going on. There is no pain that requires some immediate urgent medical condition. And he conducts a pelvic exam, just like he does every time, the same way. It's a very short, very quick examination. But it provides valuable information that can provide him how he is going to treat the patient, what he is going to order from this examination.

During the exam, she's responding to him. While he is conducting the digital portion of the exam, she is responding when he presses on her stomach and asks about, Is there pain here? And he is testing -- palpating the ovaries or palpating the uterus. There is actual discussion with her at that time. She is responding, interacting, and talking.

During the speculum exam, which is used shorthand in a lot of the discussion by some of the witnesses as a Pap, he feels like he has got to go ahead and do a Pap smear because he is concerned about the STDs and possible HPV, which is a leading cause of cervical cancer.

So he collects the samples, and -- with the brush and the spatula, and he does not at any point in time repeatedly touch her clitoris and does not jam his finger in out of her vagina.

After all this, where Ms. Alexander says he is doing

this completely inappropriate stuff, he then has a conversation where he is visually inspecting another problem she has which is her hemorrhoids, and they discuss what kind of medication she has been using for her hemorrhoids.

He develops a plan how to treat what he has observed. He orders an antibiotic. He orders another urinalysis to determine what type of infection it is. And he does a Pap smear to screen for the STD or the HPV.

Ms. Davis will tell you she saw nothing inappropriate, no reaction to anything. It was like any other exam they ever have.

Intrusive, degrading, probing -- in fact, Ms. Alexander describes what Mr. Rolston was doing during that exam at the time she said she, Ms. Davis -- excuse my language -- that he had "finger fucked her" there. When he left the room, that's the language she used directly to Ms. Davis. That's her claim. And Ms. Davis did nothing, did nothing in response to that, said, "You tell them. Don't tell me."

I think the evidence will be -- you will hear from Ms. Davis that if that type of report had come to her, she would have immediately reported it. Immediately.

And make no mistake, this claim is as much about Ms. Davis as it is about Mr. Rolston. Because if you are being told about that type of touching, that type of inappropriate conduct, and you tell someone who is mandatorily supposed to

report that and they do nothing, you believe they are uncaring

or derelict in their duties and letting a patient just, right in

front of them, be treated that way.  We believe the evidence

will not support that claim.

BOP trains their employees, all of their employees --

correctional officers, medical inmates too -- on the Prison Rape

Elimination Act.  They trained when they are hired.  It is

repeated every year.  And it requires the mandatory reporting

that I just mentioned.

It's emphasized to report everything and anything.

And that's not that unusual for medical.  In any context,

medical professionals know about mandatory reports even before

they are trained in PREA.  They have that professional duty to

report.

Mr. Cook mentioned to you that after the exam, when

Mr. Rolston came back in the room, Ms. Alexander was upset and

was crying and not talking.  But she claims, and she indicates

in her affidavits that she filed, that Mr. Rolston started

talking about her problems in her home and with her kids.

Now how would he know that she had problems in her

home with her kids lashing out, or some other problems with her

home, if she hadn't brought it up?  He wouldn't have known it.

And he was trying -- he and Ms. Davis were trying to console her

while she was crying, and she would not talk to them.  So

Mr. Rolston leaves the exam room and tells the officers that

1    she's crying and not talking.

2          So in the context of why is she upset, we believe the

3    evidence will show you she has been in the SHU, the Special

4    Housing Unit, for three months.  She came from the Marianna work

5    camp, and the difference between those two places are night and

6    day.  At the Marianna work camp, she sees her family on a

7    regular basis.  Her kids and her husband's -- five kids and two

8    adults come every two weeks and they visit.  She talks to her

9    mother on a regular basis, on the telephone daily.  She talks to

10   her husband.

11         But when she is placed in the SHU, in disciplinary

12   confinement, all of that stops.  She does not have any access to

13   her family.  She doesn't have any access through telephone or

14   email or anything.  So it's a natural upsetting situation when

15   you know your kids are lashing out and there is a problem at

16   home with your husband and you can't talk to them and you can't

17   see them.

18         So when she is -- when she leaves the exam room and

19   she is upset and not talking -- and you will hear from Officer

20   Jackson, I believe.  Officer Jackson was the officer that led

21   her back to her cell.

22         Officer Jackson, I think, will tell you that she did

23   say, "I've never had a Pap exam like that."  And at that point,

24   because she was crying and she made that statement, Officer

25   Jackson immediately reported it -- does exactly what she is

1    trained to do.  What Ms. Davis was trained to do, what any other

2    correctional officer was trained to do, is to report immediately

3    when something like that is being said.

4         What the evidence will also show you is, as Mr. Cook

5    implied or talked about, Ms. Alexander had never had a Pap smear

6    in her life while she was on her period.  And she thinks that

7    somehow proves this should never have happened.

8         In fact, according to Ms. Alexander, this fact alone,

9    that she would have a Pap smears when she was on her period,

10   demonstrates first and foremost that he was doing this exam for

11   sexual gratification.

12        Well, we believe you will hear from another expert

13   witness in the case who will tell you that it's not

14   inappropriate, first of all, to conduct a vaginal exam, a pelvic

15   exam, based on those conditions that you heard about, and that a

16   long time ago maybe a Pap smears could be obscured by blood when

17   a female is on her period.  But that was prior to the liquid Pap

18   smears and the type of more up-to-date testing that is being

19   done.  So many years ago that might be happening, but

20   scientifically now, if you need to do a Pap, if you have

21   concerns about the STD, concerns about some of the presentation,

22   it's not inappropriate to do the Pap smears.

23        So if it's clinically called for based on her

24   presentation and complaints, then it should be done.

25        But still.  The patient can decline it.  If the

1  patient does not want to do a pelvic exam and a Pap smears

2  because she is on her period, she can decline it, and that's

3  exactly what would happen and they would stop immediately.

4        Mr. Rolston's records are very detailed.  Not just his

5  records related to Ms. Alexander, but you will see a number of

6  those records, very detailed, prepared at the time of the exam

7  or during the day.  It's a very busy practice, as I said; 60

8  patients a day coming through there.  Mr. Rolston may have 15 or

9  20.  Very, very busy practice, one patient to the other, so

10  there are times when you are finishing up your report after you

11  have already had the exam.  There is no doubt about that.  But

12  he is not hiding anything in the reports.

13        In the reports themselves they say, "Conducted pelvic

14  exam.  Conducted a breast exam.  Conducted a Pap smears."  It's

15  in the report.  He is not hiding anything that he is doing.

16  It's right there in the record.  And every one of these records

17  you will see is very clinical and medical in nature, very

18  clinical and medical and objective in nature.

19        Now the detailed records, and the way in which he

20  practices, comes from this training and experience that I

21  mentioned in the beginning.

22        He has been in the medical field for almost 30 years.

23  Before PA school, he was a nurse's aide.  He worked in the -- as

24  an emergency medical technician, as an EMT.  He worked in the

25  emergency room -- emergency rooms as an emergency tech.  And

then he attended Yale University Medical School in their physician's assistant program to learn how to be a physician's assistant.  He also got his master's in medical services at the same time.

So he was in private practice, and then he was in the ERs, and then he joined the Army to continue to be a medical provider there.

And while he was there, in the Army, he provided primary care and family practice care on a number of occasions, including gynecological examinations for female soldiers, where he learned how to do exams or more experience on how to do gynecological exams.  Throughout his career he has done gynecological exams the exact same way every time.

Now, you will hear about preventative medicine and well woman examinations.  Ms. Alexander's examination was based on her presentation: the vaginal discharge and the pain that I talked about.  But you will hear a lot about preventative medicine and well woman exams.

The BOP policies and guidelines -- they are directives to their employees -- recognize that the female inmate population has a very high rate of cervical cancer incidents, much higher than the community, so the rate of abnormal Pap smears is very, very high.  The rate of STDs that can lead to cervical cancer is very high.  And BOP guidelines recognize that this may be the first time in some female inmate's life that

1    they can get systemic care, systematic care and true well woman

2    examinations.  And that's very important.

3            Mr. Rolston believes in it, because early detection

4    can be lifesaving and no one should not have that opportunity to

5    have early detection that comes from well woman examinations.

6            The medical office at FCI is supposed to act just like

7    any other medical office that you would go to in the community.

8    So they are encouraging, promoting preventative healthcare.

9            Mr. Rolston's job evaluations require him to offer

10   well woman exams when he can.

11           The institution is evaluated based on offering

12   cervical screens -- cervical cancer screens and well woman

13   examinations.

14           The guidelines, preventative medicine guidelines, even

15   say that "other means of providing preventative care is to be

16   incorporated into an annual chronic care or another time when

17   the inmate is already scheduled to be seen for preventative

18   care," to incorporate that and be efficient and offer it.  If

19   you see -- look in the computer and see a well woman examination

20   is coming up in two months, and you have a patient in your

21   office, you go ahead and offer the well woman examination at

22   that time.

23           They encourage that.  BOP encourages it.  Consolidate

24   the schedule.  Like I said, it's a busy practice.  Lots of

25   patients coming through.  So you may look into the computer and

1    see what's coming up.  And that's exactly what Mr. Rolston does

2    time and time again.  And that's exactly what Ms. Davis said in

3    the sworn affidavit and in her testimony in this case and what

4    she will say on the stand.

5         When she was talking about unnecessary Pap smears, she

6    is talking about Pap smears and well woman exams after

7    Mr. Rolston looks in the computer and sees that a patient is due

8    for another well woman examination and he goes ahead and does it

9    then.  So while the underlying problem might be something

10   different, he looks into the computer, just like BOP guidelines

11   tell you, and he offers it to the patient.  That's an efficient

12   way of running a medical practice.

13        It's not even an extra examination.  If the patient

14   declines, it's just coming up again in two or three months, and

15   Mr. Rolston would do it at that point in time.  It's not like

16   unnecessary extra examinations.

17        You will hear that Mr. Rolston does the pelvic exams,

18   the breast exams, and the rectal exams the same way every time,

19   exact same way, the way he was trained.  Very quick exam from

20   start to finish.

21        The pelvic exam is a visual exam.  It's a digital

22   bimanual exam, with two fingers, not with his entire hand.

23   Ms. Alexander claims that the pelvic exam that she received

24   included his entire hand in her vagina.  While she is on the

25   table his entire hand is in the vagina and she is not reacting

1  and Ms. Davis doesn't see that; that's the claim in this case.

2  　　　　By definition, a pelvic examination includes touching

3  in a sensitive area.  It includes touching of her vagina, and

4  touching of her cervix and her ovaries.

5  　　　　A speculum exam is a manner in which he can observe

6  and do -- it's an instrument that opens the wall of the vagina

7  so he can see in -- it has a light associated with it -- so he

8  can see and inspect and determine whether there is anything

9  going on in the cervix.  And it also allows him to take a

10  sample.  He does it the exact same way every time.  He looks for

11  lesions.  And lesions can be signs of STDs, so he looks for

12  lesions.

13  　　　　When he is using the speculum and the paddle, it takes

14  two hands.  You will hear some allegation that during the

15  speculum exam he is also touching the clitoris of the patient.

16  But the speculum exam requires him to have two hands on the

17  speculum and the brush and the spatula.

18  　　　　But the exam is over within a couple of minutes.  It's

19  very quick.  Very quick and very fast exam.

20  　　　　The breast exams are the same way.  He uses a gloved

21  hand.  He uses gloves the entire time, pelvic exam or the breast

22  exam.  He palpates the breast tissue.  He is looking for

23  fibroids or lumps.  He educates the patient and actually has the

24  patient touch the breast herself to feel the difference in

25  fibroid tissue and healthy tissue.  Does it the same way every

1   time.  It too is a very, very quick exam.  And the rectal exam

2   is less than a minute.

3          So the whole examination for a well woman examination

4   takes seven to ten minutes.  And there is nothing sexual about

5   it at all.  It's very clinical and very objective.

6          Now the other inmates that Mr. Cook mentioned that you

7   may hear from, and they may come in and testify, I think what

8   the evidence is going to show you is that they presented with a

9   wide range of complicated medical situations.

10         And you will see that Mr. Rolston treats a patient as

11  a whole patient.  He is trying to solve their medical problems,

12  not immediately going for a well woman examination to do a

13  pelvic.  I believe when they take the stand that's what you will

14  see, that he is a thorough, caring, detailed-oriented provider

15  providing excellent care.  But he also does the well woman exam

16  when it's appropriate.

17         Now, Mr. Cook mentioned Ashley Barnett who will come

18  in and testify.  Now what you will see from Ms. Barnett is the

19  first time she was examined, in an intake exam -- Mr. Rolston

20  was the one doing the intake exam when they first come to the

21  prison -- she had a very high risk -- multiple risk factors like

22  HPV -- for HPV.  She had HEP-C and STDs and other things that

23  were high risk.

24         She was offered the well woman examination because it

25  made sense.  What did Ashley Barnett do?  "I don't want it."

1  She didn't have it.  She declined it, just like every inmate can

2  do.  She declined having a breast exam, a pelvic exam, and a

3  rectal exam.

4      And you will hear that Mr. Rolston did treat her for a

5  blood clot in her arm.  She came in not knowing what her problem

6  was, and he evaluated the blood clot, but also noticed it had

7  been a year and a half since that intake exam and she was also

8  due for a well woman exam.  So he looked in the computer and

9  offered that to her.

10      You will see she was scheduled for a chronic care

11 visit on the same day.  So he saw her for three different

12 things -- the pain in the arm, offered her the well woman exam,

13 and the chronic care visit for infectious disease and mental

14 health -- all at the same time, trying to be efficient to do

15 what was available to do all at the same time for the patient

16 and for the medical office.

17      And what you will see is he went the extra mile for

18 Ms. Barnett in following up with this presentation for a blood

19 clot to refer her out -- to order testing, to order

20 electrocardiograms, to then refer her out to a doctor, and it

21 led to her having surgery at Tallahassee Memorial and then on to

22 Shands to repair a serious medical condition that she had.

23 That's the type of care you will hear, the evidence is going to

24 show you, that Mr. Rolston gives to these patients.

25      Ms. Farer is going to come in and testify, another

inmate at the time at the Federal Correctional Institution, and during her intake examination, Mr. Rolston happened to be the provider that was called to do that. In her situation, she agreed to a well woman exam. She agreed to the pelvic. But what she was presented with was she had an IUD that had migrated and could not be found. So Mr. Rolston, providing good care again, sees that and orders for a consult so that an OBGYN could take care of that problem.

This was an IUD that she had had for nine years. It had been expired for four. It was a problem. He acted on that. He didn't ignore that. He treated her exactly the way you are supposed to in a situation like that.

The situation with Ms. Blevins, she presented with -- she had fibroids on her uterus. And he did not even -- because of the presentation and what was in the record, he ordered an ultrasound. He didn't have to do a well woman exam or a pelvic exam. He looked at the records and looked at the presentation and makes a clinical judgment based on what's presented.

In fact, the type of care that Mr. Rolston is trying to give these patients is also reflected in the treatment he gave for Ms. Blevins. When she was being transferred to another prison -- after the uterine fibroids had been evaluated, she was scheduled for a hysterectomy. She was in the process of being transferred to another prison. Mr. Rolston made sure the other prison was called to know that she has a pending hysterectomy.

1  He didn't have to do that.  He cared about the patient and cared

2  that the next facility would know that she has problems and had

3  an upcoming hysterectomy.

4      He looks at the whole patient, not simply to do well

5  woman examinations.  He was looking at the whole patient.

6      You will hear about some of the problems that

7  Ms. Batchelor, another inmate, had.  She had a terrible

8  hemorrhoid problem and he was trying to treat that.  He will

9  tell you about the cycle of how hard sometimes it is to treat

10 that when you are bleeding, and you are anemic and you need

11 iron, and the iron causes you to be constipated, which causes

12 you to have more hemorrhoids.  But, he is treating her, trying

13 to take care of her.

14      Now, Mr. Cook says the evidence will show that she had

15 a hysterectomy and needed -- never needed a well woman exam,

16 never needed a Pap smears, never needed a pelvic exam.

17      What the evidence will be is she still had -- it was a

18 partial hysterectomy and she still had one ovary.  She was

19 overdue for a Pap smears and he offered it to her, and she

20 consented and did not decline and did receive a Pap smears.

21      And then you will hear from Ms. Daphne Rodriguez,

22 another inmate that was there, and all she really talks about is

23 that she believes he lingered on her breast during an exam.

24 During an exam he touched her too long is basically the claim,

25 nothing like Ms. Alexander's claim or anyone else.

1      But I think when you see what the records show about

2  Ms. Rodriguez is that he, once again, was providing her very,

3  good -- very good care.  She had a vaginal prolapse, which is a

4  very serious condition.  And he was treating that, too.

5      So, it was not being done for some sexual

6  gratification.  None of these exams were being done for sex.

7  They were not inappropriate touching in any way, not for his

8  sexual gratification.

9      It's important to know that the issues in this case --

10 it's not some personality test about Mr. Rolston.  It's not

11 about his bedside manner and how he goes about interacting with

12 the patients.  I think you will see he cares and he gives good,

13 excellent treatment.  But it's not about that.

14     It's not about whether these inmates dislike him or

15 not.  It's not about whether before they came to the prison they

16 had a doctor that did something a little different.  It's not

17 about that at all.  The issue for you is did he intentionally,

18 coercively, intrusively touch her in a degrading manner --

19 intentionally -- for the purpose of his own sexual gratification

20 or somehow to hurt the patient.  That's what is before you is

21 whether he intentionally did that.

22     The evidence does not support that.  The total

23 evidence that you are going to see from the records and the

24 testimony does not support that.

25     At the end of the case, after you have seen all of

1  this evidence, we are going to ask you to find for Mr. Rolston.

2          Thank you.

3          THE COURT:  Mr. Cook, please call your first witness.

4          MR. COOK:  I call Charnesha Alexander.

5          **CHARNESHA ALEXANDER, PLAINTIFF WITNESS, DULY SWORN**

6          THE COURTROOM DEPUTY:  For the record, please state

7  your name and spell your last name.

8          THE WITNESS:  Charnesha Ladawn Alexander,

9  A-l-e-x-a-n-d-e-r.

10          THE COURTROOM DEPUTY:  Thank you.

11                    DIRECT EXAMINATION

12  BY MR. COOK:

13  Q.  Good morning -- or good afternoon rather, Ms. Alexander.

14      I am going to pick up on some of the things that Mr. Carter

15  said, and one of the things that he said is when you got there

16  to the appointment that you complained about -- of ongoing

17  discharge, terrible pain, and that you insisted that he do a

18  pelvic exam, saying things like, "I know my body.  I know what I

19  need."

20      Did you say any of that?

21  A.  No, sir.

22  Q.  Let me pull up again the first page of the evaluation.  You

23  should be able to see it on your monitor there.

24      Is that the report of the evaluation?

25  A.  Yes.

1    MR. COOK:  Your Honor, can we publish this to the jury

2  and ask that it be admitted?

3    THE COURT:  Give me the exhibit number and if you move

4  it in, I will admit it and then you can show to the jury.

5    MR. COOK:  The exhibit number is my Exhibit 1.

6    THE COURT:  Plaintiff's 1 is admitted.

7    MR. COOK:  Okay.

8    (PLAINTIFF EXHIBIT 1:  Received in evidence.)

9  BY MR. COOK:

10  Q.   If you can read that -- I don't know whether --

11    THE COURT:  Mr. Cook, I am having some difficulty

12  hearing you.

13    MR. COOK:  I'm sorry.  I forgot to remove my mask.

14    THE COURT:  There are microphones there.  The one on

15  your counsel table may not be turned on.  I need you to speak

16  near a microphone, if you would.

17    MR. COOK:  Okay.  Yes, Your Honor.

18    THE COURT:  It's on if the red light is on.

19    MR. COOK:  It is on.  And there is one up here as

20  well?

21    THE COURT:  Yes.  There are two up there and they are

22  on all the time.

23    MR. COOK:  Okay.  I will speak up, Your Honor.

24    THE COURT:  Perfect.  Thank you.

25    MR. COOK:  Thank you.

1  BY MR. COOK:

2  Q.   I don't know if you can see this.  I am going to do what's

3  called a call-out.  This is a new thing I am getting used to.

4       It says, "32-year-old female, G3 P3, two vaginal

5  deliveries, one cesarean section."  And it looks like "Complains

6  of bad smelling, yellowish, thick vaginal discharge and pain."

7       Did you tell him that was your -- something that was

8  currently going on?

9  A.   No.

10  Q.   "She describes the pain as sharp, six to seven out of 10,

11  and when asked where she pointed to her lower pelvic region,

12  midline, lower than umbilical."

13       Did you say that?

14  A.   No.

15  Q.   It says that you were "insistent about needing an exam.

16  Certain this is abnormal.  I know my body.  Please check me

17  out."

18       Did you say any of that?

19  A.   No.

20  Q.   It said, "She did not know when the last Pap was or if it

21  had been abnormal", and it says, "the record demonstrated you

22  had a Pap in July of 2015."

23       Was that true?

24  A.   That I had a Pap?  What's the question?

25  Q.   Your last Pap was July of 2015?

1   A.   Yes.

2   Q.   Did you have a Pap in 2016?

3   A.   With Mr. Rolston.

4   Q.   Okay.  And how about before that?

5   A.   Yes.  The prior year and it had to be at another prison.

6   Q.   Okay.  I am going to go to the same record.

7          THE COURT:  Mr. Cook, I can't hear you.

8          MR. COOK:  I'm sorry, Your Honor.

9   BY MR. COOK:

10  Q.   Can you see this entry that I have blown up there?

11  A.   Yes.

12  Q.   And what does that say?

13  A.   Exam, general routine, abnormal findings [sic].

14  Q.   Without abnormal finding?

15  A.   Without abnormal findings.  Yes.

16  Q.   What date was that?

17  A.   4-7-2016.

18  Q.   Does it say "Pap smears?"

19  A.   Yes.

20  Q.   Okay.  Do you remember a mid level practitioner named

21  Hassan?

22  A.   I don't.

23  Q.   Do you remember having a Pap smears in -- at Aliceville?

24  A.   Yes.

25  Q.   Okay.  Was that just six months prior to your appointment

1  with Mr. Rolston?

2  A.   Yes.

3  Q.   Okay.  Is it true, in fact, that you hadn't had a Pap

4  smears for more than a year?

5  A.   Yes.

6  Q.   If it was in April of 2016?

7  A.   I don't remember that Pap in Marianna because that had to

8  be in Marianna.  The one I remember was at Aliceville.

9  Q.   Okay.  Do you disagree with this record?

10  A.   I just can't recall.

11  Q.   Okay.  That's fine.

12      Did you –– at any time –– were you at any time given the

13  option of refusing this examination?

14  A.   No.

15  Q.   When Mr. Rolston said that he was going to give you a Pap

16  smear did he tell that you he was going to rub your clitoris to

17  the point of arousal?

18  A.   No.

19          MR. CARTER:  I would ask for not –– no leading

20  questions, Your Honor.

21          Objection.  Leading question.

22          THE COURT:  Sustained.

23  BY MR. COOK:

24  Q.   When you –– Mr. Carter said that all prisoners have the

25  right to decline care.  If you don't know what kind of medical

1  action, or, you know, invasive examination is about to occur, do

2  you really have the option of refusing it?

3         MR. CARTER:  Objection.

4         THE COURT:  Sustained.

5  BY MR. COOK:

6  Q.   If you would just go back to the beginning and tell the

7  jury about the infection that you had and what you did about it.

8  A.   When I came to Tallahassee I came to the SHU -- Special

9  Housing Unit -- and I was given some scented soap and I can't

10 use scented soap.

11        When I began smelling an odor and have an itchy feeling, I

12 wrote a cop-out.

13 Q.   What is a cop-out?

14 A.   A cop-out is a paper request to the doctor.  You have to

15 slide it up under the door and the officer will come pick it up.

16        I wrote numerous cop-outs.  I never got a response.

17        I just was thinking, so one morning when they brought

18 breakfast I inserted yogurt in my vagina.  When I did that it

19 cleared up.

20        And in the Special Housing Unit they keep you locked down

21 and for security reasons if you are escorted out of your cell

22 they don't tell you where you are going or what you are doing.

23 They just come to shackle your feet and shackle you in handcuffs

24 and take you to your destination.

25        When I got to the medical room I asked the nurse that was

1  in there what was I coming here for and she told me that -- she

2  showed me the cop-out.  She said "you had a complaint."

3      I told her that I didn't have that problem anymore.  It had

4  been awhile ago.  It had been weeks ago and I had got it cleared

5  up.

6      She said, "Well, Mr. Rolston still want to do a Pap."  So I

7  explained to her that my period was on and she said, "Well, just

8  wait until he get in here and he'll explain it then."

9      So, when he came in he re-explained that -- what I was

10  coming to see for -- what I was coming in to be seen for and I

11  told him the same story about I inserted yogurt.  The yogurt --

12  the problem was gone.  And my period was on.  And he said that

13  wasn't a problem that my period was on.

14      And I told him that out of all of the Paps I got I never

15  had a Pap with my period on and I didn't feel comfortable and he

16  said it was okay.  And he said that he had forgot some of the

17  tools that he had to use to do the procedure with and he left

18  out of the room.

19      And when he left out Ms. Davis told me to get undressed and

20  I did what I was told.

21  Q.   Okay.  So, when he came back, how did he conduct this Pap

22  smears test?

23  A.   I was already undressed and had the little paper over me

24  when he came back.

25      So his desk was in the front of the bed and he put on his

1   gloves, and stuff, and he told me to put my feet up on the

2   stirrups.

3       So I put my feet up and he told me to scoot down some more,

4   so I scoot down.  So he told me to relax and open my legs so I

5   wouldn't cling his ears.

6       So I opened my legs a little bit and he put the lubricant

7   on his hand.  When he put the lubricant on his hand, he started

8   feeling like on the left side and the right side of my vagina.

9       After he did that, he went and he touched my clit and when

10  he touched my clit he went in a circular motion, but I was so

11  shocked I just stayed still.  And he went down and he put his

12  hand inside of my vagina.

13      So, when he came out of my vagina he went back up and he

14  did it again -- put his hand on my clit in a circular motion.

15  And I was so for sure.  I just stood still and I didn't move.

16  So -- I didn't look left or right.  I was just looking straight

17  ahead at the wall because I really couldn't see Mr. Rolston's

18  face because my legs was up and that sheet was over me.

19      So, after he did that he got the plastic thing like an

20  alligator, or an opener, and he put it inside of me.  And he put

21  his fingers inside of me and he pressed and he asked me did I

22  feel pain and I didn't respond.

23      And he pressed on the other side of my stomach and asked me

24  did I feel pain.  I still didn't respond.

25      So, he took it out and he spread my butt cheeks and he

1   asked me did I have a problem with hemorrhoids.  And I got

2   hemorrhoids.  They inside and outside, so I got hemorrhoids that

3   just stay out.  They don't go back in.  So, it was clear for him

4   to see that.

5         So I just didn't say nothing because -- I don't know why I

6   didn't say nothing.  I don't know.  I just couldn't speak.

7         So he left out of the room.  He told me get dressed and he

8   was going to leave out.  And when he left out I turned to

9   Ms. Davis.  I said, "He just finger fucked me."  She said "Huh."

10  I said, "He just finger fucked me.  He just played with me while

11  he was doing that to me."  And she was like, "Well, tell him."

12  And I said, "I am telling you."  She said, "Well, tell him."  I

13  said, "I'm telling you.  Please tell him.  You say something."

14  She said, "You tell him."

15        So, I automatically started crying.  So I sat there crying

16  and I got dressed.  I wiped myself off and I got dressed.  And

17  when Mr. Rolston came back in the room I was sitting on the side

18  of the bed crying.

19        And when he came up to me he was so close to me his

20  knees -- his thighs was on my knees and he rubbed my leg and he

21  said, "Ms. Alexander", he said, "are you okay."

22        MR. CARTER:  Your Honor.  May I have a question and

23  answer, so I can --

24        THE COURT:  Sustained.  Time for a question.

25        MR. COOK:  Okay.

1    BY MR. COOK:

2    Q.    Okay.  When he came in and asked you what was wrong, how

3    was he standing in relation to you?

4    A.    In front of me with his thighs on my knees and his hand on

5    my thigh.

6    Q.    He had his hand on your thigh?

7    A.    Yes.

8    Q.    And did he ask you about your children?

9    A.    No.  He just asked me was I hurt and what was going on, and

10   the way I was crying I seemed like I wasn't physically hurt,

11   like something that was going on with my family.  And I just

12   didn't respond.

13   Q.    So you never said anything to him at all?

14   A.    No.  I just cried.

15   Q.    Okay.  And did he ask you whether you would submit to any

16   further examination?

17   A.    Yes.

18   Q.    What did he ask?

19   A.    He asked me did I want to do a breast exam.

20   Q.    Did you say anything to that?

21   A.    I just shook my head.

22   Q.    What happened after that?

23   A.    Ms. Davis gave me a paper to sign and I signed it, because

24   I know that's the only way I can get out of there.

25   Q.    Okay.  Refusing a breast exam?

1   A.   Uh-huh.

2   Q.   What happened then?

3   A.   After I signed the paper he left out of the room and two

4   guards came to get me -- a man and a woman -- and they shackled

5   me back up.  And I was still crying.  And the officer asked me

6   what was wrong and I didn't respond to her.  And she kept asking

7   me what was wrong.  And she took me in the room and when she

8   took me in the room she said, "Alexander" --

9           MR. CARTER:  Objection, Your Honor.  Hearsay.

10          THE COURT:  Overruled.

11  A.   She said, "Alexander, speak up.  What's going on with you."

12  She said, "Did he do something to you," and I just kept crying.

13  And she said, "If he did something to you," she said, "even if

14  you don't speak up for yourself speak up for the others."

15  BY MR. COOK:

16  Q.   Speak up for the others?

17  A.   Like the other women that it had happened to that I wasn't

18  aware of.

19          MR. CARTER:  Objection.

20          THE COURT:  Overruled.

21  BY MR. COOK:

22  Q.   Okay.  What happened then?

23  A.   After that, they -- they kept me locked in the room for

24  about 30, 45 minutes.  Then they came back and got me and

25  escorted me back to my cell.

1  Q.    Was that room in the medical department, or was it --

2  A.    It was on the same hallway.  It was in the housing unit.

3  Everywhere I was was in the housing unit still.

4  Q.    Okay.  So you got back to your housing area?

5  A.    Uh-huh.

6  Q.    What happens then?

7  A.    I told my cellmate what had happened.  And in the midst of

8  us talking Mr. Rolston came down to the hallway.  And it's a

9  little square window where you can see the officers that come

10  down, you know, and he knocked on the door and asked was I okay.

11  And my cellmate started cursing at him and telling him to, "Get

12  the fuck away from the door.  You know what you did to her.  You

13  need to leave us alone."  And he just left.

14      Maybe about an hour later they came back and got me out of

15  my cell.

16  Q.    Did they say what they wanted you for when they took you

17  out of the cell?

18  A.    They don't tell you what they get you out of the cell until

19  you get there.

20  Q.    What happened then, if you would tell the jury.

21  A.    They took me in the investigation office.  The

22  investigator -- I was still in handcuffs.  They asked me for my

23  story.  And in the midst of me talking to the investigator,

24  Mr. Proffitt knocked on the door and came in.  Automatically --

25  I mean, Mr. Rolston came.  The investigator's name is

1  Mr. Proffitt.

2  And when he came in the door I just turned around to the

3  book shelf and got in the corner because I wasn't comfortable

4  with him being in the same room.

5  And Mr. Proffitt asked him why he was in there.  And he

6  told him that he needed to leave.  Why did he come in there.  To

7  leave.  And Mr. Rolston left out.  And after that I gave them my

8  story.

9  Q.  The affidavit that you gave, can you see on the monitor

10  whether that is the affidavit?

11          THE COURT:  Is this an evidence?

12          MS. MOYLE:  It should not be published yet, Your

13  Honor.

14          MR. COOK:  I'm sorry.  This is my Exhibit No. 5.  I

15  believe that we are all agreed.  I ask that it be admitted, Your

16  Honor.

17          MR. CARTER:  That one document.  Yes, sir.  5 point

18  whatever that was.

19          THE COURT:  All right.  Plaintiff's 5 is admitted.

20          MR. CARTER:  I think it's a subpart.

21          THE COURT:  Well --

22      (PLAINTIFF EXHIBIT 5:  Received in evidence.)

23          MR. COOK:  It's part of the whole report.

24          THE COURT:  All right.  That affidavit is admitted and

25  at the break somebody remind me and we will work on the

1    numbering.

2         MR. COOK:  Okay.  Thank you, Your Honor.

3    BY MR. COOK:

4    Q.   If you would, could you read that affidavit and tell us if

5    that was your affidavit, could you tell the jury what you said,

6    what you wrote?

7    A.   Read it out loud?

8         MR. COOK:  Yes.  Please try to keep your voice up.

9    A.   I, Charnesha Alexander, Reg No. 15404-002, am an inmate

10   currently housed at the Federal Correctional Institution in

11   Tallahassee, Florida, and I do hereby make this statement freely

12   without any promises or assurances.

13        On September 27, 2016, I received a Pap smear from Nurse

14   Rolston.

15        MR. CARTER:  Is it proper to just read the affidavit

16   in there?

17        THE COURT:  He can publish it.

18        MR. CARTER:  All right.

19        MR. COOK:  Go ahead.

20   A.   During my Pap smears there was another nurse present.  The

21   only name I seen on her was Lillie.  Although Lillie was present

22   she was not watching.  She was doing my paperwork.  As the Pap

23   smears started Nurse Rolston had me undress from the waist down.

24   He then told me to get on the table and place my feet in the

25   stirrups.  While my feet were in the stirrups Nurse Rolston told

1  me to spread my legs and relax so I didn't cling his ears.

2      I relaxed, spread my legs, and never touched Nurse Rolston.

3  Mr. Rolston then started rubbing my clitoris with a lubricant.

4  After rubbing my clitoris Mr. Rolston then began rubbing both

5  sides of the inside of my vagina.

6      Nurse Rolston then put his hand inside of my vagina.  Mr.

7  Rolston removed his hand and then rubbed my clitoris again.

8      Mr. Rolston then put the Pap inside of me.

9      After Mr. Rolston removed the Pap he then stuck two fingers

10 inside of me and rubbed my left, middle and then right side

11 asking me if I had any pain when he pressed down.

12     Nurse Rolston then removed his fingers and he spread my

13 butt cheeks.  Mr. Rolston asked me if I had taken any medicine

14 for my hemorrhoids.  I told him I had not since I been here, but

15 they usually give me suppositories.

16     Mr. Rolston left the room so I could get dressed and I

17 stayed in the room with the other nurse.  I explained to the

18 nurse that Mr. Rolston rubbed my clit and he fucked me with his

19 fingers.  The nurse told me I had to tell Mr. Rolston that and I

20 told her that she wasn't even looking.

21     I told the nurse that I wasn't going to tell Mr. Rolston

22 and nobody was going to believe me because she wasn't looking.

23 The nurse told me she was sorry.  She was doing my paperwork.

24     Nurse Rolston came back into the room and asked me about

25 how many pregnancies I had and asked if I wanted a breast exam.

1    Mr. Rolston told me he just had to ask me if I wanted a

2  breast exam.  That I didn't want to take a breast exam.  I

3  didn't have but it was a procedure that he ask.

4    I had to sign some papers stating why I was crying.  No --

5  I had to sign some papers stating I didn't to take the breast

6  exam.  I started crying.

7    Mr. Rolston asked me what happened so fast and why I was

8  crying.  Mr. Rolston asked what was wrong and if something going

9  on at my home or with my kids.

10    Mr. Rolston then left -- then came at me to fix my collar

11  and I snatched back.  Mr. Rolston said he was just trying to fix

12  my collar because it was crooked.

13    Mr. Rolston asked me why I was crying because it didn't

14  seem like I was crying from pain, that it seemed like I was

15  crying because I was hurt.  I didn't respond and when the guard

16  came by I asked if I could go back to my cell.

17  BY MR. COOK:

18  Q.   Did you make that statement on the day that Mr. Rolston

19  examined you?

20  A.   Yes.

21  Q.   And was that a truthful statement?

22  A.   Yes.

23  Q.   Was it made when your memory was fresh?

24  A.   Yes.

25  Q.   Now, who asked you to give a statement?

1   A.   Mr. Proffitt.

2   Q.   Okay.  Is Mr. Proffitt somehow connected with the

3   investigation process?

4   A.   Yes.  He is the SIS investigator.

5   Q.   Do you know what "SIS" stands for?

6   A.   I don't.

7   Q.   Okay.  Going back to the examination, did you ever see a

8   lab report for a Pap specimen?

9   A.   No.

10  Q.   Did you ever see a history that said that you had a Pap

11  smears that day --

12  A.   I just can't recall.

13  Q.   -- in your medical records?

14  A.   I have medical records.  I have got my medical records from

15  that time and previous times.

16  Q.   Okay.  Did you ever see anything about getting a Pap smears

17  that day?

18  A.   I can't recall.

19  Q.   Now, after you gave a statement to the investigator, did

20  they take you to the hospital?

21  A.   Yes.

22  Q.   Okay.  And what happened there?

23  A.   At the hospital or before I went in?

24  Q.   At the hospital.

25  A.   At the hospital they did a rape kit.

1  Q.   Okay.

2  A.   On my way to the hospital, they switched my clothes out.

3  They made me take off all of my clothes and my panties that I

4  had on when it happened, and they put me in a new outfit.  And

5  they shackled me, and I had to go into Tallahassee emergency

6  room with prison clothes and shackles on in the emergency room

7  and sit there and wait.

8  Q.   Did you ever discuss this with anyone within the prison

9  system or outside it?

10  A.   My cellmate.

11  Q.   Okay.  Anybody else?

12  A.   My mama.

13  Q.   Okay.  And anyone else?

14  A.   No.

15  Q.   Were you part of a prayer group?

16  A.   Yes.

17  Q.   Okay.  Is that an issue that the prayer group discussed and

18  prayed about?

19  A.   Yes, they have.

20  Q.   Okay.  Where did you get -- where did you go from

21  Tallahassee?

22  A.   I went to Aliceville.  That's when I joined the prayer

23  group.

24  Q.   Okay.  And -- so once you got to Aliceville, you say you

25  joined a prayer group?

1    A.    Uh-huh.

2    Q.    Okay.  Did you feel that you could speak freely with the

3    official psychologists or counselors at the prison?

4    A.    Yes.

5    Q.    Okay.  And did you?

6    A.    Yes.

7    Q.    Do you remember who you talked to?

8    A.    No, not exactly.

9    Q.    Okay.  Had anyone ever done a Pap smears exam like that

10   before --

11   A.    No.

12   Q.    -- of you?

13         How does this make you feel?

14         How does it make you -- how has it changed you, this

15   experience?

16   A.    I don't think I have the same self-worth.

17   Q.    Speak up, please.

18   A.    I just don't think I have the same self-worth.  And I feel

19   lonely and I feel uncomfortable with myself.  And when my cycle

20   come on, it just -- it makes me feel disgusted with myself.  I

21   feel just down and blue, just disgusted.

22   Q.    The fact that you are -- I don't know whether you testified

23   that your clitoris was aroused when he rubbed it those two

24   times.  Was it?

25   A.    Yes.

1    Q.    Did you say "yes"?

2    A.    Yes.

3    Q.    How did that make you feel?

4    A.    Guilty, like I didn't understand why I got aroused.

5    Q.    Has anything like that ever happened to you before?

6    A.    No.

7    Q.    You cried that day.  Have you cried about it since then?

8    A.    Yes.

9    Q.    How many days go by that you don't think about this?

10   A.    I always think about it, absolutely always.

11   Q.    Excuse me?

12   A.    I always think about it.

13        THE COURT:  Ms. Alexander, you are going to have to

14   speak -- speak loudly enough so if somebody was sitting back at

15   the back wall of the courtroom, they'd be able to hear you

16   without the microphone.  That way we will all be able to hear

17   you.

18        Thank you.

19        MR. COOK:  One moment, Your Honor.

20        That's all the questions I have.

21        THE COURT:  All right.  Members of the jury, that

22   makes this a good time for the afternoon break.  Please don't

23   talk about the case with each other.  As I explained in the

24   instructions when we started, find something else to talk about.

25        We've got you all in one jury room.  There are seven

1    of you, and I think there is room back there to kind of keep

2    your distance from each other.  With mask and distancing, I

3    think we will be all safe.

4            We will be back with you in a few minutes.

5        (Jury out at 2:41.)

6            THE COURT:  You may be seated.  Either side need me

7    before we break?

8            MR. COOK:  No, Your Honor.

9            THE COURT:  There is just one page of an exhibit

10   that's admissible?

11           MR. COOK:  I don't think so, Your Honor.  I believe

12   that we are in agreement on all of -- I know with the --

13           MR. CARTER:  The issue, Your Honor, that we have with

14   Exhibit No. 5, which is the investigative report that includes

15   her affidavit, other affidavits, and then the SIS

16   investigation --

17           THE COURT:  Right.

18           MR. CARTER:  -- we objected to that.  We are concerned

19   that -- we don't want to open up the door to all investigations

20   for everybody, okay?

21           THE COURT:  I understand.

22           MR. CARTER:  And I don't want -- by allowing that in,

23   I have done that because, you know, it goes to the negligence

24   case, not the case against Mr. Rolston.

25           So I think we would agree to the exhibit coming into

1  evidence, but I don't want to be opening a door.

2         THE COURT:  All right.  So all that was offered,

3  essentially, was the affidavit?

4         MR. COOK:  That was all that was offered at this --

5         THE COURT:  I probably would have sustained an

6  objection to that affidavit, frankly.  I don't understand why

7  it's not hearsay, but there was no objection, so I let it in.

8         MR. CARTER:  No objection.

9         MR. COOK:  Your Honor, the entire report includes

10  affidavits by Mr. Rolston and also by the chaperone.  And the

11  chaperone is anticipated to testify this afternoon.  I was going

12  to ask her about her affidavit and ask that be admitted.

13         THE COURT:  On what basis would her affidavit be

14  admitted?

15         MR. COOK:  Well, Your Honor, I am not sure that she is

16  going to remember it.  So it might just be a matter of

17  refreshing memory, which is fine.  I just need to make sure that

18  what she said back then is accurate.

19         THE COURT:  Well, ask her the question and she can

20  testify.  But it seems to me the affidavit is the very paradigm

21  of hearsay.  And I can't -- so tell me what exception in the

22  little book -- or what part of the definition of hearsay lets

23  that in.

24         MR. COOK:  Well, Your Honor, I think it's an official

25  investigation, and I think that the official investigation has

1    an exception.  I guess it depends on how much of the report -- I

2    mean, there is going to be a lot of hearsay in the entire

3    reports, but I really would have thought that the other parties

4    would have wanted that to come in, because it cuts both ways.

5                MR. CARTER:  I really don't --

6                THE COURT:  I take that as the answer being 803(8)?

7                MR. COOK:  Yes.

8                THE COURT:  That affidavit doesn't come in under

9    803(8).  This is not a finding.  This is just an affidavit.  It

10   is in the coming in under 803(8).

11               And I take it beyond that that the response is, Well,

12   there is no exception to the hearsay rule, but you think the

13   other side might like it in anyway; absolutely.  If everybody

14   wants it in; you offer it, nobody objects; I will let it in.

15               But, otherwise, if there is a hearsay objection, I am

16   going to sustain the objection.

17               MR. COOK:  We had that conversation with the United

18   States, but not -- and I should have had it with Mr. Carter, but

19   we will try to work it out.

20               THE COURT:  All right.  Mr. Carter, I overruled the

21   objection to what she said walking down the hall with the

22   officers afterwards.  Seems to me that comes in under 830(2) --

23               MR. CARTER:  What the officer said --

24               THE COURT:  If not 803(1) or (3).

25               I understand what the officer said, but it was part of

1    the same conversation and --

2            MR. CARTER:  I understand, but it was -- well, I

3    object to it --

4            THE COURT:  Yeah, I have it.

5            MR. CARTER:  -- because she was saying -- she was

6    having the officer say, If he did something to you, you need to

7    report it to save the other women.

8            THE COURT:  Yeah.

9            MR. CARTER:  And if he had done that -- and all that

10   kind of stuff.  That's what I was --

11           THE COURT:  Yeah, it was part of the conversation.  It

12   helps explain what she said.  It's hard to say what she said

13   and -- before the officer's comment and then what she said after

14   the officer's comment and leave out the officer's comment in the

15   middle.

16           MR. CARTER:  I understand.

17           THE COURT:  It kind of explains the conversation, so I

18   let it in for that purpose.

19           What else?  We got --

20           MS. MOYLE:  I'm sorry.  I'm unclear whether you

21   admitted -- 5.1 is admitted, the two-page affidavit?

22       (Indiscernible crosstalk.)

23           THE COURT:  Folks, look, the court reporter is going

24   to make a transcript.  When three of you are talking to one

25   another, I can't hear you and she can't take it down.

1    Now, here are the rules.  And let me just for all of

2  you -- I got a lot of lawyers here, so it's a teaching moment.

3  When I learned how to do this, the rule was a lawyer spoke to

4  the Judge, never to each other.  And so -- if when I was in

5  court and the other lawyer asked me a question, as they

6  sometimes did, I looked at the Judge and I spoke to the Judge.

7    Now, I understand I am old as dirt and nobody does it

8  that way anymore.  And that's okay.  And when you talk to each

9  other, I don't mind.

10    But here is the instruction of the court reporter:

11  She takes down every word said during the trial that I can hear.

12  When you start stage whispering to each other -- or, Mr. Cook,

13  when you are mumbling when you are looking at your machine,

14  she's not sure whether I can hear or not.  And sometimes I can

15  make out the words and sometimes not.  It's just very hard.

16    So anything worth saying is worth saying loud enough

17  that we can all hear it.  So either say it so quietly nobody can

18  hear or so loud we can all hear it.  If you wish to speak to one

19  another -- look, I commend you very much for cooperating with

20  each other, speaking to each other about whether things can be

21  admitted and so forth.  That's excellent.  And if you need to

22  confer during the trial, then despite what I told you about what

23  I was taught, I am happy to have you speak quietly to one

24  another, but speak so quietly that we can't hear you.

25    MR. COOK:  I apologize, Your Honor.

1          THE COURT:  It's all good.

2          You are very soft-spoken, and that's part of your

3     shtick and I get it.  I don't say that in a derogatory way.  Any

4     good lawyer has a shtick, and yours is you speak quietly.

5          Even in opening statements you are speaking quietly

6     enough -- I'm behind you a little bit, not that far away -- but

7     you can speak loudly enough the jurors hear you and I don't, but

8     I got to hear you.  So use it sparingly, and most of the time

9     speak up as loud as you can.

10          What else?  We have another eight minutes.  Let's

11     start back at five minutes to three by that clock.

12     (Recess taken 2:48.)

13     (Resumed at 2:56.)

14          THE COURT:  Please be seated.

15          Jury in.

16     (Jury in at 2:57.)

17          THE COURT:  All right.  You may be seated.

18          We will all be at ease for just a moment while we get

19     the witness back.

20     (Pause in proceedings.)

21          THE COURT:  While we are doing that, let me give you a

22     couple of notes.  One, I referred to publishing something.  In

23     trials we sometimes refer to "publishing" just meaning to make

24     something known to the jury either by reading it or putting it

25     on the screen.  So it doesn't mean like publishing a book, but

 1   just getting it to you in one way or another.

 2          Then, exhibits are numbered.  You notice -- I think

 3   there was a reference to Exhibit 5.  We didn't start with No. 1.

 4   Well, maybe we did start with 1, but then there was a gap.

 5   Exhibits routinely do not come in a sequence.  They got numbered

 6   awhile ago in the trial preparation process.  The numbers don't

 7   have any special significance.  It's just any number -- it gets

 8   used consistently just so we know what we are referring to.

 9          It's essentially an arbitrary number.

10          MR. COOK:  Your Honor, my client's mask broke and she

11   had to get a replacement.

12          THE COURT:  All right.  Might even have more around

13   somewhere, but you got that one fixed.  Good enough.

14      (Ms. Alexander entered the witness stand.)

15          Ms. Alexander, you are still under oath.

16          Mr. Carter, you may proceed.

17          MR. CARTER:  Thank you, Your Honor.

18                        CROSS-EXAMINATION

19   BY MR. CARTER:

20   Q.   Good afternoon.

21   A.   Hey.

22   Q.   Ms. Alexander, I wanted to ask you about something that was

23   mentioned in the beginning of the trial.

24          You have been convicted of two felonies; correct?

25   A.   Yes.

1  Q.   And those two felonies were conspiracy to defraud the
2  United States with respect to claims; right?
3  A.   Yes.
4  Q.   And aggravated identity theft and aiding and abetting;
5  correct?
6  A.   Yes.
7  Q.   And you were sentenced to a 111 months; correct?
8  A.   Yes.
9  Q.   And that occurred in March -- March 5th, 2015; correct?
10 A.   Yes.
11 Q.   Ms. Alexander, when you were assigned to the Special
12 Housing Unit that we have called the SHU -- you are familiar
13 with that; right?
14 A.   Yes, sir.
15 Q.   That's a disciplinary confinement; correct?
16 A.   Yes, sir.
17 Q.   And that was because of some issues you had at the work
18 camp in Marianna; correct?
19 A.   Yes, sir.
20 Q.   Some talking on the phone issue; correct?
21 A.   Yes, sir.
22 Q.   And so you were transported to the SHU in Tallahassee
23 because there is no SHU in Marianna; correct?
24 A.   Yes, sir.
25 Q.   And you were awaiting being transferred to another prison,

1   a higher security prison, and that's in Aliceville; correct?

2   A.   Yes, sir.

3   Q.   Now, when you are in the special housing, the SHU, you were

4   locked down; correct?

5      You can't move freely, can you?

6   A.   No, you can't.

7   Q.   Okay.  When you come out of the cell, you are escorted by

8   officers and you are generally restrained; aren't you?

9   A.   Yes, sir.

10   Q.   Just so we have the timing right, you arrived in

11   Tallahassee at the SHU July 26th of 2016; right?

12   A.   Yes.

13   Q.   Or July 2016?

14   A.   Yes, sir.

15   Q.   And stayed until you went to Aliceville in late October of

16   2016?

17   A.   Yes, sir.

18   Q.   Okay.  Now, it's your testimony, isn't it, that you had a

19   bacteria -- you had a bacterial infection in your vagina region

20   starting a week after you showed up at the SHU in Tallahassee;

21   correct?

22   A.   Yes, sir.

23   Q.   I think you testified to the jury that was because of some

24   soap you used; correct?

25   A.   Yes, sir.

1  Q.   And because of that bacterial infection, you had heavy

2  yellow discharge; correct?

3  A.   Yes.

4  Q.   And it was very bad smelling, odorous discharge; correct?

5  A.   Yes, sir.

6  Q.   And it was copious?  Lots of it; right?

7       Lots of discharge while you were in the SHU.  From the week

8  that you got there, you had lots of discharge; correct?

9       The discharge that you were having was a lot of it;

10 correct?

11 A.   Yes, sir.

12 Q.   Because of the bacterial infection that you got a week

13 after you came to Tallahassee?

14 A.   Yes, sir; correct.

15 Q.   And it is true, isn't it, that you had a sexually

16 transmitted disease; correct?

17 A.   Yes, sir.

18 Q.   You had herpes; correct?

19 A.   Yes, sir.

20 Q.   And you were actually on medication for that, acyclovir;

21 correct?

22 A.   Yes, sir.

23 Q.   And you started in, like, 2011, and you had outbreaks all

24 at different times; correct?

25 A.   Yes, sir.  Not in my vagina area, though, on my mouth.

1  Q.   Okay.  You had a history of heavy bleeding though; correct?

2  A.   Yes, sir.

3  Q.   Weren't you taking --

4  A.   When --

5  Q.   -- birth control pills --

6  A.   -- on my period; yes, sir.

7  Q.   You were actually being prescribed birth control pills

8  because it was so heavy; correct?

9  A.   Yes.

10  Q.   And you had painful cramps, painful menstrual cramps called

11  dysmen --

12          MR. CARTER:  I can't remember how to pronounce it.

13          MR. JOHNSON:  Dysmenorrhea.

14          MR. CARTER:  Dysmenorrhea.  Thank you, Mr. Johnson.

15  BY MR. CARTER:

16  Q.   Dysmenorrhea, you actually had that diagnosis while you

17  were in prison; correct?

18  A.   Before I went to prison.

19  Q.   Even before you went to prison, but up in Aliceville also;

20  correct?

21  A.   Yes.

22  Q.   And you had had heavy bleeding so much that you had to seek

23  treatment when you were in Aliceville; correct?

24  A.   Yes, sir.

25  Q.   And you'd also been diagnosed with fibroid tumors on your

1 uterus; correct?

2 A.    Uh-huh; yes, sir.

3 Q.    And you had yeast infections also; correct?

4 A.    Yes, sir.

5 Q.    And you would agree with me when you had a bacterial

6 infection and vaginal discharge, and lots of it, that would be a

7 situation in the past when you needed to have that checked out;

8 correct?

9 A.    Yes, sir.

10 Q.    And your experience with the bacterial infections that you

11 have had most of your adult life is that the providers you go to

12 actually give a Pap smears; correct?

13 A.    Yes, sir.

14 Q.    So with the condition that you presented with while you

15 were in the SHU, you would -- when you were treated, you would

16 be expecting a provider to give you a Pap smears and do a pelvic

17 exam; correct?

18 A.    Yes, sir.

19 Q.    Ms. Alexander, I have to put something on the screen that

20 you ought to be able to see there.  It's marked as Plaintiff's

21 Exhibit 2.1.

22     Do you see that?

23 A.    Yes, sir.

24 Q.    That is your handwriting in the middle of the page; isn't

25 it?

1  A.   Yes.

2  Q.   And that's the cop-out that you refer to that you made for

3  a request to see somebody because of the vaginal discharge and

4  what you believed to be a bacteria infection; correct?

5  A.   Yes, one of many.

6  Q.   That is one of many.  But that is one; correct?

7  A.   Yes, sir.

8  Q.   And this particular cop-out, you wrote that where it says:

9  Can I please have someone -- I have a bacteria, "Can I please

10 see someone?  I have a bacteria infection and I've had it for a

11 month."

12      Do you see that?

13 A.   Yes, sir.

14 Q.   All right.  And you don't describe it being a vaginal

15 bacterial infection; do you?

16 A.   No, sir.

17          THE COURT:  Mr. Carter, this is not on the jurors'

18 screens.  Did you want it?

19          MR. CARTER:  If it can be admitted.  It's a

20 plaintiff's exhibit.  We didn't object to it, so I would publish

21 it; yes, sir.

22          THE COURT:  Plaintiff's --

23          MR. CARTER:  Exhibit 2.1, Your Honor.

24          THE COURT:  Plaintiff's Exhibit 2.1 is admitted into

25 evidence.

1    (PLAINTIFF EXHIBIT 2.1:  Received in evidence.)

2        MR. CARTER:  Thank you, Your Honor.

3  BY MR. CARTER:

4  Q.   Now, Ms. Alexander, do I understand your testimony to be

5  that Mr. Rolston didn't see you at cell-front on the day that

6  you recalled that you had your examination.  Is that your

7  testimony?

8  A.   I don't understand what you mean by --

9  Q.   Did Mr. -- here's the question:  Did Mr. Rolston come to

10 the SHU cell and speak with you before you were examined?

11 A.   No, sir.

12 Q.   It's your testimony that he -- in response to this cop-out,

13 he called you into the exam room and conducted a pelvic exam; is

14 that your testimony?

15 A.   No, sir.  What he did -- he didn't do anything.  The guards

16 came and got me out of my cell.  They didn't tell me where I was

17 going.  I didn't know until I got to the medical exam room.

18 Q.   You didn't know -- he didn't know what your condition was

19 at that time; did he?

20     All he had -- all he had was the cop-out?

21        MR. COOK:  Objection, Your Honor.

22 A.   I don't know what he knew.

23        THE COURT:  Overruled.

24 BY MR. CARTER:

25 Q.   Wouldn't you agree with me, Ms. Alexander, in your

1  experience with medical providers, doctors and PAs, even in

2  prison and out of prison, they talk to you first about your

3  complaints before they start treating you; correct?

4  A.   Or I do.  I tell them my complaint.

5  Q.   Right.  They ask you about what your complaint is; right?

6  A.   Yes.

7  Q.   Right.  Now, at the time you saw -- well, nevermind.  We

8  have established that.

9       Your testimony is you used yogurt, that you had to

10  self-treat; is that right?

11  A.   Yes, sir.

12  Q.   And that's yogurt that's just off the caf -- off the food

13  tray that you received in the SHU; is that right?

14  A.   Yes, sir.

15  Q.   It has sugar in it; doesn't it?

16  A.   I don't know.  It was just Yoplait.  It was inside the

17  container, and I just used it.

18  Q.   But you would agree, given the three months of heavy

19  vaginal discharge and pain that was associated with that, you

20  needed to be checked out; right?

21  A.   It wasn't three months.

22  Q.   All right.  Two months, from July and August --

23  A.   Uh-huh.

24  Q.   -- until September?

25  A.   Yes.

1  Q.   So two and a half months?

2  A.   But it didn't last that long because when I treated with

3  the yogurt, it was gone.

4  Q.   Right.  Well, it was still ongoing on September 8, 2016,

5  like this cop-out that you prepared; correct?

6  A.   Yes, sir.

7  Q.   You would agree with me that you described your situation

8  to Mr. Rolston as having pain 6 to 7 out of a scale of 10;

9  correct?

10  A.   Yes.

11  Q.   And you had sharp pain; correct?

12  A.   Yes.  I told him I had pain from cramping.  My period was

13  on --

14  Q.   And that needed to be checked out too; correct?

15  A.   No.  My period was on.  It's normal for me to cramp that

16  way when my period is on.  That why they had me on birth control

17  pills, to regulate my period and control the cramps.  Because I

18  was pretty much like -- I was having contractions with my period

19  it used to be so bad.

20  Q.   The exam room in the SHU is a very small room; isn't it?

21  A.   Correct.

22  Q.   It has a table in it, an exam table with the stirrups, as

23  well as a desk in this very small space; correct?

24  A.   Yes.

25  Q.   Now, you understood when you would have an examination like

1  this that you would be being touched on your vaginal area;

2  correct?

3  A.   Correct.

4  Q.   And you expected a digital exam of some kind; correct?

5  A.   What you mean by "digital"?

6  Q.   That fingers would be in your vagina.

7       You expected that?

8  A.   Yeah, but not on my clit and rubbing me and stimulating me.

9  That never happened before.

10 Q.   But you had other healthcare providers actually stick

11 fingers in your vagina during an examination like Mr. Rolston;

12 right?

13 A.   No, not like him.  Never like him.

14 Q.   But it's not the fact that him touching your vagina that is

15 a sexual assault; is it?

16      It's not that?

17 A.   I can't say that.  I don't agree with that.

18 Q.   And it's not the speculum that's the sexual assault; is it?

19 A.   Not the speculum, but going inside of my vagina the way he

20 did on a circular motion and on my clitoris, that's a sexual

21 assault.

22 Q.   Ms. Alexander, you have been in the prison system since

23 2015; right?

24 A.   Yes, sir.

25 Q.   And you understood you could decline treatment; right?

1  A.   Yes, sir, I did.

2  Q.   Because you had done that before; correct?

3  A.   That I declined treatment?

4  Q.   Yeah.  In -- had you ever declined treatment in Aliceville

5  or anywhere else?

6  A.   No.

7  Q.   But you understood you had that right; correct?

8  A.   Not really, because in prison dealing with authority, it's

9  what they say.  You are up under their rules.

10  Q.   Now, Mr. Rolston left the exam room while you undressed;

11  didn't he?

12  A.   Yes.

13  Q.   He was not there watching you undress or leering at you in

14  any way; was he?

15  A.   Not while I was getting undressed.

16  Q.   Ms. Davis actually talked to you while he left the room to

17  confirm that you wanted to go forward with the exam; right?

18  A.   No.  She just told me to get undressed.

19  Q.   Mr. Rolston comes back into the room?

20  A.   And I'm undressed.

21  Q.   All right.  And you have the drape on you?

22  A.   Yes, sir.

23  Q.   And he tells you, We are going to go forward with the exam.

24  He confirms that you want to do that; correct?

25  A.   He just told me to put my legs up on the stirrups.

1   Q.   You actually declined the breast and a rectal exam;

2   correct?

3   A.   He checked my rectum.  He spreaded my butt cheeks and he

4   seen the hemorrhoids there.

5        I declined the breast exam just to get up out of there.  It

6   had went way too far.

7   Q.   And that happened when he first came back into room before

8   the exam started?  He actually asked you if you wanted to go

9   forward with the exams; correct?

10  A.   No.  That happened -- the breast exam happened after he did

11  all of that stuff to me.  That was the last things he said.

12  Q.   After you had gotten dressed; right?

13  A.   Yes.

14  Q.   So it's your testimony, then, instead of asking you before

15  the exam began whether you want to do the breast and the rectal

16  along with the other exam, he waited for you to get back dressed

17  and then asked you again did you want to do the breast and

18  rectal exam?

19  A.   Not the rectal.  The breast exam only after I was dressed.

20  Q.   I want to show you, Ms. Alexander, what's been marked as

21  Defendant's Exhibit 3.1.

22       Can you see that?

23  A.   Yes, sir.

24  Q.   And I will focus in on it a little bit.

25       That's your signature on the bottom?

1    A.    Yes.

2    Q.    On the date of 9-27-2015?

3    A.    Yes.

4    Q.    And you see in the beginning where it talks about, Describe

5    the condition:  Preventative medical exam of rectal and breast

6    exam?  Do you see that?

7    A.    Yes, sir.

8    Q.    Okay.

9    A.    I see it now, but at the time I couldn't because my eyes

10   were full of tears.  He verbally told me about the breast exam.

11   I just signed the Paper to get out of there.

12   Q.    And it's your testimony he never mentioned breast or rectal

13   exam before going forward with the pelvic exam?

14   A.    No.

15   Q.    Okay.  But you clearly declined the breast exam; correct?

16   A.    Yes.

17              MR. CARTER:  Your Honor, I would move into evidence,

18   if it's appropriate.

19              THE COURT:  What's the number?

20              MR. CARTER:  3.1.

21              THE COURT:  Government Exhibit 3.1 is admitted.

22              MR. CARTER:  Defendant's Exhibit.

23              THE COURT:  Oh, Defendant Exhibit 3.1 is admitted.

24         (DEFENDANT EXHIBIT 3.1:  Received in evidence.)

25              THE COURT:  Members of the jury, to follow up just

1    what I told you earlier, the number is just a number so we can

2    keep track of things.  It makes absolutely no difference whether

3    something is labeled a plaintiff's exhibit or defendant's

4    exhibit.  It's all evidence no matter what the label is.  The

5    labels are just a convenience.

6    BY MR. CARTER:

7    Q.   Ms. Alexander, you knew Ms. Davis was there to be a

8    chaperone for the examination; didn't you?

9    A.   Yes.  I knew she was doing my Paperwork.

10   Q.   Well, you actually knew she would be in the room during the

11   exam; correct?

12   A.   I didn't know I was having an exam until I got in there.

13   So once I saw her, I knew she was going to be in there.

14   Q.   Okay.  And she was in the room the entire time during the

15   exam; correct?

16   A.   Yes.

17   Q.   And it's your contention that she did nothing while

18   Mr. Rolston did all of these things to you that you testified

19   to; right?

20   A.   At the time she had her back turned, facing this way

21   (indicating), doing my Paperwork.

22   Q.   All right.  In this smaller room, that you have described,

23   she's got her back completely turned to you while Mr. Rolston is

24   doing the pelvic exam?

25   A.   Yes.

000304

1  Q.   And she is not paying attention whatsoever?

2  A.   No, sir, not to me anyway.  The Paperwork she was.

3  Q.   Mr. Rolston was -- he had gloves on during the examination;

4  didn't he?

5  A.   Yes, sir.

6  Q.   And he actually switched gloves during the course of the

7  examination and put new gloves on; didn't he?

8  A.   I can't see that.

9  Q.   You don't remember that?

10  A.   I just said, I couldn't see him.  My legs was up and the

11  sheet was over.  But I know initially when he started that he

12  put gloves on.

13  Q.   Ms. Alexander, I am going to show you a particular -- can

14  you see that page 239; right there? (indicating)

15  A.   Yes.

16  Q.   Do you remember your deposition being taken in the case,

17  Ms. Alexander?

18       Do you remember giving a sworn testimony to the lawyers in

19  the case?

20  A.   Yes, sir.

21  Q.   Do you remember the question being asked to you at page

22  239 --

23            MR. COOK:  Object to the form --

24            THE COURT:  Overruled.

25  BY MR. CARTER:

1  Q.   At page 239, line 7, the question was:  *I believe you*

2  *testified that Mr. Rolston had gloves on the entire examination?*

3       And you said:  *Yes, but he switched them out at one point.*

4       And the question is:  *He changed gloves is what you are*

5  *saying*?

6       And you said:  *Yes, sir.*

7       Do you remember giving that testimony?

8  A.   I don't remember all of the questions that was asked.

9  Q.   But after seeing that, do you remember if Mr. Rolston

10 actually switched gloves and changed his gloves before -- during

11 the course of the examination?

12 A.   I can't say.  I don't remember whether he switched gloves.

13 I just know when he started, he had on gloves.

14 Q.   Now, it's your testimony -- and if you need to look at it,

15 I have got the affidavit that you testified to earlier; you

16 indicated that Ms. Davis provided lubricant for him; is that

17 right?

18 A.   No.  He had --

19 Q.   Or Mr. Rolston had lubricant on his hand; is that right?

20 A.   Excuse me?

21 Q.   Mr. Rolston had lubricant on his finger?

22 A.   On his -- yes.  When he first started the exam, yes.

23 Q.   And with lubricant on his fingers, he touched and rubbed

24 your clitoris?  That's what you are contending; right?

25 A.   Yes.

1  Q.   And did you see how he got the lubricant on his finger?

2  A.   He had to do it because Ms. Davis was over here.  He did it

3  hisself.

4  Q.   So it's your testimony that Ms. Davis had nothing to do

5  with getting the lubricant on Mr. Rolston's fingers; is that

6  right?

7  A.   That's correct.

8  Q.   And you saw that; right?

9  A.   I saw what?

10  Q.   Or you did not see Ms. Davis apply lubricant?

11  A.   Could you repeat that?

12  Q.   Yeah.  Did you see Ms. Davis apply the lubricant to his

13  gloved finger?

14  A.   No.

15  Q.   It's your testimony she was turned around still on the

16  other side of the room and couldn't provide the lubricant;

17  correct?

18  A.   That's correct.

19  Q.   And when he touched your clitoris with the lubricated

20  finger, you didn't move or squirm or react to it at all?

21  A.   I don't know.  I don't remember if I reacted or not.

22  Q.   You didn't say anything?

23  A.   No.

24  Q.   And if you had said something, Ms. Davis would have heard

25  you; correct?

1   A.   Yeah, she would have heard me.

2   Q.   From your affidavit that has already been admitted into

3   evidence as Plaintiff's No. 5.17, it's your testimony, isn't it,

4   Ms. Alexander, that Mr. Rolston put his entire hand in your

5   vagina?  Correct?

6   A.   That was a misunderstanding.  A hand can't fit in my

7   vagina.

8   Q.   Well, this is the affidavit that you told your lawyer you

9   prepared at the time that this occurred; correct?

10  A.   Yes, sir.  And at the time that it was prepared --

11  Q.   Right after --

12  A.   Right after it happened, yes.

13  Q.   And you actually signed this affidavit; correct?

14  A.   Yes, sir.

15  Q.   And this affidavit specifically says, "Nurse Rolston" -- do

16  you see where I highlighted it there?

17  A.   Yes, sir.

18        MR. CARTER:  If you could publish it.

19  BY MR. CARTER:

20  Q.   It actually says, "Mr. Rolston then put his hand inside my

21  vagina."  Do you see that?

22  A.   Yes, sir.

23  Q.   And then the next sentence is, "Mr. Rolston removed his

24  hand and then rubbed my clitoris again."  Do you see that?

25  A.   Yes, sir.

1  Q.   So at the time this was fresh in your mind, when you were
2  preparing the affidavit to explain exactly what happened to you
3  during this examination, you claimed he put his entire hand in
4  your vagina; correct?
5  A.   Yes, sir.  That's the way it was said, but not meant that
6  way.  It was his fingers.
7  Q.   So he did not put his hand in your vagina?
8  A.   Not his whole hand, but his fingers.
9  Q.   During the examination at some point he was pressing on
10  your stomach, locating your ovaries; correct?  You are familiar
11  with that part of a pelvic exam; aren't you?
12  A.   Yes, sir.
13  Q.   He was doing that; wasn't he?
14  A.   Yes, sir.
15  Q.   And that was after he had touched your clitoris; right?
16  A.   Yes.
17  Q.   And he asked you, "Do you have any pain?" and you were
18  interacting with him and answering his questions; correct?
19  A.   I didn't say nothing.
20  Q.   You didn't say anything?
21  A.   No.  Once he did that to me, I shut down.
22  Q.   After he -- well, that's a normal part of a pelvic exam is
23  pressing on your stomach and asking if you are in pain; correct?
24  A.   Yes.
25  Q.   And he did that and you answered him; right?

1  A.   I didn't answer.  I didn't say nothing.

2  Q.   After the second time that he touched your clitoris, he

3  asked you about your hemorrhoids; correct?

4  A.   No.  After -- after he touched my clitoris -- my clit, he

5  went and started pressing on my stomach asking me did I feel

6  pain.  I didn't respond.  After that he spread my butt cheeks

7  and then he said something about my hemorrhoids, because they

8  were visible.  They stay out.

9  Q.   And you did respond to that?

10  A.   No; I just sat there and looked.

11  Q.   On your affidavit didn't you say, "Nurse Rolston then

12  removed his fingers and spread my butt cheeks.  Mr. Rolston

13  asked me if I had taken any medication for my hemorrhoids.  I

14  told him I had not since being here but they usually give me

15  suppositories."

16      So you were actually talking to him about the medication

17  for your hemorrhoids during this examination; right?

18  A.   I wasn't.  I was quiet.

19  Q.   So this affidavit that was done right after this

20  examination took place where you are reporting exactly what

21  happened, it says you are talking to him about your hemorrhoid

22  medication, that's inaccurate; right?

23  A.   It's not inaccurate that I took suppositories.  Because it

24  was in my file I been taking suppositories since I been in

25  prison because my hemorrhoids got bad.  But I was talking to

1  Mr. Proffitt at the same time, telling him about things that was

2  going on, so just like the hand -- it's a misunderstanding.  I

3  shut down after he did that to me.

4  Q.   So where it says, "I told him I had not since being here,"

5  and talking to him about your suppositories, that's wrong in

6  your affidavit?

7  A.   The suppositories is not wrong --

8  Q.   Talking to him:

9  A.   Talking to him is wrong after the fact.

10  Q.   Now you decided, didn't you, that after he touched your

11  clitoris the second time that it was a sexual assault at that

12  point; right?

13  A.   The first time it was a sexual assault.

14  Q.   All right.  So you believe it to be the sexual assault the

15  first time he touched your clitoris?

16  A.   Yes.

17  Q.   And you didn't say anything?

18  A.   No.

19  Q.   And the second time he touched your clitoris, you didn't

20  say anything again; right?

21  A.   Right.

22  Q.   And you were upset at the time; right?

23  A.   Yes.

24  Q.   And you thought he was raping you at the time; right?

25  A.   Yes.

1  Q.   But you didn't say anything to Ms. Davis at the time and

2  didn't say anything to Mr. Rolston and did not move off the

3  table or anything; is that right?

4  A.   Right.

5  Q.   Now you were not cuffed or restrained during this

6  examination; were you?

7  A.   No, sir.

8  Q.   Ms. Alexander, I don't mean to back up a little bit, but I

9  asked you the question earlier --

10        MR. CARTER:  And, Your Honor, I don't think you need

11  to publish this.  I wanted to show it to, Ms. Alexander.

12  BY MR. CARTER:

13  Q.   Do you remember being asked the question in your deposition

14  and I will direct you to page 74, line 23 -- *Did you say*

15  *anything at all during the examination*?

16        And you said*:  Yes.*

17        Do you see that?

18  A.   Yes, sir.

19  Q.   And do you remember giving that testimony?

20  A.   Yes, sir.

21  Q.   And that's accurate; isn't it?

22  A.   Before he did that to my clitoris, I did have a

23  conversation with him and Ms. Davis.  But after he did that to

24  me, I didn't talk.

25  Q.   Then if you go to the next page, the question is: *What did*

1  *you do?*  Page 75, line 1.  Do you see that?

2  A.   Yes, sir.

3  Q.   And then you said:  *When he asked me did I feel pain when*

4  *he pressed on my stomach, I told him no, no besides the*

5  *cramping.  And I told him like two times when he felt on my*

6  *side -- my left side and my right side.*

7       You actually, in your deposition, said that you talked to

8  him during the examination, right?

9  A.   I did talk to him before he did that to me because I told

10 him that my period was on and I was cramping.  When he asked me

11 what my pain was, I told him between a 6 and a 7 because I was

12 cramping at the time and my period was so heavy.

13 Q.   But this portion of the deposition you are saying you

14 talked to him when he was pressing on your stomach; correct?

15 A.   I didn't talk to him when he pressed on my stomach.

16 Q.   So your testimony is inaccurate in the deposition when you

17 said -- I spoke to him -- *when he pressed on my stomach I told*

18 *him no*?

19      That's not accurate?

20 A.   It's accurate that I was cramping.  And it's accurate that

21 I told him I was cramping because of my period.  But I told him

22 that before he started.

23 Q.   But your -- okay.  He wasn't pressing on your stomach

24 before the examination; was he?

25 A.   No, sir.

1   Q.   He was pressing on your stomach during the course of the

2   examination after he had touched your clitoris the first time;

3   right?

4   A.   Yes.

5   Q.   Now Mr. Rolston leaves the examination room so that you can

6   get dressed; correct?

7   A.   Yes, sir.

8   Q.   He doesn't watch you put your clothes on and stand there

9   and leer at you while you are putting your clothes back on; does

10   he?

11   A.   No, sir.

12   Q.   And this is where -- it's your testimony that you told

13   Ms. Davis at that point in time that he had fucked you with his

14   fingers; correct?

15   A.   I told her that he just finger fucked me.

16   Q.   You were very clear to Ms. Davis; right?

17   A.   Yes.

18   Q.   Was she engaged with you and understood what you were

19   saying?

20   A.   She understood me, but she told me to tell him.

21   Q.   She didn't say, "I will report it." She said, "You go tell

22   the guy who just did this to you what happened?"

23   A.   Yes.

24   Q.   You have had a chance -- you read your affidavit when you

25   were being questioned by Mr. Cook.

1    Do you remember reading that whole affidavit,

2  Ms. Alexander?

3  A.   Yes, sir.

4  Q.   Now, nowhere in that affidavit does it reference that you

5  were aroused during the examination; does it?

6  A.   No, sir.

7  Q.   And this is the affidavit you were trying to accurately

8  report what happened to you right after it happened?

9  A.   Right after it happened.

10  Q.   Now you see in your affidavit that toward the bottom,

11  Ms. Alexander, right there where I have got the pen, when you

12  were crying and Mr. Rolston came back in the room -- it's your

13  testimony, from your affidavit and you gave while you were on

14  the stand with your lawyer, that Mr. Rolston asked, "What was

15  wrong and if something -- and if something going on at my home

16  or with my kids."

17    That's what you said in your affidavit; right?

18  A.   Uh-huh.

19  Q.   Isn't it true he would have no way of knowing if something

20  was going on at home or with your kids at this time?

21  A.   Correct, because I didn't answer.

22  Q.   Well, even -- he would have no way of knowing what's going

23  on with your kids on September 27, 2016; right?

24  A.   Yes, because I didn't answer when he asked me that.  He

25  asked me the question and I didn't answer.

1    Q.   The reason he knew to ask that, and the reason you signed

2    an affidavit saying he had asked you something about your home

3    and your kids, is because you had a conversation with him about

4    that before you started crying; right?

5    A.   No, sir.

6    Q.   Now, when you were crying, didn't you testify Mr. Rolston

7    actually touched your knee, correct, or your thigh?

8    A.   My thigh.

9    Q.   Your thigh.  And you thought he was trying to comfort you

10   while you were crying; right?

11   A.   No, I think he was just trying to feel on me again.

12   Q.   You thought he was trying to feel on you again?

13   A.   Yes.  I never been in a facility where an officer ever

14   touched me.

15          MR. CARTER:  I don't need to publish this, Your Honor.

16   It's the deposition.

17   BY MR. CARTER:

18   Q.   Ms. Alexander?

19   A.   Yes, sir.

20   Q.   I want to direct you to page 170, line 10 of your

21   deposition.  Do you remember being asked the question:  O*kay.*

22   *But you didn't feel like he was trying to physically restrain*

23   *you with his hand on your thigh?*

24          And you said:  *No, I thought he was trying to comfort me.*

25          Do you remember saying that in your deposition?

1  A.    No, sir.

2  Q.    You do remember giving your deposition; don't you?

3  A.    I remember it, but I don't remember everything about it

4  because they gave me a lot of questions in my deposition.

5  Q.    You do see the testimony there that you gave; correct?

6  A.    Yes, sir.

7  Q.    And you were telling the truth in that deposition; weren't

8  you?

9  A.    Yes, sir, by the best of my knowledge at the time and what

10 with all that was going on with me and what had just happened.

11 Q.    Now you said that two male African American guards took you

12 out of the exam room; right?

13 A.    It was a lady and a man.

14 Q.    A lady and a man?  Okay.  Then when you went back to the

15 cell, you cleaned and washed off in the sink in the cell;

16 correct?

17 A.    Yes, sir.  I felt nasty and disgusted.  The first thing I

18 wanted to do was get it off me.

19 Q.    Isn't it true -- I am going to go back to something I asked

20 in the beginning, Ms. Alexander.  When you were in the SHU in

21 Tallahassee, you can't have visitors; correct?

22 A.    Yes, you can.

23 Q.    You can have visitors in the SHU?

24 A.    Yes, sir.

25 Q.    Did you have any visitors while you were the SHU?

1  A.    No, sir.

2  Q.    And your telephone restrictions are withheld too; right?

3  A.    Yes.  Once every month.

4  Q.    So you could not have visitors like you were having in the

5  Marianna work camp; can you?

6  A.    No, sir.

7  Q.    And at Marianna you would have all of your children come

8  and visit you, with your mother and husband and maybe brother or

9  something like that; correct?

10  A.    Yes.  The difference between the two, I can have a visit,

11  but I just can't have a contact visit in Tallahassee, but all my

12  kids and my husband could have came [sic] as well.

13  Q.    But you were on visitors restrictions for almost a year;

14  weren't you?

15  A.    No, sir.

16  Q.    While you were in Marianna, you talked to your mother

17  almost every day; correct?

18  A.    Yes, on the phone.

19  Q.    And then every two weeks is when they would visit with you;

20  correct?

21  A.    Yes, sir.

22  Q.    And like I said, five children, two adults, they would

23  allow that type of special visits; right?

24  A.    Yes, sir.

25  Q.    And you talked to your husband every day on the phone;

1  right?

2  A.   Most of the time.

3  Q.   Now, Mr. Cook asked you about when you got to Aliceville

4  you joined a prayer group and talked to them about things;

5  right?

6  A.   Yes, sir, eventually.

7  Q.   Eventually, after about two or three months; right?

8  A.   Yes, sir, give or take.

9  Q.   Two or three months, so that would put it in December or so

10 of that year?

11 A.   I can't recall the exact date.  But, yes, I did eventually.

12 Q.   You agree the timeframe is a couple months after you got to

13 Aliceville?

14 A.   When I got comfortable with the prayer group, yeah, I began

15 to speak about what happened.

16 Q.   Isn't it true that you told this prayer group that you were

17 having problems in your marriage because of -- with your husband

18 at that time?  Didn't you tell the prayer group that?

19 A.   That wasn't -- when I started having problems with my

20 husband, it was in 2017.

21 Q.   You told the prayer group that you got with and were

22 speaking with two or three months after you went to Aliceville

23 that you were having problem in your marriage; right?

24 A.   No, not initially.  I was talking about the sexual assault

25 that I talked to the prayer group that I eventually opened up.

1  Q.   Did you tell the prayer group that your kids were lashing

2  out and getting into trouble and that was causing you some

3  distress too?

4  A.   I have told them that; yes, sir.

5  Q.   And you told them that when you joined the prayer group;

6  right?

7  A.   Not initially.  The first thing I talked to my prayer group

8  about was just me personally, about God.  I didn't open up.

9  They didn't question me about what was going on in my personal

10  life.  The only thing they did was excited about me coming to

11  Jesus Christ.  That's it.

12      Initially, I started off at Aliceville and when I came

13  back, the prayer group wanted to know why did I come back from a

14  camp to FCI.  And when I explained to them what happened to me

15  and my transition coming back, I told them what happened in the

16  process, but they was familiar with me regardless.

17  Q.   And during the course of that -- and you remember talking

18  about it in your deposition where you said you told your prayer

19  group about your kids lashing out?

20  A.   Maybe so, yes.  That was aware of that.  They was aware of

21  my whole life.

22  Q.   They had been doing that your whole life?

23  A.   They was aware of my whole life.

24  Q.   Had the kids been lashing out?

25  A.   Maybe.

1  Q.   Even before you were in Aliceville the first time and at

2  Marianna, your kids had been lashing out?

3  A.   Not like lashing out.  They just was, you know, just going

4  through a lot without me being there.

5  Q.   That was stressful; wasn't it?

6  A.   Yes.  Being in prison was stressful alone.

7  Q.   Yeah.  At page 58 of your deposition you were asked about

8  your prayer group, and you say you talked about the sexual

9  assault and "I was going through things at home."

10      And the question was:  *What kinds of things at home.*

11      And you said:  *My kids were lashing out.  Getting into*

12  *trouble.  Okay.  And infidelity in my marriage.  The sexual*

13  *assault.  I guess everything just kind of hit me at all once.*

14      Do you remember talking about that with your prayer group

15  when you got to Aliceville?

16  A.   Yes, sir.

17  Q.   And your kids lashing out would have occurred before going

18  to the SHU, right, in Tallahassee?

19  A.   Yes, sir.

20  Q.   And the problems you were having in your marriage would

21  have occurred before going to the SHU in Tallahassee?

22  A.   You said problem with my what?

23  Q.   Your marriage?

24  A.   No.  That happened in 2017.

25  Q.   You were told in 2017 what he had done; right?

1    A.   Yes, sir.

2    Q.   But the problems with your marriage had started even before

3    then?

4    A.   I wasn't aware until 2017.

5    Q.   It's your position that you never said a word to Officer

6    Jackson after the exam when she was walking -- coming into the

7    room and then walking you to the cell, right?  You didn't speak

8    to her at all; did you?

9    A.   She asked me did I want to talk to Mr. Proffitt, and I told

10   her yes.

11   Q.   I want to show you again your deposition at page 102, line

12   12, where the question was asked:  *And so she tried to get you*

13   *to talk about it several times but you wouldn't answer.  About*

14   *how long do you recall that you were talking to Ms. Jackson in*

15   *the room?*

16        And you said:  *I didn't talk to her.*

17        You said "I didn't talk to her?"

18   A.   Uh-huh.

19   Q.   You really didn't talk to Ms. Jackson; did you?

20   A.   But I agreed to talk to Mr. Proffitt.  I didn't tell her

21   what had happened.

22   Q.   You didn't tell Ms. Jackson anything --

23   A.   She was mainly just talking to me.

24   Q.   Isn't it true, Ms. Alexander, that you contend that

25   Mr. Rolston penetrated you for his own sexual gratification?

1    Right?

2    A.    Yes, sir.

3    Q.    And you base this on the fact that he did a Pap smears of

4    you while you were on your period; right?

5    A.    On top of him rubbing my clitoris and going in and going

6    back out and rubbing it again.

7    Q.    Well, didn't you say in your deposition that it

8    *Demonstrated, first and foremost, that he was doing this for his*

9    *sexual gratification*, giving you a Pap smears while you were on

10   your period?  Didn't you say that in your deposition?

11   A.    Not just because of my period alone, because of what he did

12   to me.

13   Q.    But, first and foremost, it was because you were on your

14   period; correct?

15   A.    I just can't say that.  I told him I felt uncomfortable

16   with having a Pap with having my period on.  My period was

17   heavy.  And I was cramping.  And I told him I was uncomfortable

18   with it.  So it made me feel uncomfortable no matter what

19   because I didn't have a right after I told him that.

20        Do you remember being asked my question -- I'm sorry --

21   line 247 -- I'm sorry.  I lost it -- 247, line 15, my question

22   was:  *Was there something he said?*  And you answered:  *For one,*

23   *him wanting to do a Pap smears with my period on, that was*

24   *enough for me to say*.

25        Question: *The simple fact that you had a Pap smears while*

1    *you were on your period demonstrated to you that he was doing*

2    *this for your [sic] sexual gratification?*

3         And you answered:  *Yes.  That too.  First and foremost.*

4         Do you see that?

5    A.   Yes, sir, I see that.

6    Q.   So at the time of your deposition the thing that proved to

7    you that Mr. Rolston was doing it for his own sexual

8    gratification was, first and foremost, conducting a Pap smears

9    while you were on your period; right?

10   A.   That has nothing to do with what he did to me.  I was

11   uncomfortable when he did the Pap with my period on, first and

12   foremost, I was so uncomfortable.

13   Q.   Ms. Alexander, do you remember filing a claim for damages

14   related to this incident?

15   A.   Yes, sir.

16   Q.   And, in fact, I am showing you what's marked as Exhibit No.

17   7.  Do you see that?

18   A.   Yes, sir.

19   Q.   And that's your signature; right?

20   A.   Yes, sir.

21   Q.   Do you see where you put in the total amount of personal

22   injury, $5 million.  Do you see that?

23             MR. COOK:  Objection, your Honor.

24             THE COURT:  Overruled.

25   A.   Yes, sir.

1  BY MR. CARTER:

2  Q.  And that was your claim on April 2nd, 2018; correct?

3  A.  Yes, sir.

4  Q.  Ms. Alexander, when you arrived in Aliceville after leaving

5  Tallahassee, you were in Aliceville from October 2016 until

6  around October 2019; correct?

7  A.  Yes, sir.

8  Q.  And then you went to Minnesota, or someplace after that,

9  for an RDAP --

10  A.  Yes, sir, an RDAP program.

11  Q.  Right.  Okay.  But you were in Aliceville -- that's a

12  prison in Alabama -- for three years after leaving Tallahassee;

13  correct?

14  A.  Yes, sir.

15  Q.  And you did not receive any counseling for anything while

16  you were in Aliceville; correct?

17  A.  Besides my prayer group.  I went to counseling and I talked

18  to psychs, but they were just telling me to do breathing

19  treatments and --

20  Q.  But you didn't receive any counseling for this in

21  Aliceville; did you?

22  A.  I talked to them.  They gave me techniques like breathing

23  and reading.  But just to help me with it, I went in there and

24  vented to them.

25  Q.  Ms. Alexander, I am going to show you in your deposition at

1   page 37, line 20, where the question was asked:  *When you were*

2   *at Aliceville between October '16 and November -- or November*

3   *'16 and October 2019, did you participate in any counseling at*

4   *Aliceville?*

5       And you answered no.

6       Do you see that?

7   A.   Yes, sir; I see it.

8   Q.   Ever since this happened, I mean, if a medical provider

9   asks you if you are depressed about anything, you don't answer

10  them; right?  You just tell them no.  Correct?

11  A.   Yeah, sometimes.  I was embarrassed.  And I am still

12  embarrassed.

13  Q.   Well, if they ask you if you are depressed, you just say

14  no; right?

15  A.   Yes.

16  Q.   And you are not on any anti-depressants or anti-anxiety

17  medications; are you?

18  A.   Yes.

19  Q.   You are?

20  A.   Yes.

21  Q.   But at the time of your deposition on February 26, 2020,

22  you were not on any anti-depressants or any anti-anxiety

23  medication; were you?

24  A.   No, sir.

25          MR. CARTER:  Excuse me, Your Honor.

1    (Pause in proceedings.)

2  Q.   Ms. Alexander, when you testified for Mr. Cook that you

3  went to Tallahassee Memorial Hospital, I think you said it was a

4  rape examination there.  Is that right?

5  A.   Yes, sir.

6  Q.   Do you recall telling the nurse that was examining you that

7  you denied having any injuries?  Do you remember that?

8  A.   Physical injuries like cuts or -- they explained to me like

9  what him doing with my clitoris is like -- they were saying have

10  I been penetrated, and I told them I hadn't been penetrated with

11  a penis, but with a finger, so I do not understand what you are

12  saying.

13  Q.   When you looked at the report in your deposition and it

14  said "denies injuries," you agreed that's what the report says;

15  correct?

16  A.   I really don't understand what you are trying to say.

17       MR. CARTER:  Ms. Alexander, thank you for your time.

18  I have no further questions.

19       THE WITNESS:  You are welcome.

20       THE COURT:  Ms. Moyle?

21                    CROSS-EXAMINATION

22  BY MS. MOYLE:

23  Q.   Good afternoon, Ms. Alexander.

24  A.   Hey.

25  Q.   Just to confirm, you were never a member of the general

1  population while at FCI Tallahassee; right?

2  A.    Yes, ma'am, you are right.

3  Q.    You were only in the SHU?

4  A.    Yes, ma'am.

5  Q.    And so you allege that Mr. Rolston touched your clitoris

6  during your vaginal exam?

7  A.    Yes.

8  Q.    Okay.  Did he do anything else inappropriate besides

9  touching your clitoris?

10  A.    He rubbed it in a circular motion, and when he went inside

11  of me, he rubbed me in a circular motion.

12  Q.    So he rubbed your clitoris in a circular motion?

13  A.    Yes.

14  Q.    And he rubbed inside of you in a circular motion?

15  A.    Yes.

16  Q.    I believe you said he swept left and swept right?

17  A.    And he went back up to my clitoris again.

18  Q.    Okay.  So when he was sweeping in the circular motion

19  inside of your vagina, how long did that last?

20  A.    I don't know.  It seemed like forever.

21  Q.    Was it more than five minutes?

22  A.    No.

23  Q.    Was it more than a minute?

24  A.    I don't know.

25  Q.    Okay.  And you have had Pap smears before where digital

1  examination is part of the exam; correct?

2  A.   Yes, ma'am.

3  Q.   When he was sweeping your vagina was that at the point

4  where he was touching on your stomach, asking if you were in

5  pain?

6  A.   No, ma'am, not at that time.

7  Q.   Okay.  And you are not alleging that you sustained any

8  physical injury from this exam; right?

9  A.   No.

10  Q.   No cuts?  No bruises?  Okay.

11      You said that you were just uncomfortable with getting a

12  Pap smears while on your period because you had not had that

13  done before; right?

14  A.   Yes, ma'am.

15  Q.   You never told him:  No, I do not want a pelvic

16  examination?

17  A.   I told him, I feel uncomfortable.  I told him that I felt

18  uncomfortable having a Pap with my period on.  I never had that

19  done; do I have to do it?

20  Q.   You said, "Do I have it do it?"

21  A.   Uh-huh.

22  Q.   What did he say?

23  A.   He left out of the room, and Ms. Davis told me to get

24  undressed.

25  Q.   You never told him No, you don't want a pelvic exam?

1  A.    I just told him I was uncomfortable.

2  Q.    How much longer do you have on your sentence?

3  A.    Probation 2023.

4  Q.    Isn't it true at your deposition you thought you were only

5  seeking $5,000 in recovery?

6  A.    Not at one time.

7  Q.    Okay.

8        MS. MOYLE:  Can I have 7-2?

9  BY MS. MOYLE:

10  Q.    It may take a moment to switch.

11       Ms. Alexander, is that your signature where it says

12  "Patient signature?"

13  A.    Yes, ma'am.

14  Q.    Okay.  Do you recognize that document?

15  A.    Not really.

16  Q.    But that is your signature?

17  A.    Yes.

18       MS. MOYLE:  Okay.  Your Honor, at this time we would

19  move to admit Defendant 7-2.

20       THE COURT:  Defendant 7-2 is admitted.

21       DEFENDANT EXHIBIT 7-2:  Received in evidence.)

22  BY MS. MOYLE:

23  Q.    Ms. Alexander, I want to confirm what you said to

24  Mr. Carter.  You told him you did not speak to Mr. Rolston after

25  he touched your clitoris?  Is that -- answer verbally.  Is that

1    correct?

2    A.   Yes, ma'am.

3    Q.   Okay. And you denied telling him about your hemorrhoids

4    and that you use suppositories, even though that was in your

5    affidavit to Mr. Proffitt?

6    A.   I didn't have to tell him. He spread my butt cheeks and he

7    seen my hemorrhoids.

8    Q.   So you never told him anything about suppositories?

9    A.   No. That was already on file.

10    Q.   You didn't have any conversation with him about your

11    hemorrhoids? You did not respond to any of his questions?

12    A.   No; not after he did that to me.

13    Q.   Do you remember giving a deposition in this case?

14    A.   Yes, I do. But I don't remember everything that was on the

15    deposition.

16    Q.   But you were telling the truth then; right?

17    A.   Pretty much I was just telling to my knowledge.

18    Q.   Okay. I am going to ask you -- you were asked a question:

19    *And how did he check for your hemorrhoids?*

20    A.   He spread my butt cheeks. And they are on the outside.

21    Q.   And then you volunteered he asked you, how long I had them

22    and what I think caused them. Do you remember telling him: *I*

23    *told him that the birth of my second daughter they came out and*

24    *since I got to prison they had gotten worse?*

25    A.   I don't remember.

1   Q.   You don't remember saying that?

2   A.   No, ma'am.

3        MS. MOYLE:  All right.  Nothing further.

4        THE COURT:  Redirect?

5                    REDIRECT EXAMINATION

6   BY MR. COOK:

7   Q.   So the conversation that you had involving pain, was before

8   the vaginal examination?

9   A.   Yes, sir.

10  Q.   And that had to do with cramping?

11  A.   I couldn't hear you.  I'm sorry.

12  Q.   That had to do with your menstrual cramps; is that correct?

13  A.   Yes, sir.

14  Q.   And that was typical for you; wasn't it?

15  A.   Yes.

16  Q.   Okay.  Now, the number five million in your Federal Tort

17  Claims Act claim, you didn't choose that number; did you?

18  A.   I just put something down.

19  Q.   Okay.  Were you -- were you informed that you could never

20  ask --

21       THE COURT:  Sustained.  Don't lead.

22  BY MR. COOK:

23  Q.   Okay.  When that number was chosen, did you believe that

24  you could --

25       MR. CARTER:  Objection, your Honor.

1          THE COURT:  Sustained.

2          MR. COOK:  Okay.

3          No other questions, Your Honor.

4          THE COURT:  Thank you, Ms. Alexander.  You may step

5   down and return to counsel table.

6          Please call your next witness.

7          MR. COOK:  Your Honor, if I could check the witness

8   room I should have a witness, or three, standing by.

9          THE COURT:  All right.

10         Members of the Jury, one thing you will notice is that

11  the witness, other than parties, aren't in the courtroom while

12  the other witnesses testify.  That's not how it's done on

13  television.  It's better theater if all of the witnesses are

14  right there in the room.  But in actual trials it's a normal

15  part of the process that the witnesses don't hear the other

16  witnesses testify.  The parties, of course, it's their case and

17  they can stay for the whole case, but other witnesses come in

18  just when they testify.

19         It will often happen in a trial that it will take just

20  a minute to get a witness.  They don't know exactly how long the

21  prior witness is going to take.  They will be here available,

22  but from time to time one is not right there when it's time.  So

23  be patient with us and we will find the witness.

24         MR. COOK:  Your Honor, I call Patrice

25  Jackson-Richardson.

1    **PATRICE JACKSON-RICHARDSON, PLAINTIFF WITNESS, DULY SWORN**

2          THE COURTROOM DEPUTY:  State your full name spell your

3    last name for the record.

4          THE WITNESS:  Patrice Jackson-Richardson,

5    R-i-c-h-a-r-d-s-o-n.

6          THE COURT:  Ms. Richardson, if you are comfortable

7    with it, you may remove your mask while you are testifying right

8    there, and that far away from everyone else.

9          Thank you.

10          Mr. Cook, you may proceed.

11                        DIRECT EXAMINATION

12    BY MR. COOK:

13    Q.   Ms. Jackson-Richardson, how are you -- are you currently

14    employed -- are you currently employed or retired?

15    A.   No.  Currently employed.

16    Q.   Currently employed.  At one time did you work at FCI

17    Tallahassee?

18    A.   Yes.

19    Q.   What work did you do there?

20    A.   Well, I am still employed with FCI Tallahassee.  I work

21    with the Unicorp Industries.

22    Q.   Okay.  At one time were you a correctional officer there?

23    A.   Yes, I was.

24    Q.   Okay.  Do you remember Charnesha Alexander?

25    A.   I remember her face now.

1   Q.   Okay.  Was there a time when you had a duty to escort her

2   to or from a medical examination?

3   A.   Yes.

4   Q.   Okay.  And do you know approximately when that was?

5   A.   Back in 2016.

6   Q.   Okay.  In 2016, do you remember whether you escorted her to

7   the examination or just back from it?

8   A.   I escorted her to and from.

9   Q.   Okay.  So, when you brought her to the examination, did you

10  wait for her or did you come back for her?

11  A.   Came back for her.

12  Q.   Okay.  Do you remember how long she was in that

13  examination?

14  A.   No, I don't recall.

15  Q.   Okay.  Do you remember what time of day it was when you

16  went back to get her?

17  A.   No, I don't recall.

18  Q.   Okay.  When you brought her back from the medical

19  examination, what state was she in?

20  A.   I saw that she was upset.

21  Q.   Okay.  Was she crying?

22  A.   She was crying.

23  Q.   Okay.  Did you ask her any questions?

24  A.   I asked her what was wrong with her.

25  Q.   Okay.  And did she reply to you?

1    A.   Yes, she did.

2    Q.   What did she say?

3    A.   She told me that she had never had a Pap smear the way that

4    PA Rolston had conducted one.  She had had Pap smears like

5    throughout her life but one -- she had never had like that

6    before.

7    Q.   Okay.  And did you pass that information to anybody else?

8    A.   Yes.  I reported it to my supervisor.

9    Q.   Who was that?

10    A.   Lieutenant Singletary.

11    Q.   Okay.  Do you remember whether you took her directly back

12    to her housing area, or was she placed in a room for a period of

13    time?

14    A.   I don't recall.

15    Q.   When you -- when she finally was escorted back to her

16    housing area was it you who escorted her?

17    A.   No.  I don't recall that.

18    Q.   So you report regarding what you understood her -- the

19    source of her being upset.  That was something that you just

20    reported to Lieutenant Singletary?

21    A.   Yes.

22    Q.   Did you ever talk to Lieutenant Proffitt?

23    A.   A lieutenant who?

24    Q.   Proffitt?

25    A.   No, I didn't.

Direct Examination - Patrice Jackson-Richardson

1  Q.  Okay.  Did I have that right?  Is it Lieutenant Proffitt?

2  A.  Yes.

3  Q.  Okay.  Did you stay during any interview, or was it near

4  the end of your shift?

5  A.  No.  I didn't stay for no interview.  But my shift was over

6  I left for the day.

7  Q.  Was your shift over close to the time that you escorted her

8  back?

9  A.  I don't remember escorting her back.  I just don't recall

10 that.

11 Q.  Do you remember taking her out of the medical examination?

12 A.  Yes.

13 Q.  And asking her what the problem was?

14 A.  Yes.

15 Q.  Okay.  Was there any doubt in your mind that she was

16 actually upset?

17             MS. COLES:  Form.

18             THE COURT:  Overruled.

19 A.  Yes.  She was upset.

20 BY MR. COOK:

21 Q.  Yeah.  Did you believe that she was truly upset?

22 A.  Yes.

23 Q.  Other than the statement that was made about never having

24 had a Pap smear or a pelvic examination like that -- well, would

25 you just say as clearly as close as you can to the actual words

1   that she said.

2   A.   That was kind of what she said.

3   Q.   Okay.  I think I just garbled it though.  So if you can

4   just tell me.

5   A.   She said that she had never had a Pap smear the way PA

6   Rolston conducted the Pap smear.  She had had several Pap smears

7   conducted over the years, but this one was different.

8   Q.   Have you ever heard anybody else talk about --

9            THE COURT:  Sustained.

10  BY MR. COOK:

11  Q.   Have you ever had occasion to report anyone else, any other

12  medical staff person for --

13           THE COURT:  Sustained.

14  BY MR. COOK:

15  Q.   Okay.  Did you ask her any further questions?

16  A.   No.

17  Q.   Okay.  Did you make any statements to her --

18  A.   Yes.

19  Q.   -- that you recall?

20  A.   Yes, I did.

21  Q.   What statement did you make?

22  A.   I told her since she had reported that to me that I would

23  have to report this to my supervisor, Lieutenant Singletary, and

24  that's what I did.

25  Q.   Okay.  Anything else you remember saying?

1   A.    No.

2               MR. COOK:  Okay.

3               I have no other questions, Your Honor.

4               THE COURT:  Cross examination?

5                       CROSS-EXAMINATION

6   BY MS. COLES:

7   Q.    Good afternoon, Officer Jackson.

8         At the time this occurred you were assigned to the SHU?

9   A.    Yes.

10  Q.    What was the SHU?

11  A.    It's a Special Housing Unit.  It's confinement,

12  administrative, disciplinary.  It has two wings.

13  Q.    So there are two ranges, I have heard them referred to?

14  A.    Yes.

15  Q.    So there are two ranges in the SHU.  You had been assigned

16  there for three years.  How long had you worked at FCI at that

17  time?

18  A.    Maybe right around 20 years maybe.

19  Q.    Okay.  And you knew to report -- as you indicated you

20  reported to Lieutenant Singletary -- you knew to report when an

21  inmate reported some type of sexual allegation, or some type of

22  allegation, that might be in the realm of PREA?

23  A.    Yes.

24  Q.    So, when an inmate makes an allegation like that you would

25  report it?

1   A.   Yes.

2   Q.   You don't make a credibility determination?  You just

3   report it?

4   A.   Yes.

5   Q.   And other than what you have described for us, you don't

6   know any other details about what happened during

7   Ms. Alexander's examination?

8   A.   No.

9   Q.   When you went to -- when an inmate is called out of their

10  cell, to go to the SHU medical exam room, do they have to be

11  cuffed before they can go?

12  A.   Yes.

13  Q.   And then are -- often they are uncuffed for their exam?

14  A.   Yes.

15  Q.   And when you come back to get them you have to put the

16  cuffs back on?

17  A.   Yes.

18  Q.   And then take them back to their cell?

19  A.   Yes.

20  Q.   What you have described for us today, that was the extent

21  of your involvement in this matter?

22  A.   Yes.

23           MS. COLES:  Thank you.

24           THE COURT:  Ms. Moyle?

25                    CROSS-EXAMINATION

1  BY MS. MOYLE:

2  Q.  Good afternoon.

3      Just for the jury's information, what is Unicorp?

4  A.  Actually it's a call center.  It's one of the biggest

5  employers of the inmate population.

6  Q.  So you work at FCI Tallahassee?

7  A.  Yes.

8  Q.  How long have you worked there?

9  A.  24 years.  October.

10  Q.  What was your position directly before you were Unicorp

11  supervisor?

12  A.  Senior correctional specialist.

13  Q.  Did you work in any particular unit?

14  A.  I worked units over the years.

15  Q.  Did you ever work in the SHU?

16  A.  Yes.

17  Q.  Around what time did you work in the SHU?

18  A.  I worked there maybe like three years.

19  Q.  Did you enjoy that role?

20  A.  Yes.

21  Q.  Why?

22  A.  Because it's a busy role.  It's nonstop.  You just moving

23  all day long.

24  Q.  What type of responsibilities would you do in that role?

25  A.  Actually, at that particular time, I could -- I worked like

1  the positions of like SHU, rec officer, SHU 1, SHU 2, SHU 3, and

2  those officers are like escorting inmates to and from just rec,

3  showers, anything that may be going on within the SHU.

4  Q.   You would also escort them to medical?

5  A.   Yes.

6  Q.   Would you have any knowledge as to why they were going to

7  medical?

8  A.   No.

9  Q.   Okay.  I believe you told Ms. Coles that you reported to

10  Lieutenant Singletary?

11  A.   Yes.

12  Q.   After Ms. Alexander told you that she felt uncomfortable?

13  A.   Yes.

14  Q.   You reported to Lieutenant Singletary?

15  A.   Yes.

16  Q.   How long was the time period from when she told you to when

17  you reported to Lieutenant Singletary?

18  A.   A few minutes.

19  Q.   Can I have Government's 39, please?

20       Ms. Jackson Richardson, I want to show you this document.

21  It's on your screen.  Do you recognize this document?

22  A.   Yes.

23  Q.   What is it?

24  A.   It's the PREA tolerance -- zero tolerance policy.

25  Q.   Is this -- where is this document located?

Redirect Examination – Patrice Jackson-Richardson

1  A.    Throughout the institution: the housing units, the work

2  sites.

3         MS. MOYLES:  Your Honor, we would offer Government's

4  39 into evidence.

5         THE COURT:  Government 39 is admitted.

6     (GOVERNMENT EXHIBIT 39:  Received in evidence.)

7  BY MS. MOYLE:

8  Q.    And can you tell the members of the jury what this document

9  is?

10 A.    It's a zero tolerance policy for inmates.  If they suspect

11 sexual abuse of an inmate, inmate staff, inmates, they are to

12 write -- report it -- tell someone.

13 Q.    Can we pull up the second portion of the document.

14    Does this document reflect the various ways that an inmate

15 can make a report?

16 A.    Yes.

17        MS. MOYLES:  Okay.  Nothing further, Your Honor.

18        THE COURT:  Redirect.

19                     REDIRECT EXAMINATION

20        MR. COOK:  If I could get this document presented.

21        Your Honor, this is my 82, Exhibit 82, proof of

22 posting PREA.

23 BY MR. COOK:

24 Q.    Do you happen to know when that poster was first put up?

25 A.    Some years back.  No.

1          MR. COOK:  Okay.  I would ask to admit our Document

2     82, proof of posting.

3          THE COURT:  Plaintiff's 82 is admitted.

4          (PLAINTIFF EXHIBIT 82:  Received in evidence.)

5     BY MR. COOK:

6     Q.   Okay.  Is it possible that these documents were not posted

7     prior to May 6 of 2015?

8          MS. MOYLE:  Speculation.

9          THE COURT:  Sustained.

10    BY MR. COOK:

11    Q.   If you know.

12         THE COURT:  Sustained.

13    A.   I don't know.

14    BY MR. COOK:

15    Q.   Do you remember when those posters were first posted?

16    A.   No, I can't recall.

17    Q.   They haven't always been there, have they?

18    A.   They have been there for some years.

19    Q.   Do you remember if there was PREA audit in June of 2015?

20    A.   I don't recall.

21    Q.   Okay.  Have you ever made a PREA report before that day?

22    A.   No, I haven't.

23         THE COURT:  Sustained.

24         MR. COOK:  No other questions, Your Honor.

25         THE COURT:  Thank you, Ms. Richardson, or

1   Ms. Jackson-Richardson.  You may step down, thank you.

2          Please call your next witness.

3          MR. COOK:  Yes, Your Honor.

4          THE COURT:  By the way, members of the jury, this is

5   Kimberly Westfall.  She is the courtroom deputy this afternoon.

6   I introduced you to Ms. Markley during the jury selection

7   process.  Ms. Westfall is taking over for Ms. Markley this

8   afternoon.

9          **RONALD PROFFITT, PLAINTIFF WITNESS, DULY SWORN**

10         THE COURTROOM DEPUTY:  For the record, please state

11  your name and spell your last name for the record.

12         THE WITNESS:  Ronald Proffitt, P-r-o-f-f-i-t-t.

13         THE COURT:  Mr. Proffitt, while you are testifying, if

14  you are comfortable, you are welcome to remove your mask while

15  you are there and distanced as you are.

16         THE WITNESS:  Yes, sir.

17                    DIRECT EXAMINATION

18  BY MR. COOK:

19  Q.   Mr. Proffitt, how are you employed currently?

20  A.   I am employed by Walmart, currently.

21  Q.   Okay.  Is that a retirement job?

22  A.   That's my retirement job.  Yes, sir.

23  Q.   And when did you retire as an investigator?

24  A.   I believe it was June of 2019.

25  Q.   Okay.  Were you involved at all in the case relating to

1  Charnesha Alexander?

2  A.   I would have taken her reporting statement.

3  Q.   Okay.

4  A.   And did the referral.

5  Q.   Now, how did that case come to your attention?

6  A.   I don't remember exactly whether it was through a cop-out,

7  or through a staff member reporting to me, so I couldn't tell

8  you exactly.  I remember taking the statement and referring it.

9  Q.   How were you associated at FCI Tallahassee -- I should ask

10  you, you worked at FCI Tallahassee?

11  A.   I have worked at FCI Tallahassee.  Yes, sir.

12  Q.   How was your work related to Lieutenant Singletary?

13  A.   I was a special investigative agent and Lieutenant

14  Singletary was, at one point, my SIS lieutenant, which is

15  Special Investigative Services lieutenant.

16  Q.   Okay.  And do you happen to remember whether you spoke with

17  Lieutenant Singletary at any point in the course of this case,

18  or whether he made you aware of it?

19  A.   I don't remember how I became aware of the exact -- what

20  caused me to do the interview for the referral.

21  Q.   Okay.

22  A.   I don't remember exactly what that was.

23  Q.   Do you remember doing the interview?

24  A.   I remember interviewing, yes.

25  Q.   Okay.  And was it -- did the interview take place near the

1  time of the event complained of?

2  A.   The interview would have taken place when I became aware of

3  the incident.

4  Q.   Okay.  And this involved Ms. Alexander when she was in the

5  SHU?

6  A.   I'm not sure if I interviewed her in the lieutenant's

7  office on the compound or in the SHU.  I remember it was a

8  lieutenant's office.

9  Q.   Okay.

10     You are not sure whether it was in the same building as the

11 SHU that that interview took place?

12 A.   We have a lieutenant's office in the Special Housing Unit.

13 If she would have been in the Special Housing Unit at the time,

14 then more than likely the interview took place down there.

15 Q.   Did you ever speak to, or see, or have any contact with

16 Patrice Jackson-Richardson involving this case?

17 A.   Again, with this being the timeframe it was, I don't

18 remember how it was reported to me.  I know once it was reported

19 to me I would have went straight to do the interview.

20 Q.   Okay.  And so is this the kind of thing that you would do

21 as soon as possible after the fact?

22 A.   Absolutely.

23 Q.   Okay.  Do you remember in the course of the interview, or

24 in preparation for the interview, whether Mr. Rolston showed up

25 at the housing area, or interview room?

1  A.   I don't remember specifically.  I don't remember -- I know

2  for a point of time he was the physician's assistant assigned to

3  the Special Housing Unit.

4  Q.   Okay.  You understood that he was the subject of the

5  complaint; is that right?

6  A.   Ms. Alexander would have made me aware of that I'm sure.

7  Yes, sir.

8  Q.   Okay.  And so if he came to the interview room, what would

9  your response have been?

10         THE COURT:  Sustained.

11  BY MR. COOK:

12  Q.   Okay.  Do you remember that interaction?

13  A.   Again, I don't remember specifically if he showed up during

14  the interview.

15  Q.   Okay.  Do you happen to -- was there some kind of back-log

16  on investigations at the time?

17         MS. MOYLE:  Objection, Your Honor.

18         THE COURT:  Sustained.

19  BY MR. COOK:

20  Q.   Is there any reason that you can think of why it would have

21  taken more than two years?

22         THE COURT:  Sustained.

23  BY MR. COOK:

24  Q.   How did you -- when you did the interview, did you have a

25  recording device?

1  A.   No.  I would take a statement.  I would type the inmate's

2  statement up.  I would ask the inmate to review the statement

3  and sign stating that the statement was true.

4  Q.   Okay.  The statement wasn't necessarily word for word what

5  the person said?

6  A.   That's wrong, sir.  I try to make the statement exactly

7  what the person who is reporting to me says.  And I have that

8  person initial off, and sign and date, stating that the

9  statement is accurate.

10 Q.   Okay.  I understand that it was -- every effort was made

11 for it to be accurate, but I guess my question was, you know,

12 verbatim, when things are done verbatim, they have hems and

13 haws.  I guess I am asking whether you would summarize, or

14 clean-up the language, or --

15 A.   No, sir.  I try to put down exactly what I'm being told.

16 Q.   Do you type it as it us told to you or --

17 A.   I do.

18 Q.   -- or do you take notes?

19 A.   I type it.  I have taken notes before but I type it right

20 there.  I have the person that's making the report to me review

21 it for accuracy, and then they sign off on it, and sign and date

22 it stating that it's accurate.

23 Q.   I guess my question is, do you take handwritten notes at

24 the time of the interview and then type them up afterwards?

25 A.   The only time I would do that, sir -- the only time I can

1    picture doing that is if I am not near a computer.  If there is

2    a computer right there in front of me I would get on the

3    computer and type the statement up as I am being spoken to.

4    Q.   Okay.  And at this point you are not aware of whether you

5    had a computer at your disposal on that date?

6    A.   I know both lieutenant's office -- the lieutenant's office

7    on the compound has a computer, and the lieutenant's office in

8    the Special Housing Unit has a computer.

9    Q.   Okay.  You believe you would have had a computer available

10   that you could have typed the statement as it was given?

11   A.   I believe so, sir.  Yes, sir.

12   Q.   And then the person who reads and signs it, are they able

13   to take that with them or do they have to do it right there on

14   the spot?

15   A.   Could you explain what you are asking?

16   Q.   Sure.

17        Sometimes, if you try to read something under time

18   pressure, or somebody is expecting you to finish it, you might

19   read quickly, and if you have an opportunity to take it with you

20   and examine it then you can read it with more reflection.  Which

21   is the scenario that you would use?

22   A.   Sir, I would stay there until the interview was completed.

23   Q.   Including the --

24   A.   Even the -- even if it was beyond my shift, just to make

25   sure I had everything included in the statement.

1  Q.   Okay.  So you stayed there until it was read and signed?

2  A.   Yes, sir.

3  Q.   Okay.  Have you read the statement in this case?

4  A.   The reporting statement?

5  Q.   Yes.

6  A.   I have read it.

7  Q.   What would be the process once that affidavit was taken?

8  A.   Okay.  When I take a reporting affidavit, I would typically

9  type up what's called a referral and I would show the warden

10  what was provided in the affidavit, and provide him or her with

11  the referral, and then a referral would be signed and

12  electronically sent up to the Office of Internal Affairs.

13  Q.   Where is that?

14  A.   The Office of Internal Affairs, I believe, is out of

15  Washington DC.  The email address I would send it to.

16  Q.   Okay.  And what would the Office of Internal Affairs do

17  with that?

18  A.   As I understand it, the Office of Internal Affairs sends

19  that referral over to the Office of Inspector General for them

20  to view to see if it meets their threshold for investigation.

21       If declined, it would go back to the Office of Internal

22  Affairs, who would either do it themselves, or send it back for

23  what's called a local investigation.

24  Q.   What is the criteria for whether it's a local investigation

25  or whether it is done by them?

1    A.   I -- I am the special investigative agent, sir.  I can't

2    speak for the Office of Internal Affairs or the Office of

3    Inspector General.

4    Q.   Are they looking for criminal liability?

5    A.   I know --

6            MS. MOYLE:  Foundation.

7            THE COURT:  Sustained.

8    BY MR. COOK:

9    Q.   When you get a -- when you get a case back from Washington,

10   what kind of options do you have?

11   A.   When I get a case returned for local investigation the

12   option is to investigate the case.

13   Q.   Okay.  On average how much time typically elapses?

14           THE COURT:  Sustained.

15           Let's try this case.

16           MR. COOK:  Yes, Your Honor.

17   BY MR. COOK:

18   Q.   If you remember, can you tell us when this case came back

19   from Washington?

20           MS. COLES:  Objection; relevance.

21           THE COURT:  Overruled.

22   A.   I would have to -- I would have to see the authorization

23   and conduct a local investigation, which is -- when I send a

24   referral off for me to be permitted to do an investigation I

25   have to receive an authorization to conduct the local

1   investigation, and I would have to see the date of when that

2   came back.

3         MR. COOK:  Okay.  If I could just put something up for

4   the witness, just to refresh memory.

5   Q    (By Mr. Cook) Do you see that?

6   A.   Yes, sir.

7   Q.   I am going to go through the pages and I think I did see

8   something called on authorization.

9         Take a look at that and see if that's what you are looking

10  for.

11  A.   This is an authorization to conduct local investigation.

12  Q.   Okay.  And what's the date on that?

13  A.   October 28th, 2016.

14  Q.   Okay.  So just a little more than a month after the event;

15  is that right?

16  A.   Do you have the --

17  Q.   The event being September 27, 2016.

18  A.   If that's when the event was, yes, sir.  This came back to

19  authorize a local on October 28, 2016.

20        MR. COOK:  Can we publish this?

21        MS. COLES:  Objection; relevance.

22        MR. COOK:  I believe this is something that he needed.

23        THE COURT:  I don't want a response unless I ask for

24  it.

25        MR. COOK:  Yes, sir.

Direct Examination – Ronald Proffitt

1    THE COURT:  I guess I should explain from time to time

2  during the trial you may see me looking down.  Members of the

3  jury, I am not sleeping.  I have a computer monitor here, too.

4    The objection is sustained.

5    MR. COOK:  Okay.

6  BY MR. COOK:

7  Q.   Are you able to tell me what your -- what timeline you are

8  given for a follow-up investigation or local investigation?

9    MS. MOYLE:  Objection.

10    THE COURT:  Overruled.

11    MR. COOK:  Okay.

12  BY MR. COOK:

13  Q.   If the exhibit helps, you can refer to that.

14  A.   Well they ask for 120 days.

15  Q.   Okay.  Is that typically --

16    THE COURT:  Sustained.  This case.  No questions

17  about -- no more questions about typically.  This case only.

18    MR. COOK:  Okay.  Yes, Your Honor.

19  BY MR. COOK:

20  Q.   Do you happen to know whether at what point a statement was

21  taken from Mr. Rolston in this case?

22    MS. MOYLE:  Objection; relevance.

23    MS. COLES:  Join.

24    THE COURT:  Overruled.

25  A.   I am not sure when Mr. Rolston's statement was taken.  You

1    would have to show me that, sir.

2            MR. COOK:  Let me see if I can give you something to

3    look at.

4    BY MR. COOK:

5    Q.   Okay.  If you could just look at that affidavit.  And I

6    believe that we have a signature date.

7            THE COURT:  I can't hear you, Mr. Cook.

8            MR. COOK:  I'm sorry, Your Honor.

9    BY MR. COOK:

10   Q.   Mr. Proffitt, could you look at the signature date of that

11   affidavit and tell me when it --

12           MS. MOYLE:  Objection, Your Honor.  Motion in limine

13   ruling.

14           THE COURT:  Yeah.  Sustained.

15           MR. COOK:  No other questions, Your Honor.

16           THE COURT:  Cross-examination?

17                       CROSS-EXAMINATION

18   BY MS. COLES:

19   Q.   Mr. Proffitt, I just have a few questions for you.

20           You were asked about Ms. Alexander's affidavit, and I am

21   just going to put this here.  This has previously been marked

22   Plaintiff's Exhibit 517.

23           THE COURT:  You have a monitor right beside you too.

24           THE WITNESS:  Thank you, sir.

25   BY MS. COLES:

1  Q.   All right.  And you just testified that when you have --

2  when you bring an inmate in to take one of these statements, as

3  you did with Ms. Alexander, they are given an opportunity to

4  review this?

5  A.   Yes, ma'am.

6  Q.   And Ms. Alexander was given an opportunity to review this

7  entire statement?

8  A.   Yes, ma'am.  That's her signature right above her name on

9  there.

10 Q.   And did you administer an oath to her whenever she gave a

11 statement?

12 A.   As stated right there.  You got --

13 Q.   What oath was that?

14 A.   That what she is providing is true and accurate.

15 Q.   So she basically gave a sworn statement to you when she

16 filled this out?

17 A.   Yes, ma'am.

18 Q.   All right.  And she had the opportunity to read this?

19 A.   Yes, ma'am.

20 Q.   All right.  And I think you testified that in the

21 lieutenant's office, in the SHU, there would have been a

22 computer there, and you would have been typing this up as she

23 was talking to you; right?

24 A.   Yes, ma'am.

25 Q.   And you would make every effort to put her language in this

1  document; is that right?

2  A.   Absolutely.  Yes, ma'am.

3  Q.   So, when she would use phrases like "Nurse Rolston then put

4  his hand inside my vagina" that's her language; right?

5  A.   Yes, ma'am.

6  Q.   All right.  And when she -- this indicates, a little lower,

7  that "Mr. Rolston asked me if I had taken any medications for my

8  hemorrhoids.  I told him I had not since being here but they

9  usually give me suppositories."  That's what she is telling you

10 and you are writing that down?

11 A.   Yes, ma'am.

12 Q.   All right.  And then a little bit lower, "I explained to

13 the nurse that Mr. Rolston rubbed my clitoris and he", quote

14 unquote, "fucked me with his fingers."  Those are her words that

15 you are writing down?

16 A.   Yes, ma'am.

17 Q.   All right.  And the purpose of this interview, at this

18 stage, is to just document her allegations; is that accurate?

19 A.   It would be to take her statement, document her

20 allegations, and present them to the warden for a referral.

21 Q.   Okay.  You are not making a credibility determination?  You

22 are just documenting allegations?

23 A.   Not creditability determination.  Just documenting.

24 Q.   All allegations of a sexual nature like this would be

25 investigated?

1  A.   Yes, ma'am.

2  Q.   I think you testified you don't recall specifically how

3  Ms. Alexander's complaint came to your attention?

4  A.   I do not remember specifically.

5  Q.   You also don't have any memory of Mr. Rolston coming to the

6  interview room while you were interviewing Ms. Alexander; is

7  that right?

8  A.   I don't remember specifically anybody coming into the

9  office while I was taking the interview.

10 Q.   Is the exit to that area near your office -- where that

11 lieutenant's office in the SHU is?

12 A.   The lieutenant's office in the SHU, if he was in his office

13 in medical, to go out of SHU he would have walked by the

14 lieutenant's office to the SHU exit door.

15 Q.   That would just be to leave the building?

16 A.   Yes, ma'am.

17 Q.   But again you don't have any recollection of him knocking

18 on the door or entering the room during that interview?

19 A.   Not specifically.

20       MS. COLES:  Thank you, sir.  No further questions.

21       MS. MOYLE:  No questions, but the witness is subject

22 to recall.

23       THE COURT:  All right.  Redirect?

24                 REDIRECT EXAMINATION

25 BY MR. COOK:

1  Q.   Mr. Proffitt, you don't have any specific recollection of

2  Mr. Rolston coming to the interview room, but can you rule out

3  that he may have done so?

4           MS. MOYLE:  Speculation.

5           THE COURT:  Sustained.  Well, never mind.  Overruled.

6  You can answer that question.

7  A.   I -- I have no recollection either way.  I don't know if he

8  popped into the room, or if he did not pop into the room.  I

9  just, specifically, do not remember him coming into the room.

10          MR. COOK:  Okay.  Thanks.  No other questions.

11          THE COURT:  Thank you, Mr. Proffitt.  You may step

12  down.

13          THE WITNESS:  Yes, sir.

14          THE COURT:  Members of the jury, we are going to break

15  for the afternoon at this point.

16          I try not to keep you late on the first day of trial.

17  I know you got here awfully early this morning.

18          So, Mr. Proffitt, you can -- I will talk to the jury

19  for just a minute.  You are free to go on back.  Thank you.

20          If you didn't check in at home, or at the office, at

21  the lunch break, and you do it before we come back tomorrow

22  morning, you are going to get that kind of question, "What kind

23  of case is it."  Now you know more about it than you did at the

24  lunch break, but still please respond to that kind of inquiry by

25  saying, "I can't talk about it."  You can say you will tell them

1  about it when the case is over.

2          Don't get any information from any other source.  I

3  haven't seen any reporters in the courtroom, but I never know

4  who is here or not.  Still, I don't think it's going to be in

5  the media.  Don't get any information off the internet.

6          Have a safe and pleasant trip home and back in the

7  morning.

8          If you'd make sure that you are in that jury room by

9  9 o'clock in the morning I will get you in the courtroom right

10  at 9 o'clock and we will go to work, so build in a few minutes

11  to get the front desk and so forth.

12          Have a pleasant evening and we will see you tomorrow

13  morning.

14          Jury out, please.

15      (Jury out at 4:41.)

16          THE COURT:  You may be seated.

17          Couple of notes.  There was some hesitation about

18  admitting exhibits in the other side's case.  That is really not

19  a rule, although some judges do it that way.  It has been done

20  in this district before I got here.  Sometimes done in state

21  court.  You elicit testimony in the other side's case, you can

22  admit exhibits in the other side's case.

23          I overruled the objection to the question of the

24  officer about whether Ms. Alexander seemed to be truly upset.

25  At one point maybe that's an evaluation to what's going on in

1 someone's mind.  I understand the objection.  I really think
2 it's a question about what did you observe.  Did she seem to be
3 acting, did she seem to be legitimate.  I thought it was a fair
4 way to ask the question, so I overruled the objection.

5      I sustained the objection about whether it was
6 possible something that happened.  Just a bad way to phrase the
7 question.  Whether it's possible, or not, wouldn't tell one
8 anything.  I think that question had to do with the PREA notice
9 date and I sustained the objection.

10      Now, the most important part of this, I entered orders
11 in limine.  Mr. Cook, you violated the order in limine at least
12 twice.  I started sustaining objections very quickly.  The
13 transcript won't always have the objection.

14      When the lawyers stand up I know that the next word
15 out of their mouth is going to be "objection" and then usually
16 some description but when I know the ruling, once they start to
17 stand up, I just stay "sustained."

18      I told you at one point let's try this case.  All of
19 this is suggesting to the jury that something else is going on.
20 If somebody wants to ask for a mistrial at this point the
21 plaintiff should take the request very seriously.  I was serious
22 when I made the ruling motion in limine and I meant it to be
23 followed.

24      I don't have in front of me the exact language.  I
25 didn't make a good note of it.  But it was plainly a question --

1    I think one was how many times they had made a PREA referral, or

2    how many times they had made other reports.  Plainly improper.

3         And then, Mr. Johnson, I know you didn't like my

4    rulings.  Look, I made rulings before we started that both sides

5    objected to strenuously.  This is one of those cases where they

6    say the judge can make one side, or the other, mad in every

7    case.  And I say I can often make -- I can often upset both

8    sides.  And I think I clearly did in this case.

9         The defense very much objected to my ruling that the

10   plaintiffs can put in evidence of other alleged assaults by

11   Mr. Rolston.  That was a big deal.  And, the defense didn't like

12   it a bit.  And I ruled in favor of the plaintiffs on that issue.

13        On the issue of whether you could prove that other

14   people at FCI had sexually assaulted others my ruling was in the

15   defense favor.  I said no; you cannot prove actions by others

16   besides Mr. Rolston.  I know you didn't like that ruling, but

17   that was the ruling.  You have to abide by it.

18        So, when you start asking questions about other

19   mandatory reports it violates that ruling.  And, Mr. Johnson, I

20   don't need you shaking your head.  I know you disagree, but you

21   don't need -- and it doesn't help you to shake your head in

22   front of the jury.  Probably unconscious, but it was going on.

23        MR. JOHNSON:  I'm sorry.

24        THE COURT:  Now, those are the rulings and we are

25   going to have to follow them.  So, Mr. Cook, don't ask questions

1   about other assaults at that institution.

2           If you have got evidence of other alleged assaults by

3   Mr. Rolston you can prove them, but not other stuff.

4           And then you moved over into "how big is the backlog,"

5   and you know the inference there; oh, we got so many complaints

6   going on at FCI it takes us a long time to get to them.  You

7   can't do that.  So, let's just try this case.

8           MR. COOK:  If I may, Your Honor.  I was trying to get

9   to the fact that it took two years to take a statement from

10  Mr. Rolston, and I think that that prejudices us, or is

11  responsive, perhaps, in some sense to the question of why we

12  weren't able to gather the evidence that we needed because of

13  that delay, and so I thought that it was relevant to our -- to

14  the --

15          THE COURT:  All right.  To the extent that the

16  argument is I got the ruling wrong in the motion in limine,

17  well, I'm sorry, it's the order that I made and you have to

18  abide by it.  So it is not an acceptable explanation that you

19  did something that I had told you not to do, but you thought I

20  was wrong or you had a good reason to do it.  I know that's not

21  what you are saying, but that's kind of how that comes across.

22          If you want to ask, when did they take a statement

23  from Mr. Rolston, just ask, "when did you take a statement from

24  Mr. Rolston."

25          MR. COOK:  I think I tried to do that when I tried to

1    put Rolston's affidavit up when they took a statement from him.

2          THE COURT:  Did you ask, "when did you take a

3    statement from Mr. Rolston."  I didn't hear that question.

4          MR. COOK:  I don't think he would have known without

5    seeing that affidavit.

6          THE COURT:  Okay.  But you can get there, to that.  I

7    assume, if you have got a statement from Mr. Rolston you are

8    going to put it in evidence at some point.

9          MR. COOK:  Yes, Your Honor.

10         THE COURT:  Does it have a date on it?

11         MR. COOK:  Yes, it does.

12         THE COURT:  Well, then what did we need to talk about

13   how big their back-log was if you can put the statement in

14   that's got a date, we are going to know the date.

15         MR. COOK:  Because that's part of the exhibit that you

16   did not let us put in.  The whole investigation report included

17   that affidavit, and a few others, that we thought was relevant

18   to our case.

19         THE COURT:  I'm absolutely certain that I have not

20   made a ruling that you cannot put in Mr. Rolston's affidavit.

21   It's a statement by an opposing party.  They may have an

22   objection.  I don't know.  But it hasn't been offered and I

23   haven't ruled on it.

24         MR. COOK:  Yes, Your Honor.

25         THE COURT:  The fact that I said you can't put in an

investigation report, with lots of affidavits of others that are
hearsay, does not mean you can't put in Mr. Rolston's.

MR. COOK:  I recognize that there will be an
opportunity, but I thought it was timely.

THE COURT:  If you do it again it's not going to be
this conversation.  It is not going to end well for you.

MR. COOK:  Yes, Your Honor.

THE COURT:  You go back and read that order in limine
again and make sure that you comply with it.

MR. COOK:  Yes, Your Honor.

THE COURT:  I don't have the language in front of me.
I read it again this morning, probably two or three times today,
I can't quote it chapter and verse.  But I am pretty sure what I
said was, if you have otherwise admissible evidence of alleged
assaults by Mr. Rolston you can prove it.  You cannot prove, or
mention, or suggest to the jury in any way that there were
assault by others, or misconduct by others, at FCI not involving
Mr. Rolston.

MR. COOK:  Yes, Your Honor.

As a practical matter, how are we going to bring in
testimony on evidence that would be relevant to the United
States?

THE COURT:  You are going to have an opportunity
end-of-day when the jury goes out when you want to do it.
That's what I said, if you got witnesses that are here, we can

1    try to do it over a break, or whatever.  Just keep me advised.

2    Do it at the end of the day, or in the morning over lunch, or at

3    the end.

4            MR. COOK:  I did have a witness that I thought

5    relevant to the case against the government that I was going to

6    ask the Court to hear after the jury left.

7            THE COURT:  Today?

8            MR. COOK:  Yes.

9            THE COURT:  Is the witness here?

10           MR. COOK:  I will see.

11           THE COURT:  Mr. Johnson, a couple of times when

12   Mr. Cook has gone to get his witness I have talked to the jury

13   about irrelevant stuff.  You were here, and I am sure you can

14   pass it on to Mr. Cook.  I didn't think it would be a problem

15   talking about those things when Mr. Cook wasn't here.  The first

16   time, frankly, I was trying to fill the dead space because Ms.

17   Alexander wasn't here.  Turned out she had a mask issue, or

18   whatever.  But I was kind of trying to have something to talk

19   about so that the jury wasn't patting their foot wondering where

20   Ms. Alexander was.

21           If any of that comes up, and you would rather me hold

22   off until Mr. Cook is here, I'll be happy to do that.

23           He didn't hear this explanation either, so pass that

24   on to him and make sure he is on top of it.

25           MR. JOHNSON:  There is a little housekeeping thing.

1    THE COURT:  We got a witness here now, so we will do

2    that in a minute.

3    Right up here, sir.

4    MR. COOK:  Your Honor, if it's appropriate for me to

5    ask for a point of clarification while the witness is in the

6    courtroom.

7    THE COURT:  You started to ask if you could ask a

8    clarification question with the witness in the courtroom.  With

9    the jury out I am not worried about the order in limine at all.

10    MR. COOK:  Oh, okay.  I don't want to -- okay.  So

11    that was the answer to my question because what I want to do is

12    do a timeline on the investigation.

13    THE COURT:  All right.  That may be relevant.  To the

14    extent it's not, it's a proffer and in the judge part of the

15    trial I am not worried about any of that.

16    MR. COOK:  Thank you, Your Honor.

17    **STEVEN RIVERA, PLAINTIFF WITNESS, DULY SWORN**

18    THE COURTROOM DEPUTY:  For the record, please state

19    your name and spell your last name.

20    THE WITNESS:  It's Steven Rivera, R-i-v-e-r-a.

21    <u>DIRECT EXAMINATION</u>

22    BY MR. COOK:

23    Q.  Mr. Rivera, do you recall doing a deposition with me back

24    in December of 2020?

25    A.  Yes.

1   Q.   Yes.  Okay.  The subject of my question is -- questions --

2   is an event that, or a series of events that happened at the FCI

3   Tallahassee with regard to a back-log of investigations.  Do you

4   recall that?

5           MR. FISHER:  We object, based on relevance, Your

6   Honor.

7           THE COURT:  Well, overruled.

8   BY MR. COOK:

9   Q.   Okay.  Do you recall that conversation?

10  A.   With you?

11  Q.   Yes.

12  A.   Yes.

13  Q.   Okay.  And I understand that there was someone at the FCI

14  Tallahassee who had a kind of a physical -- with psychological

15  over-tones -- illness, who was not able to -- who was a captain

16  of investigations.  Do you remember what I am talking about?

17  A.   Are you referring to the Captain Holmes?

18  Q.   Yes.

19  A.   Dennis Holmes?

20  Q.   Excuse me.

21  A.   Are you referring to the captain at the time, Dennis

22  Holmes?

23  Q.   Yes.  And I think that you said that at the point you

24  started kind of pitching in and working on investigations that

25  were actually outside your area you had something like 170

1  investigations piled up?

2  A.  Yes.

3  Q.  The captain who was unwell remained on the books as an

4  employee technically; is that correct?

5  A.  Yes.

6  Q.  And so he never was replaced, but the investigations

7  weren't getting done; is that fair?

8          MR. FISHER:  Objection, Your Honor.

9          THE COURT:  Overruled.  But if it helps, with all due

10  respect to Mr. Rivera, I don't know who he is.

11          MR. COOK:  Oh, I'm sorry.  My error.

12          THE COURT:  And then if there is a back-log that you

13  are interested in, or a problem doing investigations, it matters

14  when you are talking about.  So if you can back up and fill me

15  in on who Mr. Rivera is and when you are talking about.

16  BY MR. COOK:

17  Q.  Mr. Rivera, I apologize for making you back up but can you

18  talk about what you did when you worked at FCI Tallahassee?

19  A.  When I initially got to FCI Tallahassee I was the shift

20  lieutenant -- the operations lieutenant who runs the shift and

21  supervises the officers and the inmates.

22      And then I was transitioned to the special investigative

23  lieutenant who supervises the two investigators and program --

24  what's called the SIS office, and we mainly handled inmate cases

25  and inmate crimes and crimes committed within the facility, that

1  sort of thing.

2   And then while I was there, like we talked about earlier,

3  the captain got ill and they moved the SIA, who was the Special

4  Investigative Agent, who handles staff cases or staff misconduct

5  cases to cover the captain's spot. And I chipped in to help out

6  to try to do some staff investigative cases.

7  Q. You were primarily investigating incidents regarding

8  inmates; correct?

9  A. Yes.

10  Q. And was Lieutenant Proffitt primarily investigating issues

11  relating to staff?

12  A. Proffitt was the special investigative agent. And, yes,

13  that was his domain was to conduct staff investigations.

14  Q. But you started to get involved in staff investigations

15  because of the need?

16  A. Yes.

17  Q. And that was not -- that had backed up. And so I guess

18  ultimately what I am trying to get to is we are here on an event

19  that happened on September 27, 2016. And it looks like Paul

20  Rolston is first interviewed on December 6th of 2018. So I am

21  trying to get an idea of what was going on that caused that kind

22  of delay.

23   MR. FISHER: Objection.

24   THE COURT: I will allow it, at least as a proffer.

25  You are right, it seems completely irrelevant.

1      MR. COOK:  Well --

2      THE COURT:  Delay that would matter would be delay

3  between the first allegation of misconduct by Mr. Rolston, and

4  the date of the alleged assault on Ms. Alexander.

5      MR. COOK:  Yes, Your Honor.

6      THE COURT:  Delay after the assault on Ms. Alexander

7  doesn't make any difference.

8      MR. COOK:  Yes, Your Honor.  But we have an

9  investigation that I think that Mr. Rivera is familiar with on

10 Shondolyn Blevins, who reported an incident from June --

11     THE COURT:  All right.  So tell me about that.  Not

12 the delay after the alleged assault on Ms. Alexander.  Put in

13 the proof on the delay before that.

14     MR. COOK:  Yes.

15     THE COURT:  That's what matters, right?

16     MR. COOK:  Okay.  It does.  But, it's the same

17 phenomenon, Your Honor.  The Blevins' investigation was actually

18 three years.

19     THE COURT:  But the question wasn't about the same

20 phenomenon.  The question was about the delay later.

21     MR. COOK:  Okay.  And we believe that both stem from

22 the same -- same wrongful conduct, or negligence, by the

23 department, and so that's why I wanted to get this in.

24 BY MR. COOK:

25 Q.  You were involved in the Blevins' investigation as well,

1  were you not?

2  A.   I am not particularly sure.  It's familiar to me, but it's

3  been a while.

4  Q.   Okay.  I think we have got an investigation file.  If I

5  could put that up and you can look at it.

6       Can you see that?

7  A.   Yes, I see it right here.

8  Q.   Okay.  And I am looking -- that's the first page.  I am

9  looking at an affidavit by Paul Rolston that is dated the 14th

10  of May, 2019.  And it looks like you are witnessing the

11  signature; is that you?

12  A.   That's me.  Yes.

13  Q.   Okay.  And so I guess the delay in addressing that, which

14  goes from actually July 16, when she first came forward, to, I

15  think, May 14th of 2019; I am wondering whether that was an

16  artifact of the same kind of problem that the prison was having

17  in getting these investigations worked through to completion.

18       MR. FISHER:  Objection, Your Honor.  Relevance.

19       THE COURT:  Overruled.

20  BY MR. COOK:

21  Q.   Would that be a fair statement that the back-up affected

22  that case as well as --

23  A.   Well I can speak about when I arrived to Tallahassee.

24  Q.   Okay.

25  A.   When --

1       MR. FISHER:  Objection.  We haven't even established

2   when he arrived in Tallahassee.

3   BY MR. COOK:

4   Q.   Yeah.  If you can go ahead and start there.

5   A.   I arrived in Tallahassee in November of 2016.  And I

6   didn't -- I did not -- I wasn't assigned to the investigative

7   office until 2018.

8   Q.   So you start working the cases, but I believe you say they

9   are already stacked up at that point?

10  A.   Well, because I was the SIS -- the special investigative

11  lieutenant at the time.

12  Q.   Right.

13  A.   And I could see and speak with the special investigative

14  agent.  And, yes, he was backed up.

15  Q.   Okay.  And the problem, was that the same problem that we

16  just talked about at the outset?

17      THE COURT:  Sustained.  If you want him to testify

18  about what went on before November 16 you have to explain how he

19  knows.

20      MR. COOK:  Okay.

21  BY MR. COOK:

22  Q.   How do you know?

23  A.   How do I know?

24  Q.   How do you know how the back-log came to develop?

25  A.   Because speaking with --

1      MR. FISHER:  Objection.

2      THE COURT:  Overruled.  Let me hear the answer.

3  A.   Speaking with the special investigative agent.

4  BY MR. COOK:

5  Q.   So you had conversations with other people in the -- in the

6  prison --

7      MR. FISHER:  Objection, hearsay.

8  BY MR. COOK:

9  Q.   -- about how the problem --

10      THE COURT:  It's not hearsay if it's your people that

11  are speaking within the course and scope of their duties.  It's

12  a statement by an adverse party, so let me hear what you have to

13  say.

14  BY MR. COOK:

15  Q.   What kind of conversations did you have that led you to

16  your conclusions about this source of the back-log?

17  A.   We would speak about inmate cases and -- because we would

18  confer with each other about inmate cases, and he would say a

19  lot of times, "Hey, man.  I'm swamped.  I need to take care of

20  this or I need to take care of that."

21  Q.   Who was that speaking?

22  A.   That's SIA Proffitt.

23  Q.   Okay.  So, did he actually come to you and say he needed

24  help?

25  A.   I don't recall if he ever came and asked me anything.

1   Q.   Okay.  Eventually you do get involved in helping to cut

2   this back-log back; did you not?

3   A.   Yes.

4   Q.   Okay.  Were you successful in getting some cases moving?

5   A.   Yes.

6   Q.   Okay.  At the time that you left, had things gotten better?

7   A.   It's a cycle.  You catch up on some and more cases come.

8   It's just revolving door of cases.

9   Q.   Okay.  You had the kind of unique situation of -- was it

10  Captain Hampton?

11  A.   No.  No.  Holmes.

12  Q.   Holmes.  I'm sorry.  Holmes.  I was looking for his name.

13       Captain Holmes, who had an illness that affected his

14  ability to do his job?

15  A.   I don't know if it affected his ability.  I know he was

16  sick.

17  Q.   He was sick?

18  A.   Yes.

19  Q.   He was out of the office actually; wasn't he?

20  A.   Yes.

21  Q.   But his position was still under his name; correct?

22  A.   Yes.

23  Q.   So it was like kind of like medical leave?

24  A.   Sick leave.  Yeah.

25  Q.   Okay.  How long did that last; do you know?

1    A.    I don't recall exactly.

2    Q.    Okay.  Rough estimate?

3    A.    I believe he never came back.

4              MR. FISHER:  Objection, foundation.

5              THE COURT:  Overruled.

6    BY MR. COOK:

7    Q.    Eventually they did fill his spot; correct?

8    A.    Yes.  Eventually.

9    Q.    Okay.

10             MR. COOK:  I have nothing further, Your Honor.

11             THE COURT:  Any cross-examination?

12             MR. CARTER:  From us?

13             THE COURT:  From anybody.  Mr. Carter?  Mr. Fisher?

14                        CROSS-EXAMINATION

15   BY MR. FISHER:

16   Q.    Mr. Rivera, you stated a few moments ago that you didn't

17   arrive at FCI Tallahassee until November of 2016; correct?

18   A.    Yes.

19   Q.    And you didn't start working on investigative cases until

20   2018; correct?

21   A.    Yes.  Towards the end of 2018.

22   Q.    So you don't have any personal knowledge as to what the

23   case was at any time prior to September 27 of 2016; do you?

24   A.    I have no knowledge of it.

25   Q.    Okay.  The name Shondolyn Blevins has been used here.  Do

1   you recognize that name?

2   A.   Yes.  That's one of the cases --

3   Q.   Did you ultimately end up completing an investigation on

4   Shondolyn Blevins' case?

5   A.   Yes.  I believe it was mixed with other names.

6   Q.   Okay.  As we sit here now, do you remember when Shondolyn

7   Blevins made her complaint?

8   A.   I do not.

9   Q.   Do you recognize the document that's on the screen in front

10  of you?

11  A.   Yes.

12  Q.   Okay.

13         MR. FISHER:  Can we blow up the executive summary,

14  please?

15  BY MR. FISHER:

16  Q.   There so the executive summary -- well, first of all, let

17  me back up just a moment.

18       You said you recognized the document.  Can you tell us what

19  it is?

20  A.   That's the investigative report.

21  Q.   And then the executive summary says, "On July 16th of 2016,

22  Inmate Shondolyn Blevins, 15329-035, alleges on June 30th of

23  2016, that midlevel practitioner Paul Rolston examined her

24  breasts through her shirt."  Those would be the accurate dates

25  for when the original date was made; is that correct?

1   A.   Yes.

2   Q.   So, in other words, the complaint that Shondolyn Blevins

3   made was made only about just a little over two months before

4   Ms. Alexander made her complaint; is that correct?

5   A.   Yes.

6   Q.   Do you recall what the standard amount of time is for an

7   investigation?

8   A.   I believe OIA puts on theirs 120 days.

9   Q.   Okay.  Do you recognize this document 1095?

10  A.   Yes.

11  Q.   Tell us what that is?

12  A.   That's the authorization to conduct a local investigation

13  at Office of Internal Affairs, sent to the special investigative

14  agent.

15  Q.   And this authorization to conduct a local investigation,

16  specifies exactly what you just said, right, that, "Within 120

17  days from the date of this correspondence please forward your

18  completed investigation including all supporting documentation

19  to the Office of Internal Affairs."  Is that correct?

20  A.   Yes.

21  Q.   And that's the standard amount of time that is normal on

22  these investigations, is that right, once it comes back in the

23  Office of Internal Affairs?

24  A.   It can be, though it depends on availability.  Some staff

25  members are on leave, or if they are military, or if they are on

1    extended leave, that timeframe can get delayed.

2    Q.    But they didn't send it back to you and say, you got to do

3    this one in five days?

4    A.    No.

5    Q.    So 120 days would be the standard that they would send the

6    investigation back to you in order for it to be conducted; is

7    that correct?

8    A.    Yes.

9    Q.    Can you just call out the date on this 1095, please.  This

10   authorization to conduct the local investigation came back from

11   OIA on August 25th of 2016; correct?

12   A.    Yes.

13   Q.    Which means -- would it be fair to say then that this

14   investigation had been pending locally for approximately a

15   little over 30 days at the point in time at which the incident

16   involving Ms. Alexander occurred; correct?

17   A.    Yes.

18   Q.    So at the point in time that the incident involving

19   Ms. Alexander occurred, this investigation was not overdue in

20   any way, was it?

21   A.    No.

22        MR. FISHER:  Okay.  Your Honor, I would like to admit

23   109-5.

24        THE COURT:  Defendant's 109-5 is admitted for the

25   bench trial portion of the proceeding.  Not before the jury.

1    MR. FISHER:  I was going to try to clarify that.

2    (GOVERNMENT EXHIBIT 109-5:  Received in evidence.)

3    THE COURT:  And for the two parties that are involved

4    with the jury, after I give the jury instructions, they go out,

5    I am going to ask you to confirm that the exhibits are properly

6    compiled.

7    One thing you need to be especially attentive to is

8    whether any of the judge-only exhibits got in the jury stack.

9    We will try to keep them separated, but make sure you review

10   those so we don't get any of the judge-only exhibits back to the

11   jury.

12   MR. FISHER:  Thank you, Your Honor.

13   BY MR. FISHER:

14   Q.   Mr. Rivera, do you recognize the document 109-7 that's in

15   front of you now?

16   A.   Yes.

17   Q.   Can you tell us what that is?

18   A.   That's the medical assessment that once an inmate makes an

19   allegation the health services is obligated to do an assessment.

20   Q.   Okay.  And the encounter date for that, I guess it's

21   self-evident.  This encounter date for this visit occurs -- do

22   you see the date up at the top?

23   A.   I believe it says 7-16-16.

24   Q.   So that was the date that Ms. Blevins made her allegation?

25   A.   Yes.

1  Q.  So on the date she has made her allegation we have sent her

2  to medical in order to have a pre-evaluation done?

3  A.  Yes.

4  Q.  This document here, this is a document that is available

5  to -- it becomes a part of the investigation; is that correct?

6  A.  Yes.

7       MR. FISHER:  Okay.  Your Honor, I would like to also

8  in the judge-only part of the trial also move to admit 109-7.

9       THE COURT:  It is admitted.

10      (GOVERNMENT EXHIBIT 109-7:  Received in evidence.)

11  BY MR. FISHER:  Thank you.

12      Can we switch to the ELMO, to the document camera?

13      THE COURTROOM DEPUTY:  Yes.

14  BY MR. FISHER:

15  Q.  I apologize.  This has my highlights on it.  I didn't

16  realize we wouldn't be able to get that up there.

17      Mr. Rivera, do you recognize 109-8 that is in front of you

18  now?

19  A.  Yes.

20  Q.  Can you tell us what that is?

21  A.  That's the psychologist evaluation.  When an inmate makes a

22  PREA allegation, medical and psychology have to do an

23  assessment.

24  Q.  Okay.  And does this document then also become part of the

25  investigative file?

1  A.    Yes.

2  Q.    And the date that this document was done was the very next

3  day after, on 7-17-2016; correct?

4  A.    Yes.

5  Q.    And so this information is also available to investigators

6  and to management of FCI Tallahassee; correct?

7  A.    Yes.

8       MR. FISHER:  Your Honor, in the judge portion of the

9  trial I would like to move to admit 109-8.

10       THE COURT:  It is admitted.

11       (GOVERNMENT EXHIBIT 109-8:  Received in evidence.)

12       MR. FISHER:  Okay.  I have kind of have done this out

13  of order.

14  BY MR. FISHER:

15  Q.    How about this 109-1, Mr. Rivera.  Do you recognize that

16  document?

17  A.    Yes.

18  Q.    Can you tell us what that is?

19  A.    That's the inmate's affidavit.

20  Q.    Okay.  So this is the affidavit that is done by Shondolyn

21  Blevins in order to give rise to her investigation, or that

22  causes her investigation?

23  A.    Yes.

24  Q.    And does that then also become a part of the investigative

25  file?

1  A.   Yes.

2  Q.   Okay.  Well -- and by her signature -- you tell me if you

3  know, I don't know if you know or not, but does her signature

4  reveal that she would have reviewed this?

5  A.   Yes.  She has an opportunity to read it and if it's true,

6  if it's her true statement, she signs it.

7         MR. FISHER:  Also in the judge portion of the trial I

8  would like to admit 109-1.

9         THE COURT:  It is admitted.

10        (GOVERNMENT EXHIBIT 109-1:  Received in evidence.)

11        MR. COOK:  May I point something out for

12 clarification?

13        THE COURT:  Yes.

14        MR. COOK:  There is a 2017 at the head of that

15 paragraph and the signature is 2016.  I am just suggesting that

16 that may be a typographical error.

17        MR. FISHER:  We agree with that.

18        THE COURT:  So, the date should be June 30, 2016 in

19 the text.

20        MR. FISHER:  Correct.

21        THE COURT:  Yeah.

22 BY MR. FISHER:

23 Q.   So, Mr. Rivera, can you tell me, are you trained on the

24 PREA policy as a BOP employee?

25 A.   Yes.

1  Q.   When I use the acronym PREA, are you familiar with what

2  that stands for?

3  A.   Prison Rape Elimination Act.

4  Q.   And that would be a set of rules and regulations that the

5  BOP imposes for dealing with instances of sexual abuse; correct?

6  A.   Yes.

7  Q.   Is that something that the institution takes seriously?

8  A.   Yes.

9  Q.   Do they offer training on that?

10  A.   Yes.

11  Q.   Did you go to training on that?

12  A.   Yes.

13  Q.   Do all employees go to training on that?

14  A.   Yes.

15  Q.   Is it a one-time thing -- do you go to training just once

16  in your career and it's over, or do you have refresher training?

17  A.   It's refresher training every year.

18  Q.   Do you ever take part in providing training?

19  A.   I have.

20  Q.   Tell us what you do.  What training do you help provide

21  yourself?

22  A.   The reporting process, the steps the officers would have to

23  take once it's reported to them, and then the steps -- what

24  happens once it's reported.

25  Q.   So you train employees at the institution about what their

1   obligations are regarding reporting?

2   A.   Yes.

3   Q.   You also train employees about what their obligations are

4   in order to safeguard inmates when you receive a complaint?

5   A.   Yes.

6   Q.   And do you train employees on the fact that the BOP has a

7   zero tolerance policy for sexual abuse?

8   A.   Yes.  That's drilled into them.  Yes.

9   Q.   All right.

10          MR. FISHER:  That's all the questions I have, Your

11  Honor.

12          THE COURT:  Redirect?

13          MR. COOK:  No questions, Your Honor.

14          THE COURT:  Thank you, Mr. Rivera.  You may step down.

15          Anybody else have any other evidence for the judge

16  part of the trial only this evening, or can we quit for the day?

17          MR. COOK:  Nothing at this time, Your Honor.

18          THE COURT:  All right.  Mr. Fisher?  Ms. Moyle?

19          MR. FISHER:  Yes, sir.

20          THE COURT:  I would ask the lawyers to be here by

21  quarter of 9 in the morning so if there is any issue I can deal

22  with it and we will get the jury in the room right at 9 o'clock.

23          MR. CARTER:  Well, I think I will go ahead and make a

24  motion for mistrial, given the way the Proffitt testimony went,

25  and a few of the questions about with Officer Jackson.  It felt

1  like that the negligence case was being suggested to the jury a

2  number of times and so I think for that purpose we would move

3  for a mistrial.

4  THE COURT:  I am not going to grant a mistrial at this

5  point.  I am not concerned at this point that the jury somehow

6  thinks it's a negligence case.  I think they understand pretty

7  well that what we are here to talk about is whether there was a

8  sexual assault or a medical exam.  I am not worried about the

9  issue being misunderstood.  I will be concerned if it seems to

10  be suggested that there is other evidence of other assaults that

11  are being kept out.

12  So, when a defense lawyer has to stand up and say

13  "ruling in limine," well that's just telling them there is stuff

14  you're not hearing.  That should never have to be said.  So I am

15  concerned about it.

16  I am not going to grant a mistrial at this point,

17  but -- look, very good lawyers all the way around.  We have got

18  good lawyers all the way around.  Good experienced lawyers all

19  the way around.  At least five of the six of you have tried

20  cases with me, and a number of them.  You know what you are

21  doing.

22  I guess I should say to the client, when I speak to

23  the lawyers and tell them how to do things, look, if you had

24  lousy lawyers I would treat it with kid gloves and not say much

25  to them.  When you have got lawyers that are this good I tell

1  them what I think.  I don't sugarcoat it.  You might notice as

2  we go along they don't sugarcoat with me either.

3  But I am -- I do think the risk of prejudice in the

4  case is substantial and so make sure that there is not a

5  suggestion that there is really other stuff going on.  Let's

6  just try this case.

7  Good enough.  I will see you at quarter of 9 in the

8  morning.  If there are any issues, let the courtroom deputy

9  know.  Otherwise, I will be in the courtroom at 9 o'clock and we

10  will get the jury in and go to work.

11  For the lawyers, we need your jury forms back -- the

12  jury questionnaires.  We need those forms back.  We don't leave

13  those with you.

14  We are adjourned.

15  (Proceedings concluded at 5:24 on Monday, September 13,
   2021.)

16  * * * * * * * *

       I certify that the foregoing is a correct transcript

17  from the record of proceedings in the above-entitled matter.
   Any redaction of personal data identifiers pursuant to the

18  Judicial Conference Policy on Privacy are noted within the
   transcript.

19  /s/ Lisa C. Snyder                          1/13/2022

20  Lisa C. Snyder, RPR, CRR                    Date
   Official U.S Court Reporter

21

22

23

24

25

1                        **I N D E X**

2    OTHER RECORD MADE                                    PAGE

3    Opening Statements By Mr. Cook                         25
     Opening Statements By Mr. Carter                       34
4    PLAINTIFF'S WITNESSES

5    CHARNESHA ALEXANDER
     Direct Examination By Mr. Cook                         60
6    Cross-Examination By Mr. Carter                        86
     Cross-Examination By Ms. Moyle                        123
7    Redirect Examination By Mr. Cook                      128

8    PATRICE JACKSON-RICHARDSON
     Direct Examination By Mr. Cook                        130
9    Cross-Examination By Ms. Coles                        135
     Cross-Examination By Ms. Moyle                        137
10   Redirect Examination Mr. Cook                         139

11   RONALD PROFFITT
     Direct Examination By Mr. Cook                        141
12   Cross-Examination By Ms. Coles                        151
     Redirect Examination By Mr. Cook                      155
13
     STEVEN RIVERA
14   Direct Examination By Mr. Cook                        163
     Cross-Examination By Mr. Fisher                       172

15

16                      **E X H I B I T S**

17   PLAINTIFF'S EXHIBITS              OFFERED   RECEIVED

18   1       Report                       61        61

19   5       Affidavit                    72        72

20   82      Proof of posting            140       140

21

22   GOVERNMENT'S EXHIBITS             OFFERED   RECEIVED

23   2.1     Form                         93        93

24   39      PREA                        139       139

25   109-5   Executive summary           176       176

     109-7   Medical assessment          177       177

| GOVERNMENT'S EXHIBITS | | OFFERED | RECEIVED |
|---|---|---|---|
| 109-8 | Psychology report | 178 | 178 |
| 109-1 | Inmate affidavit | 179 | |
| 7-2 | Form | 126 | 126 |

| DEFENDANT'S EXHIBITS | | OFFERED | RECEIVED |
|---|---|---|---|
| 3.1 | Form | 99 | 99 |
| 109-1 | | | 179 |

2 **UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
3 **TALLAHASSEE DIVISION**

4 CHARNESHA ALEXANDER,                )
                                     )
5                 Plaintiff,          ) Case No: 4:19cv138
                                     )
6         v.                          ) Tallahassee, Florida
                                     ) September 14, 2021
7                                      )
UNITED STATES OF AMERICA             )
8 and PAUL ROLSTON,                   )
                                     ) 8:49 AM
9                 Defendants.         ) VOLUME II
   _____  )

10              **TRANSCRIPT OF JURY TRIAL**
11      **BEFORE THE HONORABLE ROBERT L. HINKLE**
               **UNITED STATES DISTRICT JUDGE**
12             **(Pages 1 through 322)**

13 <u>APPEARANCES</u>:

14 For the Plaintiff:        James V. Cook, PA
                            By:  JAMES V. COOK
15                               Attorney at Law
                                 cookjv@gmail.com
16                          314 W. Jefferson Street
                            Tallahassee, Florida 32301
17
                           Richard E. Johnson, PA
18                          By:  RICHARD ERROL JOHNSON
                                 Attorney at Law
19                               rick@rej-law.com
                            314 W. Jefferson Street
20                          Tallahassee, Florida 32301

21

22              ***LISA C. SNYDER, RPR, CRR***
            **Official United States Court Reporter**
23      **111 North Adams Street, Tallahassee, FL 32301**
             **(850)567-1374 * lisasnydercr@gmail.com**

24

25          *Proceedings reported by stenotype reporter.*
        *Transcript produced by Computer-Aided Transcription.*

```
 1   Appearances Continued:

 2   For the Defendant          Henry Buchanan Hudson
     Rolston:                   By:  JOEL STEVEN CARTER
 3                                   MIRIAM REBEKKAH COLES
                                     Attorneys at Law
 4                                   scarter@henryblaw.com
                                     mcoles@henryblaw.com
 5                              2508 Barrington Circle
                               Tallahassee, Florida 32308
 6

 7   For the Defendant:         DOJ - USAO
     USA                        By:  MARIE ARMSTRONG MOYLE
 8                                   PETER GUNNAR FISHER
                                     marie.moyle@usdoj.gov
 9                                   peter.fisher@usdoj.gov
                               111 N. Adams Street, 4th Floor
10                             Tallahassee, Florida 32301

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

000391

**P R O C E E D I N G S**

1
2          (Call to Order of the Court at 8:49 AM on Tuesday,
3     September 14, 2021.)
4               THE COURT:  Good morning.  Please have a seat.
5               I am told there is an issue.  What do we have?
6               MS. MOYLE:  Good morning, Your Honor.
7               We would like to address two specific things with the
8     415 witnesses that we expect to testify today.
9               First, Ashley Barnett; your motion in limine ruling
10    excludes any mention of any possible settlement to her.  We are
11    not suggesting that Mr. Cook would try to elicit any testimony,
12    but we are unsure if she has been explicitly instructed not to
13    volunteer that information.  Because of the severe prejudicial
14    affect of that we would ask that you instruct her not to mention
15    that during your testimony.
16              THE COURT:  I assume you have told her.
17              MR. COOK:  We have talked to her about it, but it
18    might be helpful to have an instruction.
19              THE COURT:  Is she here?
20              MR. COOK:  She is in the courthouse, but she has not
21    been brought up yet.  We have an out of custody witness.
22              THE COURT:  Get her in the courtroom.  I am not going
23    to send the jury out to talk to your witness while you should
24    have told your witness in no uncertain terms.
25              MR. COOK:  We did tell her, Your Honor.  We will make

1  sure it doesn't come up.

2         THE COURT:  I assume the defense doesn't want it

3  mentioned.

4         MR. CARTER:  Absolutely.  We do not.

5         THE COURT:  If you wanted it mentioned going to

6  motive, I would let you cross-examine on it, but you don't want

7  to, so there is certainly a prejudicial concern.  I will be

8  happy to talk to her.  I understand that she doesn't work for

9  you, and so when you tell her people sometimes have their own

10  agendas.  If you think it would help for me to talk to her, I

11  will talk to her.  What I don't want to do is send the jury out

12  at a time that's not the right time for break -- I just don't

13  want to do that.

14         MR. COOK:  Yes.

15         THE COURT:  Not just because it wastes everybody's

16  time, but more because then the jury winds up wondering what's

17  going on.

18         MR. COOK:  Yes, Your Honor.  And we have an associated

19  issue, and that is that we would like Ms. Blevins to testify

20  outside the jury's presence.  The reason is because we're not

21  sure that she would be able to stay within the Court's

22  strictures on testimony and she is pretty independent-minded.

23  So we don't, of course, want opposing counsel to say why didn't

24  you bring Blevins.  But, frankly, we are -- we have that

25  concern.

THE COURT:  So, you want her to testify on the bench trial but not on the jury trial?

MR. COOK:  Right.

THE COURT:  That's up to you.  That's okay.

MR. COOK:  I guess the reason I am bringing it up is because she presumably would have to be sandwiched in at some point when the jury is out in order to keep them from having to bring her back another day.

MS. MOYLE:  That's fine.  I imagine we can take her before lunch, after the jury is sent out for lunch.

THE COURT:  Over lunch?  That's okay.

MR. COOK:  That would be fine with us.

THE COURT:  Or end of the day, or we can bring her back when the jury goes out.

She is in custody?

MR. COOK:  She is in custody.  She is in the courthouse.

THE COURT:  It's inconvenient to bring her more than once but that's okay, we can bring her back on a different day if we need to.

So you have her here today but you don't plan to call her?

MR. COOK:  No.  We wanted to call her today but not in the presence of the jury.

THE COURT:  Got it.

1    MR. CARTER:  Just bring it to the Court's attention,

2  she was talked about in opening statement as a me-too, or

3  similar witness.  Mr. Rolston will probably go through her

4  medical records because it was told to the jury.  I am just

5  letting you know that that would happen, and it is logistically

6  a problem if he is going to call her back.

7    THE COURT:  She is at FCI?

8    MR. COOK:  Temporarily.

9    THE COURT:  So she is here.  So she can be brought.

10  Look, I don't like the marshal service having to bring her more

11  than necessary, but they are very good and professional.  They

12  get their job done.  If she is needed in a trial they will get

13  her here.

14    Let me just tell you that I suspect they would much

15  prefer to bring her back on another day, as opposed to having

16  her still here after 5 o'clock.  You have people late.  They

17  deal with it at the FCI, and FDC.  But it's better if they are

18  not moving people at meal times, and count times, and all of

19  that.

20    So, look I'm not concerned about calling her back on a

21  different day, if that's how it works out.  If we can get her at

22  lunch -- you think there is a chance you would call her in your

23  rebuttal case after -- I think what Mr. Carter told me is he is

24  going to have Mr. Rolston talking about her.

25    MR. COOK:  I don't anticipate that, Your Honor.

         THE COURT:  All right.  So, if you want to put her on
over lunch, and we have time to do it, we can do that.  If not,
if we need to bring her back a different day we can bring her
back.

         Mr. Carter, I understand he may have mentioned what
she was going to testify to in opening.  I don't recall exactly
what he said.  But sometimes that happens.  People anticipate
testimony and then they think better of it and they don't call
them.  There is no reason to think Mr. Cook deliberately said
something in opening he didn't expect to --

         MR. CARTER:  No suggestion at all, Your Honor.  I
wanted to bring it to your attention so if the logistics got out
of hand at least you all know about it.

         MR. COOK:  I have one other issue when Ms. Moyle is
done.

         MS. MOYLE:  The last issue, Your Honor, is
establishing perimeters of the 415 witnesses' testimony.  As you
know, a great risk is that the jury bases their verdict on other
evidence.  And to the extent that there is testimony as to their
investigation, and emotional damages, we would submit that
that's not proper.  They are simply being offered to show
whether Mr. Rolston had a propensity.

         THE COURT:  Right.  So what matters with the me-too
witnesses is what happened to them, not how it affected them.
So, the questioning just ought to be what happened to them.  If

1     the defense wants an instruction at the time about the limits on

2     the use of the testimony I will be happy to give it.

3           MR. CARTER:  Yes, sir.  We would like that.

4           THE COURT:  If I forget, somebody stand up and ask for

5     an instruction and I will give it.

6           MR. JOHNSON:  I wanted to clarify that, because, at

7     least a couple of these witnesses are -- one of them wants to

8     talk about how there was sexual arousal that went on during the

9     exam, and she went back to the shower and found herself

10     lubricated and how she felt about that.

11           THE COURT:  How she felt about that?  No.

12           Why does how she felt about it have anything to do

13     with this case?

14           MR. JOHNSON:  Because the plaintiff talked about a lot

15     of the same thing, and about the feelings that she was having

16     and she was not articulating it quite as well as the other

17     witnesses.  And the expert is going to say one of the reasons

18     that doctors are taught not to do this stuff is because of the

19     feelings that it can create.

20           THE COURT:  You cannot introduce how the other

21     witnesses felt or reacted after the event.  The fact that there

22     was an arousal during the event, that's okay.  You can describe

23     what happened.  You cannot describe the after-the-fact reaction

24     to what happened, or how she felt during the event.  Just what

25     happened.  That's all.

1    MR. JOHNSON:  We can't say that she was -- that he was

2  stimulating her clitoris and it was arousing her and she was

3  getting wet?

4    THE COURT:  Let me try one more time to make this as

5  clear as I can make it.  You can talk about the -- you can have

6  her testify to the event.  So, how he touched her, how her body

7  reacted, what went on during the event, you can talk about that.

8  She can testify to that.  What she felt like in the shower later

9  you cannot introduce.

10    The issue is what Mr. Rolston did, not how she felt

11  about it later.  Is that clear?

12    MR. JOHNSON:  It's clear.

13    MR. COOK:  One other issue, Your Honor.

14    We anticipate that in their case the defendant will

15  bring up the fact that two of our me-too witnesses are -- did

16  not immediately report, and so we would like to introduce

17  evidence, based on Mr. Rolston's exhibit of the FCI Tallahassee

18  inmate handbook, that the primary punishments for major

19  discipline in the FCI are almost exactly the same as what

20  happens when you are placed in the SHU, in terms of loss of

21  privileges, potential loss of release, loss of programs, loss

22  of...

23    THE COURT:  You can prove through the witness when she

24  reported and why, but it's got to be in terms of what the

25  witness did and why.

1          MR. COOK:  Okay.

2          THE COURT:  So, if the witness didn't know the

3    disciplinary policies -- disciplinary policies don't make any

4    difference at all.

5          Yes, sir?

6          MR. COOK:  I understand.

7          MR. FISHER:  As far as the United States is concerned,

8    the only person who we feel like it was important when they

9    reported was Ms. Blevins that we talked about --

10          THE COURT:  I need you to speak up.

11          MR. FISHER:  I'm sorry.

12          The only person who the United States feels is

13    important as to when they reported is Ms. Blevins who reported

14    yesterday before the event occurred, so we don't intend to offer

15    that.

16          THE COURT:  All right.  That makes that easier.

17          Very good.  We got seven jurors?

18          COURT SECURITY OFFICER:  Yes, sir.

19          THE COURT:  We ready for the jury?

20          Bring them in, please.

21       (Jury in at 9:02.)

22          THE COURT:  All right.  You may be seated.

23          Good morning, ladies and gentlemen.  Welcome back.

24    Thank you for being so prompt.

25          Mr. Cook, please call your next witness.

1          MR. COOK:  Yes, Your Honor.

2          THE COURT:  Right up here.

3     **LETICIA NICOLE DAVIS, PLAINTIFF WITNESS, DULY SWORN**

4          THE COURTROOM DEPUTY:  For the record, please state

5     your name and spell your last name.

6          THE WITNESS:  Leticia Nicole Davis, D-a-v-i-s.

7          THE COURT:  Ms. Davis, while you are testifying, if

8     you are comfortable with it, you are welcome to take your mask

9     off while you are socially distanced from everybody there on the

10    witness stand.

11         Thank you.

12                    <u>DIRECT EXAMINATION</u>

13    BY MR. COOK:

14    Q.   Good morning, Ms. Davis.  Will you introduce yourself to

15    the jury?

16    A.   I'm Leticia Davis.  I'm a medical assistant at FCI

17    Tallahassee.

18    Q.   Did you say medical assistant?

19    A.   Yes.

20    Q.   Okay.  And do you have a certification?

21    A.   Yes.

22    Q.   What's your certification?

23    A.   Certified nursing assistant.

24    Q.   Okay.  And when and where did you get that?

25    A.   I got that 2005 at Valdosta Technical College.

1    Q.    Okay.  Valdosta, did you say?

2    A.    Yes.

3    Q.    Okay.  And where did you work after getting your

4    certification?  First job?

5    A.    My first job was at a nursing home.

6    Q.    Was that Brynwood Nursing Center?

7    A.    Brynwood Nursing Center.

8    Q.    Was that job full time?

9    A.    Yes.

10   Q.    40 hours?

11   A.    Yes.

12   Q.    Now, when did you start working at the women's prison in

13   Tallahassee?

14   A.    I believe it was 2000 -- the end of '14, beginning of '15.

15   Q.    Okay.  Were you a regular employee or a contract employee?

16   A.    Contract.

17   Q.    Are you still a contract employee?

18   A.    Yes.

19   Q.    When you started at FCI Tallahassee how many hours a week

20   were you working?

21   A.    I was working 30 hours.

22   Q.    Okay.  Did that get increased at some point?

23   A.    Yes.

24   Q.    Okay.  And do you remember when that increased?

25   A.    I believe it was the -- around the end of 2019.

1    Q.    Okay.  So late in 2019.

2          What did they get increased to?

3    A.    40 hours.

4    Q.    Okay.  Was that preferrable to you to have the 40 hours?

5    A.    Yes.

6    Q.    Okay.  When did you become involved with Charnesha

7    Alexander?

8    A.    I don't know.  I don't remember what year it was.

9    Q.    Okay.  Do you remember an event in September of 2016?

10   A.    I remember, yes.

11   Q.    Okay.  And did you -- were you interviewed by investigators

12   on that incident?

13   A.    Yes.

14   Q.    Okay.  But you don't remember what exact date it was?

15   A.    No.

16   Q.    Okay.  Let me see if I can refresh your memory.

17         Do you remember giving a deposition on -- in January of

18   2020?

19   A.    Yes.

20   Q.    Okay.  Actually maybe the better thing would be to show you

21   your affidavit.  If I could put that up for the witness.  I have

22   to press two buttons.

23         Do you see the affidavit --

24   A.    Yes.

25   Q.    -- that you signed?

1    I am going to move over to the signature page so you can

2  see what date it was signed.  Do you remember that?

3  A.   December the 27th, 2018.

4  Q.   Okay.  Let me see if it refers to the date of the incident.

5  Okay.  Look at the first page of the affidavit and see if you

6  can see the date that this --

7  A.   September 27th, 2016.

8  Q.   Okay.  And at the time you gave the affidavit -- actually,

9  did you do two affidavits?

10  A.   I did several affidavits, so I don't know.

11  Q.   Okay.  But I mean as regards to Charnesha Alexander, did

12  you give a second affidavit?

13  A.   I'm not sure how many I did.

14  Q.   Okay.  I will run through them at the appropriate time.

15    But at this point I want to -- we established that it was

16  September 27th, 2016?

17  A.   Yes.

18  Q.   Okay.  Did you say -- well, let me ask you this way.

19    Have you ever seen other providers do Pap smear the way

20  Paul Rolston does?

21  A.   No.

22  Q.   Did you tell that to investigators?

23  A.   Yes.

24  Q.   Did you also say that you had never experienced that

25  yourself?

1  A.   Yes.

2  Q.   Did you say anything to the effect that Paul Rolston does

3  Pap smears during women's periods and that was not what you

4  understood to be the proper way?

5           MR. CARTER:  Objection.

6           THE COURT:  Sustained.

7           MR. COOK:  Okay.

8  BY MR. COOK:

9  Q.   Did you make any critical comment about the way he does Pap

10 smears?

11 A.   No.  I just said he did them different from what I saw

12 other providers do them.

13 Q.   Did you also say that he did them -- half the Pap smears he

14 did were unnecessary?

15           THE COURT:  Sustained.

16           THE WITNESS:  Do I answer?

17           THE COURT:  No, you don't answer.

18           MR. COOK:  Okay.

19 BY MR. COOK:

20 Q.   So the only comment that you recall making, that could be

21 considered -- that you consider as critical of Mr. Rolston, was

22 that he doesn't do the Pap smears --

23           THE COURT:  Sustained.

24           MR. COOK:  Okay.

25

1          THE COURT:  The questions all call for hearsay.

2          MR. COOK:  Okay.

3    BY MR. COOK:

4    Q.   If you would take a look at that -- at the document and

5    look at number -- your sentence number 12.  Did that -- was that

6    comment critical of --

7          THE COURT:  Sustained.

8          MR. COOK:  Okay.

9          THE COURT:  What she said at another time is hearsay.

10         MR. COOK:  Yes, Your Honor.

11   BY MR. COOK:

12   Q.   Does that refresh your memory as to what you said?

13         THE COURT:  Sustained.

14   BY MR. COOK:

15   Q.   During the examination were you able to see what

16   Mr. Rolston was doing with his hands?

17   A.   No.

18   Q.   Why was that?

19   A.   There is a drape that's over the patient and I can't see

20   what's under the drape because of the limited space.

21   Q.   Okay.  Did it have anything to do with where you were

22   standing?

23   A.   No.  The room was small so I have no other place to be but

24   where I was standing.

25   Q.   Okay.  And did you express any opinion about the frequency

1    with which he did Pap smear exams?

2              THE COURT:  Sustained.

3    BY MR. COOK:

4    Q.   When you testified in deposition --

5              THE COURT:  Sustained.  You may ask her on the stand

6    what her testimony is.

7              MR. COOK:  Yes.

8              THE COURT:  You may not ask her first what her

9    testimony was at some other time.

10   BY MR. COOK:

11   Q.   Do you believe that Paul Rolston did Pap smears 50 percent

12   of the time that were unnecessary?

13             MR. CARTER:  Objection.

14             THE COURT:  Overruled.

15   BY MR. COOK:

16   Q.   Did you believe that?

17   A.   Did I believe --

18   Q.   That half of the Pap smears that he did were unnecessary?

19   A.   I believe that that wasn't the reason why they was -- the

20   issue for the appointment that they was there during that time.

21   Q.   Can you explain that a little bit?

22   A.   Sure.  Like some people that was scheduled for something

23   else but when he looked in the computer he would say that they

24   would need a Pap smear while they was there for the appointment.

25   Q.   Okay.  And did he -- do you recall if he talked them into

1  having a Pap smear whether they wanted one or not?

2  　　　　　MR. CARTER:  Objection.

3  　　　　　THE COURT:  Sustained.

4  BY MR. COOK:

5  Q.　In the case of Ms. Alexander, do you remember if you put

6  lubricant on Paul Rolston's glove prior to the examination?

7  A.　Yes.

8  Q.　Okay.  Was that your custom?

9  A.　Yes.

10  Q.　Okay.  And did you hear Mr. Rolston explain to

11  Ms. Alexander why he was doing the pap?

12  A.　I don't remember terms like pap, but he explained to

13  everyone why he did -- why he was doing a pap on them.

14  Q.　Okay.  Would he have explained it within your hearing?

15  A.　It depends on the situation.  If I was in the room when he

16  explained that, or if I came in later.

17  Q.　When you are acting as a chaperone aren't you in the room

18  at all times when he is with the patient?

19  A.　No.  Until -- when I am -- if I am doing a chaperone, I am

20  in the room, but when he is explaining stuff I am not always in

21  the room because...

22  Q.　Okay.  In this particular case, do you remember him

23  explaining?

24  A.　I'm not sure.  I'm not sure if I was in the room -- if he

25  explained it in front of me, or were they in the room by their

1   self before I got there.  So I'm not sure.

2   Q.   Okay.

3             MR. COOK:  If I could confer, Your Honor.

4        (Pause in proceedings.)

5        Your Honor, I would like to ask to admit our Exhibit 5,

6   which is the Alexander investigation, including the affidavits

7   that were taken at that time.

8             THE COURT:  The objection is sustained.

9             MR. COOK:  No other questions, Your Honor.

10            THE COURT:  Cross-examination?

11                       CROSS-EXAMINATION

12  BY MR. CARTER:

13  Q.   Ms. Davis, how are you?

14  A.   Good morning.

15  Q.   You mentioned to Mr. Cook that you have a license as a

16  certified nursing assistant; is that right?

17  A.   Yes.

18  Q.   And you described the nursing home that you worked at after

19  getting that license; right?

20  A.   Yes.

21  Q.   When you were there, as a certified nursing assistant in

22  that nursing home environment were there situations where you

23  were required to mandatory report if something occurred?

24  A.   Yes.

25  Q.   You were trained in mandatory reporting?

1   A.   Yes.

2   Q.   And if something happened in that setting you knew from

3   your professional training and experience you had to report it;

4   correct?

5   A.   Yes.

6   Q.   You were asked about being a contract employee.  Now as a

7   contract employee you go to work every day.  You are just hired

8   by somebody else to do that; right?

9   A.   Yes.

10  Q.   So you were working in the medical services department at

11  FCI on an every day basis; correct?

12  A.   Monday through Friday.

13  Q.   Monday through Friday.

14       You indicated that you did recall Ms. Alexander, and a

15  period of time when you had to give some statements about that.

16  Do you remember discussing that examination?

17  A.   Yes.

18  Q.   Let me ask you this, do you remember being in the Special

19  Housing Unit, the SHU, with an examination that involved

20  Ms. Alexander?

21  A.   Not her.

22  Q.   Not specifically?

23  A.   Not specifically, but I know I was in the SHU.

24  Q.   Okay.  Let me ask it this way.  Do you remember

25  Ms. Alexander?

1    A.    Not really.

2    Q.    Do you remember any patient ever telling you that

3    Mr. Rolston had rubbed their clitoris during a pelvic exam?

4    A.    No.

5    Q.    Do you remember any patient indicating that he had, excuse

6    me, "finger fucked" them during the exam?

7    A.    No.

8    Q.    If a patient had told you that, what would you do?

9    A.    Report it.

10   Q.    Did any patient tell you that you weren't watching during

11   the examination?  Did you ever have a patient tell you that?

12   A.    No.

13   Q.    Did you ever have a patient tell you you were doing

14   paperwork during the examination and not paying attention?

15   A.    No.

16   Q.    When you are acting as a chaperone, are you paying

17   attention?

18   A.    Yes.

19   Q.    What's the purpose of you being a chaperone in the room

20   during an intimate exam where a patient is getting undressed?

21   A.    For the safety of the inmate as well as the staff.

22   Q.    And you are observing what's going on in the room?

23   A.    Yes.

24   Q.    And you mentioned, and I want to talk specifically about

25   the exam room in the SHU compared to the medical office, but I

1  will talk about that, too; is the exam room in the SHU a tiny

2  room, a small room?

3  A.    Yes.

4  Q.    And it's got an exam table with the stirrups, in the room?

5  A.    Yes.

6  Q.    And when a patient is on that exam table, because of the

7  size of the room, does that exam table have to be turned at a

8  45-degree angle just to be able to do the exam?

9  A.    Yes.

10  Q.    And the exam room in the medical offices, that Mr. Rolston

11  used at the time, it's small also; isn't it?

12  A.    Yes.

13  Q.    A little bigger than the --

14  A.    It's bigger than the SHU.

15  Q.    A little bigger than the SHU, but the SHU exam room is

16  tiny?

17  A.    Yes.

18  Q.    You mentioned to Mr. Cook that you can't see everything

19  under the drape --

20  A.    Uh-huh.

21  Q.    -- based on where you are positioned; is that right?

22  A.    Yes.

23  Q.    But you are still observing the entire room; correct?

24  A.    Yes.

25  Q.    And you can see the face of the patient; right?

000411

1  A.   Yes.

2  Q.   Can you see any facial expresses that the patient may have?

3  A.   Yes.

4  Q.   And you are watching for body language; correct?

5  A.   Yes.

6  Q.   And if you see any sudden or unexpected movements you can

7  see that; correct?

8  A.   Yes.

9  Q.   And if the patient is acting out in pain -- you are

10 familiar with a patient being in pain, aren't you, as a

11 certified nursing assistant; you have seen that before?

12 A.   Yes.

13 Q.   And if a patient is acting in pain would you be able to see

14 that?

15 A.   Yes.

16 Q.   And if there was any sounds being made, any groans or words

17 to stop the exam, you could hear that; correct?

18 A.   Yes.

19 Q.   While you can't see under the drape you can tell if

20 anything inappropriate is occurring; right?

21 A.   By their emotion -- by their -- the way they would act.

22 Q.   You are able to see Mr. Rolston also; aren't you?

23 A.   Yes.

24 Q.   And you are familiar, you have acted as a chaperone many

25 times, not just for Mr. Rolston but for many providers; correct?

1   A.    Yes.

2   Q.    And if he is doing something different than he always does

3   you can observe that and see that; correct?

4   A.    Yes.

5   Q.    Did you ever see Mr. Rolston touch a patient in a sexual

6   way?

7   A.    No.

8   Q.    Did you ever see him touch a patient during an exam in an

9   in and out motion?

10  A.    No.

11  Q.    Like he were finger-fucking the patient?

12  A.    No.

13  Q.    Do you take your role as a chaperone seriously, Ms. Davis?

14  A.    Yes.

15  Q.    And you would not jeopardize your professional license by

16  not reporting something if you saw abuse; is that right?

17  A.    Right.

18  Q.    During the course of an exam, when you are chaperoning for

19  Mr. Rolston, are you distracted and taking notes about what is

20  going on?

21  A.    No.

22  Q.    Are there times that you may take notes?

23  A.    Yes.

24  Q.    And while you are taking notes, what do you tell

25  Mr. Rolston?

1   A.   To wait a minute.

2   Q.   To wait?

3   A.   Yes.

4   Q.   To stop the exam?

5   A.   Yes, where I can write what he is saying.

6   Q.   So you can do what?

7   A.   Write down what he is saying.

8   Q.   And then you can start observing again?

9   A.   Yes.

10  Q.   At any point during the chaperoning process, Ms. Davis, do

11  you turn your back to the patient so that you are not looking at

12  all?

13  A.   No.

14  Q.   I mean, you have a role there; don't you?

15  A.   Yes.

16  Q.   And you take it serious?

17  A.   Yes.

18  Q.   Now, in addition you are assisting in the exam; aren't you?

19  A.   Yes.

20  Q.   So, are you paying attention to the -- what's going on, and

21  the process of the exam, and the stages of the exam?

22  A.   Yes.

23  Q.   All right.  Is there a lot of discussion between you and

24  Mr. Rolston during an exam?

25  A.   No.  We just -- know what -- I know when he is finished

1  with one part that he needs the next -- what he needs next and

2  so we just hand stuff back and forth to each other.

3  Q.   And you know that by watching him; right?

4  A.   Yes.

5  Q.   And watching what's going on with the patient; right?

6  A.   Yes.

7  Q.   And if he needs lubricant on his hand --

8  A.   Glove.

9  Q.   -- his gloved hand.  He's always wearing gloves; right?

10  A.   Yes.

11  Q.   If he needs lubricant, you are watching where the stage of

12  this exam is going and you are able to be there and provide

13  that; right?

14  A.   Yes.

15  Q.   And anticipate anything else he needs, like during a pelvic

16  exam, or a Pap smear, are you watching when he goes to the next

17  stage and needs the speculum?

18  A.   Yes.

19  Q.   And you are able to give that to him at that point in time?

20  A.   Yes.

21  Q.   And during the speculum exam are you able to give him the

22  other pieces of equipment that may be needed to take a sample

23  like the brush or the paddle?

24  A.   Yes.

25  Q.   And you pay attention so you can do that; is that right?

1  A.   Yes.

2  Q.   Where are you standing when Mr. Rolston is in the SHU,

3  particularly when he is performing a pelvic exam?

4  A.   I am standing -- he is here and I am pretty close to him

5  (Indicating).

6  Q.   You are pretty close to him?

7  A.   Yes.

8  Q.   So you can observe what's going on?

9  A.   Yes.

10 Q.   When you first started, or during the time frame of

11 2015-2016, did you chaperone a good bit?

12 A.   Yes.

13 Q.   Did you chaperone for Mr. Rolston any more than you

14 chaperoned for the other providers that were there?

15 A.   No.  I am the only medical assistant so I had to chaperone

16 for everyone.

17 Q.   You had to chaperone for everybody.  There is no bigger

18 percentage for Mr. Rolston than it was anyone else; right?

19 A.   I am not sure.  I chaperoned for them all, so I am back and

20 forth to everyone's room.

21 Q.   And, if you are -- you have other duties going on in the

22 medical office; don't you?

23 A.   Yes.

24 Q.   And if you are tied up and cannot chaperone, when either

25 Mr. Rolston or anyone else needs, what happens?

1   A.   They either wait or they call for one of the nurses, or the

2   other providers, they go and help them.

3   Q.   Okay.  So a nurse could be called to chaperone?

4   A.   Yes.

5   Q.   Or another PA could be called to chaperone -- another

6   female nurse, or female PA, could be called to chaperone for

7   Mr. Rolston or someone else?

8   A.   Yes.

9   Q.   And, if necessary, I guess even a doctor or a technician or

10   a lab person could chaperone?

11   A.   Yes.

12   Q.   And it just depends on how busy the office is; right?

13   A.   Yes.

14   Q.   It's pretty busy office; right?

15   A.   Yes.

16   Q.   Back when you started in 2015 and '16, you would chaperone

17   maybe 30 or 40 times a week for Mr. Rolston, or for a provider;

18   correct?

19   A.   Yes.

20   Q.   Now, when a -- you were describing that if you were in the

21   exam, and a discussion with the patient about what was going to

22   be done, you would hear that because you were in the room, but

23   are there occasions where the patient has agreed to the exam

24   before you get into the exam room?

25   A.   Yes.

1  Q.   Okay.  What happens when you come into the exam room and

2  Mr. Rolston explains what he is going to do and then he leaves

3  the room?  Do you go over what the exam is going to be?

4  A.   If they ask me what they are there for, I will tell them

5  it's for a Pap smear, or whatever kind of exam he is going to do

6  for them.

7  Q.   And you are making sure they want to go forward with the

8  Pap smear or that pelvic exam; correct?

9  A.   Yes.

10 Q.   You are confirming that they don't want to decline that

11 exam; correct?

12 A.   Yes.

13 Q.   Have you had patients that say, at that point:  I don't

14 want to do this and I am going to decline that medical care?

15 A.   Yes.

16 Q.   I mean, it's not unusual; is it?

17 A.   No.

18 Q.   Now, when -- the next stage, after the patient indicates

19 they want to go forward with the exam, and Mr. Rolston returns

20 to the room, does he then, again, say what he is going to do and

21 what type of exam he is going to have?

22 A.   He ask them if they are ready for the exam.

23 Q.   Have you witnessed patients decline the exam at that point

24 in time?

25 A.   Yes.

1    Q.   Because a patient has a right to decline any medical care

2    including these exams at any point in time during the process;

3    correct?

4    A.   Yes.

5    Q.   When Mr. Rolston conducts a breast examination, how long

6    does that take, Ms. Davis?

7            MR. COOK:  Objection, Your Honor.

8            THE COURT:  Overruled.

9    A.   If he doesn't find anything while he does the exam it's

10   like five minutes.

11   BY MR. CARTER:

12   Q.   Like five minutes for the entire exam; is that right?

13   A.   Yes.

14   Q.   And does Mr. Carter talk to the patient, and communicate to

15   the patient, what he is about to do during a breast exam?

16   A.   Yes.

17   Q.   And does he provide education to the patient about anything

18   that he does find during the breast exam?

19   A.   Yes.

20   Q.   What does he do?

21   A.   He explains to them what he's doing, and if they see --

22   like if he sees that there is peeling on the breast he will tell

23   them, I may need to schedule you to go see the gynecologist, or

24   to go out and go get a mammogram because he sees something is

25   not right.

1  Q.   Have you ever seen Mr. Rolston have a patient touch their

2  breast and show them the type of lumps or fibroids that they may

3  have?

4  A.   Yes.

5  Q.   Does he explain to them what's going on then?

6  A.   Yes.

7  Q.   And does he talk about what healthy tissue is versus

8  something that may have fibroids or lumps in it?

9  A.   Yes.

10  Q.   Did you ever see Mr. Rolston, from the time you started and

11  the number of exams that you have chaperoned, did you ever see

12  him act inappropriately during a breast exam?

13  A.   No.

14  Q.   Did you ever see him touch a breast in a sexual way?

15  A.   No.

16  Q.   Or ever say anything inappropriate during the breast exam?

17  A.   No.

18  Q.   Did you ever see him, Mr. Rolston, hurt or degrade a

19  patient during a breast exam?

20  A.   No.

21  Q.   The pelvic exam has a number of stages; right?

22  A.   Yes.

23  Q.   Mr. Cook asked you, have you ever seen anyone do a Pap

24  smear like Mr. Rolston, or something to that effect.  Does

25  Mr. Rolston conduct a digital portion of the pelvic exam

1  initially first?

2  A.    Yes.

3  Q.    And what's your understanding of why he does that?

4  A.    He said he can see where the ovaries at and know it's the

5  right place to place the speculum.

6  Q.    The right place to place the speculum?  He does the digital

7  exam and then determines the right place to place the speculum

8  in the cervix; right?

9  A.    Yes.

10  Q.    During that digital exam, does he communicate with the

11  patient every stage of the way as far as what he is about to do?

12  A.    Yes.

13  Q.    He tells the patient before he does it what he is about to

14  do?

15  A.    Yes.

16  Q.    And you mentioned the ovaries; does he check left and right

17  ovaries and ask if there is any pain?

18  A.    Yes.

19  Q.    Does he check the uterus and the cervix and ask if there is

20  any pain?

21  A.    Yes.

22  Q.    What's different about Mr. Rolston is he does the digital

23  examination in the beginning; right?

24  A.    Yes.

25  Q.    Some of the providers that you have witnessed just go

1  straight with the speculum; right?

2  A.    Yes.

3  Q.    Now you indicated earlier that when the part of the pelvic

4  exam is moved to the speculum exam, that portion, you are paying

5  attention, you are right there at his side, and you provide the

6  speculum; is that right?

7  A.    Yes.

8  Q.    And you provide the lubricant for the speculum; correct?

9  A.    Yes.

10  Q.    During the -- I'm sorry.  Back up just a second.

11      During the digital portion of the exam, any time that you

12  chaperoned for Mr. Rolston, did you ever see him perform that

13  exam in an inappropriate way?

14  A.    No.

15  Q.    Did you ever see him perform it in a sexual way?

16  A.    No.

17  Q.    Did you ever see him moving his hand in and out of the

18  patient inappropriately?

19  A.    No.

20  Q.    Did you ever see him touch the clitoris of a patient?

21  A.    No.

22  Q.    Did you ever see a patient react as if they were having

23  that type of touching occur?

24  A.    No.

25  Q.    Did you have see Mr. Rolston insert his entire hand in a

1  patient during the digital exam?

2  A.   No.  I can't see where his hand is at and the drape is

3  over.

4  Q.   Under the drape?

5  A.   Yes.

6  Q.   Did you ever see a patient react like they had had a hand

7  stuck into their vagina?

8  A.   No.

9  Q.   And when Mr. Rolston is doing the speculum exam, and he is

10 about to use the speculum, is he communicating with the patient

11 about that portion of the exam?

12 A.   Yes.

13 Q.   And you are witnessing that; is that right?

14 A.   Yes.

15 Q.   And when he using the swab to take samples does he tell the

16 patient that's what he is doing?

17 A.   Yes.

18 Q.   And that can be samples for STDs as well as testing for

19 cervical cancer; correct?

20 A.   Yes.

21 Q.   And what do you do with those samples after the swab is

22 taken?

23 A.   They are placed into little -- a little tube and they sent

24 to the lab.

25 Q.   Does he give those to you?

1  A.   Yes.

2  Q.   Because you are right there by his side?

3  A.   Yes.

4  Q.   All right.  And I want to make sure I understand what you

5  were saying before.  As far as Mr. Rolston conducting well woman

6  examinations when a patient might come in for something else.

7  Do you remember talking about that with Mr. Cook?

8  A.   Yes.

9  Q.   All right.  What does Mr. Rolston do?  Does he look into

10 the computer when a patient is coming into the exam room to try

11 to see what's scheduled in the future?

12 A.   Yes.  He looks into his computer and sees what else they

13 might be scheduled for later on.

14 Q.   And you have seen that occur many times; right?

15 A.   Yes.

16 Q.   And does he communicate to that patient that they are

17 scheduled for a future well woman exam, or some type of pelvic

18 exam into the future?  Does he tell the patient that?

19 A.   Yes.

20 Q.   Does he give the patient the option at that point to go

21 forward with the exam that they are there for that day?

22 A.   Yes.

23 Q.   So if they come in for a headache or skin condition he can

24 look in the computer and then offer that well woman exam at that

25 time?

1  A.   Yes.

2  Q.   And do you see anything wrong with that?

3  A.   No.

4  Q.   And other providers do the same thing; don't they?

5  A.   Yes.

6  Q.   In fact, that's an efficient way to run the medical office

7  is to try to take care of those patients when they are there for

8  an exam, for either a sick call or a chronic care visit; right?

9  A.   Right.

10  Q.   You indicated Mr. Rolston always uses gloves both for

11  breast exam and pelvic exam; correct?

12  A.   Yes.

13  Q.   Does he change gloves during any of the examinations?

14  A.   Yes.

15  Q.   Each portion of the examination he will change gloves?

16  A.   Not when he does the breast exam to the -- from the breast

17  exam to the --

18  Q.   Pelvic?

19  A.   -- pelvic exam he doesn't change gloves.  But when he gets

20  ready to do the rectum exam the gloves are change.

21  Q.   The rectal exam is the screening for colon cancer that is

22  done in a well woman examination; correct?

23  A.   Yes.

24  Q.   And he would change gloves for that?

25  A.   Yes.

1   Q.   As far as any other -- I know they asked you if you

2   remember Ms. Alexander and you said you really don't remember

3   Ms. Alexander specifically; do you?

4   A.   No.

5   Q.   Do you remember an inmate by the name of Connie Batchelor?

6   A.   Who?

7   Q.   Connie Batchelor?

8   A.   No -- yes.

9   Q.   Did you ever see Mr. Rolston inappropriately examine Connie

10  Batchelor?

11  A.   No.

12  Q.   Do you remember an inmate by the name of the Beth Faber or

13  Farber?

14  A.   No.

15  Q.   Don't remember her?

16       Daphne Rodriguez, do you remember Ms. Rodriguez?

17  A.   Yes.

18  Q.   Did you ever see Mr. Rolston in any way act inappropriately

19  or examine inappropriately Ms. Rodriguez?

20  A.   No.

21  Q.   I asked you in the beginning, Ms. Davis, you know, if a

22  patient tells you that Mr. Rolston had just done something

23  inappropriately, like finger fuck them, or touched their

24  clitoris, if that patient tells you that you indicated you would

25  report it; correct?

1    A.   Yes.

2    Q.   Are you trained in the Prison Elimination Rape Act, PREA,

3    at the prison?

4    A.   Yes.

5    Q.   When you started did you receive intensive training on

6    PREA?

7    A.   Yes.

8    Q.   And you knew to report anything that was sexual in nature

9    or inappropriate in nature; correct?

10   A.   Yes.

11   Q.   And you received refresher training on PREA each year?

12   A.   Yes.

13   Q.   And would you let Mr. Rolston abuse any of these patients

14   that you were chaperoning for?

15   A.   No.

16   Q.   What would you do if you saw it?

17   A.   Report it.

18   Q.   Would you try to stop it?

19   A.   Yes.

20            MR. CARTER:  Thank you, Ms. Davis.

21            THE COURT:  Mr. Fisher.

22                      CROSS-EXAMINATION

23   BY MR. FISHER:

24   Q.   Ms. Davis, good morning.  I will be very brief.

25        I believe, if I heard correctly, earlier you said you are

1  not always in the room for Mr. Rolston's appointments; is that

2  correct?

3  A.    Correct.

4  Q.    But let me ask you this, are you -- do you ever leave the

5  room when Mr. Rolston is in with a patient while she is

6  undressed?

7  A.    No.

8          MR. FISHER:  Thank you.

9          THE COURT:  Redirect?

10         MR. COOK:  Yes, Your Honor.

11                   REDIRECT EXAMINATION

12  BY MR. COOK:

13  Q.    Ms. Davis, you testified to a whole series of things that

14  are ordinarily done by you and by Mr. Rolston.  Does that

15  reflect exactly what happened on the day that Ms. Alexander was

16  in that examination on September 27?

17  A.    I am not -- I don't remember what happened exactly on that

18  day.

19  Q.    Okay.

20         And so when you say that these things happened, you mean

21  that's the ordinary course of practice; is that correct?

22  A.    Yes.

23  Q.    And I think you testified that you couldn't see what

24  Mr. Rolston was doing with his hands because of the way the room

25  was laid out and the way the sheet covered her, is that correct?

1   A.   Yes.

2   Q.   So, if he was doing something with his hands that was

3   inappropriate, you would have had to rely on a facial

4   expression, or a word, or something like that?

5             MR. CARTER:  Objection.

6             THE COURT:  Overruled.

7             THE WITNESS:  Yes.

8   BY MR. COOK:

9   Q.   So, when you say you never saw him do anything appropriate

10  [sic] you mean that you never saw him, you never saw him

11  evidence in the word or gesture of the patient?

12  A.   Yes.

13  Q.   Now, you were required to report and, in fact, you did

14  report; didn't you?

15  A.   Yes.  If I saw something, yes.

16  Q.   You were requested to give a statement and that statement

17  reflected what you saw, what you witnessed, what you experienced

18  at the time of that event; correct?

19  A.   Right.

20  Q.   Okay.  Without saying what the change was, did, in the

21  course of time from the event to the time you gave your

22  deposition in this case, did you change any of your testimony in

23  your sworn affidavit?

24  A.   I corrected parts that needed correcting.

25  Q.   Okay.  And do you remember why you said that statement

1  needed to be corrected?

2  A.   The way -- how it was worded was incorrect.

3  Q.   Did you feel that it was worded not the way you had said

4  it?

5  A.   Yes.

6  Q.   Okay.  Now, if you would explain a little bit how these

7  affidavits are done.  Do you write it out with your hand --

8  A.   No.

9  Q.   -- your statements?  Who writes it?

10 A.   Someone from SIS.

11 Q.   Okay.  And so they give you certain statements that they

12 believe are true and then do you initial each one?

13 A.   Yes.

14 Q.   Okay.  And so if a statement was made that did not reflect

15 what you had told the investigator, then you would bring that up

16 instead of -- to initial it as true; correct?

17 A.   Correct.

18 Q.   And so your reason for changing your testimony on that

19 depo -- as to that deposition was that you didn't feel that the

20 investigator's words expressed what you had told him; is that

21 correct?

22 A.   Correct.

23 Q.   Okay.  Now, you say that in relation to the list of things

24 that you were given you said that Paul Rolston always did those

25 things correctly.  Is that your statement today?

000430

1  A.   Yes.

2  Q.   Okay.  You say that you have never seen a patient react to

3  Mr. Rolston in a way that gave you concern.  Is that your

4  testimony?

5  A.   Yes.

6  Q.   Okay.  But isn't it true that Charnesha Alexander was

7  crying by the end of that investigation [sic]?

8  A.   I didn't know was it her, but I know one inmate that he

9  seen was crying after an exam.

10 Q.   Okay.  And when you say that you never saw a patient react

11 in some concerning way to a Rolston examination, did you mean to

12 include that patient that you recall now as having become

13 tearful?

14 A.   Can you repeat the question?

15 Q.   Maybe I can say it a little better.

16      Did you -- when the patient began crying during an

17 examination -- I believe that you don't remember who the patient

18 was -- did you consider that a reaction?

19           MR. CARTER:  I would object.

20           THE COURT:  Sustained.

21 BY MR. COOK:

22 Q.   Now, you testified that although Mr. Rolston would change

23 his gloves between different kinds of examinations, for instance

24 between a pelvic and a rectal exam, you said that he did the

25 entire pelvic exam with one pair of gloves typically; is that

1  correct?

2  A.   No.  He changed for the rectal part, but --

3  Q.   Right.

4  A.   Yeah.

5  Q.   So let me phrase that again so I can see whether you are

6  agreeing with me.

7       When he -- during the time that he is doing the part of the

8  exam involving the vagina, he wears one pair of gloves?

9  A.   Yes.

10 Q.   And then he changes gloves for the other part?

11 A.   Yes.

12 Q.   Okay.  I believe that you testified that you did put

13 lubrication on that set of gloves that he used for the vaginal

14 investigation [sic]; is that correct?

15 A.   Yes.

16 Q.   And that was typically what you did?

17 A.   Yes.

18 Q.   Is there any reason to think that you would not have done

19 it that way that day?

20 A.   No.

21 Q.   And I believe with regard to some other women that Mr.

22 Carter mentioned, you said that you didn't remember seeing him

23 do anything inappropriate?

24 A.   Yes.

25 Q.   And when you say that there was nothing inappropriate,

1  that's your best recollection as of today; correct?

2  A.   Yes.

3  Q.   And some of these cases go back years.  Are you convinced

4  that your recollection as to those other women were accurate?

5  A.   Yes.

6  Q.   Okay.  And the affidavit that you changed, did you ever go

7  back and change that sworn affidavit?

8        MR. CARTER:  Objection, Your Honor.

9        THE COURT:  Wait just a minute.  Sustained.

10        MR. COOK:  Okay.  No other questions, Your Honor.

11        THE COURT:  Thank you, Ms. Davis.  You may step down.

12        MR. COOK:  Your Honor, may I ask that the witness be

13  retained for a proffer or recalled for a proffer.

14        THE COURT:  Yeah.  We will deal with it later.

15        Please call your next witness.

16        MR. JOHNSON:  Ashley Barnett.

17        THE COURT:  Is this a witness who is in custody?

18        MR. JOHNSON:  Yes, sir.

19        THE COURT:  Wait.  Wait.  Just bring her to the stand.

20        **ASHLEY BARNETT, PLAINTIFF WITNESS, DULY SWORN**

21        THE COURTROOM DEPUTY:  For the record, please state

22  your name and spell your last name.

23        THE WITNESS:  Ashlee Nicole Barnett, B-a-r-n-e-t-t.

24        THE COURT:  You may proceed.

25        Ms. Barnett, if you are comfortable while you are on

1  the stand, you may take your mask off while you testify and you

2  are this far distanced from everyone.

3          THE WITNESS:  Thank you, sir.

4                    DIRECT EXAMINATION

5  BY MR. JOHNSON:

6  Q.   Ms. Barnett, are you an inmate at FCI Tallahassee?

7  A.   Yes, sir.

8  Q.   What are you charged with?

9  A.   Conspiracy to sex traffic a minor or by force, fraud or

10  coercion, and sex trafficking of a minor, or by force, fraud or

11  coercion.

12  Q.   When are you scheduled for release?

13  A.   November 25th of 2022.

14  Q.   Okay.  During your time at FCI, did you have occasion to be

15  treated by a physician's assistant by the name of Paul Rolston?

16  A.   Yes, sir.

17  Q.   Approximately, how many times did you see Mr. Rolston?

18  A.   Probably about 10 times.

19  Q.   Okay.  And did you ever refuse a pelvic exam by Mr. Barnett

20  [sic].

21          MR. COOK:  Rolston.

22          MR. JOHNSON:  I'm sorry.  You are Barnett.  He is

23  Rolston?

24  A.   Yes, sir.

25  Q    (By Mr. Johnson) Did you ever refuse a pelvic exam?

1   A.   Yes, sir.

2   Q.   And what were the circumstances of that interaction?

3   A.   I was new to the prison and so you have an intake.  And

4   during the intake, you know, he was doing the initial checking

5   on me and he offered a pelvic exam telling me that they only

6   offer it every three years.  And I had told him that I had just

7   had one in the August previous of me arriving at the institution

8   in April, and he had stated I hadn't.

9   Q.   Okay.

10  A.   And so I told him, yeah, I did.  And it was at a previous

11  prison.  And I stated why.  And he said -- he turned the

12  computer screen to show me that -- the same the records that he

13  was showing were showing that I had not received one in August

14  like I had stated.  And when he turned the computer screen to

15  show me, I pointed out to him that it stated it and then he

16  said, oh, okay.  I see it now.  And then turned the computer

17  screen back.  And then went into saying it's very important,

18  that it's every three years, and that's when I still...

19  Q.   So it didn't happen on that visit?

20  A.   No, sir.

21  Q.   Okay.  And do you have spider veins?

22  A.   Yes, sir.

23  Q.   And did Mr. Carter ever inquire about your spider veins?

24  A.   I brought them to his attention to get compression sleeve,

25  or leg garments -- the compression for the legs -- because I do

1  have spider veins and due to the boots and the concrete it

2  increases.

3  Q.   Okay.  And what did he say when you asked him for the

4  compression sleeves --

5  A.   He asked.

6  Q.   -- for the spider veins?

7  A.   He asked me to show them.  He asked me to -- I was sitting

8  on the same table that you lay down for a pelvic or a breast

9  exam.  It's the only seating really.  And he asked me to stand

10 up.

11      The spider vein that I was referring to or varicose veins I

12 was referring to, was on the side of my leg.  And so I stood up

13 to, you know, lift my paint leg up to show him.  And he asked me

14 to turn around and bend over, pull my pant leg up from the

15 bottom to show him the spot.

16      It was kind of awkward because the spot is on the side of

17 my leg, so me having to turn around, to then turn back around to

18 him, to point to the side of my leg to show him the varicose

19 veins that I was referring to.

20 Q.   How did you feel about that?

21          MS. MOYLE:  Objection.

22          MR. CARTER:  Objection.

23          THE COURT:  Sustained.

24 BY MR. JOHNSON:

25 Q.   Did you regard that as appropriate?

1  A.    No.

2       I'm sorry.  Regard -- you mean -- what?

3  Q.    I said did you regard him asking you to turn around and

4  bend over as appropriate?

5  A.    I still don't understand the question, but did I feel like

6  it was inappropriate?  Yes.

7  Q.    Did Mr. Rolston ever unbutton your shirt?

8  A.    Yes, sir.

9  Q.    Would you tell the jury how that happened?

10 A.    Okay.  So the T-shirt that I wore is very similar to

11 exactly like this one, just not this one, and so you sit on the

12 side of the table.  So if this is the way the table goes, and

13 your body lays this way, you are sitting like this.

14 (Indicating)

15      And so he spread my legs to corner his groin on my knee and

16 unbuttoned my T-shirt to take my vitals with the stethoscope, I

17 think.

18 Q.    Stethoscope I think is the word.

19 A.    Yeah.  To listen to my lungs and my heart.

20 Q.    Okay.  And had any medical practitioner ever unbuttoned

21 your shirt before?

22 A.    No.

23 Q.    Did that strike you as unusual or inappropriate?

24 A.    Immediately.

25 Q.    And you were saying that he had his groin on your knee?

1  A.   Yes, sir.

2  Q.   And had any medical practitioner ever done that to you

3  before?

4  A.   Never.

5  Q.   Okay.  And did you feel that that was inappropriate?

6          MS. MOYLE:  Objection.

7          THE COURT:  Overruled.

8          THE WITNESS:  Yes, sir.

9  BY MR. JOHNSON:

10  Q.   Now, would you kindly tell the jury about when your arm

11  turned purple and you went down to medical?

12  A.   Yes, sir.  I was an orderly so I cleaned the showers Monday

13  through Friday.  It's a lot of scrubbing and repetitive

14  strenuous activity, especially to the upper body.

15      I have a family history of blood clots so I have naturally

16  thicker blood.

17      For a few days I noticed pain in my left arm but I just

18  associated it with maybe I was building muscle from the

19  scrubbing.

20      After a few days my arm did start to swell.  It got very

21  purple and very painful.  Underneath the arm there started to be

22  a big bulging area where I could not put my arm down.

23      So I finally went to the officer on duty and explained to

24  him what was going on.  And they referred me to go down to

25  medical.

1          When I went to medical, that's when I saw Rolston.

2    Q.    Okay.  And so you get down there and what is your arm

3    looking like at this point -- or is it this arm?

4    A.    It's the left arm.  It's very swollen.  It's purple.  It's

5    in pain.  Very different from the right one.

6    Q.    All right.  And is Mr. Rolston's reaction that you need a

7    pelvic exam?

8    A.    Immediately.  A pelvic and a breast exam.

9    Q.    Okay.  So, what do you say when he tells you that you need

10    a pelvic and a breast exam when you have come in with a purple

11    arm?

12    A.    I am very confused.  I asked why.  And he tells me that,

13    you know, it may seem strange, but sometimes when you are

14    looking in a field of lions you may find a zebra.

15    Q.    Do you understand what it means that sometimes when you are

16    looking at a field of lions you find a zebra?

17    A.    I made myself understand it.  I tried to put to -- like I

18    tried to make out what he was saying.  I tried to make the

19    metaphor make sense.

20    Q.    Okay.  And, so what happened next?

21    A.    He told the chaperone, the staff, that, you know, he was

22    going to be doing the pelvic exam and the breast exam.

23    Q.    Do you remember who that was?

24    A.    Ms. Reed.

25    Q.    Okay.  And, so is that what happened?

1   A.    Yes, sir.

2   Q.    And can you tell the jury how the exam went?

3   A.    So, when he called in Ms. Reed he was explaining to

4   Ms. Reed what was about to take place.  The entire time he is

5   speaking to her she is kind of like inching back.  I can see

6   disgust in her body language.  And so when he leaves out she

7   gives me the stuff and she tells me to ignore her face.  And I

8   said, Why.  And she said --

9            MR. CARTER:  Your Honor, objection to the hearsay.

10            THE COURT:  Overruled.

11  A.    She said to ignore her face.  And I said:  Tell me what you

12  are thinking -- she said:  Tell me what -- I said:  You are

13  probably feeling the same way I am feeling.

14        And she said:  Tell me what you are thinking.  And I said:

15  He was a creep, and that was the end of the conversation that

16  pertained to him.

17        She gave me the stuff.  I took my clothes off.  I laid on

18  the table.  And then he came in.

19        When he came in, he pulled the top part down to do the

20  breast exam.  He went from the right side to the left.  He spent

21  about 10 minutes on each breast talking about random stuff.  I

22  don't remember.  Because at this point I'm already -- I have

23  already kinda checked out.  He is talking about I don't know

24  what he is saying.

25  BY MR. JOHNSON:

1  Q.   Why had you checked out?

2  A.   Because I knew -- I knew what he was doing was

3  inappropriate to me.

4  Q.   Okay.  And you just -- didn't want to feel it or experience

5  it?

6  A.   Yeah.  I guess it was my brain's way of trying to get

7  through this traumatic moment.

8  Q.   Trying to get to what moment?

9  A.   Get through this traumatic.

10  Q.   Get through the traumatic moment?

11  A.   Get through the traumatic moment, yeah.

12       So he is just going up and down each breast.  I can feel

13  my -- his palm grazing my nipple, like as if he is trying to

14  stimulate it to keep it hard, or whatever.

15       I do remember him grabbing my hand to make me feel

16  different parts of the area of my breast to tell me that this is

17  what normal tissue, or what it normally should feel like.

18       And at the end of that one he pinched my nipple and then he

19  went to the other side and did the very same thing on the other

20  side.

21       Then he had me lift my arm to look at the area.  He

22  explained that the breast goes actually farther back than we

23  think.  And then he went to the pelvic exam.

24  Q.   Okay.  And what happened during the pelvic exam?

25  A.   During the pelvic exam, once he got down to the end to

1  where my bottom half was he told me to scoot down.  He spread my

2  legs farther.  He looked at my area -- my vagina area.  He

3  tapped two places on my vagina and told me that I need to shave

4  with the hair, with the grain and not against it, to prevent

5  ingrown hairs.

6      And then he tapped my clit a couple of times.

7      And then he -- I don't remember if he did the -- did the

8  exam first, as far as putting the speculum in to do the swab,

9  but at some point he did that.  And then he stuck fingers inside

10 of me, which felt like digging.  He was -- he went all types of

11 ways.

12     He went farther telling me that my cervix was deep.

13     When he pulled his fingers out he then put his finger in my

14 butt and pulled it out.

15 Q.   Okay.  You said he was -- you used the word "digging?"

16 A.   Yes, sir.

17 Q.   Did you experience that as some kind of sexual thing?

18 A.   Yes, sir.

19 Q.   Okay.  And you said that he tapped your clit twice?

20 A.   Yes, sir.

21 Q.   And what did you think was going on there?

22 A.   A lot of inappropriate behavior.  I felt this was not what

23 should be happening right now.

24 Q.   Okay.  And did the rectal surprise you?

25 A.   Completely.  It all surprised me.

1  Q.  Apart from the fact that you were there for an arm?

2  A.  Yeah.

3  Q.  Even if you had been there for a pelvic, would that conduct

4  have been --

5  A.  Yeah.

6  Q.  -- apparent to you?

7  A.  It still would have been inappropriate.

8  Q.  Okay.  And are -- did you ever get a result from that Pap

9  smear?

10  A.  No, sir.

11  Q.  There was never a report on it that you know of?

12  A.  I think I have medical records that show that there was one

13  done, but as far as if I was ever told whether it was good, or

14  bad, or how it pertained to what was going on, or that they were

15  able to rule out the reason for my arm having issues, I was

16  never told anything pertaining to that.

17  Q.  All right.  No lab result from the pap?

18  A.  No.

19  Q.  And did that visit lead to a hospitalization?

20  A.  Yes, sir.

21  Q.  About the arm?

22  A.  Yes, sir.

23  Q.  And did you -- who is Ms. Peoples?

24  A.  Ms. Peoples at the time was a correctional officer.

25  Q.  And did you report to Ms. Peoples what happened with

1  Mr. Rolston?

2  A.   Yes, sir.

3  Q.   And did you have any follow up with Ms. Reed after you had

4  the conversation where you told her that you were both thinking

5  he was a creep?

6  A.   No, sir.

7  Q.   Do you know if Ms. Reed ever said anything about

8  Mr. Rolston's inappropriate behavior?

9           MS. MOYLE:  Speculation.

10          MR. CARTER:  Objection, Your Honor.

11          THE COURT:  The question is whether you know.

12          THE WITNESS:  No, sir.

13 BY MR. JOHNSON:

14 Q.   So, how did you come to talk to Ms. Peoples?

15 A.   She was an officer that was sent to be a chaperone while I

16 was hospitalized due to blood clots in my lungs and upper

17 extremities.  She was the one who was taking me back to the

18 prison and so you are in a room together with her and another

19 chaperone.  So just in talking to her about my experience and

20 what brought me to the current moment where I was in the

21 hospital this conversation came up.

22 Q.   Okay.  And what did you say to her and what did she say to

23 you?

24          MS. MOYLE:  Objection.

25          THE COURT:  Sustained.

1    BY MR. JOHNSON:

2    Q.   What did -- did you tell Ms. Peoples what you just told the

3    jury?

4              MS. MOYLE:  Objection.

5              THE COURT:  Overruled.  That's a yes or no.

6              THE WITNESS:  Yes, sir.

7    BY MR. JOHNSON:

8    Q.   And, what did Ms. Peoples tell you?

9              THE COURT:  Sustained.

10   BY MR. JOHNSON:

11   Q.   Did you find out whether that was the first time she had

12   heard about the situation with Mr. Rolston?

13             THE COURT:  Sustained.

14   BY MR. JOHNSON:

15   Q.   Was there a PREA filed against Mr. Rolston?

16   A.   Yes, sir.  Ms. Peoples filed a PREA, or reported it to the

17   higher authority, which would be Lieutenant White and Lieutenant

18   Rivera, based off of her --

19             THE COURT:  You have answered the question.

20             Next question.

21   BY MR. JOHNSON:

22   Q.   Were you taken off of the list of eligible patients for

23   Mr. Rolston?

24   A.   Yes, sir.  Due to the --

25             THE COURT:  You answered that question.  He is going

1   to ask you another one.

2   BY MR. JOHNSON:

3   Q.   Did one appointment still slip through?

4   A.   Yes, sir.

5   Q.   Did you get out of it by your complaint?

6   A.   Yes, sir.

7   Q.   Without revealing the conversation, did you tell an officer

8   by the name of Langford what happened?

9   A.   Yes, sir.

10  Q.   Did you tell an officer by the name of Rivera what

11  happened?

12  A.   Yes, sir.

13  Q.   Did you tell an officer by the name of Harrell what

14  happened?

15          MS. MOYLE:  Objection, Your Honor.  Foundation.

16          THE COURT:  The objection was you haven't asked about

17  the time.

18          MR. JOHNSON:  Oh, okay.

19  BY MR. JOHNSON:

20  Q.   When did you tell Langford?

21  A.   When I was asked to do an affidavit.

22          MS. MOYLE:  Your Honor --

23          THE COURT:  Sustained.  Let's move on.

24  BY MR. JOHNSON:

25  Q.   Who is Dr. Riley?

1  A.   She is in psychology.  She's -- I don't know the exact

2  position.  I just know that she is a doctor in psychology.

3  Q.   Did you tell Dr. Riley --

4       THE COURT:  Sustained.

5  BY MR. JOHNSON:

6  Q.   Who is Felicia?

7  A.   Felicia is the lady with the PREA people that I spoke to.

8       MR. CARTER:  Objection, Your Honor.

9       THE COURT:  Sustained.

10       Maybe this is the time to explain this to the jury.

11       As you know, this is Ms. Alexander's case so the

12  question of the case is what happened to Ms. Alexander, not what

13  happened to Ms. Barnett.

14       The reason you have heard testimony from Ms. Barnett,

15  about what happened to her, is this:  You can't take evidence of

16  what happened to Ms. Barnett and say, Well, the same thing must

17  have happened to Ms. Alexander.  You can't do that.  You have to

18  evaluate the testimony about what happened to Ms. Alexander on

19  its own.

20       But one of the questions in the case is:  What did

21  Mr. Rolston intend to do?  What was going on in his mind?  And

22  when there is a question about someone's intent then a jury is

23  able to consider not just the events at-issue -- what happened

24  to Ms. Alexander -- but what happened to another witness,

25  because you can infer from intent that may have been going on in

1  one case what the intent may have been in another case.  So you

2  can consider Ms. Barnett's testimony on the question of what did

3  Mr. Rolston intend to do when he was dealing with Ms. Barnett.

4      Now, you have to evaluate the testimony of what

5  happened on its own; not based on what happened to Ms. Barnett.

6  But on the question of intent you can consider this testimony.

7      Of course, as with any testimony, and this is true of

8  every witness who testifies in every case, it's up to you to

9  decide whether you believe the testimony or not.  So just like

10  you are going to evaluate Ms. Alexander's testimony, you are

11  going to evaluate Ms. Barnett's testimony, you are going to

12  evaluate the testimony of every other witness to decide whether

13  you believe the testimony or don't believe it.

14      But if you do believe Ms. Barnett's testimony then you

15  may consider it on the issue of Mr. Rolston's intent when he was

16  dealing with Ms. Alexander.

17      MR. JOHNSON:  Nothing further, Your Honor.

18      THE COURT:  All right.  Cross examination?

19      MR. CARTER:  Yes, Your Honor.  Thank you.

20              CROSS-EXAMINATION

21  BY MR. CARTER:

22  Q.   Good morning, Ms. Barnett.

23  A.   Good morning.

24  Q.   Mr. Johnson asked you about charges that you were committed

25  to be incarcerated right now.  What was your sentence?

1   A.   10 years.

2   Q.   And what date did these charges -- was the judgment

3   entered?  Do you remember?

4   A.   What date was I arrested?

5   Q.   No, ma'am.

6   A.   Okay.

7   Q.   When were you convicted?

8   A.   Convicted?  December 18th of 2014.  I'm sorry.

9   December 18th.  I apologize.  Not 8th.

10  Q.   December 18th.

11  A.   Yes, sir.

12  Q.   That's fine.

13       Ms. Barnett, isn't it true that prior to going to prison

14  you had abnormal Pap smears and abnormal cells found during

15  pelvic examinations; isn't that true?

16  A.   Yes, sir.

17  Q.   And the abnormal cells were HPV; right?

18  A.   Yes, sir.

19  Q.   And it's also true that between the birth of your second

20  child, and when you were ultimately incarcerated, you had no

21  pelvic exam at all except one time at the health department;

22  correct?

23  A.   No.  I would have had a pelvic exam after -- with the six

24  week postpartum from my first child when the HPV was detected,

25  and I would have received a pelvic exam when I was due, when I

1  was pregnant with my second child.

2  Q.   And that's what I meant.  Your second child.  From the time

3  of your second child's birth, not your first one, you really had

4  no pelvic exams or well woman type examinations until you were

5  in prison; correct?

6  A.   I had a Pap smear at the health department; yes.

7  Q.   And that's when you had an STD; correct?

8  A.   Correct.

9  Q.   And that was gonorrhea; correct?

10  A.   Correct.

11  Q.   Now when you were first incarcerated you were at

12  Aliceville; correct?

13  A.   No.

14  Q.   Okay.  You eventually were in Aliceville before you came to

15  Tallahassee; correct?

16  A.   Yes.

17  Q.   While you were at Aliceville prison you had a cervical

18  biopsy; correct?

19  A.   Yes, sir.

20  Q.   And they actually had to cut off a piece of the cervix to

21  test it to determine whether it was cancerous; correct?

22  A.   Yes, sir.

23  Q.   You described for Mr. Johnson the intake exam that you had

24  at FCI Tallahassee.  Do you remember talking about that?

25  A.   Yes, sir.

1  Q.   Okay.  During that intake exam, with Mr. Rolston, you

2  described a number of things that would indicate you would be a

3  high risk for potential cervical cancer; correct?

4  A.   At which time?

5  Q.   At the -- do you remember when the intake exam occurred?

6  A.   Which one?

7  Q.   The first one that you were referring to when you talked to

8  Mr. Johnson, the one where you declined the pelvic exam and the

9  well woman treatment.  Do you remember that one?

10  A.   I remember, yes.

11  Q.   And that was April 27, 2017; correct?

12  A.   Yes, sir.

13  Q.   And during the course of an intake exam, there is a lot of

14  history questions as far as what your medical condition and

15  other things that go into the examination; correct?

16  A.   Yes, sir.

17  Q.   And you discussed things like the number of sex partners

18  you have had in recent times; correct?

19  A.   I do not recall the questions that we spoke about as far as

20  he is concerned.

21  Q.   You don't recall discussing how many sex partners you had

22  during that examination?

23  A.   No, sir.  The only thing I really recall pertaining to that

24  as far as we discussed was my sexual abuse from family members.

25  Q.   As far as your history of STDs, that would have been

1  discussed; correct?

2  A.   I can't say what could have been discussed because I don't

3  remember.

4  Q.   Do you remember having an inflammation of your vagina at

5  that time?

6  A.   No.

7  Q.   Had you ever had that while you were incarcerated?

8  A.   Yes, sir.

9  Q.   While you were in Aliceville?

10  A.   Yes, sir.

11  Q.   And the reason that you say that you declined the well

12  woman examination on April 27, 2017, is that you had one in

13  Aliceville; correct?

14  A.   Yes, sir.

15  Q.   Isn't it true that Mr. Rolston explained that there were

16  some risk factors based on the information you provided to him

17  and ordered that you should have the well woman exam?

18  A.   He stated that due to being an inmate you only get one

19  every three years and that he felt I should have it.

20  Q.   And he discussed those risk factors too; didn't he?

21  A.   No.

22  Q.   You don't remember that?

23  A.   No.  I'm saying he didn't discuss risk factors.

24  Q.   You declined a breast exam; correct?

25  A.   Yes.

1  Q.   You declined the pelvic exam?

2  A.   Yes.

3  Q.   And you declined the rectal exam at that time?

4  A.   I was not asked for a rectum exam.

5  Q.   Now because of coming into the prison, do you know if you

6  were scheduled for a regular Pap smear at that time into the

7  future?

8  A.   No I was not.  A pelvic exam and breast exam is not part of

9  the initial intake.

10 Q.   But after that, do you know if you were put on the schedule

11 for a regular Pap smear?

12 A.   I do not know.

13 Q.   You do not know one way or the other?

14 A.   I don't.  That information is not told to us.  We just get

15 called and we go down to medical.

16 Q.   You described for Mr. Johnson that during this intake exam

17 Mr. Rolston asked about your spider veins; right?

18 A.   I told Mr. Johnson that he did not ask me.  That I told

19 Rolston about my spider --

20 Q.   There was a discussion about your spider veins?

21 A.   Yes, sir.

22 Q.   And at the time Mr. Rolston was standing -- he was sitting

23 behind the desk in the room; correct?

24 A.   Yes, sir.

25 Q.   And when he asked for you to pull up your pant's leg he was

1  behind the desk; correct?

2  A.   Yes, sir.

3  Q.   As far as taking a stethoscope and listening to your heart;

4  you had a T-shirt up under your shirt; correct?

5  A.   Yes, sir.

6  Q.   So unbuttoning your shirt, there is still a T-shirt on;

7  correct?

8  A.   Yes, sir.

9  Q.   And that's where the stethoscope was; correct?

10  A.   Yes, sir.  But he doesn't know that going into -- or

11  listening to the heart he doesn't know what's under my T-shirt

12  that he can see.

13  Q.   You described for Mr. Johnson the exam in which you came in

14  with a swollen arm?

15  A.   Yes, sir.

16  Q.   Correct.  And do you remember that day?

17  A.   The date?

18  Q.   Yeah.  Do you remember the day?  October 17?

19  A.   October -- yeah.

20  Q.   October 17th, 2018?

21  A.   Yes.

22  Q.   Correct.  Okay.

23      And do you recall at the same time that you came in for

24  that visit, which is like a sick call, right, because you had

25  strenuously used your arm and thought you had something wrong

1   with it so you needed to see a physician; correct, or --

2   A.   I needed to see medical, yes.

3   Q.   Medical.

4       Do you know if you had a chronic care visit for that same

5   day?

6   A.   I do not.

7   Q.   You don't remember that?

8   A.   I -- like I said, they don't tell us when we are scheduled

9   to see medical.  They just call -- well, at that time, it's a

10  list that comes out every day whoever -- whatever inmate, where

11  they are supposed to go, and what time.  It doesn't state why.

12  So I would not have known that there was a chronic care --

13  Q.   But the chronic care visits are often scheduled for things

14  like infectious disease or updates on mental health and things

15  of that --

16  A.   Anything that's chronic.

17  Q.   Anything that's chronic and regular; correct?

18  A.   Uh-huh.

19  Q.   Now, during the examination that you had on October 17th,

20  do you recall discussing with Mr. Rolston that you had not been

21  doing preventative medical breast exams and "has not had a Pap

22  smear since 2015."  Do you remember discussing that?

23  A.   No.

24  Q.   But that would be true, correct, that you had not had a Pap

25  smear in between the intake and when you presented on

1  October 17th, 2018; correct?

2  A.  Correct.

3  Q.  And that would have been three years from when you had it

4  before at Aliceville; correct?

5  A.  No.

6  Q.  Okay.  You said you had a Pap smear in 2015 at Aliceville.

7  A.  No.  I said that I had a Pap smear -- the last Pap smear

8  was in August of '16.  A few months later, April of '17, was

9  when I had my intake with Rolston.  So August of '16 was my last

10 one.  When I seen him on that day it was October of '18, so a

11 little over a year.

12 Q.  You still had not had Pap smears or mammograms or breast

13 exams between the intake exam and October 17, 2018.  That is

14 true; correct?

15 A.  Right.

16 Q.  And Mr. Rolston did work-up and measure your arms during

17 that examination to determine if -- to try to evaluate whether

18 you had a blood clot or something going on with your arm?

19 A.  After the inappropriate breast exam; yes.

20 Q.  Okay.  He actually measured your arms; correct?

21 A.  Yes.

22 Q.  And he indicated to you he was going to get you seen by a

23 doctor; correct?

24 A.  That he was going to get labs.  He called the doctor, which

25 is on the floor above us, to explain to him everything that was

1  going on minus the pelvic and breast exam.  Got reassurance as

2  to what labs to do, as far as blood work is concerned.

3  Q.   So Mr. Rolston ordered blood work and diagnostic work of

4  some kind to be able to evaluate what was going on in your arm;

5  correct?

6  A.   Yes, sir.

7  Q.   And ultimately Mr. Rolston ordered an ECG, an

8  electrocardiogram to be done on your arm, too; correct?

9  A.   Now that I do not remember.

10  Q.   You don't remember that?

11  A.   I know it was not that day.

12  Q.   Right.

13  A.   I do know that.

14  Q.   But eventually you did have that; correct?

15  A.   I don't know if it's due to him.

16  Q.   Okay.  You don't know -- you don't have any knowledge at

17  all of what he did reviewing your chart after that examination;

18  do you?

19  A.   What he did.  No.

20  Q.   You have not examined in your medical records on whether he

21  continued to look into the causes of the concern that you were

22  having with your arm?

23  A.   No.

24  Q.   But you do know you did have the electrocardiogram done

25  after the October 17th visit; correct?

1    A.    I have had them, yes.

2    Q.    And Mr. Rolston had a physician -- he discussed your

3    situation with a physician.  Do you know whether Mr. Rolston

4    referred you to the emergency department, and recommended that

5    after seeing on October 17th?

6    A.    No.  That would be the Dr. Jiminez, after he got my labs.

7    He then referred me to the outside hospital due to the

8    coagulation in my blood.

9    Q.    And you don't know Mr. Rolston's role in accomplishing

10   that; do you?

11   A.    No.  Because he would have no authority for that.

12   Q.    You did -- going back to the intake exam, Ms. Barnett --

13   you felt like that was -- he was inappropriate during that exam,

14   too; right?

15   A.    Yes, sir.

16   Q.    You said that took place in April of 2000 and -- what did

17   you say '16, '17?

18   A.    '17.

19   Q.    You did not report that to anyone; did you?

20   A.    No.

21   Q.    And when the exam was going on, on October 17th, you didn't

22   say anything to Ms. Read, during the course of the exam, that

23   something inappropriate was happening; did you?

24   A.    In '17, she was not working there, or she was not -- I

25   wasn't aware of her.

1  Q.   You were not aware of --

2  A.   Ms. Read in '17.

3  Q.   -- Nurse Read, she did not chaperone the pelvic exam and

4  breast exam?

5  A.   That would be in 2018, when the pelvic exam that he

6  performed happened.

7  Q.   Okay.  In 2018?  You did not tell Ms. Read, during that

8  examination, October 17, 2018, thank you for correcting me, you

9  did not tell Ms. Read -- she was the chaperone; correct?  You

10  did not tell her that anything had happened to you during that

11  exam; did you?

12  A.   I felt there was no need.  She -- she didn't do her job so

13  I felt going to her was going to be a dead-end.

14  Q.   She didn't do her job?

15  A.   Correct.

16  Q.   Because you felt like she didn't stop it?

17  A.   No.  Because I felt like she wasn't doing her job.  She

18  wasn't chaperoning.  She was not watching like she is supposed

19  to do.

20  Q.   So she was distracted and not paying attention in this

21  exam?

22  A.   Correct.

23  Q.   This is a pretty small exam room; correct?

24  A.   Fairly so.  Yes.

25  Q.   You could almost reach out and touch Ms. Read while she is

1  in the room; right?

2  A.   Almost.

3  Q.   But you feel like she was not paying attention?

4  A.   It's not a feeling.  It's a fact.  When your back is to the

5  patient, who has their legs spread open for a pelvic exam, she

6  was definitely distracted.

7  Q.   So she had her back to you?

8  A.   Yes, sir.

9  Q.   Not paying attention at all?

10 A.   Correct.

11 Q.   And that's why you feel like you shouldn't say anything to

12 her because she wasn't paying attention or even caring; right?

13 A.   Right.

14 Q.   Now, Ms. Barnett, Connie Batchelor is a friend of yours;

15 correct?

16 A.   She is an inmate at the institution.

17 Q.   And y'all were in the same unit; correct?

18 A.   We have been, yes.  At the time I -- I don't -- I can't

19 recall.

20 Q.   But you have talked to her, as a friend, about all kinds of

21 things; right?  She is a close friend of yours?

22 A.   There are no friends in prison.

23 Q.   Daphne Rodriguez was also in your cell block; correct?

24 A.   At the time, no.

25 Q.   She was in your cell block; correct?

1   A.   She was on the compound with me.

2   Q.   And Beth Farber was in your residential drug abuse program

3   class, the RDAP class; correct?

4   A.   I was not in that program the time this happened.

5   Q.   But she was in a class with you, in RDAP, at some point,

6   where y'all knew each other; correct?

7   A.   For a couple of weeks.  And then she went out on a writ and

8   she was no longer there.

9            MR. CARTER:  Give me just a second.

10            (Pause in proceedings.)

11            MR. CARTER:  Thank you, Ms. Barnett.

12            THE COURT:  Ms. Moyle?

13                    CROSS-EXAMINATION

14   BY MS. MOYLE:

15   Q.   Good morning, Ms. Barnett.

16   A.   Good morning.

17   Q.   You told Mr. Carter that you felt that Mr. Rolston was

18   inappropriate in his first examination of you?

19   A.   Yes.

20   Q.   Did that also have to do with the way he sat in his chair?

21   A.   That was part of it.  That was -- yes.

22   Q.   Okay.  And you thought it was inappropriate how he gave you

23   advice on that shaving pubic hair?

24   A.   When he did the pelvic exam in '18.  Yes.

25   Q.   You knew that an infection can grow from an ingrown hair;

1  right?  You know that?

2  A.  Yes, ma'am.

3  Q.  And you declined the Pap smear at your intake exam with

4  Mr. Rolston?

5  A.  Yes, ma'am.

6  Q.  And in 2018, though, you never told him that you did not

7  want the Pap smear done?

8  A.  Yes, ma'am.  At that point, my life was on the line and in

9  prison you don't always get the medical attention you need,

10  so...

11  Q.  Ms. Barnett, you testified that Ms. Read had her back to

12  you.  Was that during the breast exam or you are saying during

13  the vaginal examination?

14  A.  The entire exam.

15  Q.  The entire examination?

16  A.  Yes.

17  Q.  You said he was on each breast for 10 minutes a piece?

18  A.  Yes, ma'am.

19  Q.  And Ms. Read, for that entire 20 minutes, had her back to

20  you.  She was facing the wall?

21  A.  No.

22  Q.  Can you explain that to me.

23  A.  Yes.  So, when he went to do the pelvic exam she did hand

24  him the speculum.  She did hand him the cotton swab and the test

25  tube and then he handed it back to her.

1  Q.  And during the 20 minute breast exam she is not paying

2  attention at all?  She has her back to you?

3  A.  Correct.

4  Q.  And you are familiar with how to report a PREA violation;

5  right?

6  A.  I'm sorry?

7  Q.  Are you familiar with how to report a PREA violation?

8  A.  Oh, yes, ma'am.

9          MS. MOYLE:  Nothing further.

10          THE COURT:  Redirect?

11          THE WITNESS:  And I did report a PREA violation.

12          MS. MOYLE:  No question is pending.

13          Thank you, Ms. Barnett.

14          THE WITNESS:  Thank you.

15                    REDIRECT EXAMINATION

16  BY MR. JOHNSON:

17  Q.  Ms. Barnett, Mr. Carter asked if you knew Beth Farber, if

18  you knew Ms. Rodriguez, if you knew Ms. Batchelor.  And, let me

19  just ask you this, are you part of a conspiracy to ruin the

20  reputation of Paul Rolston?

21          MS. MOYLE:  Objection.

22          THE COURT:  Overruled.

23          THE WITNESS:  No.

24          MR. JOHNSON:  That's all.

25          THE COURT:  Thank you, Ms. Barnett.  You may step

1  down.

2         Members of the Jury, that makes this a good time to

3  take the morning break.  You recall my instructions; don't talk

4  about the case, find something else to talk about.  We will be

5  back with you in a few minutes.  Jury out, please.

6      (Jury out at 10:35.)

7         THE COURT:  You may be seated.

8         Let me give you some explanations of some of the

9  rulings.

10         Mr. Cook, you started with Ms. Davis asking a number

11  of questions essentially of this form:  What did you say at some

12  earlier time.  Those questions call for hearsay.  The first

13  couple of objections I just promptly sustained.  Frankly, I

14  thought it would be obvious at that point what the problem was.

15  You surely knew what the problem was but you kept on.  And

16  finally I explained it.  Frankly, I was trying to help you out.

17         You were having trouble getting to the testimony and

18  so finally I said:  It's hearsay.  You can get her testimony

19  here on the stand, but you can't prove the case by jumping right

20  into what she said at some other time.  It's just classic

21  inadmissible hearsay.  And so there were several of those

22  questions.  I sustained the objection.

23         Then you switched and said:  Well, I am going to show

24  you to refresh your memory.  She hadn't said she didn't remember

25  something.  You can refresh memory when a witness says "I don't

remember."

Then there was an objection; the question was: Was it improper 50 percent of the time. 50 percent of the time were his pap exams improper, and there was an objection.

It was a leading question and it called for, at least on one view, it called for expert testimony that Ms. Davis was not qualified to give. I could have sustained the objection. Mr. Cook was having terrible time getting to the point of the testimony. So leading questions is one of those things where I make a judgment. Is this going to help get along or are you putting words in the witness's mouth. I didn't think he was going to put words in her mouth and we were having trouble getting to it and I overruled the objection.

As far as expertise goes, as I said, one view of that is you are calling for a CNA to give testimony about what's an appropriate medical exam. She doesn't have that expertise.

I thought this was a way to get to her testimony, and she could explain it and you could cross examine it, and as I said, we were having trouble getting to it.

She is certainly entitled to testify that she has seen lots of Pap smears, medical exams, by Mr. Rolston and try to explain what he usually did and what he didn't usually do and so forth.

I overruled the objection so we could get on to it and we did eventually get there to her saying what she saw. She

1    didn't remember this exam at all, but what the usual practice

2    was.  And I thought it perfectly appropriate for her to testify

3    to what the usual practice was.

4         Look, you all understand the same thing just in your

5    ordinary practice.  If I asked you how you examined some witness

6    12 years ago, in some routine case, you wouldn't probably

7    remember the details but you'd probably be able to say some

8    things because that's how you always do it.

9         I can do the same thing about cases.  You can tell me

10   something about a case 12 years ago, I may not remember the

11   individual case but depending on what you tell me, or suggest

12   happened, I can probably tell you whether that might well have

13   happened, or, no, that didn't happen because that's not the way

14   I do it.

15        Then, Mr. Cook, you stood up in front of the jury,

16   after I had made rulings out of the jury's hearing, and said you

17   want to proffer Exhibit 5, including the affidavits that were

18   taken and not in.  So you have stood up and told the jury:

19   There are affidavits essentially the Judge ain't going to let

20   you see.  I was astounded.

21        Please do not suggest to the jury again that you have

22   other evidence that they are not going to hear.

23        There was a -- I think, Mr. Cook -- the plaintiff

24   objected to the question how long a breast exam takes.  I

25   overruled the objection.  I thought that was an appropriate

1 question along the lines of how do these exams ordinarily get
2 conducted. I may have it backwards who asked the question, but
3 whichever side asked it, the other side objected, and I
4 overruled the objection because I thought that was okay.

5 Then, Mr. Cook, you asked a question: Was there time
6 when a patient was crying at the end of an exam. And Ms. Davis
7 said there was a time when a patient was crying after the exam.
8 And then you asked the question: When the patient was crying
9 during an exam, and it went on. I sustained the objection to
10 that. There had been no testimony that any patient was ever
11 crying during an exam. So the question assumed facts not in
12 evidence.

13 There were a lot of questions about changing an
14 affidavit. No indication of what the affidavit had to do with,
15 whether it had anything to do with this case. What respect it
16 was changed in. If there was testimony inconsistent with
17 testimony given here in court you, of course, were entitled to
18 impeach Ms. Davis by asking about the prior inconsistent
19 statement. No indication on the record from your questions
20 whether there was indeed a prior inconsistent statement.

21 It's possible that an incorrect statement in an
22 affidavit, even if it didn't relate to the facts of the case, or
23 wasn't inconsistent with testimony given here on the stand,
24 would be an area in which I would allow inquiry under 608(b),
25 but I would have to know a whole lot more than I did to think

1 this was admissible under 608(b).

2 I let that go on for a little while but I finally
3 sustained the objection.

4 It goes back to this apparent effort -- and I am
5 getting close to thinking it's a decided effort, to suggest to
6 the jury that there is more to this they are not hearing.

7 Maybe this is the time to repeat what I'm sure you
8 have heard me say -- all of you have heard me say before -- if
9 you can't win the case on the merits, you can't win the case.
10 So, let's try the case on the merits. And if what you are
11 trying to do is suggest to the jury, Oh, I may not be able to
12 prove the case on the merits but there is more. That won't do.

13 Then when Ms. Barnett was testifying there was a
14 question about how felt -- how something made her feel. I
15 sustained the objection to that. That goes to her damages and
16 emotional state. That's not part of this case.

17 I overruled the objection to whether she thought some
18 of the way she was treated was inappropriate. I thought that
19 was a way to get to what happened, and so I thought that was
20 appropriate to say where he was standing, if I thought that was
21 inappropriate. That tells you something about where he was
22 standing and what the facts are. How she perceived it at the
23 time. That's okay. That's, as I said during the break, when we
24 were talking about this, or before the trial started, what
25 happened, how she perceived it at the time, that was

appropriate.  How she felt later, or what emotional harm she had later, not part of it.

There was another question, and this one I don't suggest was intentional.  I think Mr. Johnson just didn't hear, or wasn't paying as close attention to the testimony.  I mentioned this just to say to all of you:  Listen to the answers.  It will help you get right to it.

So there was an instance where Ms. Barnett said she felt like he was digging, and then a couple of questions later, your follow up, was:  When he said he was digging.  That wasn't the testimony she gave.  She didn't say Mr. Rolston said he was digging.  She said it felt like he was digging.

Then there were questions:  What did Mr. Peoples tell you.  That was hearsay.  I don't know what she was going to say, but --

MR. JOHNSON:  That's on a statement of a party.  Offered against the party.

THE COURT:  No.  Mr. Rolston -- Mr. Rolston is the party.

MR. JOHNSON:  Oh, I'm sorry.  Right.

THE COURT:  And then:  Did you find out that was the first time.  That, again, goes to suggest other occasions that you got to prove.  You can't prove through Ms. Barnett.  She could only have known through hearsay whether somebody else reported something.  And one of the questions was:  What did she

tell you and what did you tell her.  That, in part, called for
hearsay and was in any event compound, so I sustained that
objection.

Those are my notes on rulings.

Then this probably makes no difference in the trial of
the case really, but there have been a couple of questions about
how long you are serving.  And, of course, in Ms. Barnett's
case, you find out the date of the sentence and then the date
she is getting out and the sentence is 10 years and it's not 10
years between the time she was sentenced and the time she was
getting out.

I can explain to the jury that in federal court you
serve 85 percent of a sentence, so if you get a 10-year
sentence, and you behave, you get out in eight and a half years,
but that kind of gets into whether you behave and what else is
going on.  I don't plan to say anything about it, but if either
side wants me to I can.  Or if -- I guess I tell you partly
because the government lawyers surely know this, but those of
you that handle civil cases all the time may not know it, but
that's what happens in federal court.  You get 54 days a year in
gain time if you don't get it taken away and so typically a
10-year sentence runs eight and a half years.

In her case, I'm sure she is serving a minimum
mandatory 10-year sentence on that charge and so she will serve
eight and a half years and get out, unless she loses gain time.

1          I am not going to say anything to the jury about that

2    unless somebody asks me to.

3          What else, if anything, do we need to do before we

4    break?

5          MR. CARTER:  We are going to move for mistrial again,

6    Your Honor.  We are having to stand up and object to that over

7    and over again suggesting about the other affidavits, and the

8    other things going on.  Just like we did yesterday, when those

9    type of questions were asked, we would move for a mistrial.

10         THE COURT:  If I grant the mistrial we will be back

11   here trying the case.  I mean, you have thought about this,

12   talked to Mr. Rolston, you really want to quit and start over?

13         MR. CARTER:  I have not talked to him.  I wanted to

14   make sure I brought it to your attention.

15         THE COURT:  Here is the warning.  Be careful what you

16   ask for.  You might get it.

17         Look, lots of things happen during trials.  And for a

18   lot of things, by the end, all of those things that seemed like

19   earthshaking at the time really fade into the background and

20   don't have much to do with it.

21         I can overcome a lot during a trial, and I will

22   instruct the jury very clearly, and we got a good jury paying

23   attention.  No reason to think the testimony to this point is

24   going to be any different next time than it has been this time.

25   So, aside from the improper suggestion that there is other

1   evidence, and so forth, this trial has been just fine it seems

2   to me, and I don't know that you are going to be in a different

3   situation if we come back in two years -- or, I mean, two

4   months, or four months, or whenever. But I share your concern.

5   I mean, it concerns me and I do think some of what's happened

6   should not have happened. So you talk to Mr. Rolston and see

7   what you really think.

8         Let's -- we have spent most of the break time. We

9   have seven more minutes. We will start back at five of 11 by

10  that clock.

11     (Recess taken 10:49.)

12     (Resumed at 10:56.)

13       THE COURT: Jury in, please.

14       Do you have the next witness, please?

15       MR. JOHNSON: Connie Batchelor.

16       THE COURT: Ms. Batchelor in custody? Yes.

17       MR. CARTER: Your Honor, my client is not here. I

18  don't know if he is in the bathroom, or whatever. You want me

19  to get him or let him walk in?

20       THE COURT: He can come when he comes.

21       MR. CARTER: Okay.

22     (Jury in at 10:57.)

23       THE COURT: All right. You may be seated.

24       Mr. Johnson, please call your next witness.

25       MR. JOHNSON: Connie Batchelor.

1       **CONNIE BATCHELOR, PLAINTIFF WITNESS, DULY SWORN**

2       THE COURTROOM DEPUTY:  For the record, please state

3 your name and spell your last name.

4       THE WITNESS:  Connie Batchelor.  B-a-t-c-h-e-l-o-r.

5       THE COURT:  Ms. Batchelor, you may be seated.  While

6 you are testifying, if you are comfortable, you may remove your

7 mask.

8                 DIRECT EXAMINATION

9 BY MR. JOHNSON:

10 Q.  Ms. Batchelor, I am Rick Johnson.  We've met sometimes.

11    Are you currently an inmate at the FCI Tallahassee?

12 A.  Yes, sir.

13 Q.  And what are you charged with?  What are you convicted of?

14 A.  Conspiracy to distribute methamphetamines.

15 Q.  Okay.  And how long is your sentence?

16 A.  June 23 is my out date.  I got 100 months.

17 Q.  Okay.  It's coming up soon?

18 A.  Yes.

19 Q.  I know from experience that you are a very soft speaker, so

20 if you would be sure to talk into that microphone in front of

21 you.  And it helps if you address the jury.  That helps with the

22 hearing.

23 A.  Yes, sir.

24 Q.  So, Ms. Batchelor, have you had a history of pelvic and

25 rectal exams due to pelvic inflammatory disease?

1  A.   Yes, sir.

2  Q.   Have you had a prior history of sexual abuse in your life?

3  A.   Yes, sir.

4        MS. MOYLE:  Objection.

5        THE COURT:  Sustained.

6  BY MR. JOHNSON:

7  Q.   Did you have occasion to refuse a Pap smear at your intake

8  June 7, 2017?

9  A.   Yes, sir.

10 Q.   And why did you do that?

11 A.   Because I had had a hysterectomy.

12 Q.   Okay.  And, what is it about a hysterectomy that makes a

13 Pap smear unnecessary?

14       MS. COLES:  Objection.

15       THE COURT:  Overruled.

16 A.   Um, I don't feel like I need one.  I don't have a uterus or

17 anything to -- for a Pap smear.

18 BY MR. JOHNSON:

19 Q.   Okay.  A Pap smear takes a swab out of the cervix?

20 A.   Yes, sir.

21 Q.   And you don't have a cervix?

22 A.   Right.

23 Q.   Now, did you make a complaint about your hand breaking out

24 with a rash -- eczema?

25 A.   Yes, sir.

Direct Examination – Connie Batchelor

1  Q.   I have the date of that for 9-27-2018.  Does that sound
2  about right?
3  A.   Yes, sir.
4  Q.   So, were you given an appointment?
5  A.   Yes, sir.
6  Q.   With whom?
7  A.   Rolston.
8  Q.   Okay.  And what happened when you got to the appointment
9  with Mr. Rolston?
10 A.   I was told -- I went back to see him and then he wanted to
11 do a Pap smear.
12 Q.   Okay.  And did you explain to him that you didn't have a
13 cervix?
14 A.   I told him that I had had a hysterectomy and I didn't see
15 any need to have a Pap smear.
16 Q.   And so when you told him that, how did he respond?
17 A.   He said every woman needs a Pap smear.
18 Q.   Okay.  And so did you submit?
19 A.   I did.
20 Q.   And did he do it?
21 A.   He did.  Yes, sir.
22 Q.   How would you compare it to the previous Pap smears that
23 you had had in your life?
24 A.   Very different.
25 Q.   What ways was it different?

1   A.   He inserted his fingers into my cervix and --

2   Q.   Not in your cervix.  You didn't have one?

3   A.   Well, into the -- my vagina.  And then he used his thumb it

4   felt like to move around my clitoris to like stimulate it.

5   Q.   Okay.  And was that a persistent movement?

6   A.   Yes; it was.

7   Q.   And what did you think about that?

8   A.   It was very nerve wracking.  Very different.  Very nerve

9   wracking.

10  Q.   Very nerve wracking in that did you feel like you were

11  being sexual abused?

12  A.   At that time I just thought this is just the oddest Pap

13  smear I've ever had.  I was just in shock, you know, to what was

14  going on.  I had never had no one move my clitoris around like

15  that.

16  Q.   Okay.  And did he do a breast exam?

17  A.   Yes; he did.

18  Q.   Would you tell the jury about the breast exam?

19  A.   He -- what was different about that breast exam is he

20  pinched my nipples and that I had never had done as well.

21  Q.   Do you remember who was the chaperone?

22  A.   Ms. Davis.

23  Q.   And was -- how attentive was Ms. Davis during the pelvic

24  exam?

25  A.   She just stands to the right of the table.

1  Q.  And did she appear to be paying attention?

2  A.  I mean, when he asked for her to hand him something she

3  handed it to him, but other than that...

4  Q.  Did she have her back turned at any time?

5  A.  At one point in time, yes.  When she was -- whatever the

6  sample was that he had taken she was putting it on something

7  over there with her back to me toward the table.

8  Q.  Okay.  If there is no cervix to take a sample from, did he

9  just take a sample from the vaginal wall?

10       MS. MOYLE:  Objection.

11       THE COURT:  Overruled.

12  BY MR. JOHNSON:

13  Q.  Did you ever get a result from that test?

14  A.  No, sir.

15  Q.  Did you get a rectal?

16  A.  I did.

17  Q.  Was that a surprise?

18  A.  Yes, sir.

19       MR. JOHNSON:  No further questions.

20       THE COURT:  Cross examination?

21              CROSS-EXAMINATION

22  BY MS. COLES:

23  Q.  Good morning, Ms. Batchelor.  I just have a few questions

24  for you.

25       You don't feel that Mr. Rolston sexual assaulted you; do

1   you?

2   A.   It's not like sexual assault that I have ever experienced

3   before.

4   Q.   So the answer is no?

5   A.   No.  Yes.

6   Q.   Yes, he did not sexual assault you?

7   A.   No.  He did not like penetrate me, like that type of sexual

8   assault.  But I believe it is a form of sexual assault.

9   Q.   Well, didn't -- do you remember giving your deposition?

10  A.   Yes.

11  Q.   And didn't -- during that deposition, didn't you testify

12  that you don't feel as though you had been sexual assaulted?

13  A.   Correct.  I did.

14  Q.   You have been in federal custody since June of 2017 at FCI

15  Tallahassee; right?

16  A.   Correct.

17  Q.   And when you first came in onto the compound they offered

18  you that well woman exam.  You told Mr. Johnson about that;

19  right?

20  A.   Correct.

21  Q.   And you declined that initial Pap smear?

22  A.   Correct.

23  Q.   So you understood that you had the ability to decline

24  medical service like a Pap smear or a breast exam?

25  A.   Yes.

1  Q.   And you had the ability to refuse a rectal exam or a

2  vaginal exam?

3  A.   Yes.

4  Q.   And just little bit about your history.  You have been

5  sexually active since you were 14?

6  A.   Yes.

7  Q.   And your first Pap smear was when you were around 16?

8  A.   Yes.

9  Q.   And you have had abnormal Pap smears in the past?

10 A.   Correct.

11 Q.   In fact, you had your diagnosis, pelvic inflammatory

12 disease?

13 A.   Yes.

14 Q.   And ultimately you had to have a hysterectomy; right?

15 A.   Correct.

16 Q.   But it was a partial hysterectomy?

17 A.   They left one ovary.

18 Q.   So you have one ovary remaining.

19      Do you know whether or not women who have had partial

20 hysterectomies still need to have vaginal examinations?

21 A.   No.

22 Q.   You were seen by Mr. Rolston two times at FCI Tallahassee;

23 is that right?

24 A.   Correct.

25 Q.   And the first time you met Mr. Rolston is when you were

1  seeking treatment for your hemorrhoids; is that correct?

2  A.   I believe so.  Yes.

3  Q.   You had severe hemorrhoids?

4  A.   Yes.

5  Q.   And sometimes your hemorrhoids would bleed?

6  A.   Yes.

7  Q.   And sometimes they would bleed so badly that you would soak

8  three to four pads with rectal blood; is that right?

9  A.   Correct.

10  Q.   And so you spoke to a nurse about your hemorrhoids and they

11  ultimately put you on the list to see a provider?

12  A.   Correct.

13  Q.   And that's how you ended up seeing Mr. Rolston?

14  A.   Correct.

15  Q.   During that visit, I think you testified that Mr. Rolston

16  asked you about the last time you had a Pap smear?

17  A.   Yes.

18  Q.   And you hadn't had one the entire time you had been in

19  prison; right?

20  A.   Correct.

21  Q.   You don't have any medical training do you?

22  A.   No.

23  Q.   You don't know if there are times when even a Pap smear

24  might be necessary for someone who has had a partial

25  hysterectomy?

1  A.   I don't have any medical knowledge of that, no.

2  Q.   All right.  So, when Mr. Rolston indicated that he believed

3  that a vaginal examination would be appropriate for you, you

4  consented to a vaginal examination at that time?

5  A.   Yes.

6  Q.   So a vaginal examination is not just a Pap smear.  There is

7  also an examination of your vagina that goes along with that;

8  right?

9  A.   Yes.

10  Q.   And sometimes they can perform a Pap smear but sometimes

11  they might just do a vaginal exam; right?

12  A.   I guess, yes.

13  Q.   And you had the option to decline a vaginal examination on

14  that date but you did not; is that right?

15  A.   Correct.

16  Q.   And you didn't decline the breast examination?

17  A.   Correct.

18  Q.   And you didn't decline the rectal examination?

19  A.   Correct.

20  Q.   So before the exam started, Mr. Rolston left the room;

21  right, while you undressed?

22  A.   Yes.

23  Q.   And then you draped yourself?

24  A.   Yes.

25  Q.   And Mr. Rolston was wearing gloves during the entire

1  examination?

2  A.   I believe so, yes.

3  Q.   All right.  And Ms. Davis, the chaperone, she was present

4  during that entire examination?

5  A.   Yes.

6  Q.   And she was standing by your side?

7  A.   Yes.

8  Q.   And she was handing Mr. Rolston tools; wasn't she?

9  A.   Yes.

10 Q.   And so she was standing close enough to Mr. Rolston that

11 she could hand him tools?

12 A.   Correct.

13 Q.   And you don't know, well --

14      All right.  So Mr. Rolston, first he performed the breast

15 exam that you talked about; right?

16 A.   Uh-huh.

17 Q.   And the breast exam didn't take long at all; did it?

18 A.   No, ma'am.

19 Q.   And the only aspect of that breast exam that you felt was

20 abnormal was that he pinched your nipple?

21 A.   Yes.

22 Q.   And you believe that he was checking for discharge when he

23 pinched your nipple; right?

24 A.   Yes.  That's what he informed me that he had done.

25 Q.   Do you know if there are providers when they do breast exam

1  they pinch or they pinch or milk or put pressure on the nipple

2  in order to see if there was discharge?

3  A.   I have never had that done before.

4  Q.   You don't know if there are some gynecologists that do

5  that?

6  A.   No.

7  Q.   After examining your breasts, Mr. Rolston actually

8  determined that there might be something abnormal; didn't he?

9  A.   On my breasts?

10  Q.   Yes, ma'am.

11  A.   I don't remember that, no.

12  Q.   If your medical records show that he found fibrocystic

13  tissue with multiple nodules you wouldn't have any reason to

14  disagree?

15  A.   No.

16  Q.   In fact, you know he referred you for a mammogram after

17  that breast exam; right?

18  A.   Correct.

19  Q.   So after the breast examination he performed a vaginal

20  examination; right?

21  A.   Yes.

22  Q.   That exam didn't take very long; did it?

23  A.   No.

24  Q.   And you have indicated that during the vaginal exam you

25  said he touched your clitoris?

1  A.    Yes.

2  Q.    And your testimony is he touched your clitoris at the same

3  time he had his fingers inside and he was checking for your

4  ovaries?

5  A.    Yes.

6  Q.    So, you are familiar that the part of a normal vaginal

7  examination is that the provider inserts a finger, or two, into

8  the vagina to check the woman's ovaries and cervix; right?

9  A.    Correct.

10  Q.    And they also at the same time they palpate on the stomach

11  and they ask you if you are experiencing any pain; right?

12  A.    Correct.

13  Q.    And that's when you say he touched your clitoris?

14  A.    Yes.

15  Q.    The touching of the clitoris that you say happened, it was

16  very quick; right?

17  A.    Yes.

18  Q.    It was less than five seconds?

19  A.    Give or take.  Yes.

20  Q.    And you were not aroused when that happened; were you?

21  A.    No, ma'am.  I was very nerve wrack -- nervous at that time.

22  Q.    But not sexually aroused?

23  A.    No.

24  Q.    Mr. Rolston performed a rectal exam on you; right?

25  A.    Correct.

1  Q.   And the purpose of that rectal exam was to check for

2  hemorrhoids?

3  A.   Correct.

4  Q.   And nothing seemed unusual to you about the rectal exam;

5  did it?

6  A.   No, ma'am.

7  Q.   You don't think it's inappropriate for a healthcare

8  provider to perform a rectal examination as part of a well woman

9  exam; do you?

10 A.   No.

11 Q.   And you have had other doctors perform rectal exams on you;

12 correct?

13 A.   Correct.

14 Q.   And Mr. Rolston did, in fact, find hemorrhoids at that

15 time; didn't he?

16 A.   Yes.

17 Q.   And you saw him on a second visit about a month or two

18 after that; right?

19 A.   Correct.

20 Q.   And, in fact, your hemorrhoids were still bleeding and they

21 had gotten worse?

22 A.   Correct.

23 Q.   And you asked to be seen?

24 A.   Yes.

25 Q.   And you knew that would require an examination?

1   A.   Correct.

2   Q.   And you went back to Mr. Rolston and you consented to

3   Mr. Rolston performing a rectal examination on you?

4   A.   Correct.

5   Q.   And during that second visit, you were not uncomfortable at

6   all; were you?

7   A.   No.

8   Q.   And just like the previous visit, Ms. Davis was there the

9   whole time; wasn't she?

10  A.   Yes.

11  Q.   All right.

12       He actually -- he evaluated and he found hemorrhoids were

13  still bleeding and they were inflamed?

14  A.   Correct.

15  Q.   So he referred you out to an outside doctor; didn't he?

16  A.   Correct.

17  Q.   In fact, he sent you to a gastroenterologist to get some

18  type of surgical consult to see if you needed surgery?

19  A.   He put in the paperwork, but it never did go through him.

20  I had to end up going back to see another doctor there, Dr. Li.

21  Q.   You admit that he tried to send you out?

22  A.   He tried.

23  Q.   And that was the extent of your interaction with

24  Mr. Rolston?

25  A.   Correct.

1  Q.    Now, you are friends with Beth Farber; aren't you?

2  A.    We are -- we -- I don't know if you call it friends.  We

3  know each other, yes.

4  Q.    You know each other.  All right.

5        And you know Ashley Barnett?

6  A.    Yes.

7  Q.    And you know Daphne Rodriguez?

8  A.    Correct.

9  Q.    And again when this happened you didn't consider this to be

10 sexual assault; did you?

11 A.    When it happened, no, ma'am.  But afterwards thinking about

12 it, yes.

13 Q.    In fact, you thought maybe that's just how he does a

14 vaginal exam?

15 A.    Right.

16        MS. COLES:  Okay.  No more questions.

17        THE COURT:  Ms. Moyle?

18                    CROSS-EXAMINATION

19 BY MS. MOYLE:

20 Q.    Good morning, Ms. Batchelor.

21 A.    Good morning.

22 Q.    You know how to report a PREA violation; don't you?

23 A.    There is posters posted up places to do that; yes.

24 Q.    And the posters tell the various ways to go about reporting

25 a PREA violation?

1    A.    Yes.

2    Q.    And you told Ms. Coles that you know Ms. Barnett; right?

3    A.    Yes.

4    Q.    And you initially told Ms. Barnett that you didn't want

5    anything to do with this; right?

6    A.    Right.

7    Q.    Okay.  And the whole touching of the clitoris lasted less

8    than five seconds?

9    A.    Give or take; yes, ma'am.

10   Q.    And you told me that you didn't feel like it was sexual

11   assault?

12   A.    Correct.

13   Q.    Okay.  But now you have your own lawsuit seeking damages

14   against Mr. Rolston?

15   A.    Correct.

16   Q.    Okay.  And you allege that you were sexual assaulted by a

17   coercive sexual act involving sexual penetration?

18   A.    Correct.

19          MS. MOYLE:  Okay.  Nothing further.

20          THE COURT:  Redirect?

21                    REDIRECT EXAMINATION

22   BY MR. JOHNSON:

23   Q.    When you had these acquaintances -- they want to know about

24   your acquaintance with Beth Farber, with Ashley Barnett, with

25   Daphne Rodriguez.  Did you plan with them to bring lawsuits

1  against Paul Rolston?

2  A.   No, sir.

3  Q.   Did you sit down with them and say:  Let's destroy Paul

4  Rolston?

5  A.   No, sir.

6  Q.   You say that you know how to file a PREA complaint.

7  A.   Yes, sir.

8  Q.   There is posters all over the prison; aren't there?

9  A.   Yes, sir.

10 Q.   Now, what happens to you when you file a PREA complaint?

11           MS. MOYLE:  Objection.

12           THE COURT:  Sustained.  It's a foundation.

13 BY MR. JOHNSON:

14 Q.   Do you know what happens when an inmate files a PREA

15 complaint?

16 A.   Yes.

17 Q.   What is it that happens?

18 A.   A lot of times they are placed in the SHU.

19           MS. MOYLE:  Objection.

20           THE COURT:  Sustained.

21 BY MR. JOHNSON:

22 Q.   How do you know what happens when somebody files a PREA

23 complaint?

24 A.   There's been previous people --

25           MS. MOYLE:  Same objection.

1   A.   -- that's been put in the SHU before.

2        MR. JOHNSON:  There is an objection.

3        THE COURT:  Sustained.

4   BY MR. JOHNSON:

5   Q.   Do you know anyone who has filed a PREA complaint?

6        MS. MOYLE:  Objection.

7        THE WITNESS:  Yes.

8        THE COURT:  Sustained.  You can ask if she has filed a

9   PREA complaint.

10  BY MR. JOHNSON:

11  Q.   Have you filed a PREA complaint?

12  A.   No, sir.

13  Q.   Why have you not filed a PREA complaint?

14  A.   For retaliation.

15       MS. MOYLE:  Objection.

16       THE COURT:  Overruled.

17  BY MR. JOHNSON:

18  Q.   There were three voices at once.

19       Why have you not --

20  A.   Scared of retaliation.

21  Q.   Okay.  And how strong a disincentive is that?

22  A.   Very strong.

23  Q.   If you were sent to the SHU what would happen to you?

24       MS. MOYLE:  Objection, Your Honor.

25       THE COURT:  Overruled.

1          THE WITNESS:  You could lose your job.

2          You could lose your programming, if you are in any

3    type of programs if you miss so many days.

4          If you have a lot of property, you are -- they are

5    going to break you down to the minimum amount of property.  You

6    are going to lose all that.

7          You could lose good days if you are given an incident

8    report.

9          There is a number of things that could happen if you

10   go to the SHU.

11         You only get to shower every other day.  You are

12   treated like you have done something wrong when you go to the

13   SHU for anything, even on a medical trip.  When you go on a med

14   trip they treat you like you have done something wrong.

15   BY MR. JOHNSON:

16   Q.   Are you in RDAP or have you been in --

17   A.   I have.  I have completed it.

18   Q.   Okay.  If you are sent to the SHU while you are in RDAP, do

19   you have to drop out of RDAP and start over again?

20   A.   Yes, sir.  If you lose so many days you lose that program.

21   Have to start over.  They slide you back.

22   Q.   Does RDAP help you get out of prison --

23         MS. MOYLE:  Objection.

24         THE WITNESS:  It does.

25         MR. JOHNSON:  Let me finish.  You keep answering

1   before I have finished.

2              THE WITNESS:  I'm sorry.

3              THE COURT:  The objection is overruled.  Then it will

4   help --

5              THE WITNESS:  I'm sorry.

6              THE COURT:  Let him finish the question and then let

7   her finish the answer.

8              THE WITNESS:  Yes, sir.

9   BY MR. JOHNSON:

10  Q.   When we have got all of these voices going at once it

11  creates a lot of confusion and the poor court reporter is trying

12  to capture all of the voices and she can only get one at a time.

13       So, tell me how does RDAP help you get out of prison

14  earlier and what is it?  It's a drug program; isn't it?

15  A.   Yes, sir.  Residential --

16  Q.   Tell the jury how RDAP works?

17  A.   It's a residential drug program and if you complete the

18  nine month program, if you qualify, you can get up to 12 months

19  off your sentence.

20  Q.   So, 12 months off your sentence.  And if you are in the SHU

21  during RDAP then you have to drop out and start all over?

22              MS. MOYLE:  Relevance.

23              THE COURT:  Overruled.

24              THE WITNESS:  They can slide you back.

25  BY MR. JOHNSON:

1    Q.   Okay.  And, do you -- is it common knowledge among the

2    inmates that if you make a PREA complaint --

3           THE COURT:  Sustained.

4    BY MR. JOHNSON:

5    Q.   Do you know that if you make a PREA complaint you go to the

6    SHU?

7    A.   Yes.

8    Q.   Okay.  Is that a disincentive?  Is that something that

9    keeps you from making a complaint?

10   A.   Yes.

11          MR. JOHNSON:  That's all I have.

12          THE COURT:  Thank you, Ms. Batchelor.  You can step

13   down.

14          Please call your next witness.

15          MR. JOHNSON:  Daphne Rodriguez.

16       **DAPHNE RODRIGUEZ, PLAINTIFF WITNESS, DULY SWORN**

17          THE COURTROOM DEPUTY:  For the record, please state

18   your name and spell your last name.

19          THE WITNESS:  Daphne Rodriguez, R-o-d-r-i-g-u-e-z.

20          THE COURT:  Ms. Rodriguez, you may be seated.  And

21   while you are testifying there, and distanced from everybody,

22   you are welcome to take off your mask.

23          THE WITNESS:  Thank you, sir.

24                        DIRECT EXAMINATION

25   BY MR. COOK:

1  Q.  Good morning, Ms. Rodriguez.  I am James Cook.  We have

2  met.

3      Tell me, if you would, where you are currently

4  incarcerated?

5  A.  FCI Tallahassee.

6  Q.  FCI Tallahassee?

7  A.  Yes, sir.

8  Q.  Okay.  Is that the federal women's prison in Tallahassee?

9  A.  Yes, sir.

10  Q.  Can you tell me what your conviction offense was?

11  A.  Aggravated robbery.

12  Q.  Aggravated -- is it a bank robbery?

13  A.  Aggravated robbery, category bank.

14  Q.  Okay.  What's your end of sentence?

15  A.  In two weeks.  September 28th.

16  Q.  Two weeks.  How many -- how long were you sentenced to?

17  A.  10 years.

18  Q.  10 years?  Okay.

19      Now, in the course -- how long have you been at FCI

20  Tallahassee?

21  A.  For almost eight years.  Since July 1st of 2014.

22  Q.  While you have been at FCI Tallahassee, have you had

23  occasion to seek and receive medical care?

24  A.  Yes, sir.

25  Q.  Okay.  Are you familiar with Paul Rolston?

1    A.    Yes, sir.

2    Q.    Have you had an examination with Paul Rolston?

3    A.    Yes, sir.

4    Q.    Can you tell me what kind of examination you had?

5    A.    I had a Pap smear and a breast exam.

6    Q.    Okay.  If you would describe the Pap smear exam that you

7    had?

8    A.    It was just a normal intake Pap smear.  Then after I had

9    the Pap smear he did a breast exam.  And when he did the breast

10   exam he had his hand around my breast checking for lumps and

11   then he lingered it there, like grabbed it, squeezed it a little

12   bit, and then squeezed my nipple.

13   Q.    He squeezed your breast first?

14   A.    Yes.

15   Q.    And then he squeezed your nipple?

16   A.    Yes, sir.

17   Q.    Had you had made any complaints of any kind of discharge

18   from your nipple?

19   A.    No, sir.

20   Q.    And so -- you indicated that -- did he handle both breasts

21   in that way?

22   A.    No, sir.  Just my left one.

23   Q.    Just your left breast?

24   A.    Yes, sir.

25   Q.    And didn't do anything with your right breast?

000495

1  A.   He checked the right one but he didn't do that to the right

2  one.

3  Q.   Okay.  And describe, if you would, the pap exam.

4  A.   It was just a regular Pap smear.  One thing unusual he did

5  he stuck his finger in my rectum which was -- I never had that

6  done before.

7  Q.   Okay.  Was that at the same time?

8  A.   Yes, sir.

9  Q.   Same time that he has fingers inserted in your vagina --

10 A.   No.  No.

11 Q.   Okay.  That was in the same exam?

12 A.   Yes.  That was the last thing he did before he done my

13 breast exam.

14 Q.   Okay.  Was he wearing gloves?

15 A.   Yes, sir.

16 Q.   And did you happen to see whether he changed gloves?

17 A.   Before my --

18 Q.   The rectal exam?

19 A.   No.

20 Q.   Okay.  No, he didn't.  Or, no, you didn't see?

21 A.   No, I didn't see.

22 Q.   Okay.  During the time that this was going on, when you say

23 a lingering exam, how long an exam do you think he gave to your

24 left breast?

25 A.   A couple of seconds.  Maybe four or five seconds.

1  Q.   Did it seem over long?

2  A.   Yes.

3  Q.   Okay.  And was there a nurse or a female chaperone present?

4  A.   Ms. Davis was present.

5  Q.   Okay.  Was Ms. Davis, from where she stood, was she able to

6  see what was happening with his hands?

7  A.   When he was doing the breast exam?

8  Q.   Well, either one.

9  A.   When he was doing the Pap smear I don't think she could,

10  where she was standing, she could see over the paper that he

11  had.

12  Q.   If you would, let me see if you can take a look at this and

13  tell me --

14          THE COURT:  You have a monitor right there beside you.

15          THE WITNESS:  Oh.

16  BY MR. COOK:

17  Q.   Is this the exam room?

18  A.   Yes, sir.

19  Q.   And I believe that you have a device, kind of little

20  pen-like device, or maybe you can use your finger, to show where

21  the chaperone was standing?

22  A.   He was right here and she was right here.

23          MR. COOK:  Can we bring that up for the jury?  I think

24  these are common exhibits.

25          THE COURT:  You need to give me a number and move its

1   admission.

2           MR. COOK:  6.4, Your Honor.

3           THE COURT:  Plaintiff's Exhibit 6.4 is admitted into

4   evidence.

5       (PLAINTIFF EXHIBIT 6.4:  Received in evidence.)

6   BY MR. COOK:

7   Q.   If you could -- I think you can mark with your finger on

8   the photograph -- and show the area of the floor where the

9   chaperone would have been standing.

10  A.   (Indicating.)

11  Q.   And, so you would have been on the table?

12  A.   Yes, sir.

13  Q.   And you would have been covered with a sheet; is that

14  correct?

15  A.   Yes, sir.

16  Q.   Have you had other examinations in that exam room?

17  A.   No, sir.  That was my first one at the institution.

18  Q.   Is that your only one?

19  A.   No.  I have had -- since then I have had bladder issues and

20  have had other ones.

21  Q.   Was it always this exam room?

22  A.   No, sir.

23  Q.   Okay.

24          THE COURT:  Mr. Cook, let me interrupt you for a

25  minute.  The mark came out poorly.  I don't know if you want to

1   try that better, but let me give the jury this explanation.

2           We have had this evidence presentation system for --

3   I'm not sure how long.  Probably 10 or 12 years now.  When we

4   got it, it was state of the art and quite good.  As you know

5   technology changes rapidly.  It's not as good anymore.  And it

6   happens often with witnesses when they go to mark that you get a

7   little drag line like that.  So if you want to mark it and show

8   Ms. Rodriquez.  It comes out a little better if you go at it and

9   don't let your finger drag.

10          THE WITNESS:  Okay.

11  BY MR. COOK:

12  Q.   Was the chaperone standing in that area?

13  A.   Yes, sir.

14  Q.   Is there, under the way -- the room is arranged is there

15  any place else she really could stand?

16  A.   She could have stood closer to the door.

17  Q.   Okay.  Was there anything on the, from the way I am

18  standing, the right hand side of the room that she needed to

19  access?

20  A.   No, sir.

21  Q.   So, if you were on the table and you had a sheet -- did you

22  typically have a paper sheet over you?

23  A.   Yes, sir.

24  Q.   When he was doing a vaginal exam?

25  A.   Yes, sir.

1  Q.   So from that standpoint, would she have been able to see

2  anything that he was doing with his hands?

3  A.   No, sir.

4  Q.   Okay.  As you look back on what happened, given the

5  attention that was paid to your left breast, do you feel that

6  there was any violation of PREA?

7  A.   Yes, sir.

8  Q.   Okay.  And did you make a PREA complaint at that time?

9  A.   At that time, no, sir.

10  Q.   Why did you not make a PREA complaint?

11  A.   The reason we don't -- I personally did not is because I

12  feel like in the institution that I am currently at that it

13  doesn't -- the -- what the inmates say really doesn't matter and

14  they do retaliate.  I have seen people that have --

15       THE COURT:  Don't -- wait -- maybe I shouldn't have

16  stopped you.  You can say why you didn't file a PREA complaint.

17  Tell us just based on what you took into account at the time.

18  Don't tell us what you otherwise think you know.

19       THE WITNESS:  Okay.

20  BY MR. COOK:

21  Q.   Don't say what other people told you but say what you

22  yourself have experienced.

23  A.   Okay.  I have experienced that they don't take anything

24  seriously.

25  Q.   Okay.  Other than that, is there anything that changes in

1   your status at the institution if you make a PREA complaint?

2   A.   They can put you under investigation.  Put you in the SHU.

3   Q.   Tell us what the SHU is.

4   A.   The SHU is a Special Housing Unit.  It's for disciplinary,

5   but it's also when you go to be separated from the compound or

6   certain officials, if you do write -- write them up, possibly,

7   or a PREA, that are under investigation.

8   Q.   Okay.  And I understand that the SHU is confinement, but

9   what kind of different housing status do you have when you go to

10  the SHU?

11  A.   You are in a room.  It's very cold.  You are only allowed

12  to shower three days a week:  Monday, Wednesday and Friday.

13  Depending why you are in there -- I know at all you don't have

14  any email.  You don't have contact with your family sometimes.

15  You can only use the phone once a week, that's if they allow

16  you.

17      You don't get any commissary.  You don't get any radio.

18  You have the bare minimum.

19      If you have accumulated stuff over the years, like clothes,

20  and everything like that, they take everything from you when

21  they pack you out.  So you lose pretty much everything.

22  Q.   Okay.  So, when you are in the SHU, if you are there on

23  investigation say for a PREA complaint, do they give you a

24  special status so that you don't have all the privileges taken

25  away that people who are serving a disciplinary sentence would

1   have?

2           MR. FISHER:  Objection.

3           THE WITNESS:  From what I heard it's the same.

4           THE COURT:  Sustained.

5   BY MR. COOK:

6   Q.   What would happen if you were -- if you had a school

7   program, or a job, would you be able to keep that?

8   A.   You would lose your job.

9           MR. FISHER:  Objection.

10          THE COURT:  Sustained.

11          THE WITNESS:  If you have a grade --

12          THE COURT:  He is going to ask you another question.

13  BY MR. COOK:

14  Q.   I'm sorry.  Have you ever been in the SHU?

15  A.   Yes, sir.

16  Q.   Okay.  When you were placed in the SHU, were you able to

17  continue programs or jobs?

18  A.   No, sir.

19  Q.   Okay.  I think you addressed phone calls and impoundment.

20  Did it affect your end of sentence?

21  A.   Yes, sir.

22  Q.   Okay.  And is that the same even if it is a PREA complaint

23  rather than something else?

24  A.   It could be.

25  Q.   Okay.  So, the reason that you don't make a PREA complaint

1    is because of these conditions that would change for you in the

2    prison; correct?

3              THE COURT:  Sustained.

4              THE WITNESS:  You are asking --

5              THE COURT:  He is going to ask you another question.

6    BY MR. COOK:

7    Q.   Now in the course of the examination, after the Pap smear

8    exam and the breast exam, did he do any other -- did he perform

9    any other kind of examination?

10   A.   On that day?

11   Q.   Right.  Did he check your breathing or anything like that?

12   A.   Not on that visit.  I had put in a sick call maybe a couple

13   months -- I am not sure of the time frame -- after that and I

14   had went to see him.  And we were talking about why I was in

15   there and then he checked my breathing.  And when he checked my

16   breathing I was sitting on the stool that he usually sits on

17   when he is behind his desk.  When he came and checked my

18   breathing he got very close and put the stethoscope on my back

19   and his crotch was literally this close from my face.

20   (Indicating)

21   Q.   When you say "this close" you are talking about a couple of

22   inches?

23   A.   Yes.  Like two or three inches from my face.  So close I

24   had to turn my head.

25   Q.   Did he -- did anything change in his demeanor or actions as

1  this was happening?

2  A.  When he was telling me to breathe in and out I was

3  breathing but his breathing got kind of heavy.

4  Q.  Okay.  While that was going on?

5  A.  Yes, sir.

6  Q.  All right.  And did you say anything to him --

7  A.  No, sir.

8  Q.  -- about that.  Why not?

9  A.  Retaliation.  I believe -- I'm not going to say anything

10  because I am an inmate, and I believe at the end of the day they

11  are not going to believe what an inmate says.

12       MR. COOK:  I have no other questions, Your Honor.

13       THE COURT:  Cross examine?

14                 CROSS-EXAMINATION

15  BY MS. COLES:

16  Q.  All right.  Hi, Ms. Rodriguez.  I just have a few questions

17  for you.

18       Just a little bit about your medical background.  You have

19  had vaginal deliveries for all three of your children; right?

20  A.  Yes, ma'am.

21  Q.  Before placement in federal custody, you had several Pap

22  smears before?

23  A.  Yes, ma'am.

24  Q.  All right.  And you got those examinations in the context

25  of sexually transmitted diseases or urinary tract infections,

1  but you didn't really have consistent regular gynecological care

2  from 2000 to 2013; is that fair?

3  A.   Yes.

4  Q.   So, when you arrived at FCI you were offered a complete

5  physical examination; right?

6  A.   Yes, ma'am.

7  Q.   And you would also be offered annual checkups?

8  A.   I've never been offered annual checkups.

9  Q.   Are you -- do you get chronic care?

10 A.   Yes, ma'am.

11 Q.   And so chronic care -- and so if a patient is on chronic

12 care then you get seen more frequently than that?

13 A.   We are supposed to.

14 Q.   You are supposed to be seen about every six months?

15 A.   We are supposed to, yes.

16 Q.   And if you have a specific-- so you get your initial

17 screening.  If you are on chronic care you get seen -- supposed

18 to be seen every six months, and then if you have a specific

19 complaint you can present a copout?

20 A.   Yes, ma'am.

21 Q.   That's kind of like a sick call request?

22 A.   Yes, ma'am.

23 Q.   That's basically asking a doctor to look at you -- some

24 provider to look at you?

25 A.   Yes, ma'am.

1   Q.   While you were at FCI, you did have an abnormal Pap smear;

2   right?

3   A.   Yes, ma'am.

4   Q.   And you were diagnosed with genital warts?

5   A.   Yes, ma'am.

6   Q.   And you also had surgery while you have been incarcerated

7   for bladder prolapse?

8   A.   Yes, ma'am.

9   Q.   And, Mr. Rolston was your primary care provider for some

10  time; correct?

11  A.   Yes, ma'am.

12  Q.   And you saw Mr. Rolston 10 to 12 times; is that fair?

13  A.   No.  Not that many times.

14  Q.   All right.  Do you remember giving your deposition in this

15  case?

16  A.   Yes, ma'am.

17          MS. COLES:  This is just for the witness.

18  BY MS. COLES:

19  Q.   Do you remember -- do you recall being asked how many times

20  you thought you had seen Mr. Rolston and your testimony was

21  maybe 10 to 12 times?

22  A.   Yeah.  That's round-about.  I don't have any --

23  Q.   You don't recall specifically?

24  A.   I don't recall specifically.

25  Q.   And you defer to the medical records on how many times you

1  saw him?

2  A.   Yes, ma'am.

3  Q.   A lot of your visits with Mr. Rolston related to your

4  bladder prolapse issues; right?

5  A.   Yes, ma'am.

6  Q.   So you were experiencing urinary incontinence?

7  A.   Yes, ma'am.

8  Q.   Basically that means sometimes your bladder would leak?

9  A.   Yes, ma'am.

10  Q.   So, earlier when you testified you are indicating that

11  Mr. Rolston, you allege he was inappropriate towards you during

12  two of all of those visits; is that right?

13  A.   Yes, ma'am.

14  Q.   And there were no visits with Mr. Rolston that you found

15  inappropriate?

16  A.   No, ma'am.

17  Q.   All right.  Initially when you were entered into the BOP

18  system, we talked about how you were offered a physical

19  examination, and at that time you were offered a well woman but

20  you declined it; right?

21  A.   Yes, ma'am.

22  Q.   So you were aware that you had the ability to decline

23  procedures?

24  A.   Yes, ma'am.

25  Q.   And so the first time that you -- the first time that you

1   had your Pap smear, while you were in federal custody, is that

2   one that Mr. Rolston performed?

3   A.   Yes, ma'am.

4   Q.   And do you recall whether or not you actually were there at

5   that visit with him for one of your chronic care appointments?

6   A.   I think -- I'm pretty sure, if I recall, that it was my

7   first time seeing him.  So it was like an introduction.  And he

8   went -- I think it was just a wellness check, and he said that I

9   hadn't had my Pap smear, that I need to have one, so I just went

10  ahead and had it.

11  Q.   Okay.  And the Pap smear that Mr. Rolston performed was

12  normal; right?

13  A.   No; that was the very first one.

14  Q.   The only Pap smear that Mr. Rolston performed on you -

15  A.   Yes.

16  Q.   -- there was nothing abnormal or inappropriate about that?

17  A.   No.  That was the one that he touched my breast.

18  Q.   I'm sorry.  I am not asking a very good question.

19       The vaginal examination, that portion of the exam, there

20  was nothing abnormal about that; right?

21  A.   No, ma'am.

22  Q.   He never touched your clitoris during that Pap smear?

23  A.   No.  He just inserted his finger in my rectum.

24  Q.   Right.  And I will ask you about that in a minute.  I am

25  going to ask you about each part.

000508

1    So, we are talking about the vaginal exam.  He never

2  touched your clitoris at any point during that examination?

3  A.    No, ma'am.

4  Q.    And during the vaginal examination, Ms. Davis was in the

5  room the whole time; right?

6  A.    Yes, ma'am.

7  Q.    And you have been shown a picture, and I will put it back

8  up here if I can get this to work.  All right.  So, you

9  indicated on here that Ms. Davis was near where you would have

10  been on the table the whole time; right?

11  A.    What do you mean near?

12  Q.    She is standing near Mr. Rolston; right?

13  A.    She is standing like towards, like in the middle, like in

14  the middle of my section.

15  Q.    In the middle of the section.  Was she handing Mr. Rolston

16  tools while he was doing the Pap smear?

17  A.    No, ma'am.

18  Q.    So your testimony is Ms. Davis never handed him lubricant,

19  she never handed him the speculum, she never handed him any of

20  the tools?

21  A.    Not that I recall; no.

22  Q.    But she was in the room the whole time?

23  A.    Yes, ma'am.

24  Q.    And she may have handed him tools.  You just don't remember

25  that?

1    A.    Yeah.  I don't remember that.

2    Q.    All right.  Now before Mr. Rolston did the vaginal exam

3    that's when he did your breast?

4    A.    No.  He did it afterwards.

5    Q.    He did it afterwards?  So your testimony is first he did

6    the vaginal exam and then he did the breast exam?

7    A.    Yes.

8    Q.    And Ms. Davis was present for the breast exam, too; right?

9    A.    Yes, ma'am.

10   Q.    Would you agree with me that Mr. Rolston was using his hand

11   to feel your breast tissue?

12   A.    Yes.

13   Q.    And he was talking to you about your breast?

14   A.    Yes.

15   Q.    All right.  And, you have indicated that while he was

16   examining your breast that he lingered for a couple of seconds;

17   right?

18   A.    Yes, ma'am.

19   Q.    And during the exam he pinched your nipple?

20   A.    Yes, ma'am.

21   Q.    And he did all of that while Ms. Davis was in the room?

22   A.    Yes, ma'am.

23   Q.    So, with a breast exam the sheet is pulled off from the

24   breast; right?

25   A.    Yes.

1    Q.    So your breast would be exposed while he is examining it?

2    A.    Yes.

3    Q.    And Ms. Davis is in the room while this is happening?

4    A.    Yes, ma'am.

5    Q.    And she can see him examine your breast?

6    A.    I didn't see -- she was behind him.

7    Q.    So she is standing behind him?

8    A.    Yes, ma'am.

9    Q.    In the center of that room near you?

10    A.    By this time he is -- when he was doing the Pap smear she

11    was in the middle. When he moved up, I wasn't -- he wasn't at

12    the bottom anymore. He was up, so she was standing behind him.

13    Q.    So she is standing directly behind him and can't see what

14    he is doing at all?

15    A.    Yes, ma'am.

16    Q.    The whole time he examined your breast?

17    A.    Yes, ma'am.

18    Q.    Ms. Davis stood directly behind him so that her view was

19    obscured?

20    A.    She was not where I could see her.

21    Q.    Okay. And the only aspect of that breast examination that

22    you found was abnormal was that he lingered for a couple of

23    seconds while he is talking to you about your breast?

24    A.    No when he lingered he wasn't talking to me. As he was

25    telling me -- I was asking him, because I have breast cancer

1  that runs in my family.  He was asking me questions like if I

2  ever felt a lump.  That's all he asked.  And that's all it was.

3  Q.   So you are having a discussion while he was examining your

4  breasts about your family history for breast cancer?

5  A.   Well, I had told him when he was doing it.

6  Q.   And he asked if you felt a lump?

7  A.   Yeah.  He asked if I ever felt lumps.  That's the only

8  thing that was said.

9  Q.   All right.  And after the vaginal examination is that when

10  he did the rectal exam?

11  A.   When he was down there, yeah.  The last thing he did, he

12  said "relax" and he stuck it in and that's it.

13  Q.   Had you never had a rectal exam before?

14  A.   No.

15  Q.   Do you know if there are providers who routinely do a

16  rectal exam as part of a well woman evaluation?

17  A.   No, ma'am.

18  Q.   And that was a matter of seconds he stuck his -- he stuck a

19  finger inside of your rectum and then took it out; right?

20  A.   Yes, ma'am.

21  Q.   And did Ms. Davis have a card and then he wiped the

22  specimen on the card?

23  A.   No.

24  Q.   You didn't see that happen?

25  A.   No.

1  Q.   Tell me about the next visit.

2       The next visit you had with Mr. Rolston that was a

3  complaint visit; right?

4  A.   If I recall, yes.

5  Q.   So you had submitted a sick call request about your

6  bladder?

7  A.   Yes.

8  Q.   And you were asking to be seen by a provider?

9  A.   Yes.

10 Q.   All right.  And Mr. Rolston was at his desk, is that right,

11 when you came in?

12 A.   Yes, ma'am.

13 Q.   And you sat on the stool in his office?

14 A.   Yes, ma'am.

15 Q.   And that would be the stool that -- the similar stool that

16 he would sit on when he was doing the vaginal examination?

17 A.   Yes, ma'am.

18 Q.   All right.  And so you are talking to him and he comes up

19 to evaluate your breathing; right?

20 A.   Yes, ma'am.

21 Q.   All right.  So, he used the stethoscope to listen to your

22 breath sounds; right?

23 A.   Yes.

24 Q.   So he placed the stethoscope on your back and he asked you

25 to breathe in slowly about three times; right?

1  A.   Yes.  First he did in the front, normal.  And then he put

2  it on my back.

3  Q.   So, first he listened -- he listened to you breathe on the

4  front?

5  A.   Yes, ma'am.

6  Q.   And then he put the stethoscope on the back and he listened

7  and he asked you to breathe deeply a couple of times; right?

8  A.   Yes, ma'am.

9  Q.   All right.  And then he sat back down?

10  A.   No.  When he did -- he come and sat back down, but when he

11  was telling me to breathe he was extremely close.  Where I was

12  sitting on the stool is much lower than the normal chair is so

13  my face is right in the same vicinity of his crotch area.

14  Q.   I understand.  And that's while he was asking you to

15  breathe in slowly?

16  A.   Uh-huh.

17  Q.   He is kind of leaning over a little bit because you are

18  sitting on the stool and he is leaning over a little bit and

19  he's asking you to breathe; right?

20  A.   Yes, ma'am.

21  Q.   But after he asked you to breath, and you breathed in and

22  out slowly three times; right?

23  A.   Yes.

24  Q.   And then he sat back down?

25  A.   Yes, ma'am.

1  Q.   And then when he sat back down y'all continued talking

2  about what was going on with your health?

3  A.   Yes, ma'am.

4  Q.   And when he was standing in front of you, you don't have

5  any indication that he had an erection or was aroused or

6  anything like that?

7  A.   Honestly, I couldn't tell you.  I turned my head.  It was

8  so close, I just had my head to the right side looking to the

9  side.

10 Q.   And you saw Mr. Rolston again after that for the visits

11 about your bladder issues?

12 A.   I think, if I am not mistaken, I had a call out to see him

13 but I did not show up.

14 Q.   And your medical records would document when you did or did

15 not see Mr. Rolston; right?

16 A.   Yes, ma'am.

17 Q.   All right.  And you never made any type of report about

18 that; did you?

19 A.   No, ma'am.

20 Q.   You never told Ms. Davis that anything inappropriate

21 occurred?

22 A.   No, ma'am.

23 Q.   You know Ashlee Barnett?

24 A.   Yes, ma'am.

25 Q.   All right.  You two were housed together around this time;

1   weren't you?

2   A.   I don't know if it was around that time.  We were before

3   and then we were again.  But I am not sure what times.

4   Q.   So you have actually been housed with her twice?

5   A.   Yes.

6   Q.   And you know Connie Batchelor, too?

7   A.   Yes.  We were housed together as well.

8   Q.   She is a close friend of yours; isn't she?

9   A.   We are acquaintances.  We talk.  We are on good terms.  But

10  friends, I wouldn't call it that.

11  Q.   You know Beth Farber?

12  A.   I think I have heard of her, but I am not sure if I -- I

13  can't place her face.

14          MS. COLES:  I don't have any more questions.

15          Thank you.

16          THE COURT:  Mr. Fisher?

17                    CROSS-EXAMINATION

18  BY MR. FISHER:

19  Q.   Good morning, Ms. Rodriguez.  I will be very quick.

20      A few moments ago you were testifying about the first visit

21  you had with Mr. Rolston and you had the Pap smear and the

22  breast exam; right?

23  A.   Yes, sir.

24  Q.   And then you were testifying about the second visit you had

25  when you went to see him for the bladder issue and he was

1   standing too close to you; right?

2   A.   Yes, sir.

3   Q.   And it was at this second visit when you didn't get a good

4   feel for him; right?

5   A.   Well, I didn't get a good feel after the first visit, but

6   he was my -- the doctor that I saw, the PA, that I was assigned

7   to.  So he was the only one that I could see that would change

8   medications, or give orders, or anything we need done.

9   Q.   Okay.  Now, I think you have already acknowledged you

10  remember your deposition being taken; correct?

11  A.   Yes.

12  Q.   And that deposition was being taken by Ms. Moyle; right?

13  A.   Uh-huh.

14  Q.   You were going to tell the truth at that deposition.  You

15  were under oath then; right?

16  A.   Yes, sir.

17       MR. FISHER:  This is not admitted, but if you can put

18  it on the screen so she can see it.

19  BY MR. FISHER:

20  Q.   Can you make that out and read the document that's in front

21  of you right now?

22  A.   From 15 down or where?

23  Q.   I'm sorry.  Yes.  From 15 down.

24       Just you are able to read it?

25  A.   Yes.

1    Q.   I tell you what.  You read along with me and I want you to

2    tell me if I make any mistake on it.  Okay.

3         So, she asked you a question.  She says:

4         "Okay.  Okay.  When was your next visit with Dr. Rolston or

5    PA Rolston."

6         And your answer is:  "I actually think I went and saw him

7    because of my bladder situation and I went in there and I talked

8    to him.

9         This is when I didn't get a good feel of him because he was

10   like -- he checked.  Put the stethoscope in his ears.  And I'm

11   sitting on a stool and he stands right in front of me and I'm

12   standing there, I'm lower than him but I'm on a stool, but his

13   crotch is like right in front of my face."

14        So you have now been -- at this point, you have now been

15   through an exam with Mr. Rolston where he has given you a Pap

16   smear, and he has done a breast exam, but when you don't get a

17   good feel for him is just when he is standing a little too close

18   to you?  Is that what you are saying?

19   A.   No.

20             MR. FISHER:  Okay.  Thank you.

21             THE COURT:  Redirect?

22                        REDIRECT EXAMINATION

23   BY MR. COOK:

24   Q.   Ms. Rodriguez, you talked about retaliation.  In your

25   position you need a lot of medical care; don't you?

1  A.   Yes, sir.

2  Q.   And you have to rely on the providers at FCI Tallahassee

3  gives you; is that correct?

4  A.   Yes, sir.

5  Q.   Okay.  In the course of your receiving that kind of medical

6  care, tell the jury whether you have ever had a negative

7  experience as a result of refusing or arguing about medical

8  care?

9  A.   I'm not understanding your question.

10  Q.   Okay.  I can ask it better.

11      What has been your experience, as a prisoner at FCI

12  Tallahassee, whenever you got in an argument or a disagreement

13  with medical providers?

14  A.   You just don't get anything done.  They don't help you at

15  all.  You can put in a call out and they say they can put you on

16  there.  I, myself, am currently on chronic care and I have not

17  been seen for a very, very long time.  And like the lady asked,

18  we are supposed to be seen every six months.

19  Q.   Have you had specific episodes of that kind of problem that

20  you have --

21          MR. FISHER:  Objection, Your Honor.

22          THE COURT:  Sustained.

23  BY MR. COOK:

24  Q.   Okay.  Have you had any problem specifically with Paul

25  Rolston with regard to what you felt was retaliation for

1    disagreements on medical care?

2    A.    No, sir.

3    Q.    Okay.  I think you said that in all of the time that you

4    have had medical examinations you have never had a doctor or a

5    medical provider penetrate your rectum with his finger?

6    A.    Yes, sir.  That's correct.

7    Q.    You know what hemoccult cards are; don't you?

8    A.    No.

9    Q.    Have you ever been asked to submit a stool sample?

10   A.    No, sir.

11   Q.    Okay.  Now you were asked, or you were queried about your

12   statement that you initially did not get a good feel for

13   Mr. Rolston on the visit where he examined your breast in a way

14   that you thought was strange and improper.  And then later, in

15   your deposition you say that the second time you didn't get a

16   good feel for Mr. Rolston's examination techniques.  Was it the

17   first time -- was the second time more pronounced of the

18   negative feeling?

19           MR. FISHER:  Objection.

20           THE COURT:  Sustained.

21           MR. COOK:  Okay.

22   BY MR. COOK:

23   Q.    In terms of the feeling of impropriety or PREA violation

24   would you say -- which time would you say was the most severe?

25   A.    For me I would have to say the second time.

1   Q.   Okay.  Did the experience that you had in the previous

2   visit give you any kind of different feeling about what happened

3   the second time?

4           MR. FISHER:  Objection.

5           THE WITNESS:  Yes, sir.

6   BY MR. COOK:

7   Q.   Okay.  How so?

8           THE COURT:  Overruled.

9   BY MR. COOK:

10   Q.   Go ahead?

11   A.   When it happened the first time it was my first Pap smear

12   there.  And when he done the -- when he inserted his finger in

13   the rectum I haven't been to prison before so I was like well

14   maybe that's just something they do here.  I was in my head a

15   lot thinking okay maybe I am over-reacting.  But then when I

16   went and saw him the second time, and that actually happened, I

17   was like no.  No.  I knew it wasn't just in my head because the

18   way he was too close.

19   Q.   Did that clinch it for you?

20   A.   I'm sorry?

21   Q.   Did that clinch it for you?

22   A.   Yeah.

23           MR. COOK:  Okay.  I have no other questions, Your

24   Honor.

25           THE COURT:  Thank you.

1          Thank you, Ms. Rodriguez.  You may step down.

2          Members of the jury, that makes this a convenient time

3    to take the lunch break.

4          Recall my instructions:  Don't talk with anybody about

5    the case.  Don't let anyone talk about it in your presence.

6          We take an hour and three minutes.  We will start at

7    1 o'clock on that clock.  That clock is pretty close to right.

8    We will start at 1 o'clock.

9          Have a pleasant lunch break.  We will see you back in

10   just over an hour.

11         Jury out, please.

12      (Jury out at 11:58.)

13         THE COURT:  You may be seated.

14         Couple of notes:  I made a comment earlier, and told

15   you it wasn't necessarily related to the case, but I suggested

16   that there was a 10-year minimum mandatory and explained how

17   much you serve.

18         It occurs to me I may have misled those of you who

19   have dealt with criminal practice more in state court.  Minimum

20   mandatory means something different in federal court than in

21   state court.

22         In state court, as I understand it, and I may not, a

23   minimum mandatory means how long you have to serve before you

24   can be released.  In federal court minimum mandatory just means

25   the shortest sentence the judge can give you so that even though

1  there is a 10-year minimum mandatory sentence the person can

2  still be released in eight and a half years with gain time, or

3  if there are another grounds for release.

4        Now, the one that made a difference in the case, that

5  was important, the reason I overruled the objections to the

6  questions about what happens if you make a PREA complaint, is

7  this:  The defense, I think it was the government, said:  You

8  know how to make a PREA complaint.  And she said:  Yes.  There

9  are signs everywhere.

10        The point of the question, of course, is to suggest

11  that if she had really been assaulted she knew how to make a

12  PREA complaint and could have.  She didn't.

13        Well, the plaintiff then is entitled to prove why she

14  didn't make a complaint.  And if the reason she didn't make a

15  complaint was that she feared retaliation she could say that,

16  and what she thought would happen, she could say that.

17        Then we got to the next witness and I thought at one

18  point the witness was beyond the question, and was about to go

19  talking about things that didn't affect why she made a decision

20  but what she had heard from other people and so I interrupted

21  her.  May not have been my best interruption.  She may have been

22  just talking about why she didn't report it, but I thought she

23  was about to get into other things that there had been

24  objections to.  Since there had been an objection to my allowing

25  this testimony at all I jumped in and stopped it and I explained

1   it.

2        And then, Mr. Cook, you took it upon yourself to give

3   the witness a different explanation than I had.  And that may

4   have affected where we went from there.

5        What was relevant it seemed to me was why the witness

6   did what the witness did.  So, you told her:  Don't tell me what

7   somebody else said, and then proceeded to ask her questions not

8   limited to why she did what she did.

9        Well, if the reason she did what she did was what she

10   had been told by others then what she had been told by others

11   would have been okay.  That's a non-hearsay purpose for that

12   information and it goes to why she didn't report, which was

13   appropriate.

14        But information that didn't affect the decision

15   whether to report, or not, was not admissible and likely hearsay

16   and inadmissible.

17        We got into that some later, I think, with

18   Ms. Rodriguez.  And it's the same thing; what goes to her motive

19   for what she did, if what she did matters to the case, then --

20   and why she did it matters -- then she can testify to why she

21   did it.

22        That doesn't make it open season on all of the hearsay

23   she has gotten about what else goes on in the facility.

24        What, if anything, does either side have to raise with

25   me before we break?

1          MR. COOK:  Nothing here, Your Honor.

2          THE COURT:  Mr. Carter, what did you decide about

3   whether you want a mistrial or did you not talk about it yet?

4          MR. CARTER:  Can we talk about it at lunch?

5          THE COURT:  Fair enough.

6          We will start back at 1 o'clock.  I will be in about

7   two minutes to one.  If you can be here, that will give us time

8   for you to tell me what you want in terms of a mistrial.

9          We will be in recess.

10      (Recess taken 12:04.)

11      (Resumed at 1:01 PM.)

12          THE COURT:  Please be seated.

13          Jury in, please, but as they come --

14          MR. CARTER:  Your Honor, we did have a couple of

15   issues we wanted to bring up if we could.

16          THE COURT:  All right.  Hold them up just a minute.

17          MR. CARTER:  Your Honor, obviously -- I guess the way

18   I said this I have done it before state court, but asking for a

19   conditional mistrial, but I understand, based on your

20   instructions to me that I be careful for what I ask for.

21          THE COURT:  Right.

22          MR. CARTER:  I am not really -- I don't guess I'm in a

23   position to ask for that.  So we are going to go with the trial.

24          THE COURT:  All right.  Got it.

25          MR. CARTER:  The other thing I had, Your Honor, is

1  given the way that some -- well, testimony has come out, we

2  would move now that no more 415 witnesses be allowed to --

3  　　　　THE COURT:  No.

4  　　　　MR. CARTER:  All right.

5  　　　　THE COURT:  That's the wrong sanction.

6  　　　　MR. CARTER:  Okay.  You know, we would then ask maybe

7  for a curative instruction again.  And then obviously we will

8  get to the jury instructions.

9  　　　　THE COURT:  There has been a suggestion there is

10 evidence you don't know about.  But, no -- the rule is --

11 　　　　MR. CARTER:  I care more about it being -- this

12 particular trial is Ms. Alexander's case.

13 　　　　THE COURT:  I will tell them again, if you want to say

14 the same thing I said before, I will say that again.

15 　　　　MR. CARTER:  Just so Your Honor will see where we are

16 coming from on this, Ms. Alexander was in the SHU for a totally

17 different reason, for a disciplinary incident, and had nothing

18 to do with the PREA report.  She reported it.  It got

19 investigated -- or it got reported.

20 　　　　THE COURT:  I got it.  And, look, the suggestion by

21 the plaintiff that you lose gain time when you are in the SHU

22 for an administrative reason is just not true.  You might lose

23 your RDAP credit.

24 　　　　MR. CARTER:  But even if you do it has nothing to do

25 with --

1          THE COURT:  No.  But if somebody doesn't report to

2     PREA because they don't want to lose their chance for early

3     release under RDAP then may explain why they wouldn't make the

4     PREA.  But the suggestion that somebody is going to lose gain

5     time that's just not so.

6          MR. COOK:  Yes, Your Honor.  What we believe, what I

7     believe --

8          THE COURT:  I don't want to rehash it.  You need to

9     limit that kind of stuff to the motivation for not reporting to

10    PREA.  And until the witness says that's why the witness did it,

11    then stay away from the rest of it.

12         MR. CARTER:  Yeah.  Like our motion in limine brought

13    up before, the 403 applies and that's why I made the motion I

14    made.

15         THE COURT:  Got it.

16         Jury in, please.

17         MR. CARTER:  She has one more issue.

18         MS. COLES:  So, we believe that the plaintiff's

19    expert, Dr. Tucker, is probably going to be testifying this

20    afternoon.

21         Earlier they represented that Dr. Tucker, their

22    expert, might talk about how it makes you feel, one of the

23    reasons patients should not be sexually abused is how it makes

24    them feel -- the guilt and the shame and all that -- that is

25    outside of their expert report and we would ask that they be

1  limited to what they stipulated the expert testimony would be
2  and the scope of the report.
3          MR. COOK:  No objection.  And, Dr. Tucker is in the
4  courtroom.
5          THE COURT:  She is welcome to be in the courtroom.
6  Experts can be in while others testify.
7          Jury in, please.
8          Dr. Tucker probably understands; you are here to
9  testify about how to conduct this exam, not what happens to the
10 woman or how.
11         DR. TUCKER:  Yes, Your Honor.
12         THE COURT:  You have a witness ready for the stand?
13         MR. COOK:  We have a witness.  We can call for Ms.
14 Blevins.
15         MR. CARTER:  In front of the jury?
16         MS. MOYLE:  In front of the jury?
17         MR. COOK:  Yeah.
18         THE COURT:  I heard back from the courtroom deputy,
19 when I raised the question about whether to put her on during
20 lunch that they decided to put her on in front of the jury.
21         MR. CARTER:  We didn't know.
22         MS. MOYLE:  Thank you, Your Honor.
23      (Jury in at 1:05.)
24         THE COURT:  All right.  You may be seated.
25         Mr. Cook, announce your next witness, please.

1    MR. COOK:  Yes, Your Honor.  We are calling Shondolyn

2 Blevins to the stand.

3         **SHONDOLYN BLEVINS, PLAINTIFF WITNESS, DULY SWORN**

4         THE WITNESS:  Shondolyn Rochele Blevins,

5 B-l-e-v-i-n-s.

6                    DIRECT EXAMINATION

7 BY MR. COOK:

8 Q.    Good morning, Ms. Blevins.

9 A.    Good morning.

10 Q.    Or good afternoon.  I'm sorry.  I lost my place in time.

11        I am James Cook.  I believe that we have met.

12        Would you tell the jury where you are incarcerated and on

13 what offenses?

14 A.    My prison, where I am originally designated to, I am being

15 housed in the Seattle, Washington.  I am here for this matter

16 and I am being held at Tallahassee.  FCI Tallahassee.  And I am

17 incarcerated for possession of drugs with intent to distribute,

18 possession of a firearm by a convicted felon, and possession of

19 a firearm in furtherance of a drug trafficking crime.

20 Q.    What is the length of your sentence?

21 A.    I don't -- I have never -- I have never added it up, but I

22 have seven years and eight months on my drug crime.  I have

23 seven years and eight months on my possession of a firearm by a

24 convicted felon.  And I have five years, which runs consecutive

25 to the seven years, so I guess that's 12 years and eight months.

Q.   When is your end of sentence?

A.   Presently my halfway house date -- the earliest I could go home is April the 11th, 2024.

Q.   Thank you, Ms. Blevins.

     Now, I understand that at one time prior to today, before you went to Washington, you were incarcerated at FCI Tallahassee; is that correct?

A.   Yes, sir.

Q.   Can you tell me, as nearly as you can recall, what dates you were at FCI Tallahassee?

A.   I arrived there in March of 2016.  And I was transferred I think in early February 2017.

Q.   Okay.

A.   No.  It might have been March of 2017.  When you leave and when you arrive at another prison you could be held somewhere forever, so I don't remember exactly the date I left.  But I know that I left there some time in early February or March, and I arrived at another prison in March of 2017.

Q.   Okay.  And while you were at FCI Tallahassee did you have occasion to need medical care?

A.   Yes, sir.

Q.   Okay.  If you would, what kind of medical conditions have you had?

A.   I have a -- in 2013 they found a cyst in my left breast.  They did a biopsy on it and it wasn't cancerous but they put a

1  staple in it.  So ever since 2013 I am scheduled for a yearly

2  mammogram.  They monitor that cyst in that area.

3      In 2015, I had -- they found a cyst on my ovaries, on my

4  uterus, and they scheduled me for an OBGYN.  They found the cyst

5  while I was housed at FCI Aliceville, which is in the same

6  region as FCI Tallahassee.

7      So, when I was transferred from FCI Aliceville I was

8  transferred to FCI Tallahassee, but all of my medical stuff --

9  it's all -- it just popped right up on the computer.  They had

10 access to it immediately.

11     So, when I -- the first day I was at FCI Tallahassee the

12 lady, the PA who logged me in, she scheduled me right then for

13 all of -- to update all of my medical.  She scheduled me for my

14 mammogram that I would need and she scheduled me for OBGYN.

15 Q.  Now, had you had those kinds of tests and examinations in

16 the past while you have been incarcerated?

17 A.  Yes, sir.  They from the very jump, when I first arrived at

18 FCI -- the medical center in Fort Worth, Texas, that's where

19 they found my -- the cyst in my breast at.  So they -- every

20 inmate that come into the BOP they do a full panel of tests on

21 you.  Every inmate.

22 Q.  Okay.  And so would you say that you are very needful of

23 regular medical care?

24 A.  I am still scheduled for a yearly mammogram, but I have

25 since had a hysterectomy so -- I had a hysterectomy in 2019, so

1    it's just my -- the regular stuff.  I mean, I don't know.  I'm

2    not a -- I'm not a very sick person that.  Like I don't be sick

3    all the time.

4    Q.    Okay.

5    A.    I consider myself healthy.

6    Q.    Okay.  And did you have -- do you have fibroid tumors in

7    your abdomen?

8    A.    That's why they -- that's why they gave me a hysterectomy.

9    Q.    Okay.  Was it a full hysterectomy?

10   A.    No.  I still have my ovaries.

11   Q.    You still have your ovaries?

12   A.    Yes, sir.

13   Q.    Okay.  So, if you came into FCI Tallahassee in March of

14   2016, do you remember when you had your first contact with Paul

15   Rolston?

16   A.    The way I remember it, I first saw him in -- in June.  In

17   June, that's my first time from -- if I am remembering right.

18   It's been so many years.  But I saw him in June.

19   Q.    You remember the date in June?

20   A.    Yeah.  It was June the 30th.

21   Q.    June 30th?

22   A.    Yes, sir.

23   Q.    Okay.  Thank you.

24         Now, when you went to see Paul Rolston what was -- what was

25   the purpose of the visit supposed to be?

A.   I believed I was going to see him for -- I had been

complaining about my face -- I thought I had eczema so that's

what I was -- I was under the impression that's what I was going

for when I saw myself on the call-out.  I had been worrying

Lieutenant White, running him down, asking him to please see me,

so when my name popped up on the call-out that's what I thought

I was going for.

Q.   So Lieutenant White is who?  What does he do?

A.   He was a -- only thing I know is he was over medical.  I

hadn't been at Tallahassee but a few months, but that's -- when

you go to mainline, which is when you see all the department

heads, that's who would be there for medical so that's who I

start the bugging.  Please.  See me.  Can you see me.  See all

this.  My face was burned.  And around my nose and mouth and

stuff, so...

Q.   Did you make a verbal complaint?

A.   I was going on my -- yeah.  I was making a request to

Mr. White every time I saw him walking through the compound.

But I went on my computer and was asking him.  But some time

when you trying to click on one department head, if you are not

paying attention it will click on another department head.  And

I think I sent my complaint to the warden's office but I didn't

mean to.  I was trying to send it to health services.

Q.   Okay.  And what you call mainline, is that a meeting at the

chow hall?

1   A.   Yes.

2   Q.   For department heads to interact with inmates?

3   A.   Yes, sir.

4   Q.   And so at least at some points you made the complaint to

5   Mr. White?

6   A.   Yes.

7   Q.   Okay.

8   A.   Yes.  That's when you are trying to bug a staff member.

9   That's where you catch them at if they dodging you.

10   Q.   And your complaint at that point was to a break-out on your

11   face?

12   A.   Yes.

13   Q.   So, when you went to see Mr. Rolston did he prescribe you

14   anything for your face?

15   A.   No.  No.

16   Q.   Did you ask him to look at your face and do something?

17   A.   At the end of the -- at the end of the visit I was like:

18   Say, what about my face.

19   Q.   And so when you first got there did he not acknowledge that

20   you had made a complaint about what you thought was eczema?

21   A.   It's been so long that, un -- no.  No.  Not the way I

22   remember it.  No.  He -- I went in there thinking that I would

23   be seen for my face and it turned out to be something totally

24   different, so...

25   Q.   And are you saying that when it was all over you -- that is

1   to say toward the end -- that you asked him what he could do to

2   help you with your facial -- your skin condition?

3   A.   Yes.

4   Q.   And what was his response to that?

5   A.   He -- he advised me to wash my face with some Head and

6   Shoulders shampoo.

7   Q.   Okay.  He didn't prescribe any medication?

8   A.   No.

9   Q.   Did anybody, when you checked in, did anybody ask you what

10   you were there for, or what your complaint was?

11   A.   No.  It was -- it was -- it's a -- when you go to -- when

12   you are on a call-out, nobody needs to know.  I can't remember

13   if the lady took my temperature and stuff.  I don't remember if

14   someone was up in there.  But you go in, you sit down and you

15   wait on your name to be called.  And I already know that I have

16   a call-out with who.  It's posted all over.  My bosses have it.

17   "She needs to be here at this time."  So, I don't know if

18   anybody take your blood, temperature, and pulse and all of that.

19   I can't remember.  Maybe someone did.  I don't know.

20   Q.   But, did you have an opportunity to ask anybody about your

21   skin condition prior to the examination?

22   A.   No.

23   Q.   And, so who is the first person you saw when you went into

24   the office?

25   A.   In his office?  Him.

1   Q.   And he was there when you went in?

2   A.   Yeah.  I think he was there already.

3   Q.   Did he have a chaperone present?

4   A.   No.  It was just me and him.

5   Q.   Okay.  So did he ask you what your complaint was?

6   A.   No.  He told me.

7   Q.   What did he tell you?

8   A.   That I was there for my yearly breast exam.

9   Q.   And did he ask you to do anything in preparation of your

10  breast exam?

11  A.   Yeah.  He -- he had me to get up on the -- the table and

12  told me to put my hand behind my head.

13  Q.   Your right hand behind your head?

14  A.   Yeah.  Because he was on the right side of me.

15  Q.   Okay.  And what did he do when he asked you to put your

16  right hand behind your head?

17  A.   He started his examination on my breast.

18  Q.   Okay.  Did he ask you to take off your shirt?

19  A.   I already had my shirt off, I think.  I don't remember

20  because I came from work.  So, I might not -- oh, you mean -- I

21  am thinking of -- we have two shirts we wear.

22  Q.   Okay.

23  A.   Like this here.

24       So, I don't know if I had my khaki shirt on, but I

25  definitely had a T-shirt on.

1   Q.   But he told you that you were there for a breast exam?

2   A.   My yearly breast exam.

3   Q.   Okay.  And he said breast exams were yearly, or did he say

4   they were available yearly?

5   A.   He said when I -- when he told me to get up on the table, I

6   think he told me this is my yearly -- my yearly breast exam.

7   Q.   Okay.

8   A.   I -- um.

9   Q.   At that point, did you tell him that you had a different

10   complaint?

11   A.   I didn't -- no, I didn't question him.  He a medical staff

12   member.  I thought it was -- I thought it was weird, but I

13   didn't question him.  I didn't give him no problems.

14   Q.   You didn't give him any problems?

15   A.   No.

16   Q.   Why is that?

17   A.   Because I didn't want to go to the SHU.

18   Q.   Okay.  And why would you go to the SHU?

19   A.   Ain't nothing for an employee to lie on you.  They do it

20   all the time.  Every day.  It's just like -- that's what they

21   do.  If they have any reason.  They feel like it, they might

22   have argument with they husband, they come out to work and take

23   it out on us.  And we inmates.  We deserve anything they do to

24   us.  That's the way they think.

25   Q.   So you didn't argue with him?

1  A.    No.

2  Q.    Were you concerned that there wasn't a chaperone in the

3  room?

4  A.    I thought it was a little weird but...

5  Q.    Did you feel uncomfortable?  I'm sorry.  Strike that.

6        Did you -- were you asked to disrobe?  To take off your

7  other shirt?

8  A.    I don't think he asked me to take off my other shirt.  I

9  wasn't taking it off no way if he would have asked me.

10 Q.    Okay.  You wouldn't have taken it off if he asked you?

11 A.    No.  I just would have had to go to the SHU then.

12 Q.    Okay.  And why -- why would that be?

13 A.    Because I just wouldn't have -- I -- I wouldn't have took

14 my shirt off.  Wasn't no woman in there.  And they don't do

15 that.  They don't -- I just would have knew then, like, there is

16 something very wrong, like u-un (Indicating a negative

17 response).  Like the other stuff I wasn't sure.  I didn't know.

18 I didn't know if -- I didn't know if he had the authority to do

19 what he was doing.  I didn't know.  I didn't know.  And I -- I

20 just -- when you don't know you just don't, you don't know.  I

21 don't know.  He a staff member.  They do so much that you don't

22 know.  You don't know when they can do stuff and when they not.

23 They do what they want to do.

24 Q.    Now, normally when you go to the exam to get a breast exam

25 does the provider leave the room while you disrobe, if that's

1   what you are going to do?

2   A.   Mr. Cook, I don't get -- even to this day, he is the only

3   one have given me a yearly breast exam.  I get a yearly

4   mammogram with a machine, and it's always with a female because

5   I do have to take my clothes off then for them to -- even when I

6   go outside.  Some institutions they have it on-site.  Some

7   institutions I go to places that the institution partner with,

8   or use.  And they always -- it always be a female.  That is the

9   only time that that has ever happened to me with him.

10  Q.   Okay.  So you never were required to have an annual breast

11  exam?

12  A.   Excuse me.  I have to -- I have to -- I have to correct

13  that.  But -- once I made a complaint.  I thought I had a lump.

14  So if something like that, I have to -- and so then that is when

15  a female.  She is still -- was a female.  She did exam me to see

16  if I had a lump, which it was a false call because it wasn't a

17  lump.  It just, but, that's the only time.  Now, I'm sorry.

18  Q.   Sure.  Did he ask you to take your shirt off?

19  A.   I don't -- I don't remember.

20  Q.   Okay.

21  A.   I -- I -- I was so, so nervous.  I was so, so nervous.  I

22  was -- I was afraid.

23  Q.   How did he conduct the breast exam?

24  A.   I'm closing my eyes because this is how it was on -- I

25  just -- I just remember him -- he started on this side.  So that

1  made me nervous because my thingamajig is on this side.  So, he

2  just -- he just was doing all around here, and touching, and

3  feeling, and stuff.  So I...

4  Q.   Okay.  And did he do the same thing with the other breast?

5  A.   Yes.  He did.  He moved over there.

6  Q.   And all this time there was no female in the office?

7  A.   No.  No.

8  Q.   At any time, during this visit on June 30th?

9  A.   It was -- okay.  So, then he -- he went down to examine me,

10  and where I got my -- where I had my fibroids and stuff, he was

11  touching, and touching them, because they was really big, so.

12  And so then he -- he hollers down the hall to another staff

13  member.  I can't remember that man's name.  And he asked him did

14  he want to come feel these fibroids.  "They big.  Huge",

15  something he said.  And the man said, no.  And...

16  Q.   You say he hollered?

17  A.   Yes.

18  Q.   So other people could hear?  Did you consider that

19  inappropriate?

20  A.   That made me mad.

21  Q.   What did you do?

22  A.   Nothing that I could do.

23  Q.   Okay.

24  A.   But...

25  Q.   So --

1   A.   But the man said no.  So -- so I -- he had me sit up and he

2   was -- he was standing in between my legs.  I was so afraid.  I

3   was so scared.  I just knew I was going to the SHU.  I don't

4   even know why he was that close up on me.

5   Q.   Was he touching any part of you?

6   A.   I can't remember.  I can't remember.  I just know he was

7   standing in between my legs.  And I felt like don't move because

8   if you move any kind of way -- I just felt like if I did

9   anything that he was going to send me to the SHU.  That's all I

10   kept saying.  Just -- just make your way out of here.  Just get

11   out of here.

12       And this lady, I don't know where she came from, she looked

13   like a doctor to me.  She came and stood in the doorway and she

14   had a mad look on her face.

15   Q.   Okay.

16   A.   I don't know who she was.  I don't know who she is.  But I

17   think she was tapping her foot like -- like she was -- I don't

18   know.  I think she was mad because -- I thought she was mad

19   because how he was hollering my medical business all down the

20   hallway.

21   Q.   So did she appear to be mad at him or at you?

22   A.   No.  She couldn't have been mad at me.

23       THE COURT:  Sustained.

24   BY MR. COOK:

25   Q.   Okay.  How did the conversation finally come around to the

1  issue of the complaint that you had?

2  A.   Okay.  I sat in a chair.  I sat in a chair and -- I never

3  been this nervous before in my life.

4      I sat in the chair and then that's when I asked him about

5  my face.  I asked him about my face because the lady was

6  standing in the door.

7  Q.   Did you think that you would -- that it would help you that

8  she was standing in the door?

9  A.   I don't know where she came from.  I was just glad she

10  came.

11  Q.   What did he say in response to your requests for help with

12  your skin condition?

13  A.   He -- he -- he -- he advised me to wash my face with

14  some -- some Head and Shoulders shampoo.

15  Q.   Did he make a diagnosis?  Did he say what it was -- what he

16  thought it was?

17  A.   On my face?  I can't remember.  I can't remember what he --

18  I just remember him telling me to wash my face with some Head

19  and Shoulders shampoo.

20  Q.   Okay.  So after that visit on June 30th, did you ever make

21  a complaint about what you felt was inappropriate in that visit?

22  A.   Yeah.  I was trying to -- I was trying to keep him from --

23  I was trying to keep -- I wanted them to take him off of me so

24  he could never see me again.  That's what I was trying to do.

25  Q.   Okay.  Why did you not want him to see you again?

1   A.   I just felt like -- I just felt like -- I just felt like --

2   I just felt like he one of them people.

3   Q.   He -- I'm sorry?

4   A.   I just felt like he was one of them people.

5   Q.   One of them people?

6   A.   Yeah.

7   Q.   Is that what you said?

8   A.   Yeah.

9   Q.   So, how long was it afterwards that you made a complaint?

10   A.   It was in July.  It was -- it wasn't no -- it wasn't no --

11   I thought about it and I thought about it and I thought about it

12   but I -- I was trying to word my complaint where they wouldn't

13   put me in the SHU.

14   Q.   Okay.  Now, how did you word your complaint in a way that

15   they thought -- that you thought they wouldn't put you in the

16   SHU?

17   A.   I just asked -- I just -- I -- I told them that he examined

18   me without a chaperone and I told them that I had a lot of

19   female issues that I don't think he should be able to examine

20   me.  I don't -- I think he examined me without a female present

21   but I was trying to keep him from being my PA.  I -- I didn't do

22   a good job because they still let him be my PA.

23   Q.   How many more times did you see him?

24   A.   I don't know, Mr. -- I don't know, Mr. Cook.  But only

25   thing I know is they -- they denied my request -- the

1  administration, the prison.

2  Q.   Do you remember who this was that denied it?

3  A.   The associate warden --

4        THE COURT:  The objection is sustained.

5        Maybe this is a time for a reminder to the jury we are

6  here on Ms. Alexander's case against Mr. Rolston.  You may have

7  a view one way or another about whether a man ought to be

8  conducting exams of women, but that's not the issue in this

9  case.

10        You are not here to decide who the Bureau of Prisons

11  ought to assign to do exams, or what they ought to do after a

12  complaint by someone like Ms. Blevins.

13        The reason you are hearing from Ms. Blevins is so that

14  you can evaluate whether anything that was done during the

15  examination shows intent by Mr. Rolston that may tell you

16  something about his intent when he was examining Ms. Alexander.

17        The rest of this, whether she complained afterwards

18  and what they did and whether there ought to be men or women,

19  whether she ought to be seen by the same person, that doesn't

20  have anything to do with this case so you ought not concern

21  yourself with that.

22        Mr. Cook, you may proceed.

23        MR. COOK:  Thank you, Your Honor.

24        I have no other questions.

25        THE COURT:  Cross examination?

1    <u>CROSS-EXAMINATION</u>

2  BY MS. COLES:

3  Q.   Hi, Ms. Blevins.

4      I just have a few questions for you.  I think you have

5  testified that you don't ever recall Mr. Rolston asking you to

6  take your shirt off; is that right?

7  A.   I testified that I don't remember.  I don't -- it's been --

8  I don't remember everything.  That's something that you try to

9  put out of your mind, ma'am.  Now, when -- are you the one I

10 spoke with that popped up on me in 2020?

11       THE COURT:  Ms. Blevins, it will help if you just

12 answer Ms. Coles' questions.  So, when she asks you questions

13 you just respond to the questions she asks you.  That will help

14 all of us.

15       Thank you.

16 BY MS. COLES:

17 Q.   Whenever you saw Mr. Rolston that day, didn't he suggest

18 that you should get Eucerin for your face?  A lotion called

19 Eucerin?

20 A.   No.

21 Q.   He didn't recommend that you should buy that out of the

22 commissary?

23 A.   They -- I think the medical staff have to -- I don't --

24 Q.   Didn't get upset with him because he wouldn't prescribe you

25 medication?  He wanted you to get something out of the

1  commissary that was going to cost you money out of your own

2  money?

3  A.   I didn't get upset with him.  What he told me to do I did

4  it.

5  Q.   All right.  Mr. Rolston never sexual assaulted you; did he?

6  A.   So, what I always thought to be sexual assault was

7  different from what he did.  But I have learned since that under

8  the PREA laws what he did is sexual assault.

9  Q.   All right.  And, in -- after this occurred you never

10 thought he did anything that would be considered sexual assault;

11 right?

12 A.   I didn't know it was.  I didn't know that what he did -- I

13 thought sexual assault you had to be penetrated with...

14 Q.   And you have been in the Bureau of Prisons for while now;

15 right?

16 A.   Yes, ma'am.

17 Q.   They train you on PREA from the moment you get in; right?

18 A.   No.  They show you a video with a woman sitting on your bed

19 giving you some tips and the video say "don't take the tips."

20 They don't show you -- wait.  Let me answer.  It don't show you

21 nothing about what a staff member can and can't do.  None of

22 that is on there.  Everything in the PREA video concerns

23 inmates, ma'am.

24 Q.   All right.  So, based on your understanding, in June of

25 2016, of what might be considered sexually inappropriate or

1  sexual assault you didn't think that Mr. Rolston at that time

2  had done anything that would constitute sexual assault; right?

3  A.   I didn't know it.

4  Q.   Were you -- would you agree with me that you didn't feel

5  like anything abusive happened during that exam; right?

6  A.   So, when I answer that question you want me to say what I

7  felt then, or do you want me to say what I know now?

8  Q.   Well, at that time you didn't feel anything abusive

9  happened; right?

10 A.   At the time I didn't know.  I didn't know what to think at

11 the time.

12 Q.   At the time the door was open; right?  During the entire

13 exam; right?

14 A.   Yes.

15 Q.   And you had your clothes on the entire exam?

16 A.   Yes, ma'am.

17 Q.   And you just felt more comfortable having a female; right?

18 A.   Yes, ma'am.

19 Q.   Nothing happened; right?

20 A.   As far as him penetrating me or nothing; no.

21 Q.   Nothing happened that was inappropriate; right?

22 A.   Yes, ma'am.  It was inappropriate.

23 Q.   Well, you just wanted -- you told the PREA nurse that

24 nothing happened and that you just wanted to have a female since

25 you were having female issues; right?

1  A.   I wanted a female because -- so I thought if a female was

2  present that -- I thought -- I guess I thought it was

3  inappropriate because no female was there.

4  Q.   All right.  And again you never took your clothes off

5  during that examination; right?

6  A.   No.  Well, he -- you know what?  I -- like I told you, he

7  was pulling my pants down.  He had my pubic hair showing.  And

8  he hollered down the hallway and asked another person, a man,

9  did he want to feel them; right?  So then the man said:  No.

10 All right?

11 Q.   So, just to make sure I understand, you have -- you have

12 fibroids or cysts in your abdomen; right?

13 A.   I had 'em.

14 Q.   And they were large?

15 A.   Yes.

16 Q.   And Mr. Rolston was palpating them and he was feeling them;

17 right?

18 A.   Yeah.

19 Q.   And to do that you didn't have your clothes off but he

20 pulled down your waistline so he could feel those fibroids?

21 A.   Yes, ma'am.

22 Q.   All right.  And then there was no one in the room, but your

23 testimony is he actually called for another person to come into

24 the room to also examine your fibroids?

25 A.   Yeah.  But I think it was a sign.

1    Q.   All right.  And, you would agree that --

2         Well, you also had cysts, right, in your breasts?

3    A.   Yes, ma'am.

4    Q.   And it sounds like you get mammograms annually for that?

5    A.   Yes, ma'am.

6    Q.   And there are also times you might get a breast examination

7    if you report having a lump or something of that nature?

8    A.   One time.

9    Q.   One time you reported having a lump and you received a

10   breast examination; is that fair?

11   A.   Yes, ma'am.  In 2019.

12   Q.   But during that examination Mr. Rolston did not perform any

13   type of vaginal exam on you; is that right?

14   A.   No.  He stopped pulling my pants down when the man said he

15   didn't want to feel them.

16   Q.   And you never reported, when you made your complaint, you

17   never reported that Mr. Rolston was standing between your legs;

18   did you?

19   A.   I told you that.

20   Q.   You told me that?  That you did not report that?

21   A.   If you are the person that I spoke to in 2020, I told you

22   that.  I spoke to you a US attorney in 2020 and I told you that.

23   I said -- this is what I said.  I said:  Ma'am, if you are here

24   looking for help for him you will not find it here because this

25   is what he actually did to me.

1  Q.   Ma'am, I am asking you when -- you testified earlier that

2  in July of 2016 you reported it because you wanted to get your

3  provider changed; right?

4  A.   I initiate an administrative remedy.

5  Q.   You initiated an administrative remedy?

6  A.   Yes, ma'am.

7  Q.   And you never said anywhere in that administrative remedy

8  that Mr. Rolston was standing in between your legs; did you?

9  A.   Because they took -- they give me back the administrative

10  remedy and they turned into a PREA examination.  And they do

11  that to put fear in you so you won't make a complaint.  Yes,

12  ma'am.  I have been in the BOP eight and a half years.  I know

13  what they do.  That is what they did to me.  They squashed my

14  administrative remedy.

15          THE COURT:  Ms. Blevins, if you would just answer the

16  -- listen carefully --

17          THE WITNESS:  I did answer.

18          THE COURT:  When I am speaking you don't speak.  You

19  listen until I am finished and then if I ask you a question you

20  can respond to it.

21          Here is what I would like you to do.  I would like you

22  to listen carefully to the question and just answer the

23  question.

24          Please ask another question.

25  BY MS. COLES:

1  Q.   I think you testified that you were afraid to be really

2  forthcoming about your complaint against Mr. Rolston because you

3  were afraid to be put in the SHU; is that right?

4  A.   Yes, ma'am.

5  Q.   And during your 10 years of incarceration with the Bureau

6  of Prisons you have been spent quite a lot of time in the SHU;

7  haven't you?

8  A.   Yes, ma'am.

9  Q.   And the SHU is a place for disciplinary confinement; right?

10  A.   Yes, ma'am.

11  Q.   So if inmates break rules they get sent to the SHU?

12  A.   Yes, ma'am.

13  Q.   And you have broken the prison rules before and you have

14  been sent to the SHU for punishment; right?

15  A.   Yes, ma'am.

16  Q.   For example, in August of 2016, you got in a fight with

17  inmate Wynn where you scratched her face and she bit your

18  finger?

19         MR. COOK:  Objection, Your Honor.

20         THE COURT:  Overruled.

21  BY MS. COLES:

22  Q.   Right?

23  A.   Yes, ma'am.

24  Q.   On August 21, 2016, shortly after you complained about

25  this, unrelated, you got sent to the SHU because you got in a

1  fight with Ms. Wynn?

2  A.   Yes, ma'am.

3  Q.   Right.

4       You were in Range Z-1 of the SHU, weren't you?

5  A.   I don't -- I don't know.

6  Q.   Do you not recall?

7  A.   I don't know where I was.  I just know I was in the SHU.

8  Q.   I am going to show you one of your medical records here and

9  this is dated August 24th, 2016.  Do you see that?

10      And you see it says your unit in Z01, and that's where you

11 were housed at that time; is that right?

12 A.   Yes.

13 Q.   So, in August of 2016, you would have been in Unit Z01,

14 after you got in a fight with Ms. Wynn and you scratched her

15 face and she bit your finger.

16      All right.  And you say you were afraid to report on

17 Mr. Rolston because you didn't want to get sent to the SHU;

18 right?  Now were you afraid of being sent to the SHU when you

19 wrote a letter to Officer Roberts calling her, and I quote, a

20 dumbass cracker bitch?

21 A.   I was already in the SHU.

22            MR. COOK:  Objection, Your Honor.  Move to strike.

23            THE COURT:  Overruled.

24 BY MS. COLES:

25 Q.   So you called her a lot of other things in that letter;

1  didn't you?

2  A.   Yes.

3  Q.   And you sent that letter around September 19, 2016?

4  A.   Yes.

5  Q.   And you actually got in trouble for that, too; didn't you?

6  A.   Yes.

7  Q.   And they added more time for you to be in the SHU.

8       Now, you have actually your own -- on your own representing

9  yourself -- have actually filed 24 federal lawsuits against the

10 Bureau of Prisons --

11           MR. COOK:  Objection, your Honor.  Move to strike.

12           THE COURT:  Overruled.

13           THE WITNESS:  That's untrue.

14 BY MS. COLES:

15 Q.   That's not true?

16 A.   No.  That's not true.  You have to pay for those, ma'am.

17 Q.   How many would you say you filed?

18 A.   Two lawsuits.

19 Q.   Two lawsuits?  Only two lawsuits?

20 A.   Ma'am, I know who I have sued.  I sued Carswell and I sued

21 (Indiscernible).

22 Q.   And you sued a warden before?

23 A.   They are automatically included in the lawsuit.

24 Q.   An assistant warden.

25 A.   They be included in the lawsuit.

1  Q.    In fact, I would like to show -- we can show you what we

2  have marked as Exhibit 98.  Is this your handwriting?

3  A.    Ma'am, that's not a lawsuit.

4        Well, okay, so that's an actual challenging of discipline.

5             THE COURT:  Ms. Blevins, the question was:  Is that

6  your handwriting.  I think that's a yes or no question.

7             THE WITNESS:  Yes.

8  BY MS. COLES:

9  Q.    You just mentioned, you just commented that this wasn't a

10 lawsuit.  Have you filed, maybe not what you would call a

11 lawsuit, but have you filed around 24 documents like this

12 challenging, you know, your discipline or something like that in

13 prison?

14 A.    That's a challenge to a disciplinary action; yes.

15 Q.    You filed about 24 of those; haven't you?

16 A.    No.

17 Q.    More than 10?

18 A.    No.

19 Q.    Not more than 10?

20 A.    No.  I filed one, two, three -- I have filed three or four

21 challenges to disciplinary actions.

22 Q.    Okay.  And on this page, is that your signature?

23 A.    Yes.

24 Q.    All right.  And can you tell me what the date is?

25 A.    December 20th, 2016.

1  Q.   All right.  So this would have been -- now I am going to do

2  math -- six months after the alleged interaction with

3  Mr. Rolston; right?

4  A.   Yeah.  I think it had a bad affect over me.

5  Q.   Okay.  Well -- this --

6          MS. COLES:  Permission to publish.

7          MR. COOK:  Objection, Your Honor.

8          THE COURT:  Sustained.

9  BY MS. COLES:

10 Q.   All right.  Can you tell me who this is against?

11 A.   The warden.  Okay.  That's his name.  The assistant warden

12 and two assistant wardens, the unit manager and Ms. Harvey.

13 Q.   Who else down here?  It looks like you got a few others.

14 A.   Ms. Newell, Mr. -- Ms. McDowell and Paul Rolston.

15 Q.   All right.  So, you weren't afraid of retaliation when you

16 filed this document in the United States District Court of the

17 Northern District of Florida, you weren't afraid of getting sent

18 to the SHU for this; were you?

19 A.   I was already in the SHU.

20 Q.   Because you were already in the SHU.

21     All right.  So you named Mr. Rolston on here, but -- let's

22 see what you sued him for.  You sued Mr. Rolston because he was

23 refusing to give you medical treatment for your finger; isn't

24 that right?

25 A.   Yes.  He wanted me to sign something.  When I refused to

1  sign it he wouldn't give me medication.

2  Q.   And that was for the finger that got bitten in the fight?

3  A.   Yes, ma'am.

4  Q.   And so you were claiming that he wasn't giving you

5  treatment for that so you included that in this 24-page filing

6  with the district court; right?

7  A.   No.  I don't file a 24-page filing, ma'am.

8  Q.   Well, this -- this lengthy document that you handwrote,

9  right?  You hand-wrote this?

10 A.   Can you raise it up, please?

11 Q.   Yes, ma'am.

12 A.   All the way.

13 Q.   Oh, this way?

14 A.   Of pages.

15 Q.   All right.  That's on the sixth page.  But I will show you

16 how long it is.

17 A.   Okay.

18 Q.   All right.  It looks like this is the end.  Can't tell what

19 page that is.  But at the top of the document there is a page

20 number.

21 A.   Oh, I withdrew it.

22 Q.   You withdrew it?

23 A.   Yeah.  See you flashed it.  You tried to go back past

24 there.  You see that.

25 Q.   You ultimately withdrew this; right?

1   A.   Yes, ma'am.

2   Q.   Ma'am, you never mentioned anything about Mr. Rolston

3   touching you inappropriately in this document; did you?

4   A.   No, because I didn't know that what he did was wrong.  I

5   told that you.

6   Q.   Okay.  But what you felt was wrong is that he wouldn't

7   treat your finger after you got bit?

8   A.   Yes.  My finger was swollen.  Pus was running out of it.

9   It was turning green.  It was bad.  And I put all that in there.

10  And he wouldn't treat me for it.

11  Q.   You saw Mr. Rolston about six times; right?

12  A.   I don't know how many times I saw him.

13  Q.   Well, if your medical record showed that you saw Mr.

14  Rolston for about six visits would you have any reason to

15  disagree with that?

16  A.   No.  If that's what they say but...

17  Q.   And you only complained about the one encounter on June 30,

18  2016; is that fair?

19  A.   I guess that wouldn't be fair because I complained about

20  him not treating me, so I don't understand your question.

21  Q.   You're right.  I stand corrected.  You complained about

22  that one incident and the time that you claim he wouldn't treat

23  your finger; right?

24  A.   Ma'am, before that June 30th incident I was doing so good.

25  Q.   Ma'am, on the same day in July of 2016, that you complained

1    about Mr. Rolston, and you wanted a female provider, didn't you

2    also complain about the TV channel on the unit getting switched

3    from the sports TV channel?

4              MR. COOK:  Objection, Your Honor.

5              THE COURT:  Overruled.

6              THE WITNESS:  It's the sports TV.

7    BY MS. COLES:

8    Q.   Right.  Because it was supposed to be on sports TV and it

9    had been taken off the sports TV channel and you complained

10   about that in the same complaint as Mr. Rolston; right?

11   A.   I don't -- no; that would be two different complaints.

12   Q.   But you submitted those on the same day?

13   A.   I submitted those at the same time.  That's what you are

14   saying.

15             MS. COLES:  Okay.  All right.  Thank you.  I don't

16   have anymore questions.

17             THE COURT:  Mr. Fisher?

18             MR. FISHER:  Just two quick things, Your Honor, given

19   the context of the testimony that we have heard today I would

20   like to ask that the documents that were submitted to the

21   Court -- well, I would like to introduce 109-7.

22             THE COURT:  I don't know what that is.

23             MR. FISHER:  Can you pull it up?  Please don't publish

24   it yet.

25             THE COURT:  These are her medical records?

1        MR. FISHER:  I don't know how much I am supposed to

2   say at the moment.

3            THE COURT:  Is there an objection to 109-7?

4            MR. COOK:  Yes, Your Honor.

5            THE COURT:  Can we pass it to the break?  Are you

6   going to examine about it?

7            MR. FISHER:  I was going to ask her about it, yes.

8            THE COURT:  Let me speak to you on the headphones.

9       (Following conference held at sidebar at 1:58 PM.)

10           THE COURT:  Tell me what the problem is.  What is

11  this?

12           MR. FISHER:  This was the document that was introduced

13  during Rivera's testimony that was in the Judge part of the

14  trial only.

15           THE COURT:  But what is it?

16           MR. FISHER:  It's a nursing note from Dorinda Paynter

17  where she examined Shondolyn Blevins when the complaint came in.

18  And she, Ms. Blevins, communicated to the nurse that nothing

19  happened.

20           THE COURT:  So Mr. Cook, what's wrong with that?

21           MR. COOK:  That she communicated that nothing

22  happened?  Your Honor, I think that that's already been gone

23  over and I think that she explained exactly what her response

24  was.  I think this is a self-serving document.  I don't think it

25  is for the purpose of a medical diagnosis or treatment.

1      THE COURT:  It's a prior inconsistent statement of a

2  testifying witness.

3      MR. COOK:  Well, it is a statement of a third person.

4      THE COURT:  Listen to me very carefully.  It's a prior

5  inconsistent statement of a testifying witness.

6      MR. COOK:  It's hearsay.  Well, if it's legitimate

7  that it actually happened I guess she can answer to it.  But I

8  think she already has been asked.

9      THE COURT:  The objection is overruled.  The document

10 is admitted.

11     (Sidebar concluded at 2:00 PM.)

12     THE COURT:  Members of the Jury, thank you for your

13 patience.

14     When I needed to talk to the lawyers, like I did

15 there, to determine the admissibility of a document, or

16 something else we need to talk about before something was shown

17 to you, I used to get the lawyers up at the bench and we just

18 talk to each other.

19     In the days of COVID we have a system where we can

20 stay apart from each other and still talk.  Takes us a minute to

21 get it set up.  We are still a little new with it.

22     Thank you for your patience.

23     Mr. Fisher, you may proceed.

24     MR. FISHER:  Thank you.

25     THE COURT:  Defense 109 dash 7 admitted into evidence.

1        (GOVERNMENT EXHIBIT 109-7:  Received in evidence.)

2            MR. FISHER:  Thank you.

3            THE COURT:  Ms. Blevins, there is a monitor right

4   there beside you.

5            THE WITNESS:  Yeah, I can't see it.  I can't see it,

6   Your Honor.  It's so little.

7            THE COURT:  I understand.  They may make parts of it

8   bigger.  It's worse for the jurors than it is for you.  We will

9   work through it.

10           THE WITNESS:  Your Honor, I wanted to tell you

11  something because I don't want them to be able to come back --

12           THE COURT:  No.  You just answer the questions that

13  you're asked.

14                        CROSS-EXAMINATION

15  BY MR. FISHER:

16  Q.   Ms. Blevins, do you remember seeing a nurse when you made

17  your complaint that -- about the visit that you had with

18  Mr. Rolston?

19  A.   Can you repeat your question?

20  Q.   Did you see a nurse when you made your complaint about

21  Mr. Rolston?

22  A.   I thought she was psychology.

23  Q.   Okay.  Did you also see a nurse?

24  A.   I don't remember.

25  Q.   You don't remember?

1   A.   I don't -- I thought she told me she was from psychology.

2   Q.   Did you ever state to a nurse, the last line that's in this

3   blown up paragraph right here where it says:  She states, I just

4   feel more comfortable having a female.  Nothing happened.  I

5   just wanted a female since I am having female issues.

6        Did you state that to the nurse?

7   A.   I don't -- I don't remember exactly what I told her that

8   day.  I don't want them to come back and say she perjured

9   herself.  I'm glad you asked me that.  I don't remember exactly

10  what I told her that day, but I thought I was talking to

11  somebody from psychology.  I don't remember.  I don't know who

12  she was that I talked to.

13  Q.   So you don't deny saying that nothing happened to the

14  nurse; is that correct?

15  A.   I am not saying I said that, and I am not saying I didn't

16  say that.  I don't remember exactly what I said.

17            MR. FISHER:  All right.  Thank you, Ms. Blevins.

18            THE COURT:  Redirect?

19            MR. COOK:  Thank you, Your Honor.

20                    REDIRECT EXAMINATION

21  BY MR. COOK:

22  Q.   Now, I think that you said that the PREA video just deals

23  with inmate on inmate sexual abuse and not with staff sexual

24  abuse; is that correct?

25  A.   That's the only one I ever seen is basically the chips on

1  the bed, the candy bar on the bed.

2  Q.   Was -- did you ever -- were you ever oriented or educated

3  on what constituted sexual abuse by staff?

4  A.   No.

5  Q.   Were you involved, I think you said, in an intimate

6  examination that day?

7  A.   With who?

8  Q.   I am talking about June 30th, with regard to your breast

9  and your abdomen?

10 A.   Yes, sir.

11 Q.   And did he pull your pants down to your pubic area?

12 A.   Yes, sir.

13 Q.   You said that after that -- you said, I think it was sign.

14 What did you mean by that?

15 A.   When the man told him no.  When the man told him no.

16 Q.   A sign of what?

17 A.   And I think that was a sign to let him know the lady was in

18 the building.

19 Q.   Let him know what?

20 A.   The lady was in there.

21 Q.   Oh, okay.  The lady who looked mad?

22 A.   Came to -- who came to the doorway.

23 Q.   Okay.  So, are you saying that he was -- that other man was

24 signaling that someone was in the building that --

25            THE COURT:  Sustained.

1  BY MR. COOK:

2  Q.   Okay.  You said you made a complaint and they turned it

3  into a PREA?

4  A.   Yes, sir.  I initiated a -- an administrative remedy asking

5  them to remove Mr. Rolston from my PA.  That's what I was

6  trying -- so I didn't -- I didn't want him to be able to call me

7  back over there for nothing.

8  Q.   So, the complaint was really, as you saw it, was really a

9  gender-related complaint?

10  A.   I know what I was saying.  I know what he did to me.  I

11  couldn't -- it's always your word against their word.  So they

12  have the greater weight of the evidence.  That's what they

13  always use every time.  So, I was -- I was trying to keep him

14  from being able to call me.  I didn't want him being able to

15  call me over there.  If you are put on the call-out for sick

16  call, or medical exam, PA, doctor, you have to show up.  If you

17  don't you get an incident report.

18  Q.   And you were never trained on what constituted sexual abuse

19  by staff?

20  A.   No.

21  Q.   Was there any reason, other than your uncertainty about

22  what constituted abuse, that you didn't talk to PREA?

23  A.   You just can't make a -- an accusation like that against

24  somebody if you -- I didn't know what -- I didn't know -- I

25  didn't know.  Just pure pointblank.  Never been in that position

1    before.  Never had a -- I didn't know.

2    Q.   What did you think might happen if you made a PREA

3    complaint?

4            THE COURT:  Sustained.

5    BY MR. COOK:

6    Q.   Now, I understand you filed a lawsuit yourself against Paul

7    Rolston.  Was that because he failed to treat your infected

8    finger, or was it because he was trying to get you to sign a

9    refusal of surgery?

10   A.   It was because he refused to treat me because I wouldn't

11   sign a piece of paper.

12   Q.   And that piece of paper, was that a refusal?

13   A.   That's what -- that's what he say it was.

14   Q.   Did he explain why he wanted you to sign a refusal?

15   A.   I don't remember, but I wasn't signing it.

16   Q.   Because you wanted the treatment?

17   A.   Yes.  I wanted a second opinion.  They told me that I had

18   to have a hysterectomy.  I didn't have any -- I don't have any

19   kids, so I wanted somebody else -- a second opinion.

20   Q.   A second opinion?

21   A.   Yes, sir.

22   Q.   Okay.  And he was trying to get you to sign a refusal

23   rather than get a second opinion?

24   A.   Yes.

25           MR. COOK:  No other questions, Your Honor.

1    THE COURT:  Thank you, Ms. Blevins.

2    Please call your next witness.

3    MR. JOHNSON:  Joann Bellamy.

4    **JOANN BELLAMY, PLAINTIFF WITNESS, DULY SWORN**

5    THE WITNESS:  Joann Bellamy, B-e-l-l-a-m-y.

6    THE COURT:  Ms. Bellamy, you may be seated.  If you

7    are comfortable while testifying you are welcome to take your

8    mask off.

9                    DIRECT EXAMINATION

10   BY MR. JOHNSON:

11   Q.   Ms. Bellamy?

12   A.   Yes.

13   Q.   Are you -- what relation are you to Charnesha Alexander?

14   A.   I am her mother.

15   Q.   Okay.  And -- when she was -- when she was in prison were

16   you in regular communication with her?

17   A.   Yes.

18   Q.   And forgive me if this really sounds stupid, but did you

19   know her well before she was in prison?

20   A.   Yes.

21   Q.   And you raised her?

22   A.   I sure did.

23   Q.   Okay.  And did you know her while she was in prison?

24   A.   Yes.

25   Q.   And have you been in touch with her regularly since she has

1   been out of prison?

2   A.   Yes.

3   Q.   And how did you learn about her incident with Paul Rolston?

4   A.   She wrote me a letter.

5   Q.   Okay.  And do you remember what the general gist of the

6   letter was?

7   A.   Yes, sir.

8          MR. CARTER:  Object; hearsay.

9          THE COURT:  Sustained.

10  BY MR. JOHNSON:

11  Q.   Okay.  Do you know if her degree of emotional distress was

12  changed by anything during the time she was in prison?

13  A.   Yes, I do.

14  Q.   Okay.  And do you know what it was?

15  A.   Yes, I do.

16  Q.   Was it the treatment by Paul Rolston?

17  A.   Yes, it was.

18  Q.   And how did you learn about the treatment by Paul Rolston?

19  A.   She wrote me a letter.

20  Q.   Okay.  And did you have phone calls?

21  A.   I did.

22  Q.   And was she emotionally distressed about that treatment?

23  A.   Yes, she was.

24  Q.   And was it something that caused her to hurt more after it

25  happened than she was hurting before?

1   A.   Yes, it was.

2            MS. MOYLE:  Leading.

3            THE COURT:  Sustained.

4   BY MR. JOHNSON:

5   Q.   Did she tell you anything about nightmares?

6   A.   Yes, she did.

7   Q.   As a result of the Paul Rolston experience?

8   A.   Yes.

9   Q.   What about a change in self-esteem?  Did you notice one?

10  A.   Could you repeat that, please?

11  Q.   I said did you notice a change in her sense of self-esteem?

12  A.   Yes, I did.

13  Q.   Was it for the worse?

14  A.   Yes, it was.

15  Q.   Do you know if there was any change in eating habits?

16  A.   Yes, it was.

17  Q.   And was that worse?

18  A.   Yes, it was.

19  Q.   Do you know anything about a change in sleeping habits?

20  A.   Yes.

21  Q.   Was that for the worse?

22  A.   For the worse.

23  Q.   Do you know anything whether she, after she got out, wanted

24  to isolate from friends and social activity?

25  A.   Yes, she did.

1  Q.   And do you know if that had anything to do with what she

2  suffered with Mr. Rolston?

3  A.   Yes.

4  Q.   Do you know anything about her crying because of what

5  happened?

6  A.   Yes, I do.

7  Q.   Do you know anything about a change in coping mechanisms or

8  the ability to deal with things?

9  A.   Yes, I do.

10  Q.   Has there been any change in her ability to give or receive

11  affection?

12  A.   Yes.

13  Q.   Tell me about that.

14  A.   Well, she has a son.  He used- he is a big boy.  He will

15  grab her.  Now it's like, "Hold on, █████.  Hold on.  Get

16  back."

17  Q.   Have you seen her jumpy?

18  A.   Yes, I have.

19  Q.   Is she irritable and cranky?

20  A.   Yes.

21  Q.   Ready to take offense when none is intended?

22  A.   Pardon me?

23  Q.   Ready to feel insulted when there is no insult intended?

24  A.   Yes.

25  Q.   Ready to start -- ready to fight for over little things?

1   A.   Yes.

2           MR. JOHNSON:  That's all I have.

3           THE COURT:  Cross examine?

4           MR. CARTER:  Yes, Your Honor.

5                    CROSS-EXAMINATION

6   BY MR. CARTER:

7   Q.   Ms. Bellamy, I am Steve Carter.  I have just a few

8   questions for you.

9   A.   All right.

10  Q.   While Ms. Alexander, while your daughter was in prison, you

11  were able to speak with her almost every day?

12  A.   Yes, if she called.

13  Q.   And she had the ability to send you emails through the

14  CorrLink system, and you would talk to her that way every day,

15  too?

16  A.   Yes, sir.

17  Q.   And when she called every day she was able to speak to her

18  kids; right?

19  A.   Yes, sir.

20  Q.   All of her kids?

21  A.   All of her kids, if they was home.

22  Q.   How many of those kids did she have?

23  A.   Four.

24  Q.   Four?

25       And when she was in Marianna, do you remember when she was

1   in the Marianna work camp?

2   A.   Yes.

3   Q.   And that's a lot closer to Phenix City from where you live;

4   right?

5   A.   Yes, sir.

6   Q.   So you were able to take the children and go visit

7   Ms. Alexander at the work camp on a regular basis; correct?

8   A.   Yes, I was.

9   Q.   And you were able to bring all the children, all four, and

10  I guess one of her husband's step-kids to the visit; right?

11  A.   I brought my son's son.

12  Q.   You brought your son [sic] and the four kids?

13  A.   Yes, sir.

14  Q.   And you were able to do that every couple of weeks; weren't

15  you?

16  A.   At least once a month.

17  Q.   Now, when Ms. Alexander was in Tallahassee, though, all of

18  that contact stopped; didn't it?

19  A.   It did.

20  Q.   Because she was in disciplinary confinement and you

21  couldn't talk to her on the phone; could you?

22  A.   Only once a month.

23  Q.   And you couldn't get the emails like you were doing every

24  day?

25  A.   No, sir.

1   Q.   And the kids couldn't visit her; could they?

2   A.   No, sir.

3   Q.   And all you had were letters from her; is that right?

4   A.   Yes, sir.

5   Q.   Is it true, isn't it Ms. Bellamy, that Ms. Alexander was

6   stressing out about being away from the children ever since she

7   was incarcerated the first time; correct?

8   A.   Could you repeat that?

9   Q.   Isn't it true, isn't it, that Ms. Alexander, your daughter,

10  was stressing out a lot about being away from the children ever

11  since the first time she was incarcerated?

12  A.   No.

13  Q.   That really weighed on her; right?

14  A.   About being away from the children?

15  Q.   Yes, ma'am.

16  A.   Not so much.

17  Q.   Not so much?  Did she ever talk to you about being upset

18  about being away from the children and what that was -- what

19  that was like?

20  A.   Sometimes.

21  Q.   And did it seem like she was distressed about being away

22  from the children?

23  A.   Sometimes.

24  Q.   And had that distress been consistent since she has been

25  incarcerated?

1   A.   No.

2   Q.   I want to show you -- I have -- Ms. Bellamy, you remember

3   your deposition being taken in this case; don't you?

4   A.   Yes.  Some of it.

5   Q.   I want to show you where that series of questions were

6   asked.

7        Do you see -- you can read that if you would like, starting

8   about right where the red mark is:  During the time that your

9   daughter was incarcerated, did she ever talk to you about being

10  upset about being away from the children or anything to do with

11  the family situation?

12       And you respond by clarifying the question, "Did she ever

13  talk to me about being upset about being away from the children?

14  And what was the last part?  The family situation with her

15  husband and the children.  Oh yes."

16       Do you see that answer?

17  A.   Yes.

18  Q.   And that was your answer in the deposition that you gave in

19  this case in April of last year; correct?

20  A.   Yes, sir.

21  Q.   And it goes on to ask you --

22           MR. JOHNSON:  Object.  False impeachment.  Move to

23  strike.

24           THE COURT:  Overruled.

25  BY MR. CARTER:

1  Q.   Did she seem distressed by that.  And you said:  "Yes.  She

2  was stressing about being away from the children and her

3  husband, yes."

4       Then the question is, "Has that been consistent since she

5  has been incarcerated", and it goes on to the next page.  "When

6  she first became incarcerated it really weighed on her then.

7  And that would have been when she was even in Aliceville the

8  first time?  Yes."

9       Do you see that?

10 A.   Yes.

11 Q.   And that was the testimony you gave in the deposition in

12 this case; correct, Ms. Bellamy?

13 A.   Yes, sir.

14 Q.   Okay.  And isn't it true, Ms. Bellamy, from talking to

15 Ms. Alexander, you understood that the sexual assault took place

16 in Marianna; right?

17 A.   In the SHU.  Tallahassee.

18 Q.   Okay.  I want to show you your deposition again.

19      Right there, at page 55, line 7, where you were asked the

20 question:  "Where do you understand, from talking to

21 Ms. Alexander, that she was sexual assaulted?  At which prison

22 do you believe the sexual assault took place?  That happened in

23 Marianna."

24      Do you see that?

25 A.   Yes.

1  Q.   Ms. Bellamy, isn't it true that during the time that

2  Ms. Alexander was incarcerated that the kids were lashing out a

3  lot?

4  A.   They did.

5  Q.   Isn't it also true that during that same time she was

6  having problems with her husband?  Do you know anything about

7  that?

8  A.   Having problems with her husband?

9  Q.   Yes, ma'am.

10  A.   In what way?

11  Q.   Infidelity?

12  A.   Yes.

13  Q.   So she was stressing out about that, too, wasn't she?  Yes,

14  ma'am?

15  A.   I don't know.  I am quite sure.

16  Q.   You are not sure?

17  A.   I said I am quite sure.

18  Q.   You are quite sure.

19  A.   Yes.

20       MR. CARTER:  Thank you for your time.

21       THE WITNESS:  You are welcome.

22       THE COURT:  Ms. Moyle?

23                    CROSS-EXAMINATION

24  BY MS. MOYLE:

25  Q.   Briefly.  Good afternoon, Ms. Bellamy.

1   A.   Good afternoon.

2   Q.   Ms. Alexander lives with you currently; is that correct?

3   A.   No.

4   Q.   She is not in Phenix City?

5   A.   Yes.  Yes.

6   Q.   Does she reside with you at the same address?

7   A.   No.

8   Q.   Do her four children live with you?

9   A.   Only two.

10  Q.   So two of her four children live with you?

11  A.   Yes.

12  Q.   And you are on disability; is that correct?

13  A.   Yes.

14  Q.   Okay.  And I want to clarify.  Ms. Alexander is still

15  serving the remainder of her sentence; correct?

16  A.   Yes.

17  Q.   Okay.  So even though she is in Phenix City she is still

18  serving the remainder of her sentence?

19  A.   Yes.

20  Q.   And you would benefit financially via her children if she

21  were to recover any damages in this lawsuit?

22  A.   Could you repeat that?

23  Q.   You would benefit financially if she were to recover any

24  damages in this lawsuit?

25  A.   I would benefit from it?  Not that I know.

1          MS. MOYLE:  Okay.  Nothing further.

2          THE COURT:  Redirect?

3          MR. JOHNSON:  None, Your Honor.

4          THE COURT:  Thank you, Ms. Bellamy.  You may step

5     down.

6          Please call your next witness.

7          MR. JOHNSON:  Beth Danielle Farber.

8          THE COURT:  Is this witness in custody?

9          MR. JOHNSON:  No.

10         THE COURT:  Mr. Cook, maybe somebody can get her.

11         MR. COOK:  Sure.

12     **BETH DANIELLE BARBER, PLAINTIFF WITNESS, DULY SWORN**

13         THE COURTROOM DEPUTY:  For the record, please state

14    your name and spell your last name.

15         THE WITNESS:  My name is Beth Danielle Farber,

16    F-a-r-b-e-r.

17                    <u>DIRECT EXAMINATION</u>

18    BY MR. JOHNSON:

19    Q.   Ms. Farber, did you serve some time at FCI in Tallahassee?

20    A.   Yes, sir.

21    Q.   What were you there for?

22    A.   I was in there for drugs; possession of heroin with intent

23    to distribute and conspiracy.

24    Q.   How long did you serve?

25    A.   I was sentenced to five years, but I got one year reduced

1  off my sentence and then good time so I was probably

2  incarcerated for like, halfway house everything included,

3  probably like three years and a little bit.

4  Q.   What were the years that you were there?

5  A.   From 2017 until 2019.  September -- excuse me.  May 2017 to

6  September 2019.

7  Q.   Did you have occasion to be treated by a medical provider

8  by the name of Paul Rolston during the time that you were there?

9  A.   Yes, sir.

10  Q.   Could you tell the jury about your visits with Mr. Rolston

11  starting with the first one as you recall it?

12  A.   Yes, sir.  So the first time I went down to the medical it

13  was part of the A and O process.  So we went in.  I guess it was

14  going to be just like a physical, or just the exam so to get my

15  medically cleared, or whatnot.

16      So I went in.  Ms. Davis was there with me.  I undressed.

17  I had something over my lap or whatnot.  Mr. Rolston came in a

18  short time afterwards and started doing the exam.  So I guess it

19  would have been like a pelvic exam where they go inside and

20  check you.

21      Do you want me to get into detail exactly like what

22  happened?

23  Q.   Please just describe that first exam.

24  A.   So, okay, so -- they ended up using like the -- had to use

25  the plastic thing.  What's it called.

1   Q.   Speculum?

2   A.   The speculum.  Yes.  So, when it came time to use that,

3   like, you know, lay down on your back.  Put your legs up.  Had

4   the blanket over my lap.  He had inserted the speculum in me.

5   At the time when it went in, he -- at first it felt normal, but

6   then like I felt like pressure on my clitoris.  And I was just

7   like it kind of threw me off.  But he was down there doing like

8   the swabs.  And I had complained of an IUD being inside of me,

9   so I guess he was trying to look and see if he could find it or

10   whatnot.

11       And I told him like:  You are not going to be able to find

12   it.  I have been to other doctors prior and they haven't been

13   able to get it -- been to a specialist, whatnot.

14       So after that, like when he took the speculum out, he went

15   down there and was like -- his -- like when he took his hand

16   back I was thinking okay, his hand is off of me but he went back

17   he put his hands right back on my clitoris again.  And this time

18   he was starting to do like circular motions on it.  And he

19   started going between my folds, and as he was going through my

20   folds he kept repeating that he was looking for lesions.  So I

21   was just like, okay, you know.

22       And he kept doing it.  Whatnot.  And it was like the whole

23   time he never stopped rubbing my clitoris in a circular motion

24   and he was going into between my folds.

25       In my thought process I am thinking like, like, is this --

1   like, this isn't normal.  Like I have been to doctors before.

2   And I am just -- like, I can't even concentrate on what he is

3   doing, like supposed to be doing, versus to what he is actually

4   doing.

5       So then afterwards, after he finished, I remember looking

6   at Ms. Davis.  She was --

7           THE COURT:  Wait just a minute.  Ask another question.

8   We have been in a narrative for a good while.

9   BY MR. JOHNSON:

10  Q.   Oh, okay.

11      So, he interrupted the clitoral thumb rubbing to do what?

12  A.   At this moment he had -- when he had stopped down there, he

13  was going to do the breast exam.

14  Q.   No.  I mean, you said that he stopped and started it while

15  he was still in the --

16  A.   When he stopped the first time it was to take the stuff out

17  and put it away -- the speculum and whatever tools he was using,

18  and then he went back into.

19  Q.   And this is ostensibly to look for the -- to try to fetch

20  the IUD that was dislodged?

21  A.   The first time, yes.  When he did the cultures and stuff

22  like that, and I guess he wanted to see if he can see the Mirena

23  inside me, or whatnot, if he can locate it.  And then after he

24  was finished, his hand went then back to it and this time it

25  went to like circular motions.

1    Q.    Did it feel like what he was doing was sexual?

2    A.    Yes.

3    Q.    And what were you thinking when you felt that?

4    A.    Is this happening?  Like what's -- this isn't normal.

5    Like, what's going on.  That's what was going through my head.

6          And like, you know, being -- you know, I'm in my 30's.  And

7    I have had children before.  And you go down to these clinics

8    and these doctors and you hear of these stories and they always

9    tell you, like in general, you will know if it's not right.  And

10   I've been to the doctor numerous of times and --

11              MS. MOYLE:  Objection, Your Honor.

12              THE COURT:  Sustained.

13   BY MR. JOHNSON:

14   Q.    Okay.  So, had somebody taught you previously to validate

15   your feelings if you thought something was going wrong in a

16   gynecological exam to trust yourself, to believe yourself?

17   A.    Yes.  I had an incident when I was -- when I was younger

18   with a doctor --

19              MR. CARTER:  Objection, Your Honor.

20              THE COURT:  Sustained.  Just what happened to her in

21   the exam with Mr. Rolston.  Just that.

22   BY MR. JOHNSON:

23   Q.    Okay.  What happened when he did your breast?

24   A.    When he moved up to my breast area, bare chested, I have

25   had breast augmentation done and he was, you know, he was

1    touching around on my breast and he was kind of making these

2    comments like, "Oh, wow.  Look at that", and, "Oh, you can't

3    even see her scar.  Look Ms. Davis, you can't even see her

4    scar".  And it kind of went on a little bit more excessive

5    versus:  You are fine.  There is no lumps, does that hurt?

6    There was none of those type of questions or concerns made.

7        It was more -- I was getting like more of like these oohs

8    and ahs about my breast augmentation and the appearance of the

9    scars under my breasts.

10   Q.   Okay.  And was there a point where he touched his crotch to

11   your body?

12   A.   Within the time of doing the exam -- he was on my right

13   side of me, and the bed that you are on is not a big table.  So,

14   with my arms being on my side, like put my hands across my

15   stomach, or whatnot, on my right elbow, I could feel this man's

16   area, you know, touching my arm.  And it was hard.

17       And in my mind, I am like, is this really happening.  You

18   know, because you want to think that this would not happen.  And

19   I am like questioning myself over and over again, but I know

20   what I was feeling on my arm.

21       And then after he finished touching my breasts he pinched

22   both of my nipples and asked me if I had experienced discharge

23   in my nipples, and I have never had a doctor do that to me

24   either.

25   Q.   Had you been experiencing any discharge from your nipples?

1    A.    No, sir.

2    Q.    Okay.  And were you feeling any sexual arousal during the

3    exam?

4    A.    Yes.

5    Q.    And how were you coping with that during the exam?

6    A.    Within the time I was just -- I was very confused, you

7    know.  I was getting kind of like -- this isn't right, you know,

8    but at the same time like he was -- when he was stimulating my

9    clitoris -- you have to understand.  I have had no interaction

10   with a male, or have, you know, been doing anything like that to

11   myself in the longest.  So coping with it afterwards?

12         MS. MOYLE:  Objection, Your Honor.

13         THE COURT:  Sustained.

14   BY MR. JOHNSON:

15   Q.    Okay.  We can only talk about coping with it during.  We

16   can't talk about afterwards.

17         So how were you coping with it during?

18   A.    During?  Like it was disgusting.  It wasn't a good feeling.

19   Like, you know, it just -- I can't -- it's like your mind --

20   it's just like going back and forth with each other and in your

21   heart and in your mind you are like, this isn't right but you

22   know...

23   Q.    Were you lubricated?

24   A.    Yes; I was lubricated.

25   Q.    How did you feel about that?

1  A.   The lubrication part, you know, when they are inserting the

2  spectrum [sic], that's normal.  That part is okay.  But it was

3  after the fact, when he took the spectrum [sic] out, and then he

4  was going in between the folds with the lubrication and had it,

5  you know, stimulating my clitoris.  It just -- it wasn't like

6  friction there.  It was like gliding around.

7  Q.   That was the outside lubrication.  What about your own

8  internal lubrication?  Was that happening?

9  A.   Yes.  I -- yes.  I did -- my body did form a wetness from

10  the -- from the visit with the doctor.

11  Q.   All right.  And were you experiencing a conflict of

12  feelings between this being a professional situation and this

13  being a sexual situation at the same time?

14  A.   Yes.  I was disgusted with myself.  Like it was very

15  disgusted.

16          MR. JOHNSON:  That's all.

17          THE COURT:  Cross examination?

18          MR. CARTER:  Thank you, Your Honor.

19                    CROSS-EXAMINATION

20  BY MR. CARTER:

21  Q.   Ms. Farber, how are you?  I am Steve Carter.  I just have a

22  few questions.

23      I know Mr. Johnson asked you about your federal convictions

24  that you were in the federal prison for, but you also have had

25  some other felony convictions; correct?

1   A.   Yes, sir.

2   Q.   How many?

3   A.   There has been a few of them.  All drug-related.

4   Q.   I'm sorry?

5   A.   There has been a few.  All drug-related.

6   Q.   Do you know how many there have been?

7   A.   I have had some juvenile issues.

8   Q.   I don't want to talk about that.

9   A.   So, as far as state issues I have been to state prison one

10  other time.

11  Q.   One other time with two other felonies?

12  A.   Uh-huh.

13  Q.   Yes, ma'am.  Okay.

14       The visit that you described as the A and O, the admission

15  and orientation visit with Mr. Rolston?

16  A.   Yes, sir.

17  Q.   That's the intake exam or the A and O?

18  A.   Yes.

19  Q.   That's how you refer to it.

20       You mentioned that during the examination it was

21  determined, and you discussed with Mr. Rolston, that you had an

22  IUD?

23  A.   Yes, sir.

24  Q.   That you had implanted; correct?

25  A.   Yes, sir.

1  Q.  And that IUD had been implanted nine years ago; correct?

2  A.  Correct.

3  Q.  And it had expired after four or five years; correct?

4  A.  Correct.

5  Q.  And it had migrated; right?

6  A.  Yes, sir.

7  Q.  Meaning it could not be seen on an exam.  You couldn't find

8  it; right?

9  A.  Exactly.

10  Q.  It had moved into your body and you couldn't find it;

11  right?

12  A.  Correct.

13  Q.  That's a serious situation; isn't it?

14  A.  Yes.

15  Q.  And Mr. Rolston was trying to treat that when you were

16  there, or at least order some treatment as it relates to that,

17  from his examination of you; correct?

18  A.  Yes.

19  Q.  He ordered an X-ray?

20  A.  Yes, sir.

21  Q.  And he ordered a referral out to an OBGYN that comes to the

22  prison; correct?

23  A.  Yes, sir.

24  Q.  Okay.  Dr. Forsthoefel; right?

25  A.  Yes, sir.

1   Q.   And because of that referral, because of that X-ray and

2   that referral by Mr. Rolston, you actually had your IUD removed?

3   A.   Uh-huh.  That's correct.

4   Q.   That's a good thing?

5   A.   That is a good thing.

6   Q.   In fact, you wanted that because you were able to get it

7   removed for free, for you, before you got out of prison; right?

8   A.   Yes, sir.

9   Q.   And that was because Mr. Rolston took the action he did in

10  that A and O exam; correct?

11  A.   Correct.

12  Q.   Now, the A and O exam that you described to Mr. Johnson,

13  Ms. Davis there the whole time; right?

14  A.   Yes, sir.

15  Q.   And that was a very small room; correct?

16  A.   Yes, sir.

17  Q.   A room that you could almost reach out and touch her while

18  you were in that room because it is so small?

19  A.   Yes, sir.

20  Q.   So she was right there with you and Mr. Rolston the whole

21  time?

22  A.   She was on the right side of me by my shoulder.

23  Q.   But she is there in the room observing?

24  A.   She was in the room.  Not observing.

25  Q.   She would have clearly observed the breast examination;

1   right?

2   A.   Yes.

3   Q.   Her back wasn't turned to you; was it?

4   A.   No.

5   Q.   She is paying attention when Mr. Rolston needs to start the

6   speculum exam so she handed that to him; right?

7   A.   Yes, sir.

8   Q.   And the tools related to that to do the swabbing --

9   A.   Yes, sir.

10  Q.   And things related --

11  A.   She was in there too.  Because it's a man and a woman so

12  she was in there just to stand by as, you know, just in case I

13  assume --

14  Q.   And --

15  A.   -- just protocol.

16  Q.   -- to observe and protect you?

17  A.   Yes.  Protocol.

18  Q.   You had had a biopsy, a cervical biopsy before when you

19  were in state prison; correct?

20  A.   Yes, sir.

21  Q.   The breast exam that Mr. Rolston conducted you said he

22  talked about the scarring.  That's what he was talking about

23  correct?

24  A.   Yes, sir.

25  Q.   And do you know if he made comments about where the

1  implants were located, whether under the muscle or above --

2  A.   No, sir.

3  Q.   You didn't hear him make comments like that?

4  A.   No, sir.

5  Q.   Have you ever heard a healthcare professional make a

6  comment about where your implants were located?

7  A.   No, sir.

8  Q.   You have never heard -- that's fine.

9       Now, the A and O visit you had, those type of intake exams

10  in which they do a well woman exam, the pelvic exam and Pap

11  smear and breast exam, that's normal; isn't it?

12  A.   Yes, sir.

13  Q.   Normal for a prison during an intake.  It's always offered,

14  right, in your experience?

15  A.   I am not going to say it is always offered because the

16  medical records are there, and if had one within a certain

17  amount of time I wouldn't see the Bureau of Prisons putting

18  money out for a procedure that doesn't need to be done if there

19  a medical paper trail somewhere that shows she just had this.

20  Q.   Right.  But it's not a problem you have seen that -- it's

21  not a problem for those type of preventative medicine treatments

22  to be offered to an inmate on an A and O; correct?

23  A.   Correct.

24  Q.   The description you gave Mr. Johnson of during the speculum

25  exam, during the part of the pelvic exam that the speculum is

1  being used, didn't you say that Mr. Rolston was touching your

2  clitoris during that part?

3  A.   Yes, sir.

4  Q.   In a circular motion?

5  A.   Yes, sir.

6  Q.   And he was using the speculum.  Do you know if he was using

7  the light at the same time?

8  A.   No.  There was a -- I could not see in between my legs.

9  There was a sheet or something over my legs.

10  Q.   So you don't know what he was doing -- how he was holding

11  the speculum or how he was holding the light?  You don't know

12  that?

13  A.   No, sir.  He just had the speculum in me.

14  Q.   Ms. Farber, you are familiar with some intake screening

15  forms that prisons use sometimes when you move around in the

16  prison, either from different units or different prisons; you

17  are familiar with those?

18  A.   Yes, sir.

19  Q.   Do you recall -- let me establish this.  The A and O

20  examination that you had occurred on May 10th, 2017; correct?

21  A.   Yes.

22  Q.   All right.  Do you recall filling out an intake form saying

23  that -- the question is:  Have you recently been sexual

24  assaulted and you answered no?

25  A.   On -- what was the date?

1  Q.   Let me show you.  This is the second page of defendant's

2  Exhibit 91, Your Honor.

3          THE COURT:  Are you offering this or just showing it?

4          MR. CARTER:  I am just showing it to her right now,

5  Your Honor.

6          THE COURT:  All right.

7  BY MR. CARTER:

8  Q.   Ms. Farber, do you see the document I am showing you?

9  First of all, I would ask is that your signature at the bottom?

10  A.   Yes.

11  Q.   And is it dated 11-16-2017?

12  A.   Yes.  I'm trying to think when -- this is -- what is this

13  form you said?

14  Q.   Well, I call it what's it's entitled, intake screening form

15  for the Federal Bureau of Prisons dated 11-16-2017.  That is

16  your signature on the bottom, correct?

17  A.   It is my signature.  Yes, sir.

18  Q.   Do you see in the middle of the page, the 6B question:

19  Have you recently been sexual assaulted, and do you see the

20  check box "no"?

21  A.   Uh-huh.  Yes, sir.

22  Q.   And that's your handwriting on the page, isn't it?

23  A.   Yes, sir.  That's my signature.  Yes, sir.

24  Q.   So this would have been approximately six months after this

25  A and O examination that you have described for Mr. Johnson and

1  when you filled out that form you didn't feel like you had been

2  sexual assaulted; correct?

3  A.   There was a reason for that, sir.

4  Q.   Ms. Farber, do you know Ashlee Barnett?

5  A.   Yes, sir.  I know who she is.

6  Q.   You were RDAP, that's the residential drug programs;

7  correct?

8  A.   Yes, sir.  Uh-huh.

9  Q.   And there were times on the weekends, Saturdays and

10 Sundays, when you would sit out in sun with her; correct?

11 A.   She might be up there.

12 Q.   Y'all would spend time together?

13 A.   She would be up there.

14 Q.   You wouldn't call her a friend?

15 A.   No.  Not a friend.

16 Q.   Because you don't have friends in prison?

17 A.   No.  I did have a couple of friends in prison.  I just

18 didn't have a lot of --

19 Q.   You spent time with her in RDAP and then on weekends

20 sitting in the sun?

21 A.   I didn't spend time with her in RDAP.  We were in RDAP

22 together.  There is like 93 women in RDAP.

23 Q.   Do you know Connie Batchelor?

24 A.   Yes.  Connie Batchelor is a friend.

25 Q.   She was on the same unit with you?

1  A.    Yes.  She is a friend.

2  Q.    Was Ashlee on the same unit?

3  A.    We were in RDAP together, so that would be F unit, so we

4  did reside in F unit together for a little while.

5            MR. CARTER:  Thank you, Ms. Farber.

6            THE COURT:  Ms. Moyle?

7            MS. MOYLE:  Nothing further, Your Honor.

8            THE COURT:  Redirect?

9                    REDIRECT EXAMINATION

10 BY MR. JOHNSON:

11 Q.    Ms. Farber, you said there was a reason that you checked

12 that box.  What was the reason?

13            MR. CARTER:  Your Honor.

14            THE COURT:  Overruled.

15 A.    The reason being is when you are an inmate, whether it's a

16 prison, federal prison, if you file a complaint like that they

17 put you in the Special Housing Unit or on lockdown.  I didn't

18 want to go.

19 BY MR. JOHNSON:

20 Q.    Okay.

21 A.    The reason I didn't want to go is because I was in a drug

22 program.  I wanted to get my time off.  I wanted to get my GED.

23 I wanted to go home to my family.  I have seen this with my own

24 eyes; women go to the SHU, or they will go to lockdown, with

25 their filing complaint like this, and sometimes they might come

1    back and sometimes they get shipped away and you never see them

2    again.

3           MR. CARTER:  Objection.

4    A.   The officers get moved to different locations.  And you

5    know they might not even get fired.  And it's just like being

6    swept under the rug.  So, that's the reason why I did not speak

7    out and want to -- want anything to come about this while I was

8    incarcerated in the system.  I wanted to go home.

9    BY MR. JOHNSON:

10   Q.   Mr. Carter asked you about the -- about the chaperone.  Can

11   you tell the jury generally what the chaperone was doing while

12   you were in the examination room?

13   A.   There was times when I had looked up at Ms. Davis.  She

14   was -- you got -- mind you, like the doctor is down in between

15   my legs, down about my knees.  The lady, Ms. Davis, is up by my

16   right shoulder, up against the wall.  And there were times where

17   my mind is like, is this going on, and I would look up at her

18   and she would literally be looking up at the ceiling.  Hands up

19   against the wall, just like in her own world.  She wasn't

20   looking at me period.  Not even --  I would look at her.  She

21   was looking up every time I looked at her.

22          MR. JOHNSON:  That's it.  Thank you.

23          THE COURT:  Thank you, Ms. Farber.  You may step down.

24          THE WITNESS:  Thank you, sir.

25          THE COURT:  Well, let's do that.  Let's take the

1    afternoon break at this point.  Members of the jury, recall the

2    instruction; don't talk about the case.  Leave your pad on your

3    chair.  We will be back in a few minutes.  Jury out, please.

4          (Jury out at 2:50.)

5          THE COURT:  You may be seated.

6          A couple notes on rulings:  The form that said

7    "nothing happened" I admitted under 613(b).  It's a prior

8    inconsistent statement of a testifying witness.  The conditions

9    of the rule were met, so I admitted it.

10         It's not inadmissible hearsay at the level of the

11    witness because it's the witness's prior inconsistent statement.

12    That's precisely what Rule 613(b) deals with.

13         It's not inadmissible hearsay at the level of the

14    report.  It's a statement taken in the ordinary course.  And

15    probably a government statement under 803(8).  There wasn't any

16    question about authenticity.

17         There was objection to the cross examination of

18    Ms. Bellamy with her deposition.  Mr. Johnson, you said,

19    improper impeachment.  I thought it was exactly proper

20    impeachment.  It was something that she said at the deposition

21    different from what she had just said on the stand.

22         MR. JOHNSON:  It looks to me like she said the same

23    thing in both places.

24         THE COURT:  Well, I don't think so.  My take on it was

25    she didn't say the same thing in both places.  I suppose one day

we can each read the transcript and see, but my judgment at the time was that what she said in that deposition was not the same thing she had just said on the stand.

Then Ms. Blevins' testimony -- frankly, Mr. Cook, this was a hot mess. You had her testifying about retaliation before she ever testified about what happened.

Now, I had said earlier that you could get into the fear of retaliation because the government had asked the question about failing to make the PREA complaint. But with this witness there had been no testimony she didn't make a PREA complaint. She didn't even testify to what happened. And all of a sudden we're talking about things that don't have anything to do with this lawsuit.

Her prior lawsuits, her disciplinary history, I thought was appropriate under 608(b). After she had testified, pretty broadly, and sometimes volunteering and not in response to questions, but she had testified to all manner of things about how the Bureau of Prisons does business, and why she didn't complain because of what she knew about what happened in the Bureau of Prisons. I thought her history with the Bureau of Prisons was fair cross examination about motivation and bias. And I thought the cross examination about her lawsuits and disciplinary reports was appropriate under 608(b).

I did not allow introduction of those lawsuits because under 608(b) the cross examiner is stuck with the answer.

1    Extrinsic evidence is inadmissible.

2           Couple of the questions may have been in effect asking

3    for extrinsic evidence but to the extent they were, there

4    weren't objections at the time.

5           Let me say to the defense, I do usually recognize when

6    you stand up that you are making an objection so there will be a

7    number of places where I have said "sustained" without the

8    transcript that anybody said "objection".  Because you were

9    standing up, and it seemed clear to me what the objection was,

10   and so I said "sustained".

11          That doesn't mean you get to stand up and not tell me

12   what the objection is.  So there were times you were standing up

13   and, frankly, it seemed to me the question was proper.  I wasn't

14   going to say "overrule" and just interrupt things when you

15   hadn't said "objection."

16          If you had an objection that wasn't obvious to me, it

17   wasn't obvious to me, so that's why occasionally you stood up

18   and you sat back down.  I took that as an indication that you

19   were more than happy to have me say "sustained" but you didn't

20   know what the objection was and you were hedging your bets.  So

21   if you really have an objection feel free to shout it out.

22          What else if anything do we need to discuss before we

23   break?  Well, tell me how we are coming.

24          MR. COOK:  Your Honor, we have one witness left and

25   that is our expert.

         1              THE COURT:  All right.  So the doctor will be on when
         2     we come back.
         3              The jury went out almost five minutes ago.  Let's
         4     start back at five after three by that clock.
         5              Doctor, you can be on the witness stand.  I guess
         6     that's 11 minutes from now.  You can feel free to come right up
         7     here.
         8          (Recess taken 2:56.)
         9          (Resumed at 3:07.)
        10              THE COURT:  Please be seated.
        11              Bring the jury in, please.
        12              MS. MOYLE:  Your Honor, are we formally proffering the
        13     expert?
        14              THE COURT:  I'm sorry.
        15              MS. MOYLE:  Are we formally proffering the expert in
        16     front of the jury?
        17              THE COURT:  She is testifying in front of the jury, as
        18     I understand it.
        19              MR. COOK:  That's correct, Your Honor.
        20              Your Honor, I do have one issue before --
        21              THE COURT:  What's that?
        22              MR. COOK:  Mr. Rolston's training records show that he
        23     has taken a course in -- at least one course in trauma informed
        24     care.  The Court has previously said that trauma informed care
        25     doesn't come in.

1          THE COURT:  Exactly.

2          MR. COOK:  Okay.  I am just concerned that that may

3     come up later.  And we have our expert here.

4          THE COURT:  There will be no testimony about trauma

5     informed care because the plaintiff in the case had suffered no

6     trauma.  We're going to try this case.

7          MR. COOK:  Yes, Your Honor.

8          MS. MOYLE:  Your Honor, I misspoke.  I meant formally

9     tender the witness as an expert.

10         THE COURT:  Oh, he can tender -- look, my practice is

11    I will ask if you have any questions.  I am not going to say she

12    is an expert or not.  That is, of course, up to the jury.

13    Obviously she is if she is a medical doctor.  But, I will just

14    ask if you have any questions and then I will tell Mr. Cook he

15    can proceed.

16         MS. MOYLE:  Thank you, Your Honor.

17         THE COURT:  Jury in.

18       (Jury in at 3:09.)

19         THE COURT:  All right.  You may be seated.

20         Mr. Cook, please call your next witness.

21         MR. COOK:  Yes, Your Honor.  We call Dr. Lisa Tucker

22    as our expert in gynecology.

23         **DR. LISA TUCKER, PLAINTIFF WITNESS, DULY SWORN**

24         COURTROOM DEPUTY CLERK:  For the record, state your

25    name and spell your last name.

1          THE WITNESS:  Elizabeth Tucker, T-u-c-k-e-r.

2          THE COURT:  Dr. Tucker, if you are comfortable while

3    testifying you may remove your mask.

4          THE WITNESS:  Thank you, sir.

5                    DIRECT EXAMINATION

6    BY MR. COOK:

7    Q.   Good afternoon, Dr. Tucker.

8    A.   Good afternoon.

9    Q.   If you would just start out by saying how you are employed,

10   currently.

11   A.   I'm currently employed by Santa Rosa Medical Group, which

12   is a multi-specialty group.  I serve in the OBGYN department and

13   that is in Pace, Florida.

14   Q.   Okay.  Will you tell us about your background in

15   gynecology?

16   A.   I studied -- I will start with residency, because that's

17   when really the specialization starts.  My residency began in

18   1984 to 1988.  Then I have been a practicing OBGYN since that

19   time.

20   Q.   Okay.  And are you board certified in gynecology?

21   A.   I am.

22   Q.   Are you board certified in obstetrics?

23   A.   It's combined.  It's obstetrics and gynecology.

24   Q.   Okay.  And are you a member of any associations or

25   societies?

1  A.   I am a member of the Florida Medical Association and the

2  American College of OBGYN, which that includes a membership in

3  the Escambia County Medical Society.

4  Q.   Okay.  The American -- what was the --

5  A.   It used to be the American College.  They changed it to the

6  American Congress of Obstetrician and Gynecology, so I just go

7  by ACOG.

8  Q.   Okay.  Have you ever had your medical license suspended or

9  revoked?

10  A.   No, sir.

11  Q.   Have you ever had any discipline against your license?

12  A.   No, sir.

13  Q.   What states are you licensed in?

14  A.   I am currently licensed in Florida, Alabama, Michigan, and

15  Texas.

16  Q.   Okay.  Have you ever been licensed in any other states?

17  A.   In the state of Maine I had a temporary license.

18  Q.   Would you tell us a little bit about the American College

19  of Obstetricians and Gynecology?  You call it ACOG.

20  A.   It is a membership society throughout the US, and you are

21  able to be a fellow of that society if you are board certified.

22  You can be a junior fellow if you are not board certified and

23  still in residency.

24      It serves for education, but it also has some, for the lack

25  of better word, lobbying duties as well, but mainly for

1  education.

2  Q.   Okay.  The issues that are before us today are those issues

3  that ACOG trains on?

4  A.   Yes.

5  Q.   And have you been part of that training?

6  A.   The training that it is put forth is by committee opinions

7  and I have taken part in the committee opinions.

8  Q.   Okay.  And conferences and so forth?

9  A.   I don't recall a conference that actually had this as a

10  topic.  Just the committee opinions.

11  Q.   Okay.  But broadly speaking, these are subjects that you

12  have participated in discussions of and reports on?

13  A.   Yes, sir.

14  Q.   Now, I guess I need to ask you whether you have ever had a

15  medical malpractice suit settled against you?

16  A.   I have.

17  Q.   How many?

18  A.   Two.

19  Q.   And were those settled by your insurer?

20  A.   Yes, sir.

21  Q.   Okay.  Now, have you had an opportunity -- and I know you

22  haven't seen every document in this case -- but have you had an

23  opportunity to review the medical records relating to our

24  client?

25  A.   I have.

1  Q.   And have you been able to read, or review any medical

2  records, or other records, relating to the other women who have

3  testified here?

4  A.   I don't know who all has testified, but I have been able to

5  review medical records of several women who were incarcerated.

6  Q.   You reviewed medical records of Ms. Ashlee Barnett?

7  A.   I did.

8  Q.   Let's see.  How about Connie Batchelor?  Have you looked at

9  any of those records?

10  A.   A few of those records.

11  Q.   Okay.  Okay.  And, Ms. Rodriguez?

12  A.   Yes, sir.

13  Q.   Okay.  And Ms. Blevins?

14  A.   I don't recall if I saw Ms. Blevins or not.

15  Q.   You did hear her testimony today?

16  A.   I did.

17  Q.   Did you not?

18  A.   I did.

19  Q.   And you have heard the testimony from Ms. Farber?

20  A.   Yes, sir.  I did hear that testimony.

21  Q.   Okay.  How much of your work is gynecological work?

22  A.   At this point approximately 60 percent.

23  Q.   The term well woman care, are you familiar with that term?

24  A.   Yes, sir.

25  Q.   How are you familiar with the term well woman care?

1  A.   It was produced by committee opinion from ACOG.

2  Q.   Is that a paper that is used in the profession?

3  A.   Yes, sir.

4  Q.   Now, just to be clear, I think you would agree that you

5  have never talked to any of these women?

6  A.   I have not.

7  Q.   And you have never examined any of these women, have you?

8  A.   No, sir.  I have not.

9  Q.   And you are not here to say who is telling the truth?

10  A.   I am not.

11  Q.   That's up the jury; isn't it?

12  A.   That's their job.

13  Q.   And the documents, you are not here to testify to the

14  accuracy of the documents; are you?

15  A.   No, sir.

16  Q.   Okay.  So, basically is your role, as you see it, to simply

17  talk about how things should be done?

18  A.   Yes, sir.

19  Q.   Okay.  And you have also had training about what

20  constitutes abuse; is that correct?

21  A.   Yes, sir.

22  Q.   And including sexual abuse?

23  A.   Yes, sir.

24  Q.   And also include abuse that may not be entirely sexual but

25  is gender-related?

1  A.    Yes, sir.

2  Q.    Okay.  And you have never worked in a prison either; have

3  you?

4  A.    I have not.

5  Q.    Have you ever been inside any of the federal prisons?

6  A.    No, sir.  I have not.

7  Q.    Okay.  And I imagine that you would agree that there is

8  room for professional differences on how women are treated in

9  gynecological examinations?

10 A.    Yes, sir.

11 Q.    I am going to put something up from --

12       (Pause in proceedings.)

13       This is -- I think it's 32B.  Let me double-check.  Yeah.

14 31A.  I'm sorry.  This is 31A.

15           MR. CARTER:  What page was that on?

16           MR. COOK:  This is 307.

17           If I could just put it up for the witness.

18           MS. MOYLE:  Your Honor, we would object to this

19 document.  It is not --

20           THE COURT:  Well --

21           MS. MOYLE:  -- listed in the records.

22           THE COURT:  It hasn't been offered yet.  Ask your next

23 question.

24 BY MR. COOK:

25 Q.    Yes, Your Honor.

1      This is an exhibit that is put up by Paul Rolston.

2          THE COURT:  Ask the witness your next question, or

3  move an exhibit into evidence, one or the other.

4  BY MR. COOK:

5  Q.   Okay.  I will just ask you to read the section that talks

6  about how frequent --

7          THE COURT:  The objection is sustained.

8          Until the exhibit is admitted into evidence you can't

9  have it read.

10         MR. COOK:  Okay.  I would ask to admit the exhibit as

11 31A, page 307.

12         MS. MOYLE:  Your Honor, the report does not

13 acknowledge this document as part of the record she reviewed --

14         MR. COOK:  I'm sorry?

15         THE COURT:  Get your headphones back out.

16     (Following conference held at sidebar at 3:21 PM.)

17         THE COURT:  All right.  So, Ms. Moyle, tell me what

18 the problem is.

19         MS. MOYLE:  Your Honor, we deposed this witness and

20 this was not listed under the records that she reviewed so we

21 would argue that any attempt to admit part of this 544-page

22 exhibit is not --

23         THE COURT:  You offering one page out of a 544-page

24 exhibit; is that what this is?

25         MR. COOK:  Yes, Your Honor.  This is not --

1          THE COURT:  It's not on your list, I take it.

2          MR. COOK:  No, it's not.  It's on Paul Rolston's list.

3   It's been listed from the beginning and we adopted it.

4          THE COURT:  Did the witness say anything about this in

5   her report?

6          MR. COOK:  No.

7          THE COURT:  So how does she get to testify about it

8   now?

9          MR. COOK:  Well, because it is the official Bureau of

10  Prisons standard on the frequency of --

11         THE COURT:  Listen, here is the question, if she said

12  nothing about it in her report how does she get to testify about

13  it now?

14         MR. COOK:  She has said something about it in her

15  report.  Her standards coincide with these Bureau of Prison

16  standards.

17         THE COURT:  Did she say anything in her report about

18  the Bureau of Prisons' standards?

19         MR. COOK:  No.  She just said about standards.

20         THE COURT:  The objection is sustained.

21         Take the document down and go on to something else.

22  Go on to something within the report that she made before the

23  trial.

24         MR. COOK:  Thank you, your Honor.

25      (Sidebar concluded at 3:23 PM.)

1  BY MR. COOK:

2  Q.   In your expert report, Doctor, you talk about well woman

3  care.  Can you explain what the well woman care concept is?

4           MS. COLES:  Improper question.

5           THE COURT:  The question is, what's well woman care.

6  I sustained the objection to the predicate, but it doesn't

7  matter.

8           THE WITNESS:  Well woman care is periodic visits with

9  a patient with comprehensive history, periodic physical

10  examinations to be done with the patient, usually ages 21 to

11  whenever.

12  BY MR. COOK:

13  Q.   Okay.  Are there any guidelines for frequency of Pap smear

14  examinations for women?

15  A.   Yes, sir; there are.

16  Q.   What are the preferred standards?

17  A.   Currently, and I want to give you the ACOG, the American

18  Congress, or American College of Obstetrician Gynecology, and

19  the American Society for Colposcopy and Cervical Pathology --

20  that's a lot to say -- their recommendations because the task

21  force is a little different from that.  But what most of us use

22  is the ACOG and the ASCCP, and that Pap smears every three years

23  on women from age 21 to 29, and after age 30 you can do

24  co-testing every five years with HPV co-test.

25  Q.   Okay.  And how about breast exams?

1  A.    Breast exams should be done annually.

2  Q.    How about rectal digital exams?

3  A.    Rectal digital exams can be offered; however, they are

4  recommended after age 50 for colorectal screening.  Although

5  that has really fallen to the side so that now we use

6  colonoscopy.  The colon screening, Cologuard that you see on TV,

7  and hemoccult cards.

8  Q.    Now as part of a gynecological Pap smear test, did you

9  express any opinion about the necessity of palpating the

10  clitoris?

11  A.    There is no reason to palpate the clitoris unless you see

12  an obvious lesion.

13  Q.    Okay.  Is there a practice rule called minimal touching?

14  A.    What is really followed by American College of OBGYN is

15  minimal physical contact, is the broader term for it.  And

16  that's what's very important with examinations.

17  Q.    And, in the absence of a reported complaint, in addition,

18  would there be any reason to palpate the clitoris at a pap exam?

19  A.    Under those circumstances, no.

20  Q.    Would there be under any circumstances a reason for rubbing

21  the clitoris in a circular motion until arousal?

22  A.    No, sir.

23  Q.    In your opinion would that be abusive?

24         MS. MOYLE:  Objection.

25         THE COURT:  Overruled.

1    THE WITNESS:  I'm sorry.  Would you repeat the

2  question?

3  BY MR. COOK:

4  Q.   In your opinion, would that be abusive, the stimulation of

5  the clitoris with a circular motion?

6  A.   That, in my mind, would fall under sexual violation.

7  Q.   Okay.  In your profession, are you a mandatory reporter?

8  A.   Yes, I am.

9  Q.   Would you report that?

10  A.   If I –– if I had –– under the State of Florida, if I have

11  direct knowledge, I am to report a violation and that would be

12  reportable.

13  Q.   How about your opinion regarding spreading the labia or

14  moving the fingers inside the vagina?

15  A.   You do have to move the fingers to a certain extent to be

16  able to feel the ovaries and the uterus.

17  Q.   Do you move the labia?

18  A.   Sometimes you do have to move the labia apart to put the

19  speculum in.  Sometimes you can just put pressure down below the

20  labia and that will spread the vaginal opening enough to allow

21  the speculum to be placed.

22  Q.   The speculum has a little light on it; doesn't it?

23  A.   Actually, there are two type of speculums –– there are

24  probably more than two –– but there is the metal speculum, which

25  you have to have a light shining in.  There is a plastic

1    speculum that has a light that -- a little canister that goes up

2    in the speculum that shines a light out of it.

3    Q.   And the purpose of the speculum -- insertion of the

4    speculum, absent a complaint, would that be to take a specimen

5    from the cervix?

6    A.   That is correct.  Plus view the cervix and view the vaginal

7    walls.

8    Q.   And that would normally be -- would that normally be

9    something that you could do by inserting the speculum alone?

10   A.   Yes.

11   Q.   And absent a complaint for some kind of lesion, or some

12   kind of abnormity, is there any reason to be feeling inside the

13   vagina with fingers in the course of a normal pap exam?

14   A.   The fingers are important for the bimanual exam, but just

15   for wiggling the fingers around the vagina there is no need for

16   that.

17   Q.   Would it ever be part of a routine pap examination to ask a

18   patient to clamp the muscles of the vagina on inserted fingers?

19           MS. COLES:  Relevance.

20           THE COURT:  Overruled.

21           THE WITNESS:  I'm sorry.  Would you repeat?

22   BY MR. COOK:

23   Q.   Would it ever be part of a routine pap examination to

24   insert fingers inside the vagina and ask the patient to clamp

25   the vaginal muscles?

1  A.   In my opinion, no, sir.

2  Q.   What would be the purpose of doing something like that?

3  A.   I don't do it.  I couldn't tell you what the purpose would

4  be.  That would be speculation.

5  Q.   Okay.  Now, in the course of a breast examination, absent a

6  specific complaint, is there any reason for anyone to pinch the

7  nipples?

8  A.   Not absent any complaint.

9  Q.   Would it ever be appropriate for someone to make a comment

10  about, you know, breast -- appearance of breasts, other than

11  pathological?

12  A.   I don't believe so, sir.

13  Q.   Would there ever be a valid medical purpose to say

14  something like, "oh wow" in examining a breast?

15  A.   No, there would not.

16  Q.   How long should the breast exam take, just a normal breast

17  exam without any abnormities?

18  A.   A minute on each side would be absolutely sufficient.

19  Q.   In your opinion, you talk about giving a patient space and

20  staying within the patient's range of view.  Can you explain

21  that a little bit?

22  A.   It's very important that patient be able to see you as much

23  possible.  There are times that you do have to, when you are

24  examining their back they can't see you, but it's very important

25  that the patient knows what you are doing, can you see what you

1  are doing, can see what you are about to do, and knows that you

2  are in their presence, and outside their personal space as much

3  as possible.

4  Q.  Would there ever be a circumstance where it would be

5  appropriate for a practitioner to rub his leg against their leg?

6  A.  No, sir.

7  Q.  Is that part of giving the patient space?

8  A.  It would not be giving the patient space.

9  Q.  Would it ever be appropriate for a practitioner to stand

10  with his crotch within a few inches of the woman's --

11  A.  It would not be.

12  Q.  -- in doing an examination?

13  A.  That would not be proper for a male or a female to do.

14  Q.  Okay.  What is the importance of having -- you make

15  reference to the importance of having a chaperone.  What would

16  be the importance of a chaperone in a cross-gender intimate

17  examination?

18  A.  Serves to protect the patient, but it serves to protect the

19  practitioner as well.

20  Q.  Is that a standard practice?

21  A.  For cross-gender it is standard practice.

22  Q.  You reviewed the medical records of our client, Charnesha

23  Alexander?

24  A.  Yes, sir.

25  Q.  Did you happen to notice when the last prior Pap smear

1    examination was for her?

2           MS. COLES:  Outside the scope of the disclosed

3    opinion.

4           THE COURT:  Overruled.

5    A.   It was -- just by my review, it was just a few months when

6    she was in Aliceville.  So I don't know -- I cannot remember

7    exactly how many months, but it was just a few months before the

8    alleged incident.

9    BY MR. COOK:

10   Q.   But it wasn't three years?

11   A.   No, sir.

12   Q.   Did you see in the medical records any indication that a

13   specimen ever went to a laboratory from that examination?

14   A.   I didn't see that.  No, sir.

15   Q.   Now, in the instance of a Pap smear exam, is there any

16   reason, absent emergency, for a practitioner to do a Pap smear

17   exam during menstrual cycle?

18   A.   You try to avoid the menstrual cycle because even with our

19   liquid-based Pap smears you will get a bloody smear and it will

20   get returned and the patient has to go through a Pap smear all

21   over again.  So it's best, if you can, to avoid menstrual

22   bleeding.

23   Q.   So there is a danger of contamination?

24   A.   Yes, sir.

25   Q.   Would you, given any discretion, would you do a Pap smear

1    examination during a heavy flow menstrual cycle?

2    A.    No, sir.

3    Q.    What is your opinion as to the professional standards on

4    that?

5    A.    Again, we have liquid-based Pap smears which help to dilute

6    the blood, but you will still get bloody smears back which means

7    the patient has to go through the exam all over again, and for

8    the women in the room that's not exactly a pleasant thing to

9    have to do a second time.

10   Q.    When you do have a chaperone in a cross-gender

11   gynecological examination, or an intimate examination, should

12   the chaperone be able to see what the provider is doing?

13   A.    That would be preferrable, yes.

14   Q.    And so if someone is doing an invasive examination of a

15   vagina should the chaperone be able to see what the doctor is

16   doing with the vagina?

17   A.    She would be able to see not in the vagina, necessarily,

18   but what the doctor is doing; yes.

19   Q.    See the doctor's movements?

20   A.    Correct.

21   Q.    Would you ever just simply rely on the patient making a

22   complaint or expressing shock?

23   A.    I listen to the patient.

24   Q.    You would listen to the patient.  But instead of watching

25   what -- as a chaperone?

1   A.   Oh, I see.  I'm sorry.

2   Q.   Should the chaperone simply rely on the patient telling if

3   they feel like they have been abused, or should the chaperone

4   watch?

5   A.   The chaperone should make a comment if something is

6   improper going on.  That's my opinion.

7   Q.   And if the chaperone sees something improper should they

8   make a report?

9   A.   I think they should.

10  Q.   If a chaperone is a certified nursing assistant, instead of

11  a medical professional, would that person have a reporting duty

12  as well?

13  A.   I consider a certified nursing assistant a medical

14  professional so let me clarify that.  I don't know if their laws

15  and rules require them to make a report like the 456 and 458

16  statutes of Florida do.

17  Q.   But a nurse would, wouldn't she?

18  A.   She should.  I just don't know that her laws require her to

19  do that.

20          MR. COOK:  Okay.  I have no other questions.  Thank

21  you.

22          THE COURT:  Cross examine?

23                  CROSS-EXAMINATION

24  BY MS. COLES:

25  Q.   Good afternoon, Dr. Tucker.

1  A.  Good afternoon.

2  Q.  If I understand correctly, you are not making any opinion

3  about who is telling the truth in this case; right?

4  A.  No, ma'am.  That's the fine ladies and gentlemen over

5  here's job.

6  Q.  You would agree that if Mr. Rolston's account of what

7  happened during his examination of Ms. Alexander on

8  September 27th, 2016, is true, then he didn't do anything

9  appropriate; right?

10  A.  You said he didn't do anything appropriate?

11  Q.  You are right.  Let me try that again.  I appreciate it.

12      He didn't do anything inappropriate?  You would agree if

13  his account is correct then there was no sexual abuse during

14  that exam?

15  A.  If his account is correct; yes, ma'am.

16  Q.  You would not criticize Mr. Rolston for evaluating a

17  problem if the patient presents with certain vaginal complaints?

18  A.  No, I think it would be proper to evaluate the problem.

19  Q.  And you would agree that if Ms. Alexander had presented

20  with a bacterial infection it would have been appropriate to

21  insert a speculum and swab the vagina?

22  A.  That would be appropriate.

23  Q.  All right.  And if she was complaining of vaginal pain a

24  pelvic exam would have been appropriate; right?

25  A.  Yes.

1  Q.   You have explained to us a little bit about well woman

2  care.  By their nature, a well woman exam -- we are talking a

3  vaginal exam, a breast exam -- those can be somewhat intrusive

4  procedures; right?

5  A.   Yes; they can be.

6  Q.   But these are parts of women's bodies and they require

7  preventative care; right?

8  A.   They do.

9  Q.   Some patients are at higher risk than others; right?

10 A.   That is correct.

11 Q.   And a patient's risk factors might change when necessary

12 follow-up should be given; is that fair?

13 A.   That's fair.

14 Q.   Sometimes -- I think you just said, but if a patient

15 presents with a certain complaint irrespective of when their

16 well woman is due they might require a vaginal examination?

17 A.   If they present with a complaint regarding the vagina; yes,

18 that is correct.

19 Q.   Okay.  As a physician, you're exercising your medical

20 judgment when patients come in, they have reports of symptoms,

21 and you will exercise your judgment to determine what

22 examinations are needed and then what type of diagnostic testing

23 is needed; is that fair?

24 A.   That is correct.

25 Q.   Now I think you testified that you haven't seen patients --

1  you haven't seen incarcerated individuals, treated them, for

2  decades; is that correct?

3  A.   That's correct.

4  Q.   And you have never treated inmates inside a prison?

5  A.   That is correct.

6  Q.   You don't know all of the prison protocols?

7  A.   I do not.

8  Q.   Do you know whether the female prison population is at

9  higher risk than the general population for conditions like

10  cervical cancer or STDs?

11  A.   The STDs I wouldn't expect because it's a female

12  population, so the transmission would be a little bit different

13  and not quite as much.  Cervical cancer, only if they have a

14  history of multiple sexual partners would they -- or the history

15  of HPV would they be at higher risk for cervical cancer.

16  Q.   Do you know what the statistics are on the percentage of

17  female inmates that have either cervical cancer or pre-cancerous

18  cell changes or STDs?

19  A.   I do not.

20  Q.   All right.  Would you agree with me that the complete well

21  woman exam takes about five to ten minutes?

22  A.   I think that's reasonable.

23  Q.   And, I think you said it's important to be talking to the

24  patient as you are going through the examination to tell them

25  what's going on before you do it?

1  A.   Yes, ma'am.

2  Q.   So, when you are doing an exam you are explaining what you

3  are doing to the patient?

4  A.   Yes, ma'am.

5  Q.   And part of that is because during the vaginal exam the

6  patient can't see what you are doing?

7  A.   That is correct.

8  Q.   Because the patient -- if we picture it, there is a bed,

9  with the stirrups.  The patient is in the stirrups.  They are

10  scooted down so the end of their butt is kind of off the table

11  and they are draped; right?

12  A.   That is correct.

13  Q.   And so they are draped in such a way that from the top they

14  have the sheet over, sometimes it's a cloth, sometimes it's

15  paper, but you are on the other side to some degree?

16  A.   Yes, ma'am.  That's correct.

17  Q.   And would you agree with me that sometimes even when you

18  explain to them what you are about to do they get a little

19  startled?

20  A.   Certainly.

21  Q.   And all vaginal exams involve touching; right?

22  A.   Yes, ma'am.

23  Q.   And first you would touch them between their buttocks and

24  their vaginal opening just to kind of let them know you are

25  coming; is that fair?

1  A.   I guess if you want to put it that way.

2  Q.   To signal it's about to start.  You don't want to just

3  stick your fingers in their vagina without a little --

4  A.   Warning.  Exactly.

5  Q.   So you would examine their vulva and their vestibule?

6  A.   Yes, ma'am.

7  Q.   And when you exam the vulva and vestibule you would spread

8  the labia?

9  A.   Sometimes you don't have to, but if they have got a long

10  labia or the labia oglutinated, you do have to.

11  Q.   You are spreading the labia to evaluate the vestibule?

12  A.   That -- that is correct.

13  Q.   All right.  You are also looking at the urethra, the labia

14  minora, you are looking for lesions in that area; right?

15  A.   That is correct.

16  Q.   You are looking for signs of STD and signs of infection?

17  A.   More signs of infection.  STDs, unless you are talking

18  about herpes or chancroid.

19  Q.   Okay.  So you are looking for signs of those types of STDs?

20  A.   Right.

21  Q.   You might be looking for masses?

22  A.   Yes.

23  Q.   You might be looking for redness, or swelling, or

24  discoloration?

25  A.   Yes, ma'am.

1  Q.   And so then the way you would perform a vaginal exam you

2  would insert the speculum next into the vagina?

3  A.   That is correct.

4  Q.   And so you are inserting the speculum so that you can

5  examine the cervix?

6  A.   And the vaginal walls.  Yes, ma'am.

7  Q.   And you are looking in the vaginal area to make sure there

8  are no lesions or evidence of discharge; is that right?

9  A.   That is correct.

10  Q.   Now, if you are just doing the vaginal examination, you are

11  still going to insert the speculum to examine inside the vagina;

12  right?

13  A.   I am not following --

14  Q.   You are right.  That wasn't a good question.

15       If in addition to the speculum examination you were going

16  to perform some type of diagnostic test, like a Pap smear, or a

17  STD swab, that's when you would do the diagnostic procedure;

18  right?

19  A.   With the speculum in, yes.

20  Q.   But let's say this patient doesn't need a Pap smear, you

21  would still insert the speculum and take a look in there?

22  A.   You would look at the cervix and the vagina walls.

23  Q.   All right.  And not only do you sometimes have to spread

24  the labia to examine the vulva and the vestibule, sometimes you

25  may need to spread the patient's labia to insert the speculum

1   depending on how that particular woman's body looks?

2   A.   Sometimes you have to; yes.

3   Q.   So, when you are finished with the speculum exam you would

4   do a bimanual exam?

5   A.   That is correct.

6   Q.   That involves inserting one or two fingers inside the

7   vagina?

8   A.   That's correct.

9   Q.   So you would be touching in a circular fashion inside the

10   vagina?

11   A.   You wouldn't go in a circle.  You press upward on the

12   cervix and you try to trap the uterus between your fingers and

13   then try to feel the ovaries on each side.

14   Q.   Circumferential fashion?

15   A.   You are not moving your fingers in that kind of fashion.

16   Q.   Do you recall having your deposition taken in this case?

17   A.   Yes.

18   Q.   I want to show you what you testified here at the bottom of

19   page 88, at line 22.  You were asked:

20      Okay.  Would you touch any of the upper parts of the

21   vagina?

22      And you said:  Well, when you do it bimanual exam you are

23   touching the circumferential area of the vagina.

24   A.   You are touching the vagina, but you are not going in a

25   circumferential fashion.  I am not sure that makes sense.  But

1  you are trying to feel all of the vagina, but you are not going

2  around like this. (Indicating)

3  Q.   I see.  So you are touching in a circle, but you are not

4  moving your hand in a circle?

5  A.   That is correct.

6  Q.   But you are touching all around the vagina?

7  A.   Yes, ma'am.  With your fingers there.

8  Q.   So.  During the bimanual exam the two fingers traverse the

9  whole circle around the vagina?

10  A.   You can feel all around the vagina with your two fingers;

11  yes, ma'am.

12  Q.   And then you are also trying to find the ovaries and the

13  cervix?

14  A.   If you can; yes, ma'am.  The cervix is easier to find

15  sometimes than the ovaries.

16  Q.   While you are doing this, would you also palpate the

17  patient's abdomen, their lower abdomen, and look for the pelvic

18  organs?

19  A.   That's correct.

20  Q.   And then you are palpating the abdomen, you are trying to

21  feel if the liver is enlarged, or if the spleen is enlarged, or

22  if they are having any tenderness?

23  A.   That's when you are palpating the upper abdomen; yes.

24  Q.   So, when you are mashing on the abdomen during the bimanual

25  examination are you trying to feel the ovaries?

1  A.   Trying to.

2  Q.   From the outside, I guess?

3  A.   Kind of both.  You are trying to trap it between your

4  fingers.

5  Q.   Gotcha.  Are you evaluating if there is any enlargement of

6  the ovaries or the uterus at that time?

7  A.   Yes.

8  Q.   During the bimanual exam, you would visually examine the

9  clitoris?

10 A.   Not during the bimanual.

11 Q.   Well, before the bimanual?

12 A.   When you are examining the vestibule that's when you

13 examine the clitoris.

14 Q.   I see.  So earlier, before you get to the speculum exam,

15 before you start, as you are spreading the labia, that's when

16 you would examine the clitoris?

17 A.   When you are examining the vestibule and the vulva, that's

18 the time; yes, ma'am.

19 Q.   I think your testimony earlier was that if there was a

20 particular reason that might require palpating the clitoris,

21 it's not just part of a well woman exam?

22 A.   That's correct.

23 Q.   There might be times where you might need to evaluate it

24 for masses or lesions?

25 A.   Usually lesions; yes, ma'am.

1  Q.   Okay.  I think you testified that the current standard is a

2  Pap smear every three years absent indicators?

3  A.   From age 21 to 29.

4  Q.   21 to 29.

5       And a Pap smear is a diagnostic test; right?

6  A.   That's correct.

7  Q.   The phrase Pap smear does not refer to a vaginal

8  examination.  That's a different thing?

9  A.   It is.  Yes, ma'am.

10  Q.   Often a Pap smear occurs during a vaginal exam?

11  A.   If your -- a visual vaginal exam, yes.

12  Q.   That standard, that's for asymptomatic patients; right?

13  A.   Asymptomatic patients and patients who don't have a recent

14  history of abnormal Pap smear.

15  Q.   So if a patient has recent history of abnormal Pap smears

16  how does that change the follow-up?

17  A.   It depends on how abnormal the Pap smear is.  Sometimes it

18  requires you to follow up in a year.  Sometimes it requires you

19  to do a colposcopy, which is another diagnostic procedure.  Just

20  depends on how abnormal the Pap smear is.

21  Q.   Are there times when -- let's say you had a patient who had

22  a Pap smear two years ago and they are not due for their routine

23  Pap smear for another year, but they come in with certain

24  symptoms that made you believe that they need to get a Pap

25  smear?

1  A.   It's occasional, but it can happen.

2  Q.   So based on a presentation, or a complaint, it might

3  require additional follow-up outside of those guidelines?

4  A.   That is correct.

5  Q.   So whether a Pap smear is indicated for a particular

6  patient, based on that patient's presentation, based on their

7  risk factors, based on their history, you are using and

8  exercising your professional judgment to make those decisions?

9  A.   That is correct.

10  Q.   And a well woman exam used to be called on annual?

11  A.   That is correct.  Yes, ma'am.

12  Q.   They called it that because it happened once a year?

13  A.   Right.

14  Q.   And Pap smears were given annually as part of the annual

15  exam?

16  A.   That is correct.

17  Q.   And so as the science has changed so have the standards; is

18  that fair?

19  A.   I think that's fair to say.

20  Q.   And those standards started changing around the 2012, 2013

21  time frame?

22  A.   May have been a little bit before that, but certainly by

23  that time.

24  Q.   Would you agree with me that there are still providers that

25  give annual Pap smears?

1 A. There are.

2 Q. Would you agree with me that if a patient presented with a

3 complaint, and the schedule for that patient, for their later

4 visits, showed that, you know, a month, two or three weeks down

5 the line, they were scheduled for a well woman, but they are

6 there today for a complaint, if there were no reasons not to,

7 would it be okay to go ahead and perform the well woman at that

8 visit?

9 A. Actually our policy is not to do the well woman on a

10 problem visit.

11 Q. Is that because of insurance billing?

12 A. I presume so. Yes, ma'am.

13 Q. So absent concerns for insurance billing, there is nothing

14 wrong with consolidating two visits, a complaint visit and a

15 well woman; is there?

16 A. It depends on the complaint. I will give you an example.

17 Someone comes in with a rip-roaring vaginitis. She may have

18 cervicitis as well, so you wouldn't want to do a Pap smear at

19 that time because you may get a false positive. That would be

20 an example.

21 Q. If, for example, a patient came in with a complaint

22 unrelated to their vagina health, but they were also due for a

23 well woman exam, then it would be okay to combine those

24 appointments while they were there?

25 A. I wouldn't. I mean, I can't say that it's wrong to but I

1  wouldn't.

2  Q.   You can't say that it's wrong to.  So you might not do it,

3  but you are not saying there is anything inappropriate with

4  doing it?

5  A.   I don't think so.

6  Q.   If the Bureau of Prisons has a policy that says other means

7  of providing preventative services involves incorporating the

8  preventative periodic visit into an annual chronic care visit or

9  another time when an inmate is already scheduled to be seen,

10  such as during annual TB screening, there wouldn't be anything

11  wrong with that policy?

12  A.   I don't think so as you read it, no.

13  Q.   I think you have testified that there is -- there are

14  liquid-based Pap smears that are newer?

15  A.   Yes.

16  Q.   And so older technology having a Pap smear while you were

17  menstruating was a bigger issue than it is now?

18  A.   It's still an issue.

19  Q.   It's still an issue, but it's not as big of an issue as it

20  was?

21  A.   I can't say that because I still get Pap smears back that

22  say bloody smear.

23  Q.   There are providers that will do a Pap smear if you show up

24  and you have some spotting or you have some bleeding they will

25  go ahead and try to do a Pap smear?

1  A.    I'm sure there are.

2  Q.    And the risk, I guess, of doing it with heavy menstruation

3  is that it may just turn back the false negative?

4  A.    Actually they oftentimes just won't even read it.  They

5  will return it and say "bloody smear.  Please repeat."

6  Q.    They will send it back and say repeat the test?

7  A.    Right.

8  Q.    Would you agree with me that if you had a patient who

9  reported having a Pap smear, say, three years ago, or two years,

10  or one year ago, but you don't have any indication of what the

11  results of that Pap smear were, and you don't have the lab

12  results, you would repeat it?

13  A.    Not necessarily.

14  Q.    Why not?

15  A.    If she gives the history that she had a normal Pap smear

16  certainly would take her word for it.

17  Q.    So you are going to rely on the patient's account of when

18  they had a Pap smear?

19  A.    Yes.

20  Q.    And there would be nothing wrong with that?

21  A.    No.

22  Q.    According to ACOG -- you identified ACOG earlier.  Can you

23  tell me again what ACOG is?

24  A.    ACOG used to be called the American College of

25  Obstetricians and Gynecologists.  Then they changed it to

Cross-Examination - Dr. Lisa Tucker

1  American Congress of Obstetricians and Gynecologist.  And right

2  now I just don't know what they call it.  It's ACOG.

3  Q.  They provide guidance and training to gynecologists and

4  obstetricians?

5  A.  That's correct.

6  Q.  And according to ACOG, one of the best tools to prevent

7  inappropriate contact by a provider is the use of a chaperone;

8  right?

9  A.  I would agree with that.

10  Q.  And ACOG recommends that a chaperone be present for all

11  breast, genital and rectal examinations?

12  A.  They recommend it with cross-gender.  They also recommend

13  it with same gender with the caveat that it needs more study.

14  That particular scenario needs more study.

15  Q.  So the ACOG committee opinion on sexual misconduct states

16  that:  It now believes that the routine use of chaperones is

17  needed for the protection of patients and OBs.  And therefore it

18  is recommended that a chaperone be present for all breast,

19  genital and rectal examination.  The need for chaperones is

20  irrespective of sex or gender of the person performing the

21  examination.  Is that right?

22  A.  Keep reading.  It says it deserves more study.

23  Q.  So you only use a chaperone about twenty percent of the

24  time?

25  A.  I think that's reasonable.

1  Q.   And that's because you are a female doing exams on a

2  female?

3  A.   Yes.

4  Q.   You would agree with me that ACOG has recommended that you

5  have a chaperone for all of your examinations?

6  A.   But they say that it needs more study.

7       They say they realize that that could be cumbersome but

8  more study is warranted.

9  Q.   So it would be cumbersome for female gynecologists but male

10 gynecologists have to comply with it.  Is that your

11 understanding of how the rules works?

12 A.   Pretty much, yeah.

13 Q.   Okay.  I think you testified to this, but the chaperone is

14 there for two reasons, right?  The chaperone is there to protect

15 the patient in case the provider does anything inappropriate;

16 right?

17 A.   That's correct.

18 Q.   And the chaperone is also there to protect the provider in

19 the event the patient says something happened that didn't?

20 A.   That's correct.

21 Q.   So the chaperone serves as a witness to the event?

22 A.   Yes.  And an assistant as well.

23 Q.   All right.  And so the chaperone is often engaged in

24 assisting with the exam, handing the provider tools, things like

25 that?

1  A.    Yes.

2  Q.    And you would agree that there was a chaperone present

3  during the examination of Ms. Alexander?

4  A.    Yes, ma'am.

5  Q.    And you don't have any criticism of the chaperone who

6  observed this evaluation; do you?

7  A.    Not of her, no, ma'am.

8  Q.    Now, when you perform a breast exam, part of the well

9  woman -- I know we jumped a little bit.  We are done with

10  vaginal.  We talked about paps.  And then breast exam.  That's

11  part of the well woman exam?

12  A.    That's correct.

13  Q.    So, when you perform a breast exam you touch all around the

14  nipple, all around the areola, and all around the breast?

15  A.    That is correct.

16  Q.    And is that the time you are going kind of in a circular

17  fashion around the breast?

18  A.    Either in a circular fashion or sweeping to the middle.  It

19  varies.

20  Q.    And you would also feel in the patient's armpit and you are

21  looking for any breast masses in the armpit?

22  A.    That's correct.

23  Q.    And the breast exam alone can be two minutes or more?

24  A.    I think that's reasonable.

25  Q.    And, you know, the size of the patient, the size of the

1  patient's breasts, what you are feeling inside the breast

2  tissue, may impact the length of that examination?

3  A.   It could.

4  Q.   Now, it's been -- pinching has been used, nipple pinching,

5  would you describe that as more of like a milking process?

6  A.   No.  That would be a pinching process.

7  Q.   Is there ever a time where you would need the pinch the

8  breast?

9  A.   If a patient comes in complaining of a discharge that would

10  be the time that I would try to pinch, or milk up to the nipple

11  and then pinch a little bit, to see if I can get any discharge

12  out.

13  Q.   You would agree that if a patient comes in with a complaint

14  relating to nipple discharge then you would examine that

15  complaint by pinching, or probably more appropriately describing

16  it as kind of a milking, to see if you can get discharge to come

17  out?

18  A.   Yes, ma'am.

19  Q.   Do you know if there are providers who routinely pinch or

20  milk a patient's nipple as part of a routine breast examination?

21  A.   No, I do not.

22  Q.   Do you know if that's the standard practice in some prison

23  facilities?

24  A.   I wouldn't be able to answer about prison facilities.

25  Q.   But you don't know if other providers do it, or not?

1  A.    I do not.

2  Q.    And would you agree with me that a digital rectal

3  examination used to be a routine part of all well woman exams?

4  A.    No.  It was age-related.

5  Q.    For what age?

6  A.    Usually started after age 40.

7  Q.    Are there risk factors that might cause you to want to

8  start doing it sooner than age 40?

9  A.    Well, right now, I mean, the risk factors that you would be

10 looking for, mainly, would be risk factors for colon cancer.

11 And there are better tests to do than a digital rectal exam for

12 colon cancer.

13 Q.    Is there --

14 A.    I'm sorry.

15 Q.    I did not mean to interrupt you.

16 A.    If there was a finding on the examination, such as a mass,

17 or something like that, that may be better elucidated with a

18 rectal exam, I will ask the patient:  Is it okay if I do a

19 rectal exam to be able to feel what I am feeling here.

20 Q.    Is there any other reason to do a rectal exam other than to

21 assess for colon cancer?

22 A.    If it's asymptomatic and the exam is normal, then that

23 would be the only reason to do a rectal exam.

24 Q.    You would agree with me that there are still providers who

25 will insert a finger to do a rectal examination during a well

1  woman, and they take a specimen and do a testing on the

2  specimen?

3  A.   I don't know that anybody does that anymore.

4  Q.   But it used to be common practice?

5  A.   It used to be a common practice.  Yes, ma'am.

6  Q.   When you perform a Cologuard, colon cancer screen, or

7  colonoscopy, you identified as alternative cancer screening

8  mechanisms, that are used now?

9  A.   They are probably the standards that they are using now.

10  Q.   Is that a different line item that you bill out?

11  A.   I don't bill it out.  I send that to a specialist to do.

12  Q.   You send that to a specialist?

13  A.   The Cologuard, I just order it and it comes to the

14  patient's home.  And it doesn't change my billing whatsoever.

15  Q.   That doesn't cost the patient anything?

16  A.   I don't know if it costs -- it depends on their insurance,

17  whether it cost them or not.  Some insurances cover all

18  preventative exams.  Some don't.  So the colonoscopy, if it's a

19  screening colonoscopy it's done by a gastroenterologist or a

20  general surgeon, and that's billed as a preventive exam and so

21  typically there is no payment for the patient.

22  Q.   You would agree with me that Ms. Alexander never complained

23  about rectal examinations?

24  A.   That is correct.

25         MR. COOK:  Objection, Your Honor.

1          THE COURT:  Overruled.

2          THE WITNESS:  I'm sorry.

3          THE COURT:  You can answer the question.

4          THE WITNESS:  Would you please repeat it?

5          MS. COLES:  Yes, ma'am.

6    Q    (By Ms. Coles) You would agree with me that Ms. Alexander

7    never complained about rectal examinations?

8    A.   Just that her anus was exposed.  That's the only complaint

9    she made.

10   Q.   During the well woman visit you are talking to the patient

11   about their sexual health, you are talking about the number of

12   sex partners, you are talking about STD prevention, pregnancy

13   prevention, things like that?

14   A.   Of course.

15   Q.   And it would be appropriate to discuss things of that

16   nature during a well woman exam?

17   A.   It would be.

18   Q.   Appropriate to discuss if the patient had hemorrhoids?

19   A.   Yes.

20   Q.   And you agree with me that if you had a patient with

21   ingrown pubic hair, that looked like it could be infected, you

22   would give that patient advice about maybe not shaving their

23   pubic hair; right?

24   A.   Actually.  I don't.  I just tell them to put heat on it.

25   Q.   You tell them to put heat on it?

000637

1  A.   Uh-huh.

2  Q.   Would you agree with me that a provider needs to be aware

3  if a patient has breast implants?

4  A.   It's very important to know that; yes.

5  Q.   And would you agree that limited physical contact between

6  physician and patient, like hugging or holding a patient's hand

7  at times, may be a valuable therapeutic expression of support?

8  A.   It can be if the patient is open to it.

9  Q.   Now, you use lubricant when you are doing -- when you are

10 going to insert a speculum, if you are not doing a Pap smear;

11 right?

12 A.   If I am not doing a Pap smear; yes.

13 Q.   Why would you not use lubricant if you were doing a Pap

14 smear?

15 A.   In spite of them saying that water-based lubricants do not

16 affect the Pap smear, I have had them sent back saying

17 "lubricant used.  Repeat."

18 Q.   But there is some instruction that you are supposed to be

19 able to use them, but in your experience it has not gone well?

20 A.   That's correct.

21 Q.   Okay.  And you wouldn't use lubricant for the bimanual

22 examination?

23 A.   Yes.

24 Q.   So prior to inserting the two fingers into the vagina you

25 would either -- would you put the lubricant on your gloved

1  fingers or who would you have your assistant do it?

2  A.   Either way.

3  Q.   All right.  And you agree that a patient may perceive an

4  interaction as sexual or romantic when, in fact, there was no

5  such intent on the part of the provider?

6  A.   I'm sorry.  Would you say that again?

7  Q.   Yes, ma'am.  You would agree that, as ACOG has stated, that

8  a patient may perceive an interaction between the provider and

9  the patient as romantic or sexual when, in fact, there was no

10  such intent on the part of the provider?

11  A.   I think that can happen, yes.

12       MS. COLES:  Thank you.  I appreciate it.  I don't have

13  any other questions.

14       THE COURT:  Ms. Moyle?

15       MS. MOYLE:  Just briefly, Your Honor.

16                    CROSS-EXAMINATION

17  BY MS. MOYLE:

18  Q.   Dr. Tucker, as a board certified gynecologist, is it your

19  experience that women come in all different shapes and sizes in

20  terms of vaginal anatomy?

21  A.   Yes, they do.

22  Q.   Do you have any knowledge as to whether Cologuard is used

23  in prison systems?

24  A.   I do not.

25  Q.   You are being paid to render an expert opinion in this

1  case; is that correct?

2  A.   Yes, ma'am.

3       MS. MOYLE:  Nothing further.

4       THE COURT:  Redirect?

5                   REDIRECT EXAMINATION

6  BY MR. COOK:

7  Q.   Yes, Your Honor.

8       I think our Exhibit Number 1 has been admitted, if no one

9  disagrees.

10      You -- I think you said that the well woman exam can be

11 done in as little as 5 minutes.

12      Can you see that?

13 A.   I can see that.

14      MS. COLES:  Objection.  Outside the scope of this

15 witness's testimony.

16      THE COURT:  Not yet.  Overruled.

17      THE WITNESS:  Yes, sir.  I can see this.

18 BY MR. COOK:

19 Q.   Okay.  I think you said that in your testimony and I am

20 asking whether a well woman exam should take four hours?

21      MS. COLES:  Outside the scope of the report.

22      THE COURT:  Overruled.

23      THE WITNESS:  A well woman exam should not take four

24 hours.

25 BY MR. COOK:

1  Q.   If you can look, and if you can read the time at which that

2  exam was started, and the time that the -- here.  I can do a

3  call-out here so you can see it more easily.

4       Encounter date.  Do you see the time here?

5  A.   Yes, sir.  14:49.

6  Q.   Okay.  I am going to show when the report was closed out.

7  A.   18:53.

8  Q.   Is there any reason that you think of that an examination

9  should last that long?

10          MS. MOYLE:  Objection.

11          THE COURT:  The objection is sustained.

12 BY MR. COOK:

13 Q.   Are you familiar with that kind of medical -- electronic

14 medical record?

15 A.   Not this particular one, but I am familiar with electronic

16 medical records.

17 Q.   Okay.  Is it typical that once you close the record you

18 can't go back and change anything?

19          MS. MOYLE:  Objection.

20          THE COURT:  Sustained.

21 BY MR. COOK:

22 Q.   You were asked earlier if you -- if Paul Rolston's

23 statements are believed that he committed no misconduct.  I

24 believe that you assented to that, but can you really say that

25 you have seen all of Paul Rolston's statements?

1   A.   I have not.

2   Q.   Okay.  So, you don't know of any false statements?

3   A.   I do not.

4   Q.   You were asked, I believe, if a patient -- if a client came

5   in with vaginal discharge would it have been appropriate to

6   conduct the examination in the way it was.  But, if our client

7   truthfully says that there was no discharge that would be

8   different; wouldn't it?  It would not be justified?

9   A.   If she was complaining of the discharge and the discharge

10  went away there would be no need for an examination.

11  Q.   And if she came in there and said that the discharge had

12  been cured?

13  A.   I don't see any reason to do an examination.

14  Q.   And particularly if she had had a Pap smear examination six

15  months earlier?

16  A.   Correct.

17  Q.   Okay.  And I think you discriminated in your opinion

18  between a complaint-based and a well woman exam.  Can you tell

19  me the difference between complaint-based and well woman?

20  A.   Well woman is when there is no complaints.  A woman is in

21  for her periodic check up.  There are no complaints or issues

22  going on.  The complaint-based visit is just that; the patient

23  has a specific complaint that she is coming in for.

24  Q.   So if it's not complaint-based, then the well woman exam

25  could be over fairly quickly; correct?

1    A.   Yes.

2    Q.   And if it is complaint-based wouldn't it be the duty of the

3    provider to address the complaint?

4    A.   Yes.

5    Q.   If someone comes in with a complaint of eczema and they get

6    a Pap smear or a breast exam, but the eczema is not medically

7    addressed, would that be proper for a complaint-based exam?

8         MS. MOYLE:  Your Honor, she is an OBGYN.

9         THE COURT:  Overruled.

10        THE WITNESS:  If a patient came in with a specific

11   complaint and it was not addressed that would not be proper.

12   BY MR. COOK:

13   Q.   Now, I think that you assented to the statement that it is

14   a common practice to examine the clitoris?

15   A.   To inspect the clitoris, yes.

16   Q.   That doesn't mean to touch it; does it?

17   A.   Unless there is a lesion there; no.

18   Q.   Okay.  In the absence of a lesion, there would be no reason

19   to palpate a clitoris; would there?

20   A.   No.

21   Q.   In any case, there would be no reason to stimulate the

22   clitoris in a circular motion until it becomes aroused; would

23   it?

24   A.   No.

25   Q.   What does a Pap smear -- what is the Pap smear intended to

1  diagnose?

2  A.   It is to look for pre-cancerous or cancerous changes of the

3  cervix.

4  Q.   If a woman has no cervix, what would be the purpose of a

5  Pap smear?

6  A.   The current recommendation is not to do a Pap smear on

7  women who don't have a cervix.  Unless -- there is a caveat to

8  that -- unless they were treated for a high-grade lesion within

9  the last 25 years.

10 Q.   You would want to see medical history of that; correct?

11 A.   That is correct.

12 Q.   And it says -- I believe you assented to the proposition

13 that Pap smears used to be annual, and I think you said that it

14 might be some time prior to 2012, earlier than that.

15 A.   I think it was earlier than that.

16 Q.   Okay.  So, in the last ten years has that been a practice?

17 A.   Of Pap smears every three years?

18 Q.   No.  No.  Every year?

19 A.   Oh, every year.  It's not a general practice.  There are

20 practitioners who do that, but the current guidelines are every

21 three years.  And it has been that way for, I believe, at least

22 the last ten years.

23 Q.   And the recommendation, I believe, ACOG recommendation for

24 breast exams is that there should be a -- if they are

25 cross-gender, that they should be chaperoned?

1    A.    Yes.

2    Q.    You were asked whether you had any criticism of the

3    chaperone, and I am not sure if this is criticism of the

4    chaperone, but should the chaperone have been able to see what

5    was going on with the physician's hands?

6    A.    Yes.

7    Q.    So if the chaperone herself says that she couldn't see

8    specifically what he was doing with his hands is that the true

9    business of a chaperone?

10   A.    Again, the chaperone is there to protect the patient and

11   the practitioner, so it would be wise that the chaperone be able

12   to see what the practitioner is doing.

13            MR. COOK:  I have no other questions.

14            THE COURT:  Thank you, Dr. Tucker.  You may step down.

15            Please call your next witness.

16            MR. COOK:  Your Honor, we have no further witnesses.

17   We rest.

18            THE COURT:  Members of the jury, as I told you at the

19   beginning of the case, the plaintiff goes first and when the

20   plaintiff announces that she rests it's the defendant's turn.

21            Sometimes there is some housekeeping to do as we shift

22   gears.

23            Anything now I need to do, or are you ready to call your

24   first witness?

25            MR. FISHER:  We have a motion to present to the Court,

1   Your Honor.

2   THE COURT:  Well, let's do this.  Let's -- let me let

3   you go back to the jury room for just a minute and let us get

4   our housekeeping taken care of and I will have you back in.

5   Jury out, please.

6   (Jury out at 4:19.)

7   THE COURT:  You may be seated.

8   What do we have?

9   I guess I ought to find out where we are procedurally.

10  Do you have more evidence against the government that hasn't

11  been presented in front of the jury?

12  MR. COOK:  Yes, Your Honor.

13  THE COURT:  What more do you have?

14  MR. COOK:  Your Honor, we have some exhibits that

15  would not have been appropriate for the jury but that we feel

16  that will be appropriate to the Court.

17  THE COURT:  All right.  Well, you can tell me what

18  those are right now.

19  What else do you have?

20  MR. COOK:  Okay.

21  THE COURT:  Do you have any other testimony that

22  hasn't been presented?

23  MR. COOK:  Your Honor, I would have preferred to call

24  back the chaperone that we heard from this morning.

25  THE COURT:  For questions that involve the government

1  but did not involve Mr. Rolston?

2          MR. COOK:  Well, perhaps not.  But certainly the

3  exhibits.

4          THE COURT:  All right.  Tell me what the exhibits are.

5  Give me a list.

6          MR. COOK:  Okay.  First of all, Your Honor, we want

7  to -- I believe, Exhibit 1 is entered, but if it's not we ask

8  that it be entered.

9          THE COURT:  1 is in.

10          MR. COOK:  Okay.

11          The next one is the Alexander investigation.  I don't

12  know whether you want me to put these up.

13          THE COURT:  I don't want them put up.  What I would

14  like you to do is just call out the numbers.

15          MR. COOK:  Okay.  We would like to have five.

16          We would like to have eight and nine.

17          We would like to have -- we would like to have 13.

18          We would like to have -- we would like to have 25.

19          We would like have 27.

20          We would like to have 35, 37.

21          We would like to have 48, 49, 50, 53, 55, 58, 59, 60,

22  63, 65.

23          We would like to have 83, 84, 85, 86, 87, 88, and 89.

24          And we would also like to have the Government Exhibit,

25  I believe, it's 98.  And the Rolston Exhibit 31A.

1          MR. CARTER:  You said B, too?

2          MR. COOK:  Yeah.  I think I meant -- I think I just

3     meant A.

4          THE COURT:  Speak up where I can hear you, please.

5     31A?

6          MR. COOK:  Yes.  31A.  And then the 2014 inmate

7     handbook.

8          And I am not sure how that -- well, I've got that

9     here.

10          THE COURT:  I can't hear.

11          MR. COOK:  Yes, Your Honor.

12          THE COURT:  Outside voices.  Look, the jury is not

13     here, there is nobody to impress, speak up loudly so I can hear

14     you and the court reporter can hear you.

15          MR. COOK:  I am not trying to impress anyone, Your

16     Honor.

17          THE COURT:  All right.  Well, speak up loudly.

18          MR. COOK:  Yes, sir.

19          So, 32 is inmate handbooks, but I think that they have

20     the 2010 and 2013 and the --

21          THE COURT:  Look, here is what I am trying to do.  I

22     am trying not to waste the jury's time.  If this is going to be

23     awhile, I will just send them home.  And maybe that's what I

24     should do.  If you don't have the list all ready to tell me what

25     is the evidence is you are going to offer I will send them home.

1    Let me do that.  I can go back and tell them to go home, or I
2    can bring them back in.  I will be happy to bring them back in
3    but if nobody cares I will go tell them to go home.
4            MR. COOK:  Your Honor, I don't.  And I would prefer to
5    be able to give the Court a written list.
6            THE COURT:  No.  No.  You are going to give me a list
7    right now.  We are in trial right now.  We are not going to take
8    a break while you decide what evidence to present.  We are going
9    to get it done now.  You be thinking about it.  I am going to
10   tell the jury to go home.
11           MR. COOK:  The last thing I said was it.  That's the
12   end of it.
13           THE COURT:  31A and 32.  And that's the end?
14           MR. COOK:  32, but not all of 32.  There are three
15   handbooks and one of them is the 2014.  That's what we want.
16           THE COURT:  All right.  So the 2014 handbook that's
17   included within Exhibit 32?
18           MR. COOK:  Correct.
19           THE COURT:  And then I am going to hear Mr. Fisher,
20   but he is going to want to talk for a minute.
21           We are back to, do you want me to tell the jury to go
22   home or bring the jury in and ask them to go home?
23           MR. COOK:  Ask them to discharge, Your Honor.
24           THE COURT:  You want me to bring them into the
25   courtroom or you want me to tell them in the jury room?  You

1　don't care.

2　　　　　MR. COOK:  I don't care.

3　　　　　MR. CARTER:  We don't care, Your Honor.

4　　　　　THE COURT:  All right.  Then I am going to tell them

5　to go home.  I am going to tell them don't get any information

6　from anywhere else and be back at 9 o'clock.  I will be back in

7　just a minute.

8　　　　　If anybody needs to go to the restroom quickly, do it,

9　but otherwise you are welcome to stay right here, I will be

10　right back.

11　　　　　(Judge addressed the jury in the jury room)

12　　　　　THE COURT:  I don't get to come in here.

13　　　　　It's going to take me a minute to shift gears.  It's

14　late in the day so you are going to get to go home.  You will

15　recall the instructions, don't talk about the case with anybody

16　and don't get any information from any other place.

17　　　　　We will start at 9 o'clock in the morning.  Same

18　drill.  Have a pleasant evening.

19　　　　　We don't always quit before 5 o'clock, but you got two

20　days in a row.

21　　　　　Good for you.  Thank you.

22　　　　(Jury dismissed for the evening at 4:29.)

23　　　　　THE COURT:  All right.  So I've sent the jury home.

24　Told them not to get any information from anywhere else.  Same

25　thing you have heard me say.  You heard me say at the end of the

1  day yesterday.

2          So, here is where I understand we are procedurally.

3  The plaintiff has rested as against Mr. Rolston.  Has rested

4  against the government, except that the plaintiff has moved the

5  admission of the exhibits that Mr. Cook just listed.

6          Are there -- as I told Mr. Cook, I just wanted the

7  numbers.  I didn't want to hear a description.  Are those all

8  properly admitted?  Are there any objections?

9          MR. FISHER:  No.  There are objections, Your Honor.

10          THE COURT:  There are objections?

11          MR. FISHER:  Yes, sir.

12          THE COURT:  Let me pull up my list.  I can't tell from

13  the part that was appropriated out whose exhibits those are, so

14  I am not sure I have the right list but I am going to pull it

15  up.

16          I have got somebody's exhibits one through 109; is

17  that the government's?

18          MR. FISHER:  Yes, sir.

19          THE COURT:  Then I have a drive with -- I have got a

20  drive with Exhibits 1 through 89, labeled Alexander Exhibits.

21  That may refer to the case of the plaintiffs.

22          Is that the plaintiff?

23          MR. COOK:  That's ours, Your Honor.

24          THE COURT:  Then I have got a list of 1 through 96 and

25  I'm thinking that's Mr. Rolston's list.

1          So what are the objections?

2          MR. FISHER:  Your Honor, with respect to Exhibit No.

3    5, that's the entire Alexander investigative file.  It includes

4    affidavits, it includes an assortment of documents that some of

5    which would not be admissible and the report itself wasn't

6    offered.  It was completed by Rivera.  There was an opportunity

7    at that time to go through it and we didn't.  We object to just

8    a wholesale admission.

9          THE COURT:  What else?

10         MR. FISHER:  No. 8 is an ACOG article on well woman

11   care.  Our position is that it's hearsay and also not relevant.

12         THE COURT:  Isn't it hearsay?

13         MR. COOK:  I don't think so, Your Honor, but it's not

14   an official report.

15         THE COURT:  Well, I mean what possible hearsay

16   exception would there be to an ACOG report like that?

17         MR. COOK:  I guess it is -- what is it, 807?

18         THE COURT:  Why would you need it?  You just had Dr.

19   Tucker tell us the relevant information from the ACOG standards.

20   How would this possibly come in under 807?

21         MR. COOK:  Well, I think parts of the report were

22   already referenced by Mr. Rolston and we want to have the whole

23   document.

24         THE COURT:  This is not a close question or a hard

25   question.  This is hearsay.  The objection is sustained.

1      MR. COOK:  Okay.

2      THE COURT:  What else?

3      MR. FISHER:  No. 9 is an ACOG article on sexual

4  conduct.  We have the same objections.

5      THE COURT:  Same ruling.

6      MR. FISHER:  I was trying to jot down the numbers as

7  quickly as I could.  I hope I got them.  I believe the next one

8  he said was 13, which is the rule that was -- or a copy of the

9  rule that was promulgated on the prison elimination act --

10  reform act.  And, we don't object to that.

11      THE COURT:  So 13 is admitted.

12      (PLAINTIFF EXHIBIT 13:  Received in evidence.)

13      MR. FISHER:  25, is a PowerPoint presentation that the

14  institution or BOP has used in training.  We don't object to

15  that.

16      THE COURT:  It's admitted.

17      (PLAINTIFF EXHIBIT 25:  Received in evidence.)

18      MR. FISHER:  27 is a PREA proof of posting.  We do

19  object to that, and I will say part of the reason is because we

20  noted, and I have to tell you, candidly, I don't know if this

21  was corrected, but at the point in time when we got the exhibit

22  list this exhibit was missing.  We did not get to see it.

23      THE COURT:  But it's the poster that gets put up at

24  the bureau about PREA?

25      MR. FISHER:  There is an exhibit that is a poster and

1   then there is also an exhibit that is an email that references a
2   limited period of time in which it confirms the PREA poster
3   posting.  But, I think it's irrelevant because it's incomplete
4   if it's the one I am thinking of.  I am not positive it's the
5   one I am thinking of.
6        MR. COOK:  It's a document that they provided to us,
7   Your Honor.
8        MR. FISHER:  If it's the document we provided on proof
9   of posting, then it's not complete as to the time frames when it
10  was posted and therefore are irrelevant.
11       THE COURT:  Let me just say this, and I have done a
12  fair amount fussing, and I guess do a little more, I am certain
13  at the pretrial conference I had the discussion that I always
14  have and I started off by saying, it happens more that you can
15  imagine that the jury will be in the box and somebody will have
16  an exhibit and the lawyers will start looking at each other, and
17  turn their backs on me and the jury, talking about, is this the
18  right document, and so forth.  And I said that can't happen.
19       That happened once with the jury in the box earlier.
20  It didn't go on for a long time, but it happened.  And now here
21  we are again where Mr. Fisher doesn't know what the plaintiff's
22  Exhibit 27 is.  I am certain there is an order in the case,
23  maybe not.  Maybe I got off track and the standard orders didn't
24  all go.  But I think it's very, very likely that there is an
25  order in the case that says:  You must put your exhibits in the

1    other side's hands exactly as they are going to be offered.

2            So it should never happen at a trial that somebody

3    offers an exhibit and the other side doesn't know what's in the

4    exhibit.

5            MR. COOK:  Your Honor --

6            THE COURT:  Now I am going to work on how I say it.  I

7    have been working on it for a lot of years and somehow I can't

8    get it right.  I can't get people to understand it.

9            Did you put a copy of this exhibit marked as Exhibit

10   27 in Mr. Fisher's hands before the trial?

11           MR. COOK:  Yes.  Absolutely.  What he is not telling

12   you is that 27 and 82 are exactly the same exhibit.  And it

13   turned out to be duplicates so 82 is actually the exhibit that

14   he says he doesn't have, and he did have it.

15           THE COURT:  Well, look, I don't care if it's

16   incomplete or not.  It says what it says.  And if it doesn't

17   prove everything it ought to prove, that's fine.  27 is

18   admitted.

19           MR. FISHER:  To be clear, if it's duplicative of 82 I

20   didn't know that.

21       (PLAINTIFF EXHIBIT 27:  Received in evidence.)

22           THE COURT:  The next is 35.

23           MR. FISHER:  35; that is documents related to the PREA

24   program.  We don't have any objection to that.

25           THE COURT:  35 is admitted.

1          (PLAINTIFF EXHIBIT 35:  Received in evidence.)

2          MR. FISHER:  37 is an ACA audit.  We don't have any

3    objection to that.

4          THE COURT:  37 is admitted.

5          (PLAINTIFF EXHIBIT 37:  Received in evidence.)

6          MR. FISHER:  I believe it skips to 48.  These are

7    Ms. Barnett's medical records.  We do maintain an objection to

8    that.  They should have been admitted when Ms. Barnett was

9    testifying.

10          THE COURT:  You don't have an authenticity objection?

11          MR. FISHER:  Not authenticity; correct.

12          THE COURT:  The same on down the list -- these are

13    through 55 -- 48, 49, 50, 53 and 55, are medical records of the

14    various Me Too witnesses.

15          MR. FISHER:  Correct.  There is no authenticity

16    objection.

17          THE COURT:  Those are all admitted.

18          (PLAINTIFF EXHIBITS 48, 49, 50, 53, 55:  Received in

19    evidence.)

20          MR. FISHER:  After 55, what I have written was 58.

21    Those are investigative documents.  We maintain they are hearsay

22    and also irrelevant.  That's true of 58, 59.  And my

23    understanding was that 60 had been withdrawn, but maybe not.

24          THE COURT:  Apparently it's now being offered.

25          MR. FISHER:  Okay.  Well, I think -- 60, at one point

1   in time, was similar to our 109.  It was broken down.  We had

2   put in what we believe was relevant from that.  And I don't

3   believe it would be proper just to put in wholesale the entire

4   investigation.

5         THE COURT:  Well, I think that's right to the extent

6   there are findings, and they are relevant, they are probably

7   admissible under 803.8.

8         MR. FISHER:  The findings in the report.

9         THE COURT:  But to the extent it's just a vessel to

10   put in hearsay, then it's not admissible.

11         MR. COOK:  Your Honor, I believe it's a statement of

12   the party and especially as to the affidavits.

13         THE COURT:  It depends on whose affidavit it is.  If

14   it's an affidavit of a prisoner what would make it admissible?

15         MR. COOK:  Well, Your Honor, certainly some of the

16   affidavits are affidavits of Mr. Rolston, and perhaps those are

17   the only ones that are admissible.  Although, we would certainly

18   like to include the affidavit of Ms. Davis.  And, again, she is

19   an employee at the Department.

20         THE COURT:  Ms. Davis' declaration is probably

21   admissible as a statement of a party.  Maybe.  Maybe not.  It

22   depends on -- I hadn't read it.  But, why isn't it?

23         MR. FISHER:  Well, I would say this, Ms. Davis is a

24   contractor.  She testified that she is a contractor.  I don't

25   believe that she could make statements that would be binding on

1  the United States.

2  THE COURT:  And she was -- but she was asked to submit

3  the affidavit?

4  MR. FISHER:  She was.  In the course of the

5  investigation, she was; yes.

6  THE COURT:  All right.  I will admit parts of those.

7  And the way we will deal with it is we are going to put the

8  whole documents into the record.  This is the non-jury portion

9  of the record.  I will consider the parts that are properly

10  admitted and not the other parts.  To keep up with it,

11  logistically, we are just going to put them all in.

12  To the extent it matters to anybody, and the ruling I

13  just made is not clear, I will be the first one to tell you it's

14  not clear, we can get it cleared up later to the extent it

15  matters.

16  MR. FISHER:  Okay.  I wasn't clear if I heard Mr. Cook

17  named 63 or not.

18  THE COURT:  Yes.  58, 59, 60, 63 and 65 are all in

19  that same category.

20  MR. FISHER:  Yes.

21  THE COURT:  So the findings are admitted.

22  Mr. Rolston's affidavits are admitted.  And no

23  definitive ruling has been made on the others, but they will be

24  with the record and we can -- to the extent they matter, you can

25  address them in the argument and we will deal with it.

1    MR. FISHER:  Can I ask for a point of clarification?

2    THE COURT:  Sure.

3    MR. FISHER:  The Blevins' investigation had been

4  complete, and the Barnett investigation had been completed, so

5  that would be 58 and 60.

6    59, 63, and 65 are investigations that, to my

7  knowledge, were not completed.  And the documents that would be

8  here would just be the predicating information for the

9  investigation.

10    THE COURT:  So, at the time of these documents there

11  were no findings, so there were no findings in the documents?

12    MR. FISHER:  That's correct.

13    THE COURT:  Well, then, to the extent there are no

14  findings then no findings are admitted from those documents.

15    MR. FISHER:  So for my own records and make sure we

16  get the correct documents listed:  58 and 60 then are admitted.

17  59 and 63 and 65 are not.

18    THE COURT:  Parts of them probably are.  Mr. Rolston's

19  affidavits are admitted, so if there is an affidavit from Mr.

20  Rolston in each one of those, that affidavit is now part of the

21  record in the case against the Government.  Any findings of fact

22  are part of the record in the case against the Government.

23    And I will have to look at the others.  It's almost

24  certain that any affidavit from a prisoner that's included in

25  those will not be considered.

1          Probably Ms. Davis' affidavit will not be considered.

2     I will look at that.  I need to read the affidavit and look at

3     the document and see -- the question is, was she authorized to

4     speak for the government on this topic, and I just don't know

5     the answer to that without looking at the documents.

6          (PLAINTIFF EXHIBITS 58, 60:  Received in evidence.)

7          MR. FISHER:  The next number that I have is 83; is

8     that consistent?

9          THE COURT:  Yes.

10          MR. FISHER:  Okay.  I would offer that we object to 83

11     through 89.  I can deal with them one at a time, but all of 83

12     through 89 were offered to us as exhibits after June 28th, which

13     had been the deadline, as I understand, that the Court had

14     imposed for us to exchange exhibits by.  83 through 89 each came

15     after that point, so we object on that basis.

16          We also have, with respect to individual 84, 85, 86,

17     we would have hearsay objections to each of those.

18          We would also object on 401-402 grounds.

19          On 86, we would also posit a 403 objection to 86.

20          Same with 87; we would argue hearsay, 403, as well as

21     a 401-402 argument.

22          Then the same would be true for 88 and 89 as well.

23          THE COURT:  Mr. Cook, when were these turned over?

24     Were they turned over late?

25          MR. COOK:  Yes, Your Honor.  I believe the cut-off was

1  July 26th, and I believe we got them to them -- of course, these

2  documents came from them -- within a week or so that they --

3          THE COURT:  I didn't understand that answer.  My

4  question was, were these late and you said, yes, and then you

5  seemed to give me an explanation that said they weren't late.

6  Were they timely listed as an exhibit or not?  I think that's a

7  yes or no.

8          MR. COOK:  Not.  Not.

9          THE COURT:  So why should they be admitted?

10         MR. COOK:  Well, because other parties have added

11 exhibits in the meantime.  Mr. Rolston added three exhibits just

12 a week, or so, ago, I think.

13         MR. CARTER:  It was just to let them know we had that

14 complaint.  For impeachment it is to fairly to disclose it to

15 them, but that's when we got it.

16         THE COURT:  You are talking about the lawsuit that --

17 looks like it was assigned to Judge Walker?  Maybe she withdrew

18 it.

19         MS. COLES:  She withdrew it.

20         THE COURT:  You found it?

21         MS. COLES:  Yes, Your Honor.

22         THE COURT:  In any event, Mr. Cook, it's not a reason

23 to admit an exhibit against Mr. Fisher that Mr. Carter disclosed

24 an exhibit late.

25         MR. COOK:  Yes, Your Honor.

THE COURT:  You didn't object to it.  So I am dealing
with this objection and here is the speech, and you have all
heard it, I can give you the long version of how these rules
gets adopted, but it's a long, thorough process with a lot of
really good people that look at it and they make these rules.

Here is the explanation for why you have to list this
stuff on time.  I have this principal and it's important to me.
A party whose lawyer performs at the very highest level of the
profession -- does everything right, extremely professional,
does everything they are supposed to do -- that party should
never be at a substantive disadvantage against an opposing party
whose lawyer does not perform at that level.  You just can't get
a substantive advantage by not following the rules.  It's not
fair.

Now, mistakes happen.  People overlook things.  I get
it.  And I am not suggesting that anybody held these things back
and said, I will give them these things late and they won't be
able to prepare.

I don't always like the way Mr. Cook frames his
questions, but I have never questioned that he is doing anything
devious.  I appreciate the fact that you don't.  But I can't go
applying the rules one way for the lawyers that I know and have
had in court on a frequent basis and know aren't trying to pull
a fast-one, as opposed to some lawyer I've never heard of.  I
get a lot of lawyers I've never heard of and I give them the

1    same respect I give people that I know and deal with.  I try to

2    treat all the lawyers at that level.

3            Here is what happens, if I start letting exhibits into

4    evidence that weren't disclosed on time, the devious lawyers --

5    and unfortunately there are a few, there are not many as people

6    think, but there are some -- they will figure it out.  And they

7    will do it.  And then the party whose lawyer performs at the

8    highest level of the profession will be at a substantive

9    disadvantage against that lawyer.

10           So I have made it a point, and I hope you will go tell

11   everybody out there in the community, you can go tell them:

12   Hinkle is a complete jerk.  You don't list your exhibits, you

13   don't get them in.  Great.  Go tell them that.  Because that's

14   the message they need to get.  You have to list your exhibits

15   and your witnesses on time.

16           So, not timely, not coming in.

17           MR. COOK:  Your Honor, can I just make a brief

18   statement?

19           THE COURT:  Sure.

20           MR. COOK:  We were flooded with tens of thousands of

21   pages of documents.  Some of them were Bates marked.  These were

22   late -- given to us late, and they were not Bates marked.  Some

23   of them were within banks of undescribed emails and other

24   documents.  We have seven lawyers against us.  We are two old

25   guys with some young interns.

1          THE COURT:  You got to get a different judge to make

2     that old guy stuff work.  I am older than both of you.  It's

3     close.

4          MR. COOK:  We did have seven lawyers against us, and

5     we had exhibits that -- the Barnett medical exhibit from

6     Mr. Rolston was nearly a thousand pages.  We took the time to go

7     through those pages.  There was another exhibit that was almost

8     600 pages.

9          THE COURT:  Look, let's do this.  It's the United

10    States of America against Mr. Cook and Mr. Johnson, and it seems

11    like a fair fight to me.

12          I hear you.  And, look, if they are turning over stuff

13    late, there is a remedy for that too.  I mean -- but, you see if

14    I let you put in exhibits that you didn't disclose when you were

15    supposed to, and you say it's because they didn't do things when

16    they were supposed to, you see how this works.  If we didn't

17    turn it over on time the next thing you know -- it spirals.  The

18    system really works better if everybody does this on time.

19          When we start talking about the substance, in just a

20    minute, and that's what we really need to talk about, if there

21    is something in these documents that you think makes a

22    difference then you tell me about it and we can deal with the

23    prejudice question and whether you really need these documents.

24          I don't want you to lose the case because you

25    disclosed exhibits late.

1    And the other part of my speech, aside from talking

2  about how many good people looked at the rules and decided to

3  put the rules in like this, is I hate it when this happens.  I

4  really want both sides to be able to take their best hold, put

5  in all their admissible evidence, give the case to the jury or

6  to me and make a good decision on the merits.  I don't like

7  excluding evidence for discovery violations or failure to comply

8  with Rule 23, but I do it because I have to.  If it makes a

9  difference, let's get there.

10    If there is something that makes a difference in the

11  outcome of the case, then we will look at it real hard.  But,

12  otherwise I want you believing that by golly you had to comply

13  with the rules and telling everybody on the street that you had

14  to comply with the rules.  Let's get to the substance.

15    Here is my understanding of where we are procedure

16  wise:  The plaintiff now has rested as against both defendants.

17    If there is a motion for Mr. Rolston, the standard is

18  that I am to resolve factual disputes in favor of the plaintiff

19  and decide whether when disputes are resolved that way a

20  reasonable jury could decide the case in favor of Ms. Alexander.

21    On the motion that Mr. Fisher has said he is going to

22  make for the government, that's not the standard.  At this point

23  I can find facts.  So if I find facts adversely to the plaintiff

24  in a way that would allow the defendant to prevail I can enter

25  judgment for the defendant.  That's the standard that applies in

1    any bench trial.  Different from a jury trial.

2             Mr. Fisher, have at it.

3             MR. FISHER:  Your Honor, are we dealing with the rest

4    of the exhibits now, or are we going straight to the --

5             THE COURT:  I think that was the rest of the exhibits.

6             MR. FISHER:  Okay.  I was unclear about -- if they are

7    not -- you said we are going to get to the substance on them.

8    Is that as they come up later then?

9             THE COURT:  If Mr. Cook can point to any of those

10   where it would make a difference, but the ruling is they are

11   all -- 83 through 89 are excluded because they were not timely

12   listed.

13            MR. FISHER:  Understood.  Thank you.

14            THE COURT:  To the extent you want to tell me that

15   that wouldn't make any difference, and take that into account,

16   you are welcome to.

17            MR. FISHER:  Thank you.  We have two motions to make,

18   Your Honor.  The first motion -- both motions are made under

19   Rule 50.

20            The first motion is the United States seeks judgment

21   on Count 3 of Ms. Alexander's second amended complaint.

22            Count 3 is the claim in which Ms. Alexander alleges

23   that the United States is liable for the battery.

24            THE COURT:  Let me stop you for just a minute.

25   Everybody take this device and turn the microphone toward the

1  ceiling.  Something was starting to give us some feedback.

2       All right.  Mr. Fisher, go ahead.

3       MR. FISHER:  Count 3 is the count in which they allege

4  that the United States is liable for the battery claim under the

5  Federal Tort Claims Act.

6       Our position, Your Honor, is that the Court lacks

7  jurisdiction with respect to that claim.  The reason we allege

8  that the Court lacks jurisdiction with respect to that claim is

9  because 28 USC 1346(b)(1), which is the jurisdictional provision

10 for the FTCA, requires that the action that is at issue would

11 have to have occurred within the scope of the employment of the

12 employee who is performing the action.

13      And I want to be absolutely clear.  We don't concede

14 that these activities, as they have been described, occurred.

15 But what we do believe is that if they did occur that they could

16 not have occurred while a federal employee was acting within the

17 course and scope of his employment.

18      In order to determine that question, whether he is

19 acting within the course and scope of his employment, the FDC

20 requires that we apply state law to those.  So the law that is

21 controlling on that issue of whether it's within the course and

22 scope of employment is Florida law, and under Florida law there

23 is three criteria for determining the resolution of this

24 question.  And they appear in the case of *Hunter v. United*

25 *States*, which is an Eleventh Circuit case.  The Westlaw -- or

1    the Reporter Citation is 825 F.Appx 699.  It's an Eleventh

2    Circuit case that was just decided last year in 2020.

3            And that *Hunter* case cites to the Florida standard

4    which is that the conduct is within the course and scope of

5    employment when:  Number one, it's the kind the employee was

6    hired to perform; number two, it occurred substantially within

7    the time and space limits authorized or required by the work to

8    be performed; and, number three -- and it's "and" number three,

9    is activated at least in part by a purpose to serve the master.

10           And we would contend that the conduct which has been

11   alleged would not meet the requirements for criteria one or

12   criteria three.

13           We don't believe that the kind of conduct that's been

14   alleged, and without conceding the conduct but the kind of

15   conduct that's been alleged here today by some of the 415

16   witnesses, and then by Ms. Alexander yesterday, would be the

17   kind that an employee, even a medical employee, would be hired

18   to perform.

19           It's clearly not what is envisioned by the agency when

20   they are hiring a medical professional who is already trained

21   and then is further trained by the BOP on that point.

22           So we don't believe it falls within the -- what they

23   are there to do, and what we have brought them in to do.  I

24   think perhaps even more pointedly is the third one.  The third

25   element is whether it was activated, at least in part, by a

1  purpose to serve the master.

2      And I don't think that there can be any doubt that if

3  that kind of conduct were true, there is no conceivable way that

4  that could be intended to serve the purpose of the master.

5  There is no way that that furthers a function of the Bureau of

6  Prisons.  And, in fact, it's contrary to the interests of the

7  Bureau of Prisons and it's not approved and it would be entirely

8  against BOP policy.

9      Multiple witnesses have testified repeatedly that BOP

10  has a zero tolerance policy and BOP requires the reporting of

11  this.  And if somebody is in a situation like this, and they are

12  compromised by that kind of conduct, it has very deleterious

13  effects on the running of the agency.  It becomes a security

14  concern.  All kinds of concerns.

15      THE COURT:  So let me hear from the other side on that

16  one and then we will get to the next part of your argument.

17      MR. FISHER:  Sure.

18      MR. COOK:  Yes, Your Honor.

19      THE COURT:  *Hunter* is right on point, isn't it?

20      MR. COOK:  No, sir.

21      THE COURT:  What's the difference?

22      MR. COOK:  Looking around at the cases that are out

23  there it was hard to find anything exactly like this.

24      THE COURT:  I am just looking at *Hunter* that he cited.

25   I understand it's a non-binding decision.

1          MR. COOK:  I understand that.

2          THE COURT:  Mr. Fisher, you can go back and sit down

3    and I will deal with Mr. Johnson and Mr. Cook for a minute.

4          It's a recent decision of the Eleventh Circuit, so

5    it's --

6          MR. COOK:  But it's absolutely not on point, Your

7    Honor.

8          What we have here, and this came out of the --

9    originally out of a Kansas case involving a doctor named Mark

10   Weisner (phonetic), who was a doctor at the VA, who had, I

11   think, there were 97 lawsuits filed against him; 69 of them were

12   resolved on a single day.  The government resolved nearly all of

13   them with settlement.

14         And what the Court said in that case, and this is a

15   doctrine that is extremely longstanding and solid law in

16   Florida, is what they call the slight deviation.

17         Now slight deviation happens also in traffic cases,

18   but in the Weisner case the fact was that Weisner, who was a

19   doctor, who worked at the VA doing genital examinations, many,

20   many, many of them abusive.  And he was giving medical

21   treatment -- he was giving legitimate medical treatment,

22   intermixed, highly intermixed, with abusive treatment such as,

23   for instance, he might be doing legitimate examination and then

24   he would grope and he would, and his admissions say, that he was

25   out of curiosity or for his own pleasure.

1          THE COURT:  I will let you go on, but I really

2     don't -- here is the problem.  You want to talk to me at length

3     about a Kansas case.  I asked you about an Eleventh Circuit case

4     from last year.

5          MR. COOK:  Yes, Your Honor.  But --

6          THE COURT:  Now, you heard what I told the jury about

7     right or wrong.  I follow Eleventh Circuit decisions.  And I

8     know this one is not binding, but it cites Florida law, which is

9     controlling, so what's -- my question was what's the difference

10    between *Hunter* and this case.

11         MR. COOK:  Your Honor, I have a dozen cases from

12    Florida that honor the tradition of slight deviation.  And this

13    is --

14         THE COURT:  Find me the case from Florida where sexual

15    misconduct was held to be within the course and scope of

16    employment.  Cite me those cases.  I am here and I am ready to

17    read them.

18         MR. COOK:  Okay.

19         MR. JOHNSON:  (Indiscernible.)

20         THE COURT:  I can't hear you.  Tell me again.

21         MR. JOHNSON:  I said, *Nazareth versus Herndon*

22    *Ambulance Service*, is the best one.  It's an ambulance

23    attendant, and --

24         THE COURT:  Do you have the citation?

25         MR. JOHNSON:  I don't have it on these computers.

 1          MR. COOK:  Another case, Your Honor, is *Hennagan*

 2    *versus Department of Highway Safety*.  That is a case in which a

 3    highway patrol officer was in the process of searching, patting

 4    down, a young women -- a minor -- and he used all the badge and

 5    instruments of authority, and he was serving, in part, his

 6    employer's interests, but at the same time he was doing a

 7    physically sexual assault act.

 8          THE COURT:  Hannagan?

 9          MR. COOK:  Hennegan.  It's H-e-n-n-a-g-a-n.

10          THE COURT:  You got a cite?

11          MR. COOK:  And I don't have the cite for that, Your

12    Honor.  I, frankly, wasn't prepared to do a Rule 50, although I

13    would have been tomorrow.  I have those cases but I just -- I

14    have so much stuff.

15          THE COURT:  That's all right.  I can find them.

16          Tell me the difference with *Hunter.*

17          MR. COOK:  Your Honor, I have to say I don't know

18    *Hunter.*  If the government can give me the facts in *Hunter* I can

19    compare.

20          THE COURT:  It's a sexual abuse case against the

21    employee, and the Court cites the standard that Mr. Fisher just

22    said and says that the employee wasn't serving the master when

23    he engaged in the sexual conduct.  No jurisdiction under the --

24          MR. COOK:  That's an issue of fact though, Your Honor,

25    because it is possible to both what they call a dual purpose;

1    you can both have a purpose to serve the master and also a

2    purpose to commit a wrongful act.  And there are several cases,

3    stretching back decades in Florida, that state that.  And so I

4    think it would be a matter of fact.

5            In this case, I believe that you could go through and

6    you could see Mr. Rolston doing something that served a

7    legitimate medical purpose and then right in the middle of that

8    it's just a circular motion on the clitoris he is doing a

9    sexually abusive act.  And then in the next second he can go on

10   to carrying on his employer's business.

11           So this is -- this is a perfect case of real slight

12   diversion, or slight deviation, for the master's business.  And

13   we think our case fits that, as well as the Weisner case, and

14   certainly I'm sure the facts of *Hunter* most likely don't match

15   the facts of this case.

16           THE COURT:  But you agree it's a question of fact

17   whether he was deviating from the employer's work and acting on

18   his own?

19           MR. COOK:  Yes, Your Honor.  In the sense that there

20   was a dividing line.

21           THE COURT:  All right.  And so if the fact finder

22   decides that he was not doing the government's business when he

23   made the circular motion you are talking about, but he was

24   acting contrary to what the employer had told him to do, then

25   that's a factual question and the defense wins if that's the

1   fact finding?

2       MR. COOK:  Yes, Your Honor.  But if the wrongful act

3   was so parallel to and, you know, almost simultaneous with

4   serving the master's business, it's possible to, I suppose, get

5   a Pap smear specimen while doing something that is absolutely

6   wrongful under the -- under Florida law.  And so we believe that

7   a close look at our facts will show something that is so

8   indivisible that you can't show where the defendant is departing

9   from the master's business and when he comes back; he is

10  basically doing both things at once.

11      THE COURT:  What else do you have to say in response

12  to Mr. Fisher's motion to dismiss Count 3?

13      MR. COOK:  That's our defense, Your Honor, that it's a

14  slight deviation and dual purpose.

15      THE COURT:  All right.  My finding of fact is that if

16  Mr. Rolston committed sexual activity acts, as the plaintiff

17  asserts, that he was not doing the government's business; that

18  it was not any slight deviation, but it was a profoundly

19  different undertaking than what he was hired to do and could

20  appropriately do.  So, I am going to follow *Hunter* and decide

21  that under the Federal Tort Claims Act there is no claim against

22  the government for battery under Count 3.

23      Mr. Fisher, what's next?

24      MR. FISHER:  Our second motion, Your Honor, has to do

25  with the negligence claim that's been brought against the United

1    States.

2         Specifically, the United States seeks judgment on

3    Count Two of Ms. Alexander's second amended complaint.

4         I guess I almost don't know how to say this, except to

5    say very simply, there isn't any evidence of negligence that's

6    been introduced on behalf of the United States.  The BOP did not

7    act negligently in this case.

8         The way the claims are characterized in the complaint

9    that's been alleged is the first claim of negligence is -- the

10   way they characterize -- is that the United States was negligent

11   in hiring, retaining, and trusting Defendant Rolston, who is or

12   was, should have been known to the defendant to be of poor

13   character.

14        That fits neatly into the Florida tort of negligent

15   hiring and so there is a Florida tort negligent hiring.  The

16   standard for negligent hiring is an employer knew, or should

17   have known, of an employee's unfitness at the point in time when

18   you are hiring and bringing them on.

19        There is no evidence, that's been presented to you

20   that suggests either that Mr. Rolston was unfit in any way prior

21   to coming to work for the federal government.  There has been

22   zero evidence presented that he didn't go through an appropriate

23   background check.  There has been zero evidence that he didn't

24   have the appropriate skills for the position that he came into.

25   There is no evidence at all, that has been presented, that

1  suggests the United States's decision to hire Mr. Rolston was in

2  any way negligent.

3          The rest of the claims, the --

4          THE COURT:  Tell me -- Ms. Rivera says that she -- Mr.

5  Rivera said that Ms. Blevins alleged, on July 16th, 2016, that

6  she had been assaulted by Mr. Rolston on June 30th, 2016.

7          MR. FISHER:  Right.

8          THE COURT:  Two months later, Ms. Alexander says she

9  was assaulted by Mr. Rolston.

10          MR. FISHER:  Correct.

11          THE COURT:  So, why couldn't a -- I -- not a jury --

12  why couldn't I find that within two months after the allegation

13  something different should have been done?

14          MR. FISHER:  And that is the segue into my next

15  argument.  The next set of claims would fall neatly within the

16  tort of negligence supervision in Florida and the exact --

17          THE COURT:  Am I right?  Is that only one -- the only

18  allegation before September 27th, 2016?

19          MR. FISHER:  That's correct.

20          THE COURT:  All right.

21          MR. FISHER:  And so my response to that, Your Honor,

22  is twofold.

23          So, yes; Ms. Blevins filed that claim on July 16th.

24  There is no question about that.  It's evident that the BOP

25  responded to it immediately.  That was the 109-7, 109-8, and I

1  believe -- I am not sure if the affidavit came in -- but when

2  she complained it was 109-1.  I don't want to say that was

3  admitted or not because I don't remember.

4         What 109-7 shows is that as soon as they got that

5  complaint they immediately responded.  Mr. Proffitt talked about

6  the fact that they immediately responded to the complaint.

7         She was sent to -- the 109-7, what that evidence is,

8  is that they immediately sent her for a medical exam.  That

9  medical exam is what resulted in the document that we admitted

10 earlier in front of the jury in which Ms. Blevins told the nurse

11 "nothing happened."

12        And so then in 109-8 Ms. Blevins' actually referred to

13 the psych record.  109-8 was admitted yesterday afternoon, just

14 in the Judge trial alone, so it wasn't admitted in front of the

15 jury, but 109-8 is the very next morning she was sent to be

16 interviewed for purposes of the sexual abuse intervention note.

17        Mr. Rivera testified clearly that is also a part of

18 the investigative file.  That note also says very specifically

19 that Ms. Blevins said essentially "nothing happened."  She

20 didn't want to do a PREA claim.  She didn't believe that sexual

21 abuse had happened.  I can pull it if I need to.

22        Essentially, Ms. Blevins makes this claim and then

23 entirely walks it back.  And so the United States gets to

24 respond to this in two ways:  One way would be the question of,

25 Well, was there a pending investigation.  The answer to that

 1    question is yes, there was, because -- and the reason there is a

 2    pending investigation is because they acted in accordance with

 3    PREA to do exactly what they are supposed to do which is

 4    initiate an investigation, it gets sent to OIA, and it gets

 5    authorized for a local investigation.

 6         When that investigation comes back, the OIA indicates

 7    to the institution that they have 120 days to complete the

 8    investigation.

 9         By the time Ms. Alexander is -- the alleged abuse

10    happens with Ms. Alexander it's only been 32 days.

11         THE COURT:  I get it.  They say do the investigation

12    within 120 days, and as I recall it took a couple of months,

13    something like that, to get it to Washington and back to

14    Tallahassee.  But -- and we can talk about walking it back and

15    saying nothing happened.  And I do want to talk to you more in

16    detail about what the complaint was and how she walked it back.

17         But, look, the fact that they have a plan that says

18    you have a 120 days to do the investigation, that doesn't mean

19    it's not negligent not to take him off the line right away.

20         MR. FISHER:  I agree.

21         THE COURT:  If somebody had said, look, he is driving

22    the prisoners back and forth, and he is driving drunk.  You

23    wouldn't say, well, we will look at it, and by the way, keep

24    driving and in six months if we figure out he is driving drunk

25    we will take him off the road.  You would have taken him off the

1    road the day there was a complaint.

2          So, I understand they are busy and hard to provide all

3    the medical care they need to, but it seems to me it would be

4    pretty easy to take somebody who was the subject of a sexual

5    abuse complaint and say, You are still coming to work every day

6    but you are not doing anymore well woman exams.  We are going to

7    find something else for you to do besides examine women.

8          And if you were going to leave him examining women you

9    darn sure tell the chaperone, Wake up, pay attention, don't get

10   where you can't see, make sure that nothing wrong is going on.

11         So I guess you need to convince me of what was said,

12   and when it was walked back; a reasonable employer wouldn't

13   still have said, He ain't doing this anymore until we get to the

14   bottom of it.

15         MR. FISHER:  Your Honor, I agree with your observation

16   completely.

17         So, the fact that the investigation wasn't late isn't

18   the end of the story.  I absolutely agree with that.  The

19   question becomes, do you otherwise act reasonably with the

20   information that you have.  So I think we need to think about

21   what are the ramifications of making a decision to say, We are

22   moving you, or we are suspending you, or you are staying home.

23   That has significant ramifications; it has ramifications for the

24   person who has been accused and it has ramifications for the

25   medical practice.

1        If Mr. Rolston is told, You are suspended, or you are

2    going to have to stay home, or you are going to be transferred

3    to a different location, he has a patient load, over the next

4    several weeks, that has to be changed.

5            THE COURT:  I am not worried so much about those

6    things, because, frankly, without some information -- so you all

7    know what you are dealing with.  I have presided over hundreds,

8    and at this point I am sure thousands, of prisoner cases.  And I

9    understand many of the allegations are unfounded.  Prisoners

10   lose a lot more civil cases than they win.

11       I sometimes tell people with all of these pro se

12   prisoner cases that I am presiding over, You are really looking

13   for the needle in a haystack, because there are some needles in

14   there and you have to find them.  You can't get so used to

15   looking at the straw that you don't find the needle.

16           MR. FISHER:  I agree.

17           THE COURT:  I understand the Bureau of Prisons is

18   dealing with that probably even a bigger multiple so they get

19   lots of copouts and they get lots of complaints and some are

20   well-founded, and many are not.

21       I am not suggesting that when Ms. Blevins says, He

22   conducted an inappropriate exam.  He touched me sexually, I am

23   not suggesting that at that point you ought to tell Mr. Rolston,

24   Pack your bags, you're going to Aliceville or some other

25   institution.

I'm not suggesting that they ought to discipline him, send him home, tell him to stop working. But my question was, couldn't they just juggle around the work load so that he is not doing -- I mean, for that matter, there is probably somebody that has the same skill set as Mr. Rolston working down the hill, or up the hill -- I forget which one it is, but right there at the same facility -- that's at the men's facility. They could probably swap out with his counterpart at the FDC and keep on trucking.

So that's my question; wasn't there something they could do, or should exercise reasonable care, should they have done something different so that this couldn't happen?

MR. FISHER: I think the answer to that question is it was reasonable for them to choose not to in this situation. And the reason that it was reasonable for them to choose not to in this situation is because what Ms. Blevins initially said was, "I want to change my provider."

The initial informal complaint that came to her -- that came from her, excuse me, wasn't clear that there had been sexual abuse or that there was even an allegation of sexual abuse. That turns into --

THE COURT: It was something in writing?

MR. FISHER: Yes.

THE COURT: Do I have that in front of me?

I should have it.

1        MR. FISHER:  So here is 1092.

2        THE COURT:  I have it.  I have got something called

3   Informal Resolution Process.

4        MR. FISHER:  That's the eight and a half that would

5   start her process.

6        THE COURT:  That's what would be referred to as

7   informal grievance?

8        MR. FISHER:  I believe so, Your Honor.  Yeah.

9        Whenever you are ready we can scroll down.

10       THE COURT:  I am looking at mine.

11       MR. FISHER:  Oh.  I'm sorry.

12       THE COURT:  I can scroll down when I want to.

13       All right.  And then, was it the next day she said

14   nothing inappropriate happened?

15       MR. FISHER:  Well, this ended up getting -- the next

16   document that came out was 109-1.  109-1, this is ultimately --

17   that document that you were just looking at -- 109-2, that makes

18   its way to the warden's office, or something like that, and then

19   it gets referred to SIS.

20       This is the document that Mr. Proffitt talked about

21   that he generated based on Ms. Blevins' statements.

22       THE COURT:  The very same day.

23       MR. FISHER:  No.  This came on the 16th.  This is the

24   one that had where it was misstated --

25       THE COURT:  Was that not the date when she first

1    complained?

2           MR. FISHER:  We don't actually know.  Her informal

3    complaint is dated July 6th.  It's signed July 9th.  We don't

4    actually know when that was transmitted.

5           What we do know is that, as Ronald Proffitt testified,

6    when he received that complaint he began this process and

7    initiated this affidavit.

8           THE COURT:  Without going through and reading the

9    whole three page -- two page single-spaced affidavit.

10          MR. FISHER:  The last two paragraphs by the way are

11   about her television complaint.  Only the first big paragraph is

12   the one about the alleged incident at issue here.

13          THE COURT:  The stuff at the end, the handwritten

14   stuff at the end, that I am having trouble reading, that doesn't

15   have anything to do with the medical care?

16          MR. FISHER:  My understanding is that deals with the

17   television complaint.  She had brought the two complaints

18   together in that document.

19          THE COURT:  Yeah.  All right.  So part of what she

20   says is she doesn't think a man ought to be examining her.  She

21   also says a woman ought to be present, which the Bureau of

22   Prisons agrees with.  Everybody seems to agree there should be a

23   woman present.

24          MR. FISHER:  There is a nuance to this.  Well, I don't

25   want to -- yes; a chaperone should be present.

1          THE COURT:  I take it, from the defense examination, I

2     take it that the defense position is there was and Ms. Blevins

3     is wrong about that?

4          MR. FISHER:  We don't know.  We don't know.

5          THE COURT:  Okay.  So in any event what got done?

6          MR. FISHER:  So, as soon as this gets generated then

7     we move on to 109-7.  So, 109-7, if you will notice the

8     encounter date up in the top header, the encounter date is that

9     same date, July 16th of 2016.  Ms. Blevins is sent to medical to

10    do this PREA evaluation.

11         THE COURT:  I have got it but it helps to scroll it

12    too.

13         MR. FISHER:  This is the document we were dealing with

14    earlier today where in the end -- so Ms. Paynter is an RN.  She

15    is trained to do these exams.  She is doing a PREA exam.  She is

16    figuring out what happened.  What Ms. Blevins tells her is she

17    denies any inappropriate sexual behavior by the male provider on

18    6-30-2016, or any other visits, but she would have felt more

19    comfortable with a female in the room since she was discussing

20    and being assessed by a male provider.

21         THE COURT:  All right.

22         MR. FISHER:  And then she goes on to state -- she

23    says, "I just feel more comfortable having a female.  Nothing

24    happened.  Nothing happened.  I just wanted a female since I am

25    having female issues."

1      Then -- this is the same day -- then we go to 109-8.
2 Scroll down please.

3      So, you may recall earlier on the stand Ms. Blevins
4 was -- she was confused about whether she had seen a nurse, or
5 whether she had seen somebody from psych to do a sexual abuse
6 intervention note.  Both happened.

7      So what happens is she goes to see Nurse Paynter.
8 That was the note we just looked at.  She says "nothing
9 happened".

10      They still follow up further and have her go on for a
11 sexual abuse intervention note the very next morning.  The note
12 with Ms. Paynter was completed after business hours.  So the
13 very next morning she goes to see psych for the sexual abuse
14 intervention note.

15      Can you blow up the third of the large paragraphs
16 there?  Yes.  That one there.  Thank you.

17      It says -- so, again, now she has told the nurse that
18 nothing happened.  Her own complaint downplays it.  Says, I
19 don't really know if he was acting outside the scope of his
20 authority.  And now she gets here, to this last stage of it, and
21 she is saying, again, "Inmate Blevins denied emotional distress.
22 Stated she was frustrated by the process of the investigation,
23 specifically because she did not wish to initiate a PREA report.
24 She stated she did not feel she was abused by the staff member
25 involved in the allegation.  She simply had requested her OBGYN

service provider relating to uterina fibroids and breast
examination be a female.  She feels uncomfortable discussing
those issues with a male provider.  Inmate Blevins reports that
she stated such to investigative staff as well."

I want to back up for just a moment.  Can you go back
to 109-7 for just a moment.  Go down one more page.  You can
see, when Ms. Paynter was assessing this situation -- can you
pop out paragraph E for me.  The fifth one down.  So, a report
is made to ensure separation of the victim from his or her
assailant.  So they are acting in accordance with what the
policy is supposed to do, and she finds from the inmate -- the
inmate feels safe.

And so all of this information is available to the
decision-makers that have to make a decision about what to do
now.  And if you have -- I would submit to you that it's
reasonable for a decision-maker to say, Wait a minute.  She is
not even really saying that she was abused.  That's the
information that's available to them.  She said nothing
happened.  She told the nurse nothing happened.  She told psych
that nothing happened.  Her own complaint says, "I don't know if
he abused his authority.  I just really wanted to get my
provider changed."

And this is isn't in evidence, but by the way they
deal with that kind of thing all the time.  They are constantly
dealing with female inmates that want to change their provider

1  just out of personal preference, and they can't do it because it

2  creates chaos in the medical unit.

3          So that's what they are faced with.  And that's what

4  the decision-makers had to deal with is, okay, how do we respond

5  given the information that we have here.

6          So I would suggest to the Court I really -- I think

7  it's reasonable for them to say, Okay, look, we have instituted

8  an investigation.  We have started the process.  We are going to

9  handle this the way we are supposed to handle this.  But, golly,

10 I am not going to suspend, or remove, or do something like that

11 to somebody when the inmate herself is telling us nothing

12 happened.

13         I think that -- I think that would be unreasonable,

14 frankly.

15         THE COURT:  All right.  Let me hear from the other

16 side.

17         MR. COOK:  Your Honor, could I make a factual note and

18 then hand it off to Mr. Johnson?

19         THE COURT:  Okay.  You can divide it up any way you

20 wish.

21         MR. COOK:  Okay.

22         First of all, she never did walk back that she didn't

23 have chaperone present.  Rolston himself in his affidavit said

24 that, I would never do a breast exam through clothing.  It would

25 have no clinical benefit.

1    And Dorinda Paynter says, "In 27 years of nursing I

2    have never seen a provider conduct an assessment of a breast

3    area through the clothes."

4    The practicability, the feasibility of moving him to

5    another facility, across the street, is reflected in the fact

6    that when he finally was moved across the street, they hadn't

7    three years later -- or almost three years later -- they haven't

8    even completed the Blevins investigation, and they haven't

9    completed any of the other investigations.  They finally did.

10    THE COURT:  Let me just tell you, I get it.  But here

11    is what you need to focus on.  You are in trouble on this

12    motion.

13    I don't make policies at the BOP, and I don't decide

14    cases based on anything other than the governing law and the

15    facts of the case.

16    MR. COOK:  Yes, Your Honor.

17    THE COURT:  This is your chance to address the facts.

18    Here is what you are in trouble on.  Here is the problem.

19    Unless I am missing something, you have submitted no evidence

20    that anything in Mr. Rolston's background, before July 16th,

21    2016, suggesting any reason not to put him in this job.  So

22    let's start with that.

23    Is there anything in evidence that suggests that

24    Mr. Rolston was not qualified to do this job, and that there had

25    never been any complaints about sexual misconduct before

1  July 16th, 2016?  Is that right or not right?

2        MR. COOK:  That's right as far as I know, Your Honor.

3        THE COURT:  So there is no negligent hiring and you

4  get a complaint from Ms. Blevins on July 16th, 2016.  So here is

5  the question, did they use reasonable care between that date and

6  September 27th, 2016, when Ms. Alexander had her examination?

7  That's the whole question on this motion that's now pending.

8  Should I find -- could I find, based on this evidence, that the

9  government was negligent; there was something that they should

10  have done, using reasonable care, that would have kept the

11  assault on Ms. Alexander on September 27th from occurring?  And

12  if the answer to that is no, you're going to lose this motion.

13        MR. COOK:  Yes, Your Honor.  Just again, the factual

14  side, and Mr. Johnson can argue the law, but one more fact is

15  that in the course of depositions the medical staff told us that

16  investigators never talk to them.

17        THE COURT:  I don't want to hear anything that is not

18  in the evidence of this trial.  So what they told you in

19  deposition, if you didn't prove it during this trial, it would

20  be absolutely wrong for me to take it into account as a basis

21  for the ruling I am about to make.  Isn't that true?

22        If I said, Okay, here's the evidence at trial but I am

23  going to deny the motion because of deposition testimony.

24  Wouldn't that get reversed by return mail, and should, because

25  that's absolutely a departure from the accepted law on the

1   procedures.  Wouldn't that be right?

2          MR. COOK:  Well, Your Honor, I am not conceding that

3   there is such evidence in the record.  But the deposition is

4   not.  And I will sit down and let Mr. Johnson --

5          THE COURT:  Talk to me about the record of this case.

6   And first tell me what the negligence was.

7          MR. JOHNSON:  The negligence was that they allowed him

8   to do an examination without a chaperone on Ms. Blevins.  That

9   was against their rule.

10         THE COURT:  Wait.  Just -- let me back up and tell

11   you, because, look, you can talk around this all you want but if

12   you don't come to grips with this motion you are going to lose.

13         You are a good enough lawyer to -- if you just started

14   doing this I would let you talk and I'd be quiet.  But you

15   didn't just start doing this.  And I have had a lot of cases

16   with you, and sometimes I ask you a question, you have got an

17   answer and you turn me around.  This is your chance.  I don't

18   want to know what negligence they did about Ms. Blevins.  I want

19   to know what negligence they did that affected Ms. Alexander.

20   She had a chaperone in the room.

21         MR. JOHNSON:  She had a chaperone in the room, but

22   they knew that Rolston was doing unchaperoned examinations

23   against the rule before he ever did the injury to Ms. Alexander.

24   That's one thing --

25         THE COURT:  Is there evidence he did more than one?

1 There is one allegation that he did a breast exam through a
2 shirt without a chaperone.

3          MR. JOHNSON:  Right.  That's the only one.

4          THE COURT:  All right.  So none of this -- he was
5 doing examinations, plural without a chaperone.  But I get it.
6 There is an allegation that one time he get did a breast exam
7 through a shirt without a chaperone.

8          MR. JOHNSON:  Right.  And I don't think he was even
9 counseled about it, or not even warned.

10          THE COURT:  If he had been, what difference would it
11 have made?  If they had gone to him and said, "Never do an
12 exam -- a breast exam without a chaperone or you'll be fired",
13 what difference would it have made?

14          MR. JOHNSON:  It would have made the difference that
15 he knew he was being watched, that he knew that he couldn't get
16 away with this stuff, that if violated there was going to be a
17 consequence that somebody was going to notice.  That was the
18 thing because if they knew he did something wrong, and he didn't
19 know that anybody noticed or cared about it.

20          THE COURT:  He didn't know that Ms. Blevins
21 complained?

22          MR. JOHNSON:  He didn't know that the management
23 disapproved of what she reported.

24          THE COURT:  But he knew that she reported?

25          MR. JOHNSON:  I don't know if he knew that she

1 reported.

2         THE COURT: All right. Fair enough.

3         MR. COOK: I don't think so, Your Honor, because when

4 he was -- gave an affidavit years later he had no recollection.

5         THE COURT: All right.

6         Mr. Johnson, what else? They didn't take action about

7 the exam without a chaperone.

8         MR. JOHNSON: Right. They eventually moved him over

9 to FDC but it was 3 or 4 complaints later.

10         THE COURT: I understand. And you heard me ask

11 Mr. Fisher, the first thing that occurred to me, can't you just

12 move him up the hill or down the hill?

13         MR. JOHNSON: They could have moved him sooner.

14 That's one thing.

15         Another thing is that there was an error of law when

16 they said that if he is acting on behalf of management; he can

17 not be acting on behalf of management if he is doing something

18 that they have expressly trained him not to do.

19         That is something that is played out a lot in the Home

20 Depot, and all of those other sort of cases, where they drill it

21 into the people that you never physically interfere with a

22 shoplifter and they act to prevent the shoplifting by being --

23         THE COURT: I don't know what we are talking about. I

24 have lost the argument.

25         What I want to talk about is what a reasonable person

1  would have done in response to Ms. Blevins' submission.

2          MR. JOHNSON:  Okay.  And if you will let me say

3  something.  I have tried to say this to you before and you

4  have -- you've resisted fiercely.

5          THE COURT:  Mr. Johnson, I thoroughly enjoy having you

6  in court.  I will be quiet.  But I almost find myself wanting to

7  tell Judge Hartwell's story -- you practiced in front of Judge

8  Hartwell as I did, and he used to tell people your job is to

9  talk, my job is to listen.  I am done but you keep working on

10  your job.

11          Look, I am going to listen.  And I will listen to

12  anything you have to say.  But I have tried to focus you on what

13  the problem is.  But, I will listen.  I -- I won't interrupt

14  again.

15          MR. JOHNSON:  All right.  If I had a bazooka answer to

16  the question, you know I would have given it by now.  Okay?

17          Here's the thing, there was a grapevine within the

18  prison that had been going on for a very long time talking about

19  Paul Rolston's examination techniques.

20          They even had a gesture that they used for Paul

21  Rolston.

22          And you are saying, look, you never found an officer

23  that would admit to knowing about that.  And I am saying that

24  that, in and of itself, is an offense, is a negligence, because

25  they monitor the grapevine every time something is going to be

1    big.

2         If there is somebody smuggling drugs or other

3    contraband in there, they have a snitch.  They are listening on

4    the phone calls.  They are reading the mail.  They are keeping

5    track of what the prisoners are saying, what they are

6    conspiring, and what plans they are making.

7         And if a bunch of prisoners are in there, and there is

8    a whole legend about Paul Rolston is doing sexual abuse in some

9    great number of his vaginal examinations, and they didn't know

10   about that, it's unbelievable that they didn't know about it.

11        If these prisoners were plotting an escape or an

12   assanation of a warden, they would know about it.  And if they

13   didn't know, if they didn't act upon what Rolston was doing, and

14   what his reputation was amongst the inmates, then it's only

15   because they didn't think it was important enough to do anything

16   about.

17        Because, like everything else there, that involves the

18   sexual abuse, there is some number of the administration that

19   just regards it as another perk.  It's just another benefit of

20   getting to work there.  It's what you get to do to the female

21   inmates.

22        So I wanted to make a record on that one thing.  And

23   I've never really got to say it before because whenever I tried

24   you didn't want to hear it, but I think it's important.

25        And, I think that, as a matter of law, if an employee

1    is using, under 219(2)(D), second restatement of torts, which is

2    adopted in Florida law, if an employee is using the

3    instrumentality and authority that is delegated to him by his

4    employer, if there is even the slightest fault on the employer's

5    part, the employer is liable under agency law for the offense.

6         And, that's one of the things that was covered in

7    Nazareth versus Herndon Ambulance that I gave you later.  And I

8    was able to pull a copy of it up on my screen and I can tell you

9    that it is at 467 S.2d 1076.

10        THE COURT:  What's the date?

11        MR. JOHNSON:  It is 1985, Fifth DCA.

12        Another thing that I wanted to say is that borrowing

13   from what the Supreme Court has done in Title VII law, they have

14   said that, for example, somebody wants an all-male department.

15   They are moving to serve the employer because they have an idea

16   that the company would be a better place, even if the company

17   has a contrary policy, even if the company conducts training

18   against sex discrimination, those people are acting on behalf of

19   the company because they think it's the employee's motive rather

20   than the company policy or what the reality is.

21        I could very well see how Mr. Rolston could see

22   himself acting for the good of the employer by exerting power

23   and discipline and control over women because you're supposed to

24   control people when you're an officer in a prison.

25        The power and the control, that's what it's about,

1  that's one of the things that you do by fair means or fowl.  And

2  so that could very well be motivated by a desire to serve the

3  employer as well as his own personal gratification.

4       And I think that dovetails nicely into what James Cook

5  has been saying about the slight deviation cases, because the

6  slight deviation cases are federal law in a VA context with

7  medical providers examining penises, which they are supposed to

8  examine, but they are not supposed to examine in the sort of

9  perversely sexual way that the doctor in that case was doing.

10       And, so, if you are performing a legitimate function

11  with some illegitimate features it flows right in that slight

12  deviation sort of thing.  This is a slight deviation -- we are

13  talking about maybe a physical inch from some place you are

14  allowed to touch up the clitoris.

15       So, I don't know.  That's the case I have got.  And we

16  win or lose on it.

17       THE COURT:  To the extent that that essentially

18  says -- is an argument to reconsider the ruling I announced a

19  minute ago, the request is denied.

20       *Hunter*, it seems to me, is right there.  And I

21  understand the argument essentially to be, Well, *Hunter* is

22  wrongly decided, and if you go back to *Nazareth versus Herndon*

23  *Ambulance*, or if you look at the restatement, you see that

24  *Hunter* is wrong.

25       MR. JOHNSON:  I don't know what *Hunter* says.  I'm

1  sorry.  I didn't read it.

2        THE COURT:  Well, I did quickly and it seems to me to

3  be just dead on it.

4        Look, I understand it's a non-binding -- it's an

5  unpublished decision.  Sometimes that means that the circuit

6  thought it was so clear that they didn't need to publish the

7  decision.  But, look, to the extent that the argument is, this

8  is a very slight deviation, and it's only an inch away, well,

9  the real test of a slight deviation, in any meaningful sense, is

10  not geography.  It's not how far away it is.  It is a massive

11  fundamental difference between conducting a medical exam and

12  conducting a sexual battery.  It's a huge difference.

13        Now, I understand the argument that, look, everybody

14  knows this.  Everybody has known all along that Mr. Rolston is a

15  sexual abuser and it went on.  I don't think I kept you from

16  making that argument earlier.  I understood your argument when

17  you made it back at the point where we were talking about the

18  motion in limine.  And, I think what I told you, essentially,

19  was if you have admissible evidence of that, bring it on because

20  that's important and it will carry the day for you.

21        But if all you have is a prisoner who will say,

22  "Everybody knows it.  I never told anybody that works for the

23  Bureau of Prisons, but everybody knows it." I am not going to

24  let that in.  That's not admissible.  That's not within the

25  person's personal knowledge.

1      We don't try cases on rumors.  Rumors are important,

2  if you have any evidence that anybody that worked for the Bureau

3  of Prisons ever heard the rumor.  But you can't carry the day by

4  saying:  We all know that the people at the Bureau of Prisons

5  are utterly lacking in integrity.  They're not trying to do

6  their jobs.  They're just trying to exercise control over the

7  prisoners and everybody knows what the facts are.  We just don't

8  have any evidence of it.  You can't win the case that way.

9      So I think my ruling in limine was actually correct on

10  the law -- on the rules of evidence.  And the reason you don't

11  have admissible evidence that anybody had any reason to believe

12  Mr. Rolston had committed any prior sexual abuse is not that I

13  kept you from presenting evidence; it's because you couldn't

14  find any.

15      MR. JOHNSON:  I tried to present this morning, through

16  Ashley Barnett, her conversations with four different officers

17  telling them about what happened to her with Mr. Rolston.  And

18  one of those officers said:  Yeah, I've heard that before.

19      And I had all kinds of evidence from various

20  witnesses, inmates, who were going to say that we told this to

21  officers, and inmates who were going to say who exactly they

22  heard it from, and you told me way back when -- in fact, when I

23  said, Your Honor, I want to argue this, when you told me to

24  shut-up on the phone -- you said, look, "You're getting close."

25      THE COURT:  In my defense, I may have cut you off but

1   I'm reasonably certain I didn't say "shut-up."

2       MR. JOHNSON:  You didn't say "shut-up."  You said, I

3 don't want to hear anymore about that.  And I said, Your Honor,

4 I think it's important.  And you said -- what did he say --

5 you're getting close to the edge.

6       MR. COOK:  "You're right on the edge."

7       MR. JOHNSON:  "You're right on the edge."  That was

8 what you told me, that I was right on the edge and so I shut up.

9 And so it was not a motion in limine.  It was way back in the

10 discovery phase.

11       THE COURT:  Well, look, if I said that -- and this is

12 one of those where I don't recall the details -- but I do know

13 my general practice.  And when I've ruled, and I've fully heard

14 from both sides and I have ruled, I begin losing willingness to

15 hear the same thing again.

16       Now, I told you a minute ago I was going to sit

17 quietly, you can say anything you wanted, and I did.  Even

18 though Mr. Fisher made that very same argument.  Mr. Cook had

19 responded to it.  I had heard fully from both sides and I had

20 announced the ruling and then I let you argue the very same

21 point again.

22       Okay.  Look, it's an important point and I have heard

23 you on it twice.  But I have heard you on it.

24       Now there is a transcript of the earlier hearings

25 and -- but to the extent that your argument to me right now is,

1    I messed up the evidentiary rulings I made months ago, that's

2    not a reason to let this trial go on now.  I've got to make a

3    decision now based on the evidence presented during this trial.

4              MR. JOHNSON:  That's right.  I understand that.

5              THE COURT:  And there is absolutely no evidence in

6    this trial that there was any indication to anybody at the

7    Bureau of Prisons, before July 16th, 2016, that Mr. Rolston had

8    committed, or been accused of, any sexual offense.

9              Ms. Barnett, that you wanted to ask questions about,

10   wasn't even at FCI yet at that time, so your questions were

11   about things that happened a year later.

12             What officers heard a year later could not possibly

13   indicate what they should have done a year earlier and that was

14   the basis for that ruling.  It's not a hard ruling.  It's pretty

15   easy.  What happened in 2017 can't show what should have been

16   done in 2016.

17             So I don't think you have proffered any evidence that

18   anybody told any officer before the assault on Ms. Alexander

19   that Mr. Rolston had ever committed any sexual offense.

20             The only allegation was by Ms. Blevins and that's what

21   we've talked about.  And I've listened now to both you address

22   this, and neither one of you has suggested that there is any

23   evidence in this record of any allegation, even, against

24   Mr. Rolston, other than the Blevins's allegation.

25             No evidence of any allegation against Mr. Rolston

1  before the assault on Ms. Alexander, other than the Blevins's

2  allegation.  That's true; isn't it?

3       MR. JOHNSON:  Yes.

4       THE COURT:  Anything else out of the defense?

5       MR. JOHNSON:  That's all I've got.

6       MR. COOK:  Just to say, Your Honor, that Blevins, we

7  believe, is enough.

8       THE COURT:  I understand.  And you can tell from my

9  questions of Mr. Fisher that my first reaction to it was, why

10  isn't that enough because -- I mean, I am the one that suggested

11  I think before you did, just move him to the other facility.

12  Why didn't you do that?  And that's why I asked questions and

13  interrupt because Mr. Fisher had an answer to the question.

14  When you walk through those documents it's clear that Ms.

15  Blevins said very clearly nothing inappropriate happened during

16  the exam.

17       My finding is that it was not negligent for the

18  government to allow Mr. Rolston to continue to conduct well

19  woman.  There was an allegation that he had conducted the breast

20  exam through the shirt without a chaperone present.

21       If Ms. Alexander's assertion was that an exam had been

22  conducted without a chaperone present then the failure to do

23  something in response to the allegation that there was an exam

24  without a chaperone present might well be negligence that was a

25  legal cause of harm to Ms. Alexander.  But that's not her

1    allegation.  She says there was a chaperone present.

2         So, my finding is there was no failure to use

3    reasonable care in response to the Blevins's statement that was

4    a legal cause of harm to Ms. Alexander.

5         So, I grant the -- I make findings of fact, as I can

6    under Rule 50 in a bench trial at the close of the plaintiff's

7    case, and my ruling is in favor of the United States.

8         That's all the claims against the United States?

9         MR. FISHER:  Yes, Your Honor.  That's correct.

10        THE COURT:  The question then is, how -- what you want

11   me to tell the jury.  I take it you don't want to be here for

12   the rest of this?

13        MR. FISHER:  We -- that would be our preference, Your

14   Honor, but we will do whatever you think is appropriate to

15   preserve the process.

16        THE COURT:  If you are not in the case you don't have

17   a right to ask any more questions of any more witnesses --

18        MR. FISHER:  Understood.

19        THE COURT:  -- so you won't be here.

20        I think I intend to tell the jury that, as I told them

21   at jury selection, there were issues involving the government

22   that were not part of what was being submitted to the jury.  And

23   I will just tell them that those involved the presentation of

24   the plaintiff's case and the government is not here anymore.

25        No indication that the government has won anything, or

1    that any rulings have been made.  They don't need to know what

2    my ruling was.  They won't be any wiser one way or the other.

3    They are just not here anymore.

4            Is that acceptable to the plaintiff?

5            MR. JOHNSON:  It is.  It's just the same as if they

6    had paid us.

7            THE COURT:  Yeah.  All right.  Now --

8            MR. FISHER:  Should there be any instruction that I

9    relay to the personnel in our office about being in the

10   courtroom or not, given the relationship to the case?

11           THE COURT:  Oh, no.  Anybody is welcome to come sit

12   in.  It's a public trial.  If they are witnesses they ought not

13   be in here, but other than that it's a public trial, anybody can

14   come that wants to.

15           You are welcome to come and watch out there.  Whatever

16   you want to do.

17           MR. FISHER:  Thank you.

18           THE COURT:  Ms. Coles?

19           MS. COLES:  Yes, Your Honor.  I wanted to, if the

20   Court will allow, to make a brief Rule 50 Motion on the Prison

21   Litigation Reform Act.

22           THE COURT:  Yeah.  Okay.  Explain it to me.

23           MS. COLES:  Yes, Your Honor.  As the Court knows, the

24   Prison Litigation Reform Act only allows a suit by prisoners for

25   mental or emotional injury when there is a showing of physical

1  injury or sexual act.

2         The plaintiff testified that she had not been

3  physically injured, so then the claim for emotional pain and

4  suffering hinges on whether or not there is sufficient evidence

5  of a sexual act.

6         The Prison Litigation Reform Act defines a sexual act

7  as:  Penetration, however slight, of the annal or genital

8  opening of another by hand or finger.

9         There was an allegation that in Ms. Alexander's exam

10 that there was fingers in and out, but their expert has

11 testified, at length today, that when you do a vaginal exam that

12 it's accepted that fingers go inside the vagina, all around the

13 vagina and inside.

14        So I think that leaves just the claim for clitoral

15 touching.  The allegation that he was rubbing her clitoris.

16        THE COURT:  You think that rubbing a clitoris sexually

17 is not a sexual act per PREA.

18        MS. COLES:  Your Honor, the Eleventh Circuit said it

19 in *Johnson v. White* which is at 989 F.3d 913.

20        THE COURT:  I am running behind.  Tell me again.

21        MS. COLES:  989 F.3d 913.

22        THE COURT:  99 [sic] F.3d 913.

23        MS. COLES:  Yes, Your Honor.  In that case, the Court

24 distinguished the difference between a sexual act and sexual

25 contact.  Congress also defined later, not in that same subset

but in a separate subsection, the Prison Litigation Reform Act

defined sexual contact as:  The intentional touching, either

directly or through the clothing, of the genitalia, anus, groin,

breast, inner thigh, or buttocks of any person with an intent to

abuse, humiliate, degrade, or arouse.

THE COURT:  Slow down.

MS. COLES:  I'm sorry.

With intent to abuse, humiliate -- yada yada.

So the Eleventh Circuit held that providing two

different definitions, one for sexual act and one for sexual

contact, there had to be a difference.  And so, when the

subsection references sexual act it was distinguishing those

from sexual contact.

And *Johnson v. White* said Congress intended for

allegations of sexual contact not to meet the requirements of

having been the victim of a sexual act.

And in *Johnson versus the Florida Department of

Corrections* -- this is a Northern District of Florida, that came

out in May of this year -- there was a ruling that an allegation

of sexual contact is insufficient to meet the Prison Litigation

Reform Act sexual act requirement.

In that case -- there was another case.

THE COURT:  So if it's just sexual contact and not a

sexual act there is no private right of action, or no emotional

damage?

1          MS. COLES:  There has to be a showing of -- so if you

2     have sexual act you don't have to show physical injury.  It is

3     assumed that a sexual act imposes a physical injury.  If you

4     have sexual contact you would have to show physical injury.

5          In our case, the plaintiff has indicated that there

6     was no physical injuries; then the claim for emotional pain and

7     suffering damages would be barred.

8          THE COURT:  Give me the cite to Johnson again?  I got

9     it wrong.

10          MS. COLES:  989.

11          THE COURT:  989.  Okay.  Thank you.

12          MS. COLES:  And then the *Johnson versus the Florida

13     Department of Corrections*, which that is just a Westlaw cite.

14     It's 2021 Westlaw, 2211-345, and that's a Northern District

15     case.

16          MR. COOK:  Can you give me the cite again.

17          MS. COLES:  Yes.  The Northern District case, *Johnson

18     versus Florida Department of Corrections*, it's 2021 Westlaw

19     2211-345, and that's the Northern District, it was decided

20     May 11, 2021.

21          That's all, Your Honor.

22          THE COURT:  I think this is a jury instruction issue.

23          MS. COLES:  Okay.

24          MR. COOK:  Yes, Your Honor.

25          Just to say that it would be, I think -- a reasonable

1   jury could find that the nature of the penetration described by

2   Ms. Alexander could be considered sexual as compared with the

3   kind of penetration described to our expert.

4           But there is one other thing as well, Your Honor.  I

5   don't know if the Court is familiar with the recent case of

6   *Hoover versus Marks.*

7           THE COURT:  Maybe.  Maybe not.  It's all I can do to

8   keep up with.  I don't learn their names.

9           MR. COOK:  In *Hoover versus Marks*, the Eleventh

10  Circuit has changed its interpretation of the PLRA to the extent

11  that PLRA would not have allowed punitive damages.

12          Under *Hoover versus Marks*, a reported Eleventh Circuit

13  case, which is en banc, decided that:  Henceforth the Eleventh

14  Circuit will join all of the other circuits of the United

15  States, except for the DC Circuit, that find that even in the

16  absence of a more than de-minimus physical injury a jury can

17  award in addition to nominal damages also punitive damages.

18          THE COURT:  I do know the case.

19          I still may be having trouble with your cite.  The

20  case is *Johnson versus Department of Corrections.*

21          No, that's what Mr. Cook cited.

22          Mr. Cook, you told me 2021 Westlaw 221-1345.

23          MR. COOK:  No.  I was just repeating the citation that

24  she gave me.

25          MS. COLES:  That didn't work?  *Johnson versus*

1    *Department of Corrections.*

2          THE COURT:  That is *Johnson versus Florida Department*

3    *of Corrections.*

4          MS. COLES:  Okay.

5          THE COURT:  All right.

6          MS. COLES:  There is also *Mengesha versus Stokes.*

7    That's another Northern District case.  And that cite is 2017

8    Westlaw 563-2668.  In that case and officer's conduct of

9    touching inmate's buttock and anus and grabbing his testicles

10   did not meet the definition of sex act.

11         THE COURT:  All right.  I will look at all of that and

12   we will deal with it in the jury instructions.  It really is a

13   jury instruction issue.  It's not a basis for a ruling for the

14   defense on any of the claims.

15         What else?

16         All right.  We have kept the court security officers

17   and all the court personnel here late, and all of you, so thank

18   you.

19         Again, if you can be here by quarter of nine in the

20   morning in case there are issues, I will get them resolved,

21   otherwise, I will see you at 9 o'clock.

22         MR. JOHNSON:  Do they think they will close tomorrow?

23         THE COURT:  That's a good question.  Where -- what do

24   you think time wise?  I need to do jury instructions tonight,

25   don't I?

1        MR. CARTER:  Honestly, Judge, I can misjudge it, but I
2   think maybe late.

3        THE COURT:  So here, for your planning, here is my
4   usual rule; if you don't have all of the evidence concluded
5   by -- you can all sit back down -- usually if you don't have all
6   the evidence in by about 3 o'clock it doesn't make any sense to
7   argue.  By the time you do arguments and give jury instructions
8   it's the end of the day.  And if the last of the evidence comes
9   in after about three it usually makes sense to argue the next
10  morning.

11       It's possible to do that.  I will try to do jury
12  instructions tonight.  I know I have got an emergency, or two,
13  to deal with also.  I will do my best.

14       If I do get them done, I will post them on CMECF so
15  that's how I will get them to you if I get a set of draft jury
16  instructions.

17       MR. CARTER:  It may be possible to close tomorrow.

18       THE COURT:  I will try to be ready.

19       All right.  Be here by quarter of nine.

20       Thank you all.  We are in recess.

21    (Proceedings concluded at 6:10 on Tuesday, September 14,
22  2021.)

23

24

25

1                                  * * * * * * * *

2              I certify that the foregoing is a correct transcript
       from the record of proceedings in the above-entitled matter.
3      Any redaction of personal data identifiers pursuant to the
       Judicial Conference Policy on Privacy are noted within the
4      transcript.

5      /s/ Lisa C. Snyder                        1/13/2022

6      Lisa C. Snyder, RPR, CRR                  Date
       Official U.S Court Reporter
7                                  **I N D E X**

8      PLAINTIFF'S WITNESSES                             PAGE

9      LETICIA NICOLE DAVIS
       Direct Examination By Mr. Cook                     11
10     Cross-Examination By Mr. Carter                    19
       Cross-Examination By Mr. Fisher                    38
11     Redirect Examination By Mr. Cook                   39

12     ASHLEY BARNETT
       Direct Examination By Mr. Johnson                  45
13     Cross-Examination By Mr. Carter                    59
       Cross-Examination By Ms. Moyle                     72
14     Redirect Examination By Mr. Johnson                74

15     CONNIE BATCHELOR
       Direct Examination By Mr. Johnson                  84
16     Cross-Examination By Ms. Coles                     88
       Cross-Examination By Ms. Moyle                     98
17     Redirect Examination By Mr. Johnson                99

18     DAPHNE RODRIGUEZ
       Direct Examination By Mr. Cook                    104
19     Cross-Examination By Ms. Coles                    115
       Cross-Examination By Mr. Fisher                   127
20     Redirect Examination By Mr. Cook                  129

21     SHONDOLYN BLEVINS
       Direct Examination By Mr. Cook                    140
22     Cross-Examination By Ms. Coles                    156
       Cross-Examination By Mr. Fisher                   172
23     Redirect Examination By Mr. Cook                  173

24     JOANN BELLAMY
       Direct Examination By Mr. Johnson                 177
25     Cross-Examination By Mr. Carter                   181
       Cross-Examination By Ms. Moyle                    187

PLAINTIFF'S WITNESSES                                    PAGE

BETH DANIELLE BARBER
Direct Examination By Mr. Johnson                         188
Cross-Examination By Mr. Carter                           195
Redirect Examination By Mr. Johnson                       204

DR. LISA TUCKER
Direct Examination By Mr. Cook                            211
Cross-Examination By Ms. Coles                            228
Cross-Examination By Ms. Moyle                            250
Redirect Examination By Mr. Cook                          251

## E X H I B I T S

| PLAINTIFF'S EXHIBITS | OFFERED | RECEIVED |
| --- | --- | --- |
| 6.4 Photograph | 109 | 109 |
| 13 PREA | 264 | 264 |
| 25 PowerPoint | 264 | 264 |
| 27 PREA posting | 266 | 266 |
| 35 PREA documents | 267 | 267 |
| 37 ACA audit | 267 | 267 |
| 48, 49, 50, 53, 55 Medical records | 267 | 267 |
| 58, 60 Affidavits | 271 | 271 |

| DEFENDANT'S EXHIBITS | OFFERED | RECEIVED |
| --- | --- | --- |
| 109-7 Medical record | 172 | 172 |

1

2                    **UNITED STATES DISTRICT COURT**
                    **NORTHERN DISTRICT OF FLORIDA**
3                       **TALLAHASSEE DIVISION**

4    CHARNESHA ALEXANDER,            )
                                     )
5                 Plaintiff,         ) Case No: 4:19cv138
                                     )
6         v.                         ) Tallahassee, Florida
                                     ) September 15, 2021
7                                    )
     UNITED STATES OF AMERICA        )
8    and PAUL ROLSTON,               )
                                     ) 8:46 AM
9                 Defendants.        ) VOLUME III
     _____ )
10
                      **TRANSCRIPT OF JURY TRIAL**
11          **BEFORE THE HONORABLE ROBERT L. HINKLE**
                  **UNITED STATES DISTRICT JUDGE**
12                   **(Pages 1 through 276)**

13   APPEARANCES:

14   For the Plaintiff:        James V. Cook, PA
                               By:  JAMES V. COOK
15                                  Attorney at Law
                                    cookjv@gmail.com
16                             314 W. Jefferson Street
                               Tallahassee, Florida 32301
17
                               Richard E. Johnson, PA
18                             By:  RICHARD ERROL JOHNSON
                                    Attorney at Law
19                                  rick@rej-law.com
                               314 W. Jefferson Street
20                             Tallahassee, Florida 32301

21

22                   ***LISA C. SNYDER, RPR, CRR***
                 **Official United States Court Reporter**
23        **111 North Adams Street, Tallahassee, FL 32301**
              **(850)567-1374 * lisasnydercr@gmail.com**
24

25            *Proceedings reported by stenotype reporter.*
          *Transcript produced by Computer-Aided Transcription.*

**P R O C E E D I N G S**

(Call to Order of the Court at 8:46 AM on Wednesday, September 15, 2021.)

THE COURT:  Good morning.  Please be seated.

I posted last night a draft set of the instructions. Corrected a few things.  Added something this morning.  I put the revised version out on your desks.  I think it's marked "Draft 9-15-2021 7:43 AM."

You can see the changes there.  The United States was still in the case style.  I took that out.

I added the instruction on the jury addressing only the specific issues in the case.  And added the 404(b) instruction.

On page 7, I changed or to and.  I think that's the way it ought to be.

Give me a heads up of anything significant.  I assume you read these last night, or had time with them this morning.

Ms. Coles?

MS. COLES:  Yes, Your Honor.  We would ask for the instruction about the impact of felony on credibility that I have seen in some jury instructions.

THE COURT:  Fair enough.

MS. COLES:  We would also ask for the section that talks about what the plaintiff has to prove, on page 5, we would also ask for explanation about medical purpose, not being sexual

1    act or sexual contact, and more language about intent.

2              THE COURT:  Let's start first with intent.  The

3    definition of sexual act and sexual contact both require intent.

4              MS. COLES:  Yes.

5              THE COURT:  I understand the theory anything worth

6    saying once is worth saying twice, but isn't it clear that it

7    has to be intent?

8              MS. COLES:  Yes, Your Honor.

9              THE COURT:  And then what you want me to say is

10   ordinary medical care is not a sexual act or sexual contact.

11   Obviously, it's not.  What would you have me say?  I mean, I

12   defined what it has to be.

13             MS. COLES:  I think something to the effect that

14   maybe, you know, physical touching with a purpose of delivering

15   medical care is not a sexual act.  I think it's the purpose, not

16   necessarily whether it meets the standard of care, whether it

17   meets ACOG guidelines is whether the intent is for medical

18   purpose.  That way they understand that under the case laws in

19   1983 that his actions have to be intentional or with logical

20   justification.  In this context that would be the delivery of

21   medical services.

22             THE COURT:  I don't think that's substantively

23   different.  You just want to add a sentence.  I get it.

24             MR. COOK:  Yes, Your Honor.  We would ask that that

25   say the sole purpose of medical care, because we believe that

1　there are multiple motives.

2　　　　　THE COURT:  Sure.  I will add something like that.

3　　　　　Any other issues?

4　　　　　Ms. Coles is shaking her head no.

5　　　　　Mr. Cook, anything on your side?

6　　　　　MR. COOK:  Yes, Your Honor.

7　　　　　We would like the instruction to say that sexual

8　desire or other improper non-medical purpose.

9　　　　　THE COURT:  Say it again.

10　　　　　MR. COOK:  Sexual desire or any improper non-medical

11　purpose.

12　　　　　MR. JOHNSON:  Tell him the page.

13　　　　　MR. COOK:  That's on five of ten.

14　　　　　THE COURT:  Tell me what could have happened that

15　would entitle you to prevail that does not constitute sexual act

16　or sexual contact?

17　　　　　MR. COOK:  Yes, Your Honor.

18　　　　　A sexual act is not always purely from a sexual

19　motive.  It can be a motive to assert power, to humiliate, to

20　satisfy what used to be called morbid interests.  I believe I,

21　in my amended instructions, framed it that way.

22　　　　　THE COURT:  So what part of that does not constitute,

23　is not encompassed by the language humiliate, harass, degrade.

24　　　　　MR. COOK:  You are right.  That covers it.

25　　　　　THE COURT:  All right.  What else?

1          How about the verdict form?

2          MR. CARTER:  I haven't seen that.  Did you send that

3   last night?

4          MR. JOHNSON:  Yes.

5          THE COURT:  I think I did.

6          MR. JOHNSON:  You did.

7          MR. CARTER:  I missed it.

8          THE COURT:  I will hand down copies.

9          MR. CARTER:  I saw the jury instructions.

10          THE COURT:  I only have three copies here.

11          MR. JOHNSON:  I have got mine.

12          THE COURT:  Mr. Johnson has one, so that's one for

13   each of the rest of you.

14          Here is what I would ask, the italicized instructions

15   are the road map:  Answer this question or not depending on your

16   prior answers.

17          I have read those three or four times to try to get

18   them right, but it's the kind of thing you can't read too often.

19   So as you look at those please doublecheck me on the

20   instructions to make sure that they are correct.

21          I don't need you to respond immediately if you are

22   just looking at them for the first time.  We can take that up

23   over the break or over lunch.  The verdict form is not going to

24   be hard to work with.

25          Anything else we need to do this morning?

1          MR. COOK:  Nothing here, Your Honor.

2          MS. COLES:  No, Your Honor.

3          THE COURT:  As soon as all of the jurors are here we

4    will be ready to go.

5          You can have your first witness on the stand.

6          MR. CARTER:  Okay.

7          THE COURT:  We are in recess.

8      (Recess taken 8:54.)

9      (Resumed at 9:00.)

10          THE COURT:  Good morning.  Please be seated.

11          Jury in, please.

12      (Jury in at 9:00.)

13          THE COURT:  All right.  You may be seated.

14          Good morning, ladies and gentlemen.  Welcome back.

15    Thank you for being so prompt.

16          I told you, I think at the time of the jury

17    selection -- I can't remember if it was downstairs or when we

18    first got up here -- that the government had a role in the case

19    but that your role would be to decide the dispute just between

20    the plaintiff, Ms. Alexander, and the defendant, Mr. Rolston.

21          The government's role in the case ended with the end

22    of the plaintiff's presentation of evidence.  As you know that

23    ended at the end of the day yesterday.  So you are down to the

24    folks that are involved with your part of the case.

25          The defense now has its opportunity to present

1  evidence.

2         Mr. Carter or Ms. Coles, please call your first

3  witness.

4         MR. CARTER:  Thank you, Your Honor.  We would call

5  Paul Rolston to the stand.

6         **PAUL ROLSTON, DEFENDANT WITNESS, DULY SWORN**

7         COURTROOM DEPUTY CLERK:  For the record, please state

8  your name and spell your last name.

9         THE WITNESS:  Paul Rolston, R-o-l-s-t-o-n.

10        THE COURT:  Mr. Rolston, you may be seated.  If you

11 are comfortable with it you may remove your mask while you are

12 there on the witness stand.

13        THE WITNESS:  Yes, Your Honor.

14                    <u>DIRECT EXAMINATION</u>

15 BY MR. CARTER:

16 Q.   Good morning, Mr. Rolston.

17 A.   Good morning, sir.

18 Q.   If you can, tell the jury where you were born and raised?

19 A.   Boston, Massachusetts.

20 Q.   You grew up there?

21 A.   Yes, sir.  Born in the south and raised outside of the

22 city.

23 Q.   Did -- what's your educational background?  Well, maybe the

24 better question, did you go to college?

25 A.    I did.  I attended Gordon College in Massachusetts after

1  graduating high school from Lexington Christian Academy.

2  Q.   What did you study at Gordon College?

3  A.   Switched majors a few times, but I ended up with philosophy

4  and comparative religions.  Philosophy with a specialty in

5  comparative religions.

6  Q.   When did you graduate?

7  A.   1990, sir.

8  Q.   After graduating from Gordon College, did you end up having

9  some medical jobs following college?

10  A.   Yes, I did, sir.  I had been teaching martial arts and in a

11  certain level you start to learn about Asian medicine.  That led

12  me to an interest in medicine.  And after a few years of working

13  in business I decided that I did definitely want to make the

14  change.

15      I had been taking evening courses in sciences.  I wasn't

16  particularly gifted science student, but I realized that I could

17  pass them.  And I took a job as a nurse's aid at a local nursing

18  home to see if I had the aptitude and the patience to deal with

19  some of the most difficult patients, elderly.

20  Q.   As a nursing aid, were you a CNA?

21  A.   I was.  I was a nurse's aid and I assisted in physical

22  therapy as well.

23  Q.   When you were assisting with physical therapy what type of

24  stuff are you doing?

25  A.   I was one of the males on staff so a lot of lifting, a lot

Direct Examination - Paul Rolston

1    of helping physical rehab, but there was a lot of bedside work:

2    Changing bed pans, caring for the patients, ADLs -- helping them

3    dress, helping them get ready for the day, helping them get

4    ready for visits with their families.

5    Q.   Where was this job as a nursing aid and a physical therapy

6    aid?

7    A.   Rockport, Massachusetts.

8    Q.   And for us who don't know the geography --

9    A.   I apologize.

10   Q.   -- is that near Boston, in that area?

11   A.   It is.  It's in Northshore.

12   Q.   All right.  And how long did you do that type of job?

13   A.   I'm not sure.  While I was there I took a job -- I began

14   studying towards EMT.  I knew I wanted to move into something

15   further in medicine, and that seemed to be the next logical

16   progression.  I knew I wanted to do some emergency medical work.

17   Q.   Did you do that?  Did you get into emergency medicine after

18   your nursing aid position?

19   A.   I did.  I got my basic EMT and I began working for, I think

20   it was called, Northshore Ambulance at the time, and I did

21   routine transfers for several years with them, again while

22   pursuing more courses in biology and looking at doing pre-med.

23   Q.   You said basic EMT, so you had to get a certification of

24   some kind to do that?

25   A.   Yes, sir.  You go through a background check with the

1  state.  And you -- you take the course.  You get a background

2  check.  And then you take an exam.  And then you get screened

3  again to be hired.

4  Q.  After -- well, during the time that you were doing this

5  emergency medical technician position did you move on to more

6  trauma-type work?

7  A.  I did.  An opportunity came.  One of the seniors retired

8  and they had kind of a competition to see who was going to be

9  able to be on what they called the trauma truck.

10     The trauma truck is the one that rides out of the fire

11  department.  You have the opportunity to get cross-trained with

12  the fire department, and you respond to almost exclusively

13  emergency work.  And I did work on the streets of North Boston

14  and the Northshore for several years.

15  Q.  All right.  And then following that work did you ultimately

16  become an emergency technician in a hospital?

17  A.  I did.  We had a MASSCAL off -- a school bus hit another

18  vehicle.  I brought a bunch of patients in.  And the physician

19  in charge was impressed with my presentation and how we did.

20  And it resulted in a job offer.  And I worked for a Mass General

21  subsidiary, Salem Hospital.

22  Q.  Okay.  And what position did you have at Salem Hospital?

23  A.  I was an emergency nurse technician.  So it was a nursing

24  position.

25  Q.  And what would you do as a hospital emergency tech and a

1   nurse technician?

2   A.   My primary responsibilities were getting vitals, getting

3   patients' information, verifying their identities, taking care

4   of their property.

5        I'd also draw blood.  EKGs.  I would assist in putting on

6   orthopedic splints as directed by the PAs, MPs, and physicians.

7        On traumas we all had a specific role and that role would

8   sometimes vary.  When the patient comes in, the team moves in.

9   There is a physician at the lead, but during that I usually

10  would either be the person who would place the foley catheter,

11  which is a catheter required to measure in volume, basically.

12  Q.   Let me ask, a foley catheter is that something where you

13  are having to touch a sensitive, intimate part of a patient's

14  anatomy?

15  A.   Of course.  A foley catheter is a catheter that is inserted

16  through the urethra of patients, both male and female.  Again,

17  it's a critical part of trauma making sure you measure the input

18  and output of volume to assess how critically they are injured.

19       In addition, I would -- sometimes my job was to cut the

20  clothing off as they came in.  Sometimes I was the person

21  placing the IV.  I was basically -- you knew that day when you

22  were on trauma team what your obligation, what your role in a

23  case would be.

24  Q.   All right.  Mr. Rolston, after doing the number of medical

25  jobs, nursing tech, emergency tech that you just described for

1  us, did you determine that you liked practicing in medicine?

2  A.   I did.  I didn't just feel that I had -- I guess my

3  weakness was I wasn't a fantastic student but I knew I could

4  overcome it by working hard.  But I knew I had the heart for it.

5  After -- you see an awful lot of tragedy, and to be able to be

6  there for people when they are most vulnerable, when they are

7  most sick is just a privilege.

8  Q.   Did you ultimately move to Florida to pursue some academics

9  to get more training in medicine?

10 A.   I did.  While working as an EMT I was taking evening

11 courses.

12 Q.   Where did you move?

13 A.   I had one friend who lived in Boca Raton, Florida, and I

14 moved to Florida.

15 Q.   All right.  Did you pursue academic studies while you were

16 in Boca Raton?

17 A.   Initially I was too broke, but eventually I did.  I worked

18 in -- continued working for the ambulance service down there

19 doing, again, emergency, rescue, and transport.

20 Q.   Okay.

21 A.   And I also worked for a few emergency departments and then

22 got back enrolled in school.

23 Q.   So you were taking classes to sort of further the medical

24 education?  Is that the type of classes you were taking?

25 A.   Pre-medical, sir.

1  Q.   Did there come a time when you were in Boca that you

2  learned about physicians' assistants and a PA type of position?

3  A.   I did, sir.  I was working at North Briar Trauma Center and

4  I saw a woman come out of the operating room with the letters PA

5  on her coat.  I didn't -- I only knew PA as professional

6  association and I asked her if she was a lawyer.  And she

7  laughed and she told me what PAs were and what they did.

8       I was 30 years old at the time.  I was a good student

9  for -- a good applicant for med school, but I would have been a

10  great applicant for what she explained to me was PA.  So I

11  decided to change transition because I also knew that I wanted

12  to go into the military and PAs have a certain role in the

13  military.

14  Q.   PAs do primary care; is that right?

15  A.   Yes, sir.

16  Q.   All right.  And just so we all understand what primary care

17  is, what is that and what type of work are you doing when we say

18  primary care?

19  A.   Primary care is a specialty that encompasses basically

20  everything any family member would need, from infants all the

21  until, you know, the 90s.

22  Q.   All right.  So after learning about a PA position did you

23  ultimately apply and go to a physicians' assistant school?

24  A.   I did, sir.

25  Q.   And where did you attend your physicians' assistant medical

1  training?

2  A.   Yale University School of Medicine.

3  Q.   And do they have a physicians' assistant program in Yale?

4  A.   They do have a physician associate program.  Physician

5  associate and physicians assistant are effectively the same

6  thing.  Some of the older programs call them physician

7  associate.

8  Q.   So you ended up moving from Florida back to the northeast;

9  is that right?

10  A.   Yes, sir.  Newhaven, Connecticut.

11  Q.   How long was this program?

12  A.   A little under three years.  I did the combined program.  I

13  did a master's of medical science at the Yale University School

14  of Graduate Arts and Sciences.  I also did the physician

15  associate program.

16  Q.   Did you ultimately graduated from that program?

17  A.   I did.

18  Q.   Do you remember the year that you graduated?

19  A.   2002, sir.

20  Q.   During the course of that physician assistants program did

21  you participate in something called clinical rotations in that

22  PA program?

23  A.   Yes, sir.

24  Q.   All right.  Within those clinical rotations did you attend

25  or participate in an OBGYN clinical rotation?

1  A.    Yes, sir.  One of the most difficult.

2  Q.    What did you do during the clinical rotation in which

3  obstetrics and gynecological work was being done?  What did you

4  do?

5  A.    We learned the basic rudiments of women's healthcare

6  preventative medicine.  We learned how to assist during surgery

7  and surgical procedures and the specific aspects of care for

8  women.

9  Q.    Did -- I say clinical, but would that be actually taking

10 care of patients and participating in taking care of patients?

11 A.    Yes, sir.  In a supervised environment.

12 Q.    In a supervised environment.  But actually performing some

13 of the gynecological exams that you just talked about?

14 A.    Hundreds.

15 Q.    That would include pelvic exams?

16 A.    Yes, sir.

17 Q.    It would include breast exams?

18 A.    Yes, sir.

19 Q.    It would include what we have referred to as preventative

20 medicine well woman exams?

21 A.    Yes, sir.

22 Q.    During a clinical rotation like that, is that all you do is

23 focus on that particular rotation, that clinical aspect during

24 that time?

25 A.    That rotation is a hundred percent dedicated to gynecology

1 and obstetrics, the specialty of.

2 Q.   You mentioned you did this combined program while you were

3 in PA school in which you got a master's in medical science.

4 What's that?

5 A.   It's a separate part of the study.  And, basically, Yale's

6 approach is evidence-based medicine.  It's that -- there is

7 allopathic medicine and there is osteopathic medicine.  They are

8 trying to encompass a little of both.  Where you want to look at

9 the studies and base on the studies determine care.  Not base it

10 on history or habits, but base it on the best empirical evidence

11 that the latest studies show.

12 Q.   During the course of that master's program, did you have to

13 have a particular thesis or written assignment which you studied

14 a particular aspect of medicine?

15 A.   Yes, sir.

16 Q.   And what was your master's thesis in this program?

17 A.   Surgical techniques to deal with leiomyomas.

18 Q.   What are leiomyomas?

19 A.   Colloquially known as uterine fibroids.  A condition that

20 commonly effects women.

21 Q.   After graduating from the PA program, and receiving your PA

22 degree, and your master's, what did you do after graduating?

23 A.   During my clinical rotations I was offered a job at Yale.

24 I was hired by Yale University School of Medicine and Yale

25 Newhaven Hospital.

1    Q.   What type of work were you doing when you were hired out of

2    PA school?

3    A.   I was hired as a surgical PA.  And I was working within the

4    auspices of the vascular surgery department and I worked for

5    the -- what's called the Yale University Intravascular Center

6    and I was the first PA hired by them ever.

7    Q.   How long did you do that, approximately?

8    A.   Five years or more.

9    Q.   Did you end up moving to Philadelphia at some point?

10   A.   I did, sir.  I took a private practice job in Philadelphia

11   working at several hospitals.

12   Q.   What did you do at the hospitals in Philadelphia, the

13   private practice you mentioned?

14   A.   At this point I was working as a surgical PA and the

15   specialty was interventional and vascular radiology.

16   Q.   That's in Philadelphia, at a practice in Philadelphia?

17   A.   Yes, sir.  I did a lot of vascular work but I also did --

18   what I mean by that is, my specialty was venous access.  I

19   worked with a lot of AIDS patients, cancer patients, sickle cell

20   people who have what we call poor vascular access, and I would

21   use radiographic modalities such as ultrasound, CAT scan to

22   access their veins and place catheters and devices for either

23   studies or for therapeutic such as chemotherapy.

24   Q.   While you were working in private practice, did you

25   eventually start moonlighting at an emergency room hospital

1  doing additional PA work?

2  A.    I did.  At that point I had been doing surgical work for

3  seven or so years and I started to get a little bored and wanted

4  to make sure I continued to expand my clinical skills.

5  Q.    So, in the emergency room, as a PA, what type of duties

6  were you performing?

7  A.    Under the supervision, again, of a physician, delivery of

8  all emergency care which could include everything from treating

9  people for car accidents to stabbings --

10  Q.    It's acute care?

11  A.    Major medical and trauma.  Yes, sir.

12  Q.    Problem-based care.  You assess problems and then make

13  decisions with supervision of a physician to treat a patient?

14  A.    Yes, sir.

15  Q.    All right.  During any of that work in the hospitals as an

16  emergency PA were you ever called upon to do pelvic examinations

17  or gynecological exams?

18  A.    Yes, sir.

19  Q.    Was that --

20  A.    Of course.

21  Q.    -- a routine procedure, a routine activity --

22  A.    Yes.

23  Q.    Okay.  Then after private practice, and then doing some of

24  the emergency PA work, what did you end up doing next?  And

25  maybe I can direct you.  Did you learn of the Direct Accession

1  Program and maybe you can tell us what that is?

2  A.   I did.  There was an Army recruiter who kept hitting me up

3  to work for the Army.  He kept repeating that there are two wars

4  going on and they needed providers with my skill set.

5  Q.   Did you pursue a program?

6  A.   I did.

7  Q.   All right.  And ultimately did you go into the Army to

8  pursue a PA career in the Army?

9  A.   Yes, sir.  I accepted a commission.

10  Q.   Now, upon accepting a commission did you start being a PA

11  that moment, or did you have other things that you had to do?

12  And don't go into a lot of that, but upon accepting your

13  commission did you have other training that you had to do before

14  being a PA?

15  A.   Yes.  I mean, it's a long application process.  You have to

16  get approved and go before a commission.  And once you get your

17  commission as an officer you get sent to basic training.

18  Q.   All right.  And basic training -- you weren't doing PA work

19  in basic training?

20  A.   First section, no.  There was a second part that yes.

21  Q.   That was PA and you would be trained on how to be a

22  physician assistant in the Army?

23  A.   Yes, sir.

24  Q.   What was your rank?  Ultimately, your ending rank?

25  A.   I am a field grade officer.  I am a major, sir.

1  Q.   And the branch of service is the Army?

2  A.   United States Army.

3  Q.   And how many years did you serve in the Army?

4  A.   Well, I'm still going, so I'm at 14 and change.

5  Q.   When you say you are still going, just so we can explain

6  that, you are not active Army right now; right?

7  A.   No, sir.  I left the Army, active duty Army, 2013, after

8  Afghanistan.  And then went to National Guard.

9  Q.   You are in the National Guard currently?

10 A.   Yes, sir.

11 Q.   All right.  Now, as a PA in the Army did you perform family

12 and primary practice care?

13 A.   Yes, sir.

14        MR. JOHNSON:  Objection.

15        THE COURT:  Overruled.

16 BY MR. CARTER:

17 Q.   And we talked about what primary care -- family practice is

18 similar to that; correct?

19 A.   Of course, sir.

20 Q.   Did you -- would you be treating patients, both male and

21 female patients, as a PA in the Army?

22 A.   Yes, sir.

23 Q.   What type of care would you be providing for the female

24 patients?

25        MR. JOHNSON:  Objection.  Limine.

1      THE COURT:  Overruled.

2  A.   I would provide basic medical care as well as preventative

3  medical services, well woman exams, et cetera.  Yes, sir.

4  BY MR. CARTER:

5  Q.   That would include breast examinations?

6  A.   Yes.

7  Q.   And it would include pelvic examinations?

8  A.   Yes.

9  Q.   And you said well woman care, which is the whole

10 preventative medicine?

11 A.   Yes.

12 Q.   That would include Pap smears?

13 A.   Yes.

14 Q.   Problem-based care, or female Army personnel would come and

15 you would assess their problems?

16 A.   Yes, sir.

17 Q.   And it may result in gynecological or pelvic examinations?

18 A.   As necessary, yes.

19 Q.   Now, all of that work was state side; right?

20 A.   CONUS.  State side.  Yes, sir.

21 Q.   Did there come a time when you were stationed overseas?

22      THE COURT:  Let's move on.

23 BY MR. CARTER:

24 Q.   Okay.  As far as providing additional female soldier care,

25 would there be some other situations in which you would do

1  female gynecological type examinations on female soldiers?

2  A.   Overseas I did, too, sir, and for local community.

3         THE COURT:  Let's move on.  That's enough on the

4  military service.  On to the next thing.

5         MR. CARTER:  Okay.

6  BY MR. CARTER:

7  Q.   Mr. Rolston, at some point in time did you become --

8  looking for a -- after you left all of that, a full-time job?

9  A.   Yes, sir.

10 Q.   Okay.  When you left active duty, what happened and where

11 did you end up working?

12 A.   I applied to the Federal Bureau of Prisons, sir.

13 Q.   Okay.  And were you ultimately hired by the Federal Bureau

14 of Prisons?

15 A.   Yes, sir.

16 Q.   And which facility did you apply?

17 A.   Tallahassee.

18 Q.   When did you start working in the Federal Bureau of Prisons

19 ultimately in Tallahassee?

20 A.   January 11, 2015.

21 Q.   And what position were you hired for?

22 A.   Medical officer PA, advanced practice provider, mid-level.

23 Q.   We have heard the term mid-level provider.  What is that?

24 A.   Two types of medical officers -- well, I guess there is

25 three.  There is physicians, there is dentists, and there is PAs

1  and MPs.

2  Q.    And do the -- as a mid-level provider, would you provide

3  primary care to the inmates?

4  A.    Yes, sir.

5  Q.    And the FCI Tallahassee, that you ultimately went to work

6  for, that was a women's prison but there is also a detention

7  center component; correct?

8  A.    Yes, sir.  A men's institution.

9  Q.    Would you be -- when you were first hired, were you

10 providing primary care in both places?

11 A.    Yes, sir.

12 Q.    And the primary care work, as a mid-level provider PA, with

13 the Bureau of Prisons, was that the same type of PA work that

14 you had been doing that you have already described for us during

15 your career?

16 A.    Yes, sir.

17 Q.    Do you still work at the BOP to this day?

18 A.    Yes, sir.

19 Q.    At FCI -- or, I'm sorry.  At the Federal Correctional

20 Facility in Tallahassee?

21 A.    Yes.  At FDC.

22 Q.    You don't work in the women's prison anymore; correct?

23 A.    I do not.

24 Q.    Tell us where you work now.

25 A.    I work at the US Marshals Federal Detention Center.  Which

1    is all male.

2    Q.   Which is part of the federal correctional institution

3    there?

4    A.   Yes, sir.

5    Q.   And as a member -- as an employee of the Bureau of Prisons,

6    are there other duties that you are called upon to perform other

7    than your normal PA work?  Are you part of any other teams or

8    training programs that you participate in?

9    A.   Yes, sir.  I was selected to be a regional train the

10   trainer, which, is an advanced practice provider who is

11   responsible for training other mid-level providers.

12   Q.   In what particular areas?

13   A.   Primary care.  You are picked as a leader in primary care

14   to teach.

15   Q.   And are you on any other teams besides the train the

16   trainer?

17   A.   Yes, sir.

18   Q.   What are you on?

19   A.   I was also selected to work at the National Training Center

20   as an emergency response and tactical medical trainer.  We also

21   do policy.  We help the BOP modernize emergency response policy.

22   Q.   Have you been selected to be on the BOP SORT team?

23   A.   Yes, sir.  I'm on the Special Operations Response Team,

24   which is equivalent of what most people know as SWAT.

25   Q.   In that type of position, were there times that were called

1  away from the work that you do in Tallahassee and provide a

2  certain type -- the team providing relief or something in

3  certain areas?

4  A.    Yes, sir.  I have been deployed several times, including

5  Hurricane Maria.

6  Q.    Where was that?

7  A.    That was Puerto Rico, sir.

8  Q.    When you were in Puerto Rico, as part of that SORT team,

9  did there come occasions where you provided care to the local

10 residents?

11 A.    Yes, sir.  Absolutely.

12 Q.    Was some of that female care or gynecological care?

13 A.    Female care.  Yes, sir.

14 Q.    Upon being hired by the BOP, what type of training did you

15 have from them as far as BOP operations, policies, and things of

16 that nature?

17 A.    When you are hired you go through an initial week

18 orientation, which is just strictly volumes of policies and

19 procedures that are unique to working within a prison.

20      Then they later send you to the Federal Law Enforcement

21 Academy at Quantico for certification.

22 Q.    In addition to the initial orientation and training, in

23 your every day job are policies and procedures reviewed in the

24 medical office by staff?

25 A.    Of course.  Yes, sir.

1   Q.   Is that part of regular staff meetings?

2   A.   It is.

3   Q.   I want to show you a few exhibits.

4        I can show it to you right now, Mr. Rolston.  I am going to

5   show you what we will mark as -- what we have marked as

6   Defendant's Exhibit 27.  Do you recognize that particular --

7   A.   Your Honor, I apologize.  May I get my glasses?

8             THE COURT:  Sure.

9             MR. CARTER:  Sorry about that.

10            (Pause in proceedings.)

11  BY MR. CARTER:

12  Q.   Mr. Rolston, can you see that on the screen?

13  A.   Yes, sir.

14  Q.   Do you recognize that program stating the policy of the BOP

15  as the patient care program?

16  A.   Yes, sir.

17            MR. CARTER:  Your Honor, we would like to move the

18  patient care policy program into evidence, Defendant's Exhibit

19  27.

20            MR. JOHNSON:  Without objection.

21            THE COURT:  Defendant's 27 is admitted.

22       (DEFENDANT EXHIBIT 27:  Received in evidence.)

23  BY MR. CARTER:

24  Q.   Mr. Rolston, as far as program statements and policies,

25  those are directives that you follow in performing your duties

1   as the PA at the Bureau of Prisons?

2   A.   Yes, sir.

3   Q.   I want to direct your attention to page 13 of that

4   particular document.  You would be part of the primary care

5   provider team at the BOP FCI facility; correct?

6   A.   Yes, sir.

7   Q.   As a physician assistant do you provide primary care for

8   the inmates?

9   A.   Yes, sir.

10  Q.   And the part that I had highlighted -- are you familiar

11  with the BOP's promoting preventative health measures as part of

12  the primary care delivery of medical service?

13  A.   Yes, sir.

14  Q.   And the policy under this model each inmate is assigned a

15  medical team member as a healthcare provider, are you assigned

16  an inmate -- how is the assignment done, maybe that's a better

17  question.

18  A.   They try to do it randomly so it's fair.  And the provider

19  has no say.  They do it by the sequence number, so the inmate

20  number has five digits in the first sequence and they go by the

21  last two in how they assign them.  The last two of the first

22  series.  Excuse me.

23  Q.   The medical office there at FCI, is it designed to operate

24  like a medical office in the community outside of the prison

25  environment?

1    A.    Yes, sir.

2    Q.    And promoting preventative health is an emphasis of the

3    department?

4    A.    Yes.

5    Q.    We mentioned primary care for the inmates.  I know we have

6    used some language, and it's probably understood, but what type

7    of point of contacts would you have as far as with patients?

8    Sick call?

9    A.    Yes.

10   Q.    Anything else besides sick -- well, tell us what sick call

11   is.

12   A.    Two types of sick call:  There is emergent sick call where

13   the inmate presents with emergent symptoms that are concerning.

14   Usually the nurse is the first to identify it and they would

15   refer them to the medical officers.

16        And the second is sick call in which they submit a copout

17   on the computer.  This is not transmitted to the provider.  It

18   actually is sent to the administration so they can screen all

19   communications.  And then that goes to -- that is referred

20   through the pipeline to us.

21   Q.    Okay.  When a copout, that you described, is initially done

22   it's got a process to go through before it gets to you in your

23   hands; is that what you're saying?

24   A.    Yes, sir.

25   Q.    So there can be some time delay between when it was

1  originally prepared and ultimately seen by you?

2  A.   Unfortunately, yes.

3  Q.   Are there other types of care that is provided like chronic

4  care and things of that nature?

5  A.   Yes, sir.  It is routinely scheduled chronic care

6  appointments.  Ideally it's done twice a year.  The major

7  categories are:  Infectious disease, cardiology, pulmonology, et

8  cetera, and they have the major categories for people with major

9  medical illnesses.

10  Q.   We've talked about preventative care a lot.  Do you also

11  provide preventative medicine for the inmates?

12  A.   Yes, sir.  That's also scheduled in.

13  Q.   And the exhibit that I just had admitted into evidence, 27,

14  if I direct your attention to page 27 of Exhibit 27, for you,

15  you see there is a female healthcare section there.  Does that

16  describe some of the things that you are doing, and are required

17  to do, when you interact with a female patient?  When you

18  perform a physical examination of a female patient does this

19  list the type of things you need to be doing?

20  A.   Yes, sir.

21  Q.   That includes getting a gynecological and obstetrics

22  history?

23  A.   Yes, sir.

24  Q.   To include any sexual activity and recent sexual history?

25  A.   Yes, sir.

1  Q.   It also includes conducting a breast and pelvic exam?

2  A.   Yes, sir.

3  Q.   And there is discussion that if a female staff member will

4  be present during any of those type of exams; is that right?

5  A.   All of them.

6  Q.   And this --

7  A.   Sir, correction.  All of the female care.

8  Q.   Okay.  All of the female care?

9  A.   Yes.

10  Q.   Where a patient might be undressed; is that right?

11  A.   Yes.  Anything in the private area.

12  Q.   And it indicates that during a physical examination you

13  should offer Pap smears and also collect samples for chlamydia,

14  gonorrhea and other endocervical cultures from vaginal and other

15  orifices; correct?

16  A.   As needed.

17  Q.   As needed.  Based on the presentation; correct?

18  A.   Yes, sir.

19  Q.   And during those times would you be exercising the clinical

20  judgment that you have from your training and experience of

21  whether that would be necessary?

22  A.   Yes, sir.

23  Q.   Mr. Rolston, in part of your training did you learn that,

24  according to the BOP and some of their policies, that the female

25  population had chronic medical needs which require offering the

1  preventative medicine that we've been talking about?

2  A.   Yes.  When I was hired they said it was an area of

3  deficiency on their last several program reviews -- medical

4  program reviews.

5  Q.   Did you learn through some of the policies and guidelines

6  that females in prison have a high instance of cervical cancer?

7  A.    Of HPV and other complications from HPV.

8  Q.    What is HPV?

9  A.    Human papillomavirus.  It is a sexually transmitted

10  disease.  It's fairly common.  It's a leading cause of cancer in

11  females.  It also is a leading cause in cancer in uncircumcised

12  males.

13  Q.   I want to show you a document that is one of the policies

14  and procedures.  This is the "Managing Female Offenders" and it

15  was the United States Defendant Exhibit 35.

16          MR. CARTER:  I would like to move that into evidence,

17  Your Honor.

18          MR. JOHNSON:  Without objection.

19          THE COURT:  Defendant Exhibit 35 is admitted into

20  evidence.

21      (DEFENDANT EXHIBIT 35:  Received in evidence.)

22  BY MR. CARTER:

23  Q.   Mr. Rolston, I would direct you to section two of Chapter 3

24  of that pretty thick policy and procedure, but is that where

25  some of the information we just talked about, as far as the

1  communication of incidents of high cervical cancer and STDs, is

2  communicated to you as an employee of BOP?

3  A.   Yes.

4  Q.   One more of these.  I would like to show you what we will

5  mark as -- what we have had marked as Defendant's Exhibit 31B.

6       Do you see that, Mr. Rolston?

7  A.   Yes, sir.

8  Q.   Is that too another guideline by the Federal Bureau of

9  Prisons on clinical guidance for preventative health screening

10  processes?

11  A.   Yes, sir.

12  Q.   You are familiar with that, and it's been in place since

13  you have been an employee of BOP?

14  A.   Yes, sir.

15       MR. CARTER:  I would like to move Defendant's Exhibit

16  31B into evidence, Your Honor.

17       MR. JOHNSON:  No objection.

18       THE COURT:  Defendant's 31B is admitted.

19     (DEFENDANT EXHIBIT 31B:  Received in evidence.)

20  BY MR. CARTER:

21  Q.   I would like to direct your attention, Mr. Rolston, if you

22  can see that, to page two of that document in the section

23  entitled Preventative Healthcare Timing and Scope of Services.

24  Are you familiar with the information that is communicated in

25  that portion of the policy?

1  A.    Yes.  It compels you to do your best to be efficient and

2  consolidate visits.

3          THE COURT:  Mr. Carter, this says on the face of it

4  June 2018.  You may want to address that.

5  BY MR. CARTER:

6  Q.    Mr. Rolston, this guideline does say 2018.  Was this

7  guideline in place in the communications of preventative health

8  screening in place when you started to work at BOP?

9  A.    Best of my knowledge, this has always been the policy.

10  Q.    Okay.  That particular section, Mr. Rolston, indicates --

11  you said it was directing you to be efficient and consolidating

12  exams; is that right?

13  A.    Yes, sir.

14  Q.    What's your understanding of what you are supposed to do to

15  follow that type of directive?

16  A.    One visit get as much done as possible, and -- so you're

17  able to have more space in your schedule to see more patients.

18  Q.    Because it's a busy practice; right?

19  A.    Very.

20  Q.    We will talk about that in a minute.

21          The directive also talks about other means of providing

22  preventive services.  It is, like you just said, incorporated

23  into periodic visits for chronic care.  But it also says

24  incorporating another time when inmate is already scheduled to

25  be seen.  And the example it gives is a TB screening.  Do you

1    see that?

2    A.    Yes, sir.

3    Q.    So in taking that directive, did you try to implement that?

4    A.    Yes, sir.

5    Q.    And how would you go about doing that?

6    A.    Regardless of why a patient came in I would try to look at

7    their schedule, look at their medical conditions, and get as

8    much done as I could in that visit.  If I knew they had chronic

9    care issues, and I knew they were pending chronic care in a

10   month; if I chose to pass on that and not do it, their medicines

11   might run out, so I try to get it done.

12        Similarly, if they needed well woman care, well man care, I

13   would attempt to get it done at that juncture if I was able.

14   Q.    When you are offering -- and I want to focus on the time

15   that you were at FCI taking care of women patients -- when you

16   offered well woman care, in compliance with this type of

17   directive, what would you say to the patients?

18   A.    I had a thing I would say always, because I understand

19   that -- I don't like having rectals done to me, or having

20   certain exams to me, and out of respect I would always say:

21   Look, I know you probably don't want it but before you answer

22   please listen to me and just hear me out.  Nobody should die by

23   something that's diagnosable, treatable and preventible.  This

24   is five or seven minutes of your life you will never get back,

25   but you will have the peace of mind that you know that

1  everything is okay.  And I understand nobody likes these, but I

2  want to offer it to you because this is what I'd do for my

3  mother, my sister, my daughter, my brother, my father.  I would

4  say the same thing.  And that's my standard of care for what I

5  deliver for patients.

6  Q.   Mr. Rolston, you say it the same way every time?

7  A.   Yeah, I do.  They say I'm a broken record.

8  Q.   Can patients -- the inmate patients, when you offer the

9  well woman care, can they still decline the treatment?

10  A.   Of course.  And they do.

11  Q.   Have you had the occasion where you give the speel, that

12  you just described, and talk about preventative and treatable

13  conditions, and they did still decline?

14  A.   Yes, sir.

15  Q.   And before you go forward with a well woman exam, or any

16  intimate exam, do you seek the patient's consent to do it?

17  A.   Yes, sir.

18  Q.   At the Bureau of Prisons you have an electronic medical

19  record system?

20  A.   Yes, sir it's called BEMR.

21  Q.   We heard that term.  We didn't get a real definition of it,

22  but it's called BEMR is your electronic records program?

23  A.   Yes, sir.

24  Q.   And are there more than one application going on with the

25  electronic records?

1  A.    Yes, sir.  It's a bit of an antiquated system.

2  Q.    So the clinical encounters are what part of that BEMR

3  system?

4  A.    You are asking me to -- could you --

5  Q.    Well, maybe the question is are some of the patients

6  charged with different applications?

7  A.    Absolutely.

8  Q.    Can you explain what you are talking about?

9  A.    Well, over time there is different places of different

10 things that have been kept.  So, when I initially started most

11 labs were kept under "document manager".  And document manager

12 is kind of almost a garbage pail of hundreds of documents if the

13 patient has been there a long time.  They will have the date and

14 they will have a time, but you will have to manually search

15 through all of them to find sometimes what you are looking for.

16      There is also lab results.  You can find lab results in

17 your document manager.  You can find lab results under the

18 category "lab results" where you think it should be.  But,

19 there's several locations that different items are located

20 under, so it takes a bit of searching.

21 Q.    So there is more to a patient's chart than just clinical

22 encounters that we have seen and talked about; is that right?

23 A.    Yes, sir.  Categories for X-ray, for laboratory.  Many,

24 many categories.

25 Q.    We have heard the term A and O intake exam, or admission

1    and orientation intake exam.  Do you participate in those?

2    A.    Yes.

3    Q.    And you actually perform those?

4    A.    Yes.

5    Q.    And what is an A and O intake exam?

6    A.    The intake exam is our opportunity to get to know the

7    patient.  It's kind of like your first visit.

8    Q.    So, it's a new patient to the facility usually?

9    A.    Yes.

10   Q.    And during that intake exam, are you mandated to offer well

11   woman examinations?

12   A.    Yes.

13   Q.    The bureau wants you to do that?

14   A.    Mandates it.

15   Q.    And do you do that when you conduct an intake exam?

16   A.    Always.

17   Q.    And despite the fact that it's mandated, and you are

18   required to offer it, do patients still decline to participate

19   in that preventative medicine?

20   A.    Yes.

21   Q.    And when they do that you don't do the exam?

22   A.    Move on.

23   Q.    Okay.  Mr. Rolston, we have heard about PREA training.  As

24   an employee coming on board with BOP, did you receive PREA

25   training?

1    A.    Yes.

2    Q.    And that type of training is upon orientation but it's an

3    annual refresher, too; correct?

4    A.    Yes.

5    Q.    So you know that every employee in the institution, as well

6    as inmates, are trained on PREA; don't you?

7    A.    Yes.

8    Q.    That would include the reporting aspect of PREA; correct?

9    A.    Yes.

10   Q.    Now we made passing reference to the chaperone issue.

11   That's mandatory; right?

12   A.    Yes.

13   Q.    Any time you are doing an intimate exam you have a

14   chaperone?

15   A.    Always.

16   Q.    We have heard that that also is required by BOP even if

17   it's the same gender; is that right?  If the provider is the

18   same gender of the patient?

19   A.    I am not sure if they require same gender, but I do it a

20   hundred percent.

21   Q.    Maybe we ought to ask, how do you implement the chaperone

22   policy when you are doing an intimate exam?

23   A.    Hundred percent, any intimate exam.

24   Q.    So, currently you are at FDC, which is all male facility.

25   Do you require chaperones when you are examining a male?

1    A.    Absolutely.

2    Q.    When you were at the female facility did you always require

3    a chaperone?

4    A.    Absolutely.

5    Q.    What's your understanding, from policy, what the purpose of

6    having that chaperone in the room during a sensitive

7    gynecological intimate exam?

8    A.    Primarily it's to protect the patient from any type of

9    abuse or misconduct.  It's also there to protect the staff from

10    any allegations of misconduct.

11    Q.    If you made a decision that the patient needed an exam like

12    that, and the chaperone was not readily available, what would

13    you do?

14    A.    I'm stuck.  And I just wait and complain.

15    Q.    If -- who would you use as a chaperone when you needed to

16    do one of them intimate exams?

17    A.    Ideally one of the techs -- ideally one of the nurse's

18    aids.  That was kind of their primary duty.  But, the guideline

19    is that it's a female, so I would make sure that one way or

20    another there was a same sex person there in the room and it

21    didn't matter if it was the department manager, the radiology

22    tech -- I insisted on having someone and I would wait until I

23    did.

24    Q.    That could be nurses.  Even the doctors sometimes would

25    come in there?

1  A.   Even the female physicians, yes.

2  Q.   When you see a patient, and a determination is made that

3  you are going to do a well woman exam, or because of the

4  presentation, the condition that's presented to you, you need

5  to, at that point in time do you know who your chaperone is

6  going to be?

7  A.   No, I don't.

8  Q.   Like we just talked about, they could be busy.  The person

9  that you seek out first could be busy and you just have to find

10 somebody?

11 A.   Yes.

12 Q.   Mr. Rolston, I want to talk about your particular

13 examination process and specifically talk about well woman care,

14 and the breast, pelvic, and rectal examinations.

15      You obtain consent from the patient before you proceed with

16 any of those?

17 A.   Yes.

18 Q.   All right.  And let's talk about how you do that.  If a

19 patient needs that exam, what do you do to make sure you are

20 providing or getting consent from that patient?

21 A.   Number one, I inform them that this is what I see.  This is

22 what's on the schedule.  I see what they have to say about that,

23 whether they tell me they have already had it, or -- and I look

24 through the computer to validate and verify.

25      Make sure they understand what it is we're going to do.  I

1  try to get a little background on whether they've had this done

2  before because unfortunately in this population a lot of people

3  never had healthcare, and it's tragic, and we have to explain to

4  them what we are going to do.

5  Q.  All right.  After you do that, and the decision is made to

6  go forward with the exam, do you leave the room?

7  A.  Not yet.  One, I give them the mandatory speel -- nobody

8  should die from something that's preventible.  And if they

9  consent, then I say:  Let me get a nurse.

10  Q.  Or an aid?  A chaperone?

11  A.  Someone in nursing.  Yes.

12  Q.  And you get the nurse and then what happens?

13  A.  I leave the room and the nurse consents them again.

14  Q.  All right.  When you come back into the room what do you

15  do?

16  A.  I repeat again --

17  Q.  Let me stop you there.  Is the patient getting undressed in

18  the room with the nurse aid, or the chaperone?

19  A.  Yes.  The nurse is getting prepared for the exam, and

20  talking to them, consenting them, talking to them and they are

21  getting everything ready.

22  Q.  And then you return to the exam room?

23  A.  Yes.

24  Q.  Tell us what you do when you return.

25  A.  By the time I have returned they have properly draped and

1  covered the patient.  I, again, tell them what I am there to do

2  and begin to do -- begin to do the actual exam.

3  Q.   All right.  Have you had patients that decline going

4  forward after those different levels of consent?

5  A.   Yes.  Literally at every stage.

6  Q.   Tell us about conducting a breast exam.  How do you conduct

7  a breast exam of a patient that needs it and has consented to

8  it?

9  A.   I am going to, again, tell them what I'm going to do.  I am

10  going to put the drape down.  I'm going to ask them to put one

11  arm up over their head.  I am going to tell them that I am going

12  to place my hand on their breast and I begin talking to them --

13  every moment of this is an opportunity for preventative medicine

14  training.  There is no silent time.  I try to fill the time

15  talking with the patient, telling them different techniques that

16  they can use to conduct breast exams.  I also talk to them about

17  how often are they doing it.  Are you doing routine checks?

18  Where are you doing these checks?  And then I proceed to

19  actually do the exam.

20  Q.   How do you actually conduct the breast exam?

21  A.   I start at the sternum.  I begin at the apex of the

22  sternum.  You conduct this exam with your finger tips, small

23  little circles with your finger tips.  I explain to the patients

24  that this is the best way.  That's the most sensitive part of

25  your fingers.  And it's the most likely chance you have of

1  capturing a lesion.

2      I work in rows up and down the area.  Some people start

3  mid-line and spiral outwards.  That's another technique.  I

4  start at the sternum and move vertical and inferior -- up and

5  down across the breast.

6  Q.   What are you searching for during a breast exam?

7  A.   Nodules.  The primary thing that that is searching for is

8  masses which could indicate breast cancer.

9  Q.   Do you pinch the nipple of the breast during your breast

10 exam?

11 A.   No.  But you do push down and put traction on it.  Pinching

12 is not the proper word.  You are putting pressure, and it does

13 squeeze a little, and it's to see if there is any discharge.

14 Q.   Okay.  And also during a breast exam do you take the

15 occasion to try to educate the patient on breast tissue and

16 compare healthy breast tissue to either lumps or lesions?

17 A.   Of course, because the primary purpose of that is if I find

18 something I am concerned about, that woman has those breasts

19 every day and she is going to be able to do a much better job of

20 surveilling than my limited views here and there.  So I will

21 make sure:  Hey, this spot, this is, you know, a rubbery fixed

22 nodule.  It isn't hard.  It isn't hurting you.  That's probably

23 fibrocystic tissue.  Do you know -- and I would inquire whether

24 they know and a lot of times they don't know because they have

25 never done one.  And then I'm like:  Well, I want you to follow

1    that.  It doesn't have enough feature that I am concerned about

2    that I want to send you for a mammogram.  You are not as many

3    risk factors based on age, and we talk about family history.  Or

4    I might say, You know, with your family history, I am sending

5    you for a mammogram.  Then I would apologize and explain what a

6    mammogram is like.  And it's not pleasant.  But I talk through

7    the what, the why, and what the purpose is, and where we are

8    going with it.

9    Q.   Okay.  How long would your breast examination typically

10   take?

11   A.   Obviously, it depends on the amount of breast tissue.  Some

12   people have more breast tissue.  Some people also have more

13   findings.  You may find some people have very heavy fibrocystic

14   breasts and there is a lot of check.  But even then I doubt it's

15   even five minutes.

16   Q.   Five minutes total or five minutes each breast?

17   A.   Five minutes total.

18   Q.   Okay.  All right.  Now tell us about a pelvic exam.  When

19   you conduct a pelvic exam.  I know we have referenced Pap smears

20   and pap exams, but the correct term is pelvic exam; correct?

21   A.   Yes, sir.

22   Q.   All right.  It's got the components of the examination for

23   a pelvic exam?

24   A.   Yes, sir.

25   Q.   Okay.  What do you -- assuming the patient needs it, based

1    on either well woman or presentation, consented, what do you do

2    to conduct a pelvic exam?

3    A.   Well, when I described the breast exam I should have said

4    this; there is actually three components.  You not only speak to

5    them, but you look first and you are going to comment on any

6    abnormalities you see, any scars you see -- surgical scar, what

7    caused that scar, what happened.  So you're always going to look

8    first and then you're going to touch and then you're going to

9    explain.

10   Q.   Okay.

11   A.   So with a pelvic, it's a similar fashion.

12        The first thing you're going to do is warn the patient.

13   Tell them, this is what we are going to do.  Then you are going

14   to move the drape up to about the umbilical area and you are

15   going to visualize.  And you are looking for any type of

16   lesions, any scars.  If you see a scar you are going to want to

17   say:  What's the scar from.  And you're looking for masses,

18   lesions, this type of thing.  So first step is looking.

19   Q.   This is a visual exam at that point in time; is that right?

20   A.   Yes.

21   Q.   Is it possible that you need to do something to visualize

22   the whole area?

23   A.   Well, then that's stage two.  You are going to warn the

24   patient.  I usually put my hand on the outside of their thigh:

25   This is my hand.  You are going to feel me touching you.  And I

1  start usually with the inguinal canals, which are the canals

2  that move down between your thigh.  This is where your artery is

3  located, and the lymphatics are in that canal.  And you are

4  palpating lymphadenopathy.

5  Q.  Why are you doing that?

6  A.  Sign of infection.

7  Q.  Then what next?  After you are looking for the lymphatic

8  area?

9  A.  I push on the belly.  And I am principally pushing on the

10  area of the adnexa.  So the umbilical area is the bellybutton,

11  and the adnexa is where the ovaries are located, fallopian

12  tubes, top of the uterus.  And I am pushing down on the outside

13  to see if it elicits any abdominal pain.  I am also going to

14  listen -- bowel sounds.

15  Q.  Are you communicating with the patient as you are doing

16  each part of that?

17  A.  Yes.

18  Q.  Telling them what you are going to do?

19  A.  Always.

20  Q.  And asking and communicating if they have pain?

21  A.  Yes.

22  Q.  And then what happens next after you do that?

23  A.  I am going to actually visualize the structures of the

24  vagina itself.  Place the hands on the tissue and similar to how

25  I push my cheeks out, you are going to put a little bit of

1  traction so you are able to visualize the area.  Sometimes this

2  isn't needed.  Sometimes it is.  Everyone's anatomy is a little

3  bit different.

4  Q.   Are you visualizing the entire vaginal area when you do

5  this?

6  A.   Yes.  And this lasts seconds.

7  Q.   It doesn't take very long?

8  A.   No.

9  Q.   Do you visualize the clitoral hood and that whole area,

10 too?

11 A.   Visualize, yes.

12 Q.   Why do you do that?

13 A.   It's part of the anatomy.  You want to make sure that it's

14 free from lesions, free from masses.

15 Q.   All right.  And if it's easier to explain what you do next,

16 that is a white board that you have there and we could -- if you

17 need to draw to explain that.

18         MR. CARTER:  Your Honor, can he just use it --

19         THE COURT:  You can.  There used to be a pen over

20 there.

21         MR. CARTER:  Your Honor, I have one here.

22         THE COURT:  I have got one he can have.  You may need

23 yours.  I am not going to need mine.

24         THE WITNESS:  Thank you, Your Honor.

25         You are going to learn why I am in medicine and not

1  art.  I will do my best.

2          So in a relatively simplistic fashion.

3          MR. CARTER:  Just go slow.  I think it has to engage.

4          THE WITNESS:  No.  I don't think it likes the stylus.

5  It seems like it wants me to use my finger.  It's a blunt

6  instrument.  I will do my best.

7          All right.  So in a rather simplistic view what we are

8  kind of looking at is a triangle.  And within this triangle --

9  this is the pelvic region looking from forward down.  Again,

10  this is a two dimensional image.  So up here, approximately, you

11  have your ovaries.

12          Here, again, the vagina is not that shallow but you

13  have the vagina and this would be what the uterus, more or less,

14  looks like.

15          So the ovaries sit in the space outside of the uterus,

16  obviously, and they are connected with a little tube called the

17  fallopian tube which has a hood and it sits on top of the ovary.

18          The uterus is a solid organ.  The uterus is made of

19  muscle, but it's a hollow organ.  And this you would have to --

20  the area under the ovaries, the circles, would be solid.  I

21  don't want to color it in because it will just obscure the

22  image.

23          The vagina is a hollow organ that is the entrance,

24  obviously, to the uterus.  And this area here is called the os.

25  The os is just a fancy word for the opening.  And it's the

1  opening into the uterus and that's where the samples are taken

2  for the pap, and STD testing, and that type of thing.

3        This is the principal reason why we need to use the

4  speculum is in order to reach that area.

5  Q    (By Mr. Carter) Mr. Rolston, where is the cervix on your

6  drawing that you are making?  If I am messing you up --

7  A.   Where I did the little circle and the styluses that

8  effectively is the cervix.  That is the cervix.  And the opening

9  in the cervix is called the os.

10 Q.   That's fine.  All right.  Walk us through your examination

11 of -- the digital portion of the examination.

12      Before you do that, let me ask you this, we have heard at

13 least from Dr. Tucker, she does the speculum exam first and then

14 digital.  We have heard different ways of describing that.  What

15 do you do first as part of the pelvic examination.  You have

16 talked about the visual aspect and now we are moving to the

17 digital.

18 A.   I try to pay attention, best I can, and most of my female

19 friends and my sister and mom, the big thing they complain about

20 is providers that are rough and providers that jam the speculum

21 into their uterus.  And they talk about how painful it is.  And

22 I talk to various of my female OBGYN colleagues about how to

23 avoid that.  And they say:  Know where the uterus is.  You can

24 do the digital exam first.

25      So there are principal positions for the uterus.  And

1    understand that, you know, we are drawing this all expanded, but

2    this is generally a collapsed organ.  There is not always all

3    this potential space in there.  And what you want to do is put

4    the speculum in so it goes over the top of the uterus and the

5    cervix.  Not just jam into it.

6        And in order to know this there is three primary positions;

7    you can be retroverted where the uterus is pointing towards the

8    spine.  You could be anteverted, where it's pointing towards

9    your bladder.  Or it can be midline.  And midline is ideal.  And

10   that's where it's less likely to happen.  But you also get into

11   situations where it's ante-flexed and retroflexed.  So I do my

12   digital exam fist.

13       Should I proceed?

14   Q.    All right.  So we know why you are doing your digital exam.

15   What do you do during the course of your digital exam?

16   A.    Again, I warn the patient that I am going to place my

17   fingers inside.  I place two fingers inside.  I place them

18   directly this direction, and what I am basically doing is

19   sliding my finger up while I am pushing on their belly.  And I

20   am standing.  So I am standing over this way and pushing down.

21   I am pushing down on their belly and what I am trying to do is

22   isolate the ovary.  I am trying to see if this determine --

23   cause pain, or if I can detect the presence of the ovary.  There

24   is also a pulse there if you can find it.

25       I then sweep midline.  And midline is here again.  And I

1   push under the cervix and I am looking for cervicitis and I am

2   looking for pain.

3       Then I sweep to the opposite side and do the exact same

4   thing.

5   Q.   Are you communicating with the patient during this?

6   A.   Yes.

7   Q.   Why are you communicating with the patient?  What are you

8   trying to learn?

9   A.   The principal thing is I want them to tell me if they have

10  any discomfort, any pain, and if they have told me they have

11  pain, if does me pushing on your ovary replicate the pain.  I am

12  trying to elicit information that's going to be clinically

13  valuable.  And then it's done.  It lasts again very short period

14  of time.

15  Q.   How long would you -- I know we are slowing it down and

16  talking about it slow, but how long would the digital exam that

17  you just described typically take?

18  A.   A minute, if that.  Thirty seconds.

19  Q.   On your drawing, and I know it's 2-D, two dimensional, but

20  where would the clitoris be?

21  A.   So, the clitoris, obviously, is not located in the vagina.

22  The clitoris is located -- I guess it would be five centimeters,

23  or more, above the vaginal opening.  So basically you have the

24  vaginal orifice and then you have the urethral orifice, and then

25  you have the prepuce which is basically the foreskin for the

1    clitoris above that.

2        The manuals talk about you insert the speculum, you know,

3    directly in at about a 45-degree angle.  So you are directing it

4    down this way.  You are not directing it from the top.

5    Q.   All right.  It's hard to actually show where it would be in

6    that 2-D drawing; is that right?

7    A.   Yes.  So I am guiding it very carefully with my hand --

8    Q.   It's not in the area of the cervix and the uterus and the

9    ovaries?

10   A.   No.

11   Q.   Do you touch the clitoris during your digital exam?

12   A.   Never.

13   Q.   Do you repeatedly insert your fingers in and out of the

14   vaginal walls during your digital exam?

15   A.   No.

16   Q.   We have talked about the speculum exam.  We have talked

17   about the one minute digital exam.  Now you move on to your

18   speculum exam; is that right?

19   A.   We did the digital exam so now I insert the speculum, yes.

20   Q.   All right.  And I know we have used that term, but we

21   haven't talked about what it is.  What is a speculum?

22   A.   A speculum is a device that makes -- opens up the potential

23   space.  It's, again, the vagina doesn't -- it's a hollow organ.

24   It doesn't just sit open even though we tend to draw it this

25   way.

1    The speculum you enter, and as it moves forward -- and,

2  again, you have already identified where the os is, you

3  gradually open it and it helps you visualize.  You can visualize

4  the walls of the vagina looking for lesions, and looking at the

5  rugae.  You also have an opportunity to visualize the os and the

6  cervix.

7    Again, we are looking for lesions.  We are looking for

8  growths.  We are looking for discharge.

9    And the nurse is standing on my side.  She is handing me

10 things and I use -- she hands me a cytobrush in which I insert

11 into the -- I am down -- so one hand is holding the speculum.

12 The other hand is holding the cytobrush.  I insert the

13 cytobrush, one rotation of the cytobrush, I hand it back to her.

14 Actually I do the paddle first.  Excuse me.

15    I place the paddle.  Do one rotation.  Hand it to her.

16 Cytobrush.  Hand it to her.  We're done.  And the speculum comes

17 out.

18 Q.   During that process are you communicating to the patient

19 that you've got a speculum and you are about to proceed with the

20 speculum exam?

21 A.   Yes.

22 Q.   And you just described collecting samples.  Is it always a

23 Pap smear that you are collecting samples for?

24 A.   Pap smear by definition it's collecting -- it's collecting

25 cytologic samples.  It's a pathology sample.  Yes.

1  Q.   So there may be a reason to collect samples that were not

2  solely for looking at cervical cells; is that right?

3  A.   Certainly.  It test for STDs, et cetera.  Yes.

4  Q.   How long, from start to finish -- well, let me back up just

5  a second.

6       The speculum itself, is there a light associated with the

7  speculum?

8  A.   Yes.  We're lucky.  We finally got the ones that actually

9  have the mounted light.  We have had to use the ones without one

10  and that's very difficult.  But the ones we have are plastic.

11  They do have a light on it, because otherwise it would have been

12  very difficult because your hand is already on the speculum,

13  your other hand is on the device collection sample, so --

14  Q.   And in visualizing, what types of things are you looking

15  for.  You mentioned lesions.  Are there other things you are

16  looking for?

17  A.   Lesions, masses.

18  Q.   Discoloration?

19  A.   Yes.

20  Q.   And what do those things tell you when you do a visual

21  exam?

22  A.   Everything is clinical information.  Everything lends to

23  the clinical picture and can help build your understanding.

24  Medicine is detective work.  It isn't -- the patient doesn't

25  come to you and say:  Hey, I have gonorrhea.  They may not know

1    that.  So you have to kind of put together the pieces based on

2    the evidence and you gather verbal, visual, tactile, and sample

3    data.

4         And then you create what's called the differential

5    diagnosis -- the list of things that can do this -- and then

6    through the differential diagnosis you develop your primary

7    diagnosis and your plan.

8    Q.    And I think I asked, but I may have interrupted myself,

9    from start to finish how long does the speculum exam take?

10   A.    Two minutes.

11   Q.    And --

12   A.    The whole thing is about five to seven minutes.  The whole

13   breast -- and there is one more part that we haven't covered.

14   Q.    Okay.  Well, I will cover that.

15        During the speculum exam, where you have got the speculum

16   in your hand and the chaperone -- assistant is giving you the

17   cytobrush and the paddle -- do you touch the patient's clitoris

18   during the speculum exam?

19   A.    No.  My hands are full.

20   Q.    Do you somehow jam your fingers in and out during the

21   speculum exam?

22   A.    The speculum would not allow you for putting -- I don't

23   know how I could do that.

24   Q.    During either the pelvic exam or -- let's talk about the

25   digital exam again.

1  A.   Sir, if I may correct.  My answer is no; I do not do that.

2  Q.   All right.  Would there ever be an occasion where you would

3  insert your entire hand in the vagina?

4  A.   No.

5  Q.   You said there was one part of the whole well woman exam

6  that we hadn't talked about yet and what part is that?

7  A.   The rectal.

8  Q.   Describe what you do for the rectal exam.

9  A.   We've already visualized so this is the last part.  I have

10  changed my gloves.  My nurse -- we do so many of these, hundreds

11  of these, I don't need to say anything.  I just go like this

12  (Indicating) and she already has the tube because she is

13  standing on my shoulder.  She puts some lubricant.  I tell them,

14  it's a bit uncomfortable.  I apologize.  I insert one finger,

15  with my finger facing downward, one rotation and withdraw my

16  finger.  It's 10 seconds.

17  What I am feeling for is I am feeling for, you know, the

18  external hemorrhoids I probably see but I am feeling for

19  internal hemorrhoids.  I am also feeling for stool.  Your goal

20  is to try to get a tiny bit of stool on that finger, on the

21  rotation, because what you are doing this for is also what's

22  called a hemoccult.  And hemoccult is a test -- a screening for

23  GI cancers.  It tests for the presence of blood in the stool.

24  And, again, the nurse on my shoulder already has the card.

25  I turn and I wipe the finger with the stool on the card.  And

1  that's the hemoccult test.

2  Q.   I didn't ask this, but during all of those exams, breast

3  exam and pelvic exam and rectal exam, are you wearing gloves?

4  A.   Yes, sir.

5  Q.   And during the course of the exam, do you have to switch

6  out gloves and get another pair?

7  A.   I do when I do the rectal.  Yes, sir.

8  Q.   You actually have gloves during the breast exam?

9  A.   Of course.  Yes, sir.

10 Q.   I mentioned that the practice, the medical office there at

11 FCI, is a very busy practice; correct?

12 A.   Very busy.

13 Q.   We are talking about when you were taking care of female

14 inmates, how many patients would you typically see in a day?

15 A.   It varied, but it could be 10, 15, 20.

16 Q.   Okay.

17 A.   It varied.

18 Q.   And during those visits, we talked about what they could

19 be, you would be engaging in pelvic exams, and breast exams, and

20 rectal exams, as well as other type of acute care; correct?

21 A.   Routine sick call acute care.  Any emergency care as

22 needed.  Chronic care.  Well woman care.

23 Q.   Now, when a patient presents to you with other problems

24 that might indicate that you need to do a pelvic exam, things

25 like vaginal discharge or pain, how do you make a determination

1    that you are going to, if it's not a well woman exam, go forward

2    with a pelvic exam?

3    A.    Clinical presentation.  Clinical judgment.

4    Q.    Clinical judgment meaning your clinical judgment on whether

5    the exam is necessary?

6    A.    Yes, sir.  And often in that case, if I was already doing

7    an invasive exam, out of respect for the patient I would -- if

8    there was any reason to do the pap, because it doesn't add any

9    time to do the pap, I would get the sample.

10   Q.    Okay.  And you are looking at risk factors when you are

11   evaluating a patient to then make that clinical judgment as far

12   as should you go forward or at least recommend to go forward

13   with it?

14   A.    The whole patient, yes.

15   Q.    Even if you use your clinical judgment, based on the

16   presentation, and decide that you are going to go forward or

17   it's recommended to go forward, are there times when the patient

18   declines even after you tell them what you are going to do?

19   A.    Yes.

20   Q.    Now, you have been, in detail, telling us about touching

21   this pelvic area.  What you have described to us, is it sexual

22   in nature?

23   A.    Not at all.

24   Q.    And from your perspective how would you describe the

25   anatomy and these being just body parts that you have to provide

1  an exam and medical treatment for?

2  A.   Yes.

3  Q.   In the medical office, did you have, back in the time that

4  we are talking about when you worked in the medical office in

5  FCI, did you have an office where you conducted exams?

6  A.   Yes.

7  Q.   What -- how big was the exam room in the medical offices?

8  A.   I had the small office; 7 by 14 maybe.

9  Q.   What I'd like to do is show you one photograph that's

10 already been admitted into evidence.  That's Plaintiff's Exhibit

11 6.4.  That's been admitted into evidence.

12      Does that depict the room at least from the outside of the

13 door looking in, Mr. Rolston?

14 A.   Yes, sir.

15 Q.   And you said that room is, what did you say, 7 or 8 by 14

16 or something like that?

17 A.   Yes, sir.  About that.

18 Q.   I'd like to also show you exhibit -- Plaintiff's Exhibit

19 6.7.  Is that the same exam room, maybe from a different

20 perspective?

21 A.   It is.

22 Q.   I notice in this picture it looks like the exam table is

23 turned a little bit.  Do you see that?

24 A.   Yes.

25 Q.   Tell us why that has taken place.

1    A.   In order to actually do the exam you have to turn -- you

2    have to turn the table about 45-degrees off of the corner of the

3    wall in order for the stirrups to properly extend so the patient

4    can be examined.

5    Q.   Is that because of the size of the room?

6    A.   Yes.  And that isn't extended enough.  You couldn't do an

7    exam like that.

8    Q.   Where -- obviously, the patient would be on the table

9    there; correct?

10    A.   Yes.

11         MR. CARTER:  I'm sorry, Your Honor.  I would like to

12    introduce 6.7 -- Plaintiff's Exhibit 6.7 into evidence.

13         THE COURT:  It is admitted.

14         MR. CARTER:  It is not, Your Honor.

15         THE COURT:  It is now.

16         MR. CARTER:  Thank you.

17      (PLAINTIFF EXHIBIT 6.7:  Received in evidence.)

18    BY MR. CARTER:

19    Q.   Mr. Rolston, where would the chaperone, that we have heard

20    about, typically be standing when you are performing a pelvic

21    exam?

22    A.   So, that small, silver stool would be located directly in

23    front of the blue examination table.  That step would be placed

24    in, and the chaperone would be directly on my left side.

25    Q.   I want to show you one more of the exam room.  This is --

1  you see this Plaintiff's Exhibit 6.9, Mr. Rolston?

2  A.   Yes.

3  Q.   Is that the same exam room from a different angle?

4  A.   Yes.

5       MR. CARTER:  I'd like to move Plaintiff's Exhibit 6.9

6  into evidence, Your Honor.

7       THE COURT:  It is admitted.

8       (PLAINTIFF EXHIBIT 6.9:  Received in evidence.)

9       MR. CARTER:  Okay.

10 BY MR. CARTER:

11 Q.   Maybe that's a better one, Mr. Rolston, to -- you can touch

12 the screen, I believe, if you need to show where somebody would

13 be standing.  Where would a chaperone be standing when you are

14 conducting a pelvic exam?

15 A.   From this perspective, it would be blocked but she would be

16 right here.

17 Q.   It would be blocked by the table that obscured certain

18 portions of the room from that angle?

19 A.   Yes.

20 Q.   When you conduct a breast exam with the patient laying on

21 the table, where would you be and where would the chaperone be?

22 A.   I would be standing right here and the chaperone would be

23 right there.

24 Q.   And y'all both, the chaperone and yourself, are very close

25 to one another?

1  A.  Sometimes shoulder to shoulder.

2  Q.  Almost reach -- the patient could almost reach out and

3  touch the chaperone?

4  A.  They could probably kick 'em.

5  Q.  We have heard about the SHU, the Special Housing Unit, and

6  that there is an examination room within the SHU where medical

7  can examine patients that are in the disciplinary confinement.

8  Is there an examination room within the SHU?

9  A.  Yes.

10 Q.  Is it larger or smaller than that examination room that you

11 just described?

12 A.  Smaller.

13 Q.  I want to show you what -- Plaintiff's Exhibit.

14     MR. CARTER:  Your Honor, I think the exhibit number

15 didn't print on this particular copy but it's Plaintiff's

16 Exhibit 6.13.

17     THE COURT:  That exhibit is admitted.

18     (PLAINTIFF EXHIBIT 6.13:  Received in evidence.)

19 BY MR. CARTER:

20 Q.  Mr. Rolston, is that the exam room in the SHU that we have

21 heard about?

22 A.  Yes.

23 Q.  And how would you estimate the size of that exam room?

24 A.  7 by maybe 8.

25 Q.  So significantly smaller than the medical office exam room

1  that you have talked about?

2  A.   Yes.

3  Q.   And I am going to show you what is marked as Plaintiff's

4  Exhibit 6.14, which is a different perspective of that.  Is that

5  the same room?

6  A.   Yes.

7  Q.   This is taken from a different perspective; right?

8  A.   From the head of the bed.

9       MR. CARTER:  I would like to admit Plaintiff's Exhibit

10  6.14.

11       THE COURT:  Plaintiff's 6.14 is admitted.

12       (PLAINTIFF EXHIBIT 6.14:  Received in evidence.)

13  BY MR. CARTER:

14  Q.   Mr. Rolston, the exam table in that room is also kind of

15  turned a little bit; is that right?

16  A.   Yes, sir.

17  Q.   Why is that?

18  A.   So you can extend the stirrups and conduct a proper exam.

19  Q.   So once again the room is too small for the exam table to

20  be just in the proper -- the normal space?

21  A.   In this room, when the exam table is extended, we are

22  basically trapped down on that end.

23  Q.   You say we -- you and chaperone?

24  A.   Yes.  Trapped down the end towards the desk and the window

25  you see.

1  Q.   When you are asked to provide medical service in the SHU,

2  Mr. Rolston, describe -- well, describe the process.  If there

3  is -- we've heard the term copout or an inmate request for care.

4  Describe the process of having to go to the SHU and do a -- talk

5  to patient, do an examination.  What do you do?

6  A.   In the event there is a sick call or a complaint at the SHU

7  it comes to us through administration and nursing.

8       That would mean it's not scheduled.  So I need to close

9  down my office, go through a few sallyports, which are big iron

10 locked gates.

11 Q.   Before you go on to that, you said close down your office.

12 This is the medical office where you have got 15 or 20 patients

13 scheduled to come in.  What are the hours of the medical office

14 seeing patients?

15 A.   7:30 to count time so about 4.  4:30.

16 Q.   So you have patients already scheduled, but because of,

17 obviously, a situation in the SHU you need to say close it down

18 or at least stop what you are doing in medical and go to the

19 SHU?

20 A.   Yes.

21 Q.   And it takes a process to get through the SHU as you just

22 described?

23 A.   Yes.  You would walk across the compound.  The SHU is a

24 separate building.  You have to call on the radio for them to

25 validate you.  Then you are buzzed through two security doors

1   and then you sign-in at the desk.

2   Q.   All right.  And if the decision is made, based on your

3   clinical judgment, that an examination needs to be done, and

4   done in this exam room that we just looked at, how does the

5   patient -- how does the inmate in the Special Housing Unit get

6   to the exam room?

7   A.   I need to go to the cell to speak to them so I have to be

8   let through another security gate by an officer in that unit or

9   on that wing.

10       I speak to the patient.

11       Then I have to go back to the desk and back to that officer

12  and say:  I would like to have a patient pulled.  Give them the

13  reason.

14       And go in my office and wait.

15  Q.   Do you have to arrange a chaperone to come from medical to

16  be able to -- if the exam is the type of exam that requires an

17  intimate exam, would you have to get a chaperone from medical to

18  come into the SHU?

19  A.   Yes.  And they would have to go through the same process.

20  Q.   Okay.  Now, when you said that you would ask for a patient

21  to be pulled to the exam room, are they escorted by officers

22  into the exam room?

23  A.   Yes, because they would arrive cuffed.

24  Q.   During the course of conducting the medical exam in the

25  SHU, do you require the officers to take the cuffs off or the

1  restraints off?

2  A.   Always.

3  Q.   Have you ever conducted a medical exam in the SHU or with

4  any inmate who is in cuffs?

5  A.   I refuse to do that at the female institution.

6  Q.   All right.  Mr. Rolston, I want to move to talking about --

7            THE COURT:  If you're shifting gears, we need a break

8  here somewhere.

9            MR. CARTER:  I am, Your Honor.

10            THE COURT:  Let's take a morning break at this point.

11  Members of the jury, recall my instructions.  Don't talk about

12  the case.  We will be back with you in a few minutes.  Jury out,

13  please.

14       (Jury out at 10:33.)

15            THE COURT:  You may be seated.

16            Thank you, Mr. Rolston.  You may step down and return

17  to counsel table.

18            THE WITNESS:  Yes, Your Honor.

19            THE COURT:  Couple of notes:  One from today and then

20  a couple I didn't give you last night.

21            Mr. Carter, the order in limine said about his medical

22  service you could talk about training, and what he did, how long

23  he was in the service, and which branch; not where he was.  He

24  volunteered he was in Afghanistan, and then you, in the

25  question, came back to talking about going overseas.  That was

1  not proper.  Same thing I told Mr. Cook the other day.  These

2  orders are important and I mean for them to be followed.

3          MR. CARTER:  I understand.

4          THE COURT:  What, if anything, does the plaintiff want

5  to have done about that?  I suspect mentioning it only makes it

6  worse.

7          MR. JOHNSON:  I think you did what you could do.  You

8  chastised him.  That's really, you know -- I can't think of

9  anything else.

10          THE COURT:  There was one -- the objection -- I did

11  overrule one objection but I thought that was the nature of the

12  services, not where they were being performed.

13          MR. JOHNSON:  I could see where he was going.  I was

14  trying to preempt it.

15          THE COURT:  You alerted me to the problem.

16          MR. CARTER:  It was not intended to -- I can tell you

17  where I was --

18          THE COURT:  I understand.  Look, neither side is

19  trying to do this.  But same thing with Mr. Cook, you need to go

20  back and read those orders and make sure you comply with them.

21          Then notes from last night:  There was an objection to

22  clamping the vaginal muscles.  I overruled it.  I thought maybe

23  we would get there at some point.  I hadn't heard any discussion

24  about clamping the vaginal muscles, and I still haven't, so I am

25  not sure what that question was --

1    MR. JOHNSON:  That witness didn't testify, I think, or

2  if she did she didn't get to that.

3    THE COURT:  All right.  In any event, that is a minor

4  point.  At this point it's lost in the shuffle.

5    I overruled an objection to, I think, the doctor about

6  when was the last pap, and I think the nature of the objection

7  may have been that wasn't part of her report, but that seemed to

8  me not to be a contested issue.  And it kind of moved into the

9  discussion of how often you take -- how often you do paps.  So

10  that question I thought was okay.

11    Then Mr. Cook, I overruled -- or maybe it was

12  Mr. Johnson.  I think it was Mr. Cook -- I overruled the

13  question about -- I mean, I sustained the objection to the

14  question about the length of the exam and the record.

15    Look, I understand that you've got a record where

16  there is a start time and a date of the report and you say it

17  was a four-hour exam.  That's not your best argument.  I don't

18  think Ms. Alexander said the exam lasted four hours.  It's

19  inconceivable that exam lasted four hours.

20    There has not been any testimony about how that record

21  gets created.  You are welcome to take that and argue to the

22  jury that it was a four-hour exam.  But with that witness you

23  were assuming facts, and there was no foundation for her to say

24  anything about how the record was created or how long the exam

25  was.

000779

1        And then you said, is it typical for those kind of

2   records not to be able to be changed after the fact.  The doctor

3   doesn't know anything about the Bureau of Prisons' recordkeeping

4   process or whether their records can be changed after the fact.

5        I understood from the defense objections that that

6   wasn't part of her opinion that was disclosed, so it's a Rule 26

7   problem.  But aside from that there wasn't any foundation for

8   that kind of testimony.

9        You can cross-examine her if you establish some other

10  way of how those records are kept and so forth, that's fine.

11  But at that point that hadn't been done so I sustained the

12  objection.

13       What else can we address at this point?

14       I will ship back out to you in a minute -- I made the

15  change, not quite like either side asked me to, to the provision

16  that came up this morning.  And I added the felon -- testifying

17  felon instruction.  So I think it's just a couple of pages that

18  have been changed since the draft I put on your desks this

19  morning.  I will send those two pages back out here in just a

20  second.

21       Let's start back at 10:45.

22     (Recess taken 10:38.)

23     (Resumed at 10:46.)

24       THE COURT:  Please be seated.

25       We are missing Ms. Alexander.  Do we know -- well,

1  Mr. Cook, don't you go leaving.  You can go get her, but I am

2  going to start.

3          MR. JOHNSON:  Oh, yeah, that's fine.  That's fine to

4  start without her.

5          THE COURT:  All right.  Jury in, please.

6      (Jury entered the courtroom.)

7          All right.  You may be seated.

8          Mr. Rolston, you are still under oath.

9          Mr. Carter, you may proceed.

10         MR. CARTER:  Thank you, Your Honor.

11 BY MR. CARTER:

12 Q.   Mr. Rolston, we talked about the Special Housing Unit right

13 before we took the break.  I want to show you what was

14 previously introduced into evidence as Plaintiff's 2.1.

15      Can you see that document on your screen?

16 A.   Yes, sir.

17 Q.   What's that?

18 A.   It's a copout form, sir.  Sick call form.

19 Q.   And based on the way this is described, has it gone through

20 the process that you described going through nursing and medical

21 and then being ultimately assigned to you?

22 A.   Yes.

23 Q.   I know it's dated September 8th.  We know from the other

24 records in evidence that you saw Ms. Alexander on September the

25 27th.  Yeah.  September 27th.

1    Is that normal as far as taking the amount of time before

2  you might get the copout?

3  A.   It happens.

4  Q.   So when you received this copout.  You take a look at it.

5  What does it tell you?

6  A.   Very little.  Bacterial infection.  Is it a finger?  Toe?

7  Pimple?  It could be anything.  Very nonspecific.

8  Q.   Had you ever treated Ms. Alexander at any point before

9  September 27th that we have been talking about in this case?

10 A.   No.  Not that I recall.

11 Q.   So this is your first information you've got and it's the

12 description of a bacterial infection somewhere; correct?

13 A.   Yes.

14 Q.   So, ultimately, you told us about having to go to the cell

15 front?

16 A.   Yes.

17 Q.   And, I'm going to show you a portion --

18      MR. JOHNSON:  What was that last number, Steve?

19      MR. CARTER:  Plaintiff's Exhibit 1.

20      The last number?  I'm sorry, Mr. Johnson.

21      Your Honor, the last exhibit is 2.1 that I showed to

22 Mr. Rolston.  And I am getting ready to show him Plaintiff's

23 Exhibit No. 1.

24 BY MR. CARTER:

25 Q.   Mr. Rolston, I want to show you Plaintiff's Exhibit 1.3.

1  Do you recognize that document?

2  A.   Yes.  This is a clinical encounter note from the medical

3  note.

4  Q.   All right.  So, do you go to the cell front in the SHU in

5  the manner you described earlier to talk to Ms. Alexander?

6  A.   Yes.

7  Q.   And why do you do that?

8  A.   Determine what the complaint really is.

9  Q.   All right.  And based on your notes, and -- what did you

10 determine the complaint was?  Well, let me ask it this way, too.

11      At the time you went to the cell front, did you know from

12 the copout that I showed you earlier that you would have to

13 conduct an exam, a physical examination, of Ms. Alexander?

14 A.   No.

15 Q.   So in looking at your note, what happened at cell front?

16 What did she tell you?

17 A.    I gathered some history, and probably the most pertinent

18 thing that jumps out at me is she was complaining of sharp pain

19 and a discharge.

20 Q.   All right.  And the discharge that she is complaining of,

21 how did she describe the discharge?

22 A.   Bad smelling, yellow, thick vaginal discharge with itching

23 and pain.

24 Q.   And at that point, did you explain to her that there are

25 other testing that can be done, or there is some variances that

1    relates to discharge?  Did you have a discussion like that with

2    her?

3    A.    Yes.

4    Q.    All right.  What were you communicating to her when you

5    mentioned there are variants from normal, and you might take a

6    urine, waiting on a pelvic.  What's going on there?

7    A.    I was talking about there is different types of vaginal

8    discharge.  And vaginal discharge, in and of itself, even if it

9    smells or is slightly a different color, in and of itself isn't

10   a pathologic sign.  And that it sounds like I was probing to

11   find out if there was anything else that is -- any other reason

12   we need to do anything else other than testing.  It looks like I

13   am recommending testing.  Not right off the bat a pap.

14   Q.    And if you are presented with a vaginal discharge, even if

15   it's bad smelling, but it's thick and itching and pain, what

16   type of other testing might you do, based just solely on that

17   presentation?

18   A.    Blood.  Could check hematologic studies such as a CBC, a

19   white count.  Do a differential which could tell me what the

20   cell lines which might indicate infection.  Urinalysis.

21   Possibly some other tests on her urine.

22   Q.    During the course of your conversation at the cell front

23   with Ms. Alexander, you mentioned that there was a reference to

24   pain.  Can I ask you why that would be important?

25   A.    That's a tipping point.  When she complains of pain six out

1    ten, seven out of ten, that's really important.

2         Whenever a patient tells me they have pain, I always say

3    the same thing:  Understand that seven out of ten is like a

4    broken bone.  Eight out of ten is like having a baby.  And when

5    men look at me funny when I say that, I say pull your lower lip

6    over the top of your head and now you know what it's like to

7    have a baby, temporary.  Imagine it worse.  And I say, nine out

8    of ten is screaming continuously.  Ten out of ten is passed out

9    from the pain, what would you say your pain is.  And she still

10   said six to seven out of ten.  That's remarkable.

11   Q.   Seven out of ten is severe, debilitating pain?

12   A.   It's like a broken bone.  Very severe.

13   Q.   You said that was the tipping point, but you did gather

14   additional information.  Where did she say the pain was located?

15   A.   Lower pelvic region, midline, lower than umbilical.

16   Q.   Is that significant to you?

17   A.   Well, that's the adnexal area so it's suggestive that there

18   could be issues directly related to her pelvis.

19   Q.   I note in the record there it mentions that nothing is

20   alleviating the pain.  Does that matter to you?

21   A.   That's critical.  That's another factor.  Another what we

22   call a red flag.  When someone says nothing relieves the pain

23   whatsoever, that's very unusual.

24   Q.   Okay.  Before you got into the pain discussion with her, or

25   maybe you tell me when it is, did she make any statements about

1    knowing her body and needing to be examed [sic] based on the

2    problems she was having?

3    A.    Yes.  She said that -- sounds like she scolded me.  That

4    she knows her body and that this is abnormal.

5    Q.    Okay.

6    A.    And she implored me to check her out, so...

7    Q.    So did you do that?

8    A.    I did.

9    Q.    And the process you talked about before of having to go get

10   the guard and get the chaperone and then ask for the patient to

11   come out.  You did that; correct?

12   A.    Yes, sir.

13   Q.    All right.  Tell us about your examination.  I can show you

14   portions of these notes if you need to see them.

15        What happened -- assuming the patient gets to the exam

16   room.  Well, let me ask you before we get there.

17        When she gets to the exam room, are you going to

18   communicate what you are going to do in this exam?

19   A.    Well, at the cell door I would have told her what I was

20   going to do because there is no point in having the officers go

21   to retrieve her if she doesn't want to have this done and is

22   refusing.  So I consent her at the door.

23        Then when she arrived in the room I would announce again

24   what it is we are going to do in front of the nurse.  And when I

25   would leave the nurse would again get her ready for what we just

1  talked about.

2  Q.   And what type of examination did you believe, clinically,

3  was necessary based on the presentation that she had made and

4  what she had told you at the cell front?

5  A.   She needed a pelvic exam to rule out surgical abdomen.

6  Q.   I saw in the note that there was some reference to a

7  previous urinalysis indicated there was -- she had a UTI and

8  blood and protein.  What's the significance of that,

9  Mr. Rolston?

10  A.   Well, it suggests that it was ongoing.  This has been

11  happening for while.  It again raises the clinical acuity.  It

12  raises my concern.

13  Q.   When you come back into the room would Ms. Alexander be

14  undressed?

15  A.   Yes.

16  Q.   And a drape would be over her?

17  A.   Yes.

18  Q.   Are you continuing to ask questions at that point, or have

19  you already asked all of the questions you needed at the cell

20  front?

21  A.   This would be no different than any other exam.  I would

22  continue to talk through all of the steps as described.

23  Q.   I noticed an indication in the record that you had asked

24  her about sexual activity.  Would that have been at the cell

25  front?

1  A.   Yes, but I would have asked her again in private because I

2  understand how sometimes they don't want to say something even

3  if it's just whisper in front of their cell mate.

4  Q.   So you would have confirmed or at least followed up on that

5  in the exam room?

6  A.   Yes.

7  Q.   Why is that significant?

8  A.   As much as it's not allowed, and as much as it's not

9  supposed to happen, sexual activity between inmates does happen

10 and it poses a risk for STDs.

11 Q.   And did Ms. Alexander respond to the question that you

12 asked?

13 A.   No.  She refused, I believe.

14 Q.   So, in that situation where a patient refused to answer a

15 specific question that's clinically based, like you just

16 described, what do you have to assume?

17 A.   For their safety, assume that it's true and err on the side

18 of caution.

19 Q.   The record that I mentioned or just showed you indicated

20 that a CNA acted as a chaperone, so you had a CNA for that exam

21 for a chaperone; is that right?

22 A.   Yes, sir.

23 Q.   Did you examine Ms. Alexander's abdomen following this?

24 You mentioned the abdomen was significant.

25 A.   Yes, sir.

000788

1    Q.    Why were you worried about her abdomen?

2    A.    I was ruling out that this pain was related to a potential

3    surgical process, or an evolving abdominal process that could be

4    serious, even life-threatening.

5    Q.    What did you determine based on your examination?

6    A.    Could you move down in the note?

7    Q.    I'm sorry.  Is it the exam notes is what you are looking

8    for?

9    A.    That it was not the case.  It was not a surgical -- at that

10   present time it wasn't a surgical abdomen, and that...

11   Q.    And because it wasn't a surgical abdomen that relieved that

12   immediate concern that you may have that there was some

13   emergency going on; correct?

14   A.    It did, but it did raise some other concerns.  I saw small

15   punctated lesions on the cervix which can be a sign of HPV.  I

16   noted there was no cervical motion tenderness so I wasn't

17   worried about an infection of the cervix.  And I also noted what

18   her prior diagnoses, which I felt were contributing to this,

19   including dysmenorrhea which is --

20   Q.    Tell us what dysmenorrhea is.

21   A.    It's pelvic pain related to periods.

22   Q.    And why do you think that was significant to your

23   examination?

24   A.    Well, she had tenderness over both ovaries so I believed

25   that was a contributing factor to her pelvic pain.  It validates

1  that she was having some kind of pelvic pain.

2      She also had suprapubic pain which is pain -- suprapubic

3  area is between the umbilical and the lower abdomen, and that's

4  basically the anatomic location of the bladder.

5  Q.   Anything else that was noted on your exam?

6  A.   Hemorrhoids; large, multiple.  They were not incarcerated.

7  Incarcerated hemorrhoids mean that that's also a moniker which

8  means that it probably needs something done to them.

9      A regular hemorrhoid is soft and palpable.  They hang down

10  like deflated grapes almost, but when they inflate they can

11  become incarcerated and that can be very painful and create an

12  additional problem.

13      I also comment, as I always do, I comment on everything, I

14  commented on ingrown hairs with white heads.

15  Q.   Why are ingrown hairs significant during a pelvic

16  examination when you see them?

17  A.   Well, everything is relevant.  If you are treating the

18  whole patient; if someone has multiple infections in the hair

19  follicles, that can spread.  A superficial infection can become

20  a deep infection and that can become, even if it's a separate

21  problem, it can become an additional clinical problem.

22  Q.   And following your exam I also notice in your assessment

23  there was some leiomyomas on the uterus.  What is that?

24  A.   So, leiomyoma is again uterine fibroids.  There is three

25  locations for them; there is serosal, intramural, and visas

1    intermural, meaning in the muscle there is fibroids.

2    Q.   I skipped over the actual exam itself.  Did you conduct the

3    exam on Ms. Alexander that is reflected in your exam comments

4    and on the medical records in the same manner you described

5    earlier?

6    A.   Yes, sir.

7    Q.   Both the digital exam and the speculum exam, you did

8    exactly the same way?

9    A.   Visual, digital, and speculum.  Yes, sir.

10   Q.   And, did Ms. Alexander consent to you doing this exam?

11   A.   Yes, sir.

12   Q.   During the course of the exam, Mr. Rolston, did you touch

13   her clitoris?

14   A.   No.

15   Q.   Did you insert your finger into her vagina in and out in a

16   way that would reflect finger-fucking her?

17   A.   No.

18   Q.   You made reference to the hemorrhoids.  Did you discuss the

19   hemorrhoids with her?  Would you have done that?

20   A.   I would have done that, yes.

21   Q.   Now, I want to show you what's been introduced into

22   evidence as Defendant's 3.1.  See if you recognize that

23   document.

24        What's that?

25   A.   Sir, this is some of the medical care she chose, that she

1  did not wish, so she said that she didn't want to have that

2  care.  She refused some care, but took other.

3  Q.   At what point in time in the examination would you have

4  asked about going forward with the exam, the pelvic and the

5  breast and rectal that you have here?

6  A.   Four points:  At the cell door, when they first come in the

7  room, by the nurse, and then at the end if they have refused

8  anything that's when we have them sign the form.

9  Q.   Would you have first brought up the issue of whether you

10 are consenting to other portions of the exam after a patient is

11 fully dressed [sic] and you come back into the room?

12 A.   Of course.

13 Q.   In this Plaintiff's Exhibit 1, I want to ask you a few

14 questions about some history that -- Ms. Alexander's medical

15 history that may have been in the records that you could have

16 seen.

17      I think you had noted on your examination that she had the

18 leiomyoma fibroids on her uterus; correct?

19 A.   Yes.

20 Q.   And if you had looked through the records do you think you

21 would have known that going into the exam, or do you know?

22 A.   It says an ICD-9.  It probably was on the list of medical

23 complaints.  It would have been.

24 Q.   What is -- I am going to show you the premenopausal --

25 A.   Dysmenorrhea, sir.

1    Q.   We talked about the dysmenorrhea.  What's the one below

2    that?

3    A.   Menorrhagia.

4    Q.   What is that?

5    A.   Heavy bleeding related to change of hormones that happens

6    later on in a woman's life.

7    Q.   Mr. Rolston, after you completed the examination and left

8    the room, you return after Ms. Alexander was dressed, did you

9    have some discussions with her then?

10   A.   Yes.

11   Q.   All right.  Can you tell me about that?

12   A.   That would have been when I returned back in the room.

13   That's when the refusal form was signed.

14   Q.   Before you get to that, did you have a plan before you

15   examined her as far as what your -- based on your assessment

16   what you would recommend that she have done?

17   A.   Yes.  She had reported STD chlamydia in the past and...

18   Q.   Did you order an antibiotic for her?

19   A.   Yes, sir.  I did.

20   Q.   Did you make a determination of what assessment she had?

21   A.   Yes, I felt that she had an infection and I prescribed a

22   proper antibiotic to treat that infection.

23   Q.   And you conducted a Pap smear?

24   A.   I did.

25   Q.   And that was during the course of the pelvic exam based

1  on -- you felt like that was necessary?

2  A.   I felt -- I didn't want to have to have anyone do it again,

3  so while I was already there I collected the sample.

4  Q.   All right.

5       So, I was asking you when you returned -- you left the room

6  so Ms. Alexander could get dressed.  That's your normal

7  procedure; correct?

8  A.   Yes, sir.

9  Q.   And you returned to the room after she was dressed.  What

10 happened at that point in time?

11 A.   We apparently were talking about fertility history to

12 complete note, and that led to a discussion of her children.

13 She began talking about how much she missed her kids and how --

14 she said something that a lot of inmates would say that she

15 feels bad that she isn't there for them.  And I was consoling

16 her and telling her:  There is tomorrow.  You can still be a

17 good parent.  There is nothing in this that prevents you from

18 moving forward in a positive way and being there for your

19 children as a good parent, a good role model.  And she began to

20 cry related to that.

21      You know, this isn't the first patient, male or female, who

22 have said something very similar.  And I offered words of

23 support and she continued to cry.

24 Q.   Did she talk to you at that point?

25 A.   No.  And so I thought I would leave and let her speak to

1  the nurse alone.  I thought that that might -- that would be

2  better and...

3  Q.   Mr. Rolston, did you know anything about her kids, or her

4  family, before this examination?

5  A.   Through what she had said.

6  Q.   But days before this -- would there be any way for you to

7  know it before she talked to you about it?

8  A.   No, sir.

9  Q.   All right.  What happened next?  You leave the room again

10  so Ms. Davis can try to talk to her?

11  A.   I did, sir.  And I also let the officers know that the exam

12  was over and I mentioned to them that she was crying and she was

13  upset.

14  Q.   Anything else happen after that as it relates to your

15  interaction with Ms. Alexander?

16  A.   No, sir.

17  Q.   I also noticed, it looks like on the front page of 1.3 that

18  we have been talking about, there is a designation of her name

19  at the top.  Do you see that?

20  A.   Yes, sir.

21  Q.   And that's populated by the computer; correct?

22  A.   Yes, sir.

23  Q.   It has her unit as Z01.  Do you see that?

24  A.   Yes, sir.

25  Q.   What does that mean?

1   A.   That's the SHU.

2   Q.   She was in the SHU, as we have discussed; is that right?

3   A.   Yes, sir.

4   Q.   So, after the exam, do you recall having any interaction

5   with Ms. Alexander after that?

6   A.   No, sir.

7   Q.   Do you recall going to the SHU, and going on the SHU later

8   in the day?

9   A.   No, sir.

10  Q.   And when you left for the day do you recall having any

11  interaction with Lieutenant Proffitt, or anyone, in his office

12  with Ms. Alexander?

13  A.   When we leave for the day, we -- our offices are in the

14  basement.  As I mentioned, each section of the building is

15  bracketed off by what they call a sallyport door, which is a

16  secured door that you can only enter with a certain set of keys.

17       That door is on the second floor.  There is only one way

18  out.  And that leads to a main corridor, which leads to the main

19  sallyport, so you can get out of the facility through the metal

20  detector.

21       When we leave we don't always know who remains in the

22  building.  I would often end up staying late to finish my charts

23  and it's important for the lieutenants to know who is in the

24  building in case there is an emergency.  So I have a habit of

25  going by the lieutenant's office and just saying:  I'm out of

1    here, you know, see you later.

2        And I don't specifically have any recollection of that day,

3    but it's very likely that I popped in and just stuck my head in

4    the door, or knocked on the window, and waved and said:  I'm out

5    of here.

6    Q.   I want to move to another patient, Mr. Rolston.  I want to

7    show you what's been marked as Plaintiff's Exhibit 48.  I would

8    like to move Plaintiff's 48.  It's 313 pages, individually

9    marked pages, but I would like to move that into evidence.

10            MR. JOHNSON:  We object.  It's just --

11            THE COURT:  I don't need a description.  These are

12   Ms. Barnett's medical records?

13            MR. CARTER:  Yes, Your Honor.  Ashlee Barnett's

14   medical records.

15            THE COURT:  The objection is overruled.  The exhibit

16   is admitted.

17       (PLAINTIFF EXHIBIT 48:  Received in evidence.)

18   BY MR. CARTER:

19   Q.   Do you remember a patient inmate by the name of Ashlee

20   Barnett?

21   A.   Yes, sir.

22   Q.   I know there was a lot of patients at FCI Tallahassee.  Do

23   you know -- when you were working there, do you know what the

24   prison population was?

25   A.   About 1200.

1  Q.   But you remember Ms. Barnett.  Is there a reason?

2  A.   Yes, sir; there is.

3  Q.   What is that?

4  A.   She developed a condition that is about one in 200,000

5  patients, which is an upper extremity clot in a young person

6  otherwise not known to have coagulopathy or a blood problem.

7       Having worked in vascular surgery, when I saw her, you

8  know, and I suspected that this might even be the case, it was,

9  you know, real one in a million.

10 Q.   I want to show you what is page number 48-36 of the Exhibit

11 48, just so you can see that.  Do you see that exhibit number

12 and the page number there, Mr. Rolston?

13 A.   Yes, sir.

14 Q.   Does this appear to be a history and physical, the intake

15 physical that you described earlier?

16 A.   Yes.

17 Q.   And based on the front page of that record, would you have

18 been the provider that conducted the A and O intake physical

19 exam?

20 A.   Yes.

21 Q.   So, when you do that what type of information are you

22 gathering from the patient?

23 A.   The principal parts of the note are the subjective.  The

24 subjective is everything from what the patient is complaining

25 about to a survey of everything that could be wrong with them.

1    We conduct what's called a review of symptoms where we go

2  head to toe and ask about each system and gather information,

3  but then there is also mandatory things that you should ask

4  about psychosexual history; mental health history, family

5  history, sexual history, drug abuse history.  And the reason we

6  gather this information, it again it creates a clinical picture

7  which either indicates a higher clinical suspicion for certain

8  things, or a lower clinical suspicion for certain things.

9  Q.   All right.  So on the first page of that note, in the

10  infectious disease risk factors -- what I am asking about, did

11  you see certain risk factors that would indicate to you that a

12  preventative medicine screen would be appropriate for

13  Ms. Alexander [sic]?  I'm sorry.  For Ms. Barnett?

14  A.   Yes, sir.

15  Q.   All right.  And, as we talked about earlier, in the intake

16  exam that's a mandatory thing that you are supposed to do, is to

17  do the well woman exam; correct?

18  A.   Yes.

19  Q.   On the first page was there something that would indicate

20  that she might be a risk, that Ms. Ashlee Barnett might have

21  some risk factors?

22  A.   Yes, sir.

23  Q.   What do you see there?

24  A.   Number of sexual contacts.

25  Q.   What did she indicate to you?

1  A.   It was greater than 10.

2  Q.   I am going to show you page 48-37.  Was there any other

3  factors that might be a risk that would, in your clinical

4  judgment, indicate that a well woman exam should be done?

5  A.   She indicated prior STDs and diseases to include Hepatitis

6  C and gonorrhea.

7  Q.   And why would gonorrhea be a risk factor for needing a

8  pelvic exam and a Pap smear and a screen?

9  A.   Well, number one, you need to make sure it cleared.  There

10  are some new forms of, unfortunately, of syphilis and gonorrhea

11  and chlamydia which are becoming resistance to antibiotics.  So

12  it raises the clinical suspicion and the need to surveil.

13  Q.   I want to show you page 48-50 of that record.  Do you see

14  the vestibulitis?  Do you see that?

15  A.   Yes, sir.

16  Q.   What is that?

17  A.   That's a very painful inflammation of the vulva.  She also

18  has right vulva sinopia, which is a condition where you get

19  benign little growths which can be painful or cause problems.

20  Q.   Okay.  So, after taking this subjective information from

21  Ms. Barnett, would you have offered her a well woman

22  examination?

23  A.   Yes.

24  Q.   That would include a breast exam; correct?

25  A.   Yes.

1  Q.   Can you tell from exhibit page 48-44 was there a breast

2  exam conducted?

3  A.   No.  She refused.

4  Q.   So that's declining the recommended well woman exam that

5  you were making based on the clinical presentation that you had

6  from talking with her; is that right?

7  A.   Yes, sir.

8  Q.   I want to show you page 48-46, Mr. Rolston, and I direct

9  you to the bottom of the page.  Did you conduct a pelvic exam of

10  Ms. Barnett on this April 27th intake exam?

11  A.   No, sir.

12  Q.   Why is that?

13  A.   She refused.

14  Q.   And then did you conduct a rectal exam?

15  A.   No, sir.  Refused.

16  Q.   And that's all part of the well woman exam that you were

17  offering her; is that right?

18  A.   Yes, sir.

19  Q.   Do you have any memory of discussing spider veins with

20  Ms. Barnett at this intake exam?

21  A.   No specific memory.

22  Q.   If it's noted in the records, I will show you at page

23  48-47.  Do you see there where you had noted in "other" that she

24  had a reported history of varicose veins, has spider veins and

25  early varicose disease.  Do you see that?

1  A.   Yes, sir.

2  Q.   So, based on your note what would you have done?  What --

3  what discussions would you have had with Ms. Barnett at that

4  time?

5  A.   I would have talked to her about the natural history of the

6  disease, the progression.  What leads to it.  What can be done

7  to modify it.

8  Q.   Do you have any specific memory of asking her to pull up

9  her pant's leg so you can see the spider vein?

10  A.   No specific memory, but probably would have.

11  Q.   All right.  Do you know specifically -- well, would asking

12  to look at spider veins be in any way sexual?

13  A.   No.

14  Q.   Why are you looking at the spider veins?

15  A.   Well, one to assess the burden.  Again, this is an area

16  that I spent some time.  But you can tell by looking at them

17  awful lot of information.

18       Are they merely superficial?  Are they deep-feeders, which

19  is a term of art that describes when it emerges a certain way

20  from the skin?  Is it a heavy burden?  Is it a light burden?

21  All of this a relative because these aren't comfortable and

22  these can be painful for patients.

23  Q.   Mr. Rolston, you mentioned in the beginning you remember

24  Ms. Barnett because of the unusual blood clotting issue that you

25  remembered being so rare that you treated -- part of the

1    treatment of her; correct?

2    A.    Yes.

3    Q.    I want to show you what's been marked as page 48-182 of the

4    medical record we have got on Ashlee Barnett.

5    A.    Sir, may I ask that you mag it up just a little bit?  I

6    might not have to use these.  Thank you.

7    Q.    Is that better?

8    A.    That's perfect.

9          Thank you.

10   Q.    What is the date of that clinical encounter that you had

11   with Ms. Barnett?

12   A.    10-17-2018.

13   Q.    Take a look at that, and I would ask you what did she

14   present with and what did you note upon discussion with her?

15   A.    So she describes engaging in some hard physical labor.

16   Pain throbbing in her arm -- one of her arms.  She reported that

17   the arm is purple.  And when I am do this I am doing it for a

18   very particular reason.  I would have said her arm was purple if

19   it was purple, but she is reporting it was purple.  And she said

20   it occasionally changes to a lighter color.  So obviously at

21   that time I felt it was a lighter color.

22   Q.    Okay.  On down the page, did you take some additional

23   information about Ms. Barnett and her varicose veins and her

24   preventative medical status?

25   A.    I did.  Because, again, it's not enough just to look at --

1  to zero in on exactly what you are looking at, because sometimes

2  in medicine if you are so focused on what's immediately in front

3  of you you miss the cause.

4  It's not that likely, but if she had pelvic cancer that

5  could lead to higher incidents of clots.  And I am talking about

6  this because probably in the back of my head I am thinking,

7  okay, in medicine you always rule out the things that are going

8  to kill someone, even if they are rare.  You want to rule out

9  the things that cause the greatest amount of harm, disability,

10  or problems, while working towards what's probably common and

11  more likely.  So this is my thought evolving on this.

12  Q.  Okay.  In the note on the first page there is an indication

13  about her status of preventative medical care; do you see that?

14  A.  Yes, sir.

15  Q.  Is that what she is reporting to you?

16  A.  Yes, sir.

17  Q.  All right.  Tell me what she said.

18  A.  "Has not been doing her preventative medical breast exams

19  and not had a pap since 2015."

20  Q.  That's consistent with the intake exam that you had

21  performed a year and a half earlier in April of 2017, where she

22  refused the intake pap and the intake pelvic and breast exam;

23  correct?

24  A.  Yes.

25  Q.  So, what did you do to evaluate Ms. Barnett after her

1   presentation like this?  Did you examine her?

2   A.   Yes, sir.

3   Q.   Let take the first part of it.  Did she agree to go forward

4   with the well woman examination?

5   A.   Yes, sir.

6   Q.   So you would have conducted that.  Would you have conducted

7   the well woman examination, just like you described to us

8   before, with the breast and the pelvic and the rectal?

9   A.   Yes, sir.  There is also one thing on that first page that

10  I noted.  I mentioned that I spoke to the attending about the

11  patient.  So, "patient seen by MD2".  MD2 is physician two.

12  Q.   So the last sentence of that next to the last paragraph

13  where --

14  A.   Right.  My suspicion was heightened and I started talking

15  to the attending saying:  Hey -- I remember a little bit about

16  that.  I remember he reminded me how rare it was and I quoted

17  him the stats and he said just proceed properly given the fact

18  that this is incredibly rare.  So, I was moving forward knowing

19  this is incredibly rare, but this was the thing I was not going

20  to miss.

21  Q.   This really hadn't come out before.  You mentioned the

22  attending physician came in.  In the medical office, are there

23  attending physicians?  You actually have doctors there?

24  A.   Yes.

25  Q.   And that's what you mean by MD2?  It's a doctor; is that

1  right?

2  A.   Yes.

3  Q.   So, what did you do as far as the well woman exam, and we

4  talked about that.

5  A.   No specific memory, but I would have conducted it the same

6  way I do it every time.

7  Q.   Let's look at your exam comments and see if they refresh

8  any findings that you made from your breast exam.

9  A.   So, multiple rubbery nodules.  The fibrocystic breasts that

10 I described before.

11     I described some vascular things.  I am evaluating her

12 vascular status.

13 Q.   Well, as to the breast exam, you had a chaperone present;

14 correct?

15 A.   Yes.

16 Q.   How long would that breast exam take?

17 A.   A few minutes.  The usual.  Seven minutes the whole well

18 woman.

19 Q.   Would the breast exam by itself take 20 minutes?

20 A.   No.

21 Q.   Is there any circumstance where a breast exam would take 20

22 minutes?

23 A.   No.

24 Q.   Ten minutes on each breast?

25 A.   No.

1  Q.   And would you at times -- in a situation where the breast

2  were fibrocystic breasts, show the patient what that feels like

3  and compare that to healthy breast tissue?

4  A.   Of course.  I would have told her, these are the areas I

5  want you to check.  I want you to let me know if these get sore,

6  they -- any change in size and consistency.

7  Q.   Okay.  Then you would proceed to the pelvic exam?

8  A.   Yes.

9  Q.   You would conduct that like you described you always do,

10 the same way every time?

11 A.   Yes.

12 Q.   During this examination of Ms. Barnett, would you have

13 touched her clitoris?

14 A.   No.

15 Q.   Would you have stuck your fingers in her vagina in and out

16 in any way whatsoever?

17 A.   No.

18 Q.   Would you be playing with her clitoris?

19 A.   No.

20 Q.   In a circular motion?

21 A.   No.

22 Q.   Tell us what you continued to do or what you noted as it

23 relates to her exam on her arm -- and it's a separate exam to

24 evaluate her arm; is that right?

25 A.   Yes.

1   Q.   It's part of the same examination but you were doing

2   something different; right?

3   A.   I am doing a circulatory exam; yes.

4   Q.   Describe what that is.

5   A.   Like all exams, the first thing you do is you look.  And

6   with -- so, again, there is rare things and there is not so rare

7   things.

8        There is a condition called subclavian steal syndrome, and

9   this is not that uncommon in thin people.  And it's positional

10  related, so if you put your arm in a certain position, usually

11  over your head, it can place pressure on the vessel and that can

12  cause pain and discomfort.  But, it's not a surgical emergency

13  and it can be treated with physical therapy and things.

14       So, I did some testing to kind of see if I thought that

15  was; you have them go through various maneuvers with their arm

16  and you watch the coloration in their arms.

17       You also check pulses.  You check the pulses in the wrist.

18  You do an Allen's test of the palm.  You check the brachial

19  pulse.  You also do cap refill, which is squeezing on the nail

20  bed to see how fast it refills.

21       Most importantly, anything -- God gave us two, so you are

22  going to compare the non-effected side to the effected side, so

23  we would -- I would check the same things on the opposite side

24  and see if it's any different.

25       I would also listen.  I would listen on the vessels for

1  what we call bruits.  And bruits are a change in auscultation in

2  what you hear based on blood moving through a small narrow

3  passage.

4  Q.   How would you hear?  What do you do to hear it?

5  A.   You will listen with the stethoscope and you hear a shrill

6  noise.

7  Q.   After the examination to try to measure her arm, and all of

8  the different things you did to assess that, did you come up

9  with at least an assessment of her arm situation?

10  A.   I did.  I ordered a laundry list of tests.

11  Q.   All right.  I am showing you what is marked as 48-185, and

12  then I will move it back down.  What did you order in response

13  to your examination of her arm?

14  A.   So I did coagulopathy studies.  So I did -- the things that

15  cause -- the things that cause clots, Virchow's Triad, are

16  trimal, stasis and/or blood disorders -- coagulapathy.  So I am

17  doing blood tests such as D-dimer to check the consistency of

18  the blood.

19       I am also doing a -- it actually printed wrong.  That's a

20  PTPPT.  It's not just a PT.  This is bleed time, people call

21  them, bleed time studies.

22       In addition, I did an INR.

23  Q.   What's an INR?

24  A.   International normalized ratio.  It's just a fancy way of

25  doing the same test.

1    I also -- interestingly, her pattern of varicose veins

2    actually followed a little bit what's called reticularis and

3    it's a web-like pattern that can be indicative of

4    anti-phospholipid syndrome, which is, again, an extremely rare

5    syndrome that causes clotting.  And that's why I ordered a

6    rheumatoid factor as well.  And a CRP.  And fiber degradation

7    products.  I am doing a very extensive battery to determine --

8    to rule out any kind of problem in her blood, because any one of

9    these, particularly D-dimer, would be highly suggestive that I

10   was right and this was the one in a million, or one in two

11   hundred thousand, and it was a clot.

12   Q.   So you are ordering lots of test to be able to follow up on

13   that condition that you -- on your differential that you are

14   suspecting or trying to rule out?

15   A.   Yes.  Including the chest X-ray.  The reason I ordered a

16   chest X-ray is although it's hard to see a pulmonary embolism on

17   a chest X-ray, you can, if it's bad enough.  That also -- I am

18   just leaning forward trying to protect the patient from unlikely

19   but devastating consequences.

20   Q.   All right.  So there at "other" it says:  Working up

21   potential causes of rubor.  What is rubor?

22   A.   Change in colors.  Redness.

23   Q.   That's the purple arm?

24   A.   I always say it wasn't purple.  It had some redness

25   compared to the other one, and pain.

1    Q.  And because you believed it was circulation related you

2    ordered all of these tests; right?

3    A.  Some of the tests are just standard STD testing.

4    Q.  That would be related to the Pap smear you conducted in the

5    well woman exam; correct?

6    A.  Yes.  Also, it looks like I -- did I order -- I ordered

7    medication for her too.

8    Q.  What kind of medication did you order for her?

9    A.  Anxiety disorder.  SSRI.

10    Q.  I would like to -- this is page 48-178 of that exhibit.

11    See if you recognize that.

12    It indicates that on the same day, October 17, 2018, you

13    did a chronic care clinic of Ms. Barnett; is that right?

14    A.  Yes, sir.

15    Q.  So this is another evaluation on the same day based on the

16    chronic care?

17    A.  Yes.  The patient wouldn't recognize that you're doing

18    these different things.  The BOP requires that we try to

19    document them as three different visits, or three different

20    encounters because they all meet different benchmarks for

21    mandatory patient followup.

22    The physical exam would have appeared largely the same, but

23    again I am looking at the whole patient and it looks like her

24    hepatitis isn't doing well.

25    Q.  That's why she has a chronic care appointment with you is

1  for that kind of evaluation?

2  A.   Mental health and infectious disease.  Yes, sir.

3  Q.   So in this October 17th visit that Ms. Barnett had with

4  you, you are doing chronic care, you are also evaluating the

5  specific presentation that she has had based on her arm, and you

6  offered her the well woman exam to --

7           MR. JOHNSON:  Leading, Your Honor.

8           THE COURT:  Sustained.

9  BY MR. CARTER:

10 Q.   The purpose of all three of those on the same day,

11 Mr. Rolston, why would you do that?

12 A.   Whole patient care.  I saw -- I looked in the chart.  I saw

13 that she needed chronic care done.  I saw that in that event if,

14 you know, she is on mental health meds, and I don't do the

15 chronic care, those meds can lapse and the patient can have a

16 break in care.  And I don't want that.

17      Hepatitis can influence blood status, so I am addressing

18 it.  I am addressing it now.  And I addressed the preventative

19 medicine as well as what the complaint was.

20 Q.   The previous note that we looked at also made some

21 reference that you discussed ingrown hairs with Ms. Barnett?

22 A.   Yes.

23 Q.   What would you be referring to as far as ingrown hairs?

24 A.   As I previously said, hair is part of the human body and

25 caring for it is a medical issue.

1    The largest organ is the skin and it can cause a lot of

2  pretty aggravating problems to patients, so I talk to them about

3  skin care and hair care.

4  Q.   Now, one more question I didn't ask when we talked about

5  the breast exam, Ms. Davis -- or the chaperone, would have been

6  present; right?

7  A.   Yes.

8  Q.   Do you remember a situation, ever, with Ms. Davis in the

9  room, when she would have turned her back to you and the patient

10  while a breast examination was ongoing?

11  A.   No, sir.

12  Q.   Would you have let her do that?

13  A.   No, sir.

14  Q.   It would defeat the whole purpose of having a chaperone;

15  wouldn't it?

16  A.   She is there for my safety and the patient's safety.

17  Q.   All right.  This particular visit, I want to show you

18  what's 48-177 of that exhibit, and see if you can explain what's

19  going on here.  Do you remember that type of entry for

20  Ms. Barnett on October 17, following the exam you just described

21  for us?

22  A.   So it looks like it's later on, but I am still making sure

23  I am surveilling for the rare but emergent thing.

24    You can see certain subtle changes on EKG when someone has

25  a clot.  And it's -- again, it's not a great screening tool, but

1    it's one other diagnostic tool that I had and I utilized it and

2    consulted with the physician on it.

3    Q.    And that's an electrocardiogram evaluation of her.  She had

4    that test done, too?

5    A.    Electrocardiogram.  Yes, sir.

6    Q.    You would have reviewed that.  So, the patient is gone from

7    the exam we just talked about but you are going back and

8    reviewing that; is that correct?

9    A.    Yes, sir.

10   Q.    Once again is there a reason for your continued review of

11   this situation?

12   A.    Care about her wellbeing.

13   Q.    Why would you continue to look at it?

14   A.    Care about her wellbeing and want to make sure she gets the

15   care she needs and that I don't miss something.

16   Q.    Then I would like to show you what's 48-64, which is

17   another administrative note on October 22, just a few days

18   later.  What are you doing here, Mr. Rolston?

19   A.    Unfortunately, sometimes it takes awhile for labs to get

20   back.  It looks like there was a delay on some labs.  Could you

21   move it a little to the left, sir?

22   Q.    Is that good?

23   A.    Yes, sir.

24         It suggested a clotting issue.  I was right.  And -- all

25   right.  So, during the first one I had compared the size of the

1    biceps upper and lower -- upper left and right bicep.  You often

2    won't see a change in that with a clot.  But if you have a clot

3    one place you tend to have clots other places, and the most

4    common place of this clot would be the calf.

5         This is a classic one people get when they are on the

6    plane.  And, again, following this line of reasoning I am

7    measuring her calfs and doing neurologic check and a vascular

8    check of her lower extremity to rule that out.

9    Q.   From reviewing the records, Mr. Rolston, do you know what

10   happened -- what your involvement would have been after the labs

11   came back and reviewing the testing, what would you have done

12   after that?

13   A.   I wanted her to go out and I started fighting for her to go

14   out.

15   Q.   And this particular note talks in terms of a possible

16   likely referral to ED for assessment.  Is that what you were

17   advocating for at the time?

18   A.   Yes.  I said that I want this patient to go out to the

19   emergency department immediately.

20   Q.   Where is the emergency department?

21   A.   Down the road.

22   Q.   That's off -- that's not within the FCI facility; is it?

23   A.   No.

24   Q.   That's a hospital?

25   A.   Yes.

1    Q.   All right.  So after reviewing all of the records, and the

2    testing and everything related to your examination, you are

3    recommending that she gets outside care for what you are

4    concerned about is an emergency situation; is that right?

5    A.   Yes.

6    Q.   And do you know if she got that?

7    A.   Yes.

8    Q.   And she received surgery related to that blood clotting

9    issue?

10   A.   I was told it saved her life.

11   Q.   Mr. Rolston, I want to move to Ms. Farber, Beth Farber.  I

12   want to show you some records.

13          MR. CARTER:  Your Honor, this is Plaintiffs 53, which

14   are the medical records that were identified for Ms. Beth

15   Farber.  I would like to move those into evidence.

16          MR. JOHNSON:  Object.

17          THE COURT:  Overruled.  Those are admitted.

18      (PLAINTIFF EXHIBIT 53:  Received in evidence.)

19   BY MR. CARTER:

20   Q.   Mr. Rolston, I want to show you May 10, 2017, examination

21   of Beth Farber; do you see that?

22   A.   Yes, sir.

23   Q.   What is this again?

24   A.   This is an intake history and physical, sir.

25   Q.   So would you have been assigned to her to do the A and O

1  intake physician exam; is that right?

2  A.  Yes, sir.

3  Q.  And during the A and O intake you would have offered the

4  well woman exam; is that right?

5  A.  Yes.

6  Q.  What I want to direct you to -- if she consented to that

7  you would have conducted a breast exam, a pelvic exam and a

8  rectal exam; correct?

9  A.  Yes, sir.

10 Q.  There in the pelvic examination area do you see anything

11 that was significant that you had noted upon the pelvic

12 examination?

13 A.  I wrote in all caps that I can't see the IUD string.

14 Q.  So why is that significant?

15 A.  That's how you retrieve them.  And I also note that it had

16 been in nine years and I think the longest they are supposed to

17 be in is four to five.  It could present a serious problem.

18 Q.  So what did you do as a result of the IUD string could not

19 be located?  What does it indicate the IUD had done?

20 A.  Well, it doesn't indicate it did anything, but it may have

21 done something.

22 Q.  What may -- in your differential, what would it matter to

23 you?

24 A.  It can migrate.

25 Q.  What does that mean?

1  A.    Move to a location that it's not supposed to be.

2  Q.    So after four or five years past the expiration of that IUD

3  can that create a problem for a patient?

4  A.    It can grow into the walls of the uterus and create great

5  problems for pregnancy in the future, future fertility, pain,

6  several issues.

7  Q.    Do you know -- and I can show it to you -- was there any

8  recommendations or orders that you made relating to not being

9  able to find the string of the IUD and reporting that it had

10 been five years expired?

11 A.    I did.  I immediately ordered an X-ray, which is mostly

12 pretty useful.  And I referred to her OBGYN, to the physician

13 gynecologist.

14 Q.    For what purpose?

15 A.    Removal.

16 Q.    The OBGYN would take over from that standpoint; is that

17 right?

18 A.    Yes, sir.

19 Q.    Do you know -- do you have any memory of the OB

20 gynecologist actually doing the procedure necessary to remove

21 the IUD from Ms. Farber?

22 A.    No specific memory.

23 Q.    In your examination of the breast exam, did you note

24 anything specifically related to Ms. Farber during the breast

25 exam?

1  A.   Yes.  I noted that she had implants.

2  Q.   Implants?

3  A.   Breast implants.

4  Q.   What else did you note about those breast implants?

5  A.   I noted their placement.  And this is relevant because some

6  of the older techniques it makes it more difficult to do a

7  breast exam because you have a foreign device in your body.  So

8  you should know how it was put in, if the breast tissue was

9  taken out of with it -- that's ideally, you know, if you know

10 that, you know, and that it healed properly.

11 Q.   So the breast implants being underneath as opposed to on

12 top is significant?

13 A.   It's worthy of noting.  All surgical scars I comment on.

14 Q.   So the scarring is worth noting.  You would make reference

15 to the scarring?

16 A.   If it was bad.  If there was a problem with it.

17      Part of the -- part of the chart asks that too if you have

18 any implantable devices.

19 Q.   All right.

20 A.   So --

21 Q.   Mr. Rolston, during the breast exam for Ms. Farber, did you

22 make any comments like, "Oh, wow", or any other sounds or groans

23 or comments about her breasts?

24 A.   No, sir.

25 Q.   Have you done that with any patient ever during a breast

1  exam?

2  A.   Never.

3  Q.   And during the pelvic exam of Ms. Farber, did you touch her

4  clitoris?

5  A.   No, sir.

6  Q.   Did you rub her clitoris a number of times?

7  A.   No, sir.

8  Q.   Did you play with her clitoris?

9  A.   No, sir.

10  Q.   You conducted that pelvic exam the same way you always do?

11  A.   Yes, sir.

12  Q.   Like you described when you drew the line drawing for us to

13  see?

14  A.   Yes, sir.

15  Q.   All right.  Mr. Rolston, I want to move to Ms. Batchelor,

16  Ms. Connie Batchelor, and I want to --

17        MR. CARTER:  First, I have got Plaintiff's Exhibit

18  Number 49, Your Honor.  I would like to move Ms. Batchelor's

19  records into evidence.

20        MR. JOHNSON:  Object.

21        THE COURT:  Overruled.  Plaintiff's 49 is admitted.

22     (PLAINTIFF EXHIBIT 49:  Received in evidence.)

23  BY MR. CARTER:

24  Q.   Now, let me ask you this, before we get into the details of

25  her records, Mr. Rolston, if someone has had a partial

1   hysterectomy do they still need Pap smears and pelvic exams?

2   A.   It's not the pap.  It's the pelvic examination, because

3   they still have sexual organs so you still surveil.

4        When they are removing the cervix, if they do not get it

5   all out, that can be an issue.  And I have read some literature

6   that talks about making sure that -- when I first trained they

7   used to teach us to do one pap after the hysterectomy to make

8   sure all of the remnants were out.  This can also be done

9   retrospectively sometimes with the path sample from a

10  hysterectomy.  But to check, again, it takes no extra time.  It

11  doesn't cause any pain on the patient.  And you know from the

12  sample whether or not it's clear.

13  Q.   And if it's a partial hysterectomy you still have an ovary,

14  too; right?

15  A.   Partial hysterectomy you still have an ovary.  Yes.

16  Q.   I want to show you what is page 49-6 of that exhibit.  Does

17  it appear that you actually were the provider for Ms. Batchelor

18  on September 27, 2018?

19  A.   Yes, sir.

20  Q.   Okay.  Can you tell me from that record what she presented

21  with and what you did?

22  A.   She presented with some kind of rash, eczema.  It sounded

23  like dyshidrotic eczema.  Based on the presentation and the

24  bumps, a rash, sir.

25  Q.   All right.  Did note that there was anything from a

1    preventative medicine standpoint at this encounter?

2    A.    Yes, sir.

3    Q.    What did you note?

4    A.    None on record.

5    Q.    And that she is due a well woman exam?

6    A.    Yes, sir.

7    Q.    And that was for the reasons you explained before you still

8    do a pelvic?

9    A.    Yes, sir.  Speculum and digital.  Yes, sir.

10   Q.    As it relates to Ms. Batchelor, when you conducted a pelvic

11   exam of Ms. Batchelor, did you touch her clitoris?

12   A.    No, sir.

13   Q.    When you conducted a breast exam of Ms. Batchelor, did you

14   pinch her nipples?

15   A.    No, sir.

16   Q.    Did you do anything that was sexual in nature?

17   A.    No, sir.

18   Q.    I want to direct you to page 49-1.

19        Did you see Ms. Batchelor again November 29, 2018?

20   A.    Yes, sir.

21   Q.    What was the reason for her visit then?

22   A.    She had a history of hemorrhoids.  20 years -- it's a long

23   history and I could -- I can tell, again knowing my notes, I am

24   already building a case to try to send the patient out.  I am

25   citing dates that she was having heavy bleeding and that's

1    concerning.

2    Q.   Well, let me ask you.  You said you are building a case to

3    have the patient sent out.  Couldn't you just send the patient

4    out?

5    A.   I do not have the ability to personally send them outside

6    of the building.  I have to get agreement.  And I can -- in

7    various cases, like as in Ashlee Bennett --

8    Q.   You mean Ms. Barnett?

9    A.   Barnett.  Pardon me.  I can really push it as hard as I

10   can, but I still have to get the physician's agreement.

11        The BOP is a government entity so everything is governed by

12   policies and rules.  And you have to meet certain criteria and

13   thresholds in order to send the patient out.  So we, as

14   providers, build a case, so to speak, to get that patient to the

15   care that they need because the government tries to be a good --

16   good with the taxpayers' money.  They try to be reasonable and

17   they have set up guidelines.

18   Q.   You said she had pretty severe case of hemorroids three

19   times that you have noted which included this particular

20   encounter; right?

21   A.   Yes.

22   Q.   And she was soaking three or four pads a day from the blood

23   associated with those hemorroids; right?

24   A.   Yes.

25   Q.   That's a pretty serious condition; right?

1  A.   Yes, sir.  Very uncomfortable.

2  Q.   What's the situation that's going on when you are bleeding

3  that much from any part of your body, but hemorrhoids, what's

4  the problem associated with that?

5  A.   It's a vicious cycle.

6  Q.   A vicious cycle, is that what you said?

7  A.   Yes, sir.  Bleeding leads to anemia.  Anemia leads to

8  feeling weak and feeling terrible, generally.  So, what do we do

9  as providers?  We throw iron at it.  What does iron do?  Iron

10  causes constipation.  Constipation causes the hemorrhoids to be

11  worse and so you get in this vicious cycle.  So the best

12  solution can be trying to get her surgical care.

13  Q.   I will show you what's 49-3, which is the end of that

14  particular visit with Ms. Batchelor.  Do you see any other

15  comments that you made regarding Ms. Batchelor?  Can you see

16  that?

17  A.   Very large hemorrhoid burden confluent, meaning they are on

18  top of each other.  They are no longer like grapes, they are

19  like grapes with grapes on top of grapes.

20  Q.   Did you refer her out, or did you make the case of trying

21  to refer her out?

22  A.   I did.  I referred her to a gastroenterologist --

23  intestinal GI for operative correction.

24  Q.   Because in your view that's how you correct this vicious

25  cycle that you described?

1    A.   Stop treating the cause and actually cure the cause.

2         Yes, sir.

3    Q.   I want to talk to you now about Ms. Rodriguez, Ms. Daphne

4    Rodriguez.

5              THE COURT:  It's close to lunch time.

6              MR. CARTER:  I have got Ms. Rodriguez and Ms. Blevins

7    then just a few questions after that.

8              THE COURT:  We all doing okay?  We will keep going.

9    BY MR. CARTER:

10   Q.   I want to show you what's been marked as Plaintiff's

11   Exhibit 55, which is Ms. Rodriguez's medical record.

12             MR. CARTER:  I would like to move those into evidence,

13   Your Honor.

14             MR. JOHNSON:  Object.

15             THE COURT:  Overruled.  Those are admitted.

16        (PLAINTIFF EXHIBIT 55:  Received in evidence.)

17   BY MR. CARTER:

18   Q.   Mr. Rolston, I want to run through a few of the clinical

19   encounters that you had with Ms. Rodriguez.

20        First, I want to show you page 55-18, and have you take a

21   look at that and tell me what's going on.  This is an encounter

22   on August 18, 2015.  What's she presenting with at this

23   encounter with you?

24   A.   She is burdened with a very uncomfortable and aggravating

25   thing, which is called a prolapsed bladder and uterus.  Prolapse

1    is when two hollow organs intercept effectively, so a prolapse

2    rectum would be your rectum extending past your anus into your

3    underwear rubbing against your clothes.  Prolapse vagina would

4    be also doing the same.  Very painful.  Uncomfortable.

5    Q.    So that's what she presented with to you at that point?

6    A.    Yes.

7    Q.    I will show you what is -- well, maybe the better -- did

8    you refer her to a surgical consult as a result of that

9    condition she presented with?

10   A.    No specific recollection, but I will read the note.

11        I would have.  It says she is already pending a surgical

12   consult which, as her provider, I would have asked for and she

13   is complaining of more pain recently.

14   Q.    She had presented the day before to you with the same

15   condition; correct?

16   A.    If that's what the medical record shows.

17   Q.    Okay.  Would a pelvic exam be indicated based on her

18   presentation?

19   A.    If she was due.  It says she had refused paps for several

20   years.

21   Q.    Based on her presentation, and the fact that she had

22   refused paps for several years, did you offer her an

23   examination?

24   A.    Yes, sir.

25   Q.    Did you conduct that?

1  A.    I believe so, sir.

2  Q.    During the course of the breast exam on Ms. Rodriguez, do

3  you have any specific memory of?

4  A.    No, sir.

5  Q.    Was there any -- was there ever a situation where -- you

6  would have had a chaperone of course; right?

7  A.    Yes, sir.

8  Q.    Was there ever situation where Ms. Davis was your chaperone

9  and during a breast examination you blocked her view from you

10  conducting the breast examination?

11  A.    No, sir.

12  Q.    Would you not let that happen?

13  A.    No, sir.  I would not let that happen.

14  Q.    Based on your experience from working with Ms. Davis, was

15  she ever in a situation where she could not see you performing a

16  breast examination?

17  A.    Not to my knowledge.  Obviously I am watching the patient.

18  Q.    During the breast examination of Ms. Rodriguez, would there

19  be any indication where you may be lingering on one of her

20  breasts?

21  A.    No.  Not that I know of.

22  Q.    Would you be communicating with what's going on with the

23  palpation, and the exam that you were conducting, would you be

24  communicate with Ms. Rodriguez about that?

25  A.    As is my standard, yes.

1  Q.   As you have described a number of times your process?

2  A.   Yes.

3  Q.   And because a well woman examination was done on

4  August 19th, you would have conducted a Pap smear; correct?

5  A.   Yes, sir.

6  Q.   All right.  I want to show you what's page 55-9 of this

7  record and it looks like you saw Ms. Rodriguez again on October

8  7th.  Do you see that?

9  A.   Yes, sir.

10  Q.   What's going on?  She is still waiting for her surgical

11  consult; right?

12  A.   Yes, sir.

13  Q.   And that length of time is not unusual for BOP process;

14  right?

15  A.   Unfortunately, sir.

16  Q.   Okay.  There is a reference to a recent pap.  Do you see

17  that?

18  A.   Yes, sir.

19  Q.   So what is that telling you?  How are you getting that

20  information, Mr. Rolston?

21  A.   I looked it up somewhere in the chart.  The result had come

22  back.

23  Q.   And what did it tell you?

24  A.   HPV positive, that there were cellular changes.

25  Q.   What does that mean?

1  A.   So, frequency of pap, as Dr. Tucker said the other day, is

2  dictated by not just frequency on a chronologic frequency but

3  actual cellular changes to the pathology.  That's why we do it.

4       There are several stages.  There is HPV.  Down here it says

5  positive, yes or no.  Then the next stage is, is this one of the

6  virulent strains and there are nine strains that are heavily

7  associated with cervical cancer.  That would bump you up on the

8  frequency scale.

9       Then there is ASCUS, which is cells of unspecific origin.

10  There are cellular changes, but, you know, not totally

11  concerning.  Needs to be repeated.

12       Then there is LSIL, CIN, et cetera, and as you progress

13  there is more concern for the risk of cancer.

14  Q.   Okay.  So, this result from the Pap smear would have been

15  the well woman exam that you offered her on the visit before,

16  that you are now discussing with her the positive HPV and the

17  situation that has presented from that testing; right?

18  A.   Yes, sir.  And I note -- I am obviously talking about risk

19  factors because I am discussing breast cancer in her family.

20  Q.   So having the well woman exam, when you recommended it, it

21  actually came back with some results that were important to

22  know; correct?

23  A.   Absolutely.

24  Q.   During -- I'm sorry.  Let me ask it this way.  Do you

25  listen to breath sounds of a patient when you are conducting the

1  examination?  Is that part of the normal exam?

2  A.    Yes, sir.  You're supposed to -- you hit most systems; yes.

3  Q.    Do you have any -- would you have stood so close to

4  Ms. Rodriguez that your crotch would have been in her face while

5  you listened to breath sounds?

6  A.    No.

7  Q.    You would not?  You don't do that?

8  A.    That's disrespectful.

9  Q.    How would you listen to breath sounds?

10  A.    You listen at the apices in the rear on the scapula.  And I

11  would have leaned to one side and put the stethoscope on and

12  asked her to breathe in deep.  Switched sides.

13  Q.    I want to show you another note and encounter that you had

14  with Ms. Rodriguez.  This is an administrative note.  I know --

15  I didn't bring that out before, but when you do an

16  administrative note you are not necessarily seeing the patient

17  that day; is that right?

18  A.    Yes, sir.  This is me -- administrative notes are my

19  thoughts, or other things that have happened.  You're not --

20  it's not the patient there.  It's my thoughts and other things I

21  am doing.

22  Q.    So, earlier, when we were looking at Ms. Ashlee Barnett's

23  records, there was administrative notes about you reviewing labs

24  and diagnostic testing; you are not seeing Ms. Barnett on that

25  day.  You are reviewing the results of the testing; right?

1    A.    Yes, sir.  Going back in the chart and following up on my

2    patient.

3    Q.    In this situation, on April 7, 2016, what were you doing in

4    this administrative note?

5    A.    Attempting to break the rules and get her extra toilet

6    paper.

7    Q.    Why is that?

8    A.    Because I felt like she was uncomfortable and it warranted

9    it.  Even though --

10   Q.    Uncomfortable from what?  Was she still pending this

11   surgical situation?

12   A.    Yes.  I felt that the delay was our responsibility, so I

13   was trying to get her extra privileges.

14   Q.    There is a limitation on how much toilet paper an inmate --

15   patient -- can get, but you are writing an administrative note

16   to got beyond that; is that right?

17   A.    Yes, sir.

18   Q.    All right.  I want to identify Plaintiff's Exhibit 50.1,

19   which are the medical records of Ms. Shondolyn Blevins.

20         MR. CARTER:  I would like to move those into evidence.

21         THE COURT:  Those are admitted.  I need a number.

22         MR. CARTER:  I can't remember if I moved

23   Ms. Rodriguez's records.

24         THE COURT:  I think you did.  But what's the number on

25   Ms. Blevins?

1          MR. CARTER:  55.

2          MR. JOHNSON:  That's Rodriguez.

3          MR. CARTER:  I could not recall -- Your Honor, I could

4   not remember if I moved those in.  I would like to make sure I

5   moved --

6          MR. JOHNSON:  You did.

7          THE COURT:  You did.  Those are admitted.

8          MR. CARTER:  Thank you.

9          THE COURT:  Now the Blevins' number?

10         MR. CARTER:  I'm sorry.  50.

11         THE COURT:  Plaintiff's 50 is admitted.

12     (PLAINTIFF EXHIBIT 50:  Received in evidence.)

13  BY MR. CARTER:

14  Q.   Okay.  Mr. Rolston, you would have seen -- do you have any

15  specific memory of Ms. Blevins?

16  A.   I do not.

17  Q.   Okay.  Let me ask it this way, if she had presented with

18  dry skin to you on one of your clinical encounters, and you

19  recommended to her using dandruff shampoo on the skin, why would

20  you do that?

21  A.   Number one; solium sulphide, the active ingredient in

22  dandruff shampoo, actually is a fantastic -- it's not a wive's

23  tale.  It's actually a fantastic thing to treat a number of skin

24  conditions -- eczema.  I have found over the years, in my

25  experience, that it works actually pretty well.

1    I believe I also recommended that she went to the

2    commissary and used Eucerin as well.

3    Q.   All right.  I will show you what's page 50-22, in the other

4    section where you are commenting on your exam, and that's what

5    you are referring to; recommending OTC commissary, showering

6    with dandruff shampoo, and you said you believe you also

7    recommended Eucerin; is that right?

8    A.   I did.  I also noted that she was tearing and picking at

9    her face and gave recommendations on that.

10   Q.   I want to show you a clinical encounter with Ms. Blevins on

11   June 30th, shortly after the one we just looked at.

12       Have you had a chance to look through that, Mr. Rolston, or

13   are you still reading?

14   A.   I did.  Again, knowing my notes, I can read between the

15   lines.

16   Q.   So what's going on in the June 30, 2016 record?

17   A.   She is unhappy with the commissary choice, even though it

18   looks like her skin has improved, "clear and doing well."

19       And I am doing a little patient education and she is

20   talking about when medication, Eucerin, stopping darkening from

21   the skin.  Apparently she wasn't able to get that one.  And I

22   bascially educated her that, no, that's not going to prevent --

23   that's not going to prevent that.  And I warned about skin

24   cancer.

25       She also asked about a hijab, whether I can prescribe it,

1    and I reported the institutional rules and explained to her how

2    she go to the chapel and get access to that.

3    Q.   I noted in the middle of the page there is a reference to a

4    2016 abdominal ultrasound.  Do you see that?

5    A.   Yes, sir.  When the patients are there I don't always throw

6    a note in about it, but when I can I pull up their history and

7    you surf through the piles of documents to try to lift out the

8    relevant things.

9         Patients sometimes don't hear back from us about results.

10   What we tell them is:  We will always come to you if it's an

11   abnormal result, and we will tell you it's abnormal.  But normal

12   results they don't call them back to just say "it's normal."

13        So, again, the whole patient issue when I have them in

14   front of me I am going to try to hit the high points and answer

15   questions, and mine in the data for pertinent issues and

16   pertinent things that might need addressing even if she doesn't

17   bring it up.

18   Q.   Would you have examined the fibroids at an encounter like

19   this?

20   A.   No.  I might have pushed on her belly and listened to her

21   abdomen, but...

22   Q.   What -- if you had pushed on her belly, how would you have

23   done that?

24   A.   Four quadrants to the belly.  I would have pushed down on

25   her belly and -- again, fibroids are what I did my master's

1  thesis on so I probably would have given her a lot of education

2  about what the techniques to fix them are, what the concerns

3  are, et cetera.

4  Q.   Would you have needed a chaperone for that type of pushing

5  on her belly that you just described?

6  A.   No, sir.

7  Q.   Why?

8  A.   Because I am not exposing her.

9  Q.   She is not undressing?

10  A.   Yes.

11  Q.   Okay.  Would you have ever examined the patient, examined

12  their breast through their clothes?

13  A.   Absolutely not.

14  Q.   Why?  Or why not?

15  A.   Number one, I didn't have a chaperone and I do not do that.

16       Number two, if I am going to do it, I am going to do the

17  full exam properly.  I am not going to do part of the exam and

18  leave out the visual.  I am going to do a complete thorough exam

19  with all the component parts.

20  Q.   Okay.  I will show you --

21  A.   Sir, there is one thing relevant there.

22  Q.   I'm sorry.

23  A.   I note that I got a note from the warden to see her about

24  her eczema.

25  Q.   And that's -- you put that in the note that she had

1    requested to the warden that you see her for her skin problem?

2    A.    Issued a complaint, effectively.

3    Q.    Okay.  Did you order a follow-up ultrasound?

4    A.    Yes, I did.

5    Q.    Why would you order a follow-up ultrasound based on what

6    you found from pressing on her belly during that exam?

7    A.    I would have done it based on history and the prior study.

8    Q.    Okay.  I would like to show you Plaintiff's 50-11.

9         First, before I ask you about the substance of the

10   complaint, you see this is dated August 24th, 2015.  Do you see

11   that?

12   A.    2016, sir.

13   Q.    I'm sorry.  2016.  Thank you.

14        That information across the top is populated when you call

15   the patient up; is that right?

16   A.    Yes, sir.

17   Q.    We talked about that before.  On August 24th, 2016, what

18   unit is Ms. Blevins in?

19   A.    Disciplinary housing unit.

20   Q.    Z01?

21   A.    Yes.

22   Q.    That's the SHU?

23   A.    Yes, sir.

24   Q.    Tell me what's going on in this encounter on August 24th.

25   A.    Patient has been in an altercation with another inmate and

1  I am evaluating an injury to the hand -- a thumb -- 48 hours

2  after the fight.

3  Q.   Okay.

4  A.   I asked about the fight.  She did refuse to give any

5  details to me.  Based on my experience, it looks like it was

6  made by a razor.

7  Q.   You are saying the cut that you are evaluating looked like

8  it was made by a razor?

9  A.   Yes, sir.

10  Q.   How would you make that determination?

11  A.   Based on how the wound looked.  Teeth are messy.  They

12  tear.  You have a serrated edge and they tear.  And they have a

13  very particular imprint and pattern in the skin.  And they are

14  not an incision.  An incision is clean -- clean lines.

15  Q.   Did you further have discussion with Ms. Blevins about that

16  injury and anything related to that?

17  A.   I did.  It's obvious I didn't totally believe the story

18  that she had been bit, because I gave her a tetanus shot.  You

19  don't need a tetanus shot for a human bite.  I did that because

20  I suspected she was cut with metal.  And I gave her antibiotics.

21  Q.   Did she say something to you when you made the comment to

22  her that it looked like it had been made by a razor?

23  A.   She smirked and said I was smart.

24  Q.   I want to show you what we will mark -- what's been marked

25  as page 50.4 of that exhibit.  Do you see that, Mr. Rolston?

1   A.   Yes, sir.

2   Q.   Okay.  That's a November 23rd, 2016 encounter, clinical

3   encounter with Ms. Blevins?

4   A.   Yes, sir.

5   Q.   Can you tell me what's going on this encounter?  Where is

6   the patient, number one?

7   A.   SHU.  Z01 and Z02 are SHU.  Disciplinary SHU.

8   Q.   What did she present -- and you had to go through the

9   process of getting to see her, like we talked about before, what

10  did she present to you on this day?

11  A.   "Disgusting, smelly discharge."  And when I quote it like

12  that, that's what she's talking about.  Similar to prior yeast

13  infections, based on the patient.

14  Q.   So, how did you treat this patient?  That would have been a

15  yeast infection, is what you are saying, ultimately; right?

16  A.   Yes, sir.  I don't have specific recollection of this, but

17  I see the note.

18  Q.   Let me show you page 50.5.  Do you see, after talking with

19  her and evaluating that she had a yeast infection, what you did?

20  A.   I did.  I prescribed a proper antifungal.

21  Q.   Okay.

22  A.   I also specifically noted that because she had put in the

23  sick call visit I could have actually charged her for this

24  visit.

25  Q.   You could --

1  A.  But I wrote a note so she wouldn't be charged.

2  Q.  What do you mean?

3  A.  Visit meets criteria for charge, and MLP not charging

4  inmate.  So I wrote a note so that my lieutenant commander

5  White, the man who does the charging, doesn't charge her.

6  Q.  Okay.  You ordered meds.  Can you see what time of day you

7  would have had this clinical visit with the patient?

8  A.  So, in the SHU it's tricky sometimes.  It's tricky because

9  the -- if there is any kind of issues there is only one computer

10  over there with BEMR on it.  It looks like it says 8:27.

11  Q.  So you are entering information about this assessment that

12  you had with her of the yeast infection around, or at least

13  entering the information at 8:27 on November 23rd, 2016;

14  correct?

15  A.  Yes, sir.

16  Q.  And that's before a long weekend?

17  A.  I guess it is.  Thanksgiving eve.

18  Q.  Was that around Thanksgiving, Mr. Rolston?

19  A.  Yes.

20  Q.  And so you are -- why are you offering this treatment for

21  Ms. Blevins before the long weekend, and you won't be around, or

22  a provider might not be around during that long weekend?

23  A.  I don't want her to suffer through the time that we are

24  away because medical won't have a medical officer until the

25  holiday is over.

1   Q.   And is a yeast infection an emergency situation?

2   A.   No, it's not.

3   Q.   Does it cause itching and burning and problems for that

4   patient?

5   A.   It's aggravating and uncomfortable and I didn't want her to

6   be uncomfortable.

7   Q.   So you made sure the medication was available to her?

8   A.   Yes, sir.

9   Q.   Mr. Rolston, can you send an inmate to the SHU yourself?

10   A.   No, sir.

11   Q.   Why not?

12   A.   I don't have that power or ability.  That is reserved only

13   to the lieutenants.  I can only report.

14   Q.   I'm sorry?

15   A.   I can report.  That's all I can do.

16   Q.   Mr. Rolston, did you sexually abuse or assault any of the

17   female inmates that we have been talking about?  Ms. Alexander?

18   A.   No.

19   Q.   Ms. Barnett?

20   A.   No.

21   Q.   Ms. Rodriguez?

22   A.   No.

23   Q.   Ms. Farber?

24   A.   No.

25   Q.   Ms. Batchelor?

1   A.   No.

2   Q.   Ms. Blevins?

3   A.   No.

4   Q.   At any point in time, did you act inappropriately in a

5   sexual way with any of these inmates?

6   A.   No.

7   Q.   Did you do anything during any of these examinations for

8   your own sexual gratification?

9   A.   No.

10  Q.   Why would you not do that?

11  A.   These are human beings.  They are children of God.

12  Q.   At any point during any of these examinations that we have

13  looked at were you sexually aroused?

14  A.   No.

15  Q.   Did you make any sexual sounds?

16  A.   No.

17  Q.   Did you do anything sexual in nature?

18  A.   No.

19         MR. CARTER:  Your Honor, I have got a stack here, and

20  I have an exhibit that I mixed up and I was asking Mr. Cook if I

21  could borrow the exhibit I gave him this morning.  Thank you.

22  BY MR. CARTER:

23  Q.   I would like to -- and this is not in evidence, Your Honor.

24         MR. CARTER:  It's Defendant's Exhibit 9.  I would like

25  to move that into evidence.  It's been some form of redaction --

1          THE COURT:  Is there an objection?

2          MR. JOHNSON:  What is it?

3          MR. COOK:  It's the investigation.

4          THE COURT:  I just need to know if there is an

5  objection.

6          MR. JOHNSON:  An investigation of who?

7          MR. CARTER:  Ms. Alexander.

8          MR. JOHNSON:  Okay.  Yeah, I agree.

9          THE COURT:  Without objection, it's admitted.

10         (DEFENDANT EXHIBIT 9:  Received in evidence.)

11  BY MR. CARTER:

12  Q.   Mr. Rolston, I am going to show you Exhibit Number 9 and I

13  am showing you the last page, which is the conclusion.  Did you

14  ever have an opportunity to receive this information?

15  A.   I would have been told the conclusion; yes, sir.

16  Q.   Okay.  All right.  That would have been the investigation

17  related to Ms. Alexander's allegation?

18  A.   Yes, sir.

19  Q.   And there was no finding against you?

20  A.   Yes, sir.

21  Q.   Mr. Rolston, you have a professional license to be a

22  physicians' assistant; is that right?

23  A.   Yes, sir.

24  Q.   Did it ever occur to you to sexually abuse any of these

25  female inmates that we have been talking about?

1   A.   No, sir.

2   Q.   And why not?  Have you taken a Hippocratic oath as a

3   physicians' assistant?

4   A.   Yes, sir.

5   Q.   So why would you not be -- why did it not occur to you to

6   sexually abuse any of these inmates?

7   A.   They are human beings.  It's absurd on its face.  I would

8   never do something to harm someone intentionally.

9   Q.   Would you risk your professional license?

10  A.   No, sir.  Nor my 30 years in medicine.

11          MR. CARTER:  Thank you, Your Honor.

12          I have no further questions.

13          THE COURT:  Members of the jury, that makes this a

14  convenient time to take the lunch break.

15          We will start back an hour and two minutes, I guess.

16  1:35 by that clock.

17          Have a pleasant lunch break.  We will see you back in

18  an hour.

19          Jury out, please.

20      (Jury out at 12:34.)

21          THE COURT:  You may be seated.

22          Thank you, Mr. Rolston.  You may step down and return

23  to counsel table.

24          Mr. Carter, how are we doing?  Where do we stand?

25          MR. CARTER:  We will be after 3, Your Honor, but I am

1    hoping to get everybody on this afternoon.

2              THE COURT:  You have more witnesses.

3              MR. CARTER:  Oh, yes, sir.  I have five more witnesses

4    but they are all short.  Then we have an expert at the end that

5    will be a little bit longer, but I do believe we will go past 3.

6    That's what I couldn't anticipate --

7              THE COURT:  That sounds right.  Probably what we will

8    do is get the rest of the evidence today and plan to argue in

9    the morning.

10             MR. CARTER:  Okay.

11             MR. COOK:  Your Honor, could we get the order of

12   witnesses?

13             MR. CARTER:  Sure.  I am happy to tell them.

14             THE COURT:  All right.

15             MR. COOK:  Thanks.

16             THE COURT:  You can do that when we break.

17             Mr. Johnson, I overruled the objections to the medical

18   records.  I didn't understand there to be any authenticity

19   objection.

20             MR. JOHNSON:  No.

21             THE COURT:  The first one he said was 300 pages.  I

22   don't know that all 300 pages have anything to do with this, but

23   what's the problem?  What's the objection?

24             MR. JOHNSON:  The problem was that --

25             THE COURT:  You have to stand up.

1     MR. JOHNSON:  That was the problem.  We get 309 pages

2  dumped on us and I am just too old and busy to study all of the

3  309 pages, you know, to get ready.  I didn't know which ones

4  they are going to use, or what it's about.  And I think that,

5  you know, they ought to be broken up or numbered separately.

6     THE COURT:  That objection is overruled.  It's a

7  single medical record, right?  Single set of medical records?

8     MR. CARTER:  They are not our records.  I know they --

9  it's Mr. Rolston, individually.  Records were produced by the

10  government to them.  And they were produced to me too.  And my

11  hair is gray and I am old, trying to go through the records just

12  like Mr. Johnson.

13     THE COURT:  Mr. Cook?

14     MR. COOK:  Your Honor, there are psychology records in

15  there.  There are records of --

16     MR. CARTER:  Your Honor, I don't want anything other

17  than what I referenced.  But you saw how long it was taking me

18  to go through those anyway.

19     THE COURT:  Here is what I was going to suggest.  I

20  mean, it seems to me plainly these are relevant and admissible,

21  but there may well be more than is needed and that's -- doesn't

22  do anybody any good.  So, look, if there is a way to pare those

23  down and agree to a subset of them you can do that.

24     MR. CARTER:  We will talk about that, Your Honor.

25     MR. JOHNSON:  Way back, when they were discovered, we

1   had a big argument over that and you made a ruling over my

2   objection that they were discoverable, and I don't want to do

3   anything to take away my objection on the discovery as well.

4           THE COURT:  Right.  Whatever objection you made

5   earlier you're not --

6           MR. JOHNSON:  They haven't put their private stuff in

7   evidence because they are not parties.  They are not a

8   plaintiff.

9           THE COURT:  Well, the part that they were examined

10  about are relevant to the lawsuit, and if I overruled an

11  objection to the discovery of that material the ruling was

12  correct.  But if you can pare those down, it may be hard to do

13  over lunch but we may have time this afternoon.  And certainly

14  if you can agree to a subset of that material that goes to what

15  is relevant, and leaves out the other stuff, that would be good.

16          What else, if anything, before we break for lunch?

17          I made one additional change to the instructions that

18  you don't know about.  There is a reference on page two to

19  plaintiffs plural and it should be plaintiff singular.  I struck

20  an S.

21          Other than that, you have got everything I propose to

22  give.

23          I gave you, at the last break, the felon witness

24  instruction.  That should be straightforward.

25          And then I added the sentence responding to what

1    Ms. Coles asked for, and how Mr. Cook wanted to respond.  As I

2    told you, it not exactly what either side asked for, but I think

3    it makes it clear.

4         I don't have anything in the instruction that says a

5    normal medical exam is not sexual contact or sexual act, but you

6    can make that argument.  The instruction says what it is, so

7    it's accurate.  I don't think an additional instruction would

8    change anything.

9         Mr. Cook was concerned about mixed motives, and I

10   think the way it's presented it's very clear that if there is

11   any sexual act or sexual contact, that's enough.  Doesn't mean

12   that everything has to be sexual in nature.  So I don't think I

13   need to give any additional description of mixed motives.  I

14   think it's there.  So I think what is there is good enough for

15   each side to argue your position.

16        Either side have any additional objections to that

17   sentence, or does that solve your problem?

18        MR. COOK:  No, Your Honor.

19        MS. COLES:  No, Your Honor.

20        THE COURT:  All right.

21        So we are basically good to go with the instructions.

22        How about the verdict form?  We took a break.  Did

23   anybody look at that any more?  We can do that at the end of the

24   day.

25        I will see you back at 1:35.

1    (Recess taken 12:40.)

2    (Resumed at 1:35.)

3         THE COURT:  Jury in, please.

4         Please be seated.

5    (Jury in at 1:35.)

6         THE COURT:  All right.  You may be seated.

7         Mr. Rolston, you are still under oath.

8         Mr. Cook or Mr. Johnson, you may proceed.

9         THE WITNESS:  Yes, Your Honor.

10                    CROSS-EXAMINATION

11   BY MR. JOHNSON:

12   Q.   Mr. Rolston, in all of your years at FCI, have you ever had

13   a patient come to you and tell you of being a victim of a PREA

14   evaluation?

15   A.   Sir, could you repeat the question?

16   Q.   Have you ever had a patient at FCI come to you and tell you

17   that she was the victim of a PREA violation?

18   A.   I have had men and women inmates do so, sir.  Yes.

19   Q.   What did you do?  How did you handle it?

20   A.   I reported it.

21   Q.   Who did you report it to?

22   A.   You report to the officer on duty.  Usually you notify your

23   supervisor.  You can also send a note to psychology.  It sets a

24   chain of reactions up.  Usually the operational lieutenant is

25   who --

1   Q.   Have you had to do any kind of a medical examination on a

2   PREA victim?

3           MR. CARTER:  Objection.

4           THE COURT:  The objection is sustained.

5           Get your headphones on.

6       (Following conference held at sidebar at 1:39 PM.)

7           THE COURT:  Mr. Johnson, can you hear me?

8       MR. JOHNSON:  Yes.

9           THE COURT:  Mr. Carter, are you there?

10      MR. CARTER:  Yes, sir.

11          THE COURT:  Mr. Johnson, isn't this a violation of the

12  same order in limine that I got on Mr. Cook about the other day?

13  Now you're asking of complaints of sexual violations at FCI by

14  other officials.

15          MR. JOHNSON:  I was asking about --

16          THE COURT:  Get your pad, or something up so the jury

17  doesn't hear you.

18          Isn't he -- you can't make a PREA violation unless

19  somebody has committed an act that I have told you, you are not

20  allowed to inquire about.

21          MR. JOHNSON:  Okay.  Can I inquire about the ones that

22  have testified?

23          THE COURT:  Yeah.  It's a little late now.

24          Mr. Carter, what do you want to have done?  Do you

25  want a mistrial?

1          MR. CARTER:  No, sir.  We would not want a mistrial.

2     We would want a curative instruction.

3          THE COURT:  All right.  I will give it right now.

4          Mr. Johnson, don't do it again.  If you do, it's not

5     going to be a slap on the wrist, or talking to somebody.  It's

6     going to be a sanction and it's going to hurt.

7          (End of sidebar conference.)

8          THE COURT:  Members of the jury, there was a question

9     that suggested that there had been violations of the Prison Rape

10    Elimination Act by other officials at the institution.  The

11    question about whether Mr. Rolston reported it, and, of course,

12    they are talking about whether he reported alleged violations by

13    others.  That has absolutely nothing to do with this case.

14         The reason I stopped to talk to the lawyers was I have

15    made it very clear, before the case started, that there was to

16    be no mention, no suggestion, that any other provider had

17    committed any violation.  This is a case against Mr. Rolston.

18    He is not responsible for what anybody else might have done.

19         You should not have heard it.  It should not have been

20    suggested to you.  You should totally ignore it.  This case is

21    about what Mr. Rolston might have done.

22         Now, I told you earlier that there were some women who

23    testified who say that Mr. Rolston committed sexual acts, or had

24    sexual contact with them during examinations of them, and as I

25    told you at the time you can consider that on the question of

1   intent -- Mr. Rolston's intent when he was examining

2   Ms. Alexander.

3           But you should ignore any suggestion that anyone else

4   out there has done anything.  You hadn't heard anything about

5   what they did, or when they did it, and so forth.  And as I say,

6   it has nothing to do with this case.  So please just ignore it.

7           Mr. Johnson, you may proceed.

8   BY MR. JOHNSON:

9   Q.   Mr. Rolston, why were you transferred from the women's

10  prison to the men's side?

11  A.   I was -- I moved to the FCI mens because there was an

12  active investigation.

13  Q.   What was the active investigation you are talking about?

14  A.   I believe -- I think it was Ashlee Barnett.

15  Q.   Okay.  And did you move back to the women's unit?

16  A.   No.  I opted, and would like to stay, at the men's

17  facility.

18  Q.   Why would you like to stay at the men's facility?

19  A.   I would like to stay at the men's facility because I feel

20  it's safer for me.

21  Q.   It's safer for you?

22  A.   Yes.

23  Q.   Why is it safer for you at the men's unit?

24  A.   Because there were false allegations leveled at me.

25  Q.   Okay.  Have you done anything to redress the false

1  allegations?

2  A.   Yes.  Well, the procedure is any allegation is taken as

3  serious.  The officers are moved to a different location and

4  then a full investigation takes place, which is not my effort to

5  redress it.  The effort is for the institution to thoroughly

6  research it, investigate it, and if they find any criminal

7  problem, prosecute it.

8  Q.   Okay.  Have you made a complaint against the women who

9  complained about you?  Have you said:  There is a conspiracy to

10  make false allegations against me?

11  A.   I don't know why the false allegations were made about me.

12  I can only guess, and I wouldn't guess sitting here in court.

13  Q.   Okay.  That was not my question.  My question was, have you

14  done anything about it?

15  A.   I guess I don't understand the question.  I don't feel I

16  have the power to do anything about it.

17  Q.   Okay.  Is it not a violation to make a false statement

18  under oath, for an inmate to do that?

19  A.   It is.  And they routinely get away with it constantly.

20  Q.   Okay.  And is there a system through which you can say:

21  This inmate made a false allegation against me.  I'm making a

22  complaint.  I'm making a formal complaint.  I want the false

23  allegation investigated and some discipline proposed.

24  A.   In my experience, it is never followed through on, nor

25  punished, particularly in this context because every person who

1  says anything happened has a right to be heard.  And as an

2  officer I, unfortunately, just need to sit down and shut up and

3  let the process take place.  And that is exactly what I did.

4  And I didn't want to do anything that looked like retaliation.

5  So I just sat down and let this process carry itself through.

6  Q.   Have you talked to anybody about bringing a suit for

7  slander, defamation, liable, something like that, about --

8            THE COURT:  Sustained.

9            MR. CARTER:  Objection, Your Honor.

10           THE COURT:  I sustained the objection.

11 BY MR. JOHNSON:

12 Q.   Putting aside whether you have talked to anybody about it,

13 have you taken any action towards suing for defamation?

14           MR. CARTER:  Objection, Your Honor.

15           THE COURT:  Sustained.

16 BY MR. JOHNSON:

17 Q.   Are you also an officer in addition to your medical role?

18 A.   Yes.

19 Q.   And what do you do in your capacity as an officer when you

20 do it?

21 A.   Sometimes they are so short staffed they will ask us to

22 cover other positions.  And there is also my capacity, as a

23 special operations team member, with SWAT.  So could you specify

24 which role you are speaking about?

25 Q.   Well, do you guard the perimeter?

1    A.   I have when they have been in critical shortage.   Yes.

2    Q.   Is that a gun-carrying role?

3    A.   That is the only gun-carrying role outside of the

4    institution.

5    Q.   Okay.   Is there -- do you mean to imply that there is a

6    gun-carrying role inside the institution?

7    A.   No, sir.   I guess I misspoke.   I am implying the opposite.

8    There are zero guns within the institution, nor within sight of

9    any of the residents -- the inmates.

10    Q.   Except for the perimeter?

11    A.   The perimeter is not within sight and they are not

12    brandishing weapons, sir.

13    Q.   Okay.   What kind -- do they drive?

14    A.   They are in a roving vehicle with blacked out windows.

15    Q.   Okay.   Have you ever worked the compound?

16    A.   I have never been a compound officer, no.

17    Q.   Now, with respect to Charnesha Alexander's visit notes that

18    we looked at for a long time, why did you keep that file open

19    for four hours?

20    A.   Because I was incredibly busy, I'm sure.   I don't recall

21    that specific day, but unfortunately I think you would find I

22    had a number of notes that were kept open to the end of the day,

23    often after count when the inmates would return back to the

24    cells.   This was the only time I was left alone in order to

25    document and chart.   So I would even stay late on my time to do

1  so.

2  Q.   Have you ever had -- well let me ask you this.

3       What conversation did you have with the superiors about

4  them moving you to the men's prison?

5  A.   None.  They would -- they would dictate and I follow the

6  order.

7  Q.   Who gave the order?

8  A.   I don't recall.  I believe it probably came through my

9  supervisor, but I'm sure -- again, there is a procedure that I'm

10  not involved with, with SIS.  So SIS probably initiated the

11  entire protocol that they do every time for any allegation and

12  that triggered it.  But I don't know.  I don't recall, sir,

13  specifically.

14  Q.   How did you find out that you were moved?

15  A.   Someone told me.

16  Q.   You don't remember who?

17  A.   No, I do not.

18  Q.   So it was oral?

19  A.   I believe so.

20  Q.   How did you find out that it had to do with Ashlee Barnett?

21  A.   I don't recall.

22  Q.   Was it a big deal?

23  A.   Any allegation is a big deal.  But they conduct

24  investigations.  And even when you go to Glynco, they say:

25  Look, this is just part of working in corrections.

1  Q.   Did you suffer reputational damage from being transferred

2  on an allegation of sexual misconduct?

3           MR. CARTER:  Objection.

4           THE COURT:  Sustained.

5  BY MR. JOHNSON:

6  Q.   Did you have any communications with your peers about being

7  transferred?

8  A.   My peers certainly noticed that I was working at the FDC.

9  I have no specific knowledge, but I'm certain.

10 Q.   Did you have conversations with them, was my question.

11 A.   Forgive me, sir.  What I'm saying is, yes, I am certain I

12 probably had some degree of conversation.  But I do not

13 specifically recall anything in particular.

14 Q.   Okay.  Did you make any protest about the transfer?

15 A.   I follow orders and I did what I was told.  Whether I felt

16 happy or sad about it, I don't recall, but I doubt I was happy.

17 Q.   Okay.  I didn't ask if you were happy or sad.  I asked if

18 you made a protest.

19 A.   I am not sure what you are referring to as protest, but I

20 guess I did not.

21 Q.   Did you ever write anything about your transfer?

22 A.   Not that I can specifically recall.

23 Q.   Did you ever go to Charnesha Alexander's living quarters?

24 A.   Sir, are you saying did I go to the SHU, the Special

25 Housing Unit?

1  Q.   Yeah.  The part of the SHU where she roomed, the room where

2  she roomed.

3  A.   No, I was never in her room.

4  Q.   Were you at the door of her room?

5  A.   I definitely was at the door of her room the day I went to

6  talk to her about her medical complaint.

7  Q.   And were you at the door of her room after performing the

8  exam?

9  A.   Not that I recall.  Definitely not at her particular door.

10  I might have been -- again, I might have been in the SHU either

11  attending to other medical business, or occasionally we would be

12  short-staffed and I would be assigned to go cover what's called

13  SHU round which means you walk into both wings and sign the book

14  that we walked through.

15  Q.   Did you go there to have a discussion about her crying in

16  your examining room?

17  A.   Absolutely not.  And, sir, let me be clear, I am not

18  conceding I went.  I don't recall.

19  Q.   Okay.  Was Ms. Alexander on her menstrual period the day

20  you examined her?

21  A.   I don't recall off the top of my head.  I believe the

22  medical record said she might have been.  I don't recall

23  specifically.

24  Q.   What is your practice performing a pelvic exam when the

25  woman is having her period?

1    A.   The steps are the same as I described.

2    Q.   Okay.  Do you ever turn a woman away because she is on her

3    period?

4    A.   I would give them the option.

5    Q.   Do you ever initiate a delay because of a period?

6    A.   Sir, I've some hearing damage so I didn't hear what you

7    just said there.

8    Q.   I said, Do you ever, on your known initiative, delay

9    performing an examination because a patient is on her period?

10   A.   I would give the patient the option and if they said they

11   are uncomfortable I absolutely would.

12   Q.   Let me show you what's been marked as Plaintiff's 83.3.

13        Do you recognize this document, sir?

14   A.   Yes.  It appears to be a federal email.

15   Q.   Okay.  What are you doing in this email?

16   A.   I am speaking about inmate 42809074, and talking about a

17   pap.

18   Q.   Okay.  And are you saying that because she is on her period

19   she will have to be rescheduled?

20   A.   I believe I am saying that she didn't want it because she

21   was on her period.

22   Q.   Can you point me to where it says something about her

23   wants?

24   A.   Sir, this is obviously a very short email.  What I wrote

25   doesn't say everything.  I don't know the context.  I don't know

1   the patient's name.  I don't know anything about this note other

2   than I'm talking about scheduling a pap first thing Thursday.

3             MR. JOHNSON:  I would like to move for admission of

4   Exhibit 83.3, Your Honor.

5             MR. CARTER:  No objection.

6             THE COURT:  Plaintiff's 83.3 is admitted.

7             (PLAINTIFF EXHIBIT 83.3:  Received in evidence.)

8   BY MR. JOHNSON:

9   Q.   Do you recall telling Mr. Carter that you went through PREA

10  training not only orientation but every year thereafter?

11  A.   I remember that being my testimony earlier today.

12  Q.   How important is that PREA training to you?

13  A.   All training at the bureau says -- we go through is

14  important and that's critical training.

15  Q.   Do you think it's important to be timely with it?

16  A.   Are you asking me if it's important that the course is

17  offered timely, or -- I am not quite sure what you're saying.

18  Q.   Well, what else could be timely about the training?

19  A.   Sir, there are different types of PREA.  Some PREA is

20  taught to us and some PREA you log on, online.  There are times

21  when you may log on online and it hasn't been put in your queue

22  and in that event you will later receive an email prompting you

23  that on the learning system for the Federal Bureau of Prisons

24  there is something for you to do.

25            So, that -- I apologize.  That's -- you may not recognize

1  that there is different ways to deliver this, and the delay that

2  you are referring to might have been that I hadn't gone online

3  to do it that year yet, or that it wasn't offered yet.

4  Q.   This is Plaintiff's Exhibit 83.2.  Do you recognize this?

5  A.   I do.  This is from the manager -- this is another federal

6  email from the manager of the health service unit to Dr. Yutzy,

7  Paul Rolston, myself, Nurse Practitioner Morgan, Nurse Payntor,

8  Nurse Fairchild, and Nurse Baker, telling us that we need to

9  complete PREA training that year.

10  Q.   So you were late doing it; right?

11  A.   It was late being received, yes, sir.  I don't know if this

12  was due to my delay, or -- but it does appear to be late.  Yes,

13  sir.

14        MR. JOHNSON:  I would like to move for admission of

15  Exhibit 83.2 Your Honor.

16        MR. CARTER:  We would object to relevance.

17        THE COURT:  Sustained.

18  BY MR. JOHNSON:

19  Q.   What is your belief about why Ms. Alexander says that you

20  touched her inappropriately during the examination?

21        MR. CARTER:  Object.

22        THE COURT:  Sustained.

23  BY MR. JOHNSON:

24  Q.   Do you think there was a conspiracy against you?

25        MR. CARTER:  Objection, Judge.

1    THE COURT:  Sustained.

2    MR. JOHNSON:  That's all, Your Honor.

3    THE COURT:  Redirect?

4    MR. CARTER:  Yes, sir, Your Honor.

5                REDIRECT EXAMINATION

6  BY MR. CARTER:

7  Q.  Mr. Rolston, you were asked about conducting Pap smears

8  while patients are on a menstrual period.  Is that something

9  that is done if clinically it's called for based on

10 presentation?

11 A.  Yes.  And, again, if I am going to place my female patient

12 in an uncomfortable position of having a pap, if I can attempt

13 to get a sample, I will.  And as Dr. Tucker said yesterday,

14 sometimes that can be a problem with the sample, but usually the

15 problem is just that the sample doesn't give us a result.  If it

16 turns out positive, positive is still very relevant.  It's not

17 suddenly like they were on their period so the positive test

18 result is invalid.  It's the opposite.  So we may have a false

19 negative, but we don't have a false positive.  And a positive is

20 significant.

21 Q.  So, if it's medically necessary, and your clinical judgment

22 calls for the need for it at that time, is that when you make

23 the decision to go forward with the Pap smear?

24 A.  Yes.  And not only if it calls for it, I attempt to do as

25 much as I can at that time, while I am doing that visit, because

1  there is no harm.  It's an extra, you know, five seconds to get

2  the sample.

3  Q.   Okay.

4       And the science behind doing it, or not doing it when a

5  patient is on her menstrual period, has that changed over the

6  years?

7  A.   It has.  It used to be forbidden, that you didn't do it.

8  It used to be that you didn't do it.

9  Q.   Because it affected the test itself?

10 A.   We didn't have as accurate testing then.  So it wasn't

11 going to have as much of a benefit.  Where now the testing

12 results are -- as Dr. Tucker said yesterday, the testing results

13 are better.

14          MR. CARTER:  No further questions.

15          THE COURT:  Thank you, Mr. Rolston.

16          You may step down and return to counsel table.

17          Please call your next witness.

18          MR. CARTER:  We call Dr. Laura Preston.

19      **DR. LAURA PRESTON, DEFENDANT WITNESS, DULY SWORN**

20          THE COURTROOM DEPUTY:  For the record please state

21 your full name and spell your last name.

22          THE WITNESS:  Laura Lorene Preston P-r-e-s-t-o-n.

23          THE COURT:  Thank you, Dr. Preston.  You may have a

24 seat.  If you are comfortable on the witness stand, and

25 distanced from everybody, you are welcome to take your mask off

1   to testify.

2                       DIRECT EXAMINATION

3   BY MR. CARTER:

4   Q.   Good afternoon, Dr. Preston.

5        What is your profession?

6   A.   I am a physician.

7   Q.   Do you have a particular specialty that you practice, or

8   practice in?

9   A.   Internal medicine.

10  Q.   And were you in private practice in Tallahassee?

11  A.   I was in private practice for 26 years.

12  Q.   Okay.  And that was internal medicine family practice?

13  A.   Internal medicine.

14  Q.   Okay.  In your 27 years of being in practice did you have

15  occasion to work with physicians' assistants in your practice?

16  A.   Yes.

17  Q.   That's a regular part of your practice?

18  A.   Yes.

19  Q.   You would be supervising a PA?

20  A.   Yes.

21  Q.   Was there a time where you worked at the FCI Tallahassee

22  prison?

23  A.   Yes.

24  Q.   What was that time period?

25  A.   About 2015, about February -- I think it was February 2015

1  until October 2016.

2  Q.   Okay.

3  A.   Something like that.

4  Q.   What was your position at FCI Tallahassee?

5  A.   I was clinical director there.

6  Q.   What does a clinical director do?  That's in the medical

7  office; correct?

8  A.   Yes.  Clinical director of the medical department.

9  Q.   What would you do as clinical director of the medical

10 department?

11 A.   I had both patient care and administrative duties.  So

12 patient care, we did -- the doctors did the chronic care visits

13 where the patients would come in once a year, and then six

14 months later they would see a PA.

15 Q.   So PAs do some chronic care?

16 A.   Yes.

17 Q.   But once a year a doctor is going to see an inmate for

18 medical attention?

19 A.   Correct.

20 Q.   And you said administrative duties.  Did you oversee staff

21 in the medical office?

22 A.   Yes.

23 Q.   Did you oversee midlevel providers?

24 A.   Yes.

25 Q.   Also called PAs?

1   A.   Yes.

2   Q.   Did your oversight during the period that you worked there

3   include Mr. Rolston?

4   A.   Yes.

5   Q.   As the clinical director would you review notes and cosign

6   notes that the midlevel providers would do in their medical

7   encounters with the patients?

8   A.   Yes.

9   Q.   And that would include Mr. Rolston?

10  A.   Yes.

11  Q.   When you are reviewing and cosigning -- reviewing his

12  notes, that's different than cosigning them; right?

13  A.   You review them before you cosign them.

14  Q.   So it is all the same?

15  A.   Yes.

16  Q.   When you cosigned the notes of Mr. Rolston, would you be

17  reviewing them for his ability to assess a patient?

18  A.   Yes.

19  Q.   Are you looking at his -- the complaints that the patient

20  is making, and the issues that are being presented to him as a

21  physician assistant?

22  A.   Yes.

23  Q.   And are you looking at his ability to interpret the

24  complaint and use his clinical judgment?

25  A.   Yes.

1  Q.   Did you, during the time that you were clinical director,

2  did you ever have any question about his notes on a regular

3  basis?

4  A.   No.

5  Q.   Did -- as far as you are concerned, as an administrator and

6  clinical director, did Mr. Rolston's notes accurately reflect

7  the encounters with the patients?

8  A.   Yes.

9  Q.   Were you ever able to actually watch Mr. Rolston interact

10  in the medical office and interact with patients and staff?

11  A.   Yes.

12  Q.   Describe Mr. Rolston's work, based on your observations of

13  regularly seeing him and cosigning his notes?  How would you

14  describe it?

15  A.   Very thorough, compassionate, caring, knowledgeable.  An

16  excellent physicians' assistant.  And I was very happy to work

17  with him.

18  Q.   Was he a hard worker?

19  A.   Yes.

20  Q.   Would he stay after hours to get things done?

21  A.   Yes.

22  Q.   And that's a busy practice; isn't it?

23  A.   Yes.

24  Q.   In your experience, the number of patients that go through

25  that medical office is a pretty large number; isn't it?

1   A.   Yes.

2   Q.   So, the midlevel providers, the PAs, are pretty busy;

3   right?

4   A.   Yes.

5   Q.   In your experience, do clinical providers sometimes have to

6   sign their notes after they see a patient and finally get a

7   break in the day and they update notes?

8   A.   Yes.

9   Q.   Is that an unusual practice?

10  A.   No.

11  Q.   How would you compare Mr. Rolston as a PA with others that

12  you have worked with in your career?

13  A.   I would say he is the best I have ever worked with.

14  Q.   At any point in time, as clinical director, did you ever

15  see Mr. Rolston act inappropriate with a patient?

16  A.   No.

17  Q.   Did you ever see him act in a sexual way with a patient?

18  A.   No.

19  Q.   Did you ever see -- did you ever observe him using gloves

20  on a breast exam?

21  A.   Yes.

22  Q.   All right.  Is that normal or unusual, or how would you

23  describe that?

24  A.   It's not something that I do, but it's certainly

25  appropriate in the setting.

1  Q.   And it's nothing -- there is nothing wrong with it?

2  A.   Nothing wrong with it.

3  Q.   But not all providers do that; do they?

4  A.   Not on a breast exam.

5  Q.   Right.  As to the pelvic exam or rectal --

6  A.   Everybody uses gloves.

7  Q.   But as to the breast exam it's not required to wear gloves?

8  A.   Right.

9        MR. CARTER:  Dr. Preston, thank you.

10       THE COURT:  Cross-examine?

11                   CROSS-EXAMINATION

12  BY MR. COOK:

13  Q.   Good afternoon.

14       I want to ask, what is the purpose for cross-gender

15  intimate examination to have a chaperone?

16  A.   Well, we had chaperones for every gender, both genders, to

17  help prevent any kind of misunderstandings.

18  Q.   Okay.  Or inappropriate behavior?

19  A.   That -- I don't think that was ever thought of as far as

20  providers.  It was just for someone to document an exam that was

21  done on an undressed patient.

22       MR. COOK:  If I could show this to the witness, Your

23  Honor.

24  Q.   Dr. Preston, do you remember having your deposition taken

25  on January 27, 2020?

1  A.   Yes.

2  Q.   Do you recall being asked, quote, "Are there any policies

3  at the prison governing gynecological treatment that are

4  safeguards against inappropriate behavior."

5       What was your answer?

6  A.   "Chaperone."

7  Q.   Thank you.

8       Now, is it important for a chaperone to be able to see

9  what's going on?

10  A.   There were never any guidelines on how a chaperone should

11  be seated, but usually a chaperone is available to witness any

12  kind of examination.

13  Q.   And they should be witnessing exactly what the doctor or

14  the medical provider is doing; shouldn't they?

15  A.   That would be ideal.

16  Q.   And, in fact, that's why they are there?

17  A.   Correct.

18  Q.   They are watching to see what's going on?

19  A.   Correct.

20  Q.   So would it ever be appropriate to have a chaperone

21  standing where they couldn't see a Pap smear exam being

22  conducted?

23  A.   Probably not ideal.  I wouldn't say inappropriate.

24  Q.   Would that, in fact, be against the very purpose?

25  A.   Probably not ideal situation.  Okay?  But, I don't think

1    that medical assistants were ever trained in any manner about

2    where they should stand.

3    Q.   That wasn't part of their training?

4    A.   I don't think so.

5    Q.   Now, I believe that -- I believe that it was suggested that

6    pelvic exam and a Pap smear are the same thing.  Are they?

7    A.   No.

8    Q.   Okay.  Tell me what is peculiar about a Pap smear.

9    A.   A Pap smear -- you use -- you are doing a pelvic

10   examination, usually with a speculum, to look at the external

11   and internal areas of the pelvis.  And, a pap test is addition

12   of a tool, like a little broom, or a spatula, to collect some

13   cells from the cervix that would be looked at under the

14   microscope to see if there is any cancer.  So a pap test can be

15   part of a pelvic exam.

16   Q.   That is directed at the cervix; correct?

17   A.   Yes.  Unless there is other, you know -- they are looking

18   for sexually transmitted diseases and there might be something

19   to the side of the cervix.

20   Q.   Okay.  But that would be a different kind of test; wouldn't

21   it?

22   A.   It's at the same time.

23   Q.   Right.  It's at the same time but it's a different test;

24   right?

25   A.   Correct.

1    Q.   Okay.  And so if you are doing a Pap smear you are taking a

2    specimen from the cervix; correct?

3    A.   Correct.

4    Q.   Now, do you know whether palpation of the clitoris is part

5    of any medical procedure?

6    A.   It is not.  Unless a patient said:  I am having a problem

7    at my clitoris, at which point it would be indicated.  It's not

8    part of the routine exam.

9    Q.   That brings me to this question, we understand that there

10   can be complaint-based examinations and there can be well woman

11   examinations.

12   A.   Correct.

13   Q.   And well woman examinations are pretty well formatted;

14   right?

15   A.   Yes.

16   Q.   And at FCI Tallahassee, where you worked, there were basic

17   rules about when and how you do a Pap smear; correct?

18   A.   Guidelines.

19   Q.   Guidelines?  Okay.

20        When you have guidelines for practitioners are they

21   optional?

22   A.   They are usually followed.

23   Q.   Okay.  So, what you were just talking about, if there is

24   palpation of the clitoris, because there is a complaint to which

25   that action relates, then that would be one thing.  Is that not

1   the case?

2   A.   Correct.

3   Q.   And if it were an examination that was simply:  It's time

4   for your Pap smear.  This is how we do it, then it's not a

5   palpate the clitoris?

6   A.   Correct.

7   Q.   And even if the clitoris is visually examined as part of

8   the examination, you don't touch it?

9   A.   Correct.

10  Q.   And you don't rub it?

11  A.   Correct.

12  Q.   And you don't rub it in a circular motion until it's

13  aroused?

14  A.   Correct.

15  Q.   Thank you.

16       Just to be clear, you are saying that touching a clitoris

17  is not part of a routine pap exam?

18  A.   Correct.

19  Q.   Unless, or let's not say routine.  But if there were a

20  complaint-based exam to which that were addressed then it would

21  be; is that right?

22  A.   Correct.

23  Q.   And, in that case, would the practitioner specifically

24  alert the patient that they intended to do that before doing it?

25  A.   Again, it would be ideal.  Yes.

1   Q.   Is there a part of the pap exam -- well, let me withdraw

2   that question.

3       What was the rule in terms of the frequency of Pap smears?

4   A.   Okay.  In the past it used to be once a year.

5   Q.   Okay.

6   A.   Then over the past 10 years, or more, they changed the

7   frequency to every three years if you weren't getting an HPV

8   test, or every five years if you had a negative human

9   papillomavirus test.

10   Q.   And were those the Bureau of Prisons rules?

11   A.   Guidelines, yes.

12   Q.   Okay.

13   A.   That's for routine.

14   Q.   Okay.  And how about speaking for within the past five

15   years, or so, is there a policy on rectal exams?  Was that part

16   of a routine?

17   A.   We used to do them, yes, every year as part of a routine.

18   Q.   At the Bureau of Prisons?

19   A.   I don't know, because I wasn't doing the pelvic exams at

20   the prison.  But it is part of a routine physical exam.

21   Q.   Now, do you recall -- do you recall Paul Rolston conducting

22   an unchaperoned clinical visit?

23   A.   No.

24   Q.   You never heard about that?

25   A.   You said do I recall him doing it?  I don't.

1  Q.   No.  Hearing about it.

2  A.   I recall seeing a document where a chaperone was not

3  documented.

4  Q.   Okay.  Is that one of the things that is routinely done to

5  go over medical records and check on things like that?

6  A.   I probably wouldn't have noticed it -- that it was missing.

7  Q.   How did you find out?

8  A.   The lawyer for the Bureau of Prisons for the government

9  showed it me.

10        MR. CARTER:  Objection, Your Honor.

11        THE COURT:  Sustained.

12  BY MR. COOK:

13  Q.   But that did involve Paul Rolston; correct?

14  A.   Yes.

15  Q.   You mentioned -- you mentioned that doing a breast exam

16  with gloves is something that is -- that can be done.  It's not

17  what you do, but it can be done?

18  A.   Correct.

19  Q.   Is that your testimony?

20        And typically a breast exam is done with pads of three

21  fingers; is that correct?

22  A.   Yes.

23  Q.   And is that because these are the most sensitive-feeling

24  surfaces that can be brought to bear?

25  A.   Yes.  It's a way that we learned how to do it.

1   Q.   And because of the sensitivity; is that correct?

2   A.   Certainly.

3   Q.   So you wouldn't, for instance, do a breast exam through

4   someone's clothing; would you?

5   A.   No.

6   Q.   And would it then be analogous to say that you shouldn't do

7   it with gloves on your hand?

8   A.   No.

9   Q.   That's not --

10  A.   No.

11  Q.   So that's okay?

12  A.   Yes.

13  Q.   What years were you and you may have said this and I

14  apologize -- what years were you the clinical director?

15  A.   February 2015 to the end of October 2016.

16  Q.   And during that time did you -- during that time did you

17  receive any indicator of complaints about Paul Rolston doing

18  inappropriate examinations?

19  A.   No.

20  Q.   Was your second-in-command Harold White?

21  A.   The medical department had an administrative side and a

22  clinical side.  So, the administrative side he was the

23  second-in-command.  But I was the clinical director and there

24  was a co-administrative director.

25  Q.   So, if someone came to him with a complaint, or complaints,

1    about inappropriate behavior by Paul Rolston in terms of --

2             THE COURT:  Sustained.

3    BY MR. COOK:

4    Q.   He didn't report to you?

5    A.   No.

6             MR. COOK:  Okay.  No other questions, Your Honor.

7             THE COURT:  Redirect?

8             MR. CARTER:  Yes, sir.

9                        REDIRECT EXAMINATION

10   BY MR. CARTER:

11   Q.   Dr. Preston, the policy at the BOP was to have a chaperone

12   present; correct?

13   A.   Correct.

14   Q.   For any intimate examination?

15   A.   Correct.

16   Q.   And in your experience, as supervisor and overseeing

17   Mr. Rolston, did he follow policy?

18   A.   Yes.

19   Q.   And if something is not documented in every single record,

20   like a chaperone, is that something that means it didn't happen?

21   A.   No.  Could have been an oversight in documentation.

22   Q.   You were asked about frequency of Pap smears.  If a patient

23   has a presentation or a complaint that is being looked into,

24   does that change the whole --

25   A.   Yes.

1   Q.   -- timing of when a Pap smear, or a pelvic exam, or the

2   whole testing could be done?

3   A.   Yes.  It could be a complaint, or it could be a history of

4   an abnormal pap test that needs followup more frequently.  So it

5   could be every six months.

6   Q.   You mentioned the HPV.

7   A.   Correct.

8   Q.   What is that?

9   A.   Human papillomavirus can cause cancer.

10  Q.   Paying attention to that is very important?

11  A.   Correct.

12  Q.   Is the inmate population, during your time as clinical

13  director, was it part of BOP policy, or at least guidelines, to

14  recognize the fact that the inmate female population had high

15  incidents of cervical cancer compared to the community and STDs?

16  A.   I don't know about a high rate of cervical cancer.  There

17  was a high rate of HPV.  Abnormal paps.

18          MR. CARTER:  Okay.  Thank you, Dr. Preston.

19          THE COURT:  Thank you, Dr. Preston.  You may step

20  down.

21          THE WITNESS:  Thank you.

22          THE COURT:  Please call your next witness.

23          MR. CARTER:  We will call Dr. Joann Holoka.

24          MR. COOK:  Your Honor, may we talk?

25      (Following conference held at sidebar at 2:27 PM.)

Redirect Examination - Dr. Laura Preston

1  MR. COOK:  Your Honor, we requested an address for

2  this witness and we never got a good address.  I don't think we

3  got an address at all.

4  THE COURT:  Let me ask you this, why are we bringing

5  this up wasting the jury's time when this could have been

6  brought up over lunch, at the break, this morning, last night,

7  any time during the trial?

8  MR. COOK:  Yes, Your Honor.  I just learned that she

9  was -- I knew she was on their list, but --

10  THE COURT:  What do you want me to do now?

11  MR. COOK:  I would like you to exclude the witness.

12  THE COURT:  On what basis is that?

13  MR. COOK:  That we were never allowed to find out how

14  to reach her.  I don't think she was listed.  She wasn't listed

15  by Rolston.  She -- I don't think she was --

16  THE COURT:  Let me tell you this, if she was not on

17  their witness list I am going to exclude her.  Is she on their

18  witness list?

19  MR. COOK:  No.  26(a)(1) disclosures she wasn't.

20  THE COURT:  Is she on their witness list?

21  MR. COOK:  Yes.

22  THE COURT:  The objection is overruled.  We will talk

23  about it later.

24  MR. COOK:  Thank you, Your Honor.

25  **DR. JOANN HOLOKA, DEFENSE WITNESS, DULY SWORN**

1      COURTROOM DEPUTY CLERK:  Please state your full name

2  and spell your last name for the record.

3      THE WITNESS:  Okay.  Dr. Joann Marlene Gross Holoka,

4  H-o-l-o-k-a.

5      THE COURT:  Thank you, Dr. Holoka.  You may have a

6  seat.  While you are testifying, if you are comfortable with it,

7  you may remove your mask while you are distanced from everybody.

8                    DIRECT EXAMINATION

9  BY MR. CARTER:

10  Q.   Good afternoon, Dr. Holoka.

11  A.   Good afternoon.

12  Q.   Where do you live, Dr. Holoka?

13  A.   I live in --

14      THE COURT:  Not a street address.  Just a town.

15  BY MR. CARTER:

16  Q.   I'm sorry.  What town do you live in?

17  A.   Inlet Beach, Florida.

18  Q.   Panama City Beach.

19  A.   Inlet Beach.  Panama City Beach.

20  Q.   Panama City Beach.  What do you do there?

21  A.   Well, I am a VA physician at the Seaback (phonetic) in

22  Panama City.

23  Q.   If you can, summarize for us your education background

24  including medical school.

25  A.   Okay.  Well, I am graduate of the University of Illinois

Direct Examination - Dr. Joann Holoka

1    with the bachelor's of science.  I have an MD degree from Rush

2    Medical College in Chicago.  I have done a residency in

3    anesthesiology and obstetrics and gynecology.

4        I am board certified in obstetrics and gynecology.

5        I also did some fellowship training in integrated medicine

6    and I am boarded in that as well.

7        I was in private practice for many years in Illinois, in

8    obstetrics and gynecology practice.  And did integrated medicine

9    as well.

10       And then worked at the FCI for about a year and a half and

11   then transferred over to the VA where I am now practicing.

12   Q.   Well, you summarized all of that very well.

13       Let me ask you a couple of questions related.  You said you

14   were in private practice a very long time.  It was 20 plus

15   years; wasn't it?

16   A.   Oh, yes.  More than that.  Probably -- probably more like

17   30.

18   Q.   Okay.  And you said you were an OBGYN; is that right?

19   A.   Correct.

20   Q.   During the course of being an OBGYN, did you conduct well

21   woman exams, pelvic exams, and breast exams?

22   A.   Yes.  Many.

23   Q.   And did you also supervise physician assistants in your

24   private practice?

25   A.   Not in my private practice, but obviously did at the FCI.

1   Q.   Let's talk about that.

2   A.   Okay.

3   Q.   You said you worked there for a year and a half?

4   A.   Uh-huh.

5   Q.   During the time that you worked there, was Mr. Rolston a PA

6   midlevel provider?

7   A.   Yes, he was.

8   Q.   What was your position at FCI Tallahassee?

9   A.   I was a medical officer.

10   Q.   And as a medical officer, what did you do?

11   A.   I saw patients as well, but I also -- part of my duties was

12   to oversee nurse practitioners and PAs. Worked with nurses

13   closely there as well. And we saw patients at the FCI, in the

14   front were women. And FDC, in the back, was mainly men.

15   Q.   So during that time of observing, part of your duties being

16   observing, did you observe Mr. Rolston in his performance as a

17   physician assistant?

18   A.   Yes, I did.

19   Q.   Were you able to observe his clinical interaction with

20   patients?

21   A.   Yes.

22   Q.   What would be some of the circumstances that you would

23   actually be in the room when he is clinically examining the

24   patient?

25   A.   If he had any questions concerning a particular patient.

1  If he, you know, had -- the patient had some complaints that

2  were a little unusual, or if he had prior -- had done an exam on

3  them he would call me down to look.  Perhaps there was something

4  unusual about the appearance of the cervix, or of the vulva

5  area, or whatever.

6  Q.   So, you would actually -- have you ever observed him

7  performing a pelvic, or an intimate exam like a well woman exam?

8  A.   Yes, I have.

9  Q.   During the time that you observed Mr. Rolston performing a

10  pelvic exam, did you ever see him do anything inappropriate?

11  A.   No.

12  Q.   Did it appear to you, based on your observations, that he

13  knew what he was doing?

14  A.   Absolutely.

15  Q.   And did you ever -- were you there ever on occasion when he

16  was performing a breast exam?

17  A.   Yes.

18  Q.   So the same question; did it appear, based on your

19  experience in observing how he performed breast exams, did it

20  appear he knew what he was doing?

21  A.   Absolutely.  He was an excellent PA.

22  Q.   Did you ever see, observe, him do anything inappropriate

23  during an interaction with a patient?

24  A.   No.

25  Q.   Did you ever see him act in a sexual way with a patient?

1  A.    No.

2  Q.    Did you ever see him sexually abuse a patient?

3  A.    No.

4  Q.    During those occasions when you would observe him, did you

5  ever see him inappropriately touch a female patient's clitoris?

6  A.    No.

7  Q.    How would you describe, from your oversight of Mr. Rolston,

8  the manner in which he worked as a PA?  Did you think he did a

9  good job?

10  A.    Very professional.  Always courteous and polite.  He was

11  that way with everybody in the FCI.

12  Q.    Was he that way with inmates as patients?

13  A.    Inmates, as well as fellow officers.

14  Q.    Do you think he had good clinical judgment?

15  A.    Excellent clinical judgment.

16  Q.    Did you see him be compassionate with his patients?

17  A.    Very caring, very meticulous.  And, again, very courteous

18  and always polite.

19  Q.    In the period of time that you were at FCI, did it seem to

20  be a busy practice?

21  A.    Oh, it was extremely busy there.

22  Q.    And the midlevel providers, the PAs that you oversaw, saw

23  lots of patients every single day?

24  A.    Correct.

25  Q.    And I imagine you were very, very busy yourself?

1  A.   I was as well.  Yes.

2           MR. CARTER:  Thank you, Dr. Holoka.

3           No further questions.

4           THE COURT:  Cross examine?

5                    CROSS-EXAMINATION

6  BY MR. COOK:

7  Q.   Dr. Holoka, is there any reason we wouldn't find your

8  medical license on the Internet in the Department of Health

9  license certification?

10 A.   No.  Un-un (Indicating a negative response) I have no

11 problems at all.

12 Q.   No, I mean are you listed there?

13 A.   Yes.  Uh-huh.

14 Q.   And did you recently go out -- or when I say recently, I

15 mean in the last few years, did you go out to somewhere in the

16 southwest?

17 A.   No.

18 Q.   Okay.  Have you ever resided in Walton Beach, or that area?

19 A.   Yes, I have.

20 Q.   Okay.  Do you still?

21 A.   Yes, that's where I live.

22 Q.   Okay.  So, it's not the Panama City area, it's over --

23 A.   It's Inlet Beach actually.

24 Q.   Is that near the water?

25 A.   Right next to Panama City Beach.  Yeah.

1  Q.  Well, that's not near Walton Beach; is it?

2  A.  Walton County, sir.  It's in Walton County.

3  Q.  It's in Walton County.  Not Bay County?

4  A.  Correct.

5  Q.  Okay.  Now, during the time that you worked with

6  Mr. Rolston, did you ever work in the SHU?

7  A.  Yes.  I -- I had to go over to the SHU many times.

8  Q.  I'm sorry.  I'm listening.  I'm sorry.  You worked with him

9  in the SHU?

10  A.  I would -- I went over to the SHU many times to see

11  patients.  I didn't specifically go over to work with him in the

12  SHU.

13  Q.  Okay.  But, you were there when he conducted examinations?

14  A.  In the SHU, specifically?  I do not recall.

15  Q.  In the SHU, or in the other medical exam room?

16  A.  In the SHU, or the main medical building you mean?

17  Q.  Let's take them one at a time.  Let's start with the SHU.

18  A.  The SHU is a separate building from the main medical

19  building.

20  Q.  And it's a different examination room; isn't it?

21  A.  Yes, it is.

22  Q.  Have you ever been in the examination room with Mr. Rolston

23  when he is conducting a pelvic exam?

24  A.  Yes, I have.

25  Q.  Okay.  Now, I'm going to put up a photograph, if I may.  I

1  believe it's an exhibit.  This would be our 6.4.

2       Do you see that?

3            MR. CARTER:  Your Honor, that's not -- that's not the

4  SHU.

5            MR. COOK:  I'm sorry.  Do you have one for the SHU?

6            MR. CARTER:  Your Honor, would you like me to get it?

7            THE COURT:  If you can cooperate and provide an

8  exhibit that would be great.

9  BY MR. COOK:

10 Q.   Let's do it this way.  Since you have the photograph that I

11 put up, would you tell me if that's the other examination room

12 that he used?

13 A.   This may be an examination room, I believe, that he may

14 have used after there was some damage to the room he was in.

15 Q.   This is Examination Room 2.  Is that the one that you are

16 familiar with?

17 A.   I recognize that it's an exam room in the main building.

18 Q.   And have you ever been in that room with him when he

19 conducted an examination?

20 A.   I recall the exams mainly in the other room that he was in.

21 Q.   Okay.

22 A.   Uh-huh.

23 Q.   There is a function, that I think -- if you indicate a

24 circle where you stood -- that you can show where you stood as

25 he conducted the examination.

1  A.    Well, in the room where I observed his examinations I was

2  literally right next to him.

3  Q.    Okay.  Would you show me where that is on this photograph?

4  I think you can touch the screen with --

5  A.    Well, if -- this is not the room that I was in.

6  Q.    Oh, I see.

7  A.    But, if I was it would be at the end of the exam table

8  where you basically see the footplates where the patient would

9  be placing their feet.  I was literally next to him.

10  Q.    So you are at the patient's feet?

11  A.    Correct.

12  Q.    And you are not to the side?

13  A.    I am beside Rolston -- PA Rolston, but I am literally next

14  to him looking at everything he is seeing.

15  Q.    So you could actually see what is doing with his hands;

16  correct?

17  A.    Correct.

18  Q.    Okay.  And that is -- is that what you understand a

19  chaperone is supposed to do?

20  A.    When I was called down there, sir, I was not a chaperone.

21  There was a chaperone in the room in addition to myself being

22  present.  Because in the FCI we never ever did any pelvic exams,

23  or any exam that would involve any parts of the anatomy, say

24  like breasts, without a chaperone present.  If there was not a

25  chaperone, the exam did not occur.

1  Q.   I apologize.

2       I understood that doctors sometimes even assisted as

3  chaperones, but you were consulting with him?

4  A.   Basically, yes.  If he had a question, or something that he

5  wanted me to see, I would come down and observe him.  If he

6  wanted to show me something, and do a pelvic exam or a breast

7  exam, if he had questions, I was there.

8  Q.   Okay.  And you also did these kind of pelvic exams; right?

9  A.   If I -- if I needed to assist him on that, yes.  Yes,

10  Q.   Did you do them on your own?

11  A.   I actually never had to do -- routine Pap smears were done

12  by PAs and nurse practitioners on the first level.

13  Q.   Okay.  I'm sorry.  I misunderstood.

14  A.   If there were abnormal Pap smears, or things that needed to

15  be interpreted, then I would tell him either, repeat this in six

16  months or this patient needs to go out to a gynecologist for

17  more advanced care.

18       We did not have a colposcope or other instrumentation to do

19  other extensive exams there.

20  Q.   Okay.  When you were either consulting with him, or

21  otherwise involved with a patient, where a chaperone was

22  required, were they where they could see what was going on with

23  his hands?

24  A.   When I was in the room there was a chaperone there, usually

25  they were at the -- well, the times I was there, they were at

1  the head of the table.  And they were supporting the inmate, you

2  know, observing and supporting the inmate.

3  Q.   Okay.  What do you mean by supporting the inmate?

4  A.   Well, that's -- a pelvic exam is -- is a -- can be a

5  difficult exam to go through, you know, having done many, many

6  in my practice.  Some women have quite a bit of anxiety over it,

7  and so forth, so you need emotional support, as well as being

8  there to chaperone the patient and the examiner.

9  Q.   So they should be there to comfort the patient if that need

10 be?

11 A.   Yeah.  Some women are quite anxious over their pelvic exams

12 and breast exams.

13 Q.   At the same time from there, because of the sheet, they

14 can't see what's actually going on in the pelvic exam; correct?

15 A.   No.  Usually the sheet is brought down in between the legs

16 so you can see over and in between the knees, even if you are

17 standing at the head of the table.

18 Q.   So if you are doing it properly then you should be able to

19 see what the physician is -- or what the practitioner is doing

20 with his hands?

21 A.   Absolutely.

22 Q.   So, we've talked about the difference between a well woman

23 exam on one hand, and a complaint-based exam on the other hand.

24 Now, would you say that a Pap smear exam, as part of a well

25 woman exam, as a periodic exam, is a fairly quick operation?

1  A.   Correct.

2  Q.   And then depending on the time frame, there could be a

3  breast exam as well; correct?

4  A.   Well, years ago the well woman exam, I -- you know, it can

5  be a general physical exam, listening to hearts and lungs and

6  everything else.  It always included a breast exam, abdominal

7  exam and pelvic exam, plus or minus a rectal exam depending on

8  the position of the patient's uterus.

9       However, ACOG has now come out with a statement that you

10 don't do breast exam unless there is a complaint issued to the

11 breast, but that's a recent change.  And back, I believe, when I

12 was at the FCI, breast exams were part of regular well woman

13 exams.

14 Q.   Right.  But since -- in the last 10 years the rule has been

15 three to five years; is that correct?

16 A.   For breast exams?

17 Q.   Uh-huh.

18 A.   No.  The breast exams -- it hadn't been that long where

19 they recently said that breast exams are no longer necessary.

20 It's probably more like in the -- I wouldn't say 10 years.

21 Maybe like five.

22      MR. COOK:  Your Honor, this is Defendant's Exhibit

23 31A, I believe, and it's been admitted.

24      If I could show that to the -- and I will take this

25 down here -- show that to the witness.

1    THE COURT:  I am not sure it was admitted.

2    MR. CARTER:  I think there was an objection to it at

3    the time and it was not admitted.

4    THE COURT:  Do you object to it?

5    MR. CARTER:  No.  I don't object to it, Your Honor.

6    THE COURT:  Plaintiff's 31A?

7    MR. COOK:  No.  It's Defendant Rolston 31A page 307.

8    THE COURT:  Defendant's 31A is admitted.

9    (DEFENDANT EXHIBIT 31A:  Received in evidence.)

10   BY MR. COOK:

11   Q.  If you take a look at that, this is part of the 2016-2017

12   Federal Bureau of Prisons RNAPP skills training program.  And

13   let me push it up so you can see all the way down at the bottom.

14   THE COURT:  Maybe I can help move this along.

15   You were asking her about a breast exam.

16   THE WITNESS:  Yeah.  Breast.

17   MR. COOK:  I thought this was both.  Well, anyway --

18   BY MR. COOK:

19   Q.  The Pap smear was going to be my next question.

20   A.  Oh, the Pap smears used to be done a lot more frequently,

21   and there were changes when they introduced the HPV testing.

22   But basically women under 30 are -- basically between 21 and 30

23   you have them every three years, you know, cytology only.  And

24   if over 30, age 30, you would do cytology plus HPV.  However, if

25   they have a history of abnormal Pap smear, or had abnormal Pap

1    smears, you would do them more frequently.

2        Also, depending upon past medical history; say they had

3    HIV, then you want to initially do them every six months and

4    every year.

5        There are different -- if they are immunocompromised in any

6    way, a different disease or background, then you would do them

7    more frequently.

8    BY MR. COOK:

9    Q.    And I understand that there can be special circumstances.

10   But, if a patient, for instance, had a non-abnormal Pap smear

11   six months earlier, and they were over 30, it would not be time

12   for another Pap smear six months later; correct?

13   A.    I would have to see that pathology report, what their

14   background was.  Did they have a history of dysplasia, CIN2 in

15   the past?  What was the prior Pap smear?  Would it indicate that

16   you would be repeating them every six months for a year and a

17   half or two years?

18   Q.    Dr. Holoka, this is a routine Pap smear.

19   A.    So this is a first Pap smear that someone has ever had?

20   Q.    Treat it as a hypothetical.

21   A.    No inflammation, nothing else, and no abnormities at the

22   time seen on the cervix?

23   Q.    Right.  Then it's five years; right?

24   A.    If they are over 30, and they had a negative HPV and a

25   negative cytology and no prior history of any dysplasia or

1  abnormities, on the pap or physically seen, then they could go

2  five years before having their next Pap smear.

3  Q.  Five years, and as far as -- and understand that I am just

4  trying to get you to tell me what the standard is.  Not for --

5  not with various kinds of pathology.  I just want to establish

6  what the standard is now.

7  A.  Yeah.  The problem is that medicine is not an exact

8  science, sir.  It's an art.  And I am telling you I have had

9  patients, depending on their history -- I have no idea what, for

10  instance, sexually transmitted diseases they had.  What was seen

11  at the time of the physical exam.  All of these things make a

12  difference in what you are going to do.

13      Also, we were testing on STDs on those thin preps as well,

14  so if they had a past history of that and if you had anything

15  that you were -- you know, doing your history, or your physical

16  exam, that would prompt you to do it, I would have to say you

17  would have to look at an individual case.

18  Q.  Okay.  So taking this statement, as a standard, without any

19  add-ons, a woman over 32 would normally have -- women over 30

20  would normally have a routine standard Pap smear every five

21  years; correct?

22  A.  Cytology plus HPV.  And that would be based on a negative,

23  totally all normal Pap smears and physical exam prior to that.

24  Q.  Then it could be five years?

25  A.  Then it could be five years depending.

1  Q.   Thank you.  That was my question.

2       So in a routine breast exam would it ever be appropriate to

3  squeeze the nipples?

4  A.   Yes.

5  Q.   Why would that be?

6  A.   Because you are looking for discharge from the nipples.  In

7  fact, that's -- usually that's done.

8  Q.   Isn't that part of a complaint-based exam?

9  A.   No.  Routinely, you know, you do a thorough breast exam.

10 You are always supposed to palpate that area of the areola and

11 squeeze on the breast, on the nipples.

12 Q.   Okay.

13 A.   Uh-huh.

14 Q.   And is it also routine to touch a clitoris in a standard

15 Pap smear exam?

16 A.   No one intentionally touches the clitoris unless there is

17 something abnormal about it, or complaints in that area.  But

18 when you do an exam you have to open the vulva -- the labia

19 majora and minora have to be opened to expose the vaginal

20 orifice to place the speculum.

21      Depending on the anatomy, you are always trying to place

22 that speculum as gently as you possibly can without any trauma

23 to those other folds, which you can catch in the speculum.  And

24 if you open it up when it's caught in there it's going to be

25 painful.

1  Q.   I appreciate that.  Let's get back to my question.  Would

2  it be appropriate, in a routine Pap smear exam, to palpate the

3  clitoris?

4  A.   I don't think, unless there is a reason like you are seeing

5  something there -- like a swelling or a tumorous thing or there

6  are complaints -- you generally try to, you know -- you would

7  have no -- no.  You would not do that.

8  Q.   Okay.  If the clitoris was visually inspected and there was

9  nothing abnormal then there would be no reason to palpate it;

10  correct?

11  A.   And no complaints, no.

12  Q.   Or unless there was something abnormal about the

13  practitioner.

14          THE WITNESS:  Excuse me.  What was that question?

15          MR. COOK:  Nothing.  Your Honor, I withdraw that.

16  BY MR. COOK:

17  Q.   You don't live at Panama City Beach now, do you?

18  A.   I live in Inlet Beach, sir.

19  Q.   Okay.  That's what I thought.

20          MR. COOK:  I have no other questions.

21          THE COURT:  Redirect?

22          MR. CARTER:  Yes, sir, Your Honor.

23                    REDIRECT EXAMINATION

24  BY MR. CARTER:

25  Q.   Dr. Holoka, you were asked a number of questions about the

1  chaperones.  A chaperone is in there in the room assisting the

2  provider by providing tools to do the Pap smear; right?

3  A.    Uh-huh.

4  Q.    And in your experience the chaperone is in a position to be

5  able to do that, to assist the provider?

6  A.    Yes.  If I had not been present, the chaperone would be

7  down by Mr. Rolston to hand instruments -- you know, the thin

8  prep, the sampling device, you know.  If he needed lubricant,

9  they usually open it up and drop it on the fingers for them, or

10 you know, different practitioners do it different ways.  But,

11 yes, they would be there to assist.

12 Q.    The guidelines that Mr. Cook showed you on the screen, that

13 would be for asymptomatic patients who have not had any problems

14 and therefore didn't need a Pap smear in that period of time?

15 A.    Correct.  Because you could have someone with a past

16 history of dysplasia, you are going to be doing Pap smears much

17 more frequently than what was on there.

18 Q.    And you mentioned their history with STDs or HPV.  That may

19 change it; right?

20 A.    Right.  Because we actually do testing for STDs on the thin

21 prep.

22 Q.    You have to say what that is.  That's part of the Pap

23 smear?

24 A.    On the liquid type of Pap smears that are now done.  There

25 are several out there.

1   Q.   It's not only the testing of abnormal cells, like in the

2   old days; it actually does the HPV test, too; right?

3   A.   Right.  It does HPV.  It does chlamydia, it does gonorrhea.

4   Q.   And also there would be a complaint-based presentation by

5   the patient that based on their presentation and their history

6   that may require that type of testing; right?

7   A.   That's correct.

8          MR. CARTER:  Okay.  Thank you, Dr. Holoka.

9          THE COURT:  Thank you, Dr. Holoka.  You may step down.

10         THE WITNESS:  Okay.  Thank you.

11         THE COURT:  Please call your next witness.

12         MS. COLES:  Dr. Wolf.

13    **DR. SAMUEL BRIAN WOLF, DEFENSE WITNESS, DULY SWORN**

14         THE COURTROOM DEPUTY:  For the record, state your name

15   and spell your last name.

16         THE WITNESS:  Samuel Brian Wolf, W-o-l-f.

17         THE COURT:  Dr. Wolf, you may be seated.  While you

18   are testifying, if you are comfortable with it, you may remove

19   your mask.

20                     DIRECT EXAMINATION

21   BY MS. COLES:

22   Q.   Good afternoon, Dr. Wolf.  Can you tell us what you do for

23   a living, sir?

24   A.   I am an obstetrician gynecologist in Panama City, Florida.

25   Q.   Can you tell us a little bit about your medical educational

1  background?

2  A.  I grew up in Panama City, Florida.  I went to Florida State

3  University.  Good to be back home.  And then for medical school

4  I attended Nova Southeastern University.

5      I then did an internship through the Michigan State

6  University, and then did residency University of Florida,

7  Jacksonville.

8  Q.  And, tell us about your practice history.

9  A.  I am a second generation obstetrician and gynecologist and

10  I joined my father's practice in Panama City.  That's why I came

11  home.  And I joined the practice -- at the time it was three

12  partners, and now we have seven, about to be eight, full-time

13  physicians, as well as four midwifes and three nurse

14  practitioners.  It's a very busy private practice.

15  Q.  How long have you been in private practice?

16  A.  Since 2005.

17  Q.  Have you been retained to render an opinion in this case?

18  A.  Yes.

19  Q.  Have you reviewed Ms. Alexander's medical records,

20  particularly the clinical encounter from September the 27th,

21  2016?

22  A.  I did review that over a year ago.

23  Q.  All right.  And can you tell me, generally speaking, what

24  is the customary practice for well woman examinations?  How

25  frequently should well women be getting well woman examinations?

1  A.   Current recommendations -- and remember there is different

2  organizations that make different guidelines.  Okay?  So -- and

3  there is not always consensus on those guidelines.

4       Most OBGYNs tend to go by the guidelines that are produced

5  by the ABOG, which is the American Board of Obstetrics and

6  Gynecology.  And, of course, I am a fellow of that organization.

7  So we tend to go by those guidelines which do suggest an annual

8  preventative visit once yearly.

9  Q.   Would the annual visit include a vaginal examination?

10  A.   Not always.  It does depend on age and circumstances.

11  Q.   Have the guidelines for the frequency of well woman visits

12  changed?

13  A.   There have been organizations, such as the US Preventative

14  Health -- US Preventative -- it's always hard to remember that

15  one -- the US Preventative Health Service Task Force, that's a

16  mouthful; there have been questions as to the validity of annual

17  pelvic exam and annual gynecologic exam; however, both the

18  American gynecologist as well as multiple cancer networks have

19  continued to validate the importance of an annual gynecological

20  preventive health exam.

21  Q.   So there are still organizations that are stressing the

22  importance of an annual vaginal examination and annual Pap

23  smears?

24  A.   Absolutely.  Not annual Pap smear.  Remember a Pap smear is

25  going to be different than an annual pelvic exam.  Not every

1    time a patient comes in for an annual preventative care visit

2    will they be required to get a Pap smear, or even have one

3    offered.  But, once again, those guidelines are kind of all over

4    the place as well.  The sort of classic guidelines for the last

5    10 years, or so, is a Pap smear every three years.

6         Pap smears have gotten a little more complicated with

7    adding HPV testing -- human papillomavirus testing -- so it's

8    allowed us to widen the incidents -- widen the spacing for Pap

9    smear screening.  But, typically, every three years is

10   recommended over the age of 21.

11   Q.   Prior to that change in the last few years, that was the

12   recommendation for Pap smears?

13   A.   Well, if you go kind of back beyond my time -- let's -- I

14   have a unique perspective because I am a second generation

15   OBGYN -- there has been a classic sort of -- in my dad's early

16   time -- Pap smears were annual.

17        You have to remember when Pap smears were first invented --

18   first of all, Pap smears is the most successful screening tool

19   that has ever been implemented in the history of medicine.

20   There is no other cancer that has a screen quite like a Pap

21   smear, for cervical cancer.  And that's purely what Pap smears

22   are designed for is for cervical cancer.

23        So when Pap smears were first invented, around the late

24   1960's, it was simply a wooden spatula that you would scrape the

25   opening of the cervix and you would smear it on that slide and a

1    spray-on fixative would be sprayed onto that, and that would go

2    to a lab where a person would look in the microscope and look

3    for atypia in those cells.

4        Now, even back then there were no certifications for the

5    pathologist that were looking for those.  They were general

6    pathologists.  Nowadays completely different.

7        One, is we have liquid-based paps where now we use a

8    specific instrument that will go into a little liquid container

9    that will filter those cells out, so that the cytopathologist,

10   which now has to be a board certified cytopathologist, will look

11   at those slides and the preparation is completely different and

12   allows for a much more accurate rendering of the diagnosis on

13   that Pap smear.

14       Plus, when you add HPV screening -- HPV is human

15   papillomavirus -- when you add the screening, which is now

16   recommended in 30 years and up, that increases the sensitivity

17   and the specificity of that test through the roof.

18       And for that reason, if you do a pap every single year,

19   like has long -- has always been recommended -- you are really

20   over-screening the patient in the sense that you increase the

21   risk for a false positive.

22       However, there are going to be circumstances -- remember

23   guidelines are guidelines.  There are going to be circumstances

24   where the clinical situation might make that particular

25   practitioner want to do a pap.  So there are a lot of times

1  where patients will come in to me on an annual visit, I will

2  look when their last pap was, and I will say: Your last pap was

3  two years ago.  We will do your pap next year.  But then

4  sometimes the findings on exam will make me a little suspicious,

5  or she might tell me something in the history that makes me --

6  we might want to go ahead and do that.  And at that point, I

7  will certainly tell the patient:  You know, your pap is not

8  really due until then, but then I would explain why I would

9  recommend:  Maybe I can offer you to do this this time as well.

10  That's a long-winded answer.

11  Q.   Thank you.

12      Is there any reason why, if a patient is menstruating, that

13  she would not be able to have a Pap smear or a vaginal

14  examination?

15  A.   As I mentioned in the early days, when paps were in their

16  youth, you really tried to do everything you could do to avoid

17  doing a Pap smear when they are bleeding.

18      Now remember, when a person has cervical cancer or severe

19  dysplasia, they are going to be bleeding irregularly a lot.  So

20  if you say, I'm never going to do a pap on anyone that is

21  bleeding, you are going to miss some cervical cancers.

22      Ideally, when you are trying to do a preventative health

23  visit, you want that patient to not be bleeding.

24      Given the new means, and the new modality of doing Pap

25  smears, it is okay if the patient has light bleeding.  I have

1    done this for 20 years, and I have had very, very few Paps come

2    back with a misdiagnosis or something inaccurate where I have to

3    re-Pap that person.

4    Q.   All right.  Would you agree with me that pelvic exams are

5    still indicated for hysterectomy patients, particularly patients

6    who have a partial hysterectomy?

7    A.   The way I do that -- let's define the terms because there

8    is a lot of misconception.  A partial hysterectomy, in reality,

9    is where you leave the cervix intact and you remove just the top

10   of the uterus.

11        What a lot of patients perceive as a partial hysterectomy

12   is where the uterus completely has been removed but the ovaries

13   have been left intact.  So I will have patients, when I ask them

14   their history they will tell me:  I had a partial.  Wait a

15   minute, you don't have a cervix.  No; they left my ovaries.

16   Okay, where you had a total hysterectomy but they left your

17   ovaries.

18        Yes; so if the ovaries are intact, unfortunately, at this

19   time in medicine we do not have a clinically available test for

20   ovarian cancer.  We simply don't.  The only thing we have is a

21   pelvic exam, a bimanual exam, where the clinician actually feels

22   inside the pelvis, feels the contents of the pelvis.  And even

23   then it's not the greatest test.

24        When they have done studies as to how good is a pelvic

25   exam, it's not that great.  But it's better than nothing, is how

1   most clinicians see it.  And I think if you polled my peers,

2   other, you know, board certified obstetricians and

3   gynecologists, you would find about 99.9 percent of them

4   recommend an annual pelvic exam.

5       Remember even when the ovaries are gone there are other

6   things I have picked up in my career by doing these exams.

7       Now, I am a lot more lenient with the patient.  If they

8   say:  Do we even need to do this?  I will say:  You know, the

9   chances of me finding something are extremely low, but I have

10  found things.  I diagnosed a melanoma, a vaginal melanoma that

11  would never have been looked at.

12      I had a patient also that had a primary cancer of the

13  vagina that would have been completely missed.  By the way, that

14  patient was told she never needed Pap smears again.  Well, she

15  perceived that as I never need pelvic exams again.  So, pelvic

16  exams -- there is utility to pelvic exams.

17  Q.  I'd like to show you what has been previously marked as

18  Plaintiff's Exhibit 1.  If you can read that, Doctor.

19      Do you have any opinion as to whether or not, based on the

20  presentation here, that a pelvic examination was clinically

21  indicated for Ms. Alexander on this date?

22          MR. COOK:  Objection, Your Honor.

23          THE COURT:  Let me talk to you.

24      (Following conference held at sidebar at 3:09 PM.)

25          THE COURT:  Okay.

1      MR. COOK:  Your Honor --

2      THE COURT:  Wait.  Just stop.  Let me just say, she is

3  asking if it's appropriate to do a pelvic exam based on this

4  presentation.  If that's not in his report, it's the worst job

5  of preparing a witness and report in history.  Are you really

6  asserting that her report did not have an opinion about whether

7  Ms. Alexander was appropriate for a pelvic exam?

8      MR. COOK:  No; it's general, Your Honor.

9      MS. COLES:  It says pelvic examination was indicated.

10  Ms. Alexander presented with a vaginal complaint of thick

11  discharge.

12      THE COURT:  All right.  Mr. Cook, I don't get the

13  objection.  I just don't get it.

14      MR. COOK:  I just didn't think that it fairly

15  reflected the opinion that I am looking at.

16      THE COURT:  The objection is overruled.

17      (Sidebar concluded at 3:11 PM.)

18  BY MS. COLES:

19  Q.   Doctor, based on this presentation, was a pelvic exam

20  indicated when Ms. Alexander presented on this date?

21  A.   So, there are multiple things within the first paragraph

22  that I would say absolutely, and that includes complaint of

23  vaginal discharge.  It includes pelvic pain, six to seven out of

24  ten.  And then also pain that's different from her usual pain

25  from having difficulties with hemorrhoidal pain.  And also

1    dysuria which is painful urination would be a reason you would

2    also want to do a pelvic exam.

3        So, yes, I would say it's indicated given those complaints.

4    Q.   And part of a pelvic exam, does it include speculum exam?

5    A.   Yes.

6    Q.   So is a Pap smear taken during the pelvic examination, or

7    the speculum exam part of the bimanual exam?

8    A.   So the bimanual is separate from the speculum exam.  First

9    is the speculum exam, typically.  Sometimes we do the bimanual

10   first in unique situations.  Typically the speculum is used to

11   visualize the contents of the vagina, the cervix itself, and

12   then the speculum -- and if a Pap smear is indicated it will be

13   taken at that time.  And then if -- at that point, when the

14   speculum is removed, we would do a bimanual exam which is where

15   we manually palpate the pelvic organs.

16   Q.   When you do the speculum exam, is that when you would do a

17   Pap smear or any STD testing?

18   A.   Correct.

19   Q.   And based on this patient's presentation, and her history

20   and what's documented in this note, would she have been

21   appropriate -- would you have either done a Pap smear or some

22   type of STD staining or swab on this patient?

23   A.   I would have recommended that.

24   Q.   Okay.  What about offering a rectal exam as part of a well

25   woman?  Is there anything inappropriate with that?

1  A.   Well, I would offer it, but I would tell you we are doing

2  less and less of that now that we have better screening for

3  colon cancer available.  Colonoscopy is sort of the gold

4  standard every 10 years for screening for colon cancer, but we

5  have newer technology, such as Cologuard which can be done every

6  three years.  Most insurance companies will cover for that.

7      There are other reasons to do rectal exams than just

8  screening for colon cancer.  There is evaluating hemorrhoids,

9  evaluating pelvic floor prolapse, for example a rectocele, and

10  that's where -- especially after patients have had more than one

11  baby, where the lower floor of the vagina can herniate -- the

12  rectum can herniate through the vagina into the vagina.  Doing a

13  rectal exam can sometimes differentiate that.

14      Of course, in patients with a history of cancer it's

15  important to do it to evaluate the rectovaginal septum, which is

16  the space and the skin between the rectum and the vagina.  So

17  there are indications to offer that.

18      Now, not every patient is going to agree to that.  But

19  those are things that we should offer.

20  Q.   So, there would be nothing inappropriate about offering a

21  rectal exam during the course of a well woman?

22  A.   No.  In fact, I would even turn it around and say:  If the

23  person showed up with a rectal mass, or a severally bleeding

24  internal hemorrhoid, and they didn't offer that, that could be

25  turned and say, why didn't you do that.

1  Q.   With regard to -- sorry.  I will just put Exhibit 1 back

2  on -- if this patient had presented and indicated that she had a

3  severe bacterial infection for two months, and they had had

4  thick, yellowish discharge, and they had had seven out of ten

5  pain, but they had self-treated with yogurt and felt like they

6  were fine, would you still recommend doing a pelvic examination?

7  A.   I think you are obligated to offer it for sure.  The reason

8  for that is because certain infections, such as chlamydia,

9  gonorrhea, those can present initially with mild symptoms and

10  the symptoms can kind of wax and wane.

11      But the problem with that is you can also develop what's

12  called an ascending infection.  That's where those organisms are

13  able to go through the genital track, through the cervix,

14  through the uterine cavity, out the tubes and into the pelvic

15  cavity, which causes a syndrome or a condition called PID, which

16  is pelvic inflammatory disease.

17      That can cause chronic long-lasting pain.  It can cause

18  infertility.  These patients are in bad shape.

19      PID does not happen overnight.  It takes weeks and weeks

20  for that to build up to that.

21      I think, given the circumstances, you would still offer.

22  Say: Look, I know this is better, but I definitely still

23  recommend we check this out and make sure there is nothing going

24  on.

25      Using yogurt as a probiotic is actually something I would

1   recommend in patients once I have treated -- for example,

2   patients that present with what's called bacterial vaginosis.

3       Bacterial vaginosis is an overgrowth of one type of

4   bacteria that is usually in very, very small percentage in just

5   about any woman's vagina, but it can kind of over-grow,

6   especially with pH changes the acidity base level of the vagina.

7   So you can get these blooms that cause bacterial vaginosis.

8       A lot of times I will treat that with an antibiotic that

9   brings that level down.  And then I will say:  Look, you have

10  had this happen, and to prevent this from happening again, one

11  thing you can do is take -- I say take some plain, Greek yogurt.

12  No sugar added.  No flavoring.  And put a teaspoon of that in

13  your vagina once a week.  And then after that month, go once a

14  month put it there.

15      People may not know but that yogurt is constituted from

16  lactobacillus.  Lactobacilli are the bacteria that are the

17  predominant bacteria in the vagina.  The reason they are called

18  lactobacilli because that produce lactate -- lactic acid -- that

19  keeps the vagina acidic.  The vagina needs to be acidic or these

20  infections occur.

21  Q.   That sounds like that would be more preventative and you

22  would still want to do a vaginal exam on the patient?

23  A.   Correct.  Yes.  Given the symptoms.

24  Q.   Is there anything inappropriate with compressing a

25  patient's nipples during the course of a breast examination?

1  A.    Well, the breast exam is sort of a -- it's a fairly formal

2  procedure.  Okay?  And it's performed by palpating -- there's

3  different ways to do it, but essentially you are palpating at

4  both a soft, kind of medium, and a hard level, up against the

5  rib cage.  And you are feeling all these different quadrants.  I

6  typically go in a circle.

7      The nipple is of course part of the breast, and actually

8  about 20 percent of breast cancers occur from behind the nipple.

9  So the nipple is important to evaluate, especially if there is

10 any sort of complaints of discharge, or anything like that.

11     I think sometimes when you are examining the nipples it may

12 be perceived that you are pinching, or squeezing them, or

13 something like that.  But that's why it's important.

14     Whenever I do these exams, I am talking the whole time to

15 the patient telling them exactly what I am doing.  And usually I

16 am using that opportunity to sort of educate the patient about

17 breast cancer, and sort of delve into their family history as

18 well.

19 Q.    Do doctors and midlevel providers, like PAs, exercise their

20 clinical judgment as to what diagnostic tests, or screens, or

21 treatment might be required for a given patient based on their

22 given presentation?

23 A.    That's the standard of care.

24 Q.    And would you agree with me that reasonable doctors who

25 practice in different specialities, who are in different

1    geographic areas, who work for different employers, may disagree

2    on what the guidelines are or what the standards are?

3    A.    Yeah.  So, if you look at the standard of care, how that is

4    defined, it's a little bit nebulous and it's really defined at

5    the community level.  There is different standards in different

6    communities across America.

7         When I go to meetings I will talk to doctors that are doing

8    things differently than I am doing them.  But when it comes down

9    to it, the standard of care is defined by your peers in the

10   immediate area.

11        I will tell you, as private practices are being bought up

12   and things like that, and more clinicians are being hired by

13   hospitals, they are setting the standard of care and sort of

14   making these:  This is how we do it in our organization, sort of

15   thing.

16        But I still define -- I will tell you, yes, there is

17   variety across the region, across different regions, on what the

18   standard of care is on certain things.

19   Q.    Are guidelines in this field changing frequently?

20   A.    Yes.  I think we all -- you know, every OBGYN would agree

21   that it's almost difficult to keep up with.  In fact, they

22   change at such a rapid level that I literally keep an app on my

23   phone to make sure I am still within the guidelines on certain

24   pap results.

25   Q.    Are you a board certified obstetrician gynecologist?

1  A.    I am.

2  Q.    That's all you do is obstetrician gynecology?  Is that

3  fair?

4  A.    For my profession, yes.

5  Q.    You are not a primary care physician?

6  A.    No.  But I will tell you that I get younger patients with

7  no medical problems that sort of ask me to do that, and I do

8  quite often for them.  If they typically have one or more

9  medical conditions I kind of push them to a primary care.

10  Q.    On the same vein, an OBGYN, like yourself, you are a

11  specialist in the field of obstetrician and gynecology?

12  A.    Correct.

13  Q.    And there are primary care physicians out there, or

14  midlevel providers, like PAs, who are doing primary care --

15         MR. COOK:  Objection.  Leading.

16         THE COURT:  Sustained.

17  BY MS. COLES:

18  Q.    Is primary care a little bit different from say a specialty

19  in OBG?

20  A.    So, I typically would deal with the problem the primary

21  care person finds.  There is lots and lots of primary care that

22  do annual woman's preventative health visits and do Pap smears.

23  Once the problem is found with the Pap smear I will tell you

24  that the preponderance of PAs and nurse practitioners would send

25  that patient on to an obstetrician gynecologist at that point.

1    There are few that would do the next step, which is

2  colposcopy, but that's pretty few -- most of those now, most of

3  the insurance payers, and things like that, won't even do it

4  unless that particular provider has what's called a women's

5  health certificate.

6    We are seeing that more and more, but I will tell you that

7  you don't have to have a women's health certificate to do Pap

8  smear and well woman.  I would say that is part of that standard

9  care.

10  Q.   It sounds like a general practitioner is -- that well woman

11  is one part of --

12         MR. COOK:  Objection, Your Honor.  Leading.

13         THE COURT:  Sustained.

14  BY MS. COLES:

15  Q.   What all does a general practitioner, like a family

16  practice physician, or a PA, if they are treating like say in a

17  prison system you are a PA and you are doing primary care for a

18  female population, what all would you anticipate that they would

19  be dealing with on a daily basis?

20  A.   That's a difficult question to -- I will tell you, you have

21  to take into consideration access to care.  You have more rural

22  areas, and different systems of healthcare delivery, that make

23  it more difficult for that patient to get to an OBGYN.

24    So I think that in those circumstances, nurse

25  practitioners, PAs, and also family practitioners, they have to

1  reach a little more when it comes to providing those services

2  because it's more difficult to get those patients to the

3  specialists.  I don't know if that's what you are asking.

4  Q.   It sounds like you are saying it would be appropriate for

5  them to --

6           MR. COOK:  Objection, Your Honor.  Leading.

7  BY MS. COLES:

8  Q.   Is it appropriate for them to do well woman care?

9  A.   Yes.  In many circumstances.

10  Q.   But OBGYNs would be the specialist in that care?

11  A.   They would followup problems found by the preventive

12  visits.

13           MS. COLES:  All right.

14           THE COURT:  Cross-examine?

15                    CROSS-EXAMINATION

16  BY MR. COOK:

17  Q.   Good afternoon, Dr. Wolf.

18  A.   Good afternoon.

19  Q.   I am James Cook.

20       In looking over your opinion, I see that you start out by

21  saying that you looked at most of the medical records.  Is that

22  to say that you looked at medical records for all of the --

23  Ms. Alexander, and all of the other women that complained?

24  A.   No.

25  Q.   How did you decide which ones to --

1   A.   I reviewed the ones that were sent to me.

2   Q.   Okay.

3   A.   But it was a very large file with a lot of documentation.

4   Q.   I see that you quote in your opinion from Laticia Davis who

5   was a chaperone.  So I presume that you read her affidavits?

6   A.   Yes, sir.

7   Q.   And I think you quoted from two of her affidavits.  So you

8   looked at both of them?

9   A.   Yes, sir.

10  Q.   Okay.

11          MS. COLES:  Outside the scope.

12          THE COURT:  Sustained.

13          MR. COOK:  May we sidebar?

14          THE COURT:  Yes.

15      (Following conference held at sidebar at 3:25 PM.)

16          MR. COOK:  Your Honor --

17          THE COURT:  Let me start by telling you what the rules

18  are, Mr. Cook, to make sure you don't misunderstand.  That

19  expert report is part of the disclosures prior to trial.  That's

20  not in evidence.  It's not going to be in evidence.

21          His testimony is what he said in the courtroom here

22  today.  You may cross-examine within the scope of the testimony

23  he gave.  I don't think he was asked one word about any of the

24  other women.

25          MR. COOK:  Your Honor, it was -- I believe that he --

1    I feel that I should be able to ask him about his report.

2         THE COURT:  No, you cannot.  You can ask him about the

3    testimony he gave here today, and if you need to impeach him

4    with his report, you may.  But there is no rule that says that

5    you can ask about something that came up in discovery, and did

6    not come up here in the courtroom.  You are limited to the scope

7    of the testimony given here today in the courtroom.

8         MR. COOK:  Yes, Your Honor.

9    (Sidebar concluded at 3:26 PM.)

10   BY MR. COOK:

11   Q.   Dr. Wolf, you were asked about the propriety of doing a Pap

12   smear exam during a menstrual period.  And, I believe that you

13   said that it was currently more acceptable; is that fair?

14   A.   Yes, sir.

15   Q.   Okay.  And does that reflect a mild flow or a heavy flow?

16   A.   I think it's going to depend on the clinical circumstances.

17   If there is very heavy flow, you are really not going to get the

18   specimen you really need.

19   Q.   And so your position is that even though Ms. Anderson

20   says -- I'm sorry, Ms. Alexander says she had heavy flow, the

21   assumption you are making is that it was mild flow; is that

22   correct?

23   A.   Well, if the patient is saying that, first of all, it's

24   going to be one of the reasons to do the exam.  Okay?  Now,

25   during the exam the flow might be so heavy that I see during the

1    exam that I might make the decision not to do the pap at that

2    time.  But it might be the other way around.  I say, it's not

3    really bleeding that bad.  I can get an adequate specimen here.

4    Let's go ahead and do this.

5    Q.   Could that be -- is it possible for a heavy flow menstrual

6    cycle to result in an unreadable sample?

7    A.   Yes.  It could potentially make the sample unsatisfactory.

8    Q.   Could that be a reason why no report was ever returned?

9    A.   If a pap was collected, I am not sure why no result was

10   returned on that case.

11   Q.   And where Ms. Alexander says that discharge was resolved,

12   you are opting in favor of believing that there was a heavy

13   discharge such as described in the medical document you just

14   reviewed?

15   A.   So, what -- I will repeat what I said a minute ago which

16   was, essentially, when a patient has a discharge, and then it

17   waxes and wanes -- it gets better -- I'm still going to want to

18   offer that patient an examination, and of course cultures to

19   follow that up.

20   Q.   And let them choose?

21   A.   Yes.

22   Q.   Okay.  I think that you addressed the issue of examining

23   the clitoris; is that correct?

24   A.   In my opinion?

25   Q.   Yes.  Well, in your conversation today.

1   A.   I didn't really address that yet in the conversation.

2   Q.   Okay.  What do you consider the elements of a routine Pap

3   smear exam?

4   A.   Once again, the Pap smear is the test you do during the

5   pelvic exam.  So the Pap smear is not the exam.  The Pap smear

6   is simply a test that's done during that process.  So the

7   examination, a pelvic exam starts with inspection of the

8   external genetalia, and that includes the mons -- it starts with

9   the mons.  Then there is the clitoris.  There is the opening of

10   the vagina, that's the introitus.  There is the vestibule, which

11   is the skin around the introitus.  There is the labia minora,

12   which are the labia just near the opening.  There is the labia

13   majora, which are the slightly larger labia on the outside.  And

14   then the perineum is the bottom part.  You are going to examine

15   all of that.

16      Then the next step would be to do a Pap smear -- I'm sorry.

17   A speculum exam, at which point you might, or might not, do a

18   Pap smear.

19      There are other tests you might decide to do at that time

20   as well, once the speculum is in and you have good visualization

21   of the vagina.  You might choose to do a culture for, like I

22   said, gonorrhea, chlamydia and other pathogens.

23      After that, after you remove the speculum, you are going to

24   visualize the walls of the vagina as you are coming out, and

25   assure that you are not missing something that way.  Usually, at

1  that point, if there is a rectal complaint, or something like

2  that, that's where we would address that as well.

3  Q.   Now, a Pap smear itself, that could be like 30 seconds;

4  correct?

5  A.   The collection of a Pap smear, I would hope, would only

6  take 30 seconds.

7       Now, remember though, getting adequate visualization to do

8  the appropriate Pap smear, that can be the tricky part.  In

9  order to do a Pap smear you have to be able to see the cervix,

10 which you are looking through a speculum looks like a little

11 donut.  And you need to be able to see that.

12      So I think the time-consuming part of collecting a Pap

13 smear is more the speculum exam, and doing that in a way that's

14 not uncomfortable, than the actual collection of the pap.  That

15 takes 10 seconds, if that.

16 Q.   What you were describing, just now, is not really a Pap

17 smear exam.  It's a pelvic exam; is that correct?

18 A.   You do the Pap smear during the speculum portion of the

19 pelvic exam.

20 Q.   Okay.  So the Pap smear is that, and then the other things

21 you were mentioning are a general pelvic exam?

22 A.   General inspection of the pelvis.

23 Q.   So that wouldn't necessarily be part of a well woman exam

24 under the protocols of the prison; would it?

25 A.   I would expect that it would be actually.

1  Q.   Okay.  And then it would be called a pelvic and not a Pap

2  smear exam; correct?

3  A.   You wouldn't call it a Pap smear exam.  Those terms don't

4  go together.  Because the Pap smear is a diagnostic test done

5  during a pelvic exam.

6  Q.   So, when they talk about doing a test for, I guess what

7  they call a Pap test, they are talking about just taking that

8  sample; correct?

9  A.   Right.

10  Q.   And when you talk about the process of inspection of the

11  clitoris you are talking about a visual inspection; aren't you?

12  A.   Visual, but in order to sometimes visualize it there is a

13  manual component to it.

14  Q.   Okay.  If you see something then there is a manual

15  component; correct?

16  A.   No.  Sometimes to facilitate inspection you have to

17  manually separate the labia part to visualize it.

18  Q.   You may have to separate parts of the labia to visualize

19  the clitoris, but you don't have to palpate the clitoris itself;

20  do you?

21  A.   Not usually.  If you can adequately see it.  Now, if you

22  discover there is a problem, or a concern, you would.

23  Q.   Okay.  And -- I guess I'm trying to figure out whether

24  there isn't a difference between what they call a well woman

25  exam and a complaint-based exam?

1  A.    There is.

2  Q.    And so would those deeper, more invasive, parts of the

3  examination tend to be complaint based?

4  A.    I think that you are going to do sort of a standard -- on a

5  well woman exam, if they have no complaints, you are going to do

6  a standard thorough examination.  But if you are doing a

7  problem-based visit your exam is going to be more

8  problem-focused.  You are going to focus in on what the problem

9  is and where it is.  You are going to want to visualize and

10 palpate that area.

11 Q.    If there is no problem expressed about a discharge there

12 wouldn't be any reason to squeeze the nipple; would there?

13 A.    Well, that's a different region of the body.

14 Q.    Right.  I understand that.

15 A.    So if there is no complaint of a nipple discharge?

16 Q.    Right.

17 A.    You wouldn't squeeze the nipples?

18 Q.    Right.

19 A.    Not typically.  During palpation you would just palpate

20 around the nipples.

21 Q.    Okay.  And I saw that you talked about being a member of

22 the American Board of Obstetricians and Gynecologists.

23 A.    That's who board certifies me.

24 Q.    Isn't it actually the American College of Obstetricians and

25 Gynecologists?

1  A.   That's a different organization.

2  Q.   I noticed you mentioned ACOG in your --

3  A.   ACOG is the American College of Obstetricians and

4  Gynecologists, which I am a fellow of.  The board is ABOG, the

5  American Board of Obstetricians and Gynecologists, who certifies

6  you.  You take a test, and we do annual maintenance of

7  certification as well.  We have to maintain that certification.

8  Q.   That's the certification board?

9  A.   That is.

10  Q.   And --

11  A.   And in order to be a fellow in ACOG, you have to be board

12  certified by ABOG.

13  Q.   I understand.  So are you a member of both?

14  A.   Yes, sir.

15      Wait a minute.  Let me clarify.  I am not on the board --

16  the board that certifies obstetricians and gynecologists.

17  Q.   Right.  I understand.

18  A.   I have passed the certification of the American Board to

19  allow me to be a fellow of the American College of Obstetricians

20  and Gynecolgoists.

21  Q.   Okay.  I got that.

22      Now, you talked about Ms. Alexander complaining of pain.

23  Was that pain related to cramping from her menstrual cycle?

24  A.   That would be one of the things you would want to know

25  during your evaluation.  And I can't remember every visit I

1  read.

2  Q.   And you would typically ask the patient for help in that

3  regard; wouldn't you?

4  A.   I would ask to take a medical history.  Yes, I would take a

5  medical history for sure.

6  Q.   And if the patient said the pain came from cramping, which

7  was typical of her heavy menstrual cycles, would there be any

8  reason to assume that this was something else?

9  A.   That's kind of a nebulous question, I think, because there

10 are other causes that can cause that cramping sensation.  But I

11 would delve into that problem.  I would say:  Okay.  You are

12 having pain during menses, let address that.  There is

13 treatments for that.  That's not something you just say:  Okay,

14 you have painful periods.  There are lots of reasons for that.

15 Q.   Okay.  Now, in the course of coming to your opinion, did

16 you presume that the medical records were correct and the

17 patient was wrong?

18 A.   I would not say that.

19 Q.   Now, if there is not a medical reason to palpate a

20 clitoris, absent any conditions, any abnormalities, would there

21 be any reason to do that?

22 A.   So you're saying -- let me clarify -- once I have

23 adequately manually visualized the clitoris would there be a

24 reason to palpate it at that point?  Is that what you are

25 asking?

1  Q.   When you say manually visualize, you visualize with your

2  eyes --

3  A.   But separating the genitalia to allow visualization with my

4  eyes.

5  Q.   So you can get a clear view?

6  A.   Yes.  If I can see everything there, and there is not a

7  problem, I am not going to do anything.

8  Q.   And there would never be a reason to rub the clitoris in a

9  circular motion until it's aroused; would it?

10  A.   No.

11         MR. COOK:  Thank you, very much.

12         THE COURT:  Redirect.

13                    REDIRECT EXAMINATION

14  BY MS. COLES:

15  Q.   I think I heard you say that only board certified OBGYNs

16  are members of ACOG.

17  A.   You have to be board certified to be a fellow of ACOG; yes.

18  Q.   So a family practice PA couldn't be a member of ACOG?

19  A.   Correct.

20  Q.   You were asked questions about if the patient presents with

21  copious yellow discharge, a history of STDs, and they are

22  indicating that they had six to seven out of ten pain, would you

23  recommend a vaginal examination for that patient?

24  A.   Yes.

25         MS. COLES:  Thank you.

1          THE COURT:  Thank you, Dr. Wolf.  You may step down.

2          Please call your next witness.

3          MR. CARTER:  Harold White.

4          THE COURT:  We have all been here for a little while.

5    Is everybody good to keep going?  All right.

6          **HAROLD WHITE, DEFENSE WITNESS, DULY SWORN**

7          COURTROOM DEPUTY CLERK:  For the record, please state

8    your name and spell your last name.

9          THE WITNESS:  Harold Isaiah White, W-h-i-t-e.

10         THE COURT:  Mr. White, you may be seated.  If you are

11   comfortable taking off your mask while you testify, you may do

12   that.

13         THE WITNESS:  Thank you.

14                      <u>DIRECT EXAMINATION</u>

15   BY MR. CARTER:

16   Q.   Good afternoon, Lieutenant Commander White.

17   A.   How you doing, sir.

18   Q.   Can you tell us where you work?

19   A.   I am work for the Federal Bureau of Prisons in Tallahassee.

20   Q.   Commonly referred to as FCI, or the Federal Correctional

21   Institution, here in Tallahassee?

22   A.   Yes, sir.

23   Q.   What do you do at FCI?

24   A.   I am the assistant health service administrator.

25   Q.   As the assistant health service administrator, what do you

1  do?

2  A.   I see the overall operation of the medical department.

3  Make sure we have adequate supplies, equipment, things of that

4  nature.  I make sure we properly scheduled the staffing of the

5  department.

6  Q.   And how long have you been the assistant health service

7  administrator at FCI?

8  A.   Since August of 2011.

9  Q.   And have you been a member of the health service

10  administration for BOP longer than that?

11  A.   Yes, sir.

12  Q.   How long have you been in that field?

13  A.   Since March of 2009.

14  Q.   2009?

15  A.   Yes, sir.

16  Q.   And you go by Lieutenant Commander.  Can you tell us why we

17  call you that?  You, obviously, got a uniform on.

18  A.   Yes, sir.  I was in the United States Air Force from March

19  of 1996 to March of 2009.  I transferred to public health

20  service to work up under the surgeon general.  My assignment was

21  to work for the Federal Bureau of Prisons.

22  Q.   So you are a member of the public health service and that's

23  why you are referred to in that manner?

24  A.   Yes, sir.

25  Q.   The FCI prison has how many -- I am talking about the

1  female portion of that institution -- how many inmates does it

2  typically have there?

3  A.    It can range from 600 to a maximum of 1200.

4  Q.    In 2015 to '17 time frame how many inmates did it typically

5  have, if you remember?

6  A.    Around 1100.

7  Q.    Now, as far as the way in which the medical office is

8  operated, that's under your auspice and your supervision;

9  correct?

10  A.    Yes, sir.

11  Q.    And is that office treated like, or run like a typical

12  medical office in the community?

13  A.    Yes, sir.  It's an ambulatory facility.

14  Q.    I want to talk about some policies at FCI and BOP policies.

15  What's the policy for having chaperones in the room when an

16  intimate exam is taking place with an inmate, a patient?

17  A.    The patient care policy.

18  Q.    It's the patient care policy?

19  A.    Yes, sir.

20  Q.    So, what -- how does that work with the chaperone?  What's

21  required?

22  A.    So, in the patient care policy it says that we have to have

23  a female chaperone.  It doesn't specify any specialized,

24  because, for instance, if we have a male nurse -- a male nurse

25  at a female institution after hours, and something goes on where

1  they need to examine a patient in their personal areas, they

2  could use a correctional officer that is a female to be

3  observing -- to be there for the inmate and to be there for the

4  provider.

5  Q.   Okay.  And in the normal operation of the medical office, a

6  chaperone is needed any time one of the providers does an

7  intimate exam of a patient; is that right?

8  A.   Yes, sir.

9  Q.   And that's dictated in the patient care program statement,

10  which I can show you on the screen.  It's already been admitted.

11         MR. COOK:  Objection, leading.

12         THE COURT:  There is not a question yet.

13  BY MR. CARTER:

14  Q.   It's been admitted as Defendant's Exhibit 7.

15         Is that patient care program statement 6031.04?

16  A.   Yes, sir.

17         THE COURT:  We don't have that as in.  Is there any

18  objection to Defendant's 27 [sic]?

19         MR. COOK:  No, Your Honor.

20         THE COURT:  It's admitted.

21     (DEFENDANT EXHIBIT 7:  Received in evidence.)

22         MR. CARTER:  Sorry, Your Honor.

23  BY MR. CARTER:

24  Q.   To follow up on the question I asked you; in the program

25  statement there is a directive for the office to be run like a

1    typical medical office; correct?

2    A.    Yes, sir.

3    Q.    And that includes the delivery of --

4            MR. COOK:  Objection.  Leading, Your Honor.

5            THE COURT:  Sustained.

6    BY MR. CARTER:

7    Q.    Lieutenant Commander White, if you take a look at that

8    policy that we have highlighted as paragraph A there, does the

9    bureau promote preventative healthcare?

10   A.    Yes, sir.

11   Q.    And why does it do that?

12   A.    Because at BOP, and inside the facility, we still treat the

13   medical care standards equal to that in the community.

14   Q.    Does the BOP have guidelines that reference the inmate

15   population -- female inmate population -- has certain types of

16   healthcare issues that need to be dealt with that are higher

17   incident rates than in the private community?

18   A.    Yes, sir.

19   Q.    And what areas?

20   A.    Preventative healthcare.

21   Q.    Why is that, Lieutenant Commander White?

22   A.    Due to some of the inmates that come into our institution,

23   they haven't had the best healthcare on the outside so we have

24   parameters set up to make sure we capture the same as the

25   community, as far as healthcare that they need, and that we have

1   to meet not only to our standards, but to joint commission, and

2   the American Correctional Association Standards.

3   Q.   And does the policy recognize the fact that this may be the

4   first time --

5           MR. COOK:  Object to leading, Your Honor.

6           THE COURT:  Sustained.

7   BY MR. CARTER:

8   Q.   Does this inmate population typically have regular systemic

9   care before they come to prison?

10  A.   It varies.  Some do.  Some do not, sir.

11  Q.   Does the BOP policy have a statement -- well --

12          Lieutenant Commander White, as far as seeing patients, is

13  there a policy to incorporate consolidate visits, medical

14  encounters when --

15          MR. COOK:  Objection, leading.

16          MR. CARTER:  I haven't finished.

17          THE COURT:  Overruled.

18  BY MR. CARTER:

19  Q.   Is there a policy in which BOP advocates consolidating

20  visits for well woman care?

21  A.   Well, it's not policy, but that's what we highly recommend

22  due to the high inmate population and the minimum staff that --

23  the staffing that we have, we try to encourage that when you

24  have a patient in your setting try to address all of their

25  medical needs in that visit.

1  Q.   All right.  And to address all of those medical needs in

2  one setting, is that what you said?

3  A.   Yes, sir.

4  Q.   And that would include the preventative medical?

5       MR. COOK:  Objection, leading.

6       THE COURT:  Sustained.

7  BY MR. CARTER:

8  Q.   Would it include preventative medicine?

9  A.   Yes, sir.

10 Q.   That's known as well woman care?

11 A.   Yes, sir.

12 Q.   You said it wasn't policy, but is that guidelines for the

13 BOP?

14 A.   Yes, sir.

15 Q.   So, it's definitely encouraged?

16 A.   Yes, sir.

17 Q.   In your role as assistant health service administrator,

18 Mr. White, would you be a supervisor for Mr. Rolston?

19 A.   Yes, sir.

20 Q.   During the time that he has been at FCI?

21 A.   Yes, sir.

22 Q.   Do you provide evaluations for his work?

23 A.   Yes, sir.

24 Q.   And you have done that ever since he has been a PA or a

25 midlevel provider?

1      MR. COOK:  Objection, Your Honor.

2      THE COURT:  Overruled.

3  BY MR. CARTER:

4  Q.    You have done that since he has been a PA for FCI?

5  A.    Yes, sir.

6  Q.    And what do the evaluations that you do of him include?

7  How do you make those evaluations?

8  A.    The evaluation is -- I do the part about communication,

9  maintaining security of the institution; his reviews and his

10  audits, him maintaining his accreditation, his licensure.  And

11  then there is a section about his clinical work.  That's the

12  section that I get the input from the clinical director, the

13  head physician, because he or she handles the clinical aspect

14  and they gave me their input for that element.

15  Q.    How has Mr. Rolston been consistently rated since he has

16  been doing his evaluations?

17  A.    Above -- exceeding.

18  Q.    Are there categories of his evaluation where he is

19  considered excellent?

20  A.    Yes, sir.

21  Q.    And are there categories of his evaluation that you have

22  evaluated him as outstanding?

23  A.    Yes, sir.

24  Q.    And if I understand what you said, I had a little trouble

25  hearing you, do you seek input from the clinical director?  Is

1  that what you said?

2  A.   Yes, sir.

3  Q.   Because the clinical director does what compared to you?

4  A.   The clinical side -- there's supervisors in our medical

5  department.  There is the health service administrator, then

6  there is me as the assistant health service administrator, and

7  then the clinical director who supervises the clinical side.

8  Q.   And in the medical office there is a clinical director that

9  provides clinical oversight of Mr. Rolston and the PAs that are

10 working?

11 A.   Yes, sir.

12         MR. COOK:  Objection.  Leading.

13         THE COURT:  Overruled.

14 BY MR. CARTER:

15 Q.   Lieutenant Commander, does Mr. Rolston work in the FCI

16 medical office now?

17 A.   No.

18 Q.   Where is he located now?

19 A.   The federal detention.  The male side.

20 Q.   What type of facility is that?

21 A.   It's in transit facility.  It's the transportation hub when

22 these inmates are en route to their designated institution.  We

23 move -- we transport inmates every day at that facility.  It can

24 go anywhere from 20 to 200 per week.

25 Q.   Is it a very busy facility?

1    A.    Constantly.

2    Q.    Is that because of the inmates that are coming in all the

3    time?

4    A.    Yes, sir.

5    Q.    Is that facility all male or all female?

6    A.    That's all male.

7    Q.    It's all male?

8    A.    Yes, sir.

9    Q.    And since Mr. Rolston has been -- well, do you know how

10    long he has been working there?

11    A.    Yes, sir.

12    Q.    How long has he been working at FDC?

13    A.    Since January of 2019.

14    Q.    Okay.  And how -- from your standpoint, as his direct

15    supervisor, evaluated him as you indicated that you do, how

16    would you describe how he has worked out at FDC?

17    A.    He has done a phenomenal job.  Like I said, the providers

18    they have, prior to him having to go down to the detention

19    center to do the males only, they all had case loads at FCI and

20    FDC.  So with him being down at the FDC, taking on all of the

21    clinical roles at the FDC, it alleviated the other providers

22    from having to go down there to the FDC to do patient care.

23    Q.    What does that do for the providing of medical care at FCI

24    since he has taken on the load at FDC?

25    A.    They are able to see more patients and deal with that

1  population.

2  Q.    So would you consider Mr. Rolston a valuable member of your

3  team as the assistant health service administrator over the

4  facility?

5  A.    Yes, sir.

6        MR. CARTER:  Thank you, Lieutenant Commander White.  I

7  have no further questions.

8        THE COURT:  Cross-examine?

9        MR. COOK:  Thank you, Your Honor.

10                   CROSS-EXAMINATION

11  BY MR. COOK:

12  Q.    Good afternoon, Lieutenant Commander White.

13  A.    Hello, sir.

14  Q.    You were just questioned about Paul Rolston's track record

15  in terms of the conduct of his specialty.  Doesn't he get an

16  unusual number of complaints about improper examinations?

17  A.    No, sir.

18  Q.    No?  Have people come to you and said that he has multiple

19  women complaining about him?

20        MR. CARTER:  Objection.

21        THE COURT:  Sustained.

22        I sustained the objection.

23        MR. COOK:  Yes.  Okay.

24  BY MR. COOK:

25  Q.    Have you never gotten a --

1        THE COURT:  Sustained.

2   BY MR. COOK:

3   Q.   What do you consider the qualities that he brings to the --

4   to his profession, to his job?

5   A.   He is very knowledgeable in the clinical aspect.  He is

6   very detail oriented.  He does an excellent job at educating the

7   patients of how to properly care for theirselves, because, like

8   I said, a lot of these females, when they come to the prison,

9   never really took care of their self medically and he does an

10  outstand job of detailing them how they need to take care of

11  their bodies and what they do need to do to improve their

12  health.

13  Q.   Does he observe the program parameters as far as frequency

14  of examinations?

15  A.   I don't understand the question.

16  Q.   Well, when he sets an examination for a patient, is that --

17  is that appropriate?  Have you ever had a problem with him

18  setting examinations too soon after the last one?

19  A.   No, sir.  It just depends on what the situation is; why it

20  was required.

21  Q.   In fact, did you accuse him of entering false information

22  with regard to the timing of an examination?

23        MR. CARTER:  Objection, Your Honor.

24        THE COURT:  Overruled.

25        THE WITNESS:  I don't understand the question.

1  BY MR. COOK:

2  Q.   Okay.  If I could publish this to the witness only.

3       Going back to 2015, did you have a problem with him

4  over-scheduling in terms of the time span?

5  A.   The question I was asked in that particular thing was did

6  he know the proper way of how to retrieve documents from other

7  institutions --

8  Q.   Right.

9  A.   -- before doing what he needed to do with the patient.

10 Q.   Did you also say that he had entered false information into

11 the record?

12          MR. CARTER:  Objection.

13          THE COURT:  Overruled.

14 A.   Based on the fact that he just put in the documentation

15 without going back to the other institution to verify the

16 information.

17 BY MR. COOK:

18 Q.   Okay.  But didn't you say "document false information?"

19 A.   Right.

20 Q.   So did you consider it false information at that time?

21 A.   More so inaccurate information based on he didn't get the

22 information from the other institution.

23 Q.   Okay.  And you stated that he apparently had problems

24 reading the electronic medical record in terms of finding out

25 what the scheduling should be?

1  A.   Yes, sir.  On this particular patient.

2  Q.   Okay.  Did you consider that a chronic problem?

3  A.   No, sir.

4  Q.   You say you had no complaint in that regard?

5  A.   In regards to what, sir?

6  Q.   Scheduling examinations.

7  A.   No, sir.

8  Q.   No complaints of scheduling examinations that were too

9  frequent?

10  A.   No, sir.

11  Q.   Isn't that what that conversation that you had with him was

12  about?

13  A.   That was because that was an incoming inmate.

14  Q.   Okay.  I don't understand.

15  A.   If you put it back up I can show you what I was saying.

16  Q.   Okay.  I don't want you to read it, but I want you to tell

17  me whether that had to do with improper scheduling.

18  A.   This had nothing to do -- so, when a patient comes in from

19  another institution we are supposed to check to see if they had

20  a physical at that previous institution.  If they had a physical

21  at that previous institution then we don't have to do another

22  physical.  But when they come from another institution that

23  hasn't had a physical then we conduct a physical because we are

24  required to.

25  Q.   What was the inaccurate information that you were referring

1   to?

2   A.   That he did a physical when there was a physical already

3   done at another institution.

4   Q.   So, he didn't really do the physical?

5   A.   I think he did do the physical.

6   Q.   So what was the false information?

7   A.   Based off the fact that he -- the physical shouldn't have

8   had to have been done because of the fact that there was one

9   done already.

10  Q.   Oh, I see.

11       Now, if somebody did make a complaint, would that complaint

12  come to you?

13  A.   It could come to me, or the health service administrator,

14  or the clinical director.

15  Q.   But whether it comes to you first, or it comes to somebody

16  else first, shouldn't it come to you as the day-to-day director

17  of the clinical service?

18  A.   There is three of us that are supervisors, so we all

19  oversee the day-to-day operations.

20  Q.   But you have different roles though, correct?

21  A.   Pretty much the -- me and the health service administrator

22  pretty much have the same role.  We just split up the actual

23  duties.

24  Q.   But the midlevel providers report to you; don't they?

25  A.   Correct.  Either me or the health service administrator.

1  Q.   They report to the administrator?

2  A.   Either one of us.  They report to either of us.  In my

3  absence they could report to the health service administrator.

4  Q.   Who is his supervisor?

5  A.   Me and the health service administrator.

6  Q.   He has two supervisors?

7  A.   Yes, sir.

8  Q.   And either one of you can tell him what to do?

9  A.   Yes, sir.  Well, actually three, if you want to include the

10  clinical director.

11  Q.   Including who?

12  A.   The clinical director.

13  Q.   Right.  Right.  You do the day-to-day; right?

14  A.   For the most part.

15  Q.   Now, I think you said that, or I think you have said that

16  he is not just a clinician but a correctional officer as well.

17  What difference does that make in his -- the conduct of his job?

18         MR. CARTER:  Objection, Your Honor.  Outside the

19  scope.

20         THE COURT:  Sustained.

21         MR. COOK:  No other questions, Your Honor.

22         THE COURT:  Redirect?

23         MR. CARTER:  Yes, sir.

24                    REDIRECT EXAMINATION

25  BY MR. CARTER:

1    Q.    Lieutenant Commander White, when a provider has an exam

2    scheduled, do they look into the computer and see what future

3    care is supposed to be given or being scheduled?

4    A.    Yes, sir.

5    Q.    What do they do if they see that it is something that is

6    scheduled?

7    A.    When they have the patient in the room they ask the

8    patient -- they can see they have something upcoming, they could

9    do it at that time.  If the patient chooses not to do it at that

10   time they can wait until the date that it's scheduled.

11   Q.    The discussion you had with Mr. Cook about the email and

12   the exam -- intake exam or --

13   A.    Yes, sir.

14   Q.    Did you -- in May of 2015, how recent had Mr. Rolston

15   started working for you?

16   A.    He only had been there like three or four months.

17   Q.    Is the BOP policies pretty daunting?  Do you have a lot of

18   BOP policies and procedures that you have to learn in a short

19   period of time?

20   A.    Yes, sir.

21   Q.    And since that time has he adapted and had any problems

22   with any of the procedures that you have in place?

23   A.    No, sir.

24         MR. CARTER:  Thank you.  No further questions.

25         THE COURT:  Thank you, Mr. White.  You may step down.

1          Please call your next witness.

2          MR. CARTER:  Your Honor, I will have to go get her.

3          THE COURT:  Tell me, because we hadn't had a break --

4          MR. CARTER:  We are doing pretty good.  We can take a

5    break.

6          THE COURT:  Well, how much more do you think you have?

7          MR. CARTER:  We have two more witnesses.

8          THE COURT:  Well, let's take a break.  I've had you

9    there for a good long while.

10          We will be back with you in a few minutes.

11          Jury out, please.

12      (Jury out at 4:03.)

13          THE COURT:  You may be seated.  I kept on thinking you

14   were going to say the defense rest so we probably put on an

15   extra one or two.  I thought the expert was going to be last.

16          MR. CARTER:  It was a scheduling issue, Your Honor.

17          THE COURT:  Mr. Cook, I hustled you through it because

18   we had the jury, basically, cooling their heels.  I didn't

19   understand the complaint about Dr. Holoka.  She is on the

20   witness list.

21          MR. COOK:  Yes, Your Honor; with no address, and we

22   never got a valid address apparently.

23          THE COURT:  Well, I got to tell you, she is a licensed

24   doctor in the state of Florida.  I suspect in two minutes I'd

25   have her address.  But, look, aside from that, here's the

1   problem:  We have this elaborate pretrial procedure.  We go all

2   the way through it.  Everybody files witness lists.  We have a

3   pretrial conference.  I am certain at the end of the pretrial

4   conference I said:  Is there anything else we need to address.

5   I am certain I had an order that said if there are any other

6   evidentiary issues I will schedule a hearing.  You don't have to

7   file a request for it.  Just call the courtroom deputy and say

8   you need a hearing, we will need a hearing.

9          I said at the attorney conference at 8:15 on Monday

10  morning, before we picked the jury, we are going to resolve

11  disputes not on the jury's time.  I am here in the morning,

12  afternoon after trial, over the lunch break, and I have had

13  asked -- I must have asked eight times during the trial,

14  anything else you need from me?  No.  Probably more than eight

15  times.  Probably at every break and every lunch break.

16         MR. COOK:  Yes, Your Honor.

17         THE COURT:  And then we have the jury in the box, the

18  witness comes up and you raise an objection that could have been

19  made months ago.

20         MR. COOK:  No, Your Honor.  I am pretty good at

21  finding people.  I couldn't find her.

22         THE COURT:  And so did you start looking this morning?

23         MR. COOK:  No.  I started looking months ago.

24         THE COURT:  Why didn't you tell me?

25         MR. COOK:  Because I didn't think that they were

1   actually going to bring her.

2           THE COURT:  Well, that just confirms that I made the

3   right decision.  You can't assume that the person on their

4   witness list is not going to be called as a witness, not raise

5   any question, have the jury in the box and then raise that

6   question with me.  And the problem is that they didn't list her

7   address.

8           MR. COOK:  Your Honor, they didn't list her at all in

9   their 26(a)(1).

10          THE COURT:  That's a problem months and months and

11  months ago, if it's so.

12          MR. COOK:  We have the final list that just came down

13  a couple of days ago and I saw her name on it, and I was

14  surprised.  And then I made another effort.  I am pretty good at

15  this.  And I am pretty sure that there is no Holoka by that

16  spelling in the Department of Health license database.  I

17  checked multiple times.

18          MS. COLES:  Your Honor, she has been on our witness

19  list.  She was on their Rule 26 disclosures.

20          THE COURT:  Really?

21          MR. COOK:  With an address.

22          THE COURT:  Really?  She is on your Rule 26

23  disclosures and you are now standing up telling me that the

24  other side has screwed up because she is not on their

25  disclosures?

1        MR. COOK:  Because I got an address from them that was

2    wrong and I couldn't find her.

3        THE COURT:  We will talk about this at the end of the

4    day.  But, come on, really.

5        We had another violation of the same order in limine

6    that I have talked to you about.  It's at least the fourth time

7    in the case that you have violated the order.  You have a man on

8    the stand and you say:  Have you had other complaints?  Rumors.

9    So far as I know what you want to know is, have there been

10   rumors.

11       MR. COOK:  No.

12       THE COURT:  How would the witness have known that?

13       MR. COOK:  Because one of his employees told him and

14   said in deposition that she told him -- his employee told him

15   about multiple complaints of Paul Rolston's examinations.  It

16   wasn't -- it wasn't inmates coming to him or him hearing.  It

17   was specific complaints that were reported to him according to

18   Nurse Fairchild.

19       THE COURT:  Let's talk about this at the end of the

20   day.

21       Let's go ahead and take a break here.

22       4:20 by that clock.

23   (Recess taken 4:09.)

24   (Resumed at 4:20.)

25       THE COURT:  Please be seated.

1          Jury in, please.

2          We can have the next witness on the stand.

3          MR. CARTER:  I have issues if I could just raise it

4   with you.

5          THE COURT:  Quickly.  Hold the jurors for just a

6   minute.

7          MR. CARTER:  During the questioning of Dr. Holoka, Mr.

8   Cook asked the question about was there any reason for a

9   provider to palpate the clitoris, or something like that, and

10  she said no.  And Mr. Cook made a comment at that time, "Unless

11  there was something abnormal about the practitioner."

12         THE COURT:  He did.  It was inappropriate.  I don't

13  know how many other people heard it.

14         MR. CARTER:  Okay.

15         MS. COLES:  The courtroom heard it.  They heard it

16  back there.

17         THE COURT:  I understand.  Mr. Cook, you know better.

18         Let me tell you, Ms. Alexander has a substantial

19  claim.  Try the case.  If you can't win the case on the merits

20  you can't win the case.  You can spend hours talking about

21  whether it's okay to rub the clitoris.  Everybody agrees it's

22  not.  Mr. Rolston said that.  Your expert said it.  Their expert

23  said it.  Everybody agrees.  You have got seven jurors that

24  aren't stupid.  They didn't just fall off the turnip truck.

25  They know that.  At some point you probably ought to focus on

1  whether he did it or not, not whether it would have been okay if

2  he had.  Everybody knows if he did that it was wrong.

3          Jury in, please.

4      (Jury in at 4:22.)

5          THE COURT:  All right.  You may be seated.

6          Mr. Carter, please call your next witness.

7          MR. CARTER:  Yes, sir.  We call Jalandrian Reed.

8          THE COURT:  Ms. Reed, right up here.

9  **JALANDRIAN REED, DEFENSE WITNESS, DULY SWORN**

10         THE COURTROOM DEPUTY:  For the record, please state

11 your full name and spell your last name.

12         THE WITNESS:  Jalandrian Reed, J-a-l-a-n-d-r-i-a-n,

13 R-e-e-d.

14         THE COURT:  Ms. Reed, you may be seated.  While you

15 are testifying, if you are comfortable with it, you may remove

16 your mask.

17                  <u>DIRECT EXAMINATION</u>

18 BY MR. CARTER:

19 Q.   Good afternoon, Ms. Reed.

20 A.   Hello.

21 Q.   What is your profession?

22 A.   I am a registered medical assistant.

23 Q.   As a registered medical assistant are you licensed in

24 Florida?

25 A.   Yes, sir.

1  Q.   Where do you currently work?

2  A.   Capital Regional Southwood.

3  Q.   And you perform in that role at Capital Regional Southwood?

4  A.   Yes, sir.

5  Q.   Was there a time when you worked at the FCI prison here in

6  Tallahassee?

7  A.   Yes, sir.

8  Q.   And what position did you have at the prison?

9  A.   Registered medical assistant.

10  Q.   And what did you do as a registered medical assistant at

11  FCI Tallahassee?

12  A.   I worked in the lab.  I did phlebotomy.  I assist with

13  chaperoning providers.  Went to the units, drew blood.

14  Q.   Okay.  And when was this?

15  A.   About a year and a half, two years ago.

16  Q.   When you were working at FCI Tallahassee, was Mr. Paul

17  Rolston working there as a PA?

18  A.   Yes, sir.

19  Q.   And you mentioned you had regular duties in the lab as a

20  phlebotomist, drawing blood and things of that nature, and you

21  said you were also a chaperone?

22  A.   Uh-huh.

23  Q.   Were there occasions when you would have to act as a

24  chaperone for Mr. Rolston?

25  A.   Yes, sir.

1  Q.   And would you know when that would happen as you were

2  working during the day?

3  A.   No.  Because I didn't know his schedule.

4  Q.   And you acted as a chaperone for others too, didn't you?

5  A.   Yes, sir.

6  Q.   Would you know when you would get called to be a chaperone

7  for anybody?

8  A.   No, sir.

9  Q.   It was just when they needed you; right?

10 A.   Just when they needed it.

11 Q.   Do you recall being a chaperone for Mr. Rolston for an

12 inmate by the name of Ashlee Barnett that had an arm condition?

13 Do you remember that?

14 A.   I remember that situation.

15 Q.   You remember the situation?

16 A.   With the arm.

17 Q.   With the arm?

18 A.   Yes.

19 Q.   Okay.  When you act as a chaperone, what are you -- what

20 are you doing in the room acting as a chaperone for a PA, like

21 Mr. Rolston?

22 A.   I would set up for the equipment that he would need.  He

23 would step out.  The chaperone -- the patient would get

24 dressed -- undressed.  I would get her a drape, and if he is

25 going to do a breast exam he would notify me of that before he

1  leave out of the room so I have her to get undressed.

2  Q.   All right.  And what was the purpose of you being there?

3  A.   To make sure that nothing went on that wasn't supposed to

4  take place.

5  Q.   And also to assist in the examination when needed?

6  A.   Yes, sir.

7  Q.   Okay.  And in remembering that particular chaperoning event

8  did you see anything unusual or inappropriate by Mr. Rolston on

9  that day?

10  A.   No, sir.

11  Q.   When Mr. Rolston left the room for the patient to get

12  undressed, did you make any comments, have any discussion with

13  the patient about Mr. Rolston being a creep?

14  A.   No, sir.

15  Q.   Would that be something you would do, talking about a

16  provider to an inmate like that?

17  A.   No, sir.

18  Q.   Did you make any comments, any facial comments, and tell

19  the inmate "don't be paying attention to my face?"

20  A.   No.

21  Q.   As the chaperone in the room are you observing -- I think

22  the way you said it is make sure nothing goes on; right?

23  A.   Yes, sir.

24  Q.   Are you paying attention?

25  A.   Yes, sir.

1  Q.   How are you doing that?

2  A.   I am focused on what's going on.  I am watching.  I am

3  handing him the equipment that he needs, and just hand him the

4  stuff and being present.

5  Q.   Are you able to see the patient?

6  A.   Yes.

7  Q.   Are you able to see Mr. Rolston?

8  A.   Yes.

9  Q.   Now I know that there is a drape, so can you see up under

10  the drape and exactly everything that's being done?

11  A.   No, sir.

12  Q.   But, if you -- can you see body language and --

13  A.   Uh-huh.

14  Q.   -- facial expresses of a patient?

15  A.   Yes, sir.

16  Q.   And can you see Mr. Rolston's movements too?

17  A.   Uh-huh.

18  Q.   Would you be able to see if anyone was acting out in pain?

19  A.   Yes.

20  Q.   Or shock?

21  A.   Yes.

22  Q.   And would you be in a position in that room to hear any

23  groans, or agonies of pain, or anything like that?

24  A.   Yes, sir.

25  Q.   And if somebody spoke out -- if the patient spoke out you

1  are right there to hear that too, right?

2  A.   Yes, sir.

3  Q.   And, Ms. Reed, when you were asked to be a chaperone, as

4  you said to make sure nothing inappropriate happened, did you

5  take that job seriously?

6  A.   Yes, sir.

7  Q.   It's something that you would not risk your professional

8  license not to do the job the way you are supposed to?

9  A.   Correct.

10 Q.   I will cover this quickly.  Working in the prison, did you

11 learn about PREA and the PREA reporting requirements?

12 A.   No, sir.

13 Q.   Did you learn about having to report something that was

14 inappropriate?

15 A.   Oh, of course.

16 Q.   I use the term PREA.  Prison Rape Elimination Act, and

17 training related to that?

18 A.   Yes, sir.

19 Q.   And if you saw, or heard, anything inappropriate you were

20 supposed to report that?

21 A.   Yes, sir.  Immediately.

22 Q.   Those exam rooms -- the exam room that you were in, how

23 would you describe the size of that exam room?

24 A.   It's not a very big room.

25 Q.   All right.  Are you close -- where are you stationed during

1  let's say during the breast exam, where would you be during a

2  breast exam with a patient on the table and Mr. Rolston

3  performing the breast exam?

4  A.    On my left-hand side.

5  Q.    That would have happened that day with the patient with the

6  arm issue?

7  A.    Yes, sir.

8  Q.    And when Mr. Rolston was performing the pelvic exam, where

9  would you be?

10 A.    Standing directly towards him on my left-hand side.

11 Q.    Are you paying attention to the examination so you can hand

12 him tools?

13 A.    Yes, sir.

14 Q.    And every tool he would need you would know at what time he

15 would need it?

16 A.    Yes, sir.

17 Q.    Let me ask you, Ms. Reed, during the breast exam of Ashlee

18 Barnett, when you were there as the chaperone, do you -- would

19 the breast exam last 20 minutes?

20 A.    No, sir.

21 Q.    How long would a breast exam -- or how long was that breast

22 exam?

23 A.    Maybe a good 30 seconds on each breast.

24 Q.    But it wasn't 20 minutes?

25 A.    No, sir.

1  Q.   During any of the breast exam would you have had your back

2  to the patient, turned and not facing the patient?

3  A.   No, sir.

4  Q.   Would you have done that for 20 minutes?

5  A.   No, sir.

6  Q.   That would be very unusual?

7  A.   Yes.

8  Q.   During the breast exam, specifically, did you observe Mr.

9  Rolston communicating to the patient about what was happening

10  during the exam?

11  A.   Yet.

12  Q.   Would Mr. Rolston educate the patient on breast tissue?

13  A.   Yes; he does.

14  Q.   Was that normal?

15  A.   Yes, sir.

16  Q.   That's the way he did it every time?

17  A.   Yes, sir.

18  Q.   Would Mr. Rolston look for discharge on the nipples?

19  A.   Yes, sir.

20  Q.   And is that a normal practice from your experience as being

21  a chaperone?

22  A.   Yes, sir.

23  Q.   The times that you observed Mr. Rolston he would do all of

24  that breast exam the same way every time?

25  A.   Yes, sir.

1   Q.   During a breast exam, did you ever see Mr. Rolston

2   intentionally hurt or degrade the patient?

3   A.   No, sir.

4   Q.   Did you ever see him touch the breast in a sexual way?

5   A.   No, sir.

6   Q.   As to the pelvic exam, did you ever see Mr. Rolston act

7   inappropriate on that day when you were there with Ashlee

8   Barnett, the patient with the arm condition?

9   A.   No, sir.

10  Q.   Did you ever see him touch her vagina in a sexual way?

11  A.   No, sir.

12  Q.   Did you ever see him placing his fingers in and out of her

13  vagina in a sexual way?

14  A.   No.

15  Q.   Would you have been in a position to see if he touched her

16  clitoris?

17  A.   No, sir; I would not.

18  Q.   Because of the drape?

19  A.   Yes, sir.

20  Q.   Did you see any reaction by the patient on the examining

21  table that would indicate to you something unusual was going on

22  during that part of the exam?

23  A.   No, sir.

24  Q.   And just like the breast exam, during the pelvic exam, does

25  Mr. Rolston communicate with the patient what he is doing during

1  that examination?

2  A.   Yes, sir.

3  Q.   Did you hear any comment by Mr. Rolston to the patient

4  during the pelvic exam that her cervix was too deep?

5  A.   No, sir.

6  Q.   Or any comments like that about the location of her cervix?

7  A.   No, sir.

8  Q.   And the speculum exam, where you are handing Mr. Rolston

9  tools, was there anything unusual about that?

10  A.   No, sir.

11  Q.   Ms. Reed, if you had seen anything improper during that

12  examination, as you are acting as a chaperone, tell us what you

13  would do.

14  A.   I would have asked him to stop, if she would have said

15  something to me, or if I would have insinuated something I would

16  have asked him to stop, or asked her do she feel uncomfortable

17  or do she want him to stop or do he need to stop or is she just

18  uncomfortable, and I would have reported that immediately.

19  Q.   How would you go about stopping it if you had to?

20  A.   I would more than likely ask him, maybe you should stop.

21  She feels uncomfortable.

22  Q.   And you would say something?  You would speak out?

23  A.   Yes; I would speak.

24  Q.   When you say you would go report it.  Who would you report

25  it to?

1  A.    My supervisor would be Lieutenant White.

2  Q.    You would report to him immediately?

3  A.    Yes.

4        MR. CARTER:  Thank you, Ms. Reed.  I have no further

5  questions.

6        THE COURT:  Cross-examine?

7                      CROSS-EXAMINATION

8  BY MR. JOHNSON:

9  Q.    Good afternoon, Ms. Reed.

10  A.    Hello.

11  Q.    Do you remember giving your affidavit on May 14th, 2019?

12  A.    Yes.

13  Q.    And is this your signature on that affidavit?

14  A.    Yes.

15  Q.    Were you asked to put your initials next to each paragraph

16  on the affidavit?

17  A.    Yes.

18  Q.    And did you initial this paragraph that says, "Rolston had

19  spoken to me very closely before and I have moved away from him

20  as well, but I do not recall if it happened on this day?"

21  A.    Yes.

22  Q.    "JR".  Is that your initials?

23  A.    Yes.

24  Q.    What are you saying there, that Mr. Rolston got too close

25  to you and you backed away?

1  A.   I don't like people in my personal space.

2  Q.   Okay.  And he was one?

3  A.   When I say "personal space", I don't like you too close to

4  me, but it's not like uncomfortable like I need to back away,

5  like run away.

6  Q.   Okay.  Paragraph 43 -- I'm sorry, 44.  You initialed this

7  saying that "Rolston really examines the inmate's vaginal area.

8  He get really close.  I can see why inmates are uncomfortable".

9  Did you initial that?

10  A.   Yes.

11  Q.   Is that true?

12  A.   Maybe he needs glasses, or maybe he couldn't see.  I am not

13  sure why he would be that close.  Maybe he needs glasses.

14  Q.   Okay.  48; "during the pelvic exam Rolston does check the

15  left and right side of cervix.  He does go up and down.  This is

16  also normal for a pelvic exam."

17      Now, can you see his fingers in there going to the left

18  side and right side of the cervix?

19  A.   I am not referring to his fingers.

20  Q.   Pardon me?

21  A.   I am not referring to his fingers.

22  Q.   What are you referring to?

23  A.   When you doing a Pap smear you have two separate tools that

24  you have to put in to slide both sides of the cervix.

25  Q.   Can you see it going to the left side and see it going to

1  the right side?

2  A.   Gliding motions.

3  Q.   So you see it going to the left and going to the right, but

4  you don't see the cervix?

5  A.   No.

6  Q.   Why did you leave FCI?

7  A.   I didn't feel comfortable.

8  Q.   What was uncomfortable?

9  A.   I didn't like the prison setting.

10  Q.   The prison setting?

11  A.   The prison setting.

12  Q.   Okay.  What about it?

13  A.   I didn't like it.

14  Q.   Well, I know you didn't like it, but can you say a feature

15  or two about it that you didn't like, rather than just saying

16  you didn't like it?

17  A.   For me, I didn't like going through the gates every

18  morning.  I didn't like having the keys.  I didn't like the

19  radio.  I just didn't like it.

20        MR. JOHNSON:  Okay.  Thank you.

21        THE WITNESS:  You are welcome.

22        THE COURT:  Redirect?

23        MR. CARTER:  No redirect, Your Honor.

24        THE COURT:  Thank you, Ms. Reed.  You may step down.

25        THE WITNESS:  Thank you.

1        THE COURT:  Please call your next witness.

2        MS. COLES:  Dorinda Paynter.

3        **DORINDA PAYNTER, DEFENSE WITNESS, DULY SWORN**

4        THE COURTROOM DEPUTY:  For the record, state your full

5   name and spell your last name.

6        THE WITNESS:  Dorinda Lee Paynter, P-a-y-n-t-e-r.

7        THE COURT:  Ms. Paynter, you may be seated.  If you

8   are comfortable, while testifying, you may take your mask off.

9                        DIRECT EXAMINATION

10  BY MS. COLES:

11  Q.   Good afternoon, Ms. Paynter.  Have you ever worked for FCI?

12  A.   Yes, ma'am.

13  Q.   Are you still employed there?

14  A.   Yes, ma'am.

15  Q.   All right.  In what capacity?

16  A.   Registered nurse.

17  Q.   And what do you do as a registered nurse at FCI?

18  A.   Patient care.

19  Q.   How long have you worked at FCI?

20  A.   Almost seven years.

21  Q.   What did you do before then?

22  A.   I have been a nurse for about 30 years.  So prior to that I

23  worked for the state, oncology floor at TMH --

24  Q.   You have been in the prison at FCI for seven years?

25  A.   Yes.  FCI, FDC, for the BOP.

1  Q.   Okay.  Have you ever worked with Paul Rolston?

2  A.   Yes, ma'am.

3  Q.   In what capacity?

4  A.   As a nurse.

5  Q.   Okay.  And did you ever work with him when with the female

6  patients?

7  A.   Yes, sir.

8  Q.   Do you still work with him with the male patients?

9  A.   Yes.

10 Q.   Are you familiar with the term "chaperone" in the context

11 of working at FCI?

12 A.   Yes, ma'am.

13 Q.   Can you explain to the jury what a chaperone does?

14 A.   A chaperone is basically a person that's in the room for

15 the patient as well as the provider.  They are there for the

16 patient's care, comfort, safety, as well as they are to assist

17 the provider.

18 Q.   And how would they assist the provider?

19 A.   In whatever capacity needed.

20 Q.   And what would you be looking for if you are there to

21 protect the patient?  What things are you looking for?

22 A.   For verbal and non-verbal.

23 Q.   To see if they are making a reaction to what's happening?

24 A.   Yes.

25 Q.   As part of your duties as chaperone, are you looking for

1  anything inappropriate that could be going on during the exam?

2  A.   Yes, ma'am.

3  Q.   And how would you assess for that?

4  A.   You observe the patients, what they are saying, what they

5  are not saying.  If there is a procedure, you are there to

6  assist them, to give them comfort.  And also watching for

7  non-verbal cues, if they are in pain, or for something that's

8  going on.  Basically, as a chaperone, you are there for the

9  overall experience to help the patient as well as to assist the

10 provider.

11 Q.   What types of examinations require the presence of a

12 chaperone?

13 A.   Anything that would consist of OBGYN, female health,

14 anything that would have to expose a female.

15 Q.   Okay.  And those examinations that you -- did you chaperone

16 for Mr. Rolston at FCI?

17 A.   Yes.

18 Q.   And did you chaperone for him with the female inmates?

19 A.   Yes, ma'am.

20 Q.   Did you chaperone for him during well woman exams?

21 A.   Yes.

22 Q.   So would you be in his office for those?

23 A.   Yes.

24 Q.   How large is that office?

25 A.   It's pretty tiny.

1  Q.   During the -- during a pelvic exam, where would you be

2  standing in relation to Mr. Rolston?

3  A.   Probably, if I was to guestimate, less than 18 inches away

4  from him.

5  Q.   Okay.  And are you close enough to him that you can hand

6  him tools?

7  A.   Yes.

8  Q.   Is that something you would be doing during the pelvic

9  exam?

10  A.   Yes.

11  Q.   Okay.  And would you be standing with your back turned

12  during the entire examination?

13  A.   Never.

14  Q.   What would you be doing instead?

15  A.   When you are there as a chaperone you are there to give

16  full attention to assisting as well as being there for the

17  patient.  It's not very long you are in there to be assistance.

18  Q.   I would like to show you what I believe has been previously

19  marked.  I don't remember the exhibit number.

20         MR. JOHNSON:  I have them.

21         MS. COLES:  4.6.

22         MR. JOHNSON:  That's the SHU room or the other one?

23         MS. COLES:  This is the office.

24         MR. JOHNSON:  6.4.

25         MS. COLES:  Plaintiff's 6.4.

1  BY MS. COLES:

2  Q.  Does this appear to be a photograph of -- I think there is

3  one for you too.

4  A.  Okay.  Yes, ma'am.

5  Q.  All right.  So you were describing where you would be

6  standing.  During the pelvic examination where would Mr. Rolston

7  be?

8  A.  During the exam, right there.

9  Q.  So he is there in between the stirrups?

10  A.  Uh-huh.

11  Q.  Where would you be standing?

12  A.  Right there.

13  Q.  All right.  And from that vantage point, what can you see?

14  A.  Pretty much everything.

15  Q.  Okay.  So the patient is draped somewhat?

16  A.  Uh-huh.

17  Q.  Is that a yes?

18  A.  Yes.  I'm sorry.  Yes.

19  Q.  So I am imagining you are not staring at the patient's

20  vagina during the whole exam?

21  A.  No, ma'am.

22  Q.  But can you see what Mr. Rolston is doing?

23  A.  Yes.

24  Q.  Can you observe what his hands are doing when he is

25  actually touching the patient's vagina?

1  A.   I can see when I am handing him the -- when we are doing

2  the actual exam, I am handing him all the speculum, the tube,

3  the specimen container.  So, yes.

4  Q.   How many times would you estimate that you have had

5  occasion to observe Mr. Rolston when you were chaperoning during

6  a well woman exam at FCI?

7  A.   Repeat the question.

8  Q.   How many times would you estimate that you chaperoned for

9  Mr. Rolston for well woman exams?

10  A.   I can't give you a number.  I don't know.

11  Q.   Would it be several times a week when you were working with

12  him?

13  A.   It's a guesstimation.  I don't know.  Couple times to 10 --

14  7 to 10.

15  Q.   A week?

16  A.   Maybe, yeah.

17  Q.   Okay.  So, well woman exams we have already talked about;

18  it involves a pelvic exam, a vaginal exam, and sometimes a

19  rectal exam; is that right?

20  A.   Yes, ma'am.

21  Q.   Would it be unusual for a provider at FCI to do a rectal

22  exam as part of a well woman exam?

23  A.   That's normal.

24  Q.   What about pinching or applying pressure to the nipple

25  during a breast exam, is that something that was routine?

1  A.   Yes, ma'am.

2  Q.   Did you ever know Mr. Rolston to perform well woman exams

3  or pelvic examinations without the presence of a chaperone?

4  A.   Never.

5  Q.   Did you ever perceive that Mr. Rolston conducted an unusual

6  number of vaginal exams?

7  A.   No.

8  Q.   What about unusual number of rectal exams?

9  A.   No.

10  Q.   An unusual number of breast exam?

11  A.   No.

12  Q.   Did he seem to be doing an abnormal number of Pap smears

13  compared to the other providers?

14  A.   No.

15  Q.   Did you ever hear Mr. Rolston try to talk someone into

16  getting a vaginal exam that they didn't want?

17  A.   No.

18  Q.   That said, did you ever hear Mr. Rolston educate patients

19  about their health?

20  A.   All the time.

21  Q.   Can you explain to me the things -- the type of things you

22  would hear him educate patients on?

23  A.   Anything that generally a provider would teach; monthly

24  breast exams, signs and symptoms to look for, complications if

25  you are having treatment, if you are having menstrual -- just a

1  variety of different things.  Pretty much anything that would be

2  involved in a wellness visit, like when you go to your own

3  doctor.  He taught how to perform breast exams, what to look

4  for, signs and symptoms.  Teach them how to do it appropriately

5  and how important it was.

6  Q.   Did you ever hear him try to educate patients on the

7  importance of preventative or well woman care?

8  A.   Yes.

9  Q.   Did you -- I am assuming, since you observed him do well

10  woman exams, you would have observed as he did things like

11  insert his fingers into the vagina during a pelvic exam?

12  A.   Yes, ma'am.

13  Q.   Did you ever observe him touch anyone's clitoris during a

14  well woman exam?

15  A.   No.

16  Q.   Did you ever see him touch any patient in a sexual manner?

17  A.   No.

18  Q.   Did you ever see him massage anyone's vagina?

19  A.   No.

20  Q.   How about rub on anyone's clitoris until they were aroused?

21  A.   No.

22  Q.   Did you ever see him kneading the vaginal lips of any

23  patient?

24  A.   No, ma'am.

25  Q.   Did you ever see Mr. Rolston himself get sexually aroused

1  during a vaginal exam?

2  A.   No.

3  Q.   Did you ever observe Mr. Rolston moving his fingers

4  repeatedly out of someone's vagina?

5  A.   No.

6  Q.   Nothing inappropriate that you ever observed when you were

7  chaperoning for Mr. Rolston?

8  A.   I have never seen him inappropriate.  He has always been

9  professional.

10  Q.   Is Mr. Rolston adamant about having a chaperone?

11  A.   He always mandated for somebody to come into the room, even

12  when it was inconvenient for us, as the nurse, he would not do

13  it unless there was a chaperone in there.  So we would have to

14  stop our duties and assist.

15  Q.   Do you recall a patient named Shondolyn Blevins?

16  A.   I have heard the name.  I don't know the person.

17  Q.   Did you, as part of your duties, sometimes do assessments,

18  PREA assessment, as an RN if someone made a complaint?

19  A.   Yes.

20  Q.   And would you enter that into the patient medical chart?

21  A.   Yes, ma'am.

22  Q.   And this is not published.  This is not admitted.  But I am

23  about to show the witness 109-7, USA's.

24      Does this appear to be a copy of a medical record on Ms.

25  Blevins?

1   A.   Yes, ma'am.

2   Q.   Were you the provider who completed this medical record?

3   A.   Yes.

4   Q.   Is it July 16, 2016?

5   A.   June --

6   Q.   The encounter date?

7   A.   Yes, ma'am.

8   Q.   All right.

9        MS. COLES:  I move to admit this.

10       THE COURT:  It's admitted.

11       (DEFENDANT EXHIBIT 109-7:  Received in evidence.)

12  BY MS. COLES:

13  Q.   During that exam, would you have taken information from the

14  patient as well as conducted a physical assessment?

15  A.   Yes.

16  Q.   During this particular assessment, did Ms. Blevins deny

17  that any inappropriate sexual behavior had occurred with a male

18  provider on June 30th, 2016?

19  A.   No.  There is no indication of anything that happened.

20  Q.   Reading your narrative here --

21  A.   Uh-huh.

22  Q.   -- can you see that -- would you have written down what she

23  told you during that assessment?

24  A.   Yes.  I write everything down exactly as what happens

25  during that visit.

1  Q.   So would you have asked her what her complaint was?

2  A.   Yes.

3  Q.   And so on this date did Ms. Blevins deny any inappropriate

4  sexual behavior by the male provider on June 30, 2016, or on any

5  other visit?

6  A.   She denied it.

7  Q.   She just said she would feel more comfortable with a female

8  in the room; is that fair?

9  A.   Yes, ma'am.

10 Q.   That's what you documented that she said?

11 A.   Yes.

12 Q.   All right.  And down here you wrote:  She states, and then

13 you put a sentence in, in quotes; is that because that's a

14 direct quote from Ms. Blevins?

15 A.   Yes, ma'am.

16 Q.   And what did she say to you on this date?

17 A.   "I just feel more comfortable having a female.  Nothing

18 happened."

19 Q.   All right.  And, above that did she report that the door to

20 Mr. Rolston's office was open?

21 A.   Yes, ma'am.

22 Q.   And did she report that her clothes remained on during the

23 entire assessment?

24 A.   Yes, ma'am.

25 Q.   How would you describe Mr. Rolston's interactions with the

1  inmates?

2  A.   Professional.

3  Q.   Would you say he is firm, fair and consistent?

4  A.   Yes, ma'am.

5  Q.   How would you describe -- have you observed him performing

6  his duties as a PA?

7  A.   Yes.

8  Q.   And how would you describe the way in which he performs his

9  duties?

10 A.   He is very professional.  He is very much interested in

11 educating the patients on taking responsibility of their own

12 care.  He is very much a patient advocate in my experience with

13 him.

14 Q.   Would you say he goes above and beyond?

15 A.   Yes, ma'am.

16         MS. COLES:  Thank you very much.  No more questions.

17         THE COURT:  Cross-examine?

18         MR. JOHNSON:  No, Your Honor.

19         THE COURT:  Thank you, Ms. Paynter.  You may step

20 down.

21         Please call your next witness.

22         MR. CARTER:  Your Honor, we have no other witnesses.

23         I'd like to make sure I have one of my exhibits, but

24 other than that we would rest.

25         THE COURT:  Members of the jury, as I told you at the

1  beginning, the plaintiff goes first and when the plaintiff

2  announces "rest" the defense goes.  And when the defense

3  announces "rest" the plaintiff then can present evidence just

4  responding to something new and different in the defense case.

5  That's called the rebuttal phase of the trial.  There is not

6  always any rebuttal evidence, but if there is this is the time

7  at which it would be presented.

8          Mr. Johnson or Mr. Cook, is there a rebuttal case, and

9  if so, please call your first witness.

10          MR. COOK:  Yes.  Rebuttal.  We call Ms. Alexander.

11          THE COURT:  Ms. Alexander, you may be seated.

12          You are still under oath.

13          Mr. Cook, you may proceed.

14                    CHARNESHA ALEXANDER,

15  recalled as a witness, having been previously sworn by the

16  Court, was examined and testified as follows:

17                    REDIRECT EXAMINATION

18  BY MR. COOK:

19  Q.   Ms. Alexander, did Paul Rolston ever visit you at

20  cell-front before the examination?

21  A.   No, sir.

22  Q.   Did you have a vaginal discharge related to a bacterial

23  infection on the date of your examination on September 27th,

24  2016?

25  A.   No, sir.  I was just bleeding heavy.

1  Q.   Okay.  When you talk about heavy bleeding, what kind of --

2  how much bleeding did you have in terms of, for instance,

3  sanitary pads, or whatever?

4  A.   The best way I can explain it, I have a problem with my

5  period.  I have irregular period.  So they put me on birth

6  control pill to regulate my period.  At the time I was having a

7  period like 14 to 15 days.  That's why we put me on birth

8  control pills to regulate it.  My period -- I was like my second

9  day on my period and I cramp real bad because what I'm doing,

10  I'm passing blood clots that make me feel like I am having

11  contractions.  So that's my cramping came from and the heavy

12  blood.

13       So, at that time I was maybe going through four to six pads

14  a day, heavy, including tissue that I put on top of the pad

15  because in prison you don't have the thickest pads, the best

16  pads that you can have.  So I wrap wads of tissue, put it inside

17  of the pad.

18  Q.   When you talked to Paul Rolston about having six to seven

19  out of on a scale of ten pain, what were you talking about?  Was

20  it pain from an infection, or was it --

21            MR. CARTER:  Objection.  Leading.

22            THE COURT:  Not yet.  Go ahead.

23  BY MR. COOK:

24  Q.   Okay.  What was the nature of the pain that you felt that

25  you described as six to seven out of ten?

1   A.   My pain was from my cramping and I told him.  I also told

2   him that I felt uncomfortable and I never had a Pap with my

3   period on, and I felt uncomfortable doing that with my period

4   being so heavy.  And that I had done cured what I had going on.

5   Q.   Was menstrual cramping -- severe menstrual cramping a

6   common symptom of your menstrual cycle?

7   A.   Yes.  At that time.  That's why I was continuing -- when I

8   came in prison, before I came to prison I was taking birth

9   control pills.  When I self-surrendered and turned myself in, I

10  took my medicine with me.  So, they followed up on me and gave

11  me the same medicine.  And one of those medicines was birth

12  control pills to try to regulate my period.

13  Q.   Now, when Mr. Carter talks about how would he know about

14  your home and children, certainly he knew you had a home; isn't

15  that true?

16  A.   I guess he would.  Like -- like Mr. Rolston testified

17  today, he said that inmates come in regular and talk about their

18  kids, and how they feel bad about leaving their kids, but I

19  didn't have a conversation with him about my family.

20  Q.   And the fact that -- he knew that you had had pregnancies;

21  right?

22  A.   Yes, sir.  They would have been in my records because my

23  record followed me from 2015.

24  Q.   But you never said anything to him about your children?

25  A.   No.

1    Q.   Okay.  Tell the jury why you broke into tears.

2    A.   After he played with my vagina -- first of all, while I was

3    on my period, and I got stimulated and he playing with my clit

4    like that, while I wasn't in the best setting being in prison,

5    but going into a medical setting, in a medical environment, I am

6    thinking that I am supposed to be taken care of.  Even in the

7    prison system they say they are there to serve and protect.  I

8    was just violated and I felt guilty because of the fact that I

9    know I did a crime, but I didn't deserve what he did to me.  So

10   at that moment I was in shock.  I just was still because I

11   couldn't believe that he was doing that to me.  Period.  It was

12   disgusting and I relive it all the time.

13   Q.   Did you ever -- when he queried you about your crime, did

14   you ever nod to him?

15   A.   Excuse me.

16   Q.   Nod.  Did you ever nod?

17   A.   When?

18   Q.   When he said that he asked you about your home and children

19   and the reason that you were crying, and he said you nodded.

20   Did that take place?

21   A.   I just looked down and I continued to cry.  He handed me

22   the paper and I signed off.

23   Q.   Did you have any of the long conversations that are

24   reflected in your medical records?

25   A.   Of what?

1  Q.   Did you have long conversations with Mr. Rolston about --

2  that show up in your medical records that he says you told him

3  this and that?

4  A.   I never did.  One thing about staff members and inmates,

5  they don't get personal.

6  Q.   So, where he reflects that you and he had long

7  conversations about your health problems, those never happened?

8  A.   No; that never happened.  He would have had records of that

9  in my file.

10 Q.   Well, you read his report; right?

11 A.   I read it, but I don't remember everything that it said.

12 Q.   Okay.  Did -- were conversations reflected in those reports

13 that actually didn't happen?

14 A.   A lot of it.  Majority of it didn't happen.  A lot of

15 things that he diagnosed me with, a lot of conversations that he

16 said we had, it's not true.  The things that he said he did,

17 like it was something normal, that I was going in there on a

18 normal pap, that's not true.  Me telling him that I was

19 uncomfortable, and my period was on, and I was heavy, and I

20 didn't want it to take place, he didn't acknowledge that.  He

21 still did it.  He went against me, my rights, and just violated

22 me to this day.

23            MR. COOK:  I have no other questions.

24            THE COURT:  Cross-examine?

25            MR. CARTER:  No questions, Your Honor.

1          THE COURT:  Thank you, Ms. Alexander.

2          You may step down and return to counsel table again.

3          Please call your next witness.

4          MR. JOHNSON:  We don't have any more.

5          THE COURT:  Plaintiff rests?

6          Members of the jury that makes this a convenient time

7     to break for the day.  All the evidence is now in.  Tomorrow

8     morning we will start with the closing arguments of the lawyers

9     and then I will give you your instruction on the law and you

10    will have the case to deliberate.

11         Even though you have gotten all of the evidence on

12    both sides, it's still not time to start talking about the case

13    yet.  Continue to abide by the instructions.  Don't talk about

14    the case, even with each other, until you have heard the closing

15    arguments and my instructions on the law so that you know what

16    you are going to be dealing with.

17         Don't get any information from any other source.  Have

18    a safe and pleasant trip home and back in the morning.  We will

19    start with you at 9 o'clock tomorrow morning.

20         Thank you.  Have a pleasant evening.

21         Leave your pads right there on your chair.

22       (Jury out at 5:03.)

23         THE COURT:  You may be seated.

24         Couple of notes: I sustained the objection to the

25    questions to Mr. Rolston why the women complained.  The question

1    is, what's in somebody else's mind.  It's not a proper question.

2         Did he think there was a conspiracy?  Again, he can

3    testify to personal knowledge, but that's not a proper question.

4         Mr. Cook, you started a question by saying:  I think

5    it was suggested that the Pap and the pelvic exams were the same

6    thing.  I don't think the defense has ever suggested that.  You

7    suggested that.  They responded to it and said that wasn't true.

8         Let's get back to the one that was important that we

9    were talking about before the break and I said we'd come back

10   to.

11        Your question to, I think, Mr. White, was whether

12   there were frequent complaints about Mr. Rolston.  The order

13   says that "these are not to be mentioned in the jury's hearing,

14   or suggested to the jury in any way.  Comments about

15   Mr. Rolston -- but this does not preclude evidence in the judge

16   only part of the trial outside the jury's hearing about

17   statements made by a government employee at any time, or

18   statements made to a government employee before the last alleged

19   assault on the plaintiff."

20        This is a question:  What comments did you hear about

21   Mr. Rolston.  That's exactly what this order says you cannot

22   suggest to the jury in any way.

23        This is at least the fourth violation of this order.

24   And it suggests, again, to the jury that there is information

25   that is out there, but that they are not getting, about what's

1    really going on.  This kind of plays into what a couple of your

2    witnesses said about how they lie, the Bureau of Prisons, and

3    they don't take our word for anything, and that theme.

4             This is not okay.  What do you think I should do with

5    a lawyer who repeatedly violates the order?

6             MR. COOK:  Your Honor, I didn't believe that I was

7    violating the order.  I believed that it was relevant to

8    Mr. Rolston's case that one of the nurses had reported to

9    Lieutenant Commander White that there were complaints.  He had

10   denied that he had ever heard any complaints.

11            THE COURT:  Let me back up and explain this one more

12   time to you.  My question was, what should I do.

13            I understand your defense is, you don't think it

14   violates the order.  And the explanation why it doesn't violate

15   the order is, it's relevant to the case.

16            When I enter an order in limine -- and I try to make

17   it as clear as I can -- unless authorized on a request made

18   outside the jury's hearing, these must not be mentioned in the

19   jury's hearing or suggested to the jury in any way.

20            It is not okay for you to decide I am wrong, this is

21   relevant, and you're going to do it anyway.

22            So the suggestion that this is relevant to the case,

23   that doesn't get it.  It doesn't matter whether it's relevant to

24   the case.  If things had developed to the point where this ought

25   to be admitted, the way to deal with it is to raise it with me

1  outside the jury's hearing.  You are not allowed just to violate

2  my order because you think it's wrong.

3         MR. COOK:  To answer your question, Your Honor, I

4  think that any penalty should be against me and not against my

5  client, or the case.

6         THE COURT:  What do you think the penalty should be?

7         MR. COOK:  A fine.

8         THE COURT:  Mr. Carter, you want a mistrial?

9         MR. CARTER:  Can I talk to my client, Your Honor?

10        THE COURT:  Absolutely.

11        (Pause in proceedings.)

12        MR. CARTER:  Your Honor, we are not going to move for

13  a mistrial at this point.  We would ask, Your Honor, that the

14  jury instructions reflect another curative instruction.  I would

15  only ask for that because it's so repeated over and over and

16  over again.

17        I know Your Honor has given that curative instruction,

18  but I would think, where we are now, it needs to be part of the

19  jury instructions.

20        THE COURT:  I think it's in the jury instructions, at

21  least generally.  Tell me what you want them to say.  Before I

22  ask -- here is where I think it's in there.

23        First, I have told them --

24        MR. CARTER:  Honestly, I hadn't read it as carefully

25  since I've been up at the podium.

1          THE COURT:  You are probably trying a case.  I get it.

2          I have told them five or six times by now, maybe 10 or

3    12 times by now, that they are going to decide the case based

4    just on the evidence.  That was said repeatedly during jury

5    selection and said during my preliminary instruction.

6          It is said again here in the run up, the early part of

7    the instructions, and then it's said at the end.  And that's

8    where I added the 404(b) instruction.

9          That instruction really does go to other women.  That

10   doesn't go to -- that goes to the other women who testified, not

11   to this suggestion that there are lots of other women out there

12   that they just haven't heard from.

13         MR. CARTER:  I think that's our concern.

14         THE COURT:  What would you have me say?  I mean, it

15   almost just suggests it all over again.  I already gave the jury

16   a pretty stern instruction during the trial about something that

17   should not have been mentioned at all.  That may be the --

18         MR. CARTER:  I was thinking.

19         THE COURT:  -- that may be the only comment I have

20   ever made in 25 years of trying cases that a lawyer had

21   over-stepped the bounds.  I don't think I have ever had to turn

22   to a jury and say what I have already said once in this trial.

23   I have had to tell the jury once or twice about an expert who

24   kept talking when they were told not to, but I don't think I

25   have ever had to say something shouldn't have come up the way I

1   did in this trial.

2          MR. CARTER:  Your Honor, what part of the early

3   instruction -- like I said --

4          THE COURT:  It's just the standard instruction, if you

5   will decide the case.

6          MR. CARTER:  On the issues of the case.

7          THE COURT:  Yeah.  Paragraph starts at the bottom of

8   page two.

9          MR. CARTER:  I think we want something that

10  reflects -- I know it says only on this case, but not about

11  other complaints that you have not --

12         Well, I will think about it.  I haven't had a chance

13  to think what it ought to be.  If I have something tomorrow I

14  will --

15         THE COURT:  I can tell them something like:  Each side

16  has had an opportunity to present all of the relevant evidence

17  in the case.  Any suggestion that there is any other evidence

18  that's not before you is just not correct.

19         MR. CARTER:  I mean, that's kind of what we are trying

20  to get to.

21         THE COURT:  What else, if anything, do we need to do

22  this evening?

23         There was a defense motion at the end of the

24  plaintiff's case.  As I indicated then, it really goes to the

25  jury instructions and I think I have handled it in the jury

1    instructions.

2            MS. COLES:  Yes, Your Honor.  We agree.

3            THE COURT:  All right.

4            How long you want for closing?

5            MR. JOHNSON:  I want the 75 minutes I always request

6    when you deny it and give me 60.

7            THE COURT:  Mr. Carter, how long would you like?

8            MR. CARTER:  Ms. Coles is going to handle closing.

9            THE COURT:  Ms. Coles, how long would you like?

10           MS. COLES:  I think an hour.

11           THE COURT:  Mr. Johnson, I hear your request for 75

12   minutes.  I'm going to give you 60.

13           Yeah, look, you have all heard the speech.  I watch

14   lawyers make closings and I can almost tell when the lawyer

15   realizes that they have got plenty of time, and the nice,

16   well-organized, tightly reasoned closing breaks down into just

17   kind of rambling along.  You are all good at this.  Focus and

18   address the case and you will be fine.  But I do think an hour

19   is -- you will get it all in, in an hour, won't you,

20   Mr. Johnson?

21           MR. JOHNSON:  I always do.  I just want to have the

22   extra time so I am not worried about it and I wouldn't use it if

23   I got it, but I just feel secure.

24           MS. COLES:  I am fine with that.

25           THE COURT:  Well --

1      MS. COLES:  Whatever the Court wants.

2      THE COURT:  An hour is plenty.  So I will give you an

3  hour a side.  What else, if anything, do we need to do this

4  evening?

5      I will get you a clean copy of the instructions so if

6  you want to put on the presenter and use them you will have a

7  clean copy to do that with.

8      I think at the point of talking about the verdict form

9  you hadn't really studied it.  Is the verdict form okay?

10     MS. COLES:  I still haven't read the one --

11     MR. COOK:  It looked good to me, Your Honor.

12     MR. JOHNSON:  Me too.

13     THE COURT:  The defense needs to look at it.

14     MR. CARTER:  Will you be filing the jury instructions

15  on ECF tonight, or are you just going to give them to us

16  tomorrow?

17     THE COURT:  I will give them to you tomorrow, but if I

18  come up with some language to add I will post that somehow

19  tonight.  I may post a tracked-changes version that shows any

20  change, or I may just post the one or two pages.  But I will

21  make it clear what you've got and I will have a clear copy in

22  the morning.

23     I will hear what you have to say in the morning.  Be

24  here by quarter of nine so if somebody objects to the language,

25  or whatever, we can deal with it.

```
1            Thank you all.  We are adjourned.

2        (Proceedings concluded at 5:18 on Wednesday, September 15,

3    2021.)

4                        * * * * * * * *

5            I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
6    Any redaction of personal data identifiers pursuant to the
     Judicial Conference Policy on Privacy are noted within the
7    transcript.

8

9    /s/ Lisa C. Snyder                       1/13/2022

10   Lisa C. Snyder, RPR, CRR                 Date
     Official U.S Court Reporter
11
```

12                          **I N D E X**

13   DEFENDANT'S WITNESSES                              PAGE

14   PAUL ROLSTON
     Direct Examination By Mr. Carter                     7
15   Cross-Examination By Mr. Johnson                   137
     Redirect Examination By Mr. Carter                 150
16
     DR. LAURA PRESTON
17   Direct Examination By Mr. Carter                   152
     Cross-Examination By Mr. Cook                      157
18   Redirect Examination By Mr. Carter                 165

19   DR. JOANN HOLOKA
     Direct Examination By Mr. Carter                   168
20   Cross-Examination By Mr. Cook                      173
     Redirect Examination By Mr. Carter                 184
21
     DR. SAMUEL BRIAN WOLF
22   Direct Examination By Ms. Coles                    186
     Cross-Examination By Mr. Cook                      203
23   Redirect Examination By Ms. Coles                  213

24   HAROLD WHITE
     Direct Examination By Mr. Carter                   214
25   Cross-Examination By Mr. Cook                      224
     Redirect Examination By Mr. Carter                 229

| DEFENDANT'S WITNESSES | PAGE |
|---|---|
| JALANDRIAN REED | |
| Direct Examination By Mr. Carter | 236 |
| Cross-Examination By Mr. Johnson | 246 |
| DORINDA PAYNTER | |
| Direct Examination By Ms. Coles | 249 |

| PLAINTIFF'S REBUTTAL WITNESS | PAGE |
|---|---|
| CHARNESHA ALEXANDER | |
| Redirect Examination By Mr. Cook | 261 |

**E X H I B I T S**

| DEFENDANT'S EXHIBITS | | OFFERED | RECEIVED |
|---|---|---|---|
| 27 | BOP Patient Care Policy | 26 | 26 |
| 31B | Policy and Procedure | 32 | 32 |
| 35 | Policy and Procedure document | 31 | 31 |
| 7 | Patient care program statement | 217 | 217 |
| 9 | Alexander investigation | 131 | 131 |
| 31A | BOP skills training | 180 | 180 |
| 109-7 | Blevins record | 258 | 258 |

| PLAINTIFF'S EXHIBITS | | OFFERED | RECEIVED |
|---|---|---|---|
| 6.7 | Photograph | 60 | 60 |
| 6.9 | Photograph | 61 | 61 |
| 6.13 | Photograph | 62 | 62 |
| 6.14 | Photograph | 63 | 63 |
| 48 | Barnett medical records | 86 | 86 |
| 49 | Batchelor medical records | 109 | 109 |
| 50 | Blevins medical records | 121 | 121 |

| PLAINTIFF'S EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| 53    Farber medical records | 105 | 105 |
| 55    Rodriguez medical records | 114 | 114 |
| 83.3  Email | 148 | 148 |

1          **UNITED STATES DISTRICT COURT**
           **NORTHERN DISTRICT OF FLORIDA**
2              **TALLAHASSEE DIVISION**

3    CHARNESHA ALEXANDER,              )
                                      )
4              Plaintiff,             ) Case No: 4:19cv138
                                      )
5          v.                         ) Tallahassee, Florida
                                      ) September 16, 2021
6                                      )
     UNITED STATES OF AMERICA         )
7    and PAUL ROLSTON,                )
                                      ) 8:49 AM
8              Defendants.            ) VOLUME IV
     _____  )

9

10                 **TRANSCRIPT OF JURY TRIAL**
            **BEFORE THE HONORABLE ROBERT L. HINKLE**
                **UNITED STATES DISTRICT JUDGE**
11                 **(Pages 1 through 77)**

12   APPEARANCES:

13   For the Plaintiff:       James V. Cook, PA
                              By:  JAMES V. COOK
14                                 Attorney at Law
                                   cookjv@gmail.com
15                            314 W. Jefferson Street
                              Tallahassee, Florida 32301
16
                              Richard E. Johnson, PA
17                            By:  RICHARD ERROL JOHNSON
                                   Attorney at Law
18                                 rick@rej-law.com
                              314 W. Jefferson Street
19                            Tallahassee, Florida 32301

20

21                    *LISA C. SNYDER, RPR, CRR*
             **Official United States Court Reporter**
22        **111 North Adams Street, Tallahassee, FL 32301**
             **(850)567-1374 * lisasnydercr@gmail.com**

23

24          *Proceedings reported by stenotype reporter.*
       *Transcript produced by Computer-Aided Transcription.*

25

**P R O C E E D I N G S**

1  (Call to Order of the Court at 8:49 AM on Thursday,
2  September 16, 2021.)
3        THE COURT:  Good morning.  Please be seated.
4        The courtroom deputy tells me that there was a
5  question about an exhibit, and then I wanted to talk to you
6  about the instructions.
7        MR. COOK:  Yes, Your Honor.
8        We did not print out 83.3 because that was
9  inadvertently entered.
10       THE COURT:  So you don't want it in.  Is that all
11 right, Mr. Carter?
12       MR. CARTER:  Yes, sir.
13       THE COURT:  So 83.03 is withdrawn and is not in
14 evidence.
15       MR. COOK:  Thank you, Your Honor.
16       THE COURT:  And then I think we had the instructions
17 all done except for the question about whether to add language
18 on the suggestion that there was other evidence that was being
19 excluded.  I did that and circulated it last night.  What do you
20 think?
21       MR. COOK:  Yes, Your Honor.  We have no objection.
22       MR. CARTER:  It's acceptable to us, too, Your Honor.
23       THE COURT:  All right.  Then I think we are all set.
24       I think we left the verdict form, that you were going

1     to look at that more.  Is the verdict form okay?

2              MR. CARTER:  Yes, sir.

3              MR. COOK:  It's fine with us, Your Honor.

4              THE COURT:  All right.  I think that means we have

5     resolved all of the objections to the instructions and

6     everything is in without any issue.  We will be ready for

7     arguments as soon as we get all of the jurors here.

8              MR. COOK:  Yes, Your Honor.  We did have a chance to

9     go back and forth about the larger exhibits and we proposed some

10    reduced exhibits in three cases, and the defendant proposed

11    slightly longer exhibits, to which we have no objection.  They

12    are substantially smaller than the 500 plus page exhibits.

13             THE COURT:  All right.  So you have worked out --

14             MR. CARTER:  We will be able to do that with

15    Ms. Markley before they go back.

16             THE COURT:  I don't think anything needs to be said on

17    the record about it.  The numbers are the right numbers.  It's

18    just that the exhibits that you are going to put in uses the

19    same number and has fewer pages.

20             MR. COOK:  Right.  We defer to them on that.

21             And I would also like to say that their version of the

22    Barnett records are smaller than ours. I believe that's right.

23             MR. CARTER:  It was that much, and we just used the

24    ones that were referred to during the trial.

25             MR. COOK:  And we proposed to use those -- that

1   version instead of our own.

2         THE COURT:  Okay.  So the one that Ms. Markley is

3   going to have will be the proper one.  The reference is on the

4   record that have already been made all work. It will still have

5   the same number, and anybody reading the transcript and matching

6   it should have no difficulty.

7         MR. COOK:  We have our Barnett records in the stack

8   and we would like to take them out and use the defendant's

9   exhibit.  That is number -- our number 48.  We would like to

10   take that out and have it relaced by the defense.  What's your

11   number?

12         MR. CARTER:  It's 48.  I will doublecheck.

13         MR. COOK:  Actually, I think you referred to our

14   exhibit number because yours was different.  But, anyway, the

15   physical set of the exhibit should be what's supplied by the

16   same number.

17         MR. CARTER:  We will doublecheck that, Judge, but they

18   matched what was referred to in court and what Ms. Markley has

19   as the number.  It's just truncated in the sense that they were

20   excerpts that were used in trial.

21         THE COURT:  All right.  I will get you back a clean

22   set of the instructions in just a minute.

23         We are in recess until the jury is here.

24     (Recess taken 8:56.)

25     (Resumed at 9:00.)

1          THE COURT:  Please be seated.

2          MR. COOK:  Thank you.  Your Honor.

3          THE COURT:  Unfortunately, the instructions I printed

4     still say "second discussion draft".  I will give you those.

5     They are good, except for that.  I will get a clean first page.

6     You're not going to show the jury the first page of them anyway,

7     so this is a good copy.  You can use in closing if you wish.

8     Just understand that front page is wrong.

9          Jury in, please.

10         And the verdict form should be good to go.

11       (Jury in at 9:01.)

12         THE COURT:  You may be seated.

13         Good morning, ladies and gentlemen.  Welcome back.

14    Thank you for being so prompt.

15         What I told you at the beginning of the case about

16    opening statements is also true about closing arguments.  What

17    the lawyers say is not evidence in the case.  All of the

18    evidence has already been admitted.

19         What they say also does not constitute your

20    instruction on the law.  I will instruct you on the law when

21    they have finished.

22         I have told them just exactly what I am going to tell

23    you about the law.  In fact, I have written out my instructions.

24    They have copies.  You will have copies when you go to

25    deliberate.  You will each have your own copy of the

1   instructions.  So the lawyers are free to comment on the

2   instructions, and, of course, to comment on the evidence.

3        Even though the arguments are not instructions on the

4   law, and not evidence, the arguments are important.  They are

5   designed to help you as you go about analyzing the evidence to

6   determine the facts of the case.  They are designed to help you

7   as you go about applying the law to the facts of the case.  So I

8   do ask that you give the lawyers your close attention as I

9   recognize them for their closing arguments.

10       The sequence of argument is the same as the sequence

11   of presentation of evidence during the trial.  The plaintiff

12   goes first, followed by the defendant.  The plaintiff then can

13   respond to the defense argument.  The plaintiff gets to go first

14   and last because she has the burden of proof in the case.

15       Finally, I tell you this, there is a time limit.

16   There are good lawyers on both sides.  We talked about how long

17   they needed, and set a time limit, so if I call time on them it

18   will be because they have had enough time.  I don't expect to do

19   that.  I expect that they will get their arguments in within the

20   time limit.

21       I do ask you to give them your close attention.

22       Mr. Cook or Mr. Johnson.

23       Mr. Johnson?

24       MR. JOHNSON:  Good morning.

25       This case boils down to who you believe.  Charnesha

Alexander says it was a sexually inappropriate
self-gratification.

Paul Rolston says it was a normal well woman medical
exam.

Ms. Alexander has the courage to say Mr. Rolston is
lying.  We will have to wait and see if Mr. Rolston does because
so far what he has been doing is skirting around the question
with innuendoes, with suggestions, with hints that Charnesha
Alexander is a liar, and that the various Me Too witnesses:
Ashley Barnett, Connie Batchelor, Daphne Rodriguez, Shondolyn
Blevins, and Beth Danielle Farber are also all liars.  No
evidence, but just the hint, the innuendo that they talked to
each other, they know each other.  And no evidence that they
talked to each other about this, but just that little hint that
they are plotting and scheming, that they all got together and
that they got their story straight.

See if there is any proof of that or just see if
that's a suggestion that anybody could make about anything.

You heard the testimony from Ms. Alexander, and I am
going to touch lightly on it but I am not going to go into
details of telling you what you had two good ears to hear and
the pen to take whatever notes you want.

She had a yeast infection that she cured with yogurt
while she was waiting for an appointment.  When she finally got
the appointment she was on her period.  She had a heavy flow and

1    she had severe cramps.

2         She had had a Pap smear well within the three years

3    standard and was not due for another.

4         During the examination, Mr. Rolston manipulated her

5    labia.  He stimulated her clitoris to arousal.  She began crying

6    during the examination.  She told Leticia Davis, who was the

7    chaperone, that Rolston had "finger fucked me."

8         No doctor had ever done anything like that before to

9    Ms. Alexander, nor to any of the six other women that you heard

10    from.

11         She was crying inconsolably.  She was escorted back to

12    her cell.  She says that Investigator Proffitt came and he

13    confirms that and he took a statement from her.

14         She says that Mr. Rolston came to the cell twice and

15    had to be turned away.

16         Mr. Rolston went back and he wrote a very elaborate

17    note for that day justifying all of the things that he did

18    retroactively because he had been accused.  And he went back and

19    he kept that file open after hours and wrote a justification for

20    it.

21         Ms. Alexander was taken to the hospital and she made

22    reports and she was encouraged to report for other women if not

23    for herself, by Ms. Jackson, who was escorting her back.

24         Now I have seen and you have seen a lot of

25    trivialities and wherever there can be any kind of perceived, or

1 imagined conflict in the testimony. I could not believe they

2 were going there when they did that thing about when she said he

3 put his hand in there, and they were trying to make it into he

4 put his whole hand into the vagina.

5       They were wondering if -- you said way back when that

6 the pressing on the pelvis came before the finger in the vagina,

7 and now you think it might have come in the opposite sequence.

8 Just little things like that that some trauma victim is going to

9 tell the story years apart and might not remember what the exact

10 sequence of events.

11       There was a festival of fly specking and knit picking

12 over little imagined or perceived or manufactured

13 inconsistencies in the testimony of various witnesses.

14       There was another thing that was troubling to me and

15 that is this notion of alternate stressors. The notion of

16 alternate stressors is that if somebody is already down you can

17 go ahead and kick them because they are already hurt, and

18 whatever marginal difference you make is not going to be worthy

19 of notice.

20       So that if you do an abusive pelvic exam on somebody

21 who is having trouble with her husband, then she doesn't deserve

22 as much compensation as somebody who is in a good marriage.

23       If you injure somebody who has got trouble with their

24 children, well, you know, that's a lesser offense than if you

25 injured somebody who was not having trouble with their children.

1    So the notion is that you have a cup of suffering and

2  that your cup of suffering will get filled up, and it can't hold

3  any more suffering, so after you have reached the fullness of

4  your cup of suffering they can kick you in any way they want,

5  they can do whatever injury they want to you because you have a

6  whole bunch of other injuries and your cup of suffering is full.

7    That's the notion of alternate stressors, and it's

8  just a fancy word of justifying kicking a person while they are

9  down.

10    Now, you had, what is commonly called now, the Me Too

11  witnesses and there were Alexander -- Alexander was the

12  plaintiff, is the plaintiff; the other witnesses are Barnett,

13  Batchelor, Rodriguez, Blevins, and Farber.  Five Me Too

14  witnesses and one plaintiff, all -- so what you can do with the

15  Me Too witnesses.  The judge has told you repeatedly --

16    MS. COLES:  Objection.

17    THE COURT:  Overruled.

18    MR. JOHNSON:  The judge has told you repeatedly that

19  this case is not their case.  It's Ms. Alexander's case.

20    Now you are going to be hearing some jury instructions

21  and they are going to say, about the testimony of those five

22  women, you may consider this on these issues:  Whether

23  Mr. Rolston had an opportunity to engage in a sexual act or

24  sexual contact during medical examinations; his intent while

25  examining Ms. Alexander; and, whether any contact with

1    Ms. Alexander was a mistake or an accident.

2         So, the opportunity you would want to take into

3    account for the opportunity factor that most, if not all, of the

4    witnesses spoke about the inattentive chaperone, how that

5    created an opportunity for Mr. Rolston.

6         The intent I think you can draw from the fact that

7    four of the six talked about clitoral stimulation.  And that, to

8    me, is going to be the nub of this thing.  That's the offense

9    that everybody agrees is an offense.

10        Every doctor who was up here said:  No, you can't

11   stimulate the clitoris.

12        There were people disagreeing about can you do a Pap

13   smear on a menstrual period, and there is this factor and that

14   factor and this whole complex set of decision components that go

15   into that.  And there were disagreements about other things;

16   about how long and what factors you take into account woman to

17   woman.  But there was that one thing that everybody said, you

18   don't stimulate the clitoris during the exam.

19        And so if you have four of the six saying that

20   happened, it's not that more people make a stronger case; it's

21   that more people can create an intent, can provide evidence of

22   Mr. Rolston's intent while doing the examination.

23        And they can provide evidence that this was not a

24   mistake or an accident.  It wasn't just a glancing blow, or an

25   accidental touching, or something incidental.  That's what you

1     can draw from that.

2            Now there is something that was never spelled out, but

3     it was always an undercurrent, and that was these are only

4     prisoners.

5            You heard the defense make the most of their criminal

6     background, whatever misdeeds they had perpetrated in their

7     lives.  But what you need to understand is that these women are

8     uniquely vulnerable.

9            If they make a report -- you heard several of them say

10    they feared being sent to the SHU, the Special Housing Unit,

11    where you get taken out of your educational programs.  Your drug

12    programs, that can take some time off of your sentence, you may

13    have to start over again.  You only get three showers.  You risk

14    being shipped.  And you lose your telephone privileges.  You

15    lose your visiting privileges.  These various things happen to

16    you when you go to the SHU under protective custody.  It's the

17    same as when you go there under disciplinary custody and people

18    just don't want to report.

19           And you know, in fact, Mr. Rolston, at the staff

20    level, talked about how he wasn't going to report people making

21    false allegations against him because reports are futile in this

22    prison.  It's a waste of time.  So what that tends to do is it

23    stifles the complaints and it contributes to a culture of fear

24    of complaining.

25           We also need to understand that sexual abuse is not

1  part of an inmates' sentence.  They get sentenced to a certain

2  number of years.  That's the sentence.  They don't get sentenced

3  to being abused.

4          And this is not a job perk.  It's not that these men

5  get their paid vacation, and their health insurance, and their

6  holidays, and their retirement, and access to the women.  It's

7  not even an informal benefit, although somebody may treat it

8  that way.

9          Now the credentialing thing is something that I think

10 is at the core of what the defendant's case was.  We were here

11 yesterday starting at 9 AM with Paul Rolston's testimony, and it

12 ended at 12:30 when we went to lunch.  That was just direct.

13 That was not the cross and redirect.  That was three and a half

14 hours.  And about five minutes of it, if that, were about

15 whether he did what Ms. Alexander said he did.  And what was the

16 rest of it?  Credentialing.

17         There was a poem that I was forced to study in high

18 school, Shakespearean sonnet, and it begins with the line "When

19 in the chronical of wasted time."  And I thought when the

20 transcript of this trial comes out I am going to type over the

21 section of Paul Rolston's testimony, "chronical of wasted time"

22 from Shakespeare, because if you have two hours and 30 minutes,

23 and two hours and 25 of those minutes are about credentials --

24 where did the guy go to school, what jobs has he worked in, what

25 certificates has he held, what honors has he earned, all of

these sorts of distinctions -- how does that help you decide
that he is telling the truth?

Is somebody who went to Yale more truthful, per se,
than somebody who went to Tallahassee Community College, or
Kaiser, or who got a GED in prison?  Is that a measure of truth
in any way?  They want you to consider credentials.

Sure he went to Yale.  He has impressive knowledge.
He is articulate.  He is affable.  He is likeable.  He has good
references.  He has all of these people who will come in and say
he is a wonderful person.  He is a good character.  I have never
seen him do anything inappropriate.  But think about that for a
minute.

Do you think he would do anything in front of one of
these doctors?  They say they have never seen him do anything
inappropriate in a vaginal exam, and they have watched some of
his vaginal exams, do you think he would do it in front of them?
What good is that testimony?

There is not a chance on God's green Earth that he is
going to do what she says he did, or what these other women says
he did, while there is a doctor looking over his shoulder.  What
is the value of that testimony?  Of course he didn't do it in
front of them.

Some of these women have GED earned in prison, high
school drop-out.  You can compare that to a master's degree from
Yale, and obviously you can see which is the more prestigious

1   credential.  They have a criminal record.  They have unpolished

2   presentations and bad grammar, and all of that short of thing,

3   but, I can tell you that there are many famous people that you

4   probably know about who have even better credentials than Paul

5   Rolston who have been guilty of serial sexual abuse.

6           THE COURT:  Sustained.

7           MR. JOHNSON:  They are privileged.  They are in charge

8   of inmates in this prison.  They can order them around.  But

9   there is only one class of officers that can have them take

10  their clothes off and touch their private parts, and that's in

11  the medical.  So they are even more privileged than the

12  officers.  It's not part of anybody else's job to touch

13  somebody's naked private parts.  Working under that title

14  confers a special responsibility.

15          There is a scriptural passage from Luke that says,

16  "Much is expected from those to whom much is given."

17          They have a duty that goes with the power.  When you

18  have the power to put your fingers in somebody's body, you have

19  a special responsibility not to use that power to injure that

20  person in any way.  And I think everybody knows that sexual

21  stimulation has deep psychological resonance for some people --

22  for just about everybody.

23          I think anybody who is having those private parts

24  touched -- and I think you heard about the -- you heard the

25  testimony from Ms. Alexander that she was disgusted with

1    herself.

2           You heard the testimony from Ms. Farber how she was

3    disgusted with herself.  She hated herself because she was

4    letting herself get turned on in this inappropriate circumstance

5    where she should not have been turned on.  And that's some of

6    the damage it can do.

7           It's not the damage of being hit by a car, or being

8    punched in the face, but it's a more deep, and really a more

9    lasting and enduring and damaging kind of thing that has a

10   less-familiar path than being hit by a car.

11          Now, if the prestige of a person's school, or the

12   distinguished status of their friends, or their success in their

13   career, is not how you judge credibility, how do you judge

14   credibility?

15          Well, I am glad you asked because the jury

16   instructions are going to tell you something.  They are going to

17   say:  Did the witness have an adequate opportunity to see and

18   know the things the witness testified about?

19          Two, did the witness have a good memory?

20          Three, was the witness honest and straightforward in

21   answering the questions?  And I want you to reflect back on my

22   asking Mr. Rolston about him being moved from the women's prison

23   over to the men's prison.  And he says he does not remember who

24   moved -- who gave the order to move him.  Does not remember who

25   told him he was going to be moved.  Does not remember what

conversations he had with any of his peers or his superiors

about being moved.  And this has got to be a pretty heavy event

in a professional's life, that you have been accused of sexual

misconduct and you are going to be moved from one job to another

on the same property and you don't remember anything about it.

That's not credible.

The next thing is four; did the witness have an

interest in the outcome of the case or any reason not to tell

the truth?  Well, what's going to happen to Mr. Rolston if he is

convicted?  He has an interest.  She has an interest, of course,

because she might get some money from you.  But, do the Me Too

witnesses have any interest?  None that I know of.

Did the witness's testimony seem reasonable considered

in light of all of the evidence and the light of your own

experience and common sense?

Did the witness do or say something at some other time

inconsistent with the testimony the witness gave you during the

trial?

And now there is an additional unnumbered one, after

these six numbered ones, and it says if the witness has been

convicted of a felony this is another factor you may consider in

deciding whether you believe the witness's testimony.

She's been convicted of a felony.  That's the only

one, of the six numbered and the one unnumbered, factors that I

think breaks in Mr. Rolston's favor because he has never been

1    convicted of a felony.

2         What we don't need is a category of women who because

3    of some crime they have committed, or some sentence they have

4    been given to be in prison, we don't need that category of women

5    to be fair game for sexual abuse because they are not to be

6    believed because they are felons.  And because the people who

7    perpetrate the abuses on them are distinguished citizens who go

8    to Yale.  We don't need to create that category of women who are

9    just easy targets because they have a less prestigious education

10    or a career.

11         Because, yeah, I mean, it's really just like shooting

12    fish in a barrel to find things in the character of a prison

13    inmate.  They wouldn't be in prison if they didn't have a bunch

14    of things you could sling at them.  They are here in prison.

15    They are prisoners.  They are inmates.  They have been

16    convicted.  Of course, they have bad things in their life.  They

17    have bad things in their character.  Is that going to be an

18    excuse to have your way with them in some sexual fashion because

19    you have a clean record and they have a dirty record?  We don't

20    want to create that category of women in this society.

21         Now, it's not your job, or mine, to figure out what's

22    exactly going on in an offender's mind, in a perpetrator's mind,

23    in Paul Rolston's mind.  There are a bunch of theories out

24    there -- it could be sex, or it could be power, it could be

25    anger, it could be something else.  It does not matter.  It's

some kind of self-gratification.  Only that it's wrong, and that it's against the law that the judge is about to read to you.

Now there are some jury instructions.  There is a verdict form.  This verdict form is saying:  Did Mr. Rolston engage in a sexual act during Ms. Alexander's medical examination on September 27th, 2016.

What is a sexual act?  A sexual act means the penetration, however slight, of the anal or genital opening of another by a hand or finger, or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.

Yes.  That's what happened.  If your question to one is yes, please skip question two and go directly to question three.

Question two, if you answered no, is, did Mr. Rolston engage in sexual contact as opposed to a sexual act.  Sexual contact means intentional touching, either directly or through the clothing, of the genitals, anus, groin, breasts, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.

That's the lesser offense and we have already checked one for the greater offense.

Now we go to three:  What amount of compensatory damages, if any, do you award?  Let me dwell on this.  You're going to have to find -- I told you to check the number one box is what I

1   want.  You're going to have to find that this thing happened --

2   a sexual act -- by the greater weight of the evidence.

3      Now you have probably heard these various weights of

4   evidence.  In the criminal context it's beyond a reasonable

5   doubt.  We are not in the criminal context.  That beyond a

6   reasonable doubt that's probably up around 95 on a scale of a

7   hundred.

8      We are at the greater weight of the evidence.  If you want

9   to put it on a scale it would be somewhere around 51, or if you

10   wanted to consider the familiar scales of justice -- say you

11   have one pound over here and one pound over here, and you put a

12   feather on top of the one pound, that's the greater weight of

13   evidence because you got one pound plus a feather over here and

14   you only got one pound over here.  It's a slightly greater

15   burden.

16      Now for the compensatory damages, we don't have any

17   economic losses.  All we have is mental anguish.  Ms. Alexander

18   testified that not a day goes by that she doesn't think about

19   what Mr. Rolston did to her.

20      Her mother, Ms. Bellamy, testified to Ms. Alexander's

21   social isolation, eating and sleeping problems, irritability,

22   jumpiness, inability to give and receive affection, her crying

23   jags, her peevishness, all occurring, or intensifying, since

24   Mr. Rolston's conduct.

25      Now, awarding these damages is a process that we call

making whole. Mental anguish has no formula. You are meant to draw upon your common sense and your experience of living in the world.

I don't ask you for a specific sum. There is no one way to do it. There is some examples of possible approaches that you can use. One is called a per diem. You can count the days from September 27th, 2016, to September 15, 2021, which is today. I have done it for you. That's 1,814 days. You can assign a dollar value for each day, so if it's a hundred dollars a day that's $181,400, and so forth.

There is another approach. I call it gestalt. And what that is is a total factor approach. It's not a guess. And it's not a number you pull out of the clouds. It is what you are here for. The judge, on the first day, was saying that two heads are better than one, and seven heads are better than two, and you are drawn from the community because you have lived, you have gone to school, you have worked, you have had families, you have had homes, you have lived. And we want the community to make these decisions and you are the representatives of this community.

So, it's all of that -- going to school and working and having friends and having children and having spouses and all of that -- that you bring to bear on this to get what amongst the seven of you seems like the right number. And it's just something that you can do.

Making whole means to put the victim in as good a place as she would have been if she had never been injured, if the offender had never done the wrong to her that was done.

In our jury system, money is the only remedy you are allowed to provide. So, it's not useful -- it's not useful to speculate about the imperfection of the money. Will the money make the hurt go away? No, it won't. It won't. But, it will provide some other relief and it's all we have got.

The task is to do complete justice with the remedy available. You can do justice and be proud of your verdict.

As for the rest, the sum, the nominal damages are only coming into play if you are not going to award compensatory damages.

You come over here and what amount of punitive damages do you award? I am going to put sum again.

Now let me tell you the difference -- an easy way. If you are going to calculate compensatory damages you look at the plaintiff. What has she suffered? What are we trying to make her whole for? What is the amount that would put her as close as it could put her to the condition of not being injured? That's what you do.

When you look at punitive damages you look at the defendant. What is an appropriate amount to punish the wrongdoing first, and, second, to deter the future wrongdoing.

So, in summary, compensatory damages look at the plaintiff,

1  what will make her whole.

2  Punitive damages look at the defendant, what will, A,

3  punish him, and, B, deter him from future misconduct.

4  Thank you very much.  I will reserve whatever I have left

5  for rebuttal.

6  THE COURT:  Ms. Coles?

7  MS. COLES:  Thank you, Your Honor.

8  Good morning.  Mr. Johnson is right about one thing;

9  this case comes down to credibility.  It also comes down to

10  intent and burden of proof.

11  This -- the allegations that have been alleged in this

12  case, they are serious.  These are serious claims.  They're

13  claiming that Mr. Rolston committed intentional criminal sexual

14  abusive acts against Ms. Alexander.  Cruel and unusual

15  punishment in a violation of the Constitution of the United

16  States.

17  The jury instruction that was just shown is going to

18  say that you have to decide whether or not Mr. Rolston acted

19  with the intent to abuse, humiliate, harass, degrade, or arouse

20  or gratify the sexual desire of any person.  They have the

21  burden of proving with evidence that they have presented in this

22  case that the greater weight of all of the evidence you have

23  heard this week demonstrates that he possessed that intent to

24  abuse, harass, humiliate, or sexually abuse her.

25  Now, you've heard testimony from several -- they have

1    been referencing the Me Too witnesses.  You're not here to

2    adjudicate what happened to them.  You're not here to decide if

3    they have claims.  You're here to decide what happened to

4    Ms. Alexander on September 27th, 2016.  That's the claim in this

5    case.  That's what the evidence goes to.  What happened to

6    Ms. Alexander.

7        This case rises and falls on the evidence that they

8    have submitted about Ms. Alexander's claims.  And there is only

9    three people that know what happened, that have personal

10   knowledge of what happened in that exam room on that date:

11   Mr. Rolston, Ms. Davis and Ms. Alexander.

12       And you were told about the jury instruction that says

13   you get to determine who is believable, who is credible.  That's

14   your role is to decide essentially who is telling the truth.

15   And I think there are significant reasons to doubt

16   Ms. Alexander's credibility.

17       Now I am not suggesting to you that just because

18   someone is in prison that means you can't believe anything they

19   say.  But the jury instructions said that you get to determine

20   whether or not someone's felony conviction weighs to their

21   credibility.  And Ms. Alexander's felony convictions are

22   conspiracy to defraud the United States with respect to claims

23   and aggravated identify theft.  Certainly those felony

24   convictions speak to credibility.

25       What's more, when you take that background, and you

put it -- when you look at the inconsistencies in her statements

and what we have heard this week, together with the financial

incentive that she has to bring this claim -- you heard her say

she wanted -- she put on that form she wanted $5 million.  When

you take all of that into consideration it weighs on her

credibility.

Inconsistencies; the jury instruction on credibility

is going to ask you multiple factors.  Now, Mr. Johnson just

indicated that there were -- none of the factors on credibility

weigh against his client, but one of those factors says, one,

financial interest we just talked about that.  The other one

asked you to say, did the witness do or say something at some

other time inconsistent with what they told you here in court.

That weighs on their credibility.

Ms. Alexander did.  Ms. Alexander's affidavit -- you

heard about the affidavit.  You saw the affidavit.  And I am

going to show that real quickly.  You will have the chance to

review these exhibits when you go back.  And I would like you to

take a look.

Now the plaintiff introduced this exhibit because they

believed it was helpful to them.  Okay?  This is the affidavit.

This is the sworn statement that Ms. Alexander gave the day this

allegedly happened.  She -- you heard Mr. Proffitt's testimony

that he would write down what she said.  He used her words.  He

swore her in.  He allowed her to read it and she signed it.

1    Ms. Alexander has told us this week about how she

2    didn't want a vaginal exam.  She didn't want a Pap smear.  She

3    was on her period.  She had treated it with yogurt.  She didn't

4    want to be there.  It was unnecessary, and she protested it, and

5    he essentially forced her to come in there and get a pelvic

6    exam.  That's not anywhere in here.  That's nowhere in this

7    affidavit.

8    This affidavit says, I received a Pap smear from Nurse

9    Rolston.  There was nothing about how it was unnecessary and she

10   told him she didn't want it.  Those are new facts that she has

11   introduced during this trial to explain why she was getting

12   medical care.

13   Because you were told at the beginning that this case

14   was about Mr. Rolston manufacturing reasons to give people

15   medical exams so that he could give these unnecessary Pap

16   smears.  But the evidence we have heard this week indicates that

17   the medical care that all of these women -- Ms. Alexander, the

18   other women -- that they received it was medically indicated.

19   There is no scheme to bring people and give them

20   unnecessary Pap smears.  And they have kind of dropped that.

21   They didn't talk about that.  That's not believable.

22   These are not small details.  Okay.  This is not a

23   minor inconsistency.  This is the thrust of her story that she

24   is telling you about what happened that day.  She didn't mention

25   it the day she gave her statement, but she is mentioning it now

1  four years later in court.

2        So what actually happened?  Well, what the evidence

3  has demonstrated is that Ms. Alexander put in a sick call

4  request because she had a bacterial infection.

5        Mr. Rolston testified that he went cell front.  So he

6  goes to the SHU, which is -- he is in a different building.  He

7  is in medical services.  He has his exam room there.  The

8  general population inmates come and go.  They can come in and

9  they can come.  They don't have to be drug out of their cell.

10 They don't have to be handcuffed or shackled.  They come in.

11 They have scheduled appointments.  He has got 15 or 20 patients

12 already scheduled to be seen that day.

13       So he has got a room full of women who will be lined

14 up to see.  He gets a cop-out.  He goes to the SHU.  He speaks

15 to her at cell front.  What are your complaints?  You said

16 bacterial infection.  What type of bacterial infection?  He gets

17 a history from her.

18       She denies this, but she testified that it's

19 reasonable, and she would expect a provider to talk to a patient

20 about their complaints before they conduct an exam.  Well,

21 that's just what Mr. Rolston did.  She denies that happened, but

22 that testimony, by Mr. Rolston, is reasonable.  It makes sense

23 that's what he did.

24       Mr. Rolston's note, that you will see and you will

25 have that back with you, Exhibit 1.3, indicates that when he was

cell front his initial plan is let's do a urinalysis and then we can see, based on what those results are, are we going to bring you in for a pelvic exam to see what's going on.

He doesn't want to take her out of the SHU cell. It's not easy. In order to take someone out the SHU cell he has to tell the officers "go get this inmate." They have to shackle the inmate. They have to take them to the exam room. Then they got to uncuff the inmate. He has to get a chaperone out of the other building to come over there so he can do a pelvic exam.

There is no reason for him to want to do the pelvic exam, other than the presentation and the symptoms she recounted to him on that day. She says, "7 out of 10 pain." She says, "copious discharge. I need to be seen. I know my body."

Mr. Rolston -- you have heard testimony, and I will talk about it some, he is listening to her. She is the patient. He is listening to her. If she has got 7 out of 10 pain, that can't be alleviated. She has this kind of vaginal discharge, he's going to see her. So he goes ahead and he sees her in the exam room.

Ms. Alexander claims she said she didn't want that. She was just talking about her period pain, that she was -- that she had treated it with yogurt and therefore it was cured and did not need to be treated. Again did not say that in her affidavit.

You heard the testimony of Dr. Wolf, and you heard the

1   testimony of Mr. Rolston, you would not just assume that she

2   doesn't need to be seen just because she put some yogurt in her

3   vagina.  There could still be a problem and he is going to have

4   to evaluate her.

5          So, another area of inconsistency that we have heard,

6   I think, are the details of the abuse.  First of all, that whole

7   story of how she needed to come in, and how it was an

8   unnecessary Pap smear -- you heard a lot of questioning of

9   Ms. Davis, and others, about unnecessary Pap smears.  This was a

10  complaint.  This wasn't a well woman that he -- there is a

11  complaint.  It warranted a vaginal exam.

12         Dr. Tucker testified that if you had pelvic pain, or

13  if you complained of a bacterial infection, it would warrant a

14  pelvic exam.

15         Dr. Wolf testified that it was indicated for him to

16  pull her out and give her a vaginal exam.

17         The idea that you wouldn't do a Pap smear while a

18  women is menstruating.  Now, there are probably women who are

19  uncomfortable with that.  But a women's menstrual cycle -- it's

20  just a fact of life, and doctors who exam women's vaginas

21  regularly are not scared, or embarrassed, by menstrual blood.

22  Okay.  There is nothing inappropriate.  There is no way to

23  suggest that because a doctor performs a Pap smear, while a

24  women is on her period, that that must mean it must be sexual

25  abuse.  It must be he wants to bring her back there so he can

1    touch her to abuse her and humiliate and degrade her.  You heard

2    the testimony.  There is nothing wrong with that.

3           Now, doctors may disagree.  Some providers may not

4    want to do it because it used to be you couldn't really do it.

5    But here is nothing -- the only thing that could happen is maybe

6    the Pap smear result if it's too much it doesn't take.

7           The Pap smear, again -- and they kind of dropped this

8    a little bit -- now that it's been kind of fleshed out, the Pap

9    smear is just a diagnostic test that they perform during a

10   pelvic examination.  It's essentially undisputed that, based on

11   this presentation, you would have no need to do a pelvic

12   examination.

13          Ms. Alexander has talked about fingers in the vagina.

14   That would -- that's what she has alleged to be the sexual act,

15   that there were -- that she was digitally penetrated during the

16   vaginal exam.  Yes, that's part of the vaginal exam.

17          Now, she has described it in such a way that would

18   certainly go beyond the scope of a normal vaginal examination.

19   She, in her affidavit -- and we will look back at this -- she

20   described Mr. Rolston rubbing her clitoris, putting his fingers

21   on both sides of the inside of her vagina, putting his hand in

22   her vagina, removing his hand, rubbing her clitoris.

23          The use of the word "hand" here, it is somewhat

24   outrageous, isn't it?  It seems exaggerated, doesn't it?

25   Ms. Alexander admitted that Mr. Rolston couldn't put his hand in

1  her vagina.

2        She is describing these things in a way to make it

3  seem like there is something inappropriate that occurred.  She

4  also says that she told Nurse Davis that he quote, unquote,

5  fucked me with his fingers.  Those are her words.  That's her

6  account of what happened.

7        The fact that she tried to walk that back I think

8  indicates that they understand that that type of outrageous

9  behavior that they described, Ms. Davis, the other person with

10  personal knowledge of what happened that day, Ms. Davis would

11  have seen that.  They didn't talk about Ms. Davis much at all.

12  Ms. Davis is right there.  She is in that room the whole time.

13        And we saw what that room looked like.  Let's look at

14  it again.

15        This is exhibit -- you will have this back there.

16  This is that tiny little exam room that he doesn't want to have

17  to bring a patient back to, but he will if he has to do an

18  examination, like he did with Ms. Alexander.

19        The testimony is that Ms. Davis -- you heard

20  Ms. Davis.  She knows what she is there for.  She is there to

21  protect the patient and she is also there to protect the

22  provider from false allegations, just like the ones that have

23  been raised here.  That's why she is there.

24        She is in this tiny little room, standing right next

25  to Mr. Rolston.  She is handing him tools the whole time.  And

so the plaintiff asked you to believe that she would not see,

quote unquote, Mr. Rolston fucking Ms. Alexander with his

fingers.

Why?  Well, she wasn't paying attention.  She had her

back turned the whole time doing paperwork.

Now, Ms. Davis denied that.  How could Ms. Davis have

her back turned, doing paperwork, and hand Mr. Rolston tools?

She is lubing his --

So, at the beginning -- so you have the breast exam,

but at the beginning of the vaginal exam -- she didn't have a

breast exam that time -- at the beginning of the vaginal exam

she is lubing his fingers.  Then when that part is done she is

handing him the speculum.  Then she is handing him the paddle.

Then she is handing him the brush.  Then he is handing her --

she is putting the samples in the cup.  If there is a rectal

exam -- there wasn't on that day -- she is handling that.

The point is, she is an active participant in this

exam, standing close enough to Mr. Rolston that they could

basically touch shoulders because she is handing him these

tools.

The plaintiff asked you -- Ms. Alexander asked you to

believe that Ms. Davis had her back turned and was doing

paperwork.  That's not believable.

Another thing that Ms. Alexander says that's

inconsistent is Ms. Alexander says, she told us here in court,

1   that when that happened she froze up. She didn't say anything.

2        Now, she also says that she knows that Ms. Davis was

3   there and if she had said anything, Ms. Davis would have heard

4   her, but she didn't say anything to protest. And I would submit

5   to you the reason is because nothing inappropriate happened.

6        She was answering questions when Mr. Rolston was doing

7   the bimanual exam, palpating her abdomen. She denied that in

8   court, but she gave a prior inconsistent statement in her

9   deposition where she said that while he was palpating her

10   abdomen during the bimanual exam that she spoke to him, when he

11   asked about pain, pressing on the stomach during the vaginal

12   exam, she answered him about that. She said where she had pain.

13   And you can see in his note that he documents, "pain when I

14   palpated the cervix. It's transient". He documents what she

15   said to him during that exam. She said she didn't do it this

16   time in court, but she admitted she talked to him about that

17   during the exam before.

18        When the vaginal exam was over she had a conversation

19   with him about hemorrhoids and her suppository medication for

20   the hemorrhoids.

21        Now she denied that on the stand, but it's in her

22   affidavit. The affidavit that she gave on that date she says,

23   "Mr. Rolston asked me if I had taken any medicine for my

24   hemorrhoids. I told him I had not since being here. That they

25   usually give me suppositories."

1    So she did have a conversation with him after the

2  vaginal exam where he allegedly did that to her.  They have a

3  normal conversation about suppositories.

4    Now she denied on the stand, but she gave a prior

5  inconsistent statement in her deposition where she says that

6  when he visualized her rectum she told him that the hemorrhoids

7  came during the birth of her daughter.  That's what she

8  testified to before.  And she said something different in court.

9    She also spoke to Mr. Rolston about her family

10  problems.  Now, we are not bringing that up to say that someone

11  who has -- they have had infidelity problems with their husband,

12  that they can't be the victim of sexual abuse.  That's not the

13  point of that.

14    The point is, Ms. Alexander testified that there were

15  issues with her children, and there were issues with her

16  husband.  Her mother confirmed that on the stand.

17    And she admits that Mr. Rolston asked her about, "are

18  you crying" -- when she cried after the exam, she testified not

19  during but after when she started crying, Mr. Rolston, she says,

20  asked her, "Is there something about your family" -- because if

21  you remember Mr. Rolston's testimony they had -- he came into

22  the room.  He asked her about the number of pregnancies because

23  that's information they always put in the note.  How many times

24  have you been pregnant, how many live births have you had, have

25  you ever had a stillbirth.  That's information you put in the

1    history section.

2          So, when they were talking about that she starts

3    crying.  And he asked her is it -- she starts telling him about

4    her family and the problems that she is having.  And she admits

5    that he asked about that.

6          Now, how would he know about that if they hadn't had a

7    discussion about it?  They clearly had a discussion about it and

8    that's what he documented in the note.

9          Probably the most outrageous thing that Ms. Alexander

10   asked you to believe is that when Mr. Rolston left the room, and

11   she was in there alone with Nurse Davis, that she told Ms. Davis

12   that he "rubbed my clitoris and fucked me with his fingers."

13         Her testimony is she told this to Ms. Davis and

14   Ms. Davis did nothing.  She did not report it.  Ms. Davis said,

15   "you have to tell him because I was doing paperwork."  That's

16   her testimony about Ms. Davis.

17         You heard Ms. Davis testify.  Ms. Davis would never do

18   something like that.  Ms. Davis testified that if someone had

19   actually -- this is not a situation where Ms. Davis has to

20   interpret like, well, he was standing close to the patient,

21   might that be inappropriate.  No.  This is Ms. Davis received a

22   report, according to Ms. Alexander, of sexual abuse and she did

23   nothing.  She told Ms. Alexander, "Nothing I can do.  You got to

24   tell him."

25         That is not credible.  You saw Ms. Davis.  You heard

1    her testimony.  Ms. Davis would have reported that immediately.

2         Why would Ms. Davis risk her job to cover for

3    Mr. Rolston?  Why would Ms. Davis risk her medical license to

4    cover for Mr. Rolston?  It's not credible.

5         She's not just saying -- they are not just saying, oh,

6    the chaperones weren't paying attention.  She is essentially

7    saying Ms. Davis is culpable.  She is complicit in this cruel

8    and unusual punishment.  In this sexual abuse Ms. Davis is right

9    there covering it up.  That is not believable.

10         If you don't believe that part of Ms. Alexander's

11   story, then doesn't that call the rest of it into question?

12         Now, I would submit to you that Mr. Rolston's account

13   of what occurred is believable.  Not once was he impeached with

14   a prior inconsistent statement during his testimony.

15         We can look from his notes and see that they were

16   documented thoroughly.  He has an explanation.  Mr. Rolston was

17   not equivocal on the stand.  He told you that these things did

18   not happen.  He absolutely denied touching Ms. Alexander

19   inappropriately, touching her clitoris, doing anything in and

20   out with her [sic] fingers.  He denied these allegations of

21   sexual abuse both with Ms. Alexander and with these other women.

22         I would submit he is credible.  There has been a

23   question about why was he moved to the mens' section.

24         First of all, he is a current BOP employee.  You saw

25   evidence that there was an investigation.  All of these

allegations are investigated.  They get allegations all the time.  They get investigated.  What were the conclusions of the investigation?  Insufficient evidence to say that Mr. Rolston had done anything improper.

He is moved to the mens' facility.  Why was he moved to the mens' facility?  He told you.  There was an investigation pending.  They moved him to the other facility.  And he doesn't want to go back because he doesn't want to have false allegations leveled against him.  He is happy where he is. That's not evidence that he has done anything wrong.

Now let's talk about these other witnesses.  The jury is going to -- the judge will instruct you, and it's in the jury instructions, that this case is about Ms. Alexander.  The other ladies, as Mr. Johnson said, you can consider their testimony as it relates to intent.  Mr. Rolston's intent.  But it's only relevant to intent if you believe that he actually sexually abused these other ladies.

And you get to assess their credibility.  And you get to use common sense.  The jury instruction tells you, it says, you get to use your common sense when you are evaluating the credibility of these witnesses.

So let's start with Ms. Blevins.  Now Ms. Blevins says that Mr. Rolston examined her breast through her clothes.  But Ms. Blevins also immediately told Nurse Paynter that nothing happened.  She immediately denied it.  She said, "The door was

open.  My clothes were on.  Nothing happened.  I just want to change providers.  I want a female provider."  This is an inconsistent statement.  Calls Ms. Blevins' testimony into question.

Now, we went over the records -- the medical records you will see, and I will ask you when you go back to look at Ms. Blevins' medical records.  The records show that the appointment before this she had come about her eczema and she wanted a prescription because she didn't want to have to buy the Eucerin out of the commissary.  And she was upset with Mr. Rolston because he told her you need to go to the commissary.  They have to use their money to buy something out of the commissary and she was upset with that.

Now, after this he didn't give her a prescription either, on June 30th.  He said continue using your commissary medication and that's when she makes this complaint.  And the same time she complains about Mr. Rolston touching her she also submitted a complaint about the sports TV channel -- you heard that testimony -- because someone was changing the TV off of the sports TV.  Same complaint on the same day.

She testified she was afraid that she might be sent to the SHU to complain, but she did complain.  But she didn't say the full extent of her complaint because she didn't want to go to the SHU.  Did Ms. Blevins strike you as someone who is afraid of much?

1    The jury instructions say you get to take into
2    consideration how someone acted.  You saw Ms. Blevins on the
3    stand.
4    We know that she got sent to the SHU for fighting --
5    the time when she scratched somebody's neck and face and they
6    bit her finger and she got sent to the SHU.
7    We know she got sent to the SHU for writing a letter
8    where she called one of the officers a bad word and disparaged
9    them.  She is not afraid she is going to get sent to the SHU.
10    She made a filing.  She doesn't know if she filed a
11    court file but she said she challenged her discipline in the
12    federal district court, and she names a bunch of -- she names
13    the warden, she names assistant wardens.  She is not afraid of
14    the SHU.
15    She also named Mr. Rolston.  Now she made that filing
16    a couple of months after this supposedly happened.  And she
17    actually names Mr. Rolston, and says, oh, I am suing him because
18    he didn't treat my finger and he wanted me to sign a form.  She
19    doesn't say anything in that filing -- she agreed -- she didn't
20    say anything in that filing about him touching her
21    inappropriately.
22    Now I think another thing that's important to note
23    about Ms. Blevins:  Ms. Blevins and Alexander were in the SHU at
24    the same time.  When that incident occurred with the fighting --
25    so Ms. Blevins -- when Ms. Blevins saw Mr. Rolston at the end of

June she was in general population, but she got sent to the SHU
at the end of August.  Okay.  So she is in Z01.  You can see
that on her medical records.  She is in Z01, which is a range of
the SHU.  Ms. Alexander is in the same range of the SHU.  And
she is in there.  She is upset with Mr. Rolston.  He didn't
treat her finger.  He is making her go to the commissary.  And
just so happens that a few weeks later Ms. Alexander makes her
complaint, too.

Ms. Batchelor -- we heard from Ms. Batchelor.
Ms. Batchelor is the witness who had the hysterectomy who
believed she didn't need a pelvic exam.  You heard the testimony
that even if you have had a partial hysterectomy a pelvic
examination is still indicated.

Ms. Batchelor originally denied that she had been the
subject of sexual abuse, but she has recently changed her mind
and has filed her own lawsuit seeking damages.

So, when you ask the question about none of these
other Me Too witnesses have any type of incentive to come here
and say something that might not be true, that's not accurate.
Ms. Batchelor does have her own reason.

She was upset about her nipples being pinched.  We
know that nipple pinching is not really nipple pinching; it's
traction to check for discharge.  But she was upset about the
rectal exam.  She claims that Mr. Rolston touched her clitoris
for less than five seconds.  Of course, Mr. Rolston adamantly

1  denies this.

2       Also she claims -- she agrees that Ms. Davis was there

3  the whole time.  And Ms. Davis has never seen Mr. Rolston do

4  anything inappropriate.  Ms. Davis, again, would have seen the

5  reaction.

6       If Ms. Batchelor's clitoris had been directly touched

7  for five seconds there would be a reaction.  There would be some

8  type of reaction that Ms. Davis would see.  Why would Ms. Davis

9  see it?  Because you heard her testimony.  She is paying

10 attention.  She knows why she is there.  She is actively

11 participating in that exam.  She can see the patient's face.

12 She can see their body language.  And she is looking for these

13 things.  Didn't happen.

14       So Ms. Batchelor knows that and that's why she said,

15 "Oh, Ms. Davis' back was turned."  Once again, Ms. Batchelor

16 says that Ms. Davis' back was turned.  She didn't see any of it

17 because she is not participating and she is not doing her job

18 and her back is turned.

19       Ms. Barnett.  Ms. Barnett, and again you can consider

20 her felony.  10 year sentence for conspiracy to sex traffic a

21 minor, or by force, fraud or coercion.

22       I also forget to mention that Ms. Batchelor knows all

23 of these ladies:  Barnett, Farber, Rodriguez.  They all know

24 each other.

25       But, Ms. Barnett's testimony is, first of all, the

breast exam. This is probably the most unbelievable thing that she says. She says Ms. Reed, who is the chaperone. You met Ms. Reed. She testified. She said she had never seen Mr. Rolston do anything inappropriate. Barnett testified that Mr. Rolston gave her a 20 minute breast exam -- 10 minutes on each side -- and Ms. Reed was there the whole time. Ms. Reed isn't going to see -- she is not going to notice a 20-minute long breast exam?

Ms. Reed testified she actually remembered this patient. Why? This is the blood clot patient. This is the patient that Mr. Rolston did -- now, Mr. Rolston did very thorough workups of all of these ladies. This isn't like he is just doing a well woman exam and sends them on their way. He does an incredibly thorough exam.

Ms. Barnett's records are Exhibit 48. She comes in. She has got aching and throbbing in her left arm. He takes a history. He sees she has a history of Hep C. She has got -- she has had rubbery tumors. She hasn't had a Pap smear in three years. He works her up. He does the whole examination. He does every system. He examines -- I mean, you can look at this note. This was an extensive examination.

He is concerned about what's going on with her arm. He orders her medication for her chronic care clinic. The testimony is he is looking in the computer and he is assessing all of their issues at one time.

So she has come with this complaint, but she also

1  needs a well woman exam because she hasn't had one in three

2  years.  She also has chronic care.  He is going to give her some

3  medication.  He does it all at one time.

4        He orders an extensive -- he orders all of this lab

5  work.  He is working her up.  When the lab works come out, you

6  heard the testimony, he ends up sending her out to the emergency

7  department.  She testified she went to the hospital.  This is

8  because of Mr. Rolston's workup of this patient.

9        Now, during this workup, apparently, according to

10  Ms. Barnett, if you believe her testimony, Ms. Reed has got her

11  back turned the whole time during this workup.  During this 20

12  minute breast exam that allegedly -- it's not a 20 minute breast

13  exam.  It's an extensive workup of her blood clot issue.  It's a

14  full system exam.  And Ms. Reed not paying attention?

15        Ms. Barnett also testified that she knows Farber, she

16  knows Rodriguez, she knows Batchelor.  You know, Mr. Johnson

17  asked -- he asked Ms. Barnett, you are not part of some

18  conspiracy to manufacture these allegations.  But you get to

19  decide.  She denied.  She denied.  She said she wasn't.  You get

20  to decide whose credible.

21        Ms. Farber; Ms. Farber testified that Mr. Rolston,

22  during an examination -- now Ms. Farber is the one with the IUD

23  that's lost.  Mr. Rolston is examining, he is trying to locate

24  the IUD.  He ultimately gets her sent out so that they can

25  surgically remove it.  So she also has a problem that he had to

1    extensively workup.

2            Ms. Farber testifies that he rubbed her clitoris to

3    the point that she was aroused.  And then six months later, when

4    she goes to a new prison, on her intake form she denies any

5    recent sexual assault.

6            She also says Ms. Davis was in the room the whole

7    time.  But she testifies that Ms. Davis was looking up at the

8    ceiling.  Ms. Davis was looking up at the ceiling during the

9    entire thing.

10           I think what's important is the allegation is not just

11   that these chaperones, you know, can't see through the drape.

12   Because there has been some testimony about whether or not the

13   chaperones are staring at exactly what Mr. Rolston is doing.

14           Although they are close enough that they can hand

15   tools, and they can see him moving, they can see what's going

16   on.  But that's not what the allegation is.  The allegation is

17   Ms. Reed has her back turned for 20 minutes.  Ms. Davis' back is

18   turned doing paperwork.  Ms. Davis is staring up at the ceiling.

19    That's what they are asking you to believe.  And you get to

20   decide is that credible?

21           Lieutenant White testified that at this time there

22   were about 1100 inmates at FCI.  That's a lot.

23           You've heard testimony that Mr. Rolston is seeing 15

24   to 20 patients a day.  That's a lot.  That's a lot of patients

25   that he is seeing.

1    But the only ones you heard from, they all know each

2  other and one of them has their own suit of damage.  Their

3  friend, Ms. Batcher, you heard the testimony, that they know

4  each other.  Some of them say you can't have friends in prison.

5  Others admitted that they were friends with Ms. Batchelor.

6    Now, what did the evidence show us about Mr. Rolston?

7  First of all, his background is absolutely relevant.  They

8  allege he is doing these fake examinations.  He is pulling them

9  in.  He is doing exams wrong.  His background goes to the fact

10 that he has had extensive medical training.  He knows how to do

11 pelvic examinations.  He knows what he is doing.

12    And it's not just that he knows how to do well woman

13 care.  He is a general practitioner.  He has had a broad

14 background and he is working these patients up.  He is not

15 bringing them into his office just to sexually abuse them.  He

16 is giving them probably some of the best care that they have

17 ever had.

18    He testified for -- and you can see this in the

19 record -- he looks, touches, and explains.  He takes their

20 information.  He works up a differential diagnosis.  He is

21 detailed oriented.

22    Why does it matter what his supervisors say?  Well,

23 they have access to his records.  I mean, there is allegations

24 that he is doctoring his records.  That he is doing Pap smears

25 that are unnecessary.  There is no evidence of that.

1       The evidence is that his supervisors say he does a

2   phenomenal job.  They have reviewed his notes.  They see nothing

3   inappropriate.

4       Dr. Holoka is in the room with him sometimes when he

5   conducts these examinations.  You know, oh, he is not going to

6   do something like that in front of Dr. Holoka.  But she knows

7   that he knows how to do it.  And there has been no problems.

8   1100 inmates, 20 of them a day, and there is no problems

9   identified by his supervisors.

10      What is he doing?  He is following the Bureau of

11  Prisons' guidelines to efficiently treat these patients, to

12  offer them preventative care.

13      Every single one of these inmates, you know, had a

14  reason to be seen and he worked them up and he gave them -- for

15  some of these ladies he advocated for them.

16      Ms. Batchelor with the hemorrhoids.  Ms. Batchelor is

17  the inmate who had the severe hemorrhoids and they got worse.

18  He was trying to get her surgical intervention.  She testified

19  on the stand that hadn't happened yet but it wasn't because

20  Mr. Rolston didn't try.  He put in the consult.  He tried to get

21  her help.  Does that seem like cruel and unusual punishment?

22  Does that seem like abusing, humiliating Ms. Batchelor?

23      I think Ms. Blevins honestly, I think she illustrates

24  the level of care and the intent of Mr. Rolston when it comes to

25  these inmates.

1          If any -- Mr. Johnson said, you know, they are not

2   just inmates.  And that's right.  Mr. Rolston isn't treating

3   these women like they are just inmates.  He is giving them

4   excellent medical care.  He is going above and beyond.

5          Let's look at Ms. Blevins.  This is the note.  Ms.

6   Blevins where she comes in.  She is seen.  She is upset that it

7   costs money and she wants to get the prescription, so she is a

8   little bit upset.  So that's on May 24th.  And we saw Ms.

9   Blevins.  It's believable that she was upset.

10         Then there is the June 30th, 2016.  This is the time

11  that he allegedly gave her a breast exam through her shirt.  So

12  she comes in.  As we see, she has actually complained to the

13  warden because she doesn't think she is getting appropriate

14  treatment for her eczema.  She actually made a complaint, and he

15  knows that she has made a complaint to the warden because he

16  puts it in his note.

17         He still treats her.  He still examines her.  He

18  does -- he palpates her fibroids.  He treats her.  He says,

19  "continue to use the medication out of the commissary", and you

20  know what, he also orders her an X-ray for the fibroids.

21         He is not retaliating against her.  He is not not

22  giving her medical care because she made a complaint to the

23  warden.

24         So then he sees her again.  This time it's for the

25  finger -- we heard about the finger.  She is fighting.  He

1    assesses her.  As we can see, she is in Z01.  She is in the SHU

2    now.  She is cagey about her injury, but he treats her.  Gives

3    her a tetanus shot.

4            On the same date he is thinking about her case.  He

5    doesn't just treat the finger that she came for.  He puts in --

6    he decides, you know what, that ultrasound, I don't think that's

7    good enough.  I am going to change my order and get her an

8    OB-GYN consult.

9            So ultimately we know that she -- because of the

10   consult and because of the care that she is given -- she

11   ultimately needs a hysterectomy.  And when she is leaving this

12   facility, in February of 2017, Mr. Rolston calls ahead to the

13   new facility to make sure they understand that she needs to get

14   a hysterectomy.  He doesn't have to do that.  He is doing that

15   because he wants to make sure she gets the medical care that he

16   thinks she needs to get.

17           I think most telling is this.  Let's look at this one.

18   This is on November 23rd, 2016.  We can see from the vitals

19   here -- now there has been implication and innuendo that

20   Mr. Rolston -- because Ms. Alexander's note, the note from

21   Ms. Alexander's encounter on September 27, 2016, because it was

22   opened for awhile, until after hours, it must mean that he is

23   making stuff up in the note.  There is no evidence of that.

24           The evidence is that the end of Mr. Rolston's work day

25   is 5 o'clock, but he has to stay and keep working.  And that's

1  when he sometimes has the ability to document in the chart.  Dr.

2  Wolf testified that happens all the time.

3         We can see it here with Ms. Blevins.  We can see from

4  the temperature and pulse that's about 4:38.  The day ends at 5,

5  the Wednesday before Thanksgiving.  She is in there.  She is

6  probably one of the last patients that day, Ms. Blevins, who

7  came in.  She is complaining of disgusting smelling discharge,

8  and it's similar to a prior yeast infection she has had.

9         So what does Mr. Rolston do?  You see this note.  It

10  ends at 8:32.  His day ended at 5 o'clock.  It's 8:32 on the

11  Wednesday before the long Thanksgiving weekend.  And Mr. Rolston

12  is in there making sure she gets her antifungal medication so

13  that she is not miserable, itching and burning, over the long

14  holiday weekend.

15         That's not cruel and unusual punishment.  That's going

16  above and beyond to make sure these inmates are treated like

17  people and they get the medical care that they need.

18         There is no evidence that Mr. Rolston is intending to

19  abuse, harass, or humiliate these ladies.

20         Again, you are going to be asked on this jury

21  instruction to look at whether or not there is credible evidence

22  that Mr. Rolston intentionally sexual abused Ms. Alexander.

23         This isn't about whether or not the inmates are

24  comfortable around him or if they like him.  This is about

25  intentional abuse.  Intentional sexual acts.

1          And when you weigh the credibility, which I ask you to
2     do, you are going to weigh this evidence, the greater weight of
3     the evidence they have to prove.  That is their burden of proof.
4     They have to convince you by the greater weight of the evidence.
5     That's the whole body of evidence.  That's all of the testimony
6     that you have heard.
7          You think about what each witness told you.  You think
8     about what Ms. Reed said.  She has never seen anything
9     inappropriate.  She is in there watching these examinations.
10    She has never seen anything inappropriate.
11         Ms. Davis; that's what Ms. Davis told you.  She's
12    never seen anything inappropriate.  What's more, if someone told
13    her that Mr. Rolston had sexually abused them, that he had
14    rubbed their clitoris and fucked them their [sic] fingers she
15    would have done something about it because she is not not going
16    to do her job, she is not going to risk her license.  This isn't
17    about her not paying attention.  It's about her being complicit
18    and she wasn't and she is believable.
19         You are going to look at all of this.  It's a serious
20    allegation that they have raised and they have the burden to
21    prove their case and we submit that they have not.
22         So, when you look at that verdict form we ask that you
23    would check no.
24         Thank you guys so much for your time and for your
25    attention.  I appreciate it.

1          THE COURT:  Mr. Johnson?

2          MR. JOHNSON:  I am really curious about the hill that

3    Ms. Coles seems willing to die on.  I sure wouldn't die on that

4    hill.  And that's the thing where she says that there is no way

5    on God's green Earth that Ms. Alexander told Leticia Davis that

6    Paul Rolston "finger-fucked her" during the exam.

7          What happened next?  Charnesha Alexander was escorted

8    back to the SHU, in minutes.  In minutes.  And what did she do

9    when she gets back to the SHU?  She tells her roommate that Paul

10   Rolston just finger-fucked her.

11         She gets a guard and says, Paul Rolston just

12   finger-fucked me.  She brings in Investigator Proffitt, who sits

13   down and types a statement where she says "he just finger-fucked

14   me."

15         Why on God's green Earth would she not have said the

16   same thing to Leticia Davis a few minutes earlier?

17         Leticia Davis -- this is the same Leticia Davis who

18   signed a sworn affidavit under oath saying that 50 percent of

19   Paul Rolston's pelvic exams were unnecessary.

20         And then when she was questioned about it she walked

21   it back and said:  Well, I really meant that 50 percent of them

22   were not scheduled, or said something like that.

23         But, yeah, she had a lot of time to talk to superiors

24   and she had her hours increased, and all of that, in between.

25   You know, it's a statement under oath and you can simply

1  consider it.

2         Now, one of the big things they are saying here, they

3  deny that Paul Rolston followed Ms. Alexander back to the SHU

4  and intruded on the interview with Proffitt.  But they insist

5  that he did come earlier in the day to the door front and have

6  all of this medical discussion.

7         Now there is a roommate in there.  He couldn't have

8  had a medical discussion.  That's a privacy violation.  That's

9  HIPAA --

10         THE COURT:  Objection is sustained.  If you want to

11  talk about it I can talk to you on the headphones.

12         MR. JOHNSON:  No.

13         THE COURT:  All right.

14         MR. JOHNSON:  Now, they call -- they say, well, you

15  said this one day and you said that the other day.  And one of

16  those things was a genuine -- a genuine contradiction.  She says

17  at one point that she didn't discuss hemorrhoids with him in one

18  statement and she says in another statement that she did discuss

19  hemorrhoids with him.  But a lot of these things that they are

20  pointing to are not contradictions, but that something is

21  missing from one statement that is in another.

22         You know, it's kind of the debater's trick to treat

23  that as some kind of a dishonesty or inconsistency.  I think

24  that just about any of us have recounted a tale on two

25  occasions, or three occasions, and somebody could look at it and

say, well, you included this fact this time and you left it out

that time.  That must mean you were lying the time that you left

it out.  That's not a lie.  It's not an inconsistency.  It's

just -- particularly after you have just been traumatized.

Now, she said that we are here accusing Mr. Rolston of

criminal activity.  This is not a criminal case.  You can't send

him to jail.  That's not what this is about.  And I told you the

criminal burden is beyond a reasonable doubt.  It's a very high

burden.

I am not a prosecutor, and this is not a criminal

court.  I don't know where she is going with that, or, you know,

making you think that he is going to go to jail, or something.

He is not going to go to jail for anything that happens today.

And this notion that if somebody does a few things

right that he must not have done any other thing wrong.  She

goes through the whole litany; well, he made a referral, he

prescribed the right thing, he did this -- she goes through a

whole list of things that he did right during the examination,

therefore he must not have done some other thing wrong.  What

kind of logic is that?

The judge told you the first day that your duty comes

from the Seventh Amendment.  And the Seventh Amendment itself

comes from -- it comes from the Bill of Rights.  It was 1789.

But that came from the Magna Carta, which was 1215.  And that's

where the jury comes from.  It's been 806 years that we have had

 1 | the juries.

 2 | It's the great equalizer.  A trial before a jury in

 3 | the United States may be the last place that an individual can

 4 | stand equal with a government official.  In all other places the

 5 | individual is not equal.  Not in the executive branch.  Not in

 6 | the legislative branch.

 7 | Nobody is above the law.  Even those who run the

 8 | federal government have a duty not to practice discrimination.

 9 | Not to practice cruel and unusual punishment.  Your duty is to

10 | do justice in this case.

11 | There is an Hopi Indian saying, "We are the ones we

12 | have been waiting for."  If you want justice in our court, you

13 | are the ones we've been waiting for.

14 | Injustice is eating away at our society and it's only

15 | getting worse.  The injustice in this case has all the weight of

16 | the history of female oppression, all the suspicion of the words

17 | of victims, all the intellectual distortions and twisted words

18 | that money can buy.

19 | You have a right and a duty to be tired of all of this

20 | kind of contrivance and fabrication.  You can take the easy way

21 | out, but doing justice will require that you can go back in that

22 | room and work.

23 | The task is to demand that you shed your cynicism.

24 | Put aside your division.  Come out of your isolation.  Push

25 | yourself to be better.  And that you engage with the evidence

1  and with each other.

2  It's easy enough to appeal to the basic side of our

3  nature.  Let this woman's courage be an appeal to the nobler

4  side and give this work your very best because that's what it

5  takes.

6  Ms. Alexander never needed any sympathy, or any

7  favors, and she doesn't want any now.  All she wants is to be

8  treated decently and fairly.

9  Mr. Cook and I are very fortunate to be here.  We are

10  blessed to have known this woman, and we are blessed to be the

11  ones that carried this burden for years bringing this case to

12  justice.  And, finally, we are blessed to shed that burden

13  because this is the moment where it falls out of our hands and

14  into yours.

15  THE COURT:  All right.

16  Members of the Jury:  It's now my duty to instruct you

17  on the law that you must follow in deciding the case.

18  When I have finished, you will go to the jury room and

19  begin your deliberations.

20  I have written my instructions.  I will give each of

21  you a copy for reference during your deliberations.  You,

22  therefore, don't need to take notes.  Please just pay close

23  attention as I go through these instructions with you.

24  Give me just a minute.  I want to make sure I have my

25  current version.  As you can imagine, I draft these and then I

1    work on them a little bit.

2           I am going to start with general instructions that

3    apply in all civil cases.  Then I will address the claim in this

4    case.  Then I will conclude with general instruction on things

5    like how you will return your verdict.

6           You must follow the law as I explain it to you,

7    whether you agree with the law or not.  And you must follow all

8    of the instructions as a whole.  You may not single out, or

9    disregard, any instruction.

10          Also, you must not be influenced in any way by

11   sympathy or by prejudice for or against the plaintiff or the

12   defendant.

13          The parties are two individuals.  The plaintiff is

14   Charnesha Alexander.  The defendant is Paul Rolston.  All

15   individuals, regardless of their station in life, are entitled

16   to the same fair and unbiased treatment in a Court of law.

17          You must decided the case based only on the evidence

18   presented during the trial.  The evidence consists of the

19   testimony and the exhibits.  What the lawyers say is not

20   evidence.  It is your own recollection and interpretation of the

21   evidence that controls.  Not theirs.

22          Also, you should not infer from anything I have said,

23   or done, that I have any opinion on the merits of the case

24   favoring one side or the other.

25          As you consider the evidence, you may make deductions

and reach conclusions based on reason and common sense.  And you
should not be concerned about whether the evidence is direct or
circumstantial.

Direct evidence is the testimony of a person who
asserts actual knowledge of a fact such as an eye witness.

Circumstantial evidence is proof of a chain of facts
and circumstances tending to prove or disprove a fact in
dispute.

The law makes no distinction between the weight you
may give to either direct or circumstantial evidence.

Now, in saying you must consider all of the evidence,
I do not mean you must accept all of the evidence as true or
accurate.  You should decide whether you believe what a witness
said and how important the testimony was.  You may believe, or
disbelieve, any witness in whole or in part.  Also, the number
of witnesses testifying on a dispute is not controlling.

In determining the believability of a witness and the
weight to be given the testimony, you may properly consider how
the witness acted as well as what the witness said.  Some things
you should consider are:

One, did the witness have an adequate opportunity to
see and know the things the witness testified about?

Two, did the witness have a good memory?

Three, was the witness honest and straightforward in
answering the questions?

1    Four, did the witness have an interest in the outcome

2 of the case or any reason not to tell the truth?

3    Five, did the witness's testimony seem reasonable

4 considered in the light of all the evidence and in the light of

5 your own experience and common sense?

6    And, six, did the witness do or say something at some

7 other time that was inconsistent with the testimony the witness

8 gave before you during the trial?

9    If a witness has been convicted of a felony, that is

10 another factor you may consider in deciding whether you believe

11 the witness's testimony.

12    When knowledge on a technical subject might help the

13 jury, a person having special training or experience is

14 permitted to state an opinion on the subject.  But that does not

15 mean you must accept the opinion.  The same as with any other

16 witness, it is up to you to decide whether to rely on the

17 testimony.

18    It is the responsibility of Ms. Alexander, as the

19 plaintiff, to prove every essential part of her claim by the

20 greater weight of the evidence.  That's sometimes called the

21 burden of proof.

22    The greater weight of the evidence means an amount of

23 evidence that is enough to persuade you that a contention is

24 more likely true than not true.  In deciding whether a

25 contention has been proved by the greater weight of the evidence

1  you may consider the testimony of all the witnesses, no matter

2  who called them, and all the exhibits, no matter who introduced

3  them.

4       Now let me turn to the substance of this case.

5  Ms. Alexander asserts she was sexually abused by Mr. Rolston

6  during a medical examination.  Mr. Rolston asserts he conducted

7  a proper, medically appropriate examination, that there was no

8  sexual abuse.

9       Your verdict will be for Ms. Alexander if you find, by

10  the greater weight of the evidence, that Mr. Rolston engaged in

11  a sexual act or sexual contact during Ms. Alexander's medical

12  examination on September 27, 2016.  If Mr. Rolston did not

13  engage in a sexual act or sexual contact, your verdict will be

14  for Mr. Rolston.

15       Sexual act means the penetration, however slight, of

16  the anal or genital opening of another by hand or finger or by

17  an object with an intent to abuse, humiliate, harass, degrade or

18  arouse or gratify the sexual desire of any person.

19       Sexual contact means the intentional touching, either

20  directly or through the clothing, of the genitalia, anus, groin,

21  breast, inner thigh, or buttocks of any person with an intent to

22  abuse, humiliate, harass, degrade or arouse or gratify the

23  sexual desire of any person.

24       If your verdict is for Ms. Alexander, you will assess

25  the issue of damages.  There are three possibilities:

1    Compensatory damages, nominal damages, and punitive damages.

2          First, compensatory damages are actual damages.

3    Ms. Alexander can recover compensatory damages only if you find

4    that Mr. Rolston engaged in a sexual act -- not just sexual

5    contact -- during Ms. Alexander's medical examination.

6          If you find that Mr. Rolston engaged in a sexual act,

7    you should assess as compensatory damages the amount you find to

8    be justified by the greater weight of the evidence as full,

9    just, and reasonable compensation for all the damages to

10   Ms. Alexander caused by the sexual act and any sexual contact,

11   no more and no less.

12         Compensatory damages are not restricted to loss of

13   money.  They also cover, and in this case they are limited to,

14   the mental and emotional aspects of injury.

15         No evidence of the value of mental and emotional

16   damages has been, or need be, introduced.  It's not value you

17   are trying to determine, but an amount that will fairly

18   compensate Ms. Alexander for the damages she has suffered.

19   There is no exact standard for determining the amount, and any

20   award must be fair and just in the light of the evidence, and

21   must not be based on speculation or guesswork, and must not be

22   imposed or increased to punish Mr. Rolston.

23         The second type of damages is nominal damages.  If you

24   find Mr. Rolston engaged only in sexual contact, not a sexual

25   act, you may award Ms. Alexander nominal damages of not more

1  than $10.

2         The third type of damages is punitive damages.  If you

3  find that Mr. Rolston acted with a malicious purpose or in a

4  manner showing willful disregard of Ms. Alexander's rights, then

5  you may award punitive damages if you choose to do so.  Even if

6  Mr. Rolston acted in that manner, you are not required to award

7  punitive damages.

8         Punitive damages may be awarded only to punish

9  Mr. Rolston, or to deter others from engaging in similar

10  misconduct.  Any award of punitive damages must be fair and

11  reasonable in light of the overall circumstances of the case,

12  and any award of punitive damages must be no greater than

13  necessary to punish Mr. Rolston and to deter others.

14         In assessing damages, you must not consider taxes,

15  attorney's fees, or court costs.

16         Of course, the fact that I have given you instructions

17  on damages is not an indication of which side should win the

18  case.

19         Now some concluding instructions.  Each side has had

20  its day in court -- its opportunity to present all relevant

21  evidence.  The evidence that is before you is all there is.  You

22  should ignore any suggestion that there is other information

23  that has not been made available to you, and as I have told you

24  many times now, you must make your decision based only on the

25  evidence presented during the trial.

1    I emphasize that you are here to determine the issues

2  as I have described them in these instructions.  You are not

3  here to determine any other issue.

4    In that respect let me add a note on the testimony

5  of -- about sexual abuse of other women.  As with all evidence,

6  it is up to you to decide whether to believe the testimony.

7  This is Ms. Alexander's case.  Not a case about what happened to

8  the other women.  But if you find that Mr. Rolston engaged in a

9  sexual act or sexual contact during a medical examination of

10 another woman you may consider this on these issues: whether

11 Mr. Rolston had an opportunity to engage in a sexual act or

12 sexual contact during medical examinations, his intent while

13 examining Ms. Alexander, and whether any contact with

14 Ms. Alexander was a mistake or accident.

15    Any verdict must be unanimous.  In other words, to

16 return a verdict you must all agree.  Your deliberations will be

17 secret.  You will never have to explain your verdict to anyone.

18    It is your duty as jurors to discuss the case with one

19 another in an effort to reach agreement if you can do so.  Each

20 of you must decide the case for yourself but only after full

21 consideration of the evidence with the other jurors.

22    While you are discussing the case, do not hesitate to

23 reexamine your own opinion and change your mind if you become

24 convinced that you were wrong.  But do not give up your honest

25 beliefs just because the others think differently or merely to

1 | get the case over with.

2 |       Remember that in a real way you are judges -- judges

3 | of the facts. Your interest is to seek the truth from the

4 | evidence.

5 |       When you go to the jury room you should first select a

6 | foreperson. The foreperson will preside over your deliberations

7 | and will speak for you here in the courtroom.

8 |       A verdict form has been prepared for your use. This

9 | begins with the name of the court, the name of the parties, the

10 | case number. Then it says: We the jury unanimously return the

11 | following verdict, because, as I told you, your verdict must be

12 | unanimous.

13 |       Then the first question is: Did Mr. Rolston engage in

14 | a sexual act during Ms. Alexander's medical examination on

15 | September 27, 2016. Sexual act here has the definition that I

16 | gave you just a minute ago in the instruction. There is a blank

17 | to check or put a mark showing yes or no. You answer as you

18 | find appropriate.

19 |       And then in italics there is an instruction. It's --

20 | there are a couple more as we go through here -- it tells you

21 | whether to answer the next question or not, depending on your

22 | answer to the prior question. So this one says: If your answer

23 | to question one is yes, please skip question two and go directly

24 | to question three. If your answer to question one is no, please

25 | answer question two.

1    Question two is:  Did Mr. Rolston engage in sexual

2  contact -- this is the sexual act in the first question, but

3  this is sexual contact, as I have defined it in the instructions

4  and the second question.  Again, yes or no.

5    And then the instruction -- and this matches up with

6  what I have told you in the instructions -- if your answer to

7  questions one and two are both no, please skip the remaining

8  questions.  You will have decided the case for Mr. Rolston.

9    If your answer to question one is yes, please answer

10  questions three, four and five.  Three, I am going to get to in

11  just a second.  It's the compensatory damages question, and you

12  can only award compensatory damages if you have found a sexual

13  act.  So, the answer has to be yes to number one for you to

14  answer number three.

15    And then it says:  If your answer to question one is

16  no, and your answer to question two is yes, that means you have

17  found sexual contact but not a sexual act.  Skip question three

18  and answer questions four and five.

19    And then three, four and five are about compensatory

20  damages, nominal damages, punitive damages.  Three; what amount

21  of compensatory damages, if any, do you award?  There is a blank

22  where you would put in the number, if you are answering this

23  question at all.

24    Four is nominal damages, and again there is a blank.

25  If you are answering the question at all you would put in the

1   number.

2          Five, what amount of punative damages, if any, do you

3   award?  And then at the end it says:  So say we all on

4   September, blank, 2021.  There is a signature line for the

5   foreperson.

6          You will have in the jury room the exhibits that have

7   been admitted into evidence, seven copies of these instructions,

8   seven copies of the verdict form.

9          When you reach unanimous agreement your foreperson

10  will fill in one verdict form.  Date and sign it.  And tell the

11  court security officer that you have reached a verdict.

12         Don't give the verdict form to the court security

13  officer.  Your foreperson will carry the verdict form when you

14  are brought back into the courtroom and the verdict will be

15  announced here in open court.

16         None of you should bring back into the courtroom

17  another copy of the verdict form.  The other copies are provided

18  for your convenience, but they should not be filled out or

19  signed or brought back into the courtroom.

20         I am the only person who can give you instructions, or

21  explain anything about the law, or procedures, from this point

22  forward.  If you have a question, or wish to communicate with me

23  at any time, please write down the message, or question, give it

24  to the court security officer.  The officer will bring it to me

25  and I will respond as promptly as possible, either in writing or

1  by having you brought back into the courtroom so that I may

2  address you orally.

3         In any question or message you send you should not

4  tell me your numerical division at the time.

5         With that, ladies and gentlemen, you, of course, may

6  take your pad with you and you may retire to deliberate your

7  verdict.

8      (Jury out at 10:51.)

9         THE COURT:  You may be seated.  Are there any

10  objections to the instructions as read?

11         MR. COOK:  No, Your Honor.

12         MR. CARTER:  No, sir.

13         THE COURT:  I think that means there were no

14  objections to the instructions at all.

15         I need you to review the exhibits and make sure

16  everything is there that should be and nothing is there that

17  should not be.

18         First, let me make a couple of notes.  I overruled the

19  objection, the first objection Ms. Coles made when Mr. Johnson

20  was describing Me Too evidence.  I thought that what Mr. Johnson

21  had said to that point was an appropriate use of the Me Too

22  evidence, and right after the objection Mr. Johnson went ahead

23  and tied the argument specifically to the instruction and the

24  proper use.

25         I sustained the objection to the reference to famous

1    people.  Look, you can't go saying that Epstein is an offender

2    and so you ought to return a verdict against Mr. Rolston.  I

3    thought that was improper.  I sustained the objection.

4        Then I sustained another objection.  You were arguing

5    that he wouldn't have said something about medical care to

6    Ms. Alexander in the SHU because it would be within the hearing

7    of her roommate, and that would be a HIPAA violation.  Unless I

8    missed it, there has been no testimony that she had a roommate.

9    I may be wrong, but I have been in a number of federal prison

10   facilities and I have never seen a SHU where there was a

11   roommate.

12        Am I just missing something?

13        MR. JOHNSON:  The testimony was that she came back and

14   told her roommate that she had been finger fucked, and that

15   the --

16        THE COURT:  So the SHU at FCI is big enough to have

17   two?  At FDC they got roommates in the SHU?  They may have.

18        MR. ROLSTON:  Your Honor, at times they do have two,

19   but what I would do as a procedure --

20        THE COURT:  I don't need you to tell me anything else.

21        I was not sure at the time there had been any

22   testimony there was a roommate.  Obviously, I missed it.  The

23   hazards of trying to have an encyclopedic memory of everything

24   said during the trial.

25        I will say this, though, even in all of the other

1    prison cells where there is a roommate it doesn't mean you can't

2    have a conversation through the bars without somebody else

3    hearing it.  In any event, small matter.  Doesn't amount to

4    much.

5             What else, if anything, do we need to do other than to

6    get you to review the exhibits?

7             MR. CARTER:  Well, Your Honor, once again, we are put

8    in this box.  You picked up -- we obviously objected to the Me

9    Too, which I understand tying it to the jury instructions.  That

10   probably is appropriate.  But then you link it to the famous

11   people that he argues to the jury that they know about and that

12   they should consider.  They are asking them to consider evidence

13   outside this courtroom.  And in linking all that together, it

14   puts us -- we have been fighting it every single day of this

15   trial about things we don't know about, other complaints, other

16   cases going on.  And now we're defending Bill Cosby, Epstein,

17   and Harry Weinstein, and whether it's the Simone Biles'

18   testimony yesterday to Congress.  I don't know.  But it puts us

19   in a position that we really have no choice, but, again, to say

20   we move for a mistrial based on the unfairness of that argument

21   and what we've had to deal with it.

22            THE COURT:  Mr. Johnson, tell me how it's fair to

23   argue -- you are right.  Simone Biles testified to Congress

24   yesterday, so it's all over the news last night and this

25   morning.  Why is that okay?

1        MR. JOHNSON:  It was -- I don't think there was

2  anything wrong with it.  All I said was that if somebody has

3  splendid credentials that does not mean that they cannot

4  perpetrate sexual misconduct.

5        THE COURT:  I would have overruled an objection to

6  that argument.  That argument would have been fine, but that's

7  not all you said.

8        MR. JOHNSON:  No.  I said there are famous people who

9  have great credentials and are guilty.  I didn't say that --

10       THE COURT:  What is the evidence in this trial of

11  famous people who are guilty?

12       MR. JOHNSON:  I quoted Jesus --

13       THE COURT:  If you had offered evidence of Simone

14  Biles, do you think I would have sustained the objection?

15       MR. JOHNSON:  Yeah, of course.

16       THE COURT:  Of course.

17       MR. JOHNSON:  Of course.  I made some general comment.

18  I also quoted Luke.  But I didn't put in anything about Jesus in

19  the trial.  And I talked about you are people who live in the

20  community and you go to school and, you know, you learn stuff.

21  And that's how -- that's how it works.  I mean, I don't see why

22  you can't talk about history or talk about current events --

23  yeah.  I have just never seen anything about that.

24       If I had connected it, if I had said something about

25  Dr. Larry Nasser is a medical professional, just like Paul

1    Rolston, and he secretly abused all of those gymnasts for years,

2    that would have been improper.  But if I just --

3          THE COURT:  So as long as you just infer it, without

4    saying his name -- yeah.  Look, I thought the argument was

5    improper and --

6          MR. JOHNSON:  Well --

7          THE COURT:  -- and the defense is right.  There has

8    been a long series.  There have been a number of violations of

9    the orders in limine and that is just one more.  You haven't

10   seen an opinion on this.  This case may give you the

11   opportunity.  I take the motion under advisement.

12         Please review the exhibits.  See that everything is

13   there that should be and nothing is there that should not be.

14         (Pause in proceedings.)

15         THE COURTROOM DEPUTY:  The exhibits have been

16   reviewed.

17         THE COURT:  All right.  Has each side reviewed the

18   exhibits and do you agree that everything is there that should

19   be and nothing is there that should not be?

20         MR. COOK:  Yes, Your Honor.

21         MR. CARTER:  Yes, Your Honor.

22         THE COURT:  The courtroom deputy will take seven

23   copies of the verdict form, seven copies of the instructions,

24   and all the exhibits as just approved by each side to the jury.

25         I would ask that you be within 10 minutes so that if

we have a question, or a verdict, you can be in the courtroom

within 10 minutes.

Make sure the courtroom deputy has your cell number,

unless you are going to sit around right here in the courtroom.

But if you are going to go somewhere within the building make

sure the courtroom deputy has your cell number so she can get

you.

We will be in recess until we hear from the jury.

(Recess taken 11:08.)

(Resumed at 12:51.)

THE COURT: Please be seated. I am told we have a

verdict.

Are we ready for the jury?

MR. COOK: Ready, Your Honor.

THE COURT: Jury in, please.

(Jury in at 12:52.)

THE COURT: All right. You may be seated. Will the

foreperson please stand.

I understand you have reached a verdict; is that

correct?

THE FOREPERSON: Yes, sir.

THE COURT: Please provide it to the court security

officer.

You may be seated. Thank you.

This is the verdict in Charnesha Alexander versus Paul

1  Rolston.

2        We, the jury, unanimously return the following

3  verdict:  One, did Mr. Rolston engage in a sexual act during

4  Ms. Alexander's medical examination on September 27th, 2016?

5        Answer:  No.

6        Two, did Mr. Rolston engage in sexual contact during

7  Ms. Alexander's medical examination on September 27th, 2016?

8        Answer:  No.

9        In accordance with the instructions, questions three,

10  four and five are not answered.

11        It concludes:  So say we all on September 16th, 2021.

12        The verdict is signed by the foreperson.

13        Members of the Jury, now, in accordance with the

14  practice followed in this court in every case the clerk is going

15  to poll the jury -- that is, she is going to ask each of you

16  individually whether this is indeed your verdict.

17        You have had other numbers during this process.  For

18  this purpose you are going to have a brand new number.  One

19  through three across the front row.  Four through seven across

20  the back row.

21        The clerk will please poll the jury.

22        THE COURTROOM DEPUTY:  Juror No. 1, is this your

23  verdict?

24        THE JUROR:  Yes.

25        COURTROOM DEPUTY CLERK:  Juror No. 2, is this your

1  verdict?

2          THE JUROR:  Yes.

3          COURTROOM DEPUTY CLERK:  Juror No. 3, is this your

4  verdict?

5          THE JUROR:  Yes.

6          COURTROOM DEPUTY CLERK:  Juror No. 4, is this your

7  verdict?

8          THE JUROR:  Yes.

9          COURTROOM DEPUTY CLERK:  Juror No. 5, is this your

10  verdict?

11          THE JUROR:  Yes.

12          COURTROOM DEPUTY CLERK:  Juror No. 6, is this your

13  verdict?

14          THE JUROR:  Yes.

15          COURTROOM DEPUTY CLERK:  Juror No. 7, is this your

16  verdict?

17          THE JUROR:  Yes.

18          THE COURT:  Members of the jury, now I am going to end

19  where I started Monday morning, that's by saying thank you very

20  much for your service in this court.

21          You heard my comments on the jury service at that

22  point.  I meant every word of it.  I do have more confidence in

23  your ability to receive this evidence, to sort it out, to pay

24  attention to it, and make a decision, than I would have of my

25  own.  It does help to have seven people with seven different

1     sets of life experiences.

2          I do watch you as you watch the trial.  I know you all

3     paid very close attention and I appreciate that.

4          You have put in four good days of work and you don't

5     get a chance to be part of the other branches of government,

6     other than in your individual job, but in this third branch of

7     government, in the judiciary, we do ask people to come in and

8     work for us for a few days and you have done that and I very

9     much appreciate you doing it.

10          The instruction not to talk about the case ends at

11     this point.  You may talk about the case if you wish.  You never

12     have to talk about the case.  So if somebody wants to talk about

13     it, you don't want to take the time, you should feel free to say

14     you don't want to talk about it.  On the other hand, if you do

15     want to talk about it you are welcome to do it.  There is no

16     rule that you won't.

17          You might, if you choose to talk about it, talk about

18     what you think and saw as opposed to what one of the other

19     jurors told you in the jury room.  That was told to you in

20     confidence of the jury room.  That's a suggestion.  It's up to

21     you.

22          The lawyers will not call you.  The rules that govern

23     lawyers in Florida provide that after you have served on a jury

24     they cannot reach out to you.  That's a rule that is in place to

25     keep you from having to spend more time on this than you have

1　already spent.

2　　　　You can call them, and they'd probably be happy to

3　hear from you, but they won't be calling you.

4　　　　If there is anything we could have done to make your

5　service less burdensome, or better in any respect, I'd love to

6　hear from you.  You are welcome to call me.  I think the clerk's

7　office gives you a survey.  These days you get a survey when you

8　buy a hamburger.  You get a survey from everybody.  But we

9　really do pay attention to it.  If there is something we could

10　have done better, I'd love to hear from you, especially with

11　anything we could have done better in the pandemic with respect

12　to COVID.

13　　　　We didn't do jury trials for a while last year at the

14　height of the pandemic.  We put things off.  This case is a

15　little older than it would have been, and we have a number of

16　cases that are older than they would have been.  We started

17　scheduling, and going back, and, of course, when we set them all

18　the pandemic was going in the right direction.  We thought it

19　would be a lot safer by now.  Turns out it went back up.  So we

20　are trying cases in the middle of a pandemic.

21　　　　We tried very hard to keep everybody safe.  If there

22　is anything we could have done that you think would have made

23　you safer, or made you feel safer, or more comfortable with any

24　of this, I'd love to hear from you.  I'm still trying to get it

25　right, so any input on that would be appreciated.

1          With that, I won't keep you longer.  Thank you very

2     much for your service.  You are excused with the thanks of the

3     Court.

4          Jury out.

5        (Jury out at 12:58.)

6          THE COURT:  You may all be seated.

7          The clerk will enter judgment for the defendant and

8     for the United States, based on the ruling that I made earlier.

9          What else, if anything, do we need to do in this case?

10         MR. CARTER:  Nothing.

11         MR. JOHNSON:  We have nothing.

12         THE COURT:  Thank you all.

13         I would ask that you do this, those of you in the

14    courtroom would just hold your position for just a minute so

15    that the jurors can clear.  The court security officer will let

16    you know when the jurors have cleared and you will be free to go

17    about your business.

18         Thank you all.  We are adjourned.

19       (Proceedings concluded at 12:59 on Thursday, September 16,

20    2021.)

21

22

23

24

25                    * * * * * * * *

1          I certify that the foregoing is a correct transcript
from the record of proceedings in the above-entitled matter.
2    Any redaction of personal data identifiers pursuant to the
Judicial Conference Policy on Privacy are noted within the
3    transcript.

4

5    /s/ Lisa C. Snyder                        1/13/2022

6    Lisa C. Snyder, RPR, CRR                  Date
Official U.S Court Reporter

7

8                        **I N D E X**

9

OTHER RECORD MADE                                    PAGE
10
Closing Argument By Mr. Johnson                        6
11   Closing Argument By Ms. Coles                        23
Rebuttal Closing Argument By  Mr. Johnson            51
12   Final Jury Instructions Read by the Court           55
Verdict the Court                                    72
13   Jury poll the Clerk                                  72

14

15

16

17

18

19

20

21

22

23

24

25

## Certificate of Service

I HEREBY CERTIFY a true and correct copy of the foregoing was served electronically on May 23, 2022, and by mail on:

| | |
|---|---|
| Steven Carter, Esq. | Marie Moyles, Esq. |
| Miram Coles, Esq. | David Fisher, Esq. |
| Henry Buchanan P.A. | Office of U.S. Attorney |
| Post Office Drawer 14079 | 111 North Adams Street, 4th Floor |
| Tallahassee, FL 32317 | Tallahassee, FL 32301 |

Respectfully submitted,  s/JAMES V. COOK
Law Office of James Cook
314 West Jefferson Street
Tallahassee, Florida 32301
(850) 222-8080/fax (850) 561-0836
FL Bar No. 966843
Counsel for Appellant